## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PARVEZ & RAZIA YAZDANI | : | **CIVIL ACTION** |
| | : | |
| v. | : | **NO. 2:15-cv-01427-PD** |
| | : | |
| BMW OF NORTH AMERICA, LLC | : | |
| and | : | |
| BMW MOTORRAD USA, a Division of | : | |
| BMW OF NORTH AMERICA, LLC | : | |

## O R D E R

AND NOW, this              day of                          , 2016, upon consideration of

the Daubert Motion of Defendant BMW of North America, LLC to Preclude Plaintiffs' Expert

William J. Vigilante, Jr., including any response thereto, it is hereby **ORDERED** that said

Motion is **GRANTED**.

Plaintiffs shall be precluded from presenting William Vigilante, Jr. as a witness to offer

any expert opinion testimony at trial in this case.

**BY THE COURT**

_____
TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PARVEZ & RAZIA YAZDANI | : | **CIVIL ACTION** |
| | : | |
| v. | : | **NO. 2:15-cv-01427-PD** |
| | : | |
| BMW OF NORTH AMERICA, LLC | : | |
| and | : | |
| BMW MOTORRAD USA, a Division of | : | |
| BMW OF NORTH AMERICA, LLC | : | |

**MOTION OF DEFENDANT, BMW OF NORTH AMERICA, LLC TO
PRECLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT,
WILLIAM J. VIGILANTE, JR.**

Defendant BMW of North America, LLC ("BMW NA")[1], by and through its attorneys, Marshall Dennehey Warner Coleman & Goggin, hereby files this <u>Daubert</u> Motion to Preclude the Testimony of Plaintiffs' Expert, William J. Vigilante, Jr. and in support thereof, avers as follows:

1.      In this subrogation action, Plaintiffs Parvez and Razia Yazdani seek to recover for damage caused to their residence when a motorcycle distributed by BMW NA allegedly caught fire.  <u>See</u> Plaintiffs' Complaint, a copy of which is attached hereto as Exhibit "A," at ¶¶ 8-12.

2.      According to Plaintiff Parvez Yazdani, he left the motorcycle idling in his garage for thirty minutes or more before he returned to the garage to find it on fire.  <u>See</u> <u>id.</u>; <u>see also</u> Plaintiffs' Answers to BMW NA's Interrogatories, a copy of which is attached hereto as Exhibit "B," at Answer No. 1.

---

[1] BMW Motorrad USA is a division of BMW NA.  Although it is a named defendant in this matter, it is not a separate legal entity.

3.    The Rider's Manual that accompanied the motorcycle contained two warnings that expressly prohibited that precise activity:

⚠ WARNING

Make sure that whether riding or standing still or when the motorcycle is parked, no easily flammable material (for example hay, grass, leaves, clothing or luggage etc.) can come into contact with the hot exhaust system. Do not allow the engine to idle unnecessarily or for prolonged periods —Risk of overheating or fire. Ride away immediately after starting the engine.

⚠ WARNING

Do not warm up the engine with the motorcycle at a standstill – risk of overheating or fire! Ride away immediately after starting the engine. To avoid overheating the air-cooled engine and possible damage as a result, avoid even short warm-up periods at a standstill. Avoid high engine speeds after a cold start.

See Rider's Manual, a copy of which is attached hereto as Exhibit "C," at 51, 60.

4.    Plaintiffs have identified William J. Vigilante, Jr. as an expert in this matter.

5.    Vigilante has submitted a report criticizing the adequacy of the warnings in the Rider's Manual.  See Report of William J. Vigilante, Jr., a copy of which is attached hereto as Exhibit "D."

6.    In that report, Vigilante advocates the need for an on-product warning.  See id. at 15.

7.    To support that position, Vigilante relieves the motorcycle owner of responsibility to read the Rider's Manual.  See id. at 6-7.

8.    Yet Vigilante never considers how to convey important information without the Rider's Manual, other than the single on-product warning he proposes that is at issue in this case.

