## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Parvez & Razia Yazdani**<br><br>      **Plaintiffs**<br>   **v.**<br><br>**BMW of North America, LLC**<br>**And BMW Motorrad USA, a Division of**<br>**BMW of North America, LLC**<br><br>     **Defendants** | **Civil Action No:  2:15-cv-01427-PD** |

### ORDER

    **AND NOW**, this      day of           , 2016, upon consideration of Defendant,

BMW of North America, LLC's Motion to Preclude Plaintiffs' Expert, William J. Vigilante, Jr.,

and Plaintiffs' Response in Opposition thereto, it is hereby **ORDERED** and **DECREED** that

Defendant's Motion is **DENIED**.

                       **BY THE COURT:**

                              _____
                              Timothy R. Rice, United States Magistrate Judge

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Parvez & Razia Yazdani**<br><br>**Plaintiffs**<br>**v.**<br><br>**BMW of North America, LLC**<br>**And BMW Motorrad USA, a Division of**<br>**BMW of North America, LLC**<br><br>**Defendants** | **Civil Action No: 2:15-cv-01427-PD** |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT, BMW OF NORTH
AMERICA, LLC'S MOTION TO PRECLUDE THE TESTIMONY OF PLAINTIFFS'
EXPERT, WILLIAM J. VIGILANTE, JR.**

Plaintiffs, Parvez & Razia Yazdani, by and through their attorneys, de Luca Levine, LLC,
herein file this Response in Opposition to Defendant, BMW of North America, LLC's
("BMWNA") Motion to Preclude the Testimony of William J. Vigilante, Jr. ("Dr. Vigilante"), and
in support thereof, avers as follows:

1.     Admitted.

2.     Admitted.

3.     Admitted to the extent that the warnings provided by Defendant were included in
the manual. Denied that the warnings were in any way adequate.

4.     Admitted.

5.     Admitted that Dr. Vigilante submitted a report. Dr. Vigilante's report is a writing
that speaks for itself.

6.     Admitted.

7.     Denied as stated. Dr. Vigilante merely contends that overwhelming scientific
research shows that it is unreasonable for a manufacturer to rely the owner's manual to convey

dangerous risks of fire that are not common, likely to be anticipated by the user, and/or are atypical of the reasonable risks associated with similar known products, like the risk involved in this instant case, when: (1) many users never read or receive an owner's manual, (2) most users never read the entire manual, (3) it is impossible for the typical user to remember everything that is presented in an 89 page manual, like the subject manual, and (4) research has shown repeatedly that owner's manuals are not effective in adequately educating users of a critical and atypical risks which are known to the manufacturer and allowing them to change behavior to avoid that risk. *See Exhibit A, Report of Dr. Vigilante at pp. 6-7; See Exhibit B, Dr. Vigilante Dep. Tr., at p. 115:3-12*

8.     Denied.  Dr. Vigilante consulted peer-reviewed scientific literature accepted in his field and relevant industry standards to determine that, of any possible method of alerting the rider of the danger posed by the subject motorcycle's fire hazard, this particular warning needed to be on the product itself in the direct line of sight of the rider when the rider starts the engine because it contains critical safety information that is necessary to impart on the rider at the time they start the engine. *See Exhibit A, Report of Dr. Vigilante, at pp. 5-16.*  Further, if BMWNA has any doubt as to the veracity of his conclusion, it is certainly welcome to explore that in cross-examination or through the introduction of its own expert witness.  *See e.g. Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir. 1997) ("The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination.").

9.     Denied.  Dr. Vigilante's analysis of the relevant scientific literature, industry standards, and the facts of this case dictated his opinion that this warning label needed to be affixed to the gas-tank, handlebars, or somewhere else directly in the line of sight of the rider when the rider starts the motorcycle.  *See Exhibit B, Dr. Vigilante Dep. Tr., at pp. 222-23 and Exhibit 6 (marking several locations on a photograph of the motorcycle sufficient to catch users' attention).*

From Dr. Vigilante's research and analysis it was apparent the subject motorcycle is not likely to require the amount of on-product labels in the same location necessary to have any impact on the warning's adequacy.  In summary, a manufacturer should only resort to warning labels to cure a design defect if they cannot change the design or guard against the defect first.  Further, not all warnings need to be on the product itself, only those that contain critical safety information.  Moreover, not all on-product labels need to be in the same location on the product – a warning should be in a location designed to best instruct the rider and alleviate the danger.  Simply, if the product requires so many warning labels to instruct on critical safety information in the specific locations identified by Dr. Vigilante that it can no longer adequately convey the safety information, then the product is already so defective that it should not be sold to the consumer.  *See Exhibit B, Dr. Vigilante Dep. Tr., at pp. 204-209.*

      10.     Denied as a conclusion of law.  Dr. Vigilante is qualified to give an expert opinion, based his opinion on a reliable scientific method, and his testimony will assist the trier of fact in rendering a conclusion on the adequacy of the warnings.  *See* Fed. R. Evid. 702.

      11.     Denied as a conclusion of law.  Dr. Vigilante employed the scientific method where he (1) formed a hypothesis, (2) collected relevant data, including peer-reviewed scientific research, relevant, accepted industry standards, warnings from similar motorcycles, discovery materials, etc., (3) tested and/or analyzed the data against the scientific research and industry standards, and (4) reached a conclusion based on that analysis.  This method has been accepted as reliable both in and out of this district.  *See e.g. Dolfman v. Edwards*, No. CIV.A. 13-2831, 2015 WL 3477736, at *1 (E.D. Pa. June 2, 2015) (Expert's method of reviewing discovery materials then applying those facts to principles of Human Facts/Ergonomics reliable); *Michaels v. Mr. Heater, Inc.* 411 F. Supp. 2d 992 (W.D. Wis. 2006).

12.     Denied as a conclusion of law.  Dr. Vigilante's opinions address the adequacy of BMWNA's warning, and will assist the trier of fact in coming to a resolution of the issue.  *See* Fed. R. Evid. 702.

13.     Denied.  Fittingly, the fact that BMWNA is resorting to personal attacks on Plaintiffs' expert is indicative of the merits of its motion.

14.     Denied as a conclusion of law.  Dr. Vigilante is qualified to give an expert opinion, based his opinion on a reliable scientific method, and his testimony will assist the trier of fact in rendering a conclusion on the adequacy of the warnings.  *See* Fed. R. Evid. 702.

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court deny BMW North America LLC's Motion to Preclude the Expert Testimony of William J. Vigilante Jr.