9.    Nor does Vigilante consider the impact that multiple on-product labels will have on conveying necessary information.

2

10.    Vigilante's proposed testimony will not satisfy the standard of Federal Rule of Evidence 702 or <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and its progeny.

11.    Vigilante's opinions to be given at trial in this case are not the result of tested, accepted, sound, peer-reviewed, or otherwise legitimate methodology – or indeed, any methodology.

12.    Nor do Vigilante's opinions "fit" the facts of this case.

13.    Rather, Vigilante's opinions are result-oriented and litigation-driven, and the product of nothing more than the conclusion he was paid to reach in this case.

14.    For these reasons, and for the reasons set forth more fully below in the accompanying Memorandum of Law, which is incorporated herein by reference, Vigilante's opinions do not satisfy the <u>Daubert</u> standard, and he should be precluded as an expert at the time of trial.

WHEREFORE, and for the reasons stated more fully in the Memorandum of Law filed with this Motion, Defendant BMW of North America, LLC seeks an order from the Court granting this Motion and precluding Plaintiffs from calling William J. Vigilante, Jr. to offer any expert opinion testimony at trial.

Respectfully submitted,

**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**

BY:  */s/ Keith D. Heinold*
KEITH D. HEINOLD
Attorney for Defendant
BMW of North America, LLC

2000 Market Street, Suite 2300
Philadelphia, PA  19103
215-575-2640 (P)
215-575-0856 (F)
kdheinold@mdwcg.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PARVEZ & RAZIA YAZDANI | : | **CIVIL ACTION** |
| | : | |
| v. | : | **NO. 2:15-cv-01427-PD** |
| | : | |
| BMW OF NORTH AMERICA, LLC | : | |
| and | : | |
| BMW MOTORRAD USA, a Division of | : | |
| BMW OF NORTH AMERICA, LLC | : | |

**MEMORANDUM OF LAW IN SUPPORT OF THE**
**MOTION OF DEFENDANT, BMW OF NORTH AMERICA, LLC TO**
**PRECLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT,**
**WILLIAM J. VIGILANTE, JR.**

## I.    SUMMARY OF ARGUMENT

This matter centers on the adequacy of a warning contained in the Rider's Manual of a

motorcycle owned by Plaintiff Parvez Yazdani, and distributed by BMW NA.  The motorcycle in

question, a 2004 R1150R model, includes an air cooled engine.  This means that the engine's

temperature is regulated by the flow of air, while the motorcycle is in motion.  Thus, if the

motorcycle is left to idle at a standstill for an excessive length of time, there is a risk that it may

overheat and ultimately cause a fire.

Recognizing this risk, the Rider's Manual specifically and expressly warns against

warming up the engine with the motorcycle at a standstill, cautioning that overheating or fire

could result.  Mr. Yazdani possessed the Rider's Manual and read it.  He does not dispute that the

warning is clear.  Despite the warning, Mr. Yazdani let the motorcycle warm up in his garage,

then became distracted by a telephone call and left the motorcycle idling unattended for thirty

minutes or more.  A fire occurred, damaging Plaintiffs' home.

Plaintiffs' expert, William J. Vigilante, Jr., opines that the warning in the Rider's Manual was inadequate. When one sifts through his report, his primary criticism of the motorcycle is that its lack of an on-product warning makes it unreasonably dangerous. To get around the clear warning in the Rider's Manual, Vigilante offers a number of reasons why a person might not read a manual, and opines that BMW NA cannot rely on the warnings in the manual to convey important safety information. Thus, he concludes that <u>this</u> warning in <u>this</u> case should have appeared on the motorcycle itself.

However, Vigilante's opinion must be considered in context. If BMW NA cannot rely on a motorcycle owner to read the manual, then <u>all</u> critical safety information must be conveyed through on-product labels. But too many warnings can be as uninformative as too few: Vigilante recognized that an overabundance of on-product warnings can create "clutter" and interfere with the transmission of safety warnings. The Rider's Manual contains 89 pages of instructions and warnings. If we accept Vigilante's premise that important safety information must be imparted through on-product labels, a determination must be made as to which information is important enough to include, and which is not.