**de LUCA LEVINE, LLC**

BY: *Patrick A. Hughes*

RAYMOND E. MACK, ESQUIRE
I.D. No.: 91815
rmack@delucalevine.com
PATRICK A. HUGHES, ESQUIRE
I.D. No. 91415
phughes@delucalevine.com
Three Valley Square
512 East Township Line Rd, Ste. 220
Blue Bell, PA  19422
215-383-0227 (Direct)
215-383-0082 (Fax)
Attorneys for Plaintiffs

**Dated:** April 15, 2015

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Parvez & Razia Yazdani** <br><br> **Plaintiffs** <br><br> v. <br><br> **BMW of North America, LLC** <br> **And BMW Motorrad USA, a Division of** <br> **BMW of North America, LLC** <br><br> **Defendants** | Civil Action No:  **2:15-cv-01427-PD** |

### MEMORADUM OF LAW IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO BMW OF NORTH AMERICA, LLC'S MOTION TO PRECLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT, WILLIAM J. VIGILANTE, JR.

Plaintiffs, Parvez & Razia Yazdani, by and through their attorneys, de Luca Levine, LLC, herein file this Memorandum of Law in support of their Response in Opposition to BMW of North America, LLC's ("BMWNA's") Motion to Preclude the Testimony of William J. Vigilante, Jr. ("Dr. Vigilante"), and in support thereof, avers as follows:

## I.    INTRODUCTION

The instant action arises out of a fire that originated at a 2004 BMW R1150R motorcycle ("subject motorcycle") distributed by BMWNA.   The subject motorcycle was parked in the Yazdanis' garage when the fire occurred and quickly spread throughout the Yazdani home causing substantial property damage.   Plaintiffs contend that the subject motorcycle is defective in both design and warning and initiated this action to recover for the damages sustained in the February 25, 2012 fire.

BMWNA filed a motion seeking to preclude Plaintiffs' Human Factors and Ergonomics expert, William J. Vigilante, Jr., Ph.D, CPE at the time of trial.   In its motion BMWNA challenges (only) the reliability and fit of certain opinions rendered by Dr. Vigilante in this case.   In reality, when you strip away BMWNA's rhetoric, its arguments are merely an attack on the field of Human

Factors and Ergonomics with the implication that this specialized area of behavioral science is biased.  As explained herein, Dr. Vigilante's opinions are based on sound scientific principles and research, not conjecture and are relevant to the strict liability and negligence claims asserted by Plaintiffs in this case.  At most, BMWNA's criticisms of Dr. Vigilante's opinions are properly addressed in cross-examination, not by way of a preclusion order.

For the reasons set forth herein, BMWNA's motion should be denied.

## II.   STATEMENT OF FACTS

After successfully beating a serious illness and retiring, in 2011, Mr. Yazdani purchased the subject motorcycle "used" in a private sale. *See Exhibit C, Parvez Yazdani Dep. Tr., at pp. 6, 10, 41:15-20.*   At the time of sale, the private seller provided Mr. Yazdani with the motorcycle's Rider's Manual and the service / maintenance records for the motorcycle. *See Exhibit C, Parvez Yazdani Dep. Tr., at p. 6.*  Mr. Yazdani took possession of the subject motorcycle in Boston, MA and drove it back several hundred miles to Pennsylvania. *See Exhibit C, Parvez Yazdani Dep. Tr., at pp. 6:2-7:20.*

Mr. Yazdani owned or had access to motorcycles before, both in his native India and in the United States. *See Exhibit C, Parvez Yazdani Dep. Tr., at pp. 6, 36, 37.*   However, the subject motorcycle had an air cooled engine, a fundamentally different engine design that was unfamiliar to Mr. Yazdani.  *See Exhibit C, Parvez Yazdani Dep. Tr., at pp. 20:15-18, 49:10-14.*   Unlike a water-cooled engine, an air-cooled engine uses outside air and engine oil to transfer and dissipate heat generated from the engine while in operation.  Mr. Yazdani did not know the subject motorcycle had an air-cooled engine.  *See Exhibit C, Parvez Yazdani Dep. Tr., at pp. 9:1-19; 20:15-18; 49:10-14; 50:8-12.*

In addition to an air cooled engine, the subject motorcycle had an atypical and unique

hazard that played a significant role in the fire that occurred at the Yazdani home. The subject motorcycle used an oil sight glass located on the left side of the crank case. The kickstand is also on the left side of the subject motorcycle. The oil sight glass was sealed with a plastic composite cover to enable the rider to see the oil level in lieu of a dipstick. However, when the subject motorcycle idles in a stationary position – especially when the motorcycle is leaning to the left on its kickstand – the engine oil can overheat and melt the composite plastic cover of the oil sight glass, causing hot oil to leak onto the exhaust manifold – resulting in fire. This is ultimately how the fire occurred at the Yazdani residence. *See Exhibit D, Report of Michael Zazula.*

In order to maintain the integrity of the subject motorcycle during the winter, Mr. Yazdani, approximately once a week during the colder months, would perform the same routine which involved turning the subject motorcycle on for seven to nine minutes and letting it idle and warm up while he smoked a cigarette. *See Exhibit C, Parvez Yazdani Dep. Tr., at pp.* 15-16:7. On the day of the fire, Mr. Yazdani left the motorcycle running in the garage for approximately 30 minutes. *See Exhibit C, Parvez Yazdani Dep. Tr., at p. 65.* Mr. Yazdani's home smoke alarms activated and he went to the garage where he saw flames coming from the engine (left side) of the motorcycle. *See Exhibit C, Parvez Yazdani Dep. Tr., at pp. 68-69.* Mr. Yazdani tried to push the bike out of the garage, but the bike slipped on engine oil on the floor. *See Exhibit C, Parvez Yazdani Dep. Tr., at pp. 68-69.* Mr. Yazdani was not aware that leaving the bike idling in a stationary position for any period of time would compromise the oil sight glass causing hot engine oil to leak onto the exhaust manifold and result in a catastrophic fire. *See Exhibit C, Parvez Yazdani Dep. Tr., at pp. 26-27.*

BMWNA was aware of this atypical and unique fire hazard. Instead of adjusting the design of its motorcycle in accordance with safety engineering principles or fixing a warning

directly on the motorcycle itself,  BMWNA chose to bury two warnings about this severe fire risk on pages 51 and 60 of its 89 page Rider's Manual.   *See Exhibit E, BMW Rider's Manual at pp. 51, 60.*

Mr. Yazdani testified that he received the manual upon his purchase in Boston.  *See Exhibit* When he arrived back in Harrisburg, Mr. Yazdani consulted the manual primarily to learn about the technical features as well as proper maintenance.  *See Exhibit C, Parvez Yazdani Dep. Tr., at p. 8:2-12.*  Mr. Yazdani does not recall if he read the specific warnings on page 51 and 60.  *See Exhibit C, Parvez Yazdani Dep. Tr., at pp. 23:3-11; 23:20-24:1.*  Even if he did read the warnings, Mr. Yazdani did not understand that his winter custom of letting the bike idle could cause a fire.  *See Exhibit C, Parvez Yazdani Dep. Tr., at pp.  19:8-20:18; 26:5-13.*  Mr. Yazdani testified, specifically, that if he read the warning, he was unsure whether the warning registered in his mind, *See Exhibit C, Parvez Yazdani Dep. Tr., at p. 22:20-22,* and that he was not thinking about the warning on the day of the fire or any other day that he let his motorcycle idle.  *See Exhibit C, Parvez Yazdani Dep. Tr., at p. 14:18-21.*  Mr. Yazdani further testified that he believed his winter custom to be safe, *See Exhibit C, Parvez Yazdani Dep. Tr., at p. 27:13-24,* and that if he had understood and followed the warning that he would not have let the motorcycle idle leading to the fire.  *See Exhibit C, Parvez Yazdani Dep. Tr., at p.* 93:10-13.