Crucially, Vigilante did not attempt to make that determination. He could not say that the idling warning was the most important warning in the Rider's Manual, only that it was the most important warning to his opinion in this litigation. Indeed, Vigilante admitted that he had not evaluated any other warnings in the Rider's Manual to determine whether they should be included in on-product warnings as well. He simply focused on the specific warning at issue in this case. Just as importantly, Vigilante did not analyze how many on-product warnings would be too many before their effectiveness was diminished by clutter. At his deposition, Vigilante

identified several potential methods of making that determination, including usability studies and focus groups.  ***But Vigilante did not do any of that testing.***

And that is where Vigilante's opinions fall short.  Faced with a clear warning against idling in the Rider's Manual, he opines that the Rider's Manual cannot be relied on, and that the idling warning should have been featured on the motorcycle as well.  But Vigilante has not done the work:  he has not analyzed or opined on what other portions of the 89-page manual should appear on the motorcycle, or whether the appearance of all that information would create clutter.  Accordingly, Vigilante's opinions cannot satisfy the standard of Federal Rule of Evidence 702 or Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny.  Indeed, the Daubert standard traditionally examines factors such as the rate of error or peer review status of a particular methodology.  Here, Vigilante has no methodology to evaluate.  Rather, he simply reached a result-oriented, litigation-driven conclusion without any scientific analysis to support it.

For these reasons, Vigilante should be precluded from offering opinions at trial.

## II.   STATEMENT OF FACTS

In this subrogation action, Plaintiffs Parvez and Razia Yazdani seek to recover for damage caused to their residence when a motorcycle distributed by BMW NA allegedly caught fire.  See Exhibit "A" at ¶¶ 8-12.  The motorcycle at issue is a 2004 BMW model R1150R.  See id. at ¶ 4.  The R1150R includes an air-cooled engine, which means that the engine's temperature is regulated by the flow of air, while the motorcycle is in motion.  Thus, if the motorcycle is left to idle at a standstill for an excessive length of time, there is a risk that it may overheat and cause a fire.

Recognizing this risk, the Rider's Manual contains specific and express warnings against that precise activity in two locations:



See Exhibit "C," at 51, 60.

Plaintiff Parvez Yazdani purchased his motorcycle used in approximately April 2011. See Deposition Transcript of Parvez Yazdani, a copy of which is attached hereto as Exhibit "E," at 9:25-10:3.  Plaintiff Yazdani was in possession of this manual and read it when he purchased the motorcycle.  See id. at 9:25-10:11; 13:9-10; 14:17-23.[2]  Mr. Yazdani agreed at his deposition that the warning was clear, and specifically instructed him not to do what he did.  See id. at 28:9-21.

Despite this warning, during the winter months, Mr. Yazdani did not winterize the motorcycle, but rather he would periodically idle it in his garage for a brief period to warm the engine up.  See id. at 14:24-15:6.  Mr. Yazdani's custom was to start the motorcycle and leave it idling in his garage, smoke a cigarette nearby for seven to nine minutes, then turn the motorcycle

---

[2] Although Mr. Yazdani testified three times that he read the Rider's Manual, including this warning, he later backtracked and said that he did not specifically recall reading this warning.  Compare Exhibit "E" at 9:25-10:11; 13:9-10; 14:17-23 with id. at 21:22-22:21.  Nevertheless, for purposes of this Motion, it is only important that Mr. Yazdani possessed the Manual and read portions of it.

off.  See id. at 15:24-16:18.  He estimated that he did this once or twice a week in the winter, perhaps thirty to forty times in total.  See id. at 15:13-23.