Plaintiffs retained forensic expert William J. Vigilante, Jr., Ph.D, CPE.   Dr. Vigilante is an expert in the field of Human Factors and Ergonomics[1].  Dr. Vigilante was asked to determine

---

[1] In his own words, Vigilante describes the field as "a science that studies how people interact with their use of all different types of products machines, systems and environments.  And what we're interested from the human factors side is the person that's using the products. We're interested in their perceptual abilities, that is their ability to see, hear and capture information from the environment, how they process that information and make decisions. How things such as expectancies and prior experiences affect how we perceive things and how we make decisions.  And then we as a field in a professional's work with engineers, designers and architects to design products, machines and systems that are easy to use, that are efficient to use and most importantly are safe to use."  *See Exhibit B, Dr. Vigilante Dep. Tr., at p. 9:6-10:5.*

if the warnings provided in the BMW Rider's Manual were adequate and if BMWNA's failure to provide adequate warnings caused the fire.   Plaintiffs produced a report prepared by Dr. Vigilante dated January 29, 2016.  *See Exhibit A, Report of Dr. Vigilante.*

Dr. Vigilante offers several opinions critical of the warnings provided by BMWNA related to the subject motorcycle.  *See Exhibit A, Report of Dr. Vigilante at pp. 15-16.*   Dr. Vigilante opines that BMWNA failed to provide an adequate warning system, which included an on-product warning label, which met contemporary industry standards, guidelines and practices regarding the fire hazard associated with warming the motorcycle at a standstill.  *See Exhibit A, Report of Dr. Vigilante at pp. 15-16.*   Further, BMWNA's inadequate warning system rendered the subject motorcycle unreasonably dangerous and defective and deprived the Plaintiffs of critical safety information needed to safely use the motorcycle.  *See Exhibit A, Report of Dr. Vigilante at pp. 15-16.*   Dr. Vigilante concludes that the inadequate warning system caused the subject fire.  *See Exhibit A, Report of Dr. Vigilante.*

This subject motorcycle has a unique and atypical hazard because it combines an air cooled engine with an oil sight glass (instead of a dip stick) located on the engine's crank case that can fail when exposed to foreseeable temperatures of the engine oil.  Dr. Vigilante contends, that if BMWNA chose to eschew a design change to eliminate the hazard caused by the melting oil sight glass, then to render the product safe it needed to have adequately warned the rider of the critical safety information.  *See Exhibit B, Dr. Vigilante Dep. Tr. at p. 192:4-24.*  As set forth in detail in Dr. Vigilante's report, industry standards, including ANSI Z535.4, and research in the Human Factors and Ergonomics field show that, when a warning contains critical safety information, it should be affixed directly to the product.  *See Exhibit A, Dr. Vigilante Report, at p 9-10.*

Information is considered critical safety information when there is a possibility for severe harm, when the defect is not likely to be anticipated by the average user, the risk is atypical with industry conventions, the risk occurs due to typical use of the product, and/or the risk is unique to a subject product.  *See Exhibit B, Dr. Vigilante Dep. Tr. at pp. 192:4-193:24.*

Here, the possibility of fire caused by the melting oil sight glass is unique and atypical hazard not known by the average motorcycle rider.  *See Exhibit B, Dr. Vigilante Dep. Tr. at pp. 116:22-24; 181:10-16; 193-194:6.*    The severity of harm is potentially severe and includes personal injury and/or property damage.  *See Exhibit B, Dr. Vigilante Dep. Tr. at p. 193-194:6.*   Further, common experience and practice teaches that, not only is it okay to leave a car or motorcycle idling, but that it is proper care to allow the motor to heat up during the winter.  *See Exhibit A, Report of Dr. Vigilante p. 13.*  Accordingly, the warning for this particular risk should have been displayed prominently on the product where it was likely to be seen, read, and complied with by the average user. *See Exhibit A, Report of Dr. Vigilante at pp. 9-10.*

Accordingly, for the reasons outlined below, BMW's Motion must be denied.

## III.   ARGUMENT

### A.  Legal Standard (*Daubert*)

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

F.R.E.. 702.

This has been interpreted to require the proponent of an expert to show that the expert is: (1) qualified to give an expert opinion, (2) the opinion given is based on a reliable method, and (3) the opinion offered fits, i.e. is relevant to the case at bar.  *See e.g. Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir.2000); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

"The Third Circuit has emphasized that not only do the Rules of Evidence generally 'embody a strong preference for admitting any evidence that may assist the trier of fact,' but Rule 702 specifically 'has a liberal policy of admissibility. *Dalton v. McCourt Elec. LLC*, 112 F. Supp. 3d 320, 324-26 (E.D. Pa. 2015) (quoting *Pineda v. Ford Motor Co.,* 520 F.3d 237, 243 (3d Cir.2008) (quoting *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 806 (3d Cir.1997))).

For good reason, BMWNA does not challenge Dr. Vigilante's qualifications as an expert opinions in the field of Human Factors/Ergonomics.  BMWNA recognizes that such a challenge would be futile because of Dr. Vigilante's impeccable qualifications.  In fact, BMWNA's own expert relies upon literature authored and/or edited by Dr. Vigilante.  However, through its motion, BMWNA makes vague attempts to attack Dr. Vigilante's reliability and the fit of his opinions rendered in this case.  As set forth in more detail below, BMWNA's arguments are flawed and its motion must be denied.

**B. Dr. Vigilante's testimony should not be limited because the methodology he used in forming his opinions in this case were reliable.**

"When the expert testifies to scientific knowledge, the expert's opinions must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Dalton*, 112 F. Supp. 3d 320 at 325 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir.1994) (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786))) (quotations omitted).  The focus of the *Daubert* inquiry is on the methodology of the expert, as opposed to its conclusions. *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir.1998))  Dr. Vigilante's opinions are based on the scientific method and not subjective belief or unsupported speculation.

**i. Dr. Vigilante's analysis is derived from the scientific method, which is a generally accepted methodology recognized in all courts.**

Dr. Vigilante employed the scientific method.  To employ the scientific method, the expert must: (1) come to a hypothesis, (2) collect relevant data, (3) test and/or analyze the data, and (4) reach a conclusion based on that analysis.

Here, Dr. Vigilante developed a hypothesis that the subject motorcycle's design contained an atypical and unique fire hazard that BMWNA failed to properly and adequately communicate to users – such as Plaintiffs – that resulted in the subject fire.