On the date of the fire, Mr. Yazdani diverged from his custom.  He started the motorcycle as usual, but became distracted by a phone call inside the house.  He left the motorcycle idling for approximately thirty minutes before he returned to the garage to find it on fire.  See id. at 64:15-22, 68:12-69:2; see also Exhibit "B" at Answer No. 1.

Despite the undisputed clarity of the warning, Plaintiffs' expert William Vigilante, Jr. criticizes its adequacy.  See generally Exhibit "D."  Although Vigilante's report is lengthy, his primary criticism of the motorcycle is that its lack of an on-product warning makes it unreasonably dangerous.  He proposed the following warning:



See id. at 14.[3]  Vigilante offered many reasons why a person might not read a manual, and opined that BMW NA could not rely on the warnings in the Rider's Manual to convey "critical safety related information."  See id. at 6-7; see also Deposition Transcript of William Vigilante, attached hereto as Exhibit "F," at 165 (no need for a user to read the manual if he thinks he can ride the motorcycle without it); 174 ("The manual is really an afterthought… [I]f they're not getting [a warning] on the bike they're really not likely to get it from the manual"), 216 ("I think it's reasonable that if you don't feel that you need to read the manual, that many people, reasonable people won't read the people [sic].  That's why you can't depend upon the

---

[3] BMW NA has filed a simultaneous Motion for Summary Judgment in which it addresses the adequacy of its own warning as a matter o flaw.  However, it is difficult here not to point out the substantively identical warnings in the BMW Rider's Manual and Vigilante's report.

manual to inform them of critical safety information.").  He concluded that the warning against idling should have been presented in an on-product label.  <u>See</u> Exhibit "D" at 10.

At his deposition, Vigilante admitted the obvious implication that, if BMW NA could not rely on its Rider's Manual to impart information, then warnings other than the warning against idling might have to appear on the motorcycle as well.  <u>See</u> Exhibit "F" at 189-90.  But Vigilante had not considered any warnings other than the single warning at issue in this case to determine whether an on-product warning would be necessary.  <u>Id.</u> at 194, 196.

Vigilante also agreed that the presence of too many on-product warnings could create clutter and interfere with the awareness and understanding of warnings.  <u>Id.</u> at 190.  He suggested several methods, including usability testing and focus groups, to evaluate the efficacy of warnings and determine how many warnings are too many.  <u>See</u>, <u>e.g.</u>, <u>id.</u> at 203-04 (describing usability testing).  But Vigilante has not done those studies.  He has not evaluated any warnings or instructions contained in the Rider's Manual other than the warning against idling at issue in this case.  <u>See</u> <u>id.</u> at 194, 196.

Having done nothing except opine the need for one case-oriented on-product warning, Vigilante's opinions cannot survive the scientific rigor of <u>Daubert</u> and this Court's gatekeeping functions.

## III.    ARGUMENT

### A.    The <u>Daubert</u> Standard

In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), the United States Supreme Court established a "gate keeping role for the judge" in applying Federal Rule of Evidence 702, the purpose of which is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999). Under Kumho Tire, the Daubert test extends to expert evidence based upon "technical or other specialized knowledge." Id. at 141. The Daubert test is an "exacting one." Total Containment Inc. v. Dayco Products, Inc., 2001 U.S. Dist. LEXIS 15838, *10 (E.D. Pa. 2001) (citing Weisgram v. Marley Co., 528 U.S. 440, 451 (2000)). The proponent of an expert's testimony must prove, by a preponderance of the evidence, that his testimony is reliable under Daubert. Oddi v. Ford Motor Co., 234 F.3d 136, 144 (3d Cir. 2000) (citation omitted).