As part of Dr. Vigilante's scientific process, he collected relevant data and information. Dr. Vigilante reviewed the warnings contained in the BMW Rider's Manual. Dr. Vigilante reviewed the Rider's Manuals for other air cooled engine motorcycle brands such as Harley Davidson and Yamaha to determine if and how they communicated any risks associated with leaving the motorcycle idling in a stationary position.   Dr. Vigilante examined other air cooled engine motorcycles manufactured by BMW, Harley Davidson and Yamaha (which was the manufacture of the motorcycle that Mr. Yazdani owned prior to the subject BMW motorcycle) to

determine if they possessed similar features and the same fire risk when left idling while stationary. Dr. Vigilante also investigated other motorcycles to identify the practices of other manufacturers with respect to providing on-product warnings that were readily visible when starting the vehicle. Dr. Vigilante also conducted research on common winterization techniques by the average motorcycle users.  Dr.  Vigilante also reviewed the voluminous litigation materials including the pleadings, discovery produced by BMWNA about 26 substantially similar prior incidents involving fires caused when BMWNA's air cooled motorcycle was left idling in the stationary position, BMWNA's actions with respect to an NHTSA involved recall campaign for a similar fire risk that is associated with an older model year motorcycle that is similar to the incident motorcycle, the deposition transcripts of BMWNA's corporate designee Mark Yeldham, the deposition transcript of Mr. Yazdani, the fire marshal's report and scene photographs as well as scene photographs taken by Plaintiff's fire investigator.   *See Exhibit A, Report of Dr. Vigilante, at pp. 2-3 (Subsection B – Available Material).*

Next, as part of Dr. Vigilante's scientific process he analyzed the relevant materials.   For example, Dr. Vigilante compared the warnings in the subject motorcycle's Rider's manual to the manuals of other similar motorcycles.  *See Exhibit B, Dr. Vigilante Dep. Tr., at pp. 99:23-100:16.* Next, he reviewed relevant scientific literature pertinent to humans' interactions with user manuals.  *See Exhibit A, Report of Dr. Vigilante, at pp. 6-7, 17*.   He further reviewed relevant scientific literature and industry standards related to product warnings including both on-product warnings and user manuals.  *See Exhibit A, Report of Dr. Vigilante, at pp. 8-9, 17*.   Specifically, in addition to the literature, he reviewed ANSI Z535.4, the industry standard identifying criteria for on-product warnings.  *See Exhibit A, Report of Dr. Vigilante, at p. 9*.   He then tested the adequacy of the subject motorcycles warning with the relevant literature and industry standards,

including ANSI Z535.4, and determined that it was inadequate.   *See Exhibit A, Report of Dr. Vigilante, at p. 10; see also Exhibit B, Dr. Vigilante Dep. Tr., at p. 173:4-9.*   Next, Dr. Vigilante prepared his own warning and tested it for compliance with industry standards, including ANSI-Z535.4.   *See Exhibit A, Report of Dr. Vigilante at p. 14.*   Dr. Vigilante also analyzed the subject motorcycle's configuration and identified several areas where his proposed warning could have been placed on the motorcycle.   *See Exhibit B, Dr. Vigilante Dep. Tr., at Dep. Ex. 6.*

As the final part of his scientific process, Dr. Vigilante reached a conclusion based on his analysis and testing of the relevant data.   He concluded that BMWNA failed to properly communicate critical safety information about the fire hazard which caused the fire in the Yazdani home.  Dr. Vigilante determined that if BMWNA had affixed a warning to the subject motorcycle communicating critical safety information about the unique and atypical fire hazard associated with the subject motorcycle's design, that the product would not have been defective.  *See Exhibit A, Report of Dr. Vigilante, at pp. 14-15.*

Despite BMWNA's contention to the contrary, there is no doubt that Dr. Vigilante used a reliable and recognized methodology in forming his opinions in this case.   BMWNA's arguments attacking Dr. Vigilante's methodology are merely self-serving arguments lacking merit.

### ii. The Third Circuit as well as other district courts recognize Dr. Vigilante's method as reliable.

While BMWNA first attempts to argue that Dr. Vigilante employed "no methodology," it eventually, concedes Dr. Vigilante's opinions are based on "authority . . . [and] a number of studies (some of which he authored) regarding the efficacy of on-product warnings."  *See BMWNA's Brief (Doc. 16) at p. 12.*   While Defendant may not appreciate the nuance of Dr. Vigilante's field, the method he employed is common and accepted in his field, and a method found time and time again to be reliable in federal courts in the Third Circuit.  *See e.g. Miller v. Gray Mfg. Co., Inc.*, No. CV

14-5444, 2015 WL 5000988, at *6 (E.D. Pa. Aug. 20, 2015) (Human Factors expert's method of comparing warning labels across industry reliable); *Dolfman v. Edwards*, No. CIV.A. 13-2831, 2015 WL 3477736, at *1 (E.D. Pa. June 2, 2015) (Expert's method of reviewing discovery materials then applying those facts to principles of Human Facts/Ergonomics reliable); *Durkin v. Wabash Nat.*, No. CIV.A. 10-2013, 2013 WL 1314744, at *11 (D.N.J. Mar. 28, 2013) ("Mr. Rugemer's reliance on the deposition testimony and, *inter alia,* the relevant safety regulations and manual is sufficient methodology."); *Surace v. Caterpillar, Inc.*, No. CIV. A. 94-1422, 1995 WL 303895, at *4 (E.D. Pa. May 16, 1995), *aff'd in part*, 111 F.3d 1039 (3d Cir. 1997) (Human Factors expert employed reliable method that reviewed materials relating to facts of case, pertinent literature/research on human factors, and compared the facts to the literature/research and determined the product was defective).

Further, unlike BMWNA's contention, Dr. Vigilante's method differs from the method employed by the expert in *Oddi v. Ford Motor Co.* 234 F.3d 136 (3d Cir. 2000). In *Oddi*, the expert opined on the perceived design defect of a truck. *Id.* at 156. However, in reaching that conclusion, the expert performed no research, did not consult any scientific literature, or conduct any testing. *Id.* Simply, the expert had no method whatsoever. *Id.* Here, Dr. Vigilante's conclusions are backed by peer-reviewed, scientific research, and BMWNA's warning and his own warning were tested for compliance with the relevant industry standards. *See Exhibit A, Report of Dr. Vigilante, at pp. 7-10, 14-15.* Accordingly, the other cases cited by Defendant consist of experts who utilized no discernable method and offered conclusory opinions unsupported by fact, industry standards, literature, or testing. *Williams v. United States*, 321 F. App'x 129, 132 (3d Cir. 2009) (expert not qualified, and even if qualified, expert's report consists of conclusory statements that defendant's actions caused plaintiff's harm and analysis and conclusions not

supported by any discernable standards or method); *Scrofani v. Stihl Inc.*, 44 F. App'x 559, 562 (3d Cir. 2002) (expert not qualified, and even if qualified, expert's report "gave no clue as to how he reached the bald conclusion he reached and more than suggests that he did not even read the warnings accompany the [alleged defective product] which, in any event, were the same warnings [expert] described as necessary."); *Murray v. Marina Dist. Dev. Co.*, 311 F. App'x 521, 522 (3d Cir. 2008) (expert's opinions that casino's parking lot security inadequate "were unreliable because they were not based on any industry standards and did not purport to employ any methodology."); *Furlan v. Schindler Elevator Corp.*, 864 F. Supp. 2d 291, 298 (E.D. Pa. 2012), ("The only "standard" that guided [expert's] analysis was his perception, based on an amateur photograph and the fact that an accident occurred, that the gap between the finger guard and the handrail [of an escalator] was too large.")