Although under Daubert the focus of inquiry is upon an expert's methodology rather than conclusions, methodology and conclusions are not entirely distinct from one another, and a "court may conclude that there is simply too great a gap between the data and the opinion proffered" to admit the expert's opinion. General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) (citation omitted). Furthermore, the testimony of a witness who is well-qualified by experience still may be barred if it is not based on sound data. Montgomery County v. Microvote Corp., 320 F.3d 440, 448 (3d Cir. 2003). The expert must have good grounds for his or her belief; the expert's opinion must not be based on "subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. Accordingly, the presence or absence of methodologically reliable empirical testing and data is a critical consideration in determining the admissibility of expert evidence. Id. at 593.

The Third Circuit has defined the requirements of Rule 702 under Daubert as a "trilogy" requirement: qualification, reliability, and fit. Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003). In other words:

      1. the witness proffered to testify to specialized knowledge must be an expert;

2. the expert must testify to reliable scientific, technical, or other specialized knowledge; and

3. the expert's testimony must assist the trier of fact, *i.e.*, it must "fit" the facts of the case at hand.

See In re Paoli R. R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994) ("Paoli II").  The proponent of the expert testimony must make a detailed showing of scientific validity and cannot rely on mere conclusory allegations to that effect.  See In re Paoli R. R. Yard PCB Litig., 916 F.2d 829, 858 (3d Cir. 1990) ("Paoli I").  This standard requires more than a mere *prima facie* showing by the plaintiff.  See Paoli II, 35 F.3d at 743 n.9.

In brief, Rule 702, as interpreted by Daubert and its progeny, requires searching judicial examination of expert evidence for its reliability so as to prevent "junk science" from entering the courtroom.  Daubert also prevents experts, who may otherwise greatly influence the jury simply because of their credentials, from self-authenticating their opinions and methods and from offering purely subjective beliefs in the guise of "expert" opinions.  See Heller v. Shaw Indus., Inc., 167 F.3d 146, 163 (3d Cir. 1999)("None of these assumptions" held by plaintiff's expert "appears supported by reliable scientific methods or reliable application of any valid theory.").  Under the principles enunciated in these cases, BMW NA submits that this Court, exercising its "gatekeeping" function, must exclude the testimony of Vigilante as unscientific, patently unreliable and incapable of informing the trier of fact on the issues at bar.

**B.   Vigilante's Opinions are Unreliable.**

To be admissible, an expert's testimony must be reliable, that is to say, based on reliable methodology.  See Oddi v. Ford Motor Co., 234 F. 3d 136, 144 (3d Cir. 2000)(citing Daubert, 509 U.S. 593).  As one court put it, "If Daubert and its progeny require anything, it is that plaintiffs come forward with proof of a valid methodology based on more than just the ipse dixit of the expert."  Pappas v. Sony Elecs., Inc., 136 F. Supp. 2d 413, 426 (W.D. Pa. 2000).  Put

another way, an expert's opinion must be "based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." Calhoun, 350 F.3d at 321 (internal quotations omitted).

The following factors may be considered in evaluating reliability, although they are not exhaustive:

1.  whether a method consists of a testable hypothesis;
2.  whether the method has been subjected to peer review;
3.  the known or potential rate of error;
4.  the existence and maintenance of standards controlling the technique's operation;
5.  whether the method is generally accepted;
6.  the relationship of the technique to methods which have been established to be reliable;
7.  the qualifications of the expert witness testifying based on the methodology;
8.  the non judicial uses to which the method has been put.

See, e.g., Paoli II, 35 F.3d at 742 n.8.

An expert's opinions are not reliable, and should be precluded, when they are not supported by any scientific methodology. By way of example, in Oddi, the Third Circuit precluded the testimony of an expert engineer, finding that he had engaged in a "haphazard" inquiry that had used "little, if any, methodology beyond his own intuition." Oddi, 234 F.3d at 156, 158. Indeed, the court noted that the plaintiff could not even establish the existence of his expert's methodology, much less its adequacy. Id. at 156. The expert had made no calculations, did not test his hypotheses, and failed to consider alternative explanations for the incident in question. Id. at 156-58. Ultimately, the Oddi Court concluded that the engineer's testimony constituted little more than his own "ipse dixit," or say-so, that could not reasonably be assessed and which "[did] not withstand Daubert scrutiny." Id. at 158.