Courts in other districts, applying the *Daubert* analysis, have concluded that the methodology used by Dr. Vigilante was reliable.   In an inadequate labelling case related to a defective dryer titled *State Farm Fire & Cas. Co. v. Electrolux Home Products, Inc.*, Defendants' Human Factors expert employed an almost identical method to conclude that a warning was adequate.  980 F. Supp. 2d 1031, 1038-39 (N.D. Ind. 2013).  The expert:

> reviewed the warnings, owner's guide, and instructions associated with the [subject] dryer and went on to analyze the various factors relevant to the adequacy of a warning prior to offering her opinions. Moreover, [the expert], relied upon [ANSI Z535.4] and explained that the warnings met those standards.

This method was found to be sufficiently reliable.  *Id.; see also Exhibit F – Omnibus Order on Parties' Motions to Exclude Expert Testimony, Nexter v. Textron, Inc., No. 1:13-CV-920-DAE at * 54-57 (W.D. Tx. November 17, 2015) (finding Dr. Vigilante's testimony admissible and identical method reliable).*

In yet another case, a Human Factors expert's opinion was found to be reliable and admissible in *Michaels v. Mr. Heater, Inc.* 411 F. Supp. 2d 992 (W.D. Wis. 2006). The court first recognized that:

> Human factors analysis is not novel. 'It is a recognized analytical approach that is applied in a variety of contexts and may yield legitimate insights as to the hazards that particular products and situations ... may pose in light of predictable human behavioral patterns.' *Mihailovich v. Laatsch,* 359 F.3d 892, 919 (7th Cir.2004). A human factors analysis focuses on the interaction between human behavior and the design of a machine or product. *Id.* at 915. An expert engaging in such an analysis will consider whether, in light of predictable human behavior, the design or condition of the subject item poses a potential hazard. *Id.*

*Id.* at 999. The expert's opinions and method in *Michaels v. Mr. Heater, Inc.* are strikingly similar to Dr. Vigilante's here. In that case, the expert concluded that a space heater was defective for failure to include an on-product warning, and instead relying on a warning tag attached to a replaceable component of the heater. *Id.* The court explained the expert's method used to reach his conclusion:

> In rendering his opinion in this case, [the expert] reviewed deposition transcripts, expert reports and affidavits, examined the thermocouple and valve from the allegedly defective heater and observed photographs of the heater. In addition, [he] reviewed the instructions and warnings contained on the heater or packaged with it when it was sold, and warning and instructions found on the packaging that accompanied replacement thermocouples.
>
> *****
>
> [The expert] further supported his opinions with an industry standards in place at the time the product was manufactured (standard 1.15.3) and with standards issued in 1991 (ANSI Z535.4) and 2000 (ANSI Z21.63).

*Id.* Satisfied with the expert's method, the court found that "the theories and methods upon which he relie[d] are recognized by the engineering community . . . and his knowledge of warnings and their proper design may be helpful to the jury. *Id.* at 999-1000.

Here, Dr. Vigilante's conclusions are based on much more than "just the *ipse dixit* of the expert." *Pappas v. Sony Elecs., Inc.*, 136 F. Supp. 2d 413, 426 (W.D. Pa. 2000). Rather, each conclusion is supported by scientific research and the facts of the case. Dr. Vigilante concludes that the warning needs to be affixed to the motorcycle in large part because the atypical and unique fire hazard that is contrary to ordinary experiences with similar products, and the average user, based on common experience, would not know that leaving the motorcycle at idle could result in a fire. *See Exhibit A, Report of Dr. Vigilante, at p. 13; See Exhibit B, Dr. Vigilante Dep. Tr., at pp. 116:22-24; 181:10-16; 193-194:6.* Consistent with this research, Mr. Yazdani testified that he did not know the engine was air-cooled, *see Exhibit C, Parvez Yazdani Dep. Tr., at pp. 9:1-19; 49:10-14; 50:8-12*, and did not appreciate the fact that letting it idle could result in a fire. *Exhibit C, Parvez Yazdani Dep. Tr., at pp 19:8-20:18; 26:5-13.*

Further, Dr. Vigilante states that research shows that a manual is inadequate to convey critical safety information because second-hand purchasers often do not receive a user manual, and, even if one does receive a manual, a user will often not read it, only read parts of it that interest them, or, even if they read all of it, not necessarily internalize the information contained in the manual. *See Exhibit A, Report of Dr. Vigilante, at pp. 6-7; See Exhibit B, Dr. Vigilante Dep. Tr., at p. 115:3-12.* An average user will often forget, overlook, and "not encode" a warning in a manual into their memory. *See Exhibit A, Report of Dr. Vigilante, at p. 7; See Exhibit B, Dr. Vigilante Dep. Tr., at p. 115:3-12.*

Again, consistent with that research, although Mr. Yazdani consulted at least parts of the manual, *See Exhibit C, Parvez Yazdani Dep. Tr., at pp. 23:3-11, 28:24-29:1*, he only consulted it to find technical or maintenance information. *See Exhibit C, Parvez Yazdani Dep. Tr., at p. 8:2-12.* Moreover, he did not recall if he read the specific warnings. *See Exhibit C, Parvez Yazdani*

*Dep. Tr., at pp 23:3-11; 23:20-24:1.* Even if he did read the specific warnings, he was unsure whether it registered in his mind, *See Exhibit C, Parvez Yazdani Dep. Tr., at p. 22:20-22*, and he was not thinking about the warning on the day of the fire or any other day that he let his motorcycle idle. *See Exhibit C, Parvez Yazdani Dep. Tr., at p. 14:18-21.* Ultimately, Mr. Yazdani did not know that his routine of leaving the motorcycle idling during the winter months was unsafe. *See Exhibit C, Parvez Yazdani Dep. Tr., at pp. 19:8-20:18; 26:5-13.*

### iii. BMWNA's challenges to Dr. Vigilante's conclusions are meritless and are issues of credibility and/or weight, not admissibility.

BMWNA also takes issue with Dr. Vigilante's *conclusion* that the manual was ineffective to warn the user of the atypical fire risk associated with the subject motorcycle's design. However, the focus of the *Daubert* inquiry is on the methodology of the expert, as opposed to its conclusions. *See e.g. Ruiz–Troche.,* 161 F.3d at 81. If BMWNA disagrees with Dr. Vigilante's conclusion, the proper venue to address such an issue is cross-examination. *See e.g. Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 414 (3d Cir.2002) ("Rule 705, together with Rule 703, places the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination."); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir. 1997) ("The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination.").