Following Oddi, the courts of this Circuit have repeatedly found a lack of demonstrable methodology to be fatal to the admissibility of expert testimony. See, e.g., Williams v. United

States, 321 F. App'x 129, 132 (3d Cir. 2009)(upholding the exclusion of an expert's report that was "replete with conclusory statements with no scientific method tying an alleged cause to an alleged defect"); Scrofani v. Stihl Inc., 44 F. App'x 559, 562 (3d Cir. 2002)(upholding the exclusion of an expert's opinions regarding alleged design and warning defects because he "failed to base his conclusions on sufficient data and his methodologies were either nonexistent or wholly unreliable"); Murray v. Marina Dist. Dev. Co., 311 F. App'x 521, 524 (3d Cir. 2008)(upholding exclusion of expert because he "fail[ed] to demonstrate any methodology, let alone peer-reviewed or generally accepted methodology" in support of his opinions); Furlan v. Schindler Elevator Corp, 864 F. Supp. 2d 291, 298 (E.D. Pa. 2012)(holding expert's opinions unreliable when he had conducted no tests, used little to no methodology beyond his own intuition, and applied no standards other than his own perception).

In this case, Vigilante – and Plaintiffs – must contend with the undisputed fact that the Rider's Manual contains clear warnings in two locations that expressly prohibit Mr. Yazdani's actions.  Vigilante's response to this fact is that motorcycle owners may reasonably neglect to read the Rider's Manual, and that BMW NA cannot rely on the Rider's Manual to impart instructions or warnings.  See Exhibit "D" at 6-7; Exhibit "F" at 165, 174, 216.  This position is intellectually meritless and inconsistent with Pennsylvania law; it cannot be an accepted premise in the discipline of human factors that a user of a complex product may properly ignore the instructions and warnings that accompany the product.  See, e.g., Gigus v. Giles & Ransome, Inc., 868 A.2d 459 (Pa. Super. 2005)("Where a warning is given the seller may reasonably assume that it will be read and heeded.")(quoting Restatement (Second) of Torts § 402A, cmt. j); Davis v. Berwind Corp., 690 A.2d 186, 190 (Pa. 1997)("[T]he law presumes that warnings will

be obeyed.").  Vigilante's refusal to concede the importance of reading an instruction manual only demonstrates the litigation-biased and unreliable nature of his conclusions.

But let us accept Vigilante's premise that the Rider's Manual need not be read, and BMW NA cannot rely on the Rider's Manual to impart safety information.  Even if that premise is accepted, Vigilante has failed to provide any methodology – much less a reliable methodology – to support his conclusion that this specific warning against idling should appear on the motorcycle itself.   As Vigilante points out in his report, the Rider's Manual is 89 pages long.  It contains instructions and warnings regarding the proper care of tires, proper maintenance of the brake system, the operational condition of the headlights, loading of the motorcycle, among other topics.  See Exhibit "C."

Vigilante has used hindsight to suggest that the warning against idling at a standstill should appear on the motorcycle, because that is the warning Plaintiff did not follow in this case.  But Vigilante admitted at his deposition that he has given no consideration to what other information in the Rider's Manual should be displayed on the motorcycle itself.  See Exhibit "F" at 194, 196.  He simply cherry-picked the warning that is at issue in this case.  Given his position that the Rider's Manual need not be read, and that the information contained in it should be conveyed through on-product labels, it must follow that information regarding tires, brakes, headlights, necessary vehicle maintenance, operating instructions, and the like should be contained in on-product labels as well.  By Vigilante's own admission, he has not even considered what other information in the Rider's Manual, besides the single warning that is the subject of this litigation, is important enough to warrant an on-product label.  See id. at 194, 196.