BMWNA makes the unsubstantiated proclamation that: "[Dr. Vigilante's] position [regarding the ineffectiveness of the manual] is intellectually meritless and inconsistent with Pennsylvania law; it cannot be an accepted premise in the discipline of human factors that a user of a complex product may properly ignore the instructions and warnings that accompany the product." *See BMWNA's Brief (Doc. 16) at p. 10.*

This is a gross mischaracterization of Dr. Vigilante's testimony.  Dr. Vigilante never stated that a user *may* ignore the manual, but that, based on scientific research, a user either, often does not receive a manual, or that human nature is to ignore aspects of the manual or to not internalize warnings found in the manual.  *See Exhibit A, Report of Dr. Vigilante, at pp. 6-7.*  Dr. Vigilante supports this "intellectually meritless" position by several, peer-reviewed scientific studies; BMWNA provides none to the contrary.  *See Exhibit A, Report of Dr. Vigilante, at pp. 6-7.*  Nor does BMWNA provide any evidence of what is an "accepted premise in the discipline of human factors" and how that differs from anything in Dr. Vigilante's report.

Further, Dr. Vigilante's opinions are supported by the facts of the case.  Mr. Yazdani testified that, although he received the manual, he is not sure if he read the specific warnings on page 51 and 60, *See Exhibit C, Parvez Yazdani Dep. Tr., at pp. 23:3-11; 23:20-24:1,* and if he did read it, he was not thinking about it when he warmed up his motorcycle during the winter months.  *See Exhibit C, Parvez Yazdani Dep. Tr., at pp. 22:20-22; 14:18-21.*  This is entirely consistent with the relevant literature accepted in the human factors and ergonomics scientific community about the efficacy of user manuals.  Reading the manual is not required to operate the motorcycle for someone with basic knowledge of the operation of motorcycles in general.  Although Mr. Yazdani did not know the motorcycle was air-cooled, based on his prior experience with motorcycles, common among other riders, he was able to ride the motorcycle home upon purchase in Boston back to Pennsylvania without reading the manual.  *See Exhibit C, Parvez Yazdani Dep. Tr., at p.. 7:13-20.*  Further, Mr. Yazdani only read the manual to find information related to maintenance of the motorcycle, not to look for and find critical safety information related to risks that he could not reasonably have anticipated.  *See Exhibit C, Parvez Yazdani Dep. Tr., at pp.. 8, 10.*

BMWNA's further citation to Pennsylvania law that states a defendant may presume a warning will be heeded only applies when the warning is <u>adequate</u>.  *See e.g. Pavlik v. Lane Ltd./Tobacco Exporters Int'l*, 135 F.3d 876, 887-87 (3d Cir. 1998). ("in cases where the alleged failure to warn is based on claims that a warning was given but was, for example, printed in small or unreadable type, **the comment j presumption should not apply** . . . . "**[M]anufacturers cannot rely upon a presumption that the victim read a warning to shield themselves from liability for warnings that are inadequate** precisely because they are not presented in a manner sufficient to attract the user's attention.").

Under Defendant's reading of the law, a cause of action would only exist for a complete failure to warn, *i.e.* where there is no warning period.  If, as Defendant contends, any warning is presumed to be heeded, there could be no cause of action for inadequate labeling.   However, contrary to BMWNA's contention, in Pennsylvania, a cause of action exists for inadequate warning.  An existing warning may be inadequate:

> where its warning is not prominent, and not calculated to attract the user's attention to the true nature of the danger due to its position, size, or coloring of its lettering. A warning may be found to be inadequate if its size or print is too small or inappropriately located on the product. The warning must be sufficient to catch the attention of persons who could be expected to use the product, to apprise them of its dangers, and to advise them of the measures to take to avoid these dangers.

*Pavlik v. Lane Limited/Tobacco Exporters Int'l*, 135 F.3d 876, 887 (3d Cir. Pa. 1998) (citing *Nowak by & Through Nowak v. Faberge USA*, 32 F.3d 755, 757 (3d Cir. Pa. 1994)). Accordingly, the heeding presumption relied on by BMWNA is entirely irrelevant to rebut Dr. Vigilante's opinion that the warning was <u>inadequate</u>.

      **iv.**      **Dr. Vigilante's Opinions are not unreliable for failure to Consider Other On-Product Labels**

BMWNA further contends that Dr. Vigilante's opinion is unreliable because he did not consider what other information in the owner's manual warrants an on-product warning, and "where on the motorcycle up to 89 pages worth of information should be placed." *See BMWNA's Brief (Doc. 16) at p. 11.* BMWNA's argument comes from another misapprehension of Dr. Vigilante's testimony. Dr. Vigilante's opinion that the warning should be affixed on the motorcycle does not warrant the conclusion that the entirety of the owner's manual needs to be likewise affixed to the motorcycle.

The reason this particular hazard (as opposed to the other information in the manual) needs to be warned of on the motorcycle itself is because it conveys critical safety information about an atypical and unique fire hazard. Information is considered critical for safety if the consequence is severe and the information is not well known by the average user and/or contrary to common practices. *See Exhibit B, Dr. Vigilante Dep. Tr. at pp. 116:22-24, 152-153, 181:10-16, 192-93; see also Exhibit A, Report of Dr. Vigilante at pp. 12-14* (explaining why this particular defect is not well known to potential users). Most information in the user's manual is not critical safety information. Most of the information conveyed in the manual is technical and does not involve any risk of harm. For information that does pose a risk of harm, often times it either, does not involve a severe risk of harm, or the risk of harm is well-known and therefore does not warrant a similar on-product label. *See Exhibit B, Dr. Vigilante Dep. Tr. at pp. 192-93.*

Dr. Vigilante's proposed warning, which is consistent with ANSI Z535.4, is designed to be affixed directly to the motorcycle and is labelled: **WARNING**. It next reads:

> **Fire Hazard.**
> Do NOT warm up engine with motorcycles standing still.
> Engine can overheat and cause a fire.

Ride away immediately after starting engine.