Nor has Vigilante considered where on the motorcycle up to 89 pages worth of information should be placed.  See id.  He admitted that the presence of too many warnings

could cause clutter and interfere with the transmission of important safety information.  See id. at 190.  However, he has simply not analyzed that issue in this case.  He suggested several methods, including usability testing and focus groups, to evaluate the efficacy of warnings and determine how many warnings are too many.  See, e.g., id. at 203-04 (describing usability testing).  But Vigilante has not done those studies.  He has not evaluated any warnings or instructions contained in the Rider's Manual other than the warning against idling at issue in this case.  See id. at 194, 196.

Ultimately, this Court is unable to assess the reliability of Vigilante's methodology, because there has been no methodology.  BMW NA cannot evaluate any peer review or rate of error, or any of the other traditional Daubert factors, because they simply do not apply.  By Vigilante's own admission, he has not done the work necessary to support his conclusions.

Vigilante attempts to cloak his opinions with an air of authority by referring to a number of studies (some of which he authored) regarding the efficacy of on-product warnings.  BMW NA does not contest that on-product warnings can be effective.  But crucially, Vigilante has not done the necessary work to connect those general principles to the facts of this case.  See General Electric Co., 522 U.S. at 146 (expert opinion should not admitted if it is "connected to existing data only by the ipse dixit of the expert"); Daddio v. A.I. DuPont Hosp. for Children, 650 F. Supp. 2d 387, 403 (E.D. Pa. 2009)(expert opinion may be found unreliable if there is "too great an analytical gap between the data and the opinion proffered.")(citing General Electric Co.). Instead of analyzing the contents of the Rider's Manual to determine what information should appear on the motorcycle and where, he has simply taken the single warning at issue in this case, and opined that it should be featured in an on-product label.  That opinion is result-oriented, litigation-driven, and biased.  It lacks a methodology that can be evaluated beyond his own say-

so, and is therefore unreliable.  See Oddi, supra; Williams, supra; Scrofani, supra; Murray, supra; Furlan, supra.

**C.      Vigilante's Opinions do not "Fit" this Case.**

"Fitness" is the final requirement in the Daubert analysis required of any expert opinion in federal court.  An expert's opinion must "fit" the facts of the case; in other words, the court must examine the expert's conclusions "in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." Oddi, 234 F.3d at 146.  Indeed, in order to be admissible, an expert's testimony must have some connection to existing facts. Brill v. Marandola, 540 F. Supp. 2d 563, 568 (E.D. Pa. 2008).  Stated another way, "even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of the case." Id. at 567 (quoting Paoli II, 35 F.3d at 743)(emphasis in original).

As explained above, Vigilante should be precluded from testifying because his opinions are litigation-biased and lack any scientific methodology.  But Vigilante should also be precluded because many of his opinions do not fit the facts of the case.  In attempting to combat the clarity of the warning in the Rider's Manual, Vigilante offers as many criticisms of BMW NA as possible, even when they simply do not apply to this case.

For example, Vigilante argues that it was inappropriate for BMW NA to attempt to pass along safety information to users through authorized dealers at the time of sale, because subsequent owners would not be present for such instruction.  See Exhibit "D" at 5-6.  This opinion does not fit this case:  in addition to instructions from dealers, safety warnings are included in the Rider's Manual, which is the warning at issue in this case.

13

Vigilante next criticizes BMW NA for relying on its Rider's Manual to convey warnings because "warnings research has shown that product users":

- Do not have the manual available for second hand products;

- Are less likely to read manuals for products they do not perceive as complex;

- Are less likely to read manuals when they believe they know how to use the product; that the manual will not be helpful or provide useful information; or it is quicker to learn about the product by using it;

- Often do not read the entire manual and only refer to sections of the manual that are of interest; and

- Believe hazardous products should have warnings located in close proximity to the product.