*Exhibit A, Report of Dr. Vigilante, at p. 14.*

Dr. Vigilante testified that the warning should be affixed directly in front of the rider's line of sight when they are sitting on the motorcycle ready to start the engine. *See Exhibit B, Dr. Vigilante Dep. Tr., at pp. 222-23 and Exhibit 6 (marking several locations on a photograph of the motorcycle sufficient to catch users' attention).* Dr. Vigilante's research shows that warnings are more effective when given at the time the information is necessary to catch the user's attention and change behavior. *Exhibit A, Dr. Vigilante Report, at p. 8.* Here, the information is necessary and more likely to catch the users' attention when the user is starting the motorcycle, not while reading the manual. Based on this research, manufacturers like BMWNA should place warnings in locations better designed to impart this critical safety information at the time most likely to impact the user's behavior. *Exhibit A, Dr. Vigilante Report, at p. 8.*

As part of Dr. Vigilante's research and analysis he showed that manufacturers do in fact present on-product warnings in the locations he suggested. For example, Dr. Vigilante provided examples of warnings Yamaha places on their gas tank and windshield to alerts riders to hazards associated with the use of the motorcycle. *See Exhibit B, Dr. Vigilante Dep. Tr., at pp.67-68, 194-95, 206, 258-59.* Furthermore, Dr. Vigilante refers to BMWNA's own actions with respect to the recall campaign on a predecessor air cooled motorcycle model (BMW R1100RSL) for a similar design defect/fire hazard. For the recall campaign, BMWNA provided a warning sticker that was intended to be attached to the handlebar area of the motorcycle to make the rider aware of the risk of fire if the motorcycle was left running while stationary. *See Exhibit A, Report of Dr. Vigilante at pp. 11-12.*

Dr. Vigilante acknowledged that too many warnings can clutter and interfere with a warning's ability to properly convey information. *See Exhibit B, Dr. Vigilante Dep. Tr., at p. 190.* However, as Dr. Vigilante explained in his deposition, it is unlikely that a product will have the amount of defects that warrant enough on-product warnings to convey critical safety information in a given location on the product to lead to clutter and interference with the warning's clarity. *See Exhibit B, Dr. Vigilante Dep. Tr., at pp. 204-209.* Dr. Vigilante explained the safety hierarchy: that when a defect like this is known to the manufacturer, scientific research in the field of Human Factors/Ergonomics instructs that manufacturers have three choices to alleviate the danger: change the design to eliminate the defect, guard against the defect, and, as a last and <u>least effective resort</u>, adequately warn the user. *See Exhibit B, Dr. Vigilante Dep. Tr., at pp. 157:17-24; 204-209.* Based on this analysis, if a product contains a defect that the manufacturer cannot or is unwilling to alleviate *via* design change or guard, then the product should at least adequately warn the user of the danger. *See Exhibit B, Dr. Vigilante Dep. Tr., at pp. 204-209.* Then the manufacturer must examine the defect, prioritize the warnings based on the severity of harm and likeliness that the common user would be aware of the harm, and decide where the warning should be shown. *See Exhibit B, Dr. Vigilante Dep. Tr., at pp. 204-209.* Some warnings can be adequately placed in the manual, whereas others should be on the product. *See Exhibit B, Dr. Vigilante Dep. Tr., at pp. 204-209.* As his research shows, warnings that convey critical safety information – where the potential for harm is severe and where the common user is unlikely to know of the risk – should be placed in a location on the product relevant to catch the user's attention at the moment critical to convey the information. *See Exhibit B, Dr. Vigilante Dep. Tr., at pp. 204-209.*

Here, the warning should be displayed on the gas tank, handlebars, or some other location relevant to starting the motorcycle because that is the moment necessary to convey the information

about how the user can cure the design defect.  As Dr. Vigilante testified, it is unlikely that there would be so many defects in a product to necessitate many warnings on the gas tank or handlebars, and that if there is, the product is so defective that it should not be sold in the first place.  *See Exhibit B, Dr. Vigilante Dep. Tr., at pp. 204-209.*  Therefore, it is unlikely that the product will have enough warning labels to cause the cluttering effect and impinge on the warning's ability to convey the critical safety information.  *See Exhibit B, Dr. Vigilante Dep. Tr., at pp. 204-209.*

### v. Dr. Vigilante performed testing as part of his scientific analysis concerning the adequacy of the warnings associated with the subject motorcycle.

BMWNA contends that Dr. Vigilante's method is unreliable because he did not perform testing on his warning.  However, this argument suffers from the same willful blindness as BMWNA's previous argument that Dr. Vigilante did not employ a reliable methodology.   First, Dr. Vigilante did perform testing.  He tested BMWNA's warning against the industry standards and relevant scientific research and found that, because the warning was necessary to inform the rider of critical safety information, it needed to affix it to the product itself.  *See Exhibit A, Dr. Vigilante's Report, at p. 10* ("Contrary to contemporary industry standards and guidelines for the effective waning systems, BMWNA failed to provide any warning on Mr. Yazdani's R1150 R motorcycle regarding the risk of fire if the motorcycle engine is warmed up at a standstill."). Further Dr. Vigilante tested to see if the warning he designed was consistent with ANSI Z535.4, an accepted industry standard for warnings.  *See Exhibit A, Report of Dr. Vigilante at pp. 14-15.* It was.

BMWNA contends that Dr. Vigilante should have performed usability or focus-group testing on his warning.  However, the relevant industry standards against which Dr. Vigilante tested his warning were formulated based on exactly the type of testing that BMWNA criticizes Dr. Vigilante for foregoing.  The standards were created in part so a manufacturer would not have

to perform this type of intensive testing for each warning it intended to affix to a given product, and are therefore, shorthand for conducting individual studies of specific warnings.

BMWNA further attacks that Dr. Vigilante "used hindsight," "cherry-picked the warning," or is "result-oriented, litigation-driven, and biased" are meritless.  First, of course, Dr. Vigilante "cherry-picked the warning," because that is the ultimate issue of case: whether the specific warning regarding the risk of fire that caused Plaintiffs' property damage was inadequate.  It would not be relevant for Dr. Vigilante to opine on the adequacy of the entirety of BMWNA's user manual.  And second, each is an attack on Dr. Vigilante's credibility, which is not relevant to admissibility.  As such, the appropriate avenue to address these issues is through cross-examination or the production of BMWNA's own expert witness.  *See e.g. Stecyk,* 295 F.3d at 414; *Kannankeril*, 128 F.3d at 807.

### C.  Dr. Vigilante's testimony should not be limited because his opinions fit, are relevant, and will assist the jury in this case.

[T]he "fit" standard is not a high one."  *Dalton*, 112 F. Supp. 3d 320 at 330.  The requirement is that the proffered testimony must assist the trier of fact in resolving an issue relevant to the case. *See e.g. Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000); *In re Paoli,* 35 F.3d at 743.  Dr. Vigilante's opinions fit, are relevant and will assist the jury in this case.

Here, in Plaintiffs' complaint, sounding in strict liability and negligence, at issue is whether the subject motorcycle was unreasonably dangerous.  As stated above, Dr. Vigilante's opinion is that the subject motorcycle is defective and/or unreasonably dangerous because it failed to provide a warning regarding the risk of fire on the motorcycle where it could have ultimately warned Plaintiffs of the danger and avoided the fire.  Dr. Vigilante's opinions are relevant and his expertise and research in the field will assist the trier of fact in understanding the pertinent issues in this case.