Exhibit "D" at 6-7.  It may be true that warnings research has made such findings in a general sense.  But those findings are simply inapplicable to this case.  Mr. Yazdani <u>did</u> have the manual available to him, even though he purchased the motorcycle secondhand.  <u>See</u> Exhibit "E," at 6:21-7:8.  There is no basis to discuss users who are more or less likely to have the Rider's Manual or read it, because Mr. Yazdani <u>did</u> have the manual and <u>did</u> read it.  <u>See id.</u> at 9:25-10:11; 13:9-10; 14:17-23.  Although Mr. Yazdani testified that he did not have a specific recollection of reading the warning at issue in this case, he did state that he read the manual "completely."  <u>Compare id.</u> at 10:6-11 (Mr. Yazdani read the manual completely) <u>with</u> 21:22-22:16 ("I read the book, but did I specifically remember this particular warning? I don't recall."). While there may be research behind this opinion of Vigilante's, the research addresses different factual situations than the one in this case.  <u>See</u> <u>Brill, supra</u> ("Even if an expert's proposed

14

testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge <u>for purposes of the case</u>").

Similarly, Vigilante criticizes BMW NA's warning because "the BMW Rider's Manual has the disadvantage of typically not being available or used during subsequent or later uses of the motorcycle." Exhibit "D" at 8. Again, references to the circumstances of the "typical" user are not relevant when we can examine the circumstances of Plaintiff Yazdani himself. There is no evidence to suggest that the Rider's Manual was not available to Mr. Yazdani on the date in question. We know he did not discard the Manual, because he was able to produce a copy in discovery. Further, because the motorcycle remained in his garage throughout the event, the Manual could have been ready at hand. This is another example of an unfounded criticism of the Manual that simply does not fit this case.

## IV.    CONCLUSION

Vigilante – and Plaintiffs – have a problem. The BMW Rider's Manual clearly and specifically warns users not to do what Plaintiff Yazdani did. To overcome this problem, Vigilante concluded that the Rider's Manual was insufficient, and that there should have been another warning on the motorcycle itself.

But this biased, litigation-driven approach was not scientific. Vigilante's conclusion forced him to take the untenable position that the user of a complex product should not have to read the instructions or warnings that accompany the product. Moreover, Vigilante was forced to admit the logical implication of that position:  if BMW NA cannot rely on users reading the Rider's Manual, other information contained in the Manual might need to be imparted through labels as well. But crucially, Vigilante admitted that he did not perform the analysis necessary to support that conclusion: which portions of the 89-page manual should appear on the motorcycle,

and whether printing up to 89 pages of material for labels to be applied directly on a motorcycle would undermine the effectiveness of the safety warnings.

Rather, guided by the conclusion Plaintiffs needed his report to reach, Vigilante simply focused on the warning at issue in this case, ignoring all other information, and opined that this warning should be contained in an on-product label. Without the intermediate analysis needed to support this conclusion – without any verifiable methodology whatsoever – Vigilante's opinions are fatally unreliable, and should be precluded.

Respectfully submitted,

**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**

BY:    _/s/ Keith D.  Heinold_
          KEITH D. HEINOLD
          Attorney for Defendant
          BMW of North America, LLC

          2000 Market Street, Suite 2300
          Philadelphia, PA  19103
          215-575-2640 (P)
          215-575-0856 (F)
          kdheinold@mdwcg.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing <u>Daubert</u> Motion of

Defendant, BMW of North America, LLC, was served this date, via the Court's electronic filing

system, to the following:

Patrick A. Hughes
de LUCA LEVINE, LLC
Three Valley Square
512 East Township Line Road
Suite 220
Blue Bell, PA  19422

                             **MARSHALL DENNEHEY WARNER**
                             **COLEMAN & GOGGIN**


                      BY:    */s/ Keith D. Heinold*
                             KEITH D. HEINOLD
                             Attorney for Defendant
                             BMW of North America, LLC

                             2000 Market Street
                             Suite 2300
                             Philadelphia, PA  19103
                             215-575-2640 (P)
                             215-575-0856 (F)
                             kdheinold@mdwcg.com


**DATED:**  April 1, 2016