BMWNA takes issue with some of Dr. Vigilante's statements in his report that it contends are not relevant to the case at bar.  First: in addition to the warning in the manual, BMWNA relies on instruction to purchasers of the motorcycle provided by authorized dealers at the time of purchase.  *See Exhibit A, Report of Dr. Vigilante, at pp. 5-6.*  This is directly related to information provided by BMWNA's corporate designee.  *See Exhibit G, Mark Yeldham Dep. Tr., at pp. 74-77.*  Dr. Vigilante contends that, in light of the fact that many subsequent purchasers like Mr. Yazdani do not purchase the motorcycle from authorized dealers, that BMWNA's reliance on this method of instruction/warning is inadequate.  *See Exhibit A, Report of Dr. Vigilante, at pp. 5-6.*  It is Dr. Vigilante's opinion that both methods of informing the user – the warning in the manual and the reliance on authorized dealers – are inadequate and render the product unreasonably dangerous.  *See Exhibit A, Report of Dr. Vigilante, at p. 15.*  Dr. Vigilante's criticism of BMWNA's use on authorized dealers is relevant because it goes to the heart of the question his testimony will aid the trier of fact in determining: the question of whether the product is unreasonably dangerous.  An oral warning from an authorized dealer is no different than a written warning in the manual.  Further, BMWNA's testimony concerning its use of authorized dealers warrants Dr. Vigilante's rebuttal testimony to show that this, in addition the warnings in the manual, were inadequate methods to warn users of the danger posed by the unique fire risk of the subject motorcycle.  *See Exhibit A, Report of Dr. Vigilante, at pp. 5-6.*

Defendant next seeks to preclude certain statements which do not apply to Mr. Yazdani.  Dr. Vigilante states that it was inadequate for BMWNA to rely on the user manual because, *inter alia*, many second-hand purchasers never receive a manual, whereas here, Mr. Yazdani did receive the manual.  *See Exhibit A, Report of Dr. Vigilante at pp. 6-7.*  However, BMWNA is confusing evidence of a defect with evidence of causation.  Dr. Vigilante is merely listing what research –

generally accepted in the human factors/ergonomics field – has shown regarding human interactions with warnings in manuals. *See Exhibit A, Report of Dr. Vigilante at pp. 6-7.*   This is all data relevant to his opinion that it was unreasonable for BMWNA to rely on the manual for warning its users on the danger of the atypical and unique fire risk here and the lack of an on-product warning rendered it unreasonably dangerous and defective to its users in general. *See Exhibit B, Dr. Vigilante Dep. Tr., at p. 177:11-17.*

In contrast to design or manufacturing defect cases, in inadequate warnings cases, there can be a myriad of ways in which the inadequate warning can ultimately cause the injury. While the exact way in which the inadequate warning caused the injury is relevant to the issue of causation, the other alternate ways in which an injury could occur are all relevant to the issue of whether the product is defective and unreasonably dangerous to the public as a whole. Dr. Vigilante should not be precluded from testifying to the full extent as to why it is inadequate to rely on the user manual, because each reason why an individual may not be adequately warned will assist the trier of fact in reaching the conclusion that the product is unreasonably dangerous.

In the case at bar, Mr. Yazdani consulted parts of the manual, but, consistent with the Dr. Vigilante's research, either did not read the specific warning or did not encode the warning into memory. As opposed to evidence of the defect itself, this is evidence of how the defect caused Mr. Yazdani's injuries. As such, Vigilante's statements regarding both the defect in general and the specific cause of Mr. Yazdani's injuries are both relevant, and therefore, admissible.

Next, Defendant seeks to preclude Dr. Vigilante's statement that reliance on the manual is inadequate because the manual is generally not available for use during subsequent or later uses of the motorcycle. *See Exhibit A, Report of Dr. Vigilante at p.8.* In other words, riders do not pull out the user manual each time they use the motorcycle. Dr. Vigilante's research shows that

warnings are more effective when given at the time the information is necessary. *See Exhibit A, Report of Dr. Vigilante at p. 8.* Here, the information is necessary and more likely to catch the users' attention when the user is starting the motorcycle, not while reading the manual. Based on this research, manufacturers like BMWNA should expect this type of nonuse of the manual and place warnings in locations better designed to impart this critical safety information at the time most likely to impact the user's behavior. *See Exhibit A, Report of Dr. Vigilante at p. 8.*

Again, this goes to the question as to whether the manual is adequate to warn its users and whether the product is unreasonably dangerous to the public. It is data to support Dr. Vigilante's conclusion that an on-product warning label is more effective at warning users of critical safety information because, unlike the manual, it is always on the product to remind users of the unique and atypical hazard related to the melting of the sight glass cap and alert and inform riders who did not have the benefit of reading the manual for whatever reason. It will assist the trier of fact in understanding exactly why BMWNA's reliance on the manual rendered the product defective and unreasonably dangerous.

In sum, Dr. Vigilante concludes the user manual is inadequate to convey critical safety information for multitude of reasons. Each reason is data, based on peer-reviewed scientific research in the field of Human Factors/Ergonomics, to support his conclusion. Therefore, each reason why a manual is ineffective is relevant to the question as to whether BMWNA's warning is inadequate. *See Exhibit A, Report of Dr. Vigilante at pp.15-16.* The fact that Mr. Yazdani either did not read the specific warnings or did not encode them into his memory is data, from the record, that lead to Dr. Vigilante's separate conclusion that the inadequate warning caused Mr. Yazdani's injuries. *See Exhibit A, Report of Dr. Vigilante at p. 15-16.*

**IV.**    <span style="font-variant:small-caps">Conclusion</span>

Plaintiffs' expert is qualified, employed a sound method based on accepted scientific principles, and his opinion is relevant to the case at bar.  For these reasons, Plaintiff respectfully requests this honorable Court deny Defendant's Motion to Preclude William J. Vigilante Jr.

Respectfully submitted,

**de LUCA LEVINE, LLC**

**BY:** *Patrick A. Hughes*

RAYMOND E. MACK, ESQUIRE
I.D. No.: 91815
rmack@delucalevine.com
PATRICK A. HUGHES, ESQUIRE
I.D. No. 91415
phughes@delucalevine.com
Three Valley Square
512 East Township Line Rd, Ste. 220
Blue Bell, PA  19422
215-383-0227 (Direct)
215-383-0082 (Fax)
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Patrick A. Hughes, hereby certify that a true and correct copy of Plaintiff's Response to

Defendant's Motion to Preclude William J. Vigilante Jr. was served on April 15, 2015, upon

counsel listed below by electronic mail.

Keith D. Heinold, Esquire
Marshall Dennehey Warner Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103


**de LUCA LEVINE, LLC**


BY: *Patrick A. Hughes*

RAYMOND E. MACK, ESQUIRE
I.D. No.: 91815
rmack@delucalevine.com
PATRICK A. HUGHES, ESQUIRE
I.D. No. 91415
phughes@delucalevine.com
Three Valley Square
512 East Township Line Rd, Ste. 220
Blue Bell, PA  19422
215-383-0227 (Direct)
215-383-0082 (Fax)
Attorneys for Plaintiffs