# In The Matter Of:

*Yazdani  vs.*
*BMW*

---

*William Vigilante, Jr., Ph.D.*
*March 15, 2016*

---

*Thomas G. Oakes Associates*
*535 Route 38 East, Ste. 330*
*Cherry Tree Corporate Center*
*Cherry Hill, NJ  08002*
*National Toll-Free Scheduling Line: 1.877.625.3777*



Original File 3-15-16 - Yazdanio v BMW - William Vigilante Jr.txt
Min-U-Script® with Word Index

Exhibit B

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                  - - -

 3  PARVEZ and RAZIA     :
    YAZDANI
 4       Plaintiffs,     :

 5       -vs-            :

 6  BMW OF NORTH AMERICA, :
    LLC
 7     and              :
    BMW MOTORRAD USA, a
 8  Division of BMW OF   :
    NORTH AMERICA, LLC
 9       Defendants    : NO. 2:15-cv-01427-PD

10            - - -
           Tuesday, March 15, 2016
11            - - -

12       Oral deposition of WILLIAM J.

13  VIGILANTE, JR., PhD, CPE was taken at the Law

14  Offices of deLuca Levine, Three Valley Square,

15  Suite 220, Blue Bell, Pennsylvania, commencing

16  at 10:00 a.m., before Debra J. Veneziale,

17  Court Reporter and Notary Public; in and for

18  the Commonwealth of Pennsylvania.

19

20                  * * *

21

22        THOMAS G. OAKES ASSOCIATES
23        National Court Reporting &
          Litigation Support Services
24  Phone:  1.877.OAKES.77  Fax: 1.888.344.3778
```

---

**Page 2**

```
 1  APPEARANCES:

 2       deLUCA LEVINE
 3       BY:  KENNETH T. LEVINE, ESQUIRE
         klevine@delucalevine.com
 4       Three Valley Square, Suite 220
         Blue Bell, Pennsylvania  19422
 5       Phone: (215) 383-0227
         Representing the Plaintiffs
 6

 7       MARSHALL DENNEHEY WARNER COLEMAN
           & GOGGIN
 8       BY:  KEITH D. HEINOLD, ESQUIRE
         kdheinold@mdwcg.com
 9       2000 Market Street, Suite 2300
         Philadelphia, Pennsylvania  19103
10       Phone: (215) 575-4552
         Representing the Defendants
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

---

**Page 3**

```
 1              I N D E X
 2                - - -

 3  WITNESS

 4

 5     WILLIAM J. VIGILANTE, JR., PhD, CPE

 6

 7  EXAMINATION                      PAGE

 8    BY MR. HEINOLD                   5

 9

10                - - -

11            E X H I B I T S

12                - - -

13

14  NUMBER      DESCRIPTION      PAGE MARKED

15  Vigilante-1   Report                120

16  Vigilante-2   Case List             120

17  Vigilante-3   Curriculum Vitae      120

18  Vigilante-4   Rider's Manual        120

19  Vigilante-5   Warning               222

20  Vigilante-6   Photographs           223

21  Vigilante-7   Sound Rider Article   250

22  Vigilante-8   You Motorcycle Article 252

23  Vigilante-9   American Spectator Article 253

24  Vigilante-10  Motorbike Writer Article 255
```

---

**Page 4**

```
 1  NUMBER      DESCRIPTION      PAGE MARKED

 2  Vigilante-11  Revzilla Docuemnt     257

 3  Vigilante-12  Photographs           258

 4  Vigilante-13  Photographs           261

 5  Vigilante-14  Photographs           262

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
Exhibit D
www.TGOakes.com

(1) Pages 1 - 4

Page 5

1    THE COURT REPORTER: Usual
2  stipulations?
3    MR. HEINOLD: Yes.
4    MR. LEVINE: Yes.
5    - - -
6    (It is hereby stipulated
7  and agreed by and between counsel for
8  the respective parties that sealing,
9  certification, and filing are waived
10  and that all objections, except as to
11  the form of questions, be reserved
12  until the time of trial.)
13    - - -
14    WILLIAM J. VIGILANTE, JR.,
15  PhD., CPE, after having been first duly
16  sworn, was examined and testified as
17  follows:
18    - - -
19    EXAMINATION
20    - - -
21  BY MR. HEINOLD:
22  Q.  I know you've been deposed.
23   You don't need instructions from me about a
24   deposition, do you?

Page 7

1  Q.  Yes, all the work that you've
2  done.  Well, all the work that's been done,
3  the report, Vigilante Forensic is you, has
4  been done by you?
5  A.  That's correct.
6  Q.  You issued a report in this
7  case?
8  A.  Yes.
9  Q.  Is that your only report?
10  A.  Yes.
11  Q.  No others?
12  A.  No others.
13  Q.  No supplements?
14  A.  No supplements.
15  Q.  Is it full and complete to your
16  knowledge right now?
17  A.  As of the day I wrote the
18  report it is.
19  Q.  Is there something more that
20  you would add to it?
21  A.  Well, I've since received a
22  report of the defense expert.
23  Q.  Kevin Breen?
24  A.  Yes, Kevin Breen.

Page 6

1  A.  I don't think so.
2  Q.  Okay.  Tell me about your
3  business organization.  What's the official
4  name?
5  A.  I'm doing business as Vigilante
6  Forensic.  The LLC is Vigilante Consulting.
7  Q.  Okay.  How big is your
8  organization?
9  A.  You're looking at it.
10  Q.  No staff.
11    MR. LEVINE: I'm not on his
12  staff.
13    MR. HEINOLD: I'm not looking
14  at you.
15    THE WITNESS: No staff.
16    BY MR. HEINOLD:
17  Q.  You do everything yourself?
18  A.  Yes.
19  Q.  Do you outsource any of it?
20  A.  No.
21  Q.  So everything that you've done
22  here for this case is all you?
23  A.  All the work that I've done,
24  yes.

Page 8

1  Q.  And has that caused you to
2  change your opinions?
3  A.  It has not caused me to change
4  my opinions, but it does lead to additional or
5  new opinions.
6  Q.  Okay.  Can you tell me what
7  your new opinions are?
8  A.  Basically they're in rebuttal
9  to his report.  I don't believe that what he's
10  stating in his report is correct.  I take
11  issue with several of the points that he made
12  in his deposition, and I'm happy to go through
13  them if you would like.
14  Q.  Okay.  Let's get to that a bit
15  later.
16    How long have you been working
17  as Vigilante Forensic?
18  A.  Since October of 2015.
19  Q.  What were you prior to that?
20  A.  I was an employee of Robson
21  Forensic.
22  Q.  Were you doing the same type of
23  work?
24  A.  Yes.

Exhibit D

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 9

1  Q.  Human factors?
2  A.  Yes.
3  Q.  What do you describe as human
4  factors?
5  A.  Basically human factors are
6  ergonomics, which is a synonym, is a science
7  that studies how people interact with their
8  use of all different types of products,
9  machines, systems and environments.
10     And what we're interested from
11  the human factors side is the person that's
12  using the products.  We're interested in their
13  perceptual abilities, that is their ability to
14  see, hear and capture information from the
15  environment, how they process that information
16  and make decisions.  How things such as
17  expectancies and prior experiences affect how
18  we perceive things and how we make decisions.
19     We are also interested in
20  people's physical abilities and limitations.
21  For example, strengths and weaknesses, ability
22  to lift, range of motion, sizings of people,
23  human gait or ability to walk, run, so forth.
24     And then we as a field in a

Page 10

1  professional's work with engineers, designers
2  and architects design products, machines and
3  systems that are easy to use, that are
4  efficient to use and most importantly are safe
5  to use.
6  Q.  Do you work in any capacity
7  other than forensics?  Do you know what I mean
8  by that?
9  A.  Sure.  I do traditional
10  consulting work at times.
11  Q.  What percentage of your work is
12  what you refer to as traditional consulting
13  work?
14  A.  Traditionally it's been a small
15  percentage, anywhere from five to 10 percent.
16  At some points of the year it's zero percent.
17  Q.  When you say percentage, are
18  you talking about percentage of the income you
19  create from it, or are you talking about the
20  percentage of projects?
21  A.  I think they're probably
22  positively correlated, so both.
23  Q.  What percentage of your work do
24  you do for Plaintiffs?  And when I say

Page 11

1  Plaintiffs, I'm talking about in the
2  litigation setting where you are criticizing
3  the warning.
4  A.  Yes, overall my case work tends
5  to trend about 60, 65 Plaintiff, Defendant.
6  Q.  60 to 65 Plaintiff?
7  A.  Yes.
8  Q.  And the rest is Defendant?
9  A.  35, 40 Defendant.
10  Q.  All right.  How many of your
11  Plaintiff clients are insurance companies?
12  A.  Subrogation work is maybe 30
13  percent of my work.
14  Q.  Of your total?
15  A.  Yes.  Maybe that's little high.
16  Q.  How about for Allstate?
17  A.  Allstate, like total percentage
18  of work?
19  Q.  Allstate Insurance, how much
20  work do you do for them?
21  A.  I don't have a number to give
22  you.
23  Q.  Can you give me an
24  approximation?

Page 12

1  A.  I don't think I can give you
2  that.  It would be a wild guess.  I don't
3  track information based upon insurance
4  carrier.
5  Q.  Okay.  Well, how many cases do
6  you have open right now?
7  A.  Open cases, I'm going to say
8  around 50.
9  Q.  And how many of them are
10  currently open that you're retained on behalf
11  of Allstate?
12  A.  I don't know.  I would say that
13  there's at least one other, but I don't know
14  how many more if there is more than that.
15  Q.  How about this office, deLuca
16  Levine, how much work do you do for this
17  office?
18  A.  I've done work for them in the
19  past, and I'm currently working on other cases
20  for them.
21  Q.  And what percentage of your
22  business would you say is from this office or
23  iterations of this office?
24  A.  Yes, maybe less than five

Exhibit D

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 13

1  percent.
2  Q.  How many do you have currently
3  open?
4  A.  I have maybe five, six cases
5  open.
6  Q.  Are any of those on-product
7  warning cases?
8  A.  Yes.
9  Q.  How many?
10  A.  All of them.
11  Q.  On product?
12  A.  Yes.
13  Q.  In each of those cases are you
14  advocating for an on-product warning?
15  A.  In each of those cases I'm
16  advocating to my opinion.
17  Q.  Is your opinion that there
18  should be an on-product warning?
19  A.  It depends on the case.
20  Q.  So the answer to my question
21  would be no, not each of the cases you're
22  advocating for an on-product warning?
23  A.  It depends on the case.  I
24  don't recall the cases at the moment.  So some

Page 14

1  of them may be on-product.  Some of them may
2  not be.  It may not be relevant.
3  Q.  All right.  I'm lost, so let me
4  start over.
5  A.  Sure.
6  Q.  You said you have five or six
7  cases currently with this office?
8  A.  Yes, five or six additional
9  cases.
10  Q.  Additional cases.  And I asked
11  how many of those involve the issue of
12  on-product warning and I thought you said all
13  of them?
14  A.  Yes, maybe I misunderstood the
15  question.  They're all warnings cases.
16  Q.  Yes.
17  A.  I don't recall if all of them,
18  in my opinions, I've come to the opinion that
19  they needed an on-product warning.  Some of
20  them may have been that the on-product warning
21  provided was not effective, and some of them
22  may not have involved an on-product warning at
23  all.
24  Q.  Have you issued reports in each

Page 15

1  of those cases, or are you involved in a case
2  where you haven't yet issued a report?
3  A.  I think most of them I have
4  issued a report.  There may be one or two that
5  I haven't.
6  Q.  Any of them involve
7  motorcycles?
8  A.  No.
9  Q.  Have you ever had a motorcycle
10  case before?
11  A.  In what way?  I've been
12  involved in motorcycle cases in the past where
13  they've been involved in collisions, whether
14  they be multi vehicle or single vehicle,
15  whether they be a dirt bike type vehicle or a
16  road vehicle.  So I've been involved in
17  motorcycle cases in the past.
18  Q.  Well, how about motorcycle
19  cases where the issue is warning?
20  A.  I don't recall any offhand.
21  Q.  Do you own a motorcycle?
22  A.  Yes.
23  Q.  What do you own?
24  A.  I own a Harley-Davidson Softail

Page 16

1  Deluxe 2007.
2  Q.  Is that air-cooled?
3  A.  It is air-cooled.
4  Q.  Does it have any warning
5  stickers affixed to it?
6  A.  I don't think that there's any
7  warning stickers on the exterior of the
8  surfaces.  There may be some under the seat,
9  but I don't recall offhand.
10  Q.  Okay. If you don't recall, then
11  this is probably an unfair question, but what
12  would the stickers under the seat say?
13  A.  My guess, if I have to guess,
14  is that they deal with the electrical system.
15  Q.  Okay.  You're not aware of any
16  other stickers?
17  A.  Nope.
18  Q.  Is this an air-cooled engine?
19  A.  Yes.
20  Q.  Do you idle it at a standstill?
21  A.  Yes, I do.
22  Q.  Okay.  For how long?
23  A.  I've been known to idle it for
24  up to 30 minutes sitting in my garage warming

Page 17

1   up, the same thing Mr. Yazdani was doing on
2   the day of the incident.
3   Q.  How often?
4   A.  Every winter, because I do the
5   same thing that Mr. Yazdani did.  I would
6   start the bike every couple weeks and I would
7   let it run at least 10 minutes, sometimes 20,
8   sometimes up to 30.
9   Q.  Would you do that if there was
10  an item in the manual that said don't do that
11  because it might catch a fire?
12  A.  It doesn't say that in my
13  manual.  In fact, it tells me --
14  Q.  I said if it did.
15  A.  I'm sorry, in my manual it
16  tells me that you're supposed to let it idle
17  and warm up.  If there was a warning in the
18  manual, I would have to see it and figure out
19  why it's there, determine what the
20  consequences are.
21  Q.  The warning in your Softail
22  manual says what about warming it up?
23  A.  There is no warning against
24  warming it up.  It's an instruction that says

Page 18

1   to leave the bike idle and warm up.
2   Q.  Does it say how long?
3   A.  It says:  Starting the Engine,
4   Caution:  The engine should be allowed to run
5   slowly for 15 to 30 seconds.  This will allow
6   the engine to warm up and let oil reach all
7   surfaces needing lubrication.  Failure to
8   comply can result in engine damage.
9   Q.  That is 15 to 30 seconds?
10  A.  Yes.
11  Q.  When you idled your
12  Harley-Davidson -- do you still own it?
13  A.  Yes.
14  Q.  When you do that, how did you
15  determine what was the safe period of time to
16  do it?
17  A.  First of all, I didn't know
18  that there was an unsafe limit on how long to
19  leave it idle at a standstill.  I'm not sure
20  that there is an unsafe time period to leave
21  it idle at a standstill.  So obviously that
22  doesn't apply to my bike.
23      And this is the third
24  Harley-Davidson I've owned, and I've let all

Page 19

1   of them idle for multiple minutes in the
2   winter because I don't winterize the bike
3   because I like to ride them through the winter
4   months when it get a little bit warmer.
5      So I will start them every
6   couple weeks, this has been my practice for a
7   number of years, and let them idle.  How long
8   I let them idle, I let them at least idle 10
9   minutes and sometimes I let them go longer,
10  depending upon what I'm doing.
11  Q.  You let them go longer by
12  choice or you let them go longer because you
13  were distracted and didn't get back to it
14  after 10 minutes?
15  A.  Well, I don't think it's
16  necessarily that I was distracted and didn't
17  get back to it.  It's that I didn't have a
18  concern to let it go a little bit longer if I
19  was involved in something else.
20  Q.  Was it your intent to leave it
21  run for 30 minutes, or did you become involved
22  in something else and not think about it?
23  A.  Yes, I became involved in
24  something else and didn't think about it.  But

Page 20

1   it wasn't my intent not to let it run for 30
2   minutes.
3   Q.  What were the other two
4   Harley-Davidson motorcycles that you owned?
5   A.  I owned a 2006 Softail Deuce
6   and a maybe 2004 Sportster 880.
7   Q.  Do you only own the one now?
8   A.  Yes.
9   Q.  You only one at a time?
10  A.  Yes, that's all my wife will
11  allow.
12  Q.  Understood.  2004, what was it?
13  A.  Sportster.
14  Q.  And you said you did the same
15  in terms of starting them up?
16  A.  Yes.
17  Q.  All right.  When you obtained
18  each of these motorcycles, were they new?
19  A.  They were all used.
20  Q.  Did you get a manual with them?
21  A.  I don't think I got a manual
22  with any of them.
23  Q.  Did you secure a manual?
24  A.  I did for the '07 Deluxe.  I

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-XXXX
Exhibit D

www.TGOakes.com

(5) Pages 17 - 20

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 21

1   don't recall if I did for '06 Deuce.
2   Q.   What about the '04 Sportster?
3   A.   I don't recall.
4   Q.   Why did you get a manual for
5   the '07 Deluxe?
6   A.   Well, typically I do my own
7   work, so I purchased the manual and the
8   service guide so if I have to add something,
9   take something off, do some work I have the
10  material I need to understand how to do so.
11  Q.   When you say you do your own
12  work, are you talking about doing your own
13  maintenance?
14  A.   Sure.  Then I do my own
15  customization.
16  Q.   What kind of customization work
17  do you do?
18  A.   Well, for example, on the
19  Deluxe I replaced the handlebars, the risers
20  and the controllers up front, replaced the
21  cables, clutch cable, brake cable, upgraded
22  them to stainless.  So different things like
23  that.
24  Q.   How long have you been riding

Page 22

1   and working on motorcycles?
2   A.   I started riding when I was
3   preteen, dirt bikes at the time, and then
4   there was a lapse before I bought my first
5   Harley, when I could afford to buy my first
6   Harley.
7   Q.   How long have you owned bikes?
8   A.   Well, I owned them since I was
9   preteen.
10  Q.   How long have you owned
11  Harleys?  When did you buy the 2004?
12  A.   Where or when?
13  Q.   When, what year?
14  A.   I'm going to say maybe 2007,
15  2008.
16  Q.   Did you own bikes before that?
17  A.   I did own bikes before that.
18  Q.   What did you own?
19  A.   I owned dirt bikes.
20  Q.   What type?
21  A.   I had a Yamaha.  That's it.
22  Q.   Just one?
23  A.   Yes.
24  Q.   And when did you buy that?

Page 23

1   A.   Maybe when I was 12, 13.
2   Q.   And had it for how long?
3   A.   I had it until about 17, 18.
4   Q.   And then you had nothing until
5   you bought the Sportster?
6   A.   That's right.
7   Q.   How old are you now?
8   A.   Forty four.
9   Q.   Do you consider yourself an
10  expert in motorcycles?
11  A.   I consider myself maybe an
12  advanced motorcyclist.  I'm not sure that
13  expert would be the correct term.
14  Q.   So the answer to my question is
15  no?
16  A.   The answer to your question is
17  what I gave you.
18  Q.   Can you answer that question
19  yes or no, are you an expert -- do you
20  consider yourself an expert in motorcycles?
21  A.   I would consider myself an
22  advanced rider.
23  Q.   Okay.  Well, we're in a court
24  of law and people are going to be declared

Page 24

1   experts or not.  Are you an expert in
2   motorcycles for purposes of your opinion here
3   today?
4   A.   It depends on the question as
5   to whether or not I'm an expert in that area
6   as it relates to motorcycling.  So if we're
7   talking about rider behavior, I would consider
8   myself, with the experience, knowledge,
9   education and training, to be an expert in
10  that area.
11      If you're talking about whether
12  or not I can whip a bike around the racetrack
13  at 150 miles an hour, I would consider myself
14  not an expert.
15  Q.   How about in design?
16  A.   It depends on the issue.
17  Q.   Outside of the warning issue?
18  A.   It depends on the issue.
19  Q.   What issues do you consider
20  yourself an expert in design of the
21  motorcycle?
22  A.   If there's issues related to
23  controls and displays, I consider myself an
24  expert in the design for a motorcycle or any

Exhibit D

Page 25

1  other product.
2  Q.  All right.  How about other
3  than controls and displays?
4  A.  It depends on the issue.
5  Q.  What issues do you consider
6  yourself an expert in motorcycles other than
7  design and displays generally?
8  A.  Controls, displays,
9  instructional information, warnings.  It could
10  involve training.  It depends on the question.
11  Q.  How about an expert in
12  mechanical operations of a motorcycle, any
13  design and the way it operates?
14  A.  I won't be offering any
15  opinions with regard to the mechanical design
16  of the motorcycle unless I'm asked.
17  Q.  Are you an expert in the issues
18  of mechanical design of motorcycles?
19  A.  Again, it depends on the
20  question.  If I'm asked the question, I'll be
21  happy to answer.  My opinions, as I plan on
22  giving them, are set forth in my report which
23  deal with failure to provide adequate warning.
24  Q.  Are you an expert on how the

Page 26

1  oil system of an air-cooled motorcycle should
2  be designed?
3  A.  I never designed the --
4  Q.  You can answer that yes or no.
5  Can you not answer that question yes or no?
6  A.  Well, first of all, I can
7  answer it if you allow me to finish and not
8  interrupt me.  Second, I'll answer the way I
9  feel best.  If that works for you we can
10  continue.  Otherwise, we can stop now and come
11  back at a later time.
12  Q.  No, we're not going to stop.
13  I'm going to ask the question, you're going to
14  answer the question.  If I don't feel you
15  answered my question, I'll ask you again.  And
16  if I don't feel you answered it again, I'll
17  ask it again.  If we get to the point where
18  you don't answer my questions, perhaps then
19  we'll stop and we'll come back at a later
20  time.
21  So, do you consider yourself an
22  expert in the design of the oil system in an
23  air-cooled motorcycle?
24  A.  Yeah, I would not consider

Page 27

1  myself an expert in the design.  I never
2  designed an air-cooled engine or the oil
3  system for an air-cooled engine.  But there
4  are aspects of it that I may be or have expert
5  insight into, including potentially the
6  problems with the location of the oil sight
7  glass being on the left side of the crane case
8  as opposed to the right side and the potential
9  problems it creates based upon BMW's
10  substandard design.
11  Q.  What is your expertise in
12  motorcycle design that you feel permits you to
13  offer that type of opinion?
14  A.  Well, first of all, I don't
15  plan on offering it unless I'm asked.  But I'm
16  not going to cut myself off from being able to
17  answer it if you do, in fact, ask it.
18  So, any opinions as I
19  plan to give them are laid out in my report.
20  If you want to go into these other areas, I
21  want to reserve my ability to answer them.  So
22  it depends upon the question.
23  MR. LEVINE:  May I interject
24  for just a moment.  As you noticed, I haven't

Page 28

1  been very obstructive.  It is my understanding
2  that Mr. Vigilante's testimony, the scope of
3  will be within the four corners of his report,
4  although, they may be expanded by some
5  responses to your experts' report.  While I do
6  appreciate you're trying to understand the
7  full scopes of his expertise, we are only
8  offering him as an expert within the four
9  corners of his report.
10  BY MR. HEINOLD:
11  Q.  Have you ever written any
12  articles on motorcycle warnings?
13  A.  Not specifically to motorcycle
14  warnings.
15  Q.  Have you done any research on
16  motorcycle warnings?
17  A.  Not specific for motorcycle
18  warnings, but I have done a whole lot of
19  research on the factors that affect the
20  adequacy of product warnings, and I've done
21  research on the perceptions of motorcycle
22  riders for different issues and topics.
23  Q.  Operational issues?
24  A.  Yes.

Exhibit b

Page 29

1 Q.  Any presentations on motorcycle
2  warnings?
3 A.  Not specifically on motorcycle
4  warnings.
5 Q.  Okay.  Any articles or research
6  or presentations on on-product motorcycle
7  warnings?
8 A.  Not related specifically to
9  on-product warnings, but generally related to
10  motorcycle on-product warnings, yes.
11 Q.  Generally, how?
12 A.  Because they deal with product
13  warnings for all, not specifically a
14  motorcycle or specifically another widget, but
15  that apply to all products.
16 Q.  Have you written any articles
17  on on-product labels?
18 A.  Yes.
19 Q.  What have you written on
20  on-product warnings?  Is it in your C.V.?
21 A.  Yes.
22 Q.  Can you identify which ones are
23  related to on-product warnings?
24 A.  Sure.  Do you have a version

Page 30

1  date on there just so we're talking --
2 Q.  I have the version date that
3  you gave me, November 1, 2015.
4 A.  Okay.
5 Q.  Is there an updated version?
6 A.  There looks like that's the
7  most updated version.  So, Page 5, the first
8  one is a Joyce, Byrd, Vigilante, Wogalter
9  article dealing with labeling and format
10  preferences for on-product warnings and
11  labels.
12 Q.  Page 5, the one that says
13  Over-the-counter drug labeling?
14 A.  Correct.  The second one,
15  Consumers' interpretation of the statement:
16  "Do not leave (insert product here)
17  unattended."  That is both on product and in
18  manual.
19 Q.  What was your conclusion in
20  that article?
21 A.  I'm sorry?
22 A.  The Consumers' interpretation
23  of the statement, "Do not leave blank
24  unattended", what was your conclusion?

Page 31

1 A.  Generally, my conclusion is
2  that consumers have a different expectation or
3  understanding of that phrase as opposed to the
4  intention of the manufacturer.
5 Q.  Meaning what?
6 A.  Meaning that they believe the
7  phrase means something different than what the
8  manufacturer intended.
9 Q.  What do you believe they mean?
10 A.  Well, the manufacturer often
11  means it or intends it to mean don't leave the
12  product out of your site, whereas the consumer
13  believes that as long as the product is in
14  what they believe to be a safe state, they can
15  go about their daily lives coming back to
16  check on it on a periodic basis.
17     Particularly, not aware that
18  there's a potential fire hazard or other
19  hazard associated with the product that it can
20  occur at any moment without forewarning or
21  advanced forewarning.
22 Q.  You mean like don't leave this
23  because it might catch on fire?
24 A.  Sure.

Page 32

1 Q.  And that would send a different
2  message than just don't leave this unattended?
3 A.  Well, I think you're maybe
4  minimizing the issue.  It's better off to read
5  the paper.  I don't remember everything that's
6  in the paper.  I've given you the general --
7 Q.  Do you still have these papers?
8 A.  I'm sure I do.
9 Q.  If I requested them, you would
10  be able to find them and produce them?
11 A.  I might.  You can also obtain
12  them.  These are all publicly available.
13     Do you want me to continue?
14 Q.  Sure.
15 A.  The next one is the top of Page
16  6, Nemire and Vigilante.  Page 7, the first
17  one related to on-product is Vigilante
18  Wogalter 1999.
19     MR. LEVINE: Can you just spell
20  Wogalter for her?
21     THE WITNESS: W-O-G-A-L-T-E-R.
22  The second one also deals with on-product
23  labeling, Vigilante, Wogalter 1998.
24     BY MR. HEINOLD:

Page 33

1  Q.  Did you study under him?
2  A.  Mike Wogalter is my major
3  advisor.  Wogalter, Conzola and Vigilante,
4  2006 is applicable to the design of the text
5  in on-product warnings.  There's a similar
6  publication under that, Wogalter, Vigilante,
7  1999.
8      Next page, Wogalter, Vigilante,
9  2006 is a book chapter related to the
10  attention switch and maintenance of warnings
11  both on product and in manual.  Wogalter,
12  Vigilante 2010 deals with formatting of on
13  product labels.
14  Q.  Some of these were written when
15  you were a student at NC State?
16  A.  Some of them were done while I
17  was a graduate student at North Carolina State
18  University.
19  Q.  I also saw in your C.V. that
20  you listed the Motorcycle Safety Foundation.
21  What is that?
22  A.  The Motorcycle Safety
23  Foundation is a nonprofit organization in this
24  country that looks to improve the safety of

Page 34

1  motorcyclist by offer of training and
2  education.  Many states, such as Pennsylvania,
3  it's Motorcyclist Safety Foundation classes
4  are offered free to licensed motorcyclists in
5  those looking to be a licensed motorcyclist.
6  Q.  What are the important issues
7  of safety that they're dealing with, mostly
8  operation?
9  A.  Mostly operation, and some of
10  them deal with, for example, precheck
11  inspections of the motorcycle.  But most of
12  the emphasis is on road traveling safety.
13  Q.  Have you published anything in
14  your work in that organization?
15  A.  I have not.
16  Q.  Do you serve -- in what
17  capacity do you serve in the organization?
18  A.  I don't serve in any capacity.
19  I've taken some of their education that they
20  offer.
21  Q.  You're a member?
22  A.  I'm not a member.
23  Q.  You're not a member.  There's
24  just classes that you take?

Page 35

1  A.  Sure.
2  Q.  Are they operational classes?
3  A.  Well, again, they deal with
4  basic rider course.  It deals with everything
5  from personal protective equipment to pretrip
6  inspections, the correct purchasing of the
7  equipment to issues related while you're
8  riding or traveling.
9  Q.  How many classes have you
10  taken?
11  A.  I've taken two.
12  Q.  And when did you take those?
13  A.  The basic rider course was
14  probably 2005.  The off-highway motorcycle
15  course maybe 2006, 2007.  Or I'm sorry, the
16  basic rider course was 2006, 2007.  The
17  off-highway motorcycle course was maybe a year
18  or two before that.
19  Q.  Anything about warnings in that
20  organization?
21  A.  How do you mean?
22  Q.  Well, anything taught about
23  warnings?
24  A.  Well, I'm sure they give plenty

Page 36

1  of warnings.
2  Q.  You said you took two classes.
3  Anything about warnings in those two classes?
4  A.  I don't understand what you're
5  asking me.
6  Q.  You're not a member of the
7  organization?
8  A.  That's correct.
9  Q.  You don't serve in any
10  capacity?
11  A.  I don't serve in any
12  capacity, that I'm aware of.
13  Q.  You don't hold a position where
14  you're an officer or a director or anything of
15  that nature?
16  A.  No, I do not.
17  Q.  Have you taught classes there?
18  A.  No, I have not.
19  Q.  So you've taken two classes?
20  A.  That's correct.
21  Q.  One was basic rider class and
22  one was an off-road riding class?
23  A.  That's correct.
24  Q.  And neither of those two

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 37

1  classes, did they address the issue of
2  warnings, motorcycle warning, manual or on
3  product?
4  A.  Are you asking me whether they
5  addressed the design and development of
6  warnings for motorcycles in the class, or are
7  you asking whether or not they provided
8  warnings related to the operation or ownership
9  of motorcycles in those classes?
10  Q.  Did they teach you about
11  warnings?
12  A.  Yes, I'm going to say yes.
13  Q.  What did they teach you?
14  A.  That you should look for
15  warnings and follow the warnings that they
16  provide during the classes and during the
17  training.
18  Q.  Were they classes -- they did
19  provide warnings during classes and training?
20  A.  Sure.
21  Q.  Were they operational in terms
22  of riding warnings?
23  A.  Sure.  They would give you
24  warnings.  For example, you should wear a

Page 38

1  helmet.  You should wear eye protection.  You
2  should practice the search, evaluate, execute
3  strategy when riding to potentially avoid
4  collisions.  So I'm sure that there was
5  multiple warnings that they gave through the
6  classes and trainings.
7  Q.  Any warnings that you would
8  consider relevant to your opinions in this
9  case?
10  A.  No.
11  Q.  I have your Testimony List.  Is
12  that up to date?
13  A.  Do you have a date on it?
14  Q.  1/1/16.
15  A.  It's been updated since then.
16  Q.  Okay.  Have any of these -- any
17  of the cases on the Testimony List involved
18  motorcycles?
19  A.  If you give me a moment, I'll
20  be happy to check.
21  A.  Okay.  Two of them.
22  Q.  Okay.  Which ones?
23  A.  August 2013, David Vititoe vs.
24  Rocky Mountain Pavement Maintenance,

Page 39

1  Incorporated, et al.
2  Q.  This is 2013?
3  A.  Yes.  And then 7/2014, Ramon
4  Ernesto Ortega vs. Hector Enrique Lopez,
5  Osceola Farms.  That's a motor scooter, not a
6  motorcycle.
7  Q.  Which one was that?  I'm
8  sorry.
9  A.  July 2014.
10  Q.  Vandenberg vs. Brunswick?
11  A.  I'm sorry, that's actually a
12  typo.  That should be 2015.
13  Q.  All right.  So July 2014 as it
14  appears at Page 4 at the top, Vandenberg vs.
15  Brunswick?
16  A.  On my Page 5 it's July 2014,
17  out of order.  It goes from June --
18  Q.  Oh, I see, okay.
19  A.  Sorry about that.
20  Q.  No.  I was looking at the top
21  of Page 4, July of 2014, Vandenberg vs.
22  Brunswick.
23  A.  No, that's not it.
24  Q.  In that case, who -- in

Page 40

1  Vandenberg vs. Brunswick, who retained you?
2  A.  I was retained on behalf of the
3  Plaintiff.
4  Q.  What was the issue in that
5  case?
6  A.  That had to do with fall
7  protection on the upper deck of a pleasure
8  yacht.
9  Q.  Is that case still pending?
10  A.  That --
11      MR. LEVINE:  Experts are often
12  the last to know.
13      MR. HEINOLD:  Only if their
14  bill has not been paid.
15      THE WITNESS:  That one went to
16  trial in June of last year.
17      BY MR. HEINOLD:
18  Q.  What was the result?
19  A.  I don't recall.  And I don't
20  know if the bill was paid.
21  Q.  So Orgega vs. Lopez and Osceola
22  Farms, is that July 2015 or '16?
23  A.  2015.
24  Q.  Okay.  And that was also a

Page 41

1    motorcycle case?
2    A.   That was a motor scooter.
3    Q.   Okay.  What was the issue in
4    that case?
5    A.   That was a truck versus motor
6    scooter collision at a T-intersection, and it
7    had to do with the ability of the operators to
8    see and avoid each other.
9    Q.   How about the Vivitoe case?
10   A.   Vivitoe was a Harley-Davidson
11   Softail Deluxe that ran into the back of a
12   trailer that was attached to a truck that was
13   stopped on a four-lane roadway at a green
14   traffic light at night.
15   Q.   Who retained you in this case?
16   A.   I was retained on behalf of Mr.
17   Vivitoe.
18   Q.   Did that go to trial?
19   A.   Yes.
20   Q.   What was the result?
21   A.   They found for David Vivitoe,
22   although the damages were less than Plaintiff
23   I think was hoping for.
24   Q.   Which sometimes occurs.

Page 42

1    A.   He wasn't wearing a helmet.
2    Q.   But neither of those dealt with
3    warnings -- did either of those deal with
4    warnings?
5    A.   Well, they didn't deal with
6    product warnings, per se.  The Vivitoe issue
7    was an issue of the failure of the lights on
8    the back of the trailer to provide adequate
9    warning as to the stopped state of the tractor
10   trailer.
11   Q.   Did any of this testimony deal
12   with motorcycle warnings?
13   A.   Warnings on the motorcycle
14   itself?
15   Q.   Yes, or related to the
16   motorcycle?
17   A.   Nothing in the Vivitoe matter.
18   The warnings related to the signals on the
19   back of the trailer of the truck.
20        The Ortega matter, I don't
21   recall if the issue was -- I don't recall if
22   the -- I don't recall if the issue was
23   related -- part of the issue was related to
24   whether or not Ortega was using his headlight

Page 43

1    and his turn signal.  I just don't recall if
2    that was an issue.
3    Q.   Okay.  Any of these involve the
4    assessment of the manufacturer's warnings,
5    whether in manuals or on product?
6    A.   No.
7    Q.   And I'm not limiting that
8    question to motorcycles.
9    A.   I don't understand.
10   Q.   The first questions I asked
11   about motorcycles.
12   A.   You're talking about these two
13   specific cases?
14   Q.   No.  I'm talking about your
15   list.  On your list, any of these cases --
16   your testimony in any of these cases concern
17   manufacturer's -- the quality of
18   effectiveness, et cetera, of the
19   manufacturer's warning, whether in a manual or
20   on product?
21   A.   Yes.
22   Q.   Can you tell me which ones?
23   A.   Starting on my copy it's the
24   first one, 2012, that's the Power vs.

Page 44

1    Electrolux North America.  The next one is a
2    product warnings case.
3    Q.   Tell me about Power, what was
4    the issue in Power?
5    A.   It was the failure to provide
6    adequate warning on a clothes dryer regarding
7    a lint fire hazard associated with the design
8    of the dryer.
9    Q.   And you were retained by whom?
10   A.   Looks like American Family
11   Mutual Insurance Company.
12   Q.   What was your opinion?
13   A.   All of them?
14   Q.   Give me the thumbnail.
15   A.   That the manufacturer failed to
16   provide adequate warning.
17   Q.   And what was your solution?
18   A.   The solution was to provide
19   adequate warning.
20   Q.   In what method?
21   A.   In had to do both with the
22   design of the product and the supplementation
23   of that design with an on-product warning or
24   the failure to provide a design solution

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
Exhibit B
www.TGOakes.com

(11) Pages 41 - 44

Page 45

1  adding a warning to the product.
2  Q.  Did that go to trial or is that
3  still active?
4  A.  That one settled.
5  Q.  Okay.  What was the next one?
6  A.  Next one is Royal Indemnity
7  Company vs. Crane Company, et al.
8  Q.  Okay.
9  A.  The next one is --
10  Q.  Tell me about it.
11  A.  That one was a product warning
12  case.  I think that was fiber reinforced
13  plastic panels that were installed in an oven
14  room of a manufacturer of chicken nuggets, I
15  believe, food processor.
16  Q.  And you were retained on behalf
17  of whom?
18  A.  One of the insurance companies
19  for the company, the manufacturer or -- not
20  the manufacturer of the product, the
21  manufacturer of the chicken processor is
22  probably a good way to put it.
23  Q.  Is your conclusion that
24  whatever warning was at issue was satisfactory

Page 46

1  or unsatisfactory?
2  A.  I'm going to say they didn't
3  provide warning as to the fire hazard
4  associated with the use of the panels they
5  were selling with it.  That was part of the
6  problem.
7  Q.  What was the next case?
8  A.  Jessica Durkin vs. Paccar,
9  Incorporated, et al.
10  Q.  Are all of these -- would you
11  say all of these are warnings cases for
12  products?
13  A.  No.
14  Q.  Okay, go ahead.  How many would
15  you say there are?
16  A.  I can count them.
17  Q.  Go ahead, why don't you count
18  them.
19  A.  Do you want me to start from
20  the top or do you want me to count the ones we
21  already talked about?
22  Q.  We got two.  You can begin at
23  three.
24  A.  Now, just to clarify, are we

Page 47

1  looking at product warnings or are we looking
2  for warnings in general?
3  Q.  Looking for product warnings.
4  A.  Okay.  I'm counting 15.  I
5  would say 15.
6  Q.  Can you identify which ones?
7  A.  Sure.  So we did the two.  The
8  next one is 5/12 Jessica Durkin v. Paccar,
9  Incorporated.  The next one is also --
10  Q.  Can you tell me what the
11  product was?
12  A.  That was a bulkhead, aluminum
13  bulkhead, I believe it was an aluminum
14  bulkhead on a flatbed trailer.
15  Q.  Okay.
16  A.  The next one is also in May of
17  2012, Kleiman vs. Jay Peak, Incorporated.
18  Q.  What was the product?
19  A.  That was a gas fireplace.
20  Q.  If I say generically, on the
21  Durkin case, you were retained on the side of
22  the Plaintiff?
23  A.  Yes, I was retained on behalf
24  of the deceased Plaintiff, estate of.

Page 48

1  Q.  The Kleiman case on behalf of
2  the Plaintiff?
3  A.  Retained on behalf of the
4  Plaintiff's parents.
5  Q.  Okay.  What's next?
6  A.  10/2012, Mitchell Robinson, et
7  al. vs. YJ USA Corporation doing business as
8  JumpKing.
9  Q.  Okay.  What was the product?
10  A.  That was a trampoline.
11  Q.  And what was your -- were you
12  retained on behalf of the Plaintiff?
13  A.  Yes.
14  Q.  Okay.  Next?
15  A.  January 2013, it looks like
16  John and Emily McGrath vs. Rust-Oleum
17  Corporation.
18  Q.  Product?
19  A.  Yes.
20  Q.  What type?
21  A.  That I think that was a stain.
22  Q.  Were you retained on behalf of
23  the Plaintiff?
24  A.  Yes.

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 49

1  Q.  Next, please.
2  A.  Jacqueline Down and IDA Wescott
3    vs. USC.
4  Q.  What was the product?
5  A.  That was a pole vault mat.
6  Q.  Okay.  And were you retained
7    behalf of Plaintiffs?
8  A.  Yes.
9  Q.  Okay.  What is next?
10  A.  I think, I'm not a hundred
11    percent sure, but I think Megan Smith vs. In
12    Gear Fashions was a warnings case.
13  Q.  What was the product?
14  A.  It would be clothing.  I don't
15    remember exactly what article of clothing.
16  Q.  Were you retained on behalf of
17    the Plaintiff?
18  A.  I'm going to guess yes.
19  Q.  What would the next one be?
20  A.  February 2004, Jesus Flores v.
21    Alexander Andrew, doing business as Fall
22    Tech.
23  Q.  You said 2004, you meant 2014?
24  A.  You're correct.

Page 50

1  Q.  What was the product?
2  A.  That was a fall arrest system.
3  Q.  Like a harness?
4  A.  Well, it was the complete
5    system.  I'm trying to think now if that
6    actually involved an on-product warning.  So
7    we'll put that in the maybe category.
8  Q.  Okay.  Were you retained on
9    behalf of the Plaintiff?
10  A.  Yes.
11  Q.  Okay.  What would the next one
12    be?
13  A.  Next one that I see is March
14    2015, Member Select Insurance Company vs.
15    Electrolux Home Products and Sears.
16  Q.  What was the product involved
17    in that?
18  A.  That was a clothes dryer.
19  Q.  What was the issue?
20  A.  Multiple issues, but failure to
21    warn.  Failure to provide adequate on-product
22    warning was one of the issues.
23  Q.  Was that a dryer fire?
24  A.  Yes, lint dryer fire.

Page 51

1  Q.  Were you retained on behalf of
2    the Plaintiffs?
3  A.  Yes.
4  Q.  What would the next one be?
5  A.  Virginia and Robert Nester v.
6    Textron, Incorporated.
7  Q.  Okay.  What was the product
8    involved?
9  A.  That's a golf car.
10  Q.  Golf cart?
11  A.  Golf car.
12  Q.  Car?
13  A.  Car.
14  Q.  Like you drive around on the
15    golf course?
16  A.  Yes.
17  Q.  Were you retained on behalf of
18    the Plaintiff?
19  A.  Yes.
20  Q.  What was the issue in that
21    case?
22  A.  The issue was -- that I was
23    asked to address?
24  Q.  Yes.

Page 52

1  A.  The failure of the on-product
2    warning to effectively and adequately
3    communicate the risks that were involved with
4    the incident.
5  Q.  What was the risk?
6  A.  Inadvertent activation of the
7    golf cart.
8  Q.  Okay.  What was the next one?
9  A.  The next one looks to be June
10    2016, Westfield Insurance vs. Modern Glass
11    Paint and Tile Company.
12  Q.  What was the product about?
13  A.  That may have been a stain as
14    well.
15  Q.  Were you retained on behalf of
16    the Plaintiff?
17  A.  Yes.
18  Q.  What's the next?
19  A.  August 2015, United Preferred
20    Insurance Company vs. Electrolux North
21    America.
22  Q.  What was the product involved?
23  A.  Clothes dryer.
24  Q.  Lint fire?

Thomas G. Oakes Associates
1-877-625-3777   www.TGOakes.com

Exhibit D

Page 53

1 A.  Lint dryer fire, yes.
2 Q.  Were you retained on behalf of
3 the Plaintiff?
4 A.  Yes.
5 Q.  What's next?
6 A.  Kelvin and Krystle Carr vs.
7 Taylor Industries, LLC.
8 Q.  What product was involved?
9 A.  That was an oil well service
10 rig.
11 Q.  Were you retained on behalf of
12 the Plaintiff?
13 A.  Yes.
14 Q.  Next one?
15 A.  That's it.
16 Q.  You had said 15, I counted 14.
17 A.  Yes, I told you I thought it
18 was about 15.
19 Okay.  Well, I'm not going to
20 cross-examine you on that.  If I did, I don't
21 think I'd win the case.
22 Have you ever been precluded
23 from testifying by a Court?
24 A.  Sure.

Page 54

1 Q.  How often?
2 A.  There are two Daubert
3 challenges where the Judge ruled that I would
4 not be allowed -- actually, one Daubert
5 challenge where they would not allow me to
6 testify in a case.
7 And then there was a case in
8 Virginia State Court where a Judge wouldn't
9 let me testify because she fell the state of
10 Virginia didn't recognize the field of or
11 science of human factors.
12 Q.  Are either of those on your
13 Testimony List?
14 A.  No.
15 Q.  They preceded that or did you
16 not give testimony?
17 A.  The Daubert case was 2004 where
18 the Judge ruled that the field of psychology
19 was nothing more than common sense.
20 Therefore, my opinions were beyond the
21 province of the Jury.  The Virginia case was,
22 I'm going to say, around the 2010 time frame.
23 Q.  What Federal Court was the
24 Daubert challenge?

Page 55

1 A.  Well, I've had multiple Daubert
2 challenges that have been successfully
3 overcome in the last dozen years.
4 Q.  I'm talking about the one that
5 you were precluded.
6 A.  That one was either Connecticut
7 or New York.
8 Q.  If New York, the Southern
9 District?
10 A.  I don't remember whether it was
11 New York or Connecticut.  I don't remember
12 which particular district.
13 Q.  Have you been precluded any
14 other times?
15 A.  The only other thing I can
16 remember was after -- I was in trial in
17 Florida State Court and the defense objected
18 to my testimony and the Judge had me go and
19 direct the Plaintiff outside the Jury's
20 purview, and then ruled afterwards that he
21 wasn't going to let any expert testify.
22 So, I think that would preclude
23 me from testifying.  But I don't think it had
24 anything to do with my testimony.  The Judge

Page 56

1 felt it was a veracity issue between the
2 Plaintiff and Defendant, so he wasn't going to
3 let any expert testify.
4 Q.  Any others?
5 A.  Not that I can recall.
6 Q.  Have you ever been -- have you
7 ever had any portion of your testimony
8 restricted going into trial by Daubert or any
9 other reason other than what you just told me?
10 A.  I'm pretty sure my testimony is
11 always restricted to what my opinions are in
12 my field.
13 Q.  Do you know what I mean by that
14 question?
15 A.  You're saying that --
16 Q.  Someone filed a Motion and said
17 I want to preclude him and the Judge precluded
18 some of it, but not all of it?
19 A.  The only time -- if they were
20 the opinions I was planning on giving, the
21 Judge wouldn't let me give all them, the only
22 time I can remember was a Court in Maryland
23 involving a bicycle collision where the
24 bicyclist hit a defect in the sidewalk, and I

Page 57

1 think the Judge only allowed me to testify on
2 certain -- or only provide certain opinions of
3 the substantive opinions that I planned to
4 give.
5 Q.  Do you know why you were
6 restricted?
7 A.  I don't know why.
8 Q.  Well, do you know whether you
9 were restricted because your opinions were not
10 scientific?
11 A.  I don't believe that my
12 opinions have ever been found to be not
13 scientific.
14 Q.  Has any of your testimony, to
15 your knowledge, been stricken after you have
16 testified by a trial judge or subsequently on
17 appeal?
18 A.  No.
19         - - -
20 (Whereupon, a short break was taken at
21 this time.)
22         - - -
23     THE WITNESS: I remembered
24 another Daubert challenge in Virginia State

Page 58

1 Court where the Judge ruled that the hazard
2 was an act of God.  Therefore, there was no
3 responsibility on behalf of the manufacturer
4 to provide a warning.
5     BY MR. HEINOLD:
6 Q.  So someone filed a Daubert
7 Motion to preclude you and the Judge granted
8 that Motion because he said there was no need
9 for a warning because the event was an act of
10 God?
11 A.  Mine and the other expert in
12 the case.
13 Q.  Expert for Plaintiff or
14 Defendant?
15 A.  Plaintiff, same side.
16 Q.  I saw in your C.V. some various
17 publications that are references to what I'll
18 call ordering and prioritizing warnings and
19 product manuals?
20 A.  Okay.
21 Q.  Does that sound correct, my
22 general statement?
23 A.  Sure.
24 Q.  You recognize what I'm talking

Page 59

1 about?
2 A.  I believe so.
3 Q.  What does that mean, what are
4 those articles?
5 A.  Generally, it's an issue with
6 the way manufacturers provide information in
7 manuals.  These were studies that looked
8 at -- they were for power tools, there were
9 multiple power tools and they were UL listed
10 power tools.  And UL has a certain set of
11 requirements for warnings to be presented in
12 the literature for the particular product to
13 be UL certified.
14     The problem is that the
15 manufacturers are taking that list of warnings
16 and dropping them in within the order that UL
17 is providing.
18 Q.  Do you mean sort of the
19 numerical order of the UL requirements?
20 A.  No.  UL has a list of warnings,
21 these warnings have to be in the literature,
22 and they just list them out.  There's no real
23 reason or intention for -- on behalf of UL to
24 say this is the order in which you have to

Page 60

1 present the warning.  It's just these are the
2 list of warnings you have to present.
3     The problem with it is that a
4 lot of UL warnings are what we would consider
5 common sense, warnings that people would have
6 information on.  So, for example, don't
7 submerge an electrical product into water,
8 that's a fairly well-known warning dealing
9 with electrical tools.  So why should that be
10 first on the list.
11     Later on in the list and other
12 warnings that the manufacturer give that
13 product specific are lesser known hazards,
14 lesser known instructions, lesser known
15 information, and they tend to be populated at
16 the bottom of the list.
17     One of the things we know from
18 a warnings perspective is if you give people
19 warnings that they're well aware of at the
20 start of a list or at the start of a
21 publication they're going to stop reading it
22 because they're going to think that it's
23 information they already know or have or
24 self-evident and therefore, there's no reason

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
Exhibit D
www.TGOakes.com

(15) Pages 57 - 60

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 61

1    to spend the time reading through an entire
2    list of obvious information.
3        So if you want to get the user
4    to read and understand information that is
5    specific to your product or unique to your
6    product, you need to provide it higher in that
7    prioritization or make it more of a priority
8    in the way you're presenting it in the manual.
9    Q.   Were there rules about that?  I
10   mean, did you come to conclusions about how to
11   prioritize it?
12   A.   There are conclusions in the
13   studies.  Typically, I suggest in the study
14   that you put information that people are not
15   aware of, not open and obvious, not commonly
16   known first, present that information first so
17   the user will recognizes that they're getting
18   information that they didn't know, information
19   that is important, that it's filling knowledge
20   gaps and that it's worthwhile to continue
21   reading.
22   Q.   Those were studies that you
23   did?
24   A.   Yes.

Page 63

1    manuals.  So those are one that are specific
2    to product manuals.
3    Q.   Have you done any other
4    research on the issue of prioritizing warnings
5    on products?
6    A.   On product, yes.
7    Q.   What have you done for
8    prioritization on-product warnings?
9    A.   What I've published under
10   Publications and Presentations is Page 7 would
11   be Vigilante Wogalter, The ordering of
12   over-the-counter pharmaceutical label
13   components.
14   Q.   What year?  Oh, I see, 1997,
15   The preferred order of over-the-counter
16   pharmaceutical label components?
17   A.   Yes.
18   Q.   Did that deal with on-product?
19   A.   Yes.
20   Q.   Only?
21   A.   That was only on-product.  The
22   information on that study was used by the FDA
23   when they redid their over-the-counter
24   labeling format requirements in 1999.

Page 62

1    Q.   And you did those while at NC
2    State as a graduate student?
3    A.   Yes.
4    Q.   I didn't see any other
5    publications on that topic of prioritizing in
6    manuals, warnings in manuals, except for two,
7    1997, 1996.  Did I miss any?
8        I mean, when I asked the
9    question about prioritization you went to
10   those studies.
11   A.   The first two that are related
12   to the prioritization of warnings and product
13   manuals are Vigilante 1998 and Vigilante 1997,
14   and then should be a --
15   Q.   Okay.  That's on Page 6, 1998,
16   Product manual safety warnings effective
17   ordering?
18   A.   Yes.
19   Q.   And 1997, okay.
20   A.   Okay.  Then on the next page,
21   Vigilante, Wogalter 1997 on the prioritization
22   of safety warnings in product manuals.  And
23   then there's Vigilante, Wogalter 1996,
24   Ordering of safety warnings in product

Page 64

1    Q.   When you talk about on-product
2    on over-the-counter pharmaceuticals, are you
3    talking about on the package?
4    A.   On the container of the, for
5    example, medication pills or tablets or
6    whatever, your aspirin bottle or your Tylenol
7    bottle or what have you.
8    Q.   What conclusions did you reach
9    there?
10   A.   Well, the conclusions that I
11   reached was the way medication label --
12   over-the-counter medication labeling was
13   presented, the information was presented was
14   with information that the user, the end user
15   didn't care about, couldn't understand, didn't
16   need.
17       So it gets into the problem,
18   again, where you're presenting information
19   that's irrelevant or not understandable to the
20   consumer and preventing them from getting the
21   information that they need which is buried
22   further in the label.
23       So if you put the information
24   the user needs up front, like, for example,

Page 65

1 directions and contraindications, the user
2 doesn't have to go searching for it.  They're
3 more likely to see it and they're more likely
4 to read it.
5 Q.  So, for example, a bottle of
6 aspirin, you're talking about putting it on
7 the bottle?
8 A.  Yes.
9 Q.  Not the box, not the inserts?
10 A.  Well, I think the requirements
11 for the box and the insert -- excuse me, the
12 box and the bottle are the same because a lot
13 of medications, over-the-counter medications
14 are sold just in a container, not a box,
15 although some are sold in the box, the
16 container in the box.
17 Q.  All right.  I read your report,
18 you listed the things that you reviewed and
19 relied on.  Is there anything that you didn't
20 list that you reviewed or relied on?
21 A.  As far as discovery material, I
22 list everything in here that I reviewed for
23 this case.  As far as specific references used
24 to support my opinions, I provided them in

Page 66

1 Section G.
2     Other things that I'm relying
3 upon are my education, experience and
4 training.  And then I did bring some
5 additional photographs that I did not provide
6 in the report.  And I did have a couple other
7 websites that I had looked at, downloaded
8 prior to writing my report that I didn't
9 reference specifically in the report.
10 Q.  So is this something you can
11 provide me?
12 A.  Sure.
13 Q.  That I can see it, or are you
14 going to tell me I have to write it down?
15 A.  Do you want to see it now or
16 you want it later?
17 Q.  I don't know what they are.
18 A.  Sure.
19 Q.  I mean, we can do it later.
20 A.  I provided my entire file on
21 the thumb drive.  It's my understanding you
22 wanted a copy of my entire file.
23 Q.  Oh, here (indicating)?
24 A.  Yes, it's yours to take home.

Page 67

1 Q.  It's kind of hard for me to
2 question you about it if it's on the thumb
3 drive.
4 A.  The other stuff I did bring
5 hard copies so we can look at it here.
6 Q.  Extra hard copies?
7 A.  Not extra ones.  Just one copy.
8     MR. LEVINE: I can make
9 copies.
10     BY MR. HEINOLD:
11 Q.  Of what?  What did you bring?
12 A.  So, for example --
13 Q.  Of the things that are on
14 there?
15 A.  -- I brought some printouts
16 from websites dealing with winterization of
17 motorcycles, overheating of air-cooled
18 engines, water-cooled engines, et cetera.  And
19 then I brought several photographs of
20 different motorcycles.  One is a Yamaha YZF,
21 1998, depicting the oil sight glass on the
22 right side of the engine so that when it's on
23 its kickstand the oil doesn't cover the oil
24 sight glass like it does on the incident

Page 68

1 bike.
2     I also photographed warnings
3 that are on the bottom of that motorcycle.  As
4 I'm sure one of the things you've asked about
5 was -- for instance, the propensity of
6 likelihood of the manufacturers to put
7 warnings directly on the body of the
8 motorcycle.
9     So here's an example of the
10 Yamaha putting a warning sticker right on the
11 fuel tank above the Yamaha YZF sport bike and
12 a warning on the windshield front fairing of
13 the bike.
14     Then I brought a photograph of
15 a BMW, 2010 BMW F800 GS showing the dipstick
16 on the left side of the crank case in a
17 similar position, although not exact, same
18 position as the oil sight glass on the
19 incident bike.
20     And then I provided just an
21 article from American Motorcyclist in 2007
22 that categorizes the Yamaha YZF and the
23 BMW R1150 R sports bike.  So they're in the
24 same category as opposed to my

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 69

1  Harley-Davidson, which is a different category
2  of bike.
3      And then I brought photographs
4  of the control panel console and the steering
5  head of an R1150 R BMW motorcycle and an
6  R1100rsl motorcycle.
7      In my report I discuss
8  alternatives to place the warning on the bike,
9  and I wanted to bring photographs to show the
10  area I was talking about so we are clear and
11  on the same page as to what I was referring to
12  in the report.
13  Q.  Is all of this information that
14  you just generalized for me here something you
15  had prior to writing your report?
16  A.  I had everything except for the
17  photographs of the Yamaha YZF and photographs
18  of the F800 GS.  Just to clarify, I did see
19  both bikes in person prior to writing my
20  report.  I didn't photograph them until after
21  writing my report.
22  Q.  Okay.  Why did you not include
23  those in your report?
24  A.  I didn't think it was necessary

Page 70

1  at the time.
2  Q.  Why do you think it's necessary
3  now?
4  A.  Because I knew you would ask me
5  about everything I looked at and I tried to
6  make sure my file was complete as possible.
7  Q.  Did you think when you were
8  writing your report I wasn't going to ask you
9  that?
10  A.  Typically when I write my
11  report I write it to express my opinions and
12  support my opinions.  When I get ready for a
13  deposition I try to anticipate what's going to
14  be asked or required by the opposing attorney.
15      MR. HEINOLD: I would like to
16  get copies of those, Ken.  You don't have to
17  do it this minute.  You can do it when we take
18  a break.
19      MR. LEVINE: Okay, next break
20  I'll send it out for colored copies.
21      MR. HEINOLD: I am going to
22  want to ask him about that.  Having not seen
23  them I'm at a disadvantage at this moment.
24      BY MR. HEINOLD:

Page 71

1  Q.  Other than those additional
2  things, is there anything else in your report
3  that you reviewed or relied for purposes of
4  this case? I'm sorry, that you reviewed or
5  relied on?
6  A.  The only additional work I did
7  was review the report of -- I think his name
8  was Mr. Breen?
9  Q.  Yes.
10  A.  So I think that's the only
11  additional thing I did other than prepare for
12  the deposition.
13  Q.  And does the list of the things
14  you reviewed and the report fairly depict all
15  work that you've done to perform -- to prepare
16  your report in this case and reach your
17  opinions?
18  A.  I'm not quite sure I understand
19  that.
20  Q.  Okay.  Tell me what you did to
21  prepare your report.  I don't mean sit down
22  and prepare your report, but I mean from the
23  time you were retained in this case -- when
24  were you retained, by the way?

Page 72

1  A.  I was officially retained in
2  October of 2015.  I should say Vigilante
3  Forensic was retained in I think October of
4  2015.  I may have been retained prior than
5  October 2015 when I was with my prior
6  company. I don't have the file from my prior
7  company because I left.  So I don't have the
8  inquiry sheet, if it was created before then.
9  Q.  Do you have a list of the
10  activities you performed in this case?
11  A.  I don't have a list of
12  activities, per se.  But typically my reports
13  are written in the way that I can go through
14  the file.
15      So, for example, I'll start
16  with a brief understanding of the issue, and
17  then I'll discuss a purpose to my
18  investigation.  That is the hypothesis I want
19  to test, and then I'm provided with the
20  discovery material that's available.  I'll go
21  through that material to get a better
22  understanding of the product, of the issue
23  relevant to my purpose, and I'll go through
24  the information to determine what happened and

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
Exhibit B
www.TGOakes.com

(18) Pages 69 - 72

Page 73

1 how it happened.
2     So, for example, Mr. Yazdani's
3 testimony as to what he did, why he did, how
4 he did it.  And then I go through my analysis,
5 and in going through my analysis I corporate
6 my education, training and experience to
7 determine and test my hypothesis.
8     So the first thing I addressed
9 was did BMW provide adequate warning?  My
10 analysis goes through the steps on how I came
11 to my conclusions that they failed to provide
12 adequate warning.  Then the next thing I did
13 was looked at whether BMW North America was
14 aware of the need to provide on-product
15 warning.
16 Q.  I seen your report.  We don't
17 have to go through it.
18     I'm interested in, for example,
19 you mentioned that you inspected some other
20 vehicle, some other motorcycles?
21 A.  Yes.
22 Q.  Okay.  And in your report you
23 say you may use as Exhibits as photos --
24 looking at Page 2, photos of the incident

Page 74

1 motorcycle and exemplar motorcycle.  You
2 didn't say that you had looked at other
3 motorcycles.
4 A.  I'm sorry?
5 Q.  So I'm wondering what other
6 activities that you conducted prior to
7 authoring your report?
8 A.  Well, I did --
9 Q.  You reviewed the material that
10 you said was available?
11 A.  Yes.
12 Q.  What else?
13 A.  I looked at the websites to get
14 information on issues that are relevant.  I
15 looked at my motorcycle manual.  I looked at
16 my motorcycle.  I talked to a friend of mine
17 that is an expert in motorcycles.  And when I
18 was at his place back in October I looked at
19 his bikes which are the photographs that I
20 took later on.
21 Q.  Who is that person?
22 A.  Erin Higinbotham.
23 Q.  And you say he is?  What is he?
24 A.  Well, he's an engineer with a

Page 75

1 background in I guess design, development and
2 testing of motorcycles.
3 Q.  And what did you ask?
4 A.  We talked about my experiences
5 and his experiences.  We talked a little bit
6 about the use of oil sight glasses in bikes,
7 his experience with them, my experience with
8 them.  Just kind of generalities.
9 Q.  Did he give you any information
10 you thought useful?
11 A.  Yeah, I don't think that he
12 told me anything I didn't know.
13 Q.  Where is he?
14 A.  He's located in Ohio.
15 Q.  You went out there?
16 A.  Well, I was out there for
17 another case that he and I were investigating.
18 Q.  Where in Ohio?
19 A.  He's outside of Columbus.
20 Q.  Does he operate a business?
21 A.  Yes.
22 Q.  What's the name of his
23 business?
24 A.  830 Engineering.

Page 76

1 Q.  8-3-0?
2 A.  Correct.
3 Q.  What town?
4 A.  I'm going to say Milford
5 Center.
6 Q.  I'm sorry, I interrupted your
7 answer to ask that question.  Go ahead.
8 A.  I don't know where I was.  I
9 kind of lost track.
10     MR. HEINOLD: Do you want to
11 read it back.
12     - - -
13 (Whereupon, the court reporter read the
14 pertinent information.)
15     - - -
16     THE WITNESS: Okay, so I did
17 that.  I did look at the websites, and I don't
18 recall if I asked friends that are
19 motorcyclists their understanding of the
20 potential -- if they understood that there was
21 a potential fire hazard associated with
22 leaving their bike idling, what their
23 practices were with respect to leaving it
24 idle.  I just don't recall specific instances,

Page 77

1  but it's possible that I did.
2      BY MR. HEINOLD:
3  Q.  You may have talked to some of
4  your friends?
5  A.  Sure.
6  Q.  Or you did?
7  A.  I'm saying I may have because I
8  typically -- because typically if I'm involved
9  in a case that is either a common product or a
10  product that has a -- people that I knew that
11  you used them, you know, I'll talk to them
12  about my case and explain a little bit about
13  it, kind of get their feedback on what their
14  practices and knowledge were.  Just kind of a
15  general research, if you will, not something
16  that I'm specifically relying upon for my
17  opinions.  Just kind of general background.
18  Q.  Anything else?
19  A.  I think that would be it.
20  Q.  On Page 6 of your report --
21  wait a minute, Page 5 of your report, Section
22  E, talking about providing an adequate
23  warning.
24      MR. LEVINE: Off the record a

Page 78

1  second.
2      - - -
3  (Whereupon, a discussion was held off
4  the record.)
5      - - -
6      BY MR. HEINOLD:
7  Q.  The warning that you cite in
8  the manual you talk about Mr. Yeldham's
9  testimony and you talk about Mr. Zazula's
10  report in the next paragraph.
11  A.  Okay.
12  Q.  Now, I had asked you about the
13  scope of your expertise as a motorcycle design
14  expert, you said -- your Counsel said you're
15  going to be sticking within your report.
16      Are your references here to
17  those things references to the need for a
18  warning as compared to a criticism of the
19  design other than a warning?
20  A.  Yes.  So my opinions are
21  both.  So the need for a warning is dependent
22  upon the design choice that BMW made or BMW
23  North America made.  So you can't have
24  opinions with respect to warnings without

Page 79

1  understanding the design decisions and choices
2  that were available or made.
3  Q.  Okay.  Well, I understand, for
4  example, the product hierarchy, there is a
5  design and you should try to design out the
6  hazard.  If you can't, then you offer a
7  warning.  They're two separate issues.
8  A.  Well, they're not separate
9  issues.
10  Q.  Well, let me just finish.  I
11  understand that the design issue is a
12  predicate for the warning, right?
13  A.  Yes.  So the design of the BMW
14  creates a potential for a hazardous situation,
15  that is the potential for fire.  There was
16  choices that BMW made in the design of the
17  bike that could have eliminated that
18  potential.  They chose not to.  If they're
19  going to not eliminate through design, they
20  have the option of safeguarding it.
21      I think that Mike Zazula
22  addressed some of those issues guarding it
23  with the use of the optional police fan kit.
24  I don't recall offhand if he had an issue with

Page 80

1  respect to the monitoring of the engine
2  temperature, potential shutting it down if it
3  got too hot.  But certainly, those are
4  guarding solutions that were available to BMW
5  to my understanding and they chose not to do
6  that.
7      And then so they relied upon a
8  warning as their mitigation strategy.  And my
9  opinion is that reliance on that warning was
10  inappropriate in that the warning they
11  provided was inadequate.  And that if they
12  were going to rely upon the warning, solely
13  upon the warning, they needed to provide it on
14  the motorcycle itself like they did with the
15  recall motorcycle a few years prior because of
16  the unique characteristic of the potential
17  fire hazard with the design of this bike.
18  Q.  I understand that.  My question
19  is:  Are you going to criticize the design as
20  a design?  Are you going to say the
21  motorcycle -- forget the warnings.  Are you
22  going to say I'm the motorcycle expert and
23  this motorcycle is defective because it had a
24  sight glass in this location and I'm offering

Page 81

1 an alternative?
2 A.  No.  My opinion is that because
3 of the way they designed it, they created a
4 potential fire hazard, and as such they had a
5 responsibility to mitigate that, and they
6 could have mitigated it through design or
7 guarding.  If they weren't doing to do that,
8 they should have at least provide adequate
9 warning, and the warning that they did chose
10 to provide was inappropriate and inadequate.
11 Q.  Are you offering an opinion
12 that the design of the motorcycle beyond the
13 warning is defective and unsafe?
14 A.  I think that they were --
15 excuse me, I think that they already
16 established that.  I'm not establishing the
17 fact that oil sight glass or its position in
18 its composition failed meeting to a
19 catastrophic event.  That's why I'm citing
20 Mark Yeldham, his testimony, to establish
21 that.
22     So I'm not planning on
23 establishing that on my own.  I'm using his
24 testimony to establish that there was a hazard

Page 82

1 due to the design of this bike.
2 Q.  Okay.
3     MR. HEINOLD: Ken, do you
4 understand my question?
5     MR. LEVINE: I do.  I think
6 that you're asking him to disconnect
7 something -- let me start off, you can keep
8 this on the record.  Inevitably he has to say
9 that the design resulted in a hazard.  I don't
10 think that he is opining that personally other
11 than through the acceptance of statements by
12 folks at BMW and other experts that such a
13 hazard simply exists based on it.
14     I don't think he's going to
15 come in, and correct me if I'm wrong, and
16 testify that the design in and of itself
17 should have been different.  But he will say
18 the obvious, which he's already stated, that
19 if it did not have that design it would not
20 have that hazard.
21     So you're asking him is he an
22 expert in that area?
23     MR. HEINOLD: See, I don't know
24 that I can agree with your last statement.

Page 83

1     MR. LEVINE: Oh, okay.
2     MR. HEINOLD: I'm with you a
3 hundred percent.  There's a warning that says
4 here's a hazard, don't do this, and that's
5 what we're here about.
6     But your last statement that
7 he's going to say if you had a different
8 design you wouldn't have the hazard, he
9 doesn't have that in his report.  And if you
10 are going to declare him to be a motorcycle
11 design expert, then we'll see if he
12 qualifies.  But that is the next step.
13     MR. LEVINE: The part that you
14 don't agree with me on, let me just address
15 that just for a second, I'm rather confident
16 that your own client who designed the bike
17 would say that if designed differently, as
18 some other vehicles are designed, that that
19 precise hazard would not exist.  It's just a
20 nature of the design of that particular bike.
21     So I don't think it requires
22 him to be an expert, although he probably has
23 enough of that expertise to say that
24 statement, that if it was designed differently

Page 84

1 it would not have that hazard.  I doubt your
2 client or you when you pause for a second
3 would disagree with that statement.  So that's
4 all that he would be saying, I believe, and he
5 can answer for himself.
6     So when you say is he a
7 motorcycle expert as to the design or whether
8 or not the design generated that hazard, I
9 believe that everybody involved knows that the
10 design generated that hazard.  So I'm not
11 sure -- I'll be happy to continue.
12     MR. HEINOLD: I will say this,
13 I don't disagree with you that it has a design
14 and that design can lead to the consequences
15 of a fire if you leave it idling at
16 standstill, because there's a hazard
17 recognized and a warning in the manual to that
18 effect.
19     MR. LEVINE: Then a safety
20 engineer or an ergonomic expert will
21 inevitably say every single time you've got
22 this hazard that I've been asked to address,
23 but that integral with that opinion is the
24 straightforward statement that if it had been

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777

Exhibit B

(21) Pages 81 - 84
www.TGOakes.com

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 85

1   designed differently, it's not the case with
2   all products, but if it was designed
3   differently it would not have that hazard.
4        MR. HEINOLD: And what's the
5   different design he's going to say it should
6   be?
7        MR. LEVINE: Oh, he's not going
8   to say it should be because there's six
9   million ways to build a motorcycle, and some
10  of them will have that hazard, some of them
11  will not have that hazard based on their
12  design.
13       I think that -- again, I
14  welcome his contribution to the conversation,
15  but I think his opinion is that when a
16  motorcycle is designed in this fashion, if the
17  manufacturer chooses to allow this hazard to
18  exist, because the nature of the design of
19  this motorcycle, not unlike every other
20  motorcycle, but the design of this type of
21  motorcycle generates this hazard, and once
22  they decided to have that design, which would
23  generate this known hazard, then they must do
24  X, Y and Z, but they are not guiltless --

Page 86

1   that's a horrible lawyer word that I'm using.
2   They're not guiltless deciding, all right,
3   we're going to design it to allow this hazard
4   to exist.
5        MR. HEINOLD: You have an
6   expert who has addressed the design issues.
7        MR. LEVINE: Yes, we have.
8        MR. HEINOLD: And this witness
9   has addressed the warning issues given the
10  design.
11       MR. LEVINE: You have just
12  limited, frankly, the scope of his testimony.
13  He was asked to analyze the safety.  You want
14  to say he was asked to analyze the warning.  I
15  think any ergonomic expert is going to be
16  asked to analyze the safety.  Integral to that
17  is a review as to the hazard and what causes
18  them, first and foremost, and that inevitably
19  goes back to the design.
20       So it would be impossible for
21  him to say I'm analyzing the safety that led
22  to fire, that he did not look at the design,
23  the design options and whether or not they
24  created a hazard.  I don't -- you can ask him

Page 87

1   if he has opinions with regard to other
2   designs that would not generate the hazard.
3        You can ask him whatever
4   questions you'd like to ask him.  I've tried
5   to answer I think the conflict between you as
6   best I can.
7        MR. HEINOLD: Well, I think
8   your position tries to turn him into a design
9   expert, which he doesn't have in his report.
10       MR. LEVINE: I think the scope
11  of his opinions that he will say at trial with
12  regard to design and hazard generation as a
13  result of this design are stated in his
14  opinion and will be the testimony at the time
15  of trial.
16       But if you want to explore
17  that, if you feel as if he's going to give
18  testimony at trial beyond the scope of his
19  abilities or the scope of his report, I
20  certainly appreciate that, and an issue will
21  arise that we're going to have to address.
22  But I think that your questions may eliminate
23  that concern.
24       BY  MR. HEINOLD:

Page 88

1   Q.  Do you consider yourself a
2   motorcycle design expert?
3   A.  It depends on the specific
4   topic.
5   Q.  How about on the location of
6   sight glasses, are you an expert in the
7   location and use of sight glasses for oil
8   systems?
9   A.  It depends on the question.  So
10  maybe I can short circuit this.  I do not plan
11  on providing an alternative design solution.
12  So I would leave that to Zazula and Yeldham
13  and anybody else that testifies.
14       My opinion is simply that it's
15  my understanding that bikes that are designed
16  differently don't have this hazard.  If you're
17  going to choose this design that creates this
18  hazard you need to A, accept that you're doing
19  it, and then B, think about providing a
20  different design.
21       If you can't provide a
22  different design for whatever reason, you have
23  to decide whether or not you're going to
24  provide a safeguard to prevent the hazard from

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 89

1  occurring that is inherit in your design.  And
2  if you're not going to do that, then you need
3  to provide an adequate warning.
4      My opinion is that instead of
5  providing a design that doesn't create the
6  hazard, BMW, for whatever reason, I don't know
7  for whatever reason, given the hazard, chose
8  to leave it in the design of the bike.  They
9  didn't provide a safeguard to prevent the
10 hazard from occurring.
11     It would be my opinion if asked
12 that it's unreasonable if the safeguard is
13 available and feasible, I didn't do the
14 analysis of what they should be, that's for
15 Mike Zazula to determine, but my opinion is
16 simply that if it's available and it's
17 feasible, it should have been used rather than
18 relying upon a third option.  If they have a
19 hazard because of the design and they're not
20 going to safeguard it, the least they can do
21 is provide adequate warning.
22     My opinion in this case is that
23 they failed to provide adequate warning.  If
24 they're going to solely on the warning, what

Page 90

1  they needed to do was to put it on the bike
2  like they did in the recall back in the early
3  models.
4  Q.  So if I understand what you're
5  saying, you're not going to offer any type of
6  alternate design; correct?
7  A.  I'm not planning on offering
8  alternative design.
9  Q.  You're not planning on
10 criticizing any specific aspect of this
11 design?
12 A.  The only thing I would limit my
13 opinion to or plan on providing an opinion is
14 that I've given alternative designs, they
15 should have been the first choice of
16 manufacturers as opposed to choosing a design
17 they had an inherent hazard.
18 Q.  But that's going to be a
19 general statement --
20 A.  Yes.
21 Q.  -- about this motorcycle has
22 features and characteristics that lead to a
23 hazard that the Owner's Manual addresses;
24 correct?

Page 91

1  A.  The Owner Manual does attempt
2  to address it.
3  Q.  Okay.  I'm not trying to say
4  there isn't a hazard.  I'm acknowledging that
5  what has been said about what can occur if the
6  operator does certain things can occur, and
7  there's a warning about that.  I'm not arguing
8  the merits of the warning.  I'm saying it's
9  there, so therefore the characteristic is
10 known.
11     You're going to say, as I
12 understand it, that if you have that
13 characteristic the first thing you should do
14 is --
15     MR. LEVINE: Consider.
16     BY MR. HEINOLD:
17 Q.  -- to consider is to have a
18 design that doesn't present that
19 characteristic.  That you're going to leave
20 that fight to other experts; correct?
21 A.  Yes, I'm going to leave -- I'm
22 not offering a design solution.  But the
23 problem is that the design of the bike is
24 unique in that it creates a fire hazard that

Page 92

1  doesn't exist on other types of bikes.  And it
2  exists because of the design of the bike.
3      Whether it's the location
4  and/or the material or the manner in which the
5  oil sight glass was manufactured and mounted,
6  I don't know whether it's one or the other or
7  a combination of all three.  But the design of
8  this bike creates a unique hazard to this bike
9  that does not occur or exist in my
10 Harley-Davidson, does not occur or exist in
11 the Yamaha bike that Mr. Yazdani had for 20
12 years prior to the BMW.
13 Q.  Is that opinion -- or excuse
14 me, in that statement are you planning to talk
15 about the specifics of the design in saying
16 the characteristics of this bike create a
17 hazard of fire?  Are you going to say and
18 here's what they are?
19 A.  I'm going to say that Mr.
20 Yeldham testified that the design of this bike
21 and the designed oil sight glass creates a
22 fire hazard.
23 Q.  I don't think he testified as
24 to that.

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 93

1  A.  Sure he did.
2  Q.  What did he say?
3  A.  Mr. Yeldham testified that if
4  BMW R 1150 R motorcycle is left idling in a
5  stationary position the oil sight glass cover
6  can fail and cause a fire.
7  Q.  That's the extent of what
8  you're going to talk about there?
9  A.  I mean, he goes on.  I'm citing
10  the rest of that paragraph as to why this is a
11  problem.  I mean, he's acknowledging in that
12  testimony that there is a hazard associated
13  with the oil sight glass cover.  And if you
14  don't have the oil sight glass cover it can't
15  fail, and if you have a dipstick you don't
16  have an oil sight glass cover.  And therefore,
17  from the oil sight glass cover can't fail.
18  Q.  Okay.  So are you going to
19  offer an opinion about it should have had a
20  dipstick?
21  A.  No, I am not, but my opinions
22  because of the unique characteristics of this
23  bike users don't understand or appreciate it
24  because it's abnormal, atypical due to the

Page 94

1  unique or due to the design of this bike.
2  Q.  Is there anything else that you
3  consider abnormal or unique?
4  A.  Other than the fact that the
5  oil sight glass cover can fail and cause a
6  fire, that's the only thing that's relevant to
7  this incident.
8  Q.  Are you aware of any --
9  A.  Well, I take that back, because
10  apparently to prevent the fire due to the
11  design BMW wants you to ride away immediately
12  and that, again, is a unique or atypical trait
13  associated with this bike.
14  Q.  Anything else?
15  A.  Not that I can think of at the
16  moment.
17  Q.  Have you done a survey on
18  motorcycles?
19  A.  I've not surveyed every
20  motorcycle ever available, but I've looked at
21  a lot of bikes over a lot of years and most of
22  them have dipsticks.
23  Q.  Any that don't other than BMW?
24  A.  Well, the Yamaha has an oil

Page 95

1  sight glass, but it's on the right side of the
2  crank case that when it's on its left
3  kickstand the oil isn't covering the oil sight
4  glass.
5  And Mark Yeldham testified that
6  part of the reason why the oil sight glass may
7  fail is because when its on its left kickstand
8  the oil, hot oil covers the oil sight glass.
9  So to me intuitively that means that if it's
10  on the right side and it's not covering the
11  oil sight glass it can't cause it to fail in
12  that manner.
13  Q.  Are you planning to offer the
14  opinion that the oil sight glass on this
15  motorcycle should have been on the right side,
16  not the left?
17  A.  I do not plan on providing an
18  alternative design to this bike.
19  Q.  And I think we've already
20  agree, but I want to be clear, you're not
21  planning on design that says there should be a
22  dipstick instead of an oil sight glass?
23  A.  I was not planning on offering
24  an opinion with respect to alternative design.

Page 96

1  MR. LEVINE: I'm compelled to
2  step in.  He has said a number of times that
3  he does not intend to present alternative
4  design.  I just want to clarify that in one
5  way.  Some people view warnings provided on a
6  product as an alternative design.  I just
7  wanted to mention that so there's no lack of
8  clarity.
9  And I would ask that we pause
10  so I can go do and get those menus.
11  MR. HEINOLD: Can I just finish
12  this?
13  MR. LEVINE: Sure.
14  MR. HEINOLD: And I understand
15  what you say about the warning issuing
16  wasn't -- that's not a problem.  I didn't take
17  it that way.
18  MR. LEVINE: Okay.
19  MR. HEINOLD: We do have a
20  report full of --
21  MR. LEVINE: Of warning
22  issues.
23  MR. HEINOLD: Of warning
24  issues.

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 97

BY MR. HEINOLD:

1 BY MR. HEINOLD:
2 Q.  Do you plan -- I want to create
3 a distinction between pointing out
4 characteristics that others have identified,
5 BMW and Mr. Zazula, and you personally
6 criticizing them yourself, do you plan on
7 criticizing the design, not the warning
8 issues, the design of this motorcycle or
9 simply point out based on what others have
10 said that these characteristics lead to this
11 hazard and either should be prevented or a
12 better warning, here's what I think is a
13 better warning?
14 A.  I think the best way to answer
15 is that I'm relying on Yeldham and Zazula and
16 others to identify the hazard associated with
17 this bike and understanding why that hazard
18 occurs with respect to design.  I'm not
19 offering an alternative design solution.
20     If one is presented to me, I
21 can have opinions with regard to whether or
22 not that would be the appropriate thing to
23 do.  So that gets back into this design work.
24 As an ergonomist and product safety expert,

Page 98

1 it's my opinion that if an alternative design
2 exists that's feasible that eliminates the
3 hazard, that is the appropriate thing to do.
4     So, if someone presents it,
5 whether it's you or Mr. Hughes, at the time of
6 trial, I'm asked that question, that would be
7 my opinion.  I'm not going to opine what the
8 alternative should be or the pros and cons of
9 it or how, you know -- because I don't know.
10     For example, they could have
11 used a different glass that doesn't deform at
12 329 degrees.  Maybe that solves the problem.
13 I'll leave that to, you know, someone else to
14 determine.  If they use a dipstick
15 instead of the sight glass maybe that fixes
16 the problem.  I'll leave that to somebody else
17 to determine.
18     If you put it on the right
19 side, if they could have put it on the right
20 side, does that alleviate the problem, I'll
21 let someone else determine that.
22     But if there is a design
23 solution that eliminates the hazard, it's my
24 opinion that would have been appropriate.  Not

Page 99

1 only appropriate, but the correct thing to do.
2 Q.  Okay.
3     - - -
4 (Whereupon, a short break was taken at
5 this time.)
6     - - -
7 BY MR. HEINOLD:
8 Q.  Okay, I think I get it.  You
9 said that this design is unique.  Is it your
10 understanding that the BMW air-cooled
11 motorcycles are the only motorcycles capable
12 of fire if the customer leaves it idling for
13 an extended period at a standstill?
14 A.  Yeah, I'm not aware of any
15 other motorcycles that have the same potential
16 fire risk due to the same issue.
17 Q.  Did you research that?
18 A.  I did not research it.
19 Q.  So you can't point me to any
20 source, literature or anything that says that,
21 to support your understanding; it's just your
22 understanding?
23 A.  Well, I should take that back.
24 Part of the research I did was look at the

Page 100

1 manuals for other motorcycles to see what they
2 identify as hazards associated with their
3 bikes.  Like I said, I went through the Yamaha
4 manuals and the Harley manuals and it wasn't
5 identified as being a hazard with those bikes,
6 in the design of those bikes.
7     I'm not aware of it through my
8 experience as being an issue with most bikes.
9 This was the first time I became aware that it
10 was an issue with any bike.  And certainly, I
11 understand that there could be fires if a
12 motorcycle is left idling near combustibles.
13 So certainly that was something that I
14 understood, but not that a component on the
15 bike would fail and lead hot oil to escape the
16 engine and ignite and start a fire.
17 Q.  Okay.  But other than your
18 general knowledge and the manuals you
19 reference, is there any other basis for your
20 understanding?
21 A.  I didn't find anything when I
22 was doing the research on oil cool and letting
23 them sit at a standstill when I did the web
24 research.

Thomas G. Oakes Associates
1-877-625-3777 www.TGOakes.com

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 101

1  Q.   Are those the web pages that
2  you're going to provide me with a copy with at
3  some point?
4  A.   Well, no, I did a web
5  research.  These are just some of the pages
6  that I came across that I printed out as some
7  examples of what I was finding on the web.
8  Q.   Did you find -- did you search
9  for fires for other manufacturers?
10  A.   I didn't do a specific search,
11  for example, Kawasaki XYZ bike.  I just looked
12  at starting at a standstill, cold weather
13  winterization trends, tips, practices.  I
14  looked at, like I said, the manuals for the
15  other bikes to see if they were warning
16  against the practice because of a potential
17  fire hazard and I didn't see any.
18  Q.   You gave me three manuals,
19  three Yamaha and one Harley, were those the
20  manuals that you said you researched?
21  A.   I do have a couple more Yamaha
22  manuals that I looked at, and Kawasaki, I
23  think.  They're on the disk.  So whatever
24  manuals I pulled out I put on the disk.

Page 102

1      There was a number -- I'm sorry
2  to interrupt, but there were a number of
3  years.  Like I cited the 2002 models and the
4  XVS 1100 and the Road Star XV 16A.  There were
5  multiple model years manuals that I had for
6  either one or both of the bikes.  I don't
7  recall offhand.
8  Q.   It was -- well, you provided
9  like a covering page for two different
10  manuals.  Do you think there's something more
11  some?
12  A.   I think I provided the entire
13  manuals for the Yamahas on the disk.  The
14  Harley-Davidson Manual I only provided the
15  cover of the page because I would have had to
16  scan the entire thing.
17  Q.   Well, what is on -- I got a
18  link from your attorney that had the
19  references which you cited.  This flash drive
20  that you're providing that's different;
21  correct?
22  A.   Yes, I'm sorry.  The references
23  were to those specific pages.  So I think
24  that's why when I -- I don't recall, you may

Page 103

1  have asked Pat Hughes to ask me to provide my
2  references that were cited in my report.
3      So I put together the
4  references that were cited in my report.  In
5  my report I cited specific pages to those
6  manuals.  So instead of providing the entire
7  manual I provided those specific pages.  On
8  the disk I provided the entire manual for the
9  Yamahas, not for the Harley-Davidson because I
10  didn't have the Harley-Davidson in PDF format,
11  I had hard copy.  So I had to scan the pages
12  that I was interested in, if that makes sense.
13  Q.   This flash drive, what's on it?
14      MR. LEVINE: I can tell you
15  because I have it open, or you can ask him.
16      MR. HEINOLD: Well, I'm going
17  to ask him.
18      MR. LEVINE: Okay.
19      THE WITNESS: It's all the
20  documents that I have that are related to --
21  specifically related to this case.
22      BY MR. HEINOLD:
23  Q.   Anything that's not referenced
24  in your report on the flash drive?

Page 104

1  A.   Yes.
2  Q.   What?
3  A.   Well, for example, the
4  motorcycle pictures that I mentioned earlier.
5  Q.   Okay.
6  A.   The websites that I printed
7  that I mentioned earlier.  And then like I
8  said, the full manuals for several model year
9  Yamahas.  There's a Road Star 2000 Manual,
10  E-Star 2010, E-Max 2011, E-Star 2001 and
11  E-Star 2002.  I believe they're the complete
12  manuals, not just pages.
13  Q.   Anything else on there that
14  wasn't part of your references that I would
15  have received?
16  A.   I don't believe so.  Other than
17  what we talked about, right, the pictures and
18  the --
19  Q.   Yes, hence the word "else".
20      MR. HEINOLD: That's for me,
21  right?
22      MR. LEVINE: That is for you.
23      BY MR. HEINOLD:
24  Q.   Let's talk about, you mentioned

Page 105

1   the recall motorcycle and the warning on the
2   recall motorcycle.
3   A.   Okay.
4   Q.   Did you consider that warning,
5   the on-product portion adequate?
6   A.   I don't know that I considered
7   that adequate. I don't recall offhand what
8   the warning looked like, number one. So I
9   don't recall if it had the appropriate signal
10  word panel. And two, the language is still a
11  bit -- what's the word I want to use? It's
12  not specific and explicit.
13  Q.   What page in your report are
14  you referring to?
15  A.   11.
16  Q.   Okay.   What is -- I think you
17  said not specific and some other --
18  A.   Explicit.
19  Q.   What is not explicit and
20  specific in that language?
21  A.   Well, my understanding is that
22  BMW intended -- well, you go down to the --
23  I'm sorry, you go down to the warning in the
24  manual, it says: Do not keep the engine

Page 106

1   running while the motorcycle is at a
2   standstill - Risk of overheating and fire.
3   Ride away immediately after starting the
4   engine.
5       When you look at the warning
6   that was on the -- they put on the motorcycle
7   itself it says: Avoid increased idle speed at
8   a standstill with choke in use - Risk of
9   overheating and fire.
10      They're two different
11  messages. So the one says -- the one that's
12  on bike says: Avoid increased idle speed at a
13  standstill with choke in use. The other one
14  says: Do not keep the engine running while
15  the motorcycle is at a standstill. Ride away
16  immediately after starting the engine.
17      So if you want them to ride
18  away immediately after starting the engine you
19  need to specifically and explicitly state that
20  in the warning on the product.
21  Q.   Okay. Is the warning from the
22  insert -- let's do a little housekeeping.
23      We're looking at Page 11 of
24  your report, and in the middle you have the

Page 107

1   language from the on-product label that was
2   put on the 1997 motorcycle; correct?
3   A.   I'm sorry, I was reading it and
4   I didn't follow your question.
5   Q.   Okay. We're on Page 11 of your
6   report, and indented there you have three
7   lines that purport to repeat the language that
8   was on the on-product label as part of that
9   recall?
10  A.   Yes.
11  Q.   And just below that you have
12  the language that was part of the warning
13  insert to the Rider's Manual?
14  A.   Yes.
15  Q.   And you were comparing the
16  on-product to the Rider's Manual insert just a
17  moment ago?
18  A.   I was -- yes.
19  Q.   And you were saying that the
20  on-product label wasn't sufficient, wasn't
21  explicit or specific?
22  A.   Yes.
23  Q.   And in contrast you referred to
24  the insert?

Page 108

1   A.   Yes.
2   Q.   Is that specific and explicit?
3   A.   The information in the insert
4   warning provides more information to
5   understand the hazard and what the issue is
6   and what you need to do to avoid it.
7   Q.   So is that sufficiently
8   explicit and specific?
9   A.   I think that it's okay for an
10  on-product warning. My opinion would be that
11  if you're going to include that in your manual
12  that you provide additional information to let
13  the user know what the problem is and why it's
14  a problem. So part of the, you know, reason
15  that you provide information in manuals,
16  warnings in manuals is you have more space to
17  provide more information.
18      So as I note in my report on
19  Page 15 that the appropriate thing to do is
20  to repeat the on-product warning in the manual
21  with an explanation of how the fire occurs.
22  Q.   So the insert in the manual is
23  okay, it's sufficient if you were going to put
24  that on the product?

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 109

1 A.  I think it's better than what
2  they did provide on the product.
3 Q.  Is it sufficient?
4 A.  If I was designing it I would
5  say you put the one on Page 14 of my report.
6  I think that's specific and explicit and
7  succinct.
8 Q.  Do you understand that --
9  strike that.
10     Do you have an understanding of
11  the issue that led to the recall?
12 A.  Yes.
13 Q.  What is it, your understanding?
14 A.  It looks like there were
15  multiple fires reported to BMW with this
16  particular model motorcycle.  They attributed
17  it to the fact that while it was idling at a
18  higher idle than no choke, for example, that
19  the engine was heating up, overheating and
20  igniting the fairing that was adjacent to
21  either the exhaust or the engine itself.
22 Q.  Okay.  So it was the fairing
23  which was igniting rather than the oil sight
24  glass which was deformed?

---

Page 110

1 A.  I think -- my understanding is
2  that at least from the discussions with NHTSA
3  it was the fairing that was igniting due to
4  its proximity to either the exhaust or the
5  engine.  They're pointing it to the exhaust
6  system temperature rising considerably
7  increasing the risk of fire.
8 Q.  As a result of the fairing, the
9  ignition of the fairing?
10 A.  The ignition of the fairing,
11  yes.
12 Q.  This did not involve oil sight
13  glass failures?
14 A.  That's not what's noted in the
15  NHTSA notification.  I don't know if Mark
16  Yeldham testified that the oil sight glass was
17  involved or not.  I don't recall offhand.
18 Q.  Okay.  Do you have any
19  information if the oil sight glass was
20  involved in the recall issue?
21 A.  Not based upon the NHTSA
22  document that I have.
23 Q.  What is your understanding of
24  what the change in the design would be -- let

---

Page 111

1  me ask you.  Let me start that over.
2     Do you have an understanding
3  whether as a result of the fairing igniting,
4  whether the design of the BMW motorcycles at
5  issue is changed?
6 A.  It's my understanding that the
7  incident bike in the recall was discontinued
8  at some point in time, and then the 1150,
9  R 1150 took its place and that the R 1150 had
10  three different packages, if you will.  The
11  one involved in this incident was like a
12  strip-down version.  And then the next two had
13  different levels of front bearings and so
14  forth.
15     I think Yeldham testified that
16  there was a potential for the oil sight glass
17  to fail in the 1150 due to the engine
18  overheating at a standstill or the potential
19  for the front fairing and/or wiring harness on
20  the bikes to ignite because of the heat of the
21  exhaust when at a standstill.
22 Q.  On the subject motorcycle?
23 A.  Not on the subject motorcycle
24  because it didn't have a -- the front fairing

---

Page 112

1  wasn't near the exhaust, but on the -- there's
2  two other versions of that same bike.  I don't
3  remember the names offhand, but they had
4  different levels of the amount of fairing on
5  the front of it.
6 Q.  When you say the names, what do
7  you mean?
8 A.  Well, the incident bike was the
9  R 1150 R.  My understanding is that there were
10  two versions of that bike.  There was the
11  R 1150 R, and I don't know what the letter
12  designations were for those other two models.
13 Q.  Were you aware of any fires
14  regarding the fairings?
15 A.  Apparently one of the other
16  models is the R 1150 GS, and I'm aware of a
17  fire as a result of the oil sight glass
18  failing on that bike.  There's an R 1150 80V
19  that also was involved in an oil sight glass
20  fire, oil sight glass failure fire.
21     And it looks like there's a
22  fire involving an R 11 RT that involved an oil
23  leak.  It doesn't say whether the oil sight
24  glass failed or not.

---

Page 113

1 Q.   These are allegations; correct?
2 A.   These are a list of claims.
3 Q.   Right.  A claim is an
4 allegation?
5 A.   I don't know if I can agree or
6 not agree with that statement.
7 Q.   Okay.  What is that document
8 you're looking at?
9 A.   It's a BMW production document
10 summary.
11 Q.   Prepared by?
12 A.   Mr. Hughes' office.
13 Q.   Is that part of what you
14 provided me on this flash drive?
15 A.   It has to be.
16 Q.   Okay.  You hadn't mentioned it
17 as one of the -- when I said anything else,
18 but it's your book and your --
19 A.   I think that was part of the
20 material reviewed.  I'm sorry, I was including
21 that under the material available for review.
22 Q.   Perhaps I didn't notice it.  I
23 didn't notice it in your materials available
24 for review.

Page 114

1 A.   Yeah, I don't -- I didn't
2 reference the summary.  I just referenced the
3 document.  Now I forget the question there.
4 Q.   There wasn't.  You finished.
5 A.   Okay.
6 Q.   What assumption, if any, did
7 you make about whether Mr. Yazdani read this
8 manual?
9 A.   It's my understanding that he
10 was provided with the manual for the
11 motorcycle when he purchased it used and that
12 after getting home -- driving the motorcycle
13 home, at some point in time he read it when he
14 first got the bike.
15 Q.   What's your assumption about
16 whether he read the pertinent sections of this
17 manual that dealt with the warning not to
18 leave it at a standstill because it might
19 overheat and cause a fire?
20 A.   Mr. Yazdani testified that he's
21 not sure if he read them, and if he read them,
22 that it sunk in, if you will.  And if he had
23 read them, he didn't remember them,
24 Q.   What are your assumptions for

Page 115

1 purposes of your opinions about whether he
2 read those or didn't read those?
3 A.   To me it doesn't matter if he
4 read them or didn't read them several years
5 before the fire.
6     That's one of the limitations
7 of providing information and important
8 warnings in the manual is that people are
9 likely to overlook it, they're likely to
10 forget it, and they're likely not to be
11 recalling or thinking about it at the time the
12 information is needed.  Hence the need for an
13 on-product warning.
14 Q.   Is it important to read the
15 Manual?
16 A.   It depends.
17 Q.   It depends on what?
18 A.   It depends on whether it's
19 required or not to use and operate the piece
20 of equipment or machinery.
21 Q.   How does someone know whether
22 it's required until they read?
23 A.   Well, two things.  One is that
24 the product may be like other products that

Page 116

1 they've used in the past, and therefore they
2 possess the knowledge necessary to use it.  Or
3 two, the manufacturer has a requirement to
4 read it.  And then if they have a requirement
5 to read it, it may not be all that important
6 to read it.
7 Q.   Is it important to your opinion
8 whether Mr. Yazdani read it and understood it
9 prior to the accident?
10 A.   No, it doesn't matter to me.
11 My assumption is that either he read it, read
12 it and didn't understand it, or read it,
13 understood it and forgot it.  Either way he
14 wasn't thinking about it at the time.
15     He had read the manual several,
16 I don't know if it's two years or
17 year-and-a-half before the fire, but it's very
18 common for people to read information in
19 manuals and then not have a recollection of it
20 or not be thinking about it at the time the
21 information is needed.
22     Again, this gets back to the
23 necessity of on-product warning for a unique
24 and atypical hazard.

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
Exhibit D
www.TGOakes.com

(29) Pages 113 - 116

Yazdani vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 117

1 Q.  If he did not read, but would
2 have understood it if he had read it, is that
3 important for your opinion?
4 A.  I think he testified that had
5 he read it he would have understood it.  I
6 think he read it and in his deposition said he
7 understood it.
8 Q.  Okay.  Is that important to
9 your opinion?
10 A.  To me it's irrelevant because
11 he wasn't thinking about it at the time.  So
12 that's part of the problem with the warning in
13 the manual, is that people, A, don't read it,
14 B, read it and don't remember it at the time
15 or the location where the information is
16 necessary.
17 Q.  If he read it and understood
18 it, forgetting about whether he forgot it or
19 whether he should have been reminded of it,
20 the message in the manual was sufficient at
21 least to be understood as to the activity and
22 the consequences; correct?
23 A.  That's what Mr. Yazdani
24 testified, that he understood what the warning

Page 118

1 meant in the manual.
2 Q.  So in this case your criticism
3 is not of the information imparted in the
4 manual because it was adequate, was it not?
5 A.  Well, I have opinions with
6 regard to whether or not the information that
7 was provided in the manual is adequate or not,
8 but to this case they're irrelevant.
9     The point is that we don't know
10 if Mr. Yazdani read it or not, but he wasn't
11 thinking about it at the time.  It was a
12 unique or atypical hazard associated with this
13 motorcycle, and had the proper warning been on
14 the product it would have insured that Mr.
15 Yazdani saw it, read it, understood it both
16 when he got the bike and then when he was
17 started it or planning on starting it a year
18 and a half, two years later.
19 Q.  Is it also irrelevant because
20 he said I read it and understood it?
21 A.  That's what he testified to.
22 Q.  Does that make it irrelevant?
23 A.  It doesn't make it irrelevant
24 because he didn't recall it at the time of the

Page 119

1 incident.  He's not sure if he ever read it.
2 Q.  Do you think he would have
3 recalled if the warning had been different?
4 A.  I think that had the warning
5 been different it would have been more
6 appropriate, but I don't know that he would
7 have recalled it at the time.
8 Q.  So this case boils down to an
9 on-product warning?
10 A.  The case boils down to the fact
11 that there was a design defect in the
12 motorcycle, and that instead of fixing it
13 through a design or providing an adequate
14 safeguard they provided an inadequate warning
15 in the manual.
16 Q.  And the design defect was what?
17 A.  The fact that the oil sight
18 glass can fail when the bike is left at a
19 standstill, which is a customary, foreseeable
20 use of the motorcycle.
21 Q.  But you're relying on others to
22 determine that design defect?
23 A.  Sure.  I'm relying upon Mark
24 Yeldham and his testimony as to what the

Page 120

1 problem was.
2 Q.  So in terms of the warning in
3 the manual, let me --
4 A.  I have it here if you would
5 like it.
6 Q.  Yes, let's do a little
7 housekeeping.  We've been referring to some
8 things.
9     MR. HEINOLD: Let's mark his
10 report as Vigilante-1.
11     - - -
12 (Whereupon, Exhibit Vigilante-1 was
13 marked for identification.)
14     - - -
15     MR. HEINOLD: And we'll mark
16 his Testimony List as Exhibit 2 and his
17 Curriculum Vitae as 3.
18     - - -
19 (Whereupon, Exhibits Vigilante-2, 3 and
20 4 were marked for identification.)
21     - - -
22     BY MR. HEINOLD:
23 Q.  I'm going to show you what's
24 been previously marked as Yazdani-1 and now

Page 121

1   marked as Vigilante-4, which is the cover
2   sheet and two pages of the Rider's Manual that
3   you have the original of and I have the
4   original of.  Do we like the same one?
5 A.  Wait, you have a publication
6   date on that?
7      MR. LEVINE: The last page.
8      THE WITNESS: 10/2002?
9      MR. HEINOLD: Yes.
10     THE WITNESS: All right.
11     BY MR. HEINOLD:
12 Q.  I didn't mark down the Bates
13   number.
14 A.  It's BMW North America 1
15   through BMW North America 2, BMWNA55 and
16   BMWNA64.
17 Q.  One is 55, I believe that is
18   Page 351, Section 3, Page 351?
19 A.  That is -- I'm going to say
20   it's 51.
21 Q.  Okay.  Down in the lower
22   right-hand corner of that page, all right,
23   would you read that into the record?
24 A.  Sure.  You want me start from

Page 122

1   Risk of fire or the Warning?
2 Q.  You can start with the
3   Warning.
4 A.  Warning:  Make sure --
5 Q.  There's a Warning in large
6   letters, all bold, all caps, right, with a
7   Warning placard?
8 A.  Oh, Warning:  Make sure that
9   whether riding or standing still or when the
10   motorcycle is parked no easily flammable
11   material (for example, hay, grass, leaves,
12   clothing or luggage, etc.) can come into
13   contact with the hot exhaust system.  Do not
14   allow the engine to idle unnecessarily or for
15   prolonged periods - Risk of overheating or
16   fire.  Ride away immediately after starting
17   the engine.
18 Q.  Okay.  Now, the word Warning is
19   large; correct?
20 A.  It's larger than the print on
21   the page.
22 Q.  Do you have a criticism with
23   the use of the Warning placard, the use of the
24   word Warning with all capitals and all bold

Page 123

1   and in a box?
2 A.  It's not the traditional way to
3   do signal work, but I'm not going to argue
4   about it because it looks like the entire
5   manual is black and white, except for the
6   front page.  So they apparently chose to do
7   everything in black and white.
8      MR. LEVINE: He does not opine,
9   I don't believe, or criticize the form and
10   substance of the in manual warning; am I
11   correct?
12     THE WITNESS: That's correct.
13   It wasn't relevant to my opinions.
14     MR. LEVINE: He will not be
15   testifying as such at trial.  You can do what
16   you want.  I just thought that I would clarify
17   that.
18     BY MR. HEINOLD:
19 Q.  But is it -- you say it's
20   irrelevant.  My only question is, is it
21   inadequate?
22 A.  It is inadequate.
23 Q.  Is adequate or inadequate?
24 A.  It is inadequate the way it's

Page 124

1   presented on that page.
2 Q.  Why?
3 A.  Well, first of all, the section
4   above it starts:  Risk of fire, high
5   temperatures at the exhaust system,
6   particularly if the catalytic converter is
7   installed.
8      So obviously that's dealing
9   with a different fire cause scenario than the
10   oil sight glass failing.  So I would think
11   that it's fairly self evident that the exhaust
12   gets hot and there's a potential for fire.
13     So now we have a warning
14   directly underneath that information that
15   deals with, again, stuff, combustibles coming
16   in contact with the hot exhaust system.  A
17   person reading it would be expected to read
18   the Risk of fire section above it, get to the
19   warning and think that the whole thing, the
20   whole section was related the exhaust system
21   and the exhaust system being hot.
22     So they bury the information
23   related to not allowing it to idle
24   unnecessarily or for long periods within the

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
Exhibit D
www.TGOakes.com

(31) Pages 121 - 124

Page 125

1  section dealing with don't let hot stuff
2  contact hot exhaust.  So that warning should
3  have been related to don't let it idle
4  unnecessarily for long periods, should have
5  been separated from the other information to
6  make it distinct and to let readers know that
7  it's a different topic, a different specific
8  topic.
9      Second, Do not allow the engine
10  to idle unnecessarily or prolonged periods.
11  Neither of those terms, unnecessarily or
12  prolonged, are defined.  I think Mark Yeldham
13  testified to that as well.  We don't know what
14  unnecessarily or prolonged means and neither
15  does the reader.
16      So, for example, Mr. Yazdani
17  testified that he was starting the bike
18  because he didn't winterize it.  So obviously
19  it was necessary to him to start the bike
20  because he wasn't winterizing it.  A prolonged
21  period is, again, open to interpretation.
22      Some people's fires apparently
23  claim they're happening in 10 to 15 minutes.
24  Mr. Yazdani is not sure how long exactly he

Page 126

1  let the bike run, up to a half hour, maybe a
2  little bit longer.  It could have been a
3  little bit less.  So we don't know if he had
4  planned on leaving it run for 30 minutes
5  whether the fire would have started within
6  that period of time.  If he planned on letting
7  it run for 15 minutes you don't know whether
8  the fire would have started in that time or
9  not.  So, it's not specific, it's not explicit
10  and leaves open to interpretation as to what
11  is necessary, what is prolonged.
12      And then we have:  Ride away
13  immediately after starting engine.  That's in
14  direct conflict with other instructions in the
15  manual that tell you have to put it in high
16  choke, hold the button in for some period of
17  time on a cold engine until the engine warms
18  up enough that you can release it so that the
19  bike doesn't stall.
20      So that's apparently in direct
21  conflict, unless you expect the rider to be
22  holding the choke start or the choke button in
23  while riding down the street, which I don't
24  think BMW intended.  So they're some of the

Page 127

1  reasons why this information on Page 51 of the
2  manual is inadequate.
3      Kind of a higher level issue is
4  that this atypical hazard associated with the
5  failure of the sight glass isn't communicated
6  to the rider or the reader until Page 51.
7  That means they've had 50 pages of other
8  information about the bike that doesn't
9  reference the fact that the oil sight glass
10  can fail and cause a fire if you let it idle
11  for periods of 10 to 15 minutes or longer.
12      And then I did forget to
13  mention too that it doesn't tell you why
14  there's a risk of fire for letting it idle,
15  that being the oil sight glass can fail or the
16  wire harness can ignite.  So it would be nice
17  to know, typically in the manual, why they're
18  telling me why not to idle unnecessarily or
19  for a prolonged period of time.
20  Q.  Are you finished?
21  A.  Yes.
22  Q.  Okay.  Doesn't the phrase "ride
23  away immediately" help define not allowing the
24  engine to idle unnecessarily or prolonged

Page 128

1  periods?
2      Is it your testimony that
3  there's no correlation there, there's no
4  assistance in helping the reader understand
5  what unnecessarily or for prolonged periods
6  mean?
7  A.  Well, two things.  The question
8  is whether or not it's related to Do not allow
9  the engine to idle unnecessarily or for
10  prolonged periods, or is related to the
11  potential for combustible to contact the
12  exhaust.  So we don't know based upon the way
13  it's formatted and presented.
14      Second, the ride away
15  immediately after starting the engine is
16  contrary and conflicting with other
17  instructions, and the reality of starting this
18  bike on a cold day.  That you can't ride away
19  immediately after starting the engine.  You
20  have to go through a warm-up period.  So
21  obviously it's in direct conflict with other
22  instructions in the book.
23  Q.  Where is the conflict for the
24  other instructions?

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 129

1   A.  Well, Mark Yeldham testified
2   that on cold days you have to hold the choke
3   in all the way for it to heat up.  Otherwise,
4   the engine will stall if you release it.
5       So, again, if you have to hold
6   the choke in for a period of time on cold
7   engines to get it not to stall, you can't ride
8   away immediately.  It means that you have to
9   let that bike warm up for some period of time.
10      Now, Mr. Yeldham also testified
11  that what that period of time is subjective to
12  the user.  So if it's subjective to the user,
13  one rider may think that five seconds is okay,
14  another rider may think 10 minutes is
15  necessary.  Again, that's the problem with not
16  being specific and explicit, you're allowing
17  the user to interpret subjective terms.
18  Q.  You agree that -- what are you
19  looking at there?
20  A.  Oh, this is my summary of Mark
21  Yeldham's testimony.
22  Q.  That's also on your flash
23  drive?
24  A.  Yes.

Page 130

1   Q.  Would you agree that Mr.
2   Yazdani said when he read it that he
3   understood it?
4   A.  In his deposition that's what
5   he testified to.
6   Q.  Yes.  And that he understood
7   that he should not leave it at idle at a
8   standstill?
9   A.  After the fact he certainly did
10  read it and understand it, but he also
11  testified that until the deposition he wasn't
12  aware of why this thing caught fire, which
13  means he didn't understand what he did and how
14  it correlated with the fire.  So after the
15  fact in his deposition reading the manual he's
16  testified that he understood it.
17  Q.  So it's your testimony that
18  this manual is not clear about one, don't
19  leave it at idle at a standstill because it
20  may catch on fire, is that your testimony?
21  A.  My testimony is it's an
22  inadequate warning.  The information provided
23  on Page 51 of the Manual is inadequate to
24  alert and inform a rider as to the fire risk

Page 131

1   and how to avoid it and what can happen if
2   it's not avoided and why it occurs.
3   Q.  For the reasons you stated?
4   A.  Yes.
5   Q.  How about on Page 60 of the
6   manual.  I think it's Bates number 64 on
7   Yazdani Exhibit 1.
8   A.  Page 60, right?
9   Q.  Yes.  Do you consider that
10  inadequate?
11  A.  Yes.
12  Q.  Why?
13  A.  Again, first of all, it's on
14  Page 60 of the manual as opposed to being at
15  the start of the manual to alert and inform
16  someone before they read 59 pages of things
17  that are not related to this hazard.
18      Second, the risk of overheating
19  or fire is provided after telling them do not
20  warm up the engine with the motorcycle at a
21  standstill.  It would have been more
22  appropriate to say, warning, fire hazard, and
23  then you can explain it, as opposed to giving
24  the consequence of fire as the very last part

Page 132

1   of that sentence.
2       The next sentence says:  Ride
3   away immediately after starting the engine,
4   which is consistent with the other page.
5   However, directly under that it says:  To
6   avoid overheating the air-cooled engine and
7   possible damage as a result, avoid even short
8   warm-up periods at a standstill.  However, it
9   says, period, avoid high engine speeds after a
10  cold start.
11      So, again, it's inconsistent.
12  You have to have high-engine speeds after a
13  cold start because you're supposed to hold the
14  choke in.  The choke in is associated with
15  high-engine speeds.  Again, if you have to
16  hold the choke in until the engine warms up so
17  it doesn't stall out you can't ride away
18  immediately.  So there's a conflict.
19      Also, it doesn't tell you that
20  the oil sight glass can fail and spread or
21  allow hot oil to escape and create a fire.  So
22  someone may read that and think that if it's a
23  fire it's because combustible materials are
24  near the exhaust.  That's probably why they

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 133

1  want me setting this bike -- letting it stand
2  still for a while.  If I don't have any
3  combustibles it's not really an issue.
4  Q.  Are you finished?
5  A.  I think so.
6  Q.  So is it your testimony that if
7  someone reads this sentence:  Do not warm up
8  the engine with the motorcycle at a
9  standstill, the risk of overheating or fire,
10  with an exclamation point, that they are not
11  going to understand that they should not warm
12  up the motorcycle and engine at a standstill,
13  is that your testimony?
14  A.  I think that if they read the
15  entire sentence they would understand that's
16  what the sentence had told them.  But
17  again --
18  Q.  They would understand what not
19  to do; correct?
20  A.  But they would understand --
21  Q.  Correct?
22  A.  It's in conflict with other
23  parts of the manual and the testimony of Mark
24  Yeldham, that they can't follow it.

Page 134

1  Q.  The conflict with other parts
2  of the manual meaning the use of the choke?
3  A.  It tells you start the engine,
4  but hold the choke in until the engine smooths
5  out, go to low choke, and then you can go.
6      Mark Yeldham testified that if
7  you come up high choke too soon the engine
8  will stall.  He testified that you have to
9  hold the choke in its high position until the
10  engine smooths out, and that smooth-out
11  process is subjective or the smooth-out point
12  is subjective.
13  Q.  Okay.  So that someone who is
14  operating a motorcycle, can we -- let me step
15  back.
16      Can we assume that someone who
17  is going to operate a motorcycle has a basic
18  understanding of how to operate it?
19  A.  As you mean -- excuse me, do
20  you mean how to start it and ride it, I'm sure
21  they do, unless it's an unfamiliar bike that
22  maybe they're borrowing a friend's or what
23  have you, then may need someone to show them
24  how to start it.

Page 135

1  Q.  So someone who is going to own
2  and operate a motorcycle they read the
3  statement:  Do not warm up the engine with
4  motorcycle at a standstill, risk of
5  overheating or fire, exclamation point, is not
6  going to understand don't leave this idling at
7  a standstill or it might catch on fire, is
8  that your testimony?
9  A.  No.  My testimony is that it's
10  in conflict with other information in the
11  manual, but it's also, this is important too,
12  for the purchaser of a new bike, it's
13  inconsistent and in conflict with the training
14  that the BMW North America dealership is
15  providing him on how to operate the bike.
16      So you've got a statement in
17  the manual that's in direct contrast, conflict
18  with other parts in the manual, their own
19  prior experiences if they've ridden and used
20  motorcycles before, and the training that BMW
21  provided them if they purchased it new from
22  the dealership.
23  Q.  What is that training?
24  A.  According to Mark Yeldham

Page 136

1  they're trained to show them how to start the
2  bike by holding in the choke until the engine
3  smooths out and then dropping it down to the
4  detent position of the choke switch.
5  Q.  Are there any parameters on how
6  long that takes in a motorcycle like this?
7  A.  Well, that's part of what Mr.
8  Yeldham testified to.  It's subjective and
9  it's depended upon the ambient temperature and
10  the temperature of the engine.  So it may take
11  a shorter amount of time if the machine is
12  warm or if the temperature is warmer.  It may
13  take a longer time.  It's also subjective to
14  the user.  And either you let it go long
15  enough, whatever that time may be because it
16  is very variable, or you come off too soon,
17  and if you come off too soon the engine can
18  stall.
19  Q.  Are there any parameters on
20  that time?
21  A.  Mark Yeldham testified it was
22  subjective.
23  Q.  Subjective.  Are there any
24  parameters in your mind?

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 137

1  A.  I'm relying upon Mark Yeldham.
2  He should know the bike better than me.
3  Q.  So could someone have to hold
4  the choke in for two hours?
5  A.  I doubt it.
6  Q.  Okay.  So there has to be some
7  parameter?
8  A.  But it could be in warm
9  weather.  It could be a warm engine.  It might
10  be 10 seconds.  It could be a couple minutes.
11  If it's cold weather, cold engine.
12     Now, my Harley-Davidson
13  Sportster had a manual choke.  It wasn't on
14  the handlebar.  It was a switch underneath
15  the -- or on the side of the engine, I
16  believe, and it would have to stay warmed up
17  for several minutes.  In five or 10 minutes if
18  I was taking that bike out in January, which I
19  did often, even when I was a younger rider, to
20  get it to get into the mid point of the choke
21  before I could ride off, otherwise it would
22  stall.  It took minutes, 10 minutes, 15
23  minutes to warm up at high choke.
24     It wasn't -- I don't know what

---

Page 138

1  the BMW is.  According to Mr. Yeldham it's
2  subjective.  But I do know with other bikes
3  that it could take a number of minutes, a
4  period of time for it to warm up.
5  Q.  So the basis of your opinion is
6  that the operator of an motorcycle would not
7  be able to tell the difference between the
8  time you have to leave the choke on until it
9  smoothed out and not leaving the motorcycle
10  engine running at a standstill because it
11  might catch on fire?
12  A.  Exactly.  You're telling him
13  two different things.
14  Q.  And the motorcycle rider can't
15  tell the difference between those two things?
16  A.  I think he would look at it and
17  say what the heck is this trying to say,
18  because it's inconsistent with my experience,
19  my past experience, and it's inconsistent with
20  the training BMW gave me, and it's
21  inconsistent with other parts of the manual.
22  So is this some type maybe translation error
23  from German.  I don't know what the rider is
24  going to think, but it's certainly not clear

---

Page 139

1  and it leaves room for interpretation, which
2  is subjective, which leads to all different
3  kinds of conclusions.  Some of them may be
4  right, but some of them are going to be
5  wrong.
6     And that's the problem,
7  warnings aren't supposed to be subjective.
8  They're not supposed to leave open for
9  interpretation.  They're supposed to be
10  specific, explicit and they're supposed to be
11  consistent with other information and
12  experiences.  If they're not, it leaves people
13  to question the warning and then come up with
14  their own subjective idea of what the warning
15  is supposed to me and what they're supposed to
16  do.  And some people will get it right and
17  some people will get it wrong.  And that's not
18  the definition of an adequate warning.
19  Q.  Okay.  So it's your opinion if
20  someone reads, Do not warm up the engine with
21  the motorcycle at a standstill - Risk of
22  overheating or fire, is going to say it's okay
23  for me to leave this warming up at a
24  standstill for 30 minutes or more?  Is that

---

Page 140

1  your opinion?
2  A.  I doubt that they will read
3  that and say that allowing it to warm up for
4  30 minutes or more is appropriate.
5  Q.  Okay.  How about 20 minutes or
6  more, would they say that?
7  A.  Probably not 20 minutes.
8  Q.  How about five minutes?
9  A.  That's where it can get
10  questionable because then some bikes -- some
11  temperatures it's going to take five minutes
12  of warming up on high choke for that engine to
13  smooth out.
14  Q.  So do you disregard for your
15  opinions in this case the fact that Mr.
16  Yazdani read the warning and said I understood
17  it, I understood the communication to me what
18  not to do and the consequence of it and I just
19  don't remember reading it?
20  A.  Well, I think he testified that
21  reading it in the deposition he understands.
22  That's reading it in the deposition after a
23  fire occurred, after being told what happened
24  he understands what the manual means.

---

Exhibit D

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 141

1    He testified that he's not sure
2  if he read that part of the manual or if he
3  read it, if he understood it at the time he
4  read it, or if he read it and either
5  understood it or didn't understand it, but he
6  didn't remember it.
7    So asking him after the fact,
8  the Monday morning quarterback, what that
9  statement means is not fair and is not the
10  right way or a valid way to assess the
11  adequacy of that warning.
12  Q.  Do you believe -- you said that
13  he didn't know whether he would have
14  understood it if he read it back before the
15  fire?
16  A.  That's what he testified to.
17  Q.  And that's important to your
18  opinion?
19  A.  What's important to my opinion
20  is that the warning wasn't on the bike to
21  alert and inform the rider of the unique fire
22  hazard associated with the design of this
23  bike.
24  Q.  Is it important to your opinion

Page 142

1  that you believe Mr. Yazdani would not --
2  might not have understood the warning if he
3  read it back before the fire?
4  A.  It would be important to my
5  opinion if Mr. Yazdani testified that he read
6  it in the Manual, he fully understood it,
7  could explain it and was thinking about it at
8  the time of the fire and did it anyway.  That
9  would certainly be important to my opinion.
10    MR. HEINOLD: Can your read
11  back my question and please answer my
12  question.
13    - - -
14  (Whereupon, the court reporter read
15  back the pertinent information.)
16    - - -
17    THE WITNESS: It's my opinion
18  that Mr. Yazdani did not appreciate the fire
19  hazard associated with his actions, whether
20  it's because he didn't read the manual or read
21  it and didn't understand it, or read it,
22  didn't understand it or understood it and
23  forgot it.  He wasn't aware of it at the time
24  of the fire.

Page 143

1    It's my opinion had he read the
2  manual that it wouldn't have been adequate to
3  inform him of the fire hazard at the time he
4  first owned the bike.  Therefore, even if he
5  had read it and understood -- if he had read
6  it he wouldn't have understood what BMW was
7  trying or claiming that the warning is
8  intended to address and intended to say.  It
9  would be my opinion that he wouldn't have
10  understood it at that time.
11    MR. HEINOLD: Can you read the
12  question back and can you answer it this time.
13    - - -
14  (Whereupon, the court reporter read
15  back the pertinent information.)
16    - - -
17    THE WITNESS: It's the same
18  answer.
19    MR. LEVINE: Do you feel he's
20  not answering your question?
21    MR. HEINOLD: Yes.
22    MR. LEVINE: I heard the
23  question, I heard the answer.  Let me break it
24  down and see if I understand.  You've asked

Page 144

1  him, is it your opinion that it would not have
2  mattered?
3    MR. HEINOLD: No.  I asked
4  him -- he said he wouldn't have understood it
5  and that he testified -- strike that.  I'll
6  start over.
7    He said that Mr. Yazdani
8  testified that he wouldn't have understood it
9  back then or might not have understood it back
10  then.  And I said:  Is it important to your
11  opinion that he wouldn't have understood it?
12  That's a simple question.
13    MR. LEVINE: First off, is it
14  accurate that the witness here, Dr. Vigilante,
15  stated that he did not understand it, would
16  not have understood it, might have not
17  understood it, because you threw those in a
18  little bit softly there?
19    In other words --
20    MR. HEINOLD: I didn't throw
21  them in.
22    MR. LEVINE: Bear with me, I'm
23  going to get you your answer that you're
24  looking for, I promise you.  You put that

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 145

1  supposition in in the beginning of your
2  question:  Based upon the fact that you have
3  testified Mr. Yazdani might have not have
4  understood, did not understood it or would not
5  have understood it.
6      MR. HEINOLD: I didn't ask the
7  question that way, Ken.
8      MR. LEVINE: I'm going to help
9  you here. I'm promising you. Maybe I need to
10  hear it again. I apologize.
11      MR. HEINOLD: Go ahead, ask
12  whatever you want to do.
13      MR. LEVINE: No. I was asking
14  her what your question was because I don't
15  want to change your question.
16      MR. HEINOLD: I'll start over.
17      MR. LEVINE: I promise you I'm
18  not going to let him avoid you.
19      BY MR. HEINOLD:
20  Q. Do you believe Mr. Yazdani said
21  that he would not have understood that warning
22  if he had read it back before the fire?
23  A. What I testified to, and I'll
24  read my summary of his testimony, he read the

Page 146

1  manual, but he does not recall if he read the
2  manual, if he -- excuse me, I'll start over.
3      He read the manual, but he does
4  not recall if he read the warning and didn't
5  register it or if he did not read the
6  warning. So his testimony is he doesn't know
7  if he read it, and if he read it, it didn't
8  register to him. So that's my understanding.
9      So there's no testimony,
10  there's no evidence to state that he either
11  read it and that if he read it, he understood
12  it in the manner in which BMW North America is
13  claiming they intended it to mean.
14      So it's possible, it certainly
15  is possible that Mr. Yazdani read that
16  language or part of that language and took it
17  to understand the same thing that other people
18  would understand by reading the entire
19  manual. And based upon prior experiences,
20  that it's not consistent with the way you're
21  supposed to use the bike, and that it's in
22  conflict with the way you're supposed to use
23  the bike. And if it's in conflict, how valid
24  is the statement. And if it's not valid, why

Page 147

1  should I abide by it or comply with it.
2  Q. Okay. When you testified
3  earlier you said he testified he didn't
4  understand it, he didn't know if he understood
5  it. You just read that and you used the word
6  registered and transformed registered into
7  lack of understanding rather than perhaps it
8  didn't sink in, perhaps he forgot rather than
9  understand. We've been sitting here talking
10  about whether this is understandable or not.
11      I want to know -- after that
12  description of why I'm asking you this
13  question, I want to know this: Is it
14  important to your opinion that he did not
15  understand it prior to the accident if he read
16  it?
17  A. Again, my understanding is he
18  testified he was not aware of the fire hazard
19  prior to the incident. He testified he
20  doesn't recall whether he read the manual --
21  excuse me, that part of the manual, if he read
22  it, if it didn't register --
23      MR. LEVINE: I'm going to
24  interrupt. You don't need to keep repeating

Page 148

1  what Mr. Yazdani did or didn't testify to. I
2  appreciate that's part of your answer, but I
3  sit here and listen to you repeating
4  exactly -- we have read it. We've seen it,
5  Bill. The question was entirely different.
6      So he's asking you whether or
7  not his opinion as expressed there, and
8  correct me if I'm wrong, are important or
9  unimportant to your opinions here? But if you
10  want to correct me, go ahead.
11      THE WITNESS: Yeah, it's not
12  important to my opinion if -- I don't want
13  to -- I'm not going to sit here and say that
14  Mr. Yazdani read that manual and understood it
15  the way BMW is intending it to mean at this
16  point in time. So, that's number one, I'm not
17  going to say that I agree with that.
18      So based upon -- what I read
19  through his deposition, I don't think that's
20  correct that he understood the message that
21  BMW was intending to convey. But if he did,
22  understood that line when he read that manual
23  when he first got the bike, it didn't sink in,
24  it didn't register, he wasn't aware of it and

Page 149

1  he sure wasn't thinking about it or aware of
2  it at the time of the incident.
3      And that's because A, the
4  manual is inadequate and the information in
5  the manual is inadequate.  And B, providing
6  the information only in the manual is
7  inadequate and inappropriate.
8      I'm starting to get a little
9  big tongue-tied because I'm starving.  So it
10  might help if I eat, take a break.
11      MR. HEINOLD: Let's take a
12  break.
13      - - -
14  (Whereupon, a short break was taken at
15  this time.)
16      - - -
17      BY MR. HEINOLD:
18  Q.  Do you believe the owner of a
19  motorcycle has the responsibility to
20  understand the motorcycle and its features in
21  order to own and operate it safely?
22  A.  To a reasonable degree, sure.
23  Q.  Okay.  How to operate it?
24  A.  Sure.

Page 150

1  Q.  Its features and
2  characteristics?
3  A.  To a reasonable degree.
4  Q.  How to maintain it, service it?
5  A.  To a reasonable degree.
6  Q.  What the safety features are?
7  A.  To a reasonable degree.
8  Q.  Do you believe the owner of a
9  motorcycle has the responsibility to read the
10  Owner's Manual?
11  A.  I don't believe they have the
12  responsibility to study an Owner's Manual.
13  They should read the manual, but I don't think
14  they have the responsibility to study it.
15  Q.  What's the difference between
16  reading and studying in your mind?
17  A.  The ability to extract every
18  piece of information the manufacturer provides
19  in the manual would be under the definition of
20  studying as opposed to reading it in a
21  leisurely fashion where you are collecting the
22  information that you're interested in and
23  perhaps skipping parts that you're not
24  interested in, and generally getting a feel

Page 151

1  for the vehicle as opposed to understanding
2  all of its nooks and crannies.
3  Q.  Are there parts that it's okay
4  to skip?
5  A.  Sure.
6  Q.  What parts are those?
7  A.  Things that you're not
8  interested in or that you think you may have
9  already known.  I think these are reasonable
10  things that people do quite often.
11  Q.  When it says "Warning, Risk of
12  fire", is that okay to skip?
13  A.  It depends on where it's
14  presented, how it's presented.
15  Q.  Well, I mean, let me be clear.
16  Is it okay not to read it?  Do you justify the
17  decision that an owner -- that a manual --
18  that an owner would look at the Rider's Manual
19  and see it said Warning, and then doesn't read
20  what the warning is?  Do you justify that?
21  A.  Again, it depends upon how it's
22  presented, where it's presented, why it's
23  presented and what other information it's
24  presented with.

Page 152

1  Q.  I'm not talking about not
2  noticing it.  Let's be clear on my question.
3      Let's say there's a warning and
4  it says Warning, are you saying it's okay for
5  that person not to read what's under that
6  Warning?  I'm talking about reading.
7  A.  Again, it depends upon the
8  information that it's presented with, how it's
9  presented, where it's presented, why it's
10  presented.
11      So, for example, if there's a
12  picture of a helmet and it says Warning,
13  somebody is going to infer that's probably
14  going to say, Warning, don't ride a motorcycle
15  without a helmet.  So there's a good chance
16  people are going to skip it.
17  Q.  Is that okay?
18  A.  Absolutely.  They already have
19  the information or believe they have the
20  information.  So the question is, again, how
21  you're presenting the information to make sure
22  that if it's important, if it's urgent, that
23  it's set off and it's identified as such.
24      Making the warning the same as

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
Exhibit D
www.TGOakes.com

(38) Pages 149 - 152

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 153

1  all the other warnings on the page, by the
2  time I read all the other warnings I'm like
3  this is ridiculous, I don't need to know this,
4  or this isn't relevant, or I already knew
5  this, why should I read the fifth warning on
6  the page.  That's a reasonable reaction of a
7  person.
8      So if it's unique and specific
9  to this bike it needs to have greater
10  prominence in the book and where it's
11  presented, not on Page 51, at the front of the
12  manual, and how it's presented.  Not the same
13  type of signal word as the other four warnings
14  that are on the page that may or may not be
15  relevant to the information I need as a
16  rider.
17      So it just depends on how it's
18  presented, where it's presented, why it's
19  presented and what other information it's
20  presented with.
21      So here's a good example, on
22  Page 49: Warning, do not read -- excuse me,
23  do not ride the motorcycle after drinking
24  alcoholic beverages.  I'm done reading.  As a

---

Page 154

1  reasonable adult I know I should not be doing
2  that.  Do I need to read the rest of that
3  paragraph, no.  Is it reasonable to expect
4  that somebody is going to skip the rest of
5  that paragraph, absolutely.
6      If there is something down here
7  at the bottom of that paragraph that's not
8  really related to the top of it, but
9  particularly unique or important to this bike,
10  shouldn't it have been presented in a
11  different manner, absolutely.
12  Q.  Let's talk about Page 51 where
13  on the right-hand side under Risk of -- on a
14  page it says: Important notes, where it says
15  Risk of fire, and then these big bold warning
16  placard, is it okay not to read that warning?
17  A.  Well, again, as I mentioned
18  earlier, it's very possible and likely that
19  somebody is going to read, Risk of fire, high
20  temperatures occur at exhaust system,
21  particularly in a catalytic converter.
22  Warning, making sure that whether riding or
23  standing still no easily flammable material, I
24  understand what they're saying, don't let

---

Page 155

1  anything combustible get near my exhaust
2  because it gets hot.  Do I need to read the
3  rest of that to understand, no.
4      So that's the problem with the
5  way this particular warning is presented,
6  because it's in the information that's readily
7  observable, readily known.  So there's no
8  reason for the user to continue reading down
9  to that third sentence that says:  Oh, by the
10  way, do not allow the engine to idle
11  unnecessarily or for prolonged periods.
12  Q.  So we're clear, it's okay with
13  you if the owner of a motorcycle doesn't read
14  the warning on Page 51 that we're talking
15  about, yes or no?
16      I'm not asking for reasons why
17  someone might not.  I'm asking you, a warning
18  experts, is it okay -- are you saying yes,
19  it's okay, you don't to have read that?
20  A.  It is foreseeable and
21  reasonable for a person not to read an
22  inadequately presented warning.  So the fact
23  that it's inadequate on Page 51, 53 would be
24  reasonable for a person not to read it.

---

Page 156

1  Q.  Is it okay with you?
2  A.  It's not okay with me, but it's
3  not okay for the manufacturer to present
4  important critical safety information in an
5  inadequate fashion that encourages people not
6  to read it.
7  Q.  How about on Page 60 under
8  Warning where it says: Do not warm up the
9  engine with the motorcycle at standstill -
10  Risk of overheating and fire, that's right
11  upfront, isn't it?
12  A.  It's on Page 60.
13  Q.  It's right under Warning,
14  right?
15  A.  It is under Warning.
16  Q.  Let me ask you a question:  Do
17  you think the length of manuals in today's
18  world has anything to do with guys like you
19  who criticize warnings all the time and make
20  the manufacturers add a lot of warnings like
21  don't ride a motorcycle after you're drinking?
22  A.  I don't know about don't ride a
23  motorcycle after drinking, but I do know
24  manufacturers choose to rely upon an

---

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 157

1   Instruction Manual to mitigate the design
2   defect with the motorcycle, it's inappropriate
3   and it leads to long manuals.
4       So if they had fixed it from
5   the beginning or provided an adequate
6   safeguard, there wouldn't be a need to add it
7   to the manual, maybe cut a page-and-a-half out
8   of it.
9   Q.   So human factors experts have
10  no role in the length of the modern day
11  manual?
12  A.   Maybe litigation attorneys.
13  Human factors experts would say fix the
14  design, provide the safeguard, do not rely
15  upon a warning.  Particularly they would say
16  do not rely upon a warning in a manual.
17      As a human factors professional
18  my preference is to fix the design.  When I
19  worked for the IBM Corporation I worked with
20  the engineers to fix the design before we
21  relied upon a warning in a manual around the
22  product.  Eliminating it through design is
23  always the first and best option.  Providing a
24  guard is the second and second best option.

---

Page 158

1   Relying upon a manual means you've already
2   given up on your design, and that to me si
3   inappropriate.
4   Q.   Go back to Page 60.
5   A.   Sure.
6   Q.   You criticized this warning
7   because it was on Page 60.  My question is:
8   Are you saying it's okay for the owner of this
9   type of motorcycle not to read that warning,
10  not to gain the information that it provides?
11  Yes or no?
12  A.   There's plenty of reasons why
13  it would okay for the owner of a motorcycle
14  not to read this part of the manual.  And it
15  was foreseeable to BMW that a rider wouldn't
16  read this part of the manual, and if they
17  didn't read this part of the manual they would
18  have gotten the information presented.
19  Q.   So if Mr. Yazdani didn't read
20  this manual, read this part of the manual on
21  Page 60, you're saying that's okay, good job,
22  Mr. Yazdani, good job?
23  A.   I would say his behavior is
24  consistent with the majority of consumers and

---

Page 159

1   riders.  So it means everybody is wrong, or
2   does it mean BMW is wrong for depending upon a
3   warning on Page 60 of their manual to fix a
4   design defect.
5   Q.   What's the point of a manual
6   then?
7   A.   The point of a manual is to say
8   here are the features of the bike, if you need
9   to know them because it's not apparent in the
10  way the bike is presented then read the
11  manual.
12      From a human factors
13  standpoint, again, you make products easy to
14  use, intuitive to use.  If you make them easy
15  to use and intuitive to use and you design out
16  the hazards to provide adequate safeguard the
17  need for a manual becomes less and less and
18  less.  The goal of the human factors engineers
19  is to make manuals as short as possible by
20  making the design intuitive and easy to use as
21  possible.
22  Q.   Do you have a list that you use
23  when you advise clients or make
24  recommendations to tell the owner of a product

---

Page 160

1   what warnings he should or shouldn't read in
2   the manual, which ones are okay not to read?
3   A.   Nope.
4   Q.   Are there some warnings that
5   are okay not to read?  Just forget about why
6   they might not, are there warnings that are
7   okay not to read?
8   A.   Again, it's my opinion that a
9   reasonable rider, a reasonable person would be
10  reasonable in not reading an inadequate
11  warning or inadequate information that's
12  presented in an inadequate fashion.
13  Q.   Tell me which warnings are okay
14  not to read.
15  A.   Well --
16  Q.   You just bought a motorcycle.
17  Which warnings are okay not to read?
18  A.   If I bought a motorcycle and I
19  went through my rider training with BMW --
20  Q.   I'm not asking that, sir.  And
21  we can go around and around, and I can do the
22  same thing we've done and I'll ask them over
23  and over again.  You've got your speech, I get
24  it.  I'd like you to answer my question.

---

Page 161

1   Are there warnings that are
2   okay not to read, yes or no?
3   A.   So as I was saying --
4   Q.   I'll tell you what, answer me
5   yes or no and then give whatever explanation
6   you want.
7      MR. LEVINE: I'm going to
8   object to this question, because if you were
9   to hear your own question, you're saying --
10  you haven't self defined it yourself, are
11  there warnings okay not to read?
12     MR. HEINOLD: I don't need any
13  more definition.  Are you objecting to the
14  form?
15     MR. LEVINE: I'm objecting to
16  the form because you can have 17 different
17  meanings.  So when he answers it you're not
18  even going to know what --
19     MR. HEINOLD: 17 different
20  meanings to what?
21     MR. LEVINE: It could have been
22  warnings that are in a product, warnings that
23  are in a manual.
24     MR. HEINOLD: I said in a

Page 162

1   manual.  I'll start over.
2      MR. LEVINE: In this manual.
3      BY MR. HEINOLD:
4   Q.   You just bought this
5   motorcycle, are there warnings that are okay
6   not to read?
7   A.   I think, again, my opinion is
8   it's --
9   Q.   Can you answer me yes or no?
10  Can we get that?  Answer me yes or no and --
11     MR. LEVINE: I would ask that
12  the witness answer the question and then
13  explain his answer.
14     THE WITNESS: Yes, it's okay
15  not to read inadequate warnings.
16     BY MR. HEINOLD:
17  Q.   How does the reader know that
18  they're inadequate if he hasn't read it?
19  A.   I think that it would be up to
20  me to decide whether it's inadequate or not
21  and it would be consistent with the person's
22  behavior as to whether they read it or not as
23  to  whether it was inadequate or not.
24  Q.   But do you come with the

Page 163

1   manual?  When someone buys this bike, do they
2   get you too and say hey, do I have to read
3   this warning?
4      My question is:  Somebody buys
5   a product, they get the manual.  Are there
6   warnings that they don't have to read?
7      You just said yes, there are
8   warnings.  So now I want to which ones they
9   are.  How do you determine which ones they
10  are?  How does he determine which ones they
11  are?
12  A.   As I was trying to explain
13  generally, if it's an inadequate warning it's
14  okay not to read it because that's what you
15  would reasonably expect from a reasonable
16  person.
17     There are other reasons why you
18  wouldn't read a warning.  So, for example,
19  maybe there's a section of the manual that
20  doesn't apply to your bike or your product,
21  this bike is for.  This bike is for R 1150s
22  and R 850s.  It may be a warning that's
23  presented in part of the manual that something
24  you're not going to deal with.

Page 164

1   So, for example, there's a
2   headlight basic setting in here.  Maybe I'm
3   not planning on setting my own headlights.
4   I'll let the garage and the mechanic do that.
5   So why am I going to read it.
6      You know, there's different
7   features of the bike that I may not be
8   interested in, don't planning on using them.
9   Therefore, the warning wouldn't be relevant to
10  me and that would be okay not to read it.
11  There are plenty reasons of why it would be
12  okay not to read a warning.
13  Q.   Okay.  I just bought a bike, I
14  want you to assume that.
15  A.   Okay.
16  Q.   I picked up this manual.  Is it
17  okay for me not to read the warning on Page 60
18  that says:  Warning, do not warm up the engine
19  with the motorcycle at a standstill - Risk of
20  overheating and fire?  Is it okay for me not
21  to read that?
22  A.   I think it would be foreseeable
23  that somebody would not read it, and it
24  wouldn't be okay because they're not getting

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
Exhibit D
www.TGOakes.com

(41) Pages 161 - 164

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 165

1    important safety information, but it's not
2    their fault that they're not reading it.
3    Q.   If I came to you and said hey,
4    Bill, I just bought a manual, should I read
5    it, what would you tell me?  Yes or no?
6    A.   I would think as a manufacturer
7    I would say I'm providing --
8    Q.   That wasn't my question.  I'm
9    your neighbor, Bill.  Hey, Bill, I just bought
10   this, should I read this manual or not, yes or
11   no?
12   A.   Yes, I would say if you find it
13   interesting go ahead and read it.  If you
14   think you can ride a bike without it then
15   don't read it.
16   Q.   On Page 10 -- I'm sorry, Page
17   12 of your report at the bottom flowing over
18   onto Page 13, you list 10 items that should
19   have been included in this manual regarding
20   the fire as I -- I'm sorry, the risk of fire;
21   is that correct?
22   A.   I don't know what you're asking
23   me.
24   Q.   Look at Page 12.

Page 166

1    A.   Yes.
2    Q.   Do you see at the bottom Item 1
3    through 9?
4    A.   Yes.
5    Q.   Please turn to Page 13.
6    A.   Okay.
7    Q.   Do you see the top, Item 10?
8    A.   Yes.
9    Q.   What are those?
10   A.   As it states in there, it's 10
11   things that a person would need to understand
12   to foresee a potential fire hazard associated
13   with warming up the engine with motorcycle at
14   a standstill without adequate warning.
15   Q.   So is it your testimony that
16   these 10 things need to be in the manual?
17   A.   No.
18   Q.   What's the purpose of these 10
19   things?
20   A.   Well, I think it's pretty
21   explicit in the paragraph:  To foresee the
22   potential fire hazard associated with warming
23   up the engine with the motorcycle at a
24   standstill without adequate warning the rider

Page 167

1    would have to know 1 through 10.
2    So without adequate warning you
3    would have to hope that the rider knows 1
4    through 10.  As the next paragraph states,
5    most people are not going to know or have
6    information all of 1 through 10, therefore,
7    they're not going to appreciate the fire
8    hazard associated with the design defect
9    without adequate warning.
10   Q.   So this doesn't have to be in
11   the manual?
12   A.   I never said it had to be in
13   the manual.
14   Q.   Well, that's the way I read it.
15   That's why I'm here.  That's why I get to ask
16   you questions, to clarify.  It's a great
17   system.
18   So what is the point of these
19   10 things?  What is it you're telling us
20   should be done with this information?  How is
21   it imparted to the rider?
22   A.   Well, I don't know that it's
23   necessarily to impart all of it to the rider.
24   What I'm simply saying is that if you're not

Page 168

1    going to provide adequate warning and if you
2    want the rider to appreciate the hazard, they
3    would need to know all of these 10 things.
4    And it's very unlikely that a rider would know
5    all of these 10 things, and therefore, they
6    wouldn't be aware or appreciate the hazard.
7    Q.   So what is the adequate
8    warning?
9    A.   I give the adequate warning on
10   Page 14 of the report.
11   Q.   And that's the placard at the
12   bottom?  Is that the sticker for an on-product
13   warning?
14   A.   That is the example on-product
15   warning that I suggest should have been on the
16   motorcycle.
17   Q.   Okay.  What should have been in
18   the manual?
19   A.   As I state on the top of Page
20   15, the warning itself should have been
21   repeated in the manual along with the
22   explanation of how the fire occurs.  For
23   example, oil temperature increases to an
24   elevated level causing the oil sight glass to

Exhibit D

Page 169

1  fail and allow hot oil to escape the engine or
2  heat from the exhaust headers can ignite the
3  body work or wiring harness.
4  Q.  Is that the language that you
5  are proposing should have been in the manual?
6  A.  Sure.
7  Q.  And is it just that where -- I
8  mean, I want to know precisely what it looks
9  like.
10  A.  Well, I give you precisely what
11  the warning looks like on the illustration --
12  Q.  That's the on-product.  It's
13  the same thing?
14  A.  I said it should be repeated in
15  the manual.
16  Q.  So that should be repeated in
17  the manual and then what?  How do you add this
18  e.g.?
19  A.  You can put it right under it.
20  Q.  And that's the language you
21  would use?
22  A.  Sure.
23  Q.  Now I understand.  Why is it
24  important to have something different in the

Page 170

1  manual than on the product?
2  A.  I didn't say it was.
3  Q.  All right.
4      MR. LEVINE: He said he didn't
5  say that.
6      MR. HEINOLD: I'm starting a
7  new question.  My question, as I recall, why
8  is it important to have it more in the manual,
9  and he said it's not.
10      THE WITNESS: No.  I said I
11  didn't say that.  You said that.  I didn't say
12  that.
13      BY MR. HEINOLD:
14  Q.  Is it important to have more in
15  the manual?
16  A.  I don't know that it is, but
17  certainly you can.
18  Q.  Let's be really clear then.
19  What is it that needs to be on this motorcycle
20  in order to make it safe for its intended use?
21  A.  They need to fix the design
22  defect, make it safe for its intended use.  If
23  they weren't going to provide or eliminate the
24  hazard for design they need to provide an

Page 171

1  adequate safeguard, such as the fan, what have
2  you, like Mike Zazula talked about.
3      If they weren't going to do
4  that, the least they could have done is put
5  the warning in Illustration 1 on Page 14 of my
6  report on the motorcycle itself and then
7  repeated the warning in the manual.
8  Q.  Is it sufficient if that
9  warning is simply repeated without further
10  explanation?
11  A.  I think it would be best
12  practice to include the further information.
13  Q.  Is it sufficient, just the
14  warning?
15  A.  I think it's sufficient with
16  just the warning on the product.
17  Q.  Is it sufficient with just the
18  warning in the manual?
19  A.  No.  It needs to be on the
20  product.
21  Q.  Let's assume the warning is on
22  the product, is it sufficient to have that
23  same warning in the manual without more?
24  A.  I think you could put it in the

Page 172

1  manual and you can add the information as best
2  practice or you can leave it off.  I don't
3  think it's going to make that big of a
4  difference.
5  Q.  So it's sufficient not to add
6  the additional information that's at the top
7  of Page 15?
8  A.  All right.  I think -- it's
9  given the placement in the manual you should
10  provide the information at the top of Page 15
11  in the manual.  I think it provides additional
12  information for the user to understand what
13  the issue is, what the hazard is and why it's
14  occurring, increasing their understanding of
15  the event and increasing the propensity to
16  follow the warning.
17  Q.  So the understanding of the
18  event is not sufficient in a manual if you
19  just put the warning illustration, repeat that
20  in the manual?
21  A.  I'm not sure what you're asking
22  me.
23  Q.  I'm having trouble
24  understanding what you're telling me.  I

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 173

1 really don't mean to be repetitive, but the
2 warning that's an illustration on Page 14
3 should be on the motorcycle?
4 A.  I'm sorry, my opinion is that
5 the warning that's on Page 14, and it's under
6 Illustration 1, is an example of on-product
7 warning, meaning the ANSI Z535.4 2002 criteria
8 for on-product safety warnings, BMW North
9 America should have presented on the bike.
10 Q.  Okay.  And that is sufficient.
11 They don't need to put on the bike an
12 explanation about the oil temperature
13 increases elevated level causing the oil sight
14 glass to fail; correct?
15 A.  They don't need to put that
16 information on the bike.
17 Q.  Okay.  Now I want to talk about
18 the manual.  I want to assume this warning is
19 on the bike, okay?
20 A.  Okay.
21 Q.  If we put that placard, that
22 warning label that you have just said is
23 satisfactory to put on the product, if there
24 is -- if that is all that is in the manual on

---

Page 174

1 the top, is that sufficient for the manual, or
2 do you require this additional information to
3 be in the manual to make the bike safe for its
4 intended use?  Require is my word.
5 A.  So I guess I'm having a problem
6 with make it safe.  The manual is really an
7 afterthought.  I mean, you put it on the bike
8 so people see, read and understand it, but
9 you put it in the manual for completeness
10 sake.  Whether or not you put the explanation
11 of it for best practices, yes, it should be
12 there.  If you don't put it, is it going to
13 make that big of a difference, probably not,
14 because if they're not getting it on the bike
15 they're really not likely to get it from the
16 manual.
17 You know, as we had this
18 discussion earlier about whether or not --
19 MR. LEVINE:  One second.  He
20 asked you when answering that question to
21 assume that the warning was on the bike.
22 Am I right about that?
23 MR. HEINOLD:  Oh, yes.
24 MR. LEVINE:  So, in other

---

Page 175

1 words, and you may not have understood the
2 question, he said if the warning is on the
3 bike and the warning is in the manual, do you
4 also require, correct me if I'm wrong, that
5 the explanation following the warning is also
6 in the manual?  I think that was your
7 question.
8 MR. HEINOLD:  Yes.
9 THE WITNESS:  I would say yes
10 because there's no reason not to put it.
11 BY MR. HEINOLD:
12 Q.  In your report you criticize
13 BMW NA because -- you talk about you can't
14 rely on second purchasers getting the manual;
15 correct?
16 A.  Okay.  I think it's a true
17 statement.
18 Q.  But is that relevant to this
19 case?
20 A.  What do you mean?
21 Q.  Because Mr. Yazdani got the
22 manual and he received that?
23 A.  Yeah, it's not really relevant
24 to what Mr. Yazdani did with respect to

---

Page 176

1 whether or not the motorcycle was defective
2 and whether or not BMW failed to provide
3 adequate warning.
4 Q.  We can dance around this, sir.
5 You know I'm trying to be respectful, and
6 personally, I think you're avoiding my
7 questions.  And we can just do some things
8 really simply and get to the nuggets of what
9 we want.
10 My question is this:  You have
11 criticized my client for relying on -- strike
12 that.  You criticized my client because they
13 may not -- a second purchaser, used purchaser
14 may not get the manual, correct?
15 You rendered that criticism in
16 your report.  That is easy to answer yes or
17 no.  Did you or did you not render that
18 criticism in your report?
19 A.  What I said in the report is
20 that BMW couldn't rely upon secondhand users
21 having the manual.
22 Q.  Is that relevant to this case?
23 And I ask that question because Mr. Yazdani as
24 a secondhand user received the manual, did he

---

Ex. XII b

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 177

1  not?
2  A.   You just asked me two
3  questions.  So which one do you want me to
4  answer?
5  Q.   Both.
6  A.   Is it relevant to this case,
7  yes.  Did Mr. Yazdani get a manual with the
8  bike, yes.
9  Q.   Why is it relevant to this case
10  if he received a manual?
11  A.   Because my opinions with
12  respect to the defect and the failure to warn
13  is on all of these motorcycles that have this
14  unique and specific fire hazard, not just Mr.
15  Yazdani's.  I didn't write a report
16  specifically for Mr. Yazdani's bike.  I wrote
17  it for the product at issue, the R 1150 R.
18  Q.   I'd like you to look at Page 6
19  of your report.  We'll come back to that.  I
20  can't find the reference.  It is on Page 6.
21  The bottom paragraph beginning with the word,
22  However... Are you with me?
23  A.   Yes.
24  Q.   However, it's not reasonable

Page 178

1  for to BMW NA to rely solely on the Rider's
2  Manual to communicate critical safety related
3  information and warnings to secondary owners
4  of the R 1150 R motorcycle.
5      What are the critical safety
6  related -- what is the critical related
7  safety -- I'm going to start over.
8      What is the critical safety
9  related information and warnings to which you
10  are referring in that sentence?
11  A.   Well, it's the one we're
12  talking about, the one that I have on Page 14
13  in my report.
14  Q.   So what is the alternative to
15  not relying on the Rider's Manual?
16  A.   Well, as we discussed several
17  times, the alternative is to mitigate it
18  through fixing the design, providing a
19  safeguard.  And then if you're not going to do
20  those two, provide an on-product warning as I
21  depicted on Page 15 of my report.
22  Q.   So your reference there is only
23  to critical safety related information
24  relating to this issue for this fire, from

Page 179

1  leaving the vehicle idle at a standstill?
2  A.   That's what my report is about,
3  but I'm not exactly sure what you're asking
4  me.
5  Q.   Well, I'm reading, is that what
6  you're referring to?
7  A.   Well, what I'm referring to
8  there is critical warning and safety
9  instructions must be provided where and when
10  the information is needed and where the
11  information is most likely encountered and
12  seen.
13      I don't know what other design
14  defects that are on this bike that an
15  on-product warning may need to be considered
16  as a third alternative, but I'm speaking
17  specifically in this report to the warning
18  that I have on Page 14.
19  Q.   Does it have to be a product
20  defect to have a warning?
21  A.   Well, it could be -- it doesn't
22  have to be a defect.  It has to be critical
23  warning and safety instructions.  So it has to
24  be important.

Page 180

1  Q.   So aren't you saying here that
2  BMW should not rely on the Rider's Manual to
3  communicate critical safety related
4  information of any type to secondary owners?
5  A.   Again, it depends on what the
6  issue is.  If there is a critical issue that
7  needs to be communicated for the operator to
8  safely use the bike, then burying it in the
9  manual as the sole and only way that you're
10  communicating it is ineffective.
11      So then they got to figure out
12  what is the best way to deal with that hazard,
13  and putting it in the manual is not the best
14  way to deal with that hazard.
15  Q.   But is this the only safety
16  related information that's critical to the
17  safe operation of a motorcycle?
18  A.   I haven't analyzed the complete
19  design of the bike and all the hazards
20  associated with its design.  I'm only
21  concerned about this particular issue, the
22  fire because of the oil sight glass failure
23  when the bike is allowed to idle standstill.
24  Q.   But your point is we have a

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 181

1  potential for a secondhand user and we have
2  critical information that's in the manual that
3  he might not get or she might not get;
4  correct?
5  A.  Absolutely.
6  Q.  And therefore, there needs to
7  be another way to communicate?
8  A.  It depends on how you're
9  dealing with issue, what the issue is.
10      So, again, in this case we have
11  an atypical problem.  Most bikes when you let
12  them idle at a standstill don't catch on fire.
13  A lot of people allow their bikes to warm up
14  at a standstill for different periods of time
15  that are not aware that this is a potential
16  problem with the BMW R 1150.
17      Because of that they needed to
18  find a different way to communicate that
19  information to the user if they're going to
20  choose not to fix it by changing the design or
21  providing a necessary safeguard.
22  Q.  I can understand why you don't
23  want to answer my question.  So let's try it
24  again.  This issue, I don't need to hear your

Page 182

1  opinion on this issue, I think I've heard it
2  100 times perhaps.
3      My question is:  Your
4  criticizing my client on relying on a manual
5  to communicate critical safety related
6  information and warnings, plural, to secondary
7  owners; correct?  You criticized my client for
8  that, yes?
9  A.  I -- yes, it's --
10  Q.  Is this the only -- is this
11  issue the only critical safety related
12  information or warning that has to be
13  communicated in some other manner if we accept
14  your criticism?
15  A.  I'm sorry, I did not analyze
16  the complete BMW R 1150 R to determine what
17  other defects may or may not have been present
18  and what other critical warnings or safety
19  information needs to be presented on the bike.
20  Q.  Should Harley-Davidson be
21  concerned about the same thing?
22  A.  Harley-Davidson doesn't have
23  the same defect, so I wouldn't think they
24  would be concerned about the same thing.

Page 183

1  Q.  Okay.  Does Harley-Davidson
2  have to be concerned about critical safety
3  related warnings not being communicated to
4  secondary owners?
5  A.  I think that Harley-Davidson in
6  their hazard analysis and safety analysis of
7  their motorcycles would want to see what
8  hazards are associated with its product,
9  eliminate those that they can through design,
10  provide adequate safeguards and then determine
11  whether or not a warning in the manual is
12  appropriate or whether or not it needs to be
13  on the product because it's atypical and not
14  something that most riders would be aware of
15  or think about.
16      MR. HEINOLD: Ken, I'm getting
17  this close to saying let's go see a Judge.
18      MR. LEVINE: I think it's a
19  middle ground, frankly.  I think that he can
20  answer the questions yes or no and then give
21  an explanation.
22      MR. HEINOLD: You know what I'm
23  asking.  You know what I'm asking.  You don't
24  have to admit this on the record.  You know

Page 184

1  what I'm asking and you know he's not
2  answering.
3      MR. LEVINE: I'm going to
4  disagree with that.  And I agreed with you
5  before, by the way.  I agreed with you before
6  that he wasn't answering your question.
7      You're asking him something
8  that from his analysis standpoint takes a lot
9  more than a yes or no.  It just does.  You can
10  tell the way that this witness does his
11  analysis.
12      MR. HEINOLD: Excuse me for
13  interrupting --
14      MR. LEVINE: No, it's okay.
15  The truth is -- you want to know -- the last
16  question was does Harley-Davidson need to put
17  any specific -- let me use the proper words
18  here, any specific critical safety related
19  information physically on their bikes?
20      MR. HEINOLD: No, I didn't say
21  that.
22      MR. LEVINE: I apologize, I
23  thought that was your question.
24      MR. HEINOLD: I didn't say that

Thomas G. Oakes Associates
1-877-625-3777
Exhibit D
www.TGOakes.com

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 185

1  at all.
2      MR. LEVINE: I thought that was
3  your question.
4      MR. HEINOLD: I'll tell you
5  what, I'm going to tell you, okay, and then
6  you see if he answers the question.
7      MR. LEVINE: Fair enough.
8      MR. HEINOLD: Okay.
9      MR. HEINOLD: This is an
10  explanation with a question at the end.  I'm
11  sure you're intelligent to follow it and not
12  have to sort through it and say this big long
13  thing.
14      MR. LEVINE: I'm ready.
15      MR. HEINOLD: He's made a
16  statement critical of my client for relying on
17  a manual to communicate critical safety
18  related information to people who buy used
19  motorcycles because they might not get it.
20      MR. LEVINE: Yes.
21      BY MR. HEINOLD:
22  Q.  Correct?
23  A.  Sure.
24  Q.  Okay.

Page 186

1      MR. HEINOLD: So, I want to
2  know is this the only critical safety related
3  information, this issue in this case, to which
4  he's referring, or is he talking generically?
5      MR. LEVINE: I can answer your
6  question.
7      MR. HEINOLD: I know you can
8  answer it.
9      MR. LEVINE: And I believe that
10  he has, actually.
11      MR. HEINOLD: What do you think
12  the answer is?
13      MR. LEVINE: As written there,
14  it was meant to express the concept in
15  general.
16      MR. HEINOLD: In general?
17      MR. LEVINE: Yes, in general.
18      MR. HEINOLD: That means, Ken,
19  does it not, that there's more than one issue
20  that has to be communicated in a critical
21  safety related warning in an alternate --
22      MR. LEVINE: There may be.
23      MR. HEINOLD: There may be.
24      MR. LEVINE: There may be, I

Page 187

1  agree with that.
2      BY MR. HEINOLD:
3  Q.  So I accept the proposition
4  there may be.  Do you accept that proposition?
5  A.  If you asked that question I
6  would say maybe, sure.
7      MR. LEVINE: And also, then you
8  said to him what other critical related safety
9  information would be required?  To which I
10  believe the witness said, I have not analyzed
11  the bike for any other issue other than this
12  particular one, which I found to be of a
13  critical related, safety related information
14  issue.  And then I believe --
15      MR. HEINOLD: And then I think
16  he went on to --
17      MR. LEVINE: Well, he does his
18  thing.
19      MR. HEINOLD: -- a soliloquy.
20      MR. LEVINE: Well, let me say
21  this to you in defense to the gentleman to my
22  right, and that is this:  We continue to focus
23  on whether or not it was right or wrong for a
24  warning to be placed on the bike, because I

Page 188

1  know that's part of this case, but when asked
2  about the behavior, whether or not that was
3  right or wrong, inherently as an ergonomics
4  guy he also wants to say that we should never
5  even -- in addition to your focus on that
6  issue, we should never have gotten there, and
7  he is fearful that it will get lost in the
8  wash and then it will be only the answer to
9  the very isolated question you have.
10      By the way, you then went on to
11  ask him about the Harley-Davidson, whether or
12  not their critical related safety information
13  that they should have physically put on it, to
14  which he went into his very long answer that I
15  haven't analyzed the Harley-Davidson.
16      MR. HEINOLD: I asked that
17  because he wouldn't answer my other question.
18  It's a simple question.
19      MR. LEVINE: I can answer that.
20      BY MR. HEINOLD:
21  Q.  It's a simple question.  If
22  you're not going to produce the manual -- if
23  they're not going to get the manual because
24  they're a secondhand user, would you agree

Yazdani vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 189

1   with me there's probably a whole bunch of
2   stuff that they ought to know that they're not
3   going to get?
4   A.   It's possible.
5   Q.   Okay, it's possible.  And if
6   they're not going to get it, is the solution
7   to put something on the product?
8   A.   It depends on what the issue
9   is.
10  Q.   You hold open the possibility
11  that you might have other -- you haven't done
12  the analysis, I understand that, to hold open
13  the possibility that there might be other
14  issues that you have to put on the product?
15  A.   Anything is possible.
16  Q.   You don't know?
17  A.   I don't know what?
18  Q.   You don't know whether there
19  would or wouldn't be more?
20  A.   As I said earlier, I did not
21  analyze the complete bike to determine what
22  other defects there may be that would require
23  a warning because BMW chose not to deal with
24  it in its design.

Page 190

1   Q.   You've talked about on-product
2   warning is necessary because of the clutter of
3   information, 89 Pages of the Rider's Manual;
4   correct?
5   A.   That is a problem with
6   presenting warnings in manuals.
7   Q.   Can you have too many
8   on-product warnings?
9   A.   Sure.
10  Q.   Can you create clutter there?
11  A.   Sure.
12  Q.   Can it interfere with
13  understanding awareness and recollection?
14  A.   Of each -- or a single
15  individual warning, sure.
16  Q.   Is there any study or research
17  or literature that tells how many such
18  warnings would create clutter?
19  A.   There's not research that's
20  going to tell you any given situation whether
21  or not it would be considered clutter or have
22  a detrimental effect on the individual's
23  warnings ability to draw attention, have
24  somebody read it and understand it.

Page 191

1       It would be the manufacturer's
2   responsibility to do that study to determine
3   what may or may not be appropriate.
4   Q.   In the human factors world of
5   expertise, are there any warnings or
6   instructions, warnings or research that would
7   tell you that?
8   A.   Tell me what?
9   Q.   Tell you about how -- how to
10  determine how many warnings there would be so
11  as to avoid interference with understanding?
12  A.   Sure, there's all kinds of text
13  and research, not necessarily text,
14  publications, guidelines on how to conduct
15  usability testing on your product to determine
16  whether or not a warning is appropriate,
17  whether the number of warnings you're
18  providing is appropriate.
19      I conducted many of tests like
20  that when I was with the IBM Corporation to
21  determine what worked and what didn't work.
22  Q.   On what?
23  A.   On products.
24  Q.   No, but on-product warnings?

Page 192

1   I'm talking about --
2   A.   Yes, on-product warnings and
3   manual warnings, whatever the case may be.
4       Again, and I know you don't
5   want to hear it, but the warning design is an
6   integral part of the product design.  You
7   don't wait until the product is done and then
8   figure out that you have all these unaddressed
9   hazards and now you have to figure out what
10  warnings you're going to stick on the product
11  to make it safe.
12      You determine what hazards
13  there are with your product, and then you go
14  through the safety hierarchy, which ones can I
15  eliminate through design, which ones can I
16  minimize through design, which ones can I
17  provide a safeguard for.
18      At the end of the day what
19  happens is that list of hazards shrinks, and
20  now you're down to whatever residual hazards
21  are left and you have to decide on how you're
22  going to warn.  And part of that decision is
23  what goes on the product, what goes in the
24  manual.  And you decide that based upon

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 193

1 consequences such as death and severe property
2 damage as opposed to a paper cut and maybe I
3 ruined the chrome on my exhaust.  So there's
4 different levels of the severity of the
5 hazard.
6     You deal with it based on how
7 you expect people are going to use your
8 motorcycle, how people use the other
9 motorcycles and the knowledge that the people
10 are most likely going to have.
11     So if it's an issue well, we
12 want to warn people to wear a helmet, that's
13 probably not something you need to put on the
14 bike itself, but something you can regulate or
15 set off into the manual.
16     But if you have a unique fire
17 hazard associated with the design of your oil
18 sight glass, that's something that can lead to
19 severe consequences, including severe injury
20 or death and property damage.  And two, it's
21 inconsistent with the way you know people use
22 bikes.  And three, it's inconsistent with
23 people's knowledge of how you can safely use
24 the bike.

Page 194

1     So those three factors make it
2 important that it be on the product as opposed
3 to another hazard that may not be as severe or
4 people may know about it generally or is
5 consistent with how people typically use their
6 bike.
7 Q.  Have you done an analysis for
8 this bike, this manual, to determine whether
9 there should be any other on-product warnings?
10 A.  I have not.
11 Q.  Do you agree or disagree with
12 the possibility that there might be the need
13 for one if you did that analysis, one or more?
14 A.  It's certainly possible.  I
15 showed you a photograph of that Yamaha earlier
16 that had two warnings that were conspicuously
17 placed on the motorcycle, one on the
18 windshield and one on the top of the gasket.
19 Q.  We didn't get copies of those
20 yet.  You referred to the fact that you had
21 looked at them and had it included in your
22 report, but I didn't see them yet.
23 A.  I'm sorry, I'll pull them out
24 right now.  There you go.

Page 195

1     MR. LEVINE: Off the record.
2     - - -
3 (Whereupon a discussion was held off
4 the record.)
5     - - -
6     BY MR. HEINOLD:
7 Q.  One warning says:  Before you
8 operate this vehicle read the Owner's Manual
9 and all labels.  The other says:  Always wear
10 approved motorcycle helmet, eye protection and
11 protective clothing.  The other on the
12 windshield says:  Caution, cleaning with
13 alkaline or acid cleaner gasoline solvent will
14 damage the windshield.  Use neutral material.
15     Do you believe both of those
16 are necessary?
17 A.  I didn't do an analysis to
18 determine if they were necessary on that
19 Yamaha.  I brought those pictures to depict
20 the fact that some manufacturers do, in fact,
21 put multiple warnings that they feel are
22 necessary on the bike.
23 Q.  So you haven't done an analysis
24 of whether there might be others that you

Page 196

1 would think would be appropriate to put -- to
2 use as on-product warnings if that was the
3 issue before you; correct?
4 A.  I think that I've answered this
5 multiple times, but I have not done that
6 analysis.  So I do not have an answer to your
7 question.
8 Q.  Are there any guidelines that
9 say how many is too many?
10 A.  There are no guidelines that
11 say how many is too many.  If you have a list
12 of warnings or hazards that you rely upon
13 warnings, the guideline is to make sure that
14 during design you're eliminating those that
15 you can through design and provide guards for
16 those you can't.
17     When you've gone through that
18 process and you are left with the warnings,
19 then you have to determine how you're going to
20 present it.  And it can be on the product or
21 in the manual, and that decision is based upon
22 those things I talked about earlier.
23 Q.  And if you've gone through all
24 of that and you determined that there are a

Page 197

1  lot of things that you want to put on -- a lot
2  of labels and warnings and instructions that
3  you want to put on the motorcycle so that
4  someone doesn't sue you if they don't follow
5  it, are there -- is there any literature, is
6  there any scientific approach to say how many
7  is too many?
8  A.   There is a scientific approach.
9  Q.   What is it?
10  A.   It is the manufacturer's
11  responsibility to do their testing.  If
12  they've got that many warnings left over that
13  they decided need to be on the bike they
14  better go and do their testing to insure that
15  they can do it appropriately.  If they can't
16  do it appropriately, then they need to start
17  reconsidering whether or not they should be
18  offering that product for sale.
19  Q.   But from a warnings standpoint,
20  an expert such as yourself, there's no
21  guideline that says woh, that's too many,
22  right?
23  A.   There's no specific number of
24  warnings that are considered too many

Page 198

1  warnings.
2  Q.   But you agree that someone
3  could put too many on there?
4  A.   A lot of manufacturers do.
5  Q.   On products?
6  A.   On products.
7  Q.   And when you say they do, you
8  mean they do put too many on there?
9  A.   Absolutely.
10  Q.   And the consequence of that is
11  an interference with the whole purpose of
12  having the warning in the first place?
13  A.   It can have a detrimental
14  effect on any single or any individual warning
15  within that clutter.
16  Q.   But that decision has to be
17  made individually by a manufacturer?
18  A.   It needs to be made by the
19  manufacturer.  They're in control of their
20  product.
21  Q.   But there's no technique, no
22  guideline, no peer-reviewed studies, no any of
23  that they can refer to that says this is --
24  here's the guidelines?

Page 199

1  A.   Again, there are guidelines on
2  what you do.  You can reference some of them
3  in my report.  The very first reference is the
4  National Safety Council's Accident Prevention
5  Manual for Business and Industry
6  Administration Programs, 12th Edition.  In
7  there they give a whole chapter, I've cited on
8  loss control and product safety.  They tell
9  you the process that you need to go through to
10  analyze the hazards associated with your
11  product to determine how you're going to
12  mitigate it.
13      There are references and
14  guidelines with respect to determining which
15  warnings need to be on the product versus
16  need -- or could be in the manual.
17      Then after you decided which
18  can be eliminated or which should be
19  eliminated through design, which should be
20  guarded, so it's the residual hazards such as
21  hazards, all hazards, the residual hazards,
22  maybe that's a key step I'm not emphasizing
23  enough.
24      MR. LEVINE: Oh, you're

Page 200

1  emphasizing.
2      BY MR. HEINOLD:
3  Q.   You're emphasizing.
4  A.   But then there is a list of
5  other warnings related references that I cited
6  that deal with how to determine what warnings
7  go on the product, what warnings don't, and it
8  gets down to the severity of the injury, the
9  likelihood of the people having the knowledge
10  beforehand, and how the product is typically
11  used or commonly used.
12      So those three factors hedge to
13  the fact that it needs to be on the product.
14  If you have several hazards that are
15  associated or have that same characterization
16  and you decided that they need to be on the
17  product, now you go do your own testing to
18  determine how you're going to best present
19  them.  And if you can't best present them,
20  then you got to question whether or not it's
21  safe to launch the product into the
22  marketplace.
23  Q.   Okay.  So that's my question.
24  You did all of the dissertation about how to

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
Exhibit D
www.TGOakes.com

(50) Pages 197 - 200

Page 201

1  decide if you need to put a label on a
2  product, and then the question that I'm
3  interested in is:  Well, then how many can you
4  put on there?  And you said you would have to
5  do your own testing.  That's the answer to
6  that question, right?
7  A.  It's an empirical question.
8  Yes.
9  Q.  Okay.  So then you agree with
10  me that when I'm -- well, you're agreeing with
11  me because I'm not -- I'm asking the question,
12  but my understanding from what you said is
13  that there are no guidelines about how many
14  you can put on the product so that you don't
15  achieve clutter and interference, or where you
16  have to put them, if you've got a product, you
17  got multiple warnings, you have to determine
18  that individually; correct?
19  A.  Well, part of what you said was
20  correct.  Part of what you said was incorrect.
21  Q.  What part was correct?
22  A.  That you have -- you're the
23  product manufacturer, it's your product,
24  you're going to have to decide where to put

Page 202

1  those warnings if you have multiple warnings.
2  Q.  Okay.  How many?
3  A.  That's up to the manufacturer
4  to decide.  If they narrowed it down that they
5  have of list of two, 10, 20, whatever the case
6  may be, they have to decide can they do that
7  adequately.
8  Q.  Okay.  And there's nothing that
9  they can refer that gives them the important
10  factors about how to make that decision; is
11  that right?
12  A.  That's not right.
13  Q.  Okay.  Where is it?
14  A.  The guidelines talk about what
15  warnings should be -- how you prioritize
16  warnings.
17  Q.  Yes.
18  A.  Okay.  Now, once you prioritize
19  it and you're trying to decide which ones go
20  on the product or how many, I should say, can
21  fit on the product, that's empirical testing.
22  There's guidelines how to conduct usability
23  testing.  There's, you know, dozens and dozens
24  of books on how to conduct usability testing.

Page 203

1  If you don't have the ability
2  in-house, you hire a human factors consulting
3  company to do it for you.  You guys can call
4  me, I'd be happy to do it for you.  I offer
5  that service.
6  Q.  Did you say usability testing?
7  A.  Yes.
8  Q.  What is usability testing?
9  A.  Usability testing is, in
10  essence, taking your users and providing them
11  or allowing them to interface with your
12  product and determine whether or not whatever
13  feature you're interested in is usable.
14  So, in the case of warnings,
15  you want to know whether or not the two,
16  three, four, five or how many warnings you're
17  considering putting on the product, the place
18  where you're considering to put it on would be
19  effective.  So you run them through hands-on
20  testing with the product.
21  You can even start with doing
22  mock-ups, pencil paper mock-ups where you're
23  just showing users the design.  If this is the
24  design of a motorcycle and I put a warning

Page 204

1  here, would this capture your attention?  You
2  can mock it up with Styro-foam if you have,
3  physically place the warnings where you think
4  that they're relevant or should be placed and
5  have the users conduct tasks and determine
6  whether or not they're seeing them, reading
7  them, understanding them and complying with
8  them.
9  As you get farther along in
10  developing, you can actually take the
11  motorcycle and have alternative places where
12  you're going to test to determine what works
13  and what doesn't work.  This is all empirical
14  testing.
15  Q.  If somebody was to come in this
16  case and say we need 25 labels, and that's too
17  many because it will create clutter, what
18  would you have to do to say no, they're wrong,
19  in terms of creating clutter?
20  MR. LEVINE: Can I interrupt
21  for one second just so I understand.  Do you
22  mean 25 in one place or 25 all over the
23  product?
24  MR. HEINOLD: All over the

Page 205

1  product.
2    THE WITNESS: First I would
3  want to know why they have that many.  That
4  would be the absolute first question.  I'd
5  want to know what was done to eliminate
6  through design, what was done to guard against
7  it.  Then I would want to know the
8  prioritization that was given to each of the
9  warnings.  Then I want to know were they
10  relevant to on the bike, when they're
11  relevant, where they're relevant.
12    So, for example, if it has
13  something to do with bleeding the brakes, for
14  example, the warning being placed on the gas
15  tank is probably not the appropriate place for
16  it.  You would probably want it down on the
17  caliber.  So it could be that when you get
18  done you can find the spots that are relevant
19  on the bike and place them specifically at
20  those spots and you decrease the issue of
21  clutter.
22    If they're all relevant to the
23  tank, the gas tank, let's say you've got 10
24  warnings that are related to the gas tank, I

Page 206

1  don't see how that's possible, then you got to
2  look at whether or not they can be combined
3  into a single one.
4    I think the -- for example, the
5  Yamaha warning that you looked at earlier,
6  there was two different topics addressed in
7  the same warning, so that's a multi topic
8  warning.  That's one way to reduce it.  You
9  know, there's just multiple ways of doing it.
10  Q.  So, if somebody said look, we
11  have made a determination that we need to put
12  20 stickers on the gas tank, what would you
13  have to do to say no, that would be clutter,
14  that would be too many?
15  A.  Again, I would have to look at
16  what was done from a hazard analysis --
17  Q.  You said all that.  I'm
18  assuming you've done that.  Now we've
19  concluded that there's 20 pieces of
20  information that need to be imparted in order
21  for us to feel as if our product is safe, but
22  we're concerned about clutter so we can't do
23  that, what would you have to do to determine
24  whether that would create clutter and be an

Page 207

1  interference with the transmission of useful
2  safety information or not?  Usability test?
3  A.  Again, I can offer to do the
4  usability testing.  I can look at it and do a
5  heuristic evaluation of it.
6    MR. LEVINE: A what?
7    THE WITNESS: Heuristic.
8    BY MR. HEINOLD:
9  Q.  That's off the cuff?
10  A.  I'm sorry?
11  Q.  Is that like off the cuff?
12  A.  No.  It's done based on what
13  the professional knowledge and experience
14  looking at the standards, guidelines and
15  recommendations are from warning design,
16  seeing whether or not you can meet those.  So
17  that's a certainly a way to do it.
18    But again, you've got a
19  hypothetical that is so outlandish that it
20  stretches the imagination in the realms of
21  possibility.  If you have 20 different
22  warnings that had to go on the gas tank, you
23  know, my first inclination is that you can't
24  do it, that this is ridiculous.  You shouldn't

Page 208

1  have this many hazards associated with the gas
2  tank.  What did you do differently or wrong
3  with your design that requires 20 different
4  warnings on the gas tank.
5  Q.  So if I distill all this, you
6  would have to do a usability test to determine
7  whether that particular decision of 20
8  stickers on the gas tank would create clutter
9  or interfere with the transmission of safety
10  information because, as I understand, there's
11  no guideline that says anything more than five
12  is too many, you need to have five to seven,
13  you know, anything like that?
14    You would have to look at all
15  the other things you talked about to make that
16  kind of decision; is that right?
17  A.  I would say you're incorrect.
18  For 20 different warnings on the gas tank, I
19  think I can safely look at that and say that
20  that would be inappropriate and inadequate.
21  Q.  Well, what -- that would be
22  your opinion, right?
23  A.  That would be my learned
24  opinion based on my education, training and

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 209

1  experience.
2  Q.  Well, what would -- how about
3  five?
4  A.  Again, I'd go through the same
5  process, determine why there's five that you
6  would have to put on.
7  Q.  No, I got that process.  I'm
8  talking about we reached that point.
9     See, here's my question --
10  A.  Then I think --
11  Q.  -- it's a simple one.
12  A.  Well, do I get to answer or do
13  I get interrupted again?
14  Q.  Oh, you'll get interrupted
15  again if you keep giving the same answer,
16  non-answer.
17  A.  I'm sorry, go ahead.  You keep
18  asking the same question over and over again.
19  Q.  You're right, I do.  You keep
20  answering the same question.  Here's the
21  problem, your answer isn't my question.
22  A.  It depends on the situation.
23  I'd have to look at it and give you my
24  opinion.

---

Page 210

1  Q.  My point is simply this:  You
2  would be guided by your experience and your
3  knowledge of what an individual warning ought
4  to be and whether it's an appropriate
5  communication, not by a reference manual or a
6  study that says this many warnings create
7  clutter or any testable hypothesis, yours you
8  would be testing to create answers, right?
9  A.  I don't know what you're trying
10  to ask me, and I'm having a hard time giving
11  you an answer because I'm sure if I give you
12  an answer you're going to tell me it wasn't
13  responsive to your question.
14  Q.  Likely.
15  A.  So please try to maybe break
16  that question apart, rephrase it.
17  Q.  Well, my point was this:  If
18  you had a question as to whether a certain
19  number of labels created clutter or
20  interference of with a transmission of safety
21  information, you would conduct a usability
22  study in order to answer that question;
23  correct?
24  A.  I would evaluate it, and

---

Page 211

1  depending upon the situation would determine
2  what type of tool I used to evaluate it.
3  Q.  Okay.  And within the arsenal
4  of tools, what would they be?
5  A.  Well, the usability study would
6  be one of them.  A heuristic evaluation would
7  be one of them.
8  Q.  Okay.  Anything else?
9  A.  You need to go through a litany
10  of different tools that are available to a
11  manufacturer or a consultant.
12  Q.  That is specific to that
13  question?
14  A.  There's multiple different ways
15  you can do it.  You can perform hallway
16  testing on it.  You can perform focus group
17  testing on it.  There's different fidelities
18  in your usability testing.  So there's
19  different ways to skin the cat.  It depends on
20  the situation.
21  Q.  You mentioned a few moments ago
22  making a decision on whether an on-product
23  warning is appropriate or not.  Let's say
24  necessary.  Okay, you would evaluate whether

---

Page 212

1  an on-product warning is necessary.
2     What are the guidelines,
3  factors that you have to consider?
4  A.  I went through them multiple
5  times.
6  Q.  Are they written anywhere or is
7  this just a general --
8  A.  They're written in the
9  references I cited and other references.  I
10  determined an organization of warnings.
11  Q.  Those references give you the
12  guidelines about -- I understand you have an
13  opinion, all right.  I want to look at what
14  field that you claim expertise says about
15  that.  That's what I'm looking for.
16     Is it these references?
17  A.  The easiest one to point is
18  the -- I see the Warnings and Risk
19  Communication most likely has a chapter
20  dealing with the prioritization of warnings.
21  I didn't bring a reference specifically cited
22  to address that topic because it wasn't -- I
23  didn't think it was relevant or necessary.
24  Q.  What, how to decide whether or

---

Exhibit D

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 213

1  not you need an on-product warning, you didn't
2  think it was a relevant or necessary topic for
3  this deposition?
4  A.  Well, BMW North America
5  determined what was needed.
6  Q.  Well, you determined that their
7  determination was wrong?
8  A.  No.  I determined that it was
9  right.  Then when they put on the warning on
10  the product in 1997 for the same type of
11  hazard, that was the appropriate thing to do.
12  What they did for the incident bike was
13  inappropriate.
14  Q.  It's correct that BMW North
15  America didn't make those determinations.
16  That's the Defendant in this case.  You're
17  aware of that, right?
18  A.  I'm aware that BMW North
19  American administered the recall.
20  Q.  Okay.  They didn't make the
21  determinations?
22  A.  They could have administered
23  however they wanted.  They were the responding
24  party in this country.

---

Page 214

1  Q.  Okay.  So, I thought you were
2  giving me an answer and then you appeared to
3  back away from the answer in terms of the
4  guidelines that says and the factors that say
5  whether on-product is necessary or not?
6  A.  Looking at chapter -- or
7  Reference 3, Wogalter and Vigilante, that's my
8  chapter in the Handbook of Warnings, I notice
9  the date on there is incorrect, it should be
10  2006, not 1999, does deal with location and
11  prioritization.  Peters, 15 cardinal
12  principles to ensure effectiveness of warning
13  systems will deal with location of warning
14  information.
15  Q.  Any others?
16  A.  I'm not seeing offhand.
17  Q.  So, if I read that, I'll
18  understand the factors that one would apply to
19  determine whether an on-product is necessary;
20  correct?
21  A.  I don't know what you
22  understand, but the information is in there.
23  Q.  Let's say somebody who
24  understands would be able to follow guidelines

---

Page 215

1  that you embrace and say this warning
2  qualifies or this warning doesn't?
3  A.  I think your expert referred to
4  the Handbook of Warnings that I authored, two
5  chapters and edited two other chapters in his
6  report.  So I think that's probably a very
7  good resource for you.
8  Q.  Okay.  Let's assume we have a
9  purchaser of a used motorcycle who didn't get
10  the manual.  Are you with me?
11  A.  Sure.
12  Q.  What information can you think
13  of, as you sit here, needn't be an exhaustive
14  list, but what information would that person
15  need to know before he or she got on the
16  motorcycle or attempted to operate it?
17  A.  It depends.
18  Q.  On what?
19  A.  Their experience, the manner in
20  which it's set out.  Maybe the person selling
21  it to them gave them some tips and
22  information.
23      Mr. Yazdani testified he didn't
24  read the manual until after he drove the thing

---

Page 216

1  back to Boston.  So he's on a multi hundred
2  mile trip before ever picking up and reading
3  that manual.
4  Q.  Do you think that's a good
5  idea?
6  A.  Yes.  We talked about this
7  before.  I think it's reasonable that if you
8  don't feel that you need to read the manual,
9  that many people, reasonable people won't read
10  the people.  That's why you can't depend upon
11  the manual to inform them of critical safety
12  information.
13      So, you know, it gets back to
14  the question if you feel you need to read the
15  manual, if you have no idea how to use the
16  product, then it's probably necessary and
17  reasonable for you to read a manual.
18      I bought my new car in
19  December.  I drove home from the dealer
20  without reading the manual.  It's a several
21  hundred page manual.  I can tell you I haven't
22  read the thing front to back because I don't
23  have the time to do it.  So I looked at some
24  information that I was interested in that I

---

Page 217

1  didn't need to know like how to set the
2  navigation, and that's it.
3      If there was something uniquely
4  dangerous about that car I would have hoped
5  that the dealer and/or the on-product warning
6  would have told me.
7  Q.  Let's use the most common
8  denominator, a used purchaser who might not
9  know very much, bought it used?
10  A.  How do you know they don't know
11  it very much?
12  Q.  Let me ask you this:  You've
13  been critical of the reliance on the manual to
14  communicate important safety information to
15  secondhand purchasers who may not get the
16  manual.  So if that's the case, doesn't there
17  have to be some baseline of basic information
18  that should be communicated if your criticism
19  is valid, in some other method?
20  A.  Sure.
21  Q.  I'm not asking for the
22  baseline.
23  A.  Sure, absolutely.
24  Q.  Okay.  So what's the baseline?

Page 218

1  A.  The baseline, for example, with
2  a motorcycle is that they are typically
3  operated the same way.  They have two levers
4  at the handlebars, one's a clutch, one's a
5  brake, they have two pedals, one on each side,
6  one's for the gears, one's for the rear
7  brakes.  If a person gets on a motorcycle
8  they've never driven before and the buttons
9  for start, stop, or what have you, are clearly
10  labeled, they would probably get on that
11  motorcycle and drive away.
12      Now, you do recall that I had
13  three used Harley-Davidsons and I'm not sure
14  that one of them came with an Operator Manual,
15  but I do know when I rode it home from where I
16  bought it I didn't read any of the Operator
17  Manuals.  I think at least two, if not all
18  three of them, I didn't get the manual until
19  much later until, which means I had been
20  riding around on that bike for a while without
21  reading and never did I feel unsafe or never
22  did I feel that I was doing something wrong or
23  unsafe or incorrect.
24      Now, if you were to put a

Page 219

1  product out on the market that is like a
2  motorcycle, but has different controls, maybe
3  there's no hand levers, maybe there's three
4  pedals on one side and none on the other, then
5  you're probably going to need a manual or if
6  somebody teaches you how to use it or how to
7  ride it.
8      But if you're talking about
9  basic operation, there's no need to read the
10  manual.  If you're not planning on doing your
11  own maintenance, as Mr. Yazdani apparently
12  wasn't, there's no reason to go into the
13  manual to figure out all these different
14  things related to maintenance.  You take it to
15  the shop, and BMW North America makes money
16  because the dealer charges a lot to have you
17  maintain the bike.  So, again, it's a -- it
18  just depends on the bike and the situation.
19  Q.  Do you think you answered my
20  question?
21      MR. LEVINE: I actually think
22  he gave you more than you ever asked for.
23      MR. HEINOLD: Oh, absolutely.
24  You think the answer's in there?

Page 220

1      MR. LEVINE: I do believe the
2  answer to that one is in there.
3      You are asking him some
4  questions about minimal things that -- you're
5  very broad in these circumstances.
6      MR. HEINOLD: Absolutely.
7      MR. LEVINE: You're very broad
8  in these circumstances.  So his answer, to be
9  complete, is to be very broad as well.  I
10  think that it is very hard in this instance to
11  come up with a very concise question that will
12  allow for a very concise answer when you're
13  talking about these warnings topics.
14      But keep trying, and if I think
15  he's offensive or going astray, as I have in
16  the past, I would either cut him off, I'll ask
17  him to answer directly.  I'm more helpful than
18  the average opposing counsel.
19      MR. HEINOLD: You probably are,
20  but I agree to disagree on this one.
21      MR. LEVINE: Okay.
22      THE WITNESS: Do you mind if we
23  take a five-minute break?
24      MR. HEINOLD: Sure.

Page 221

1      - - -
2    (Whereupon, a short break was taken at
3    this time.)
4      - - -
5      BY MR. HEINOLD:
6    Q.  Do you think the warning that
7    you've been discussing about the risk of fire
8    is the most important warning in regard to
9    operating this motorcycle?
10   A.  The most important warning with
11   respect to my opinions in this case, yes.
12   Q.  With respect to operating the
13   motorcycle?
14   A.  I don't think I went through
15   all the different warnings for operating
16   motorcycles.
17   Q.  So the answer is you don't
18   know?
19   A.  I don't know.
20   Q.  This proposed warning on Page
21   14, what size is it?
22   A.  That's actually the size that I
23   intended.  No, I take that back.  I did print
24   out the actual size.  That's about the size I

Page 222

1    intended.
2      MR. HEINOLD: Let's mark this
3    as an Exhibit.
4      - - -
5    (Whereupon, Exhibit Vigilante-5 were
6    marked for identification.)
7      - - -
8      MR. HEINOLD: I don't know if
9    we gave a list of the Exhibits thus far.
10   Vigilante-1 is the report.  Exhibit 2 is the
11   Testimony List.  Exhibit 3 is the C.V.
12   Exhibit 4 is what was marked as Yazdani-1.
13   And Exhibit 5 is the actual warning and size
14   which the witness has printed and provided.
15     BY MR. HEINOLD:
16   Q.  Where would you place it
17   precisely?
18   A.  Oh, I don't know that I have to
19   be pinned down to a precise location, but
20   certainly on top of the gas tank, on the
21   handlebars between the clamps and then on the
22   console or even on the center pivot.
23   Q.  Can you take whatever photo
24   you're referring to and pull it out and mark

Page 223

1    where you think it should be in order to be
2    effective?
3    A.  There's multiple locations, but
4    I'll be happy to.
5    Q.  Identify as many of them as you
6    can, please.
7    A.  (Witness indicates.)
8    Q.  Can you prioritize which ones
9    you think is best or how did you reach that
10   decision?
11   A.  I think they all would be fine
12   (indicating).
13   Q.  Are you finished?
14   A.  Yes.
15     MR. LEVINE: For the record,
16   the witness put X marks on I believe four
17   locations on two pictures.
18     - - -
19   (Whereupon, Exhibit Vigilante-6 was
20   marked for identification.)
21     - - -
22     BY MR. HEINOLD:
23   Q.  Page 15 of your report --
24   A.  Okay.

Page 224

1    Q.  Finding number 4, you say that:
2    This warning failed to meet contemporary
3    industry standards, guidelines and practices.
4      Can you identify what those
5    contemporary industry standards, guidelines
6    and practices are?
7    A.  Sure, Page 17, I'll just give
8    you the numbers, if that's okay.
9    Q.  All right.
10   A.  Number one, these are my
11   references --
12   Q.  On Page 17, sorry.
13   A.  Number 1, Number 2, Number 3,
14   Number 4, Number 5, Number 6.
15   Q.  1, 2, 3, 4, 5, 6, is that what
16   you said?
17   A.  Yes.
18   Q.  1 through 6?
19   A.  Yes, and then -- that's fine.
20   Q.  And do you believe that the
21   warning in the manual violated ANSI Z535.4?
22   A.  I'm sorry, one more time.  Do I
23   believe that it violated it?
24   Q.  Is it your opinion that the

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
Exhibit D
www.TGOakes.com

(56) Pages 221 - 224

Page 225

1 warnings on this issue in the manual violated
2 ANSI Z535.4?
3 A.  That's for on-product safety
4 signs and labels.  This is in a manual.
5 Q.  So the failure to comply is
6 because there was no on-product safety?
7 A.  Yes.
8 Q.  Okay.  Do you believe that the
9 on-product label that was provided with the
10 recall product, provided to the recall product
11 violated Z535.4?
12 A.  Well, it depends on which part.
13    MR. LEVINE: I think he was
14 done with his answer, by the way.
15    MR. HEINOLD: It depends on
16 which part.  I guess I was waiting for him to
17 tell me which part violates it and which part
18 doesn't.
19    THE WITNESS: I'm sorry, I was
20 trying to keep the answer short.
21    BY MR. HEINOLD:
22 Q.  Which part violates it and what
23 part doesn't?
24 A.  Well, the on-product where ANSI

Page 226

1 Z535.2 requires it be located at the time and
2 location the information necessary is met.
3 But the parts requiring signal word were not
4 met.  The parts requiring the formatting of
5 the signal word were not met.  Parts
6 recommending a border were not met.  Parts
7 recommending a signal word icon were not met.
8 Q.  You said signal word --
9 A.  Icon?
10 Q.  No.  Then you said a second
11 thing.  Then you said border and then you said
12 a signal word icon.
13 A.  Oh, I'm sorry, the first was
14 just a signal word.
15 Q.  Right.  And then what was the
16 second one?
17 A.  I said there was -- I don't
18 remember the order of them.
19 Q.  You said four.  I only wrote
20 down three.  We can read it back or you can
21 tell me the four again.
22 A.  There was no signal word, no
23 signal word icon.  There's no format.  A
24 signal word header is not format.  There was

Page 227

1 not signal word header, orange, safety orange,
2 no border.
3 Q.  Is Z535.4 mandatory?
4 A.  Is it mandatory?  No, it's
5 not -- well, I'm sorry, it depends.
6 Q.  What does it depend on?
7 A.  It depends on whether there's a
8 Federal regulation that calls out the
9 requirement to meet it or not.  So there are
10 some Federal regs that require it be met.  But
11 in this case I don't think it's required.  So
12 sorry.
13 Q.  In this case, Mr. Yazdani's
14 intention was to start the motorcycle, to warm
15 it up, go outside and smoke a cigarette for
16 seven or nine minutes, come back and turn it
17 off.  Is that your understanding?
18 A.  That's my understanding.
19 Q.  All right.  And is it your
20 understanding he got distracted and forgot?
21 A.  That's my understanding.
22 Q.  And that he walked back through
23 the garage where the motorcycle was running
24 and went back into the house?

Page 228

1 A.  A little bit fuzzy what you're
2 trying to say there.
3    MR. LEVINE: He asked for the
4 last two factors you put before him.
5    BY MR. HEINOLD:
6 Q.  That he went from outside the
7 garage door that was open back through the
8 garage and into his house to talk on the
9 phone.  Is that your understanding?
10 A.  I would say my understanding is
11 that he walked through the garage into the
12 house.  I don't know that he walked back from
13 outside.  So you put that caveat on there.
14 I'm not sure that's a hundred percent -- my
15 understanding is he walked from the garage
16 into the house.
17 Q.  Okay.
18 A.  And the bike was running in the
19 garage.  I agree with all that.
20 Q.  There was a two-car garage with
21 one door opening?
22 A.  Two-car garage.  I don't
23 remember if it was one or two doors open, but
24 one or the other.

Case 2:15-cv-01427-TR   Document 17-2   Filed 04/15/16   Page 59 of 155
Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 229

1  Q.  Does that matter to you?
2  A.  No.
3  Q.  Do you agree that on that date
4  he didn't act as he intended to act when he
5  started the motorcycle?
6  A.  Sure.
7  Q.  Do you believe that an
8  on-product warning that satisfies your
9  requirements, as you suggested, would have
10  caused him not to be distracted and forget the
11  motorcycle was running and then go into the
12  house?
13  A.  I don't think it would have
14  caused him not to be distracted.  I think it
15  would have informed him that he shouldn't let
16  the bike run at a standstill.  Therefore, he
17  wouldn't have started it in the first place.
18  Q.  What is your basis for that?
19  A.  The basis is that he would have
20  been provided with the warning and the
21  information he needed to understand the hazard
22  and that when he was planning on doing,
23  letting it run seven to 10 minutes was not
24  safe because it could result in a fire.

Page 230

1  Q.  People don't always follow
2  warnings and instructions; correct?
3  A.  They absolutely do not, that's
4  why you try to eliminate them by design,
5  provide the necessary safeguards and not rely
6  upon warnings.
7  Q.  But you do agree that people
8  don't always follow warnings?
9  A.  I absolutely agree with that.
10  Q.  And what is your basis for
11  saying that Mr. Yazdani would have followed
12  this particular warning?
13  A.  A couple things.  Number one,
14  he wasn't aware of the hazard that he was
15  exposed to when he started the bike to leave
16  it run for even seven to nine minutes.
17  And two, there's a litany of
18  research out there that shows if you provide
19  adequate warnings most people will follow,
20  see, understand and company with an on-product
21  warning.
22  Q.  Is there some type of technique
23  to decide whether he would or would not
24  have -- I mean, you have an opinion it would

Page 231

1  have.  Is there some technique, something you
2  rely on to say that Mr. Yazdani would or would
3  not have followed the warning?
4  A.  Sure.
5  Q.  What is it?
6  A.  Well, I would look at his
7  testimony and his statements to see if there's
8  anything to indicate that he's not a
9  reasonable person that wouldn't act like the
10  majority of people would act.  And I don't see
11  anything in his testimony to suggest that he
12  wouldn't have acted like the majority of
13  people or the way you expect the majority of
14  the people to act.
15  And number two, he testified
16  that he wasn't aware of the hazard before he
17  did what he did.
18  Q.  Is there any literature which
19  discusses the limitations of on-product
20  warnings?
21  A.  Well, I think the answer to
22  your question is that most warnings literature
23  recognize the limitations of using an
24  on-product warning saying it's a hazard,

Page 232

1  particularly when there are design regarding
2  solutions available.
3  Q.  Is there any literature which
4  discusses the limitations and the
5  effectiveness of an on-product warning itself?
6  A.  Well, there certainly are
7  studies that have been done on the
8  effectiveness of adequate warnings to change
9  behavior.  And a good one, I don't know if I
10  referenced it or not, but it's done by Cox and
11  Wogalter, it was a Met-analysis done on the
12  effectiveness of warnings, and they showed
13  that, in fact, when you provide adequate
14  warnings they do change behavior.
15  MR. LEVINE: Can you tell her
16  the name of the two authors?
17  THE WITNESS: Cox, C-O-X, and
18  Wogalter.  And then I note from my own
19  research in my own experience in designing and
20  developing on-product warnings that when you
21  provide effective and adequate on-product
22  warnings they do, in fact, change behavior.
23  BY MR. HEINOLD:
24  Q.  Which studies have you

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 233

1  researched for that?
2  A.  Well, to give you an example,
3  some of the technical reports I wrote that
4  would -- on Page 9 of my C.V., second to the
5  last page, there's a technical report dealing
6  with the feasibility and competitive
7  evaluation of the IBM high rate wireless land
8  PC card, and the part of that testing had to
9  do so with testing the provisions of a warning
10  on the product.
11  Q.  What was the warning?
12  A.  The warning basically said that
13  the PC card needed to be installed after the
14  drivers was installed, otherwise it wouldn't
15  work.  And it was a -- you want me to explain
16  all of it?  Because I want to keep things
17  short.
18  Q.  Thirty words or less.
19  A.  When they designed the wireless
20  card they should have designed it so that it
21  worked, the install worked regardless whether
22  you put the PC card in first or not.  But the
23  way they designed the driver, the driver had
24  to be installed first before the PC card.

Page 234

1      And I told them that most
2  people are going to put the PC card in first
3  and then try and install the driver, and when
4  they do that they're going to cause a problem,
5  which is going to drive the help call, service
6  call.
7      So the compromise they did for
8  the initial release of the product was to put
9  a warning on the plastic case of the PC card
10  saying, Don't install the PC until you
11  installed the driver.  And that was a
12  workaround until they fixed the driver issue.
13  Q.  So was that a study that you
14  did?
15  A.  Yes, part of a usability test.
16  Q.  Peer reviewed?
17  A.  I don't know if it was peer
18  reviewed in a classical sense.
19  Q.  Published?
20  A.  It was published as an IBM
21  Technical Report.
22  Q.  Within IBM?
23  A.  Yes.  It was implemented in the
24  design of the product and sold.

Page 235

1  Q.  How about the effectiveness
2  study of Cox and Wogalter, was that a peer
3  reviewed study?
4  A.  Yes.  And the other study I was
5  looking for was the December 1999 Ideascan
6  2000, usability study and competitive
7  evaluation.  And this looked at the
8  effectiveness of adding a warning to the
9  scanner to prevent another damage to the
10  scanner.
11  Q.  Another IBM?  I didn't find it
12  yet.  What page is it?
13  A.  It's on the second to the last
14  page.
15  Q.  And that's another IBM internal
16  use?
17  A.  Technical Report.
18  Q.  Any others?
19  A.  They're the only two I believe
20  that I wrote, technical reports.
21  Q.  My question was literature on
22  the effectiveness and/or limitations on
23  on-product warnings?
24      MR. LEVINE: I'm sorry, can you

Page 236

1  repeat the question.
2      BY MR. HEINOLD:
3  Q.  The effectiveness or
4  limitations on on-product warnings.
5  A.  Well, there's other examples.
6  So, for, example, Reference 11 looked at the
7  compliance to Owner's Manuals warnings,
8  influence of familiarity and placement of a
9  supplemental directive.  So in that study they
10  put a warning label, an abbreviated warning
11  label on the device pointing to the manual or
12  additional information regarding the
13  particular problem versus just having the
14  information in the manual.
15  Q.  And that's a 1995 study?
16  A.  Yes.
17  Q.  Is that peer reviewed?
18  A.  Yes, it's in the Journal of
19  Ergonomics.
20  Q.  I assume you provided me with a
21  copy of that?
22  A.  It's on the disk.
23  Q.  Any others?
24  A.  I mean, I can -- if you give me

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
E-Xhibit b
www.TGOakes.com

(59) Pages 233 - 236

Page 237

1   time I can come up with other ones, but
2   they're the ones that I have referenced either
3   in my report or in my C.V.
4   Q.   So let me go back to usual
5   distraction.  Is it your opinion that that
6   doesn't matter because he wouldn't have been
7   doing the activity to begin with, the fact
8   that he was distracted and forgot?
9   A.   Right.  The distraction is
10  irrelevant.  The question is whether or not he
11  had the information he needed to leave the
12  bike in the first place.
13  Q.   Will you agree with me if Mr.
14  Yazdani had read the Manual and had understood
15  the warning and had followed the warning, he
16  would not have left the motorcycle idling at a
17  standstill in his garage on that day?
18  A.   If he followed BMW's intention
19  for the warning in the Manual he wouldn't have
20  left it running at a standstill in the garage.
21  Q.   And if he had read the Manual
22  and he had understood the warning prior to this
23  incident, the existence or nonexistence of the
24  label you propose on the motorcycle would not

Page 238

1   matter; correct?
2   A.   That's not true.
3   Q.   Okay.  Why would it matter?
4   A.   Well, first of all, the warning
5   needs to be on the bike regardless of whether
6   Mr. Yazdani ever purchases the bike.  So it
7   should have been there when he got it.
8      Number two, if Mr. Yazdani did
9   happen to read the Manual, did happen to read
10  all the Manual, did happen to read all of 51
11  and 60 to understand exactly what BMW was
12  trying to communicate to him, and then
13  subsequently forgot it, the warning would have
14  reminded him at the time of location it was
15  needed.  If read it and remembered it, the
16  warning on the bike would have reinforced what
17  he had read in the Manual encouraging him not
18  to do what he did.
19  Q.   Assuming he had read it, read
20  these warnings, okay, assume he understood
21  what BMW was trying to tell him about not
22  running at a standstill, idling at a
23  standstill because of the risk of fire, and
24  assume he remembered that, then the on-product

Page 239

1   warning would have -- its presence or absence
2   would have no causal effect on this incident.
3   Do you agree with that?
4   A.   It would reinforce what he had
5   read and remembered.
6   Q.   If he remembered it, does he
7   need to be reinforced?
8   A.   Sure.
9   Q.   If he remembered it and he
10  wasn't reinforced, would he still do the
11  prohibited act?
12  A.   If he remembered -- my opinion
13  is if he had read the Manual, read Pages 51
14  and 60, understood what BMW was trying to
15  communicate to him, and then practiced that
16  and recalled that at the time he wouldn't have
17  done what he did.
18  Q.   And therefore, the existence or
19  nonexistence of the label on the motorcycle
20  would have no causal effect to this incident;
21  correct?
22  A.   The only thing it would have
23  served in that purpose was to remind him and
24  reinforce what he had remembered and read and

Page 240

1   understood.
2   Q.   But if he wasn't going to do it
3   anyway, which we just agreed under my
4   hypothetical, then it wouldn't have mattered
5   whether it was on there or not; correct?
6   A.   I would agree if he knew that
7   there was a risk of fire by letting the bike
8   idle in a stationary position, decided to do
9   it anyway, the warning wouldn't have changed
10  his mind.  That's why you want to eliminate
11  through design or by safeguard.
12  Q.   I want to get your opinion on
13  this clearly and cleanly.
14      We're going to assume for
15  purposes of my question that he had read the
16  appropriate pages in the Manual regarding the
17  risk of fire if he ran the engine at a
18  standstill, okay?  So we're assuming that;
19  correct?
20  A.   Okay.
21      MR. LEVINE:  Your question is
22  assuming that.
23      MR. HEINOLD:  My question is
24  assuming that.

Page 241

1   MR. LEVINE: Fair enough.
2   BY MR. HEINOLD:
3 Q.  I'm asking you to assume that.
4 A.  Okay.
5 Q.  And I'm asking you to further
6   assume that when he read those pertinent
7   portions of the Manual he understood the risk
8   that was being conveyed in those lines, okay?
9 A.  Okay.
10 Q.  And I want you to further
11   assume that he remembered it; correct?  Okay?
12 A.  Okay.
13 Q.  If you make those three
14   assumptions, then he wouldn't need a reminder
15   on the motorcycle to change his conduct;
16   correct?
17 A.  If he remembered it at the time
18   he went out to start the bike he wouldn't need
19   a reminder.
20 Q.  Okay.  And therefore, if he
21   read it and if he understood it and if he
22   remembered it he wouldn't -- the label,
23   whether it is there or not, is of no
24   consequence; correct?

Page 242

1   MR. LEVINE: To this case?
2   MR. HEINOLD: To this case.
3   THE WITNESS: But to causation
4   it's not, but the bike is still defective
5   without it.
6   BY MR. HEINOLD:
7 Q.  Okay, I understand that.  But
8   to causation it's not?
9 A.  To causation, if he was aware
10   of the hazard, was thinking about it at the
11   time and recalled and made a decision, made a
12   conscious decision to disregard the
13   information he had, then the label wouldn't
14   have done anything except reinforce what he
15   read in the Manual.
16   Now, is it possible that by
17   reinforcing it it would have changed his
18   behavior, it's possible.  Is it as likely as
19   if he didn't know when the warning was there
20   to tell him, I don't think it's -- we're
21   looking at degrees, that's similar to a
22   degree.
23 Q.  If it was going to change
24   behavior he would do it because you already

Page 243

1   agreed that if he read it, understood it and
2   remembered it, he wouldn't be doing it in the
3   first place which is why there's no causal
4   connection, which you also agreed to; correct?
5 A.  If he read it, fully understood
6   it and remembered it at the time and did it
7   anyways, like I said, the on-product warning
8   may have reinforced the manual, but I doubt it
9   would have changed his behavior if he was
10   intending to disregard what he had known and
11   remembered otherwise.
12 Q.  As the owner of a motorcycle,
13   did Mr. Yazdani have a responsibility to read
14   the Manual?
15 A.  If he didn't know how to
16   operate the bike, then I would suggest he had
17   a responsibility to read it.
18 Q.  But if you thought he knew how
19   to operate it, it's okay with you that he
20   didn't read it?
21 A.  I think it's a reasonable thing
22   that many reasonable people do often.
23 Q.  But reasonable people do things
24   that they shouldn't do and they don't do

Page 244

1   things that they should do.
2   My question is not whether it
3   was reasonable to you to do, but does he have
4   a responsibility -- you're a warnings expert,
5   does the owner of the product, in this case a
6   motorcycle, have the responsibility to read
7   the Manual?
8 A.  If he didn't know how to
9   operate the bike he should have read the
10   manual to find out how to operate it.
11 Q.  And if he knew how -- if he
12   thought he knew how to operate it, then he has
13   no responsibility, in your opinion, to read
14   the manual?
15 A.  I don't think so.
16 Q.  Do you think that his failure
17   to read the manual if, in fact, he didn't read
18   the manual, gives him any responsibility for
19   this fire?
20 A.  I don't think you can hold him
21   to be responsible for the fire when he wasn't
22   aware of the atypical, unique hazard
23   associated with the bike.
24 Q.  But he might have been aware if

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
E-Xhibit 13
www.TGOakes.com

(61) Pages 241 - 244

Page 245

1  he read the manual?
2  A.  I doubt it.
3  Q.  He might have been?
4  A.  I doubt it.
5  Q.  I know you doubt it.
6  A.  It's my professional --
7  Q.  Are you certain of it?
8  A.  Within a reasonable degree of
9  scientific certainty.
10  Q.  What does that mean?
11  A.  It means more likely than not
12  that the information in the Manual was
13  inadequate to convey the information that BMW
14  North America is claiming they intended to
15  convey.
16  Q.  That's 50.1 percent, right?
17  A.  Sure.
18  Q.  Are you more certain than that?
19  A.  I don't have to be.
20  Q.  So your answer is no?
21  A.  My answer is I don't have to
22  be.
23  Q.  Are you more certain than 50.1
24  percent?  That's a yes or no.  Either you are

Page 246

1  or you aren't.
2      MR. LEVINE: Just so when you
3  use this against him later, he at least knows
4  what question he's more than 50.1 percent.
5      MR. HEINOLD: The one that
6  we've been asking.
7      MR. LEVINE: Whether or not Mr.
8  Yazdani would have understood the risk if he
9  read the manual?  Is that the question?
10  Because that's what I thought the question is.
11      MR. HEINOLD: Yes.
12      THE WITNESS: One more time,
13  please.
14      BY MR. HEINOLD:
15  Q.  The question is this:  Let me
16  preface the question with what you previously
17  said so we can put it into context.
18      I asked you were whether his
19  failure to read the Manual gave him any
20  responsibility for this fire, and you said,
21  no, because he didn't know the risk.  And I
22  said, But could he have learned the risk if he
23  read the manual?  And you said, I doubt it.
24  And I said, If you doubt it, that means

Page 247

1  there's some possibility that he would have
2  understood it?  And you said, Eventually, more
3  likely than not.  And I said, That means 50.1
4  percent?  And you agreed.  And then I said,
5  and this is the question, Are you certain
6  beyond 50.1 percent?  And you said, I don't
7  have to be.
8  A.  Correct.  So you want me to
9  answer it again?
10  Q.  No.  If that's your answer,
11  then that's the one you're going to live with.
12      Do you believe that the
13  Plaintiff's failure, Mr. Yazdani -- let me
14  start that over.
15      Do you believe that Mr.
16  Yazdani's failure to understand the features
17  and characteristics of his motorcycle with
18  regard to idling at a standstill
19  responsibility for this fire?
20  A.  You're going to have to do that
21  one more time.
22  Q.  Do you believe that Mr.
23  Yazdani's failure to understand the features
24  and characteristics of his motorcycle with

Page 248

1  regard to idling at a standstill and the risk
2  of fire gives him responsibility for this
3  event?
4  A.  I don't think he's responsible
5  for it.
6  Q.  Why not?
7  A.  Because BMW North America
8  failed to provide adequate warning.
9  Q.  And does that excuse his
10  failure to investigate the characteristics and
11  features of his bike regarding the risk of
12  fire at a standstill?
13  A.  How does he know to investigate
14  it?
15  Q.  I get to ask the questions.
16  A.  I'm sorry.  It's late in the
17  day, excuse me.  I don't know that he knows
18  that he has to investigate it, that's why he
19  haven't investigated it.  And he doesn't know
20  to investigate it because BMW North America
21  failed to provide adequate warning.
22  Q.  Do you believe -- let's assume
23  he read it, okay, and understood it, do you
24  believe his failure to remember it gives him

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
Exhibit D
www.TGOakes.com

(62) Pages 245 - 248

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 249

1  any responsibility for the fire?
2  A.  So you're asking me if his
3  failure to be human makes him responsible for
4  the fire?  I don't think so.
5  Q.  No, that's not what I'm asking.
6  A.  Sure it is.
7  Q.  That's your interpretation of
8  and your spin as a hired gun.
9      My question is:  If he read it
10  and he understood it and he forgot it, does
11  that give him any responsibility for this?
12  A.  It happens all the time.
13  Q.  Is your answer no?
14  A.  My answer is without adequate
15  warning he was not responsible for it.
16  Q.  Is your answer no?
17  A.  Without adequate warning his
18  responsibility would be no.
19  Q.  Zero?
20  A.  Sure.
21  Q.  Okay.  Do you believe that Mr.
22  Yazdani forgetting that his motorcycle was
23  running in his garage and going into his house
24  gives him any responsibility for this event?

Page 250

1  A.  Not without knowing the risk.
2      MR. HEINOLD: I'd like to get
3  those copies.
4      MR. LEVINE: Sure, let me do
5  that.
6      - - -
7  (Whereupon, a short break was taken at
8  this time.)
9      - - -
10      BY MR. HEINOLD:
11  Q.  We took a break, you provided
12  me with some additional materials from your
13  notebook that you brought here.  Let me just
14  ask you what some of these are.
15      MR. HEINOLD: You can mark this
16  as Vigilante-7.
17      - - -
18  (Whereupon, Exhibit Vigilante-7 was
19  marked for identification.)
20      - - -
21      BY MR. HEINOLD:
22  Q.  I think these go together.  It
23  looks like a website?
24  A.  Yes, but I don't have the

Page 251

1  second page.  I got them, I'm sorry.
2  Q.  Four pages?
3  A.  Yes.
4  Q.  What is that?
5  A.  It's a publication entitled
6  Sound Rider.  Well, it's a website called
7  Sound Rider, a motorcyclist enthusiast
8  website, and there's an article called Half
9  A$$ Winterization.
10      And basically, it's just an
11  explanation from the author as how he
12  winterizes his motorcycle and still allows him
13  to ride during the off season when it's a
14  little bit warmer.  And his process is, you
15  know, essentially what Mr. Yazdani was doing
16  on the day of the incident.
17      And he notes that he once every
18  couple weeks let's the engine run for 15 to 20
19  minutes at least once a week during the cold
20  season even if you're not riding.
21  Q.  Is that an air-cooled?
22  A.  I don't think he ever
23  references whether it's air-cooled or
24  liquid-cooled.

Page 252

1  Q.  Okay.  Anything else
2  significant about that?
3  A.  No.  You know, I just came
4  across an article in a rider enthusiast
5  website that explains what Mr. Yazdani was
6  doing.
7  Q.  What is the next one?  Do these
8  four pages go together?
9  A.  Yes.
10  Q.  And what is that?
11      MR. HEINOLD: Let's mark that
12  as 8.
13      - - -
14  (Whereupon, Exhibit Vigilante-8 was
15  marked for identification.)
16      - - -
17      BY MR. HEINOLD:
18  Q.  Explain what Exhibit 8 is.
19  A.  It's another website for
20  motorcycle enthusiasts.  The one thing that I
21  noticed in here is that the author makes a
22  statement that most people say that
23  Harley-Davidsons never overheat.  And then
24  there's some examples of one of the people

Exhibit D

Page 253

1  that commented, I don't know who it is, but
2  just an example of sitting in traffic in
3  Myrtle Beach and couldn't move and eventually
4  had to pull over and turn off because
5  the -- to cool the bike off.
6      Another guy was noticing that
7  his VTX has a fan that comes on just like a
8  car to keep the cooling even at a stopped
9  light.  That was just one of the things I ran
10  into.
11      MR. HEINOLD: Let's mark this
12  as 9.
13      - - -
14  (Whereupon, Exhibit Vigilante-9 was
15  marked for identification.)
16      - - -
17      BY MR. HEINOLD:
18  Q.  How about the next one?
19  A.  The next one is from The
20  American Spectator.  Looks like it's an
21  organization related to vehicles.  The author
22  is a columnist for automotive and vehicle
23  related topics.  It just gives a description
24  of air-cooled versus water-cooled engines.

Page 254

1      You know, before I involved in his case I knew
2  my vehicle was air-cooled, but I assumed and
3  believed that the purpose of the oil was to
4  lubricate and to cool the engine.  And that's
5  what he was stating -- that's what the author
6  is stating in this paper, that an air-cooled
7  engine is actually an air/oil cooler.
8      And he also says that's why
9  mini bikes have external oil coolers and that
10  some of them have deep sump or additional
11  capacity oiling systems to prevent them from
12  overheating.
13      Then he makes a statement that
14  if that an engine is well-designed and factory
15  stock and in good running order, usually will
16  not overheat.  And then he says:  However, if
17  the engine was not well-designed or it's been
18  modified to produce additional power, or is
19  not in good tune, running lean, for instance,
20  is more vulnerable to overheating to
21  heat-related damage.
22  Q.   Anything else significant about
23  that?
24  A.  He also says that if you leave

Page 255

1  the bike alone, no adding upgrades to the
2  pistons or what have you, simply change the
3  oil and filter every now and then you'll
4  probably never have any problems, period.
5  Q.  Anything else?
6  A.  No.
7  Q.  Is that a two-page article?
8  A.  I also attached the -- you see
9  in your hand right there, that's just his
10  Bio.  You see the Author Bio here
11  (indicating)?
12  Q.  Okay.
13      - - -
14  (Whereupon, Exhibit Vigilante-10 was
15  marked for identification.)
16      - - -
17      BY MR. HEINOLD:
18  Q.  What's the next one?
19  A.  The next one is from a website
20  called Motorbike Writer.  It's another website
21  for motorcyclists.
22  Q.  And what's the significance of
23  that?
24  A.  He just kind of gives a

Page 256

1  description of how people who have a tendency
2  to let their bike idle for a while and rev it
3  up to warm it up.  And he states that
4  consistent with BMW that it's not good for the
5  engine.
6      He says that older motorcycles
7  with carburetors and gluggy oils require a
8  long period of warming up, but today's fuel
9  injected engines with moderate sympathetic
10  oils can go straight after you push the
11  button.  So he's just kind of giving an idea
12  of different motorcycles of different age,
13  different engine styles, some require longer
14  warm-up periods than others.
15  Q.   So these are -- the last
16  several Exhibits are general background
17  information, not something on what you
18  specifically rely for an opinion?
19  A.   Yes, just general background
20  information.
21  Q.  Is this part of the same
22  article or is that a separate one?
23  A.  I think that -- nope, you're
24  right.  That's a different article.

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 257

1     MR. HEINOLD: We'll call that
2  Exhibit 11.
3     - - -
4  (Whereupon, Exhibit Vigilante-11 was
5  marked for identification.)
6     - - -
7     BY MR. VIGILANTE:
8  Q.  Explain what Exhibit 11 is,
9  please.
10  A.  Another website.  This one is
11  revzilla.com.  Revzilla is a large distributor
12  of aftermarket parts and motorcycle riding
13  accessories.  And they're just giving their
14  understanding of the difference between
15  air-cooled and liquid-cooled.  And they note
16  that they believe an air-cooled engine
17  operates in a water range of temperatures that
18  are considered normal.  That's the other only
19  thing in there that I found interesting.
20  Q.  Okay.  Then we have a series of
21  photographs.  Tell me what those are.  Let's
22  break them down by vehicle if we can.
23  A.  Yes, there's two sets then.
24  Well, actually, there's four sets.  There's

---

Page 258

1  four pages of a blue Yamaha motorcycle.
2  Q.  Okay.
3     MR. HEINOLD: We'll call that
4  Exhibit 12.
5     - - -
6  (Whereupon, Exhibit Vigilante-12 was
7  marked for identification.)
8     - - -
9     BY MR. HEINOLD:
10  Q.  Is there a model or year
11  designated?
12  A.  Yes.
13  Q.  What is it?
14  A.  It's a 1998 Yamaha YZF R1.
15  It's 1,000 CC motor.
16     MR. HEINOLD: I'm just going to
17  put a 1 on here because it didn't make it
18  through the copy on the Exhibit.
19     MR. LEVINE: Okay, sure.
20     BY MR. HEINOLD:
21  Q.  Okay.  What's the significance
22  of it?
23  A.  Well, I took the pictures
24  because A, they're -- you know, it's a sports

---

Page 259

1  bike manufacturer that put a warning on the
2  gas tank and then another warning on the
3  windshield.  So just an example of a motorcyle
4  manufacturer putting warnings directly on the
5  bike itself.
6  Q.  Those are actually the same
7  warnings as the prior photograph of Exhibit;
8  correct?
9  A.  It's the same, same one?
10  Q.  Same bike or --
11  A.  Same bike.
12  Q.  I was looking for the other
13  Exhibit.  Exhibit 6, is that the same -- it's
14  not the same bike?
15  A.  Vigilante-12 is different than
16  Vigilante-6.
17  Q.  Okay.  But the warning is the
18  same.  Is this the one I read from earlier?
19  A.  Yes.
20  Q.  We just didn't mark it?
21  A.  Yes.  There's two other
22  pictures in here and they just depict the
23  location of the oil sight glass, the right
24  side of the bike.  And in the pictures you can

---

Page 260

1  see that when the bike is on its center
2  kickstand, which is -- you can see the oil
3  halfway up the oil sight glass.
4  Q.  Which picture is that?
5  A.  Let me pick it up for you.
6  There it is.
7  Q.  I have a four-page Exhibit.
8  It's the last page?
9  A.  The bottom one on the last
10  page.
11  Q.  Is this upside down?
12  A.  No.
13  Q.  Are you looking at it correctly
14  or am I looking at it correctly?
15  A.  This is the orientation of the
16  bike (indicating).
17  Q.  Yeah, okay.
18  A.  So the oil level is this dark
19  liquid here (indicating).  So the top picture
20  and then the picture on the preceding page is
21  the bike on the left kickstand.  You'll see
22  the oil is not in the oil sight glass.  The
23  oil is on the left side of the engine.
24  Q.  Okay.  And we have some more

---

Page 261

1  pictures?
2  A.  Yes, the next two pages are a
3  BMW F800 GS 2010.
4  Q.  What's the significance of
5  this?
6  A.  That's a 2010 BMW sport bike
7  and they're using a dipstick on the left side
8  of the crane case that's depicted in the top
9  photograph.
10  Q.  Okay.
11      - - -
12  (Whereupon, Exhibit Vigilante-13 was
13  marked for identification.)
14      - - -
15      BY MR. HEINOLD:
16  Q.  Then there's a one-page
17  article?
18  A.  Yes, that is just stating that
19  IIHS has categorized BMW R 1150 and the Yamaha
20  YZF R1 as essential sport bikes or super sport
21  bikes.  The only reason I pulled that is just
22  to show they're in the same classification as
23  opposed to a cruiser type bike.
24  Q.  I'm not going to bother marking

Page 262

1  that one, unless you --
2      MR. LEVINE: No.
3      BY MR. HEINOLD:
4  Q.  Then the last photos?
5  A.  The last photos are three
6  different bikes, but they're all the BMW
7  R 1100 RSL.  So I believe this was the model
8  bike that was involved in the NHTSA recall.
9      - - -
10  (Whereupon, Exhibit Vigilante-14 was
11  marked for identification.)
12      - - -
13      BY MR. HEINOLD:
14  Q.  And that's it for the
15  materials, right?
16  A.  Yes, you took the other Exhibit
17  photos I had and marked those as Vigilante-6.
18  Q.  You need those back.
19      MR. HEINOLD: Ken, can you make
20  a copy of this Exhibit?
21      MR. LEVINE: Yes.
22      MR. HEINOLD: Whenever you get
23  a chance.
24      MR. LEVINE: Okay.

Page 263

1      BY MR. HEINOLD:
2  Q.  Now, the last area I want to
3  cover is your comments and report on Mr.
4  Breen's report.  You had some criticisms of
5  his report and his conclusions and
6  inaccuracies.
7      If it's all right with you, I'd
8  like you just to take me through it, point out
9  what they are and explain what it is.
10      Would that be satisfactory for
11  me to understand that?
12  A.  I can try.
13  Q.  Okay.  If I have a follow-up
14  I'll ask it.
15  A.  Let's go, the bottom of Page 3,
16  he notes that when Yazdani purchased the
17  motorcycle it was a used unit, he received and
18  read this manual.  And one of the things I was
19  thinking is that I don't know that anyone ever
20  established that Yazdani was given the
21  R 1150 R, R850 Manual.
22      In the deposition, his
23  deposition they talk about it in generalities
24  and then show him the manual, but I don't

Page 264

1  think they ever validated that's the manual
2  all he received.  And I did have a question
3  about that so I marked that.
4      On Page 4, second paragraph,
5  Mr. Breen states that motorcyclists tend to be
6  enthusiasts and into the sport of motorcycling
7  and knowledgeable about the features of their
8  motorcycles as well as competitor models.  And
9  he offers no proof to that statement, and it's
10  generalized statement without any proof or
11  insight into how much information people
12  have.
13      At the end of that paragraph he
14  states:  All of these activities tend to make
15  motorcyclists more aware of their riding
16  environment and the nature of their motorcycle
17  compared to many average owners of passenger
18  vehicles.  And again, I noticed that's pure
19  speculation and generalization.  No proof to
20  support that.
21  Q.  Okay.  For the record, you're
22  against pure speculation, generalization and
23  no proof?
24  A.  Sure, I try to provide support

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 265

1  for all my opinions.
2  Q.  Okay, I just want to be sure.
3  What's next?
4  A.  The next paragraph he states:
5  On-product labeling has significant
6  substantial to deteriorate.
7       And although that is possible
8  for poorly designed warnings, certainly many
9  warnings on vehicles are designed to be a
10 hardy and stand up to the elements as the 1998
11 Yamaha YZF photos I produced show.
12      He also states:  There is a
13 limited space available on motorcycles to
14 provide label.
15      And again, that's a half true
16 statement.  That certainly a motorcycle is not
17 a tractor trailer with 53 feet of real estate,
18 there's still significant space to add a
19 label, depending upon the issue and where it's
20 applicable.  Then I also note that contrary to
21 his two points, BMW North America added an
22 on-product warning to deal with their recall
23 defect.
24      Page 6, top of the

Page 266

1  paragraph --
2  Q.  Do you recall what Mr.
3  Yeldham's explanation for that was?
4  A.  Explanation for what?
5  Q.  Adding the on-product warning
6  to the motorcycle itself?
7  A.  Yes, it was to inform people of
8  the potential fire hazard.
9  Q.  Okay.  What's next?
10 A.  I'm sorry?
11 Q.  That's what you recall?
12 A.  That's what he testified.  I
13 was going to go to the page.  He testified on
14 Page 171:  BMW AG decided to send out, put on
15 label, on the bike itself to reduce the risk
16 of fire occurring in bikes already on market.
17 175:  They added label because
18 there was a risk of fire and they wanted to
19 make the end user aware of the risk.
20      Back to the report?
21 Q.  Yes.
22 A.  Page 6, top of Page 6 he
23 states:  The approach of -- the information
24 provided in the manual addresses the issue of

Page 267

1  potential for overheating, fire if motorcycle
2  is allowed to run for prolonged periods in a
3  clear and concise manner.  This approach is
4  consistent with the strategy to communicate
5  similar information utilized by other
6  motorcycle manufacturers, air-cooled engine
7  vehicles, including Suzuki, Harley-Davidson
8  and Yamaha.  This approach is appropriate and
9  consistent within the motorcycle industry and
10 is safe and appropriate.
11      And I note that Yamaha and
12 Harley-Davidson do not require that you ride
13 away immediately.  So their approach -- BMW's
14 approach is not consistent with Yamaha and
15 Harley-Davidson as he states.
16 Q.  How about Suzuki?
17 A.  I don't know that I looked up
18 the Suzuki manual.
19 Q.  Go ahead.
20 A.  In the third paragraph he
21 states:  Yazdani reportedly started his engine
22 in the high idle choke position and then left
23 the engine riding for approximately 30
24 minutes.

Page 268

1       This is two points.  One is it
2  was required to start it in the high idle
3  choke position.  And two, he forgot to add
4  that the idle had to go down to detent,
5  because to keep it in high you have to keep
6  pressure on the choke switch, and when you
7  release it it goes to detent.  So it wasn't
8  left in high idle.  He kind of missed that
9  point.
10      He says:  Leaving it go for 30
11 minutes is well beyond a reasonable or normal
12 warm-up period.  But he misses the point that
13 it's foreseeable.
14      He say:  The engine is not
15 intended to be warmed up or operated in this
16 manner.  So he misses the point again that it
17 is foreseeable to BMW.
18      And he also says that:  The
19 engine will build up heat if left on full
20 choke position for an extended period of
21 time.  Again, apparently doesn't realize that
22 the choke switch had to move down to detent
23 and not full choke after he released the choke
24 button.

Page 269

1    MR. LEVINE: You keep using the
2 term detent.
3    THE WITNESS: Yeah, there's
4 a --
5    MR. LEVINE: I just want you to
6 spell it.
7    THE WITNESS: Oh, I'm sorry,
8 D-E-T-E-N-T.
9    MR. LEVINE: Thank you.
10    THE WITNESS: So he says at the
11 bottom of that section: The subject incident
12 was solely related to a situation in which
13 Yazdani did not follow his standard practice
14 and became mentally distracted.
15    And I put the comment in
16 there: So it's okay for BMW to let his house
17 burn down and possibly kill or hurt someone
18 because he got distracted rather than fix the
19 design for him.
20    Next section, he says: That
21 sight glass is easier to use. And my question
22 is, Says who? Dipsticks have been used for
23 decades. And then I've never seen any
24 research to suggest the sight glass is easier,

Page 270

1 and I never saw any research that said why
2 they needed to change to sight glass if it
3 introduces a new risk.
4    He says: Air-cooled engines
5 and motorcycles have a long history of
6 successful and acceptable use. And I comment
7 that my air-cooled Harley-Davidsons with
8 dipsticks can be left idling for 30 minutes
9 without spraying hot oil into the environment
10 and causing a fire. And that to me would be a
11 good reason why air-cooled engines have
12 been -- have a long history of success in
13 acceptable use as opposed to the design of
14 this BMW engine.
15    Later on in that paragraph he
16 says: The general concept is that when the
17 engine on the motorcycle is running, the
18 vehicle is moving, except during short periods
19 during warm-up or in traffic. He does not
20 define short.
21    And I got to tell Mr. Breen
22 that I sat in traffic jams longer than 30
23 minutes, and prior to this case I never
24 thought that a potential fire was a potential

Page 271

1 risk of sitting in traffic for that long.
2    BY MR. HEINOLD:
3 Q.  Where was this?  What
4 paragraph?
5 A.  That's the second from the
6 bottom (indicating).
7 Q.  Okay.
8 A.  Next paragraph he says:  The
9 police fan kit is specifically designed for
10 motorcycles that will be used in a manner in
11 which they may be sitting idle for extended
12 periods of time to run equipment and/or
13 maneuvering at general low speeds.  And it's
14 especially useful to riders such as patrol
15 officers who may be riding at slow speeds for
16 extended periods of time.
17    And again, my point is riding
18 at low speeds for extended periods of time is
19 foreseeable, and obviously BMW knew it was
20 foreseeable because they provided an option
21 for some of their bikes.
22    Top of Page 7:  An air-cooled
23 engine --
24 Q.  Can I just stop you and ask you

Page 272

1 this question:  You don't -- do you intend to
2 offer an opinion about the efficiency of the
3 police van kit?
4 A.  No, I'm going to leave that to
5 Mike Zazula.
6 Q.  Okay.  Then I won't ask you
7 about that.
8 A.  Top of Page 7 he states:  An
9 air-cooled engine on a motorcycle is widely
10 accepted and is not an unsafe or unreasonable
11 design configuration.  My question is then
12 what makes the BMW different that a fire --
13 the oil sight glass can fail causing fire.
14    Next paragraph he says:  The
15 system utilized by BMW is consistent with that
16 of the motorcycle industry and safe for the
17 intended purposes.  And I note that it's not
18 even consistent with BMW's own practices
19 regarding the hazard.
20 Q.  That being the --
21 A.  The warnings.
22 Q.  -- the choke that you talked
23 about?
24 A.  The warning, the warning in the

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 273

1  manual.
2  Q.  You're saying it's not
3  consistent with --
4  A.  BMW's practice regarding
5  similar hazard.
6  Q.  I don't know what you mean by
7  its own practice regarding similar hazard.
8  Can you explain that?
9  A.  Sure.  I apologize, the start
10  of that paragraph goes into my report -- my
11  report is primarily focused on allegations
12  that the product information or warnings
13  provided by BMW were inadequate and were the
14  cause of this incident.  And he's saying that
15  this system utilized by BMW is consistent with
16  that of motorcycle industry and safe for the
17  intended purposes.
18      And I'm saying it's not even
19  consistent with BMW North America's practice
20  regarding the similar type hazard.  And, of
21  course, that's the recall and their decision
22  to place a warning on the bike regarding the
23  fire risk of leaving it sit stationary.
24  Q.  Okay.

Page 274

1  A.  The next paragraph he gets into
2  risk prioritization, and the risks that are
3  the most significant in terms of frequency
4  and/or severity should be given priority.  I
5  agree with that.
6      However, what he forgets and
7  doesn't deal with is that what also works its
8  way into prioritization is the expected
9  knowledge of the user and whether or not the
10  hazard is created by something that is
11  atypical or unique of that product as opposed
12  to the rest of the industry.
13      And in here we have a case
14  where you have the potential for severe injury
15  or death or property damage, which is the
16  highest severity you can get.  And you have
17  everyone that gets on this is potentially
18  exposed, and you have a very low expected
19  knowledge, and it's not consistent with
20  features of other bikes that don't get catch
21  fire if allowed to sit and idle for 15, 20, 30
22  minutes.
23  Q.  Tell me what the next paragraph
24  begins with.

Page 275

1  A.  Warning Related Information.
2  The second to the last sentence he says:
3  There is always a significant question as to
4  if any individual follow or heed any specific
5  warning, sign or label.  And we talked about
6  this earlier in the deposition, and I note in
7  his report that is why you eliminate by design
8  or guard as preferred, particularly over a
9  warning buried in a manual.
10      The next paragraph he says:
11  The common practice in the motorcycle
12  industry, et cetera.  And I note, again, he's
13  failing to note that it's not consistent with
14  BMW North America's own practice regarding a
15  similar hazard risk.
16      The next paragraph, the end of
17  the paragraph he states:  In terms of risk
18  hierarchy an attempt to provide this
19  information in the form of on-product label
20  would not be appropriate.  And I simply
21  state:  No, he is not following the safety
22  hierarchy.  If he was, he would recognize that
23  eliminating the risk for alternative design,
24  providing a guard and then an on-product

Page 276

1  warning would be the appropriate way in which
2  to follow the risk hierarchy.
3  Q.  The safety hierarchy being --
4  A.  Design.
5  Q.  Design, guard, warn?
6  A.  Yes.
7  Q.  Okay.
8  A.  The next paragraph is where he
9  really comes off the boat.  He says that:  The
10  risk of a fire due to the motorcycle being
11  allowed to run without moving for prolonged
12  periods is relatively low and has a relatively
13  low severity.  And it's the last part that I
14  take exception with.  Potentially killing
15  somebody, burning down their house is the
16  highest severity you can give to a hazard.
17  How he can say it's relatively low is
18  completely beyond me.
19  Q.  Okay.  You're not aware of any
20  personal injury, are you?
21  A.  Related to the oil sight glass
22  failing?
23  Q.  Yes.
24  A.  No, but the potential is there.

E-XHIBIT   D

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 277

1  Q.   You're talking there simply
2  about potential?
3  A.   When you do your risk analysis
4  you're basing it upon potential.  It's
5  inappropriate to wait and get the product in
6  the field and possibly kill somebody before
7  you decide whether or not it's a hazard you
8  should have dealt with through design.
9  Q.   Are there other risks with
10  regard to operating a motorcycle, a higher
11  risk potential?
12  A.   Well, there's more chance that
13  you can hurt yourself if you're going at a
14  high speed, but it's a different issue and a
15  different topic that what we're dealing with
16  here.
17  Q.   Well, I understand that, but if
18  you're looking at the comparison of the
19  various risks that come with being a
20  motorcycle owner --
21  A.   Well, here's the comparison,
22  because I was getting to that in the end of
23  that paragraph, the other risk associated with
24  letting it run idle is overheating.

Page 278

1  Overheating can cause problems to the
2  mechanical functioning of the bike, but it's
3  not going to burn your house down.  So that
4  would be a less severe risk.  Burning your
5  house down and potentially killing the
6  occupants of it is a very severe, most severe
7  hazard.
8  So another point I wanted to
9  make with that is he says:  That enthusiast
10  level motorcycle riders, and I don't know how
11  he defines enthusiast level, or whether
12  Yazdani was an enthusiast level, but
13  apparently they understand that an air-cooled
14  engine needs air flow to cool.  When attended
15  there are other warnings to riders that the
16  motorcycle engine is overheating.  These
17  warnings include radiating heat and
18  understanding the engine runs heat will
19  develop.  And these are the warnings that he's
20  talking about, alert the rider to the fact
21  that the engine may overheat.  It doesn't
22  alert them to the fact that the oil sight
23  glass is going to fail, allow hot oil to
24  escape and ignite and cause a fire.  So there

Page 279

1  are two different issues and they need to be
2  looked at separately.
3  And the knowledge of motorcycle
4  riders or owners of this product need to
5  consider their knowledge with respect to the
6  potential for the glass to fail and the fire
7  to occur, not whether it's going to overheat
8  or not.
9  The next page after the
10  pictures he says that:  In addition, the
11  Service Bulletin can include a label to be
12  affixed to the front portion of the motorcycle
13  regarding the potential for overheating and/or
14  fire.  And he's calling the recall Service
15  Bulletin.  He says:  An on-product advisory
16  label is not appropriate as this represents a
17  change in the information -- I'm sorry, it
18  says:  An on-product advisory label --
19  MR. LEVINE: She's trying to
20  understand.  Try to keep her in mind while
21  you're answering the question.
22  THE WITNESS: Okay.  He says:
23  An on-product advisory label is not
24  inappropriate as this represents a change in

Page 280

1  the information provided to users for this
2  specific model.  The Service Campaign was
3  based on a limited number of incidents and no
4  reported injuries.  And I note it's the same
5  type of hazard.  It's the same issue.  The
6  rider is not aware of the risk of not riding
7  away immediately.
8  And the argument for why it's
9  okay for the Service Bulletin/Recall to
10  include the label is completely contrary to
11  the same argument he just made on Page 7 as to
12  why it wasn't needed.  That is, low risk, no
13  injury and people should know.
14  So if there's low risk, no
15  injury, people should know, and that's why
16  it's not needed, as he argues on Page 7, how
17  does he argue that a low risk, no injury,
18  people should know, Page 8, it's okay to have
19  it an on-product warning.  To me they appear
20  to be completely conflicting opinions.
21  Q.   Weren't there two different
22  issues involved with the motorcycle?  He's
23  talking about with the on-product label in the
24  Service Campaign versus Mr. Yazdani's

Page 281

1  motorcycle?
2  A.   The Recall Campaign was for a
3  fire hazard associated with letting the bike
4  sit at idle, stationary for an extended period
5  of time.
6  Q.   And what was the specific
7  hazard that was recognized?
8  A.   It was a fire hazard.  That was
9  the hazard.
10  Q.   That's very general.  That
11  wasn't my question.  What was the specific
12  issue that was going to cause the fire?
13  A.   The fire was going to be caused
14  by letting the bike sit idle for an extended
15  period of time having the exhaust eat up and
16  potentially igniting the fairing.  Regardless
17  of the underlying mechanism of the fire, the
18  risk is still the same.  If you let the bike
19  sit at a standstill for a prolonged period of
20  time you get a fire.  It's the same hazard,
21  fire hazard.
22  Q.   On Mr. Yazdani's bike what is
23  the risk of catching the lower fairings on
24  fire?

Page 282

1  A.   There is no lower fairing.
2  Q.   The risk would be --
3  A.   The risk would be the oil sight
4  glass failing.
5  Q.   The risk of that would be zero;
6  correct?
7  A.   The risk of the fairing
8  catching on fire would be zero, but the
9  hazards --
10  Q.   So that risk is different than
11  the risk of the oil sight glass failure;
12  correct?
13  A.   It's the same hazard and the
14  same behavior of the operator that's
15  associated with the hazard.  The ignition
16  scenario may differ, but it's the same
17  result.  You have a fire to an unattended or
18  maybe even it's an attended motorcycle that's
19  allowed to sit at a standstill.
20      He states in the next
21  paragraph:  A warning was never intended nor
22  can warning address issues related to
23  distraction.  Two points there.  Number one,
24  the potential for distraction is why you want

Page 283

1  to eliminate hazards through design to provide
2  safeguards so you don't have to rely upon the
3  weakest link in the chain, that is the human
4  and all their frailty.
5      Two, warnings are used to
6  overcome distraction.  Most typically audible
7  warnings are used to grab a person's attention
8  who's attention is focused elsewhere.  That's
9  the whole intent and purpose of the warning.
10  Q.   Is an audible warning practical
11  in this circumstance?
12  A.   I didn't assess whether or not
13  it was practical.  Is it possible, I think
14  that if you give me a second there was an
15  expert in the Amsdale vs. BMW North America
16  that opined that they could have provided an
17  indicator light on the master -- excuse me,
18  the -- it says, I'll read it.  I'm a little
19  bit tied up with my words at the moment, I
20  apologize:  The model R 1150 GS has a
21  well-designed warning panel with lights
22  including a master warning light and an oil
23  temperature gauge.  However, there was no
24  reference on the panel to as what the oil

Page 284

1  temperature reading should be to indicate to a
2  rider that his or her engine is up to a safe,
3  operating temperature and he or she should
4  turn off the choke and drive away.
5  Q.   Does that have any relevance in
6  Mr. Yazdani's situation?
7  A.   Well, it -- the reason I
8  brought it up was that you said it would be
9  impractical or not feasible to put an audible
10  indicator in this case.
11  Q.   No.  I asked if it was.
12  A.   And my response was that
13  apparently there's another expert that felt it
14  was possible to include an indicator light to
15  monitor the heat of the engine.  If you can
16  put an indicator light to monitor the heat of
17  the engine, you can put an audible indicator
18  in conjunction with it.  That was the point I
19  was trying to make.
20  Q.   Are you advocating that here?
21  A.   No, I'm not, but you asked.
22  Q.   Okay.
23  A.   And I was also pointing out the
24  fact that his statement that warning was never

Page 285

1  intended or can warning address issues related
2  to distraction is just plain wrong.
3  Q.  Well, the way we got on this
4  audible warning is because you said it's wrong
5  because you could put an audible warning on
6  there and we do it all the time.  And then I
7  said, Are you advocating that?  And then you
8  went to the other expert.  So you brought up
9  the audible warning.
10     And now I'm asking you:  Are
11  you advocating that?
12  A.  If it's feasible, absolutely.
13  Q.  Are you advocating that in this
14  case?  It's not in your report.
15  A.  I'm not aware of anybody
16  advocating the audible warning.  The point I'm
17  making is that he made an incorrect statement,
18  he made a false statement, and I was pointing
19  out why it was false, why warnings are used to
20  capture the attention of people who may
21  otherwise be distracted.
22     I pointed out that another
23  expert thought you could put an indicator
24  light onto this bike to alert people to an

Page 286

1  overheat condition.  And if you can put the
2  indicator light on, you can put an audible
3  warning on it.
4     At the end of that paragraph he
5  says:  This would not have impacted him
6  because -- this would not have impacted him
7  becoming distracted.
8     And my comment was he misses
9  the point, it has nothing to do with him being
10  distracted, because it would have prevented
11  him from starting it and letting it idle in
12  the first place.
13     His findings, Finding Number 2,
14  he states:  Configuration of the motorcycle,
15  including the air-cooled engine and oil sight
16  glass is an appropriate design and does not
17  pose an unreasonable risk.  And I say that's
18  false.  It's a design that introduced a risk
19  that doesn't exist with the dipstick,
20  including the dipstick on my Harley-Davidson
21  that won't fail and spray hot oil from the
22  engine and cause a fire.
23     So you've introduced a feature
24  that may have some benefits, but it introduced

Page 287

1  risks, unnecessary risks to the product.  That
2  means it is not reasonable.
3     Finding 3, he says:  The manner
4  in which BMW provided information is
5  consistent with that in the motorcycle
6  industry.  I just point out that it's not
7  consistent with BMW North America's own action
8  regarding a similar issue.
9     Number 4:  There's no need to
10  provide an on-product warning label that
11  indicates that the engine if run without
12  moving for a prolonged period of time, that
13  the engine can overheat and may result in a
14  fire.  Potential for engine overheating is
15  common knowledge.  My point is that it's not
16  common knowledge that the oil sight glass is
17  going to fail and cause a fire.
18     Number 5, he says:  That is not
19  the situation that would have been prevented
20  with an on-product label.  And I counter the
21  fire occurred because Yazdani didn't know that
22  leaving the bike idle stationary could cause
23  the oil sight glass to fail and cause a fire.
24  Had they provided an adequate warning on the

Page 288

1  bike he would have been alerted to it,
2  informed of it and complied with it.
3  Q.  Are you aware of any advantages
4  that the sight glass, oil sight glass might
5  have over a dipstick?
6  A.  I think that it's provided so
7  that you get a reading without having to
8  remove the dipstick, and potentially to get
9  oil dripping on the surface of the bike.
10  Q.  Anything else?
11  A.  I think that's the only thing I
12  recall being mentioned.
13  Q.  So you're relying on what he
14  said rather than your independent knowledge of
15  the design of a motorcycle for that; correct?
16  A.  Yes, I didn't see a real
17  benefit of it other than you don't have to
18  pull the dipstick out.  But then, again, I
19  check my oil sitting on my bike.  To do it
20  with an oil sight glass I got to stop, get off
21  the bike and check the oil  I don't really see
22  the benefit of it.  If there's another
23  benefit, I'm not aware of it.
24  Q.  What's the consequence of oil

Min-U-Script®

Thomas G. Oakes Associates
1-877-625-3777
Exhibit D
www.TGOakes.com

(72) Pages 285 - 288

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 289

1  dripping onto the engine?
2  A.  Well, first of all, if it drips
3  on the engine it's probably just going to burn
4  off.  But typically, the dipstick is in the
5  oil pan.  On my Harleys they're on the right
6  side of it behind the engine.  They may drip
7  on the chrome, but I can wipe it off.  They
8  may drip on the exhaust, but I can wipe it
9  off.
10  Q.  What if the exhaust is real
11  hot?
12  A.  It's not that big of a deal.
13  Q.  Any disadvantages of the use of
14  a dipstick?
15  A.  Well, I think that's what they
16  said, the advantage was that you don't have to
17  worry about getting oil on things.  I mean,
18  we're talking about a dipstick.  We're not
19  talking about a fountain of oil coming out of
20  this thing.
21  Q.  Anything else?
22  A.  There shouldn't be a whole lot
23  of oil dripping off of it.  Yeah, I'm not
24  aware of anything else offhand.

Page 290

1  Q.  Any advantages or disadvantages
2  of having a sight glass on one side of the
3  engine or the other, and if so, what it's
4  depended on?
5  A.  I'm not aware of the advantages
6  or disadvantages of having it on -- I'm not
7  aware of the advantages of having it on the
8  left side.  It's my understanding the oil is
9  supposed to be checked with the bike on the
10  center stand, not the left side, so that the
11  engine is level.
12    So if you had it on the right
13  side, in the same position on the right side
14  as you could, and I'm not saying you could,
15  but if you had it on the right side and you
16  checked it on the center stand it shouldn't
17  make a difference.
18    If it's something unique to the
19  way they designed that engine, you know, it's
20  possible.  I don't know offhand.  I haven't
21  seen anybody explain from BMW why it's on the
22  left side, not the right side.
23  Q.  But you don't have an
24  explanation one way the other?

Page 291

1  A.  I don't know.  I pointed to
2  that Yamaha YZF as an example of the
3  manufacturer putting it on the right side.
4  And again, the oil is checked when the bike is
5  upright, not leaning on its left side
6  kickstand.
7  Q.  Are you intending to offer the
8  opinion in your discussions about this
9  motorcycle that the product is defective
10  because it uses an oil sight glass, or is that
11  going to be left to somebody else?
12  A.  Yes.  Again, it's my assumption
13  that the hazard is created by the use of the
14  oil sight glass and the makeup of the oil
15  sight glass, the material they chose.  And I'm
16  relying upon Mark Yeldham for that testimony.
17  Q.  But you're not --
18  A.  And Mike Zazula.
19  Q.  But you're not going to offer
20  that opinion in terms of product defect,
21  whether it is or isn't defective without -- I
22  think we're clear, you're going to describe it
23  as a characteristic that has this potential
24  consequence and therefore --

Page 292

1  A.  I'm going to characterize it as
2  a defect that allows the risk, fire risk to
3  exist.
4  Q.  Are you -- all right.  Do you
5  consider any motorcycle that uses an oil sight
6  glass defective?
7  A.  I don't, but I don't know of
8  any others that have this type of melting
9  point with it being placed on the left side of
10  the crank case and having the hot oil touch it
11  and being the reason why it's deformed.
12  Q.  Do you know what the design of
13  the seal around any other oil sight glass is?
14  A.  I do not.
15  Q.  Is it your opinion that if an
16  oil sight glass is on the left side of the
17  engine that the motorcycle is defective
18  because of that?
19  A.  Not necessarily because it's on
20  the left side of the engine, but if it's going
21  to be on the left side of the engine and
22  deformed when exposed to foreseeable
23  temperatures, that is a design defect.
24  Q.  And you define foreseeable

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 293

1   temperatures as what?
2   A.  Well, the report of fire is
3   anywhere from 10 minutes to 30 minutes.
4   Q.  Anything else?
5   A.  No.
6   Q.  Have we fairly covered the
7   opinions that you're intending to express in
8   the trial of this case?
9   A.  I don't -- I can't think of
10  anything that we missed.
11  Q.  Okay.  Have we fairly covered
12  the basis for your opinions?
13  A.  I can't think of anything that
14  we missed.
15     MR. HEINOLD: Okay, we're done.
16  Thank you.
17     THE WITNESS: I would like to
18  read and sign.
19     - - -
20  (Whereupon, the deposition was
21  concluded at 4:50 p.m.)
22     - - -
23
24

Page 294

1          C E R T I F I C A T E
2      I, Debra J. Veneziale, a Court Reporter
3   and Notary Public, do hereby certify that the
4   proceedings, evidence, and objections upon the
5   deposition of WILLIAM J. VIGILANTE, JR., PhD,
6   CPE are contained fully and accurately in the
7   stenographic notes taken by me upon the
8   foregoing matter on March 15, 2016, and that
9   this is a true and correct transcript of the
10  same.
11
12
13          _____
            Debra J. Veneziale
14          Court Reporter
            Notary Public
15          My Commission Expires
            July 16, 2019
16
17
18
19  (The foregoing certification of this
20  transcript does not apply to any reproduction
21  of the same by any means, unless under the
22  direct control and/or supervision of the
23  certifying shorthand reporter.)
24

## A

**A$$ (1)**
251:9
**abbreviated (1)**
236:10
**abide (1)**
147:1
**abilities (3)**
9:13,20;87:19
**ability (8)**
9:13,21,23;27:21;41:7;
150:17;190:23;203:1
**able (4)**
27:16;32:10;138:7;214:24
**abnormal (2)**
93:24;94:3
**above (3)**
68:11;124:4,18
**absence (1)**
239:1
**absolute (1)**
205:4
**Absolutely (11)**
152:18;154:5,11;181:5;
198:9;217:23;219:23;220:6;
230:3,9;285:12
**accept (4)**
88:18;182:13;187:3,4
**acceptable (2)**
270:6,13
**acceptance (1)**
82:11
**accepted (1)**
272:10
**accessories (1)**
257:13
**accident (3)**
116:9;147:15;199:4
**According (2)**
135:24;138:1
**accurate (1)**
144:14
**achieve (1)**
201:15
**acid (1)**
195:13
**acknowledging (2)**
91:4;93:11
**across (2)**
101:6;252:4
**act (8)**
58:2,9;229:4,4;231:9,10,
14;239:11
**acted (1)**
231:12
**action (1)**
287:7
**actions (1)**
142:19
**activation (1)**
52:6

**active (1)**
45:3
**activities (4)**
72:10,12;74:6;264:14
**activity (2)**
117:21;237:7
**actual (2)**
221:24;222:13
**actually (10)**
39:11;50:6;54:4;186:10;
204:10;219:21;221:22;
254:7;257:24;259:6
**add (9)**
7:20;21:8;156:20;157:6;
169:17;172:1,5;265:18;
268:3
**added (2)**
265:21;266:17
**adding (4)**
45:1;235:8;255:1;266:5
**addition (2)**
188:5;279:10
**additional (15)**
8:4;14:8,10;66:5;71:1,6,
11;108:12;172:6,11;174:2;
236:12;250:12;254:10,18
**address (10)**
37:1;51:23;83:14;84:22;
87:21;91:2;143:8;212:22;
282:22;285:1
**addressed (6)**
37:5;73:8;79:22;86:6,9;
206:6
**addresses (2)**
90:23;266:24
**adequacy (2)**
28:20;141:11
**adequate (42)**
25:23;42:8;44:6,16,19;
50:21;73:9,12;77:22;81:8;
89:3,21,23;105:5,7;118:4,7;
119:13;123:23;139:18;
143:2;157:5;159:16;166:14,
24;167:2,9;168:1,7,9;171:1;
176:3;183:10;230:19;232:8,
13,21;248:8,21;249:14,17;
287:24
**adequately (2)**
52:2;202:7
**adjacent (1)**
109:20
**administered (2)**
213:19,22
**Administration (1)**
199:6
**admit (1)**
183:24
**adult (1)**
154:1
**advanced (3)**
23:12,22;31:21
**advantage (1)**
289:16

**advantages (4)**
288:3;290:1,5,7
**advise (1)**
159:23
**advisor (1)**
33:3
**advisory (3)**
279:15,18,23
**advocating (8)**
13:14,16,22;284:20;
285:7,11,13,16
**affect (2)**
9:17;28:19
**affixed (2)**
16:5;279:12
**afford (1)**
22:5
**aftermarket (1)**
257:12
**afterthought (1)**
174:7
**afterwards (1)**
55:20
**AG (1)**
266:14
**Again (52)**
25:19;26:15,16,17;27:18;
35:3;64:18;85:13;94:12;
116:22;124:15;125:21;
129:5,15;131:13;132:11,15;
133:17;145:10;147:17;
151:21;152:7,20;154:17;
159:13;160:8,23;162:7;
180:5;181:10,24;192:4;
199:1;206:15;207:3,18;
209:4,13,15,18;219:17;
226:21;247:9;264:18;
265:15;268:16,21;271:17;
275:12;288:18;291:4,12
**against (5)**
17:23;101:16;205:6;
246:3;264:22
**age (1)**
256:12
**ago (2)**
107:17;211:21
**agree (22)**
82:24;83:14;95:20;113:5,
6;129:18;130:1;148:17;
187:1;188:24;194:11;198:2;
201:9;220:20;228:19;229:3;
230:7,9;237:13;239:3;
240:6;274:5
**agreed (7)**
5:7;184:4,5;240:3;243:1,
4;247:4
**agreeing (1)**
201:10
**ahead (8)**
46:14,17;76:7;145:11;
148:10;165:13;209:17;
267:19
**air (1)**

**advantages (4)**
278:14
**air/oil (1)**
254:7
**air-cooled (25)**
16:2,3,18;26:1,23;27:2,3;
67:17;99:10;132:6;251:21,
23;253:24;254:2,6;257:15,
16;267:6;270:4,7,11;
271:22;272:9;278:13;
286:15
**al (4)**
39:1;45:7;46:9;48:7
**alcoholic (1)**
153:24
**alert (6)**
130:24;131:15;141:21;
278:20,22;285:24
**alerted (1)**
288:1
**Alexander (1)**
49:21
**alkaline (1)**
195:13
**allegation (1)**
113:4
**allegations (2)**
113:1;273:11
**alleviate (1)**
98:20
**allow (15)**
18:5;20:11;26:7;54:5;
85:17;86:3;122:14;125:9;
128:8;132:21;155:10;169:1;
181:13;220:12;278:23
**allowed (8)**
18:4;54:4;57:1;180:23;
267:2;274:21;276:11;
282:19
**allowing (5)**
124:23;127:23;129:16;
140:3;203:11
**allows (2)**
251:12;292:2
**Allstate (1)**
11:16,17,19;12:11
**alone (1)**
255:1
**along (2)**
168:21;204:9
**alternate (2)**
90:6;186:21
**alternative (16)**
81:1;88:11;90:8,14;95:18,
24;96:3,6;97:19;98:1,8;
178:14,17;179:16;204:11;
275:23
**alternatives (1)**
69:8
**although (6)**
28:4;41:22;65:15;68:17;
83:22;265:7
**aluminum (1)**
47:12,13

Exhibit B

Case 2:15-cv-01427-TR    Document 17-2    Filed 04/15/16    Page 77 of 155

Yazdani  vs.                                                    William Vigilante, Jr., Ph.D.
BMW                                                                      March 15, 2016

**always (6)**
56:11;157:23;195:9;
230:1,8;275:3
**ambient (1)**
136:9
**America (17)**
44:1;52:21;73:13;78:23;
121:14,15;135:14;146:12;
173:9;213:4,15;219:15;
245:14;248:7,20;265:21;
283:15
**American (4)**
44:10;68:21;213:19;
253:20
**America's (3)**
273:19;275:14;287:7
**amount (2)**
112:4;136:11
**Amsdale (1)**
283:15
**analysis (16)**
73:4,5,10;89:14;183:6,6;
184:8,11;189:12;194:7,13;
195:17,23;196:6;206:16;
277:3
**analyze (6)**
86:13,14,16;182:15;
189:21;199:10
**analyzed (3)**
180:18;187:10;188:15
**analyzing (1)**
86:21
**and/or (7)**
92:4;111:19;217:5;
235:22;271:12;274:4;
279:13
**Andrew (1)**
49:21
**ANSI (4)**
173:7;224:21;225:2,24
**answered (4)**
26:15,16;196:4;219:19
**answer's (1)**
219:24
**anticipate (1)**
70:13
**anyways (1)**
243:7
**apart (1)**
210:16
**apologize (4)**
145:10;184:22;273:9;
283:20
**apparent (1)**
159:9
**apparently (9)**
94:10;112:15;123:6;
125:22;126:20;219:11;
268:21;278:13;284:13
**appeal (1)**
57:17
**appear (1)**
280:19

**appeared (1)**
214:2
**appears (1)**
39:14
**applicable (2)**
33:4;265:20
**apply (4)**
18:22;29:15;163:20;
214:18
**appreciate (8)**
28:6;87:20;93:23;142:18;
148:2;167:7;168:2,6
**approach (7)**
197:6,8;266:23;267:3,8,
13,14
**appropriate (25)**
97:22;98:3,24;99:1;105:9;
108:19;119:6;131:22;140:4;
183:12;191:3,16,18;196:1;
205:15;210:4;211:23;
213:11;240:16;267:8,10;
275:20;276:1;279:16;
286:16
**appropriately (2)**
197:15,16
**approved (1)**
195:10
**approximately (1)**
267:23
**approximation (1)**
11:24
**architects (1)**
10:2
**area (5)**
24:5,10;69:10;82:22;
263:2
**areas (1)**
27:20
**argue (2)**
123:3;280:17
**argues (1)**
280:16
**arguing (1)**
91:7
**argument (2)**
280:8,11
**arise (1)**
87:21
**around (10)**
12:8;24:12;51:14;54:22;
157:21;160:21,21;176:4;
218:20;292:13
**arrest (1)**
50:2
**arsenal (1)**
211:3
**article (10)**
30:9,20;49:15;68:21;
251:8;252:4;255:7;256:22,
24;261:17
**articles (4)**
28:12;29:5,16;59:4
**aspect (1)**

90:10
**aspects (1)**
27:4
**aspirin (2)**
64:6;65:6
**assess (2)**
141:10;283:12
**assessment (1)**
43:4
**assistance (1)**
128:4
**associated (26)**
31:19;44:7;46:4;76:21;
93:12;94:13;97:16;100:2;
118:12;127:4;132:14;
141:22;142:19;166:12,22;
167:8;180:20;183:8;193:17;
199:10;200:15;208:1;
244:23;277:23;281:3;
282:15
**assume (14)**
134:16;164:14;171:21;
173:18;174:21;215:8;
236:20;238:20,24;240:14;
241:3,6,11;248:22
**assumed (1)**
254:2
**assuming (5)**
206:18;238:19;240:18,22,
24
**assumption (4)**
114:6,15;116:11;291:12
**assumptions (2)**
114:24;241:14
**astray (1)**
220:15
**attached (2)**
41:12;255:8
**attempt (2)**
91:1;275:18
**attempted (1)**
215:16
**attended (2)**
278:14;282:18
**attention (6)**
33:10;190:23;204:1;
283:7,8;285:20
**attorney (2)**
70:14;102:18
**attorneys (1)**
157:12
**attributed (1)**
109:16
**atypical (9)**
93:24;94:12;116:24;
118:12;127:4;181:11;
183:13;244:22;274:11
**audible (9)**
283:6,10;284:9,17;285:4,
5,9,16;286:2
**August (2)**
38:23;52:19
**author (5)**

251:11;252:21;253:21;
254:5;255:10
**authored (1)**
215:4
**authoring (1)**
74:7
**authors (1)**
232:16
**automotive (1)**
253:22
**available (13)**
32:12;72:20;74:10;79:2;
80:4;89:13,16;94:20;
113:21,23;211:10;232:2;
265:13
**average (2)**
220:18;264:17
**avoid (11)**
38:3;41:8;106:7,12;108:6;
131:1;132:6,7,9;145:18;
191:11
**avoided (1)**
131:2
**avoiding (1)**
176:6
**aware (37)**
16:15;31:17;36:12;60:19;
61:15;73:14;94:8;99:14;
100:7,9;112:13,16;130:12;
142:23;147:18;148:24;
149:1;168:6;181:15;183:14;
213:17,18;230:14;231:16;
242:9;244:22,24;264:15;
266:19;276:19;280:6;
285:15;288:3,23;289:24;
290:5,7
**awareness (1)**
190:13
**away (17)**
94:11;106:3,15,18;
122:16;126:12;127:23;
128:14,18;129:8;132:3,17;
214:3;218:11;267:13;280:7;
284:4

## B

**back (42)**
19:13,17;26:11,19;31:15;
41:11;42:8,19;74:18;76:11;
86:19;90:2;94:9;97:23;
99:23;116:22;134:15;
141:14;142:3,11,15;143:12,
15;144:9,9;145:22;158:4;
177:19;214:3;216:1,13,22;
221:23;226:20;227:16,2,
24;228:7,12;237:4;262:18;
266:20
**background (4)**
75:1;77:17;256:16,19
**based (16)**
12:3;27:9;82:13;85:11;
97:9;110:21;128:12;145:2;

Exhibit B

146:19;148:18;192:24;
  193:6;196:21;207:12;
  208:24;280:3
**baseline (4)**
  217:17,22,24;218:1
**basic (8)**
  35:4,13,16;36:21;134:17;
  164:2;217:17;219:9
**Basically (4)**
  8:8;9:5;233:12;251:10
**basing (1)**
  277:4
**basis (7)**
  31:16;100:19;138:5;
  229:18,19;230:10;293:12
**Bates (2)**
  121:12;131:6
**Beach (1)**
  253:3
**Bear (1)**
  144:22
**bearings (1)**
  111:13
**became (3)**
  19:23;100:9;269:14
**become (1)**
  19:21
**becomes (1)**
  159:17
**becoming (1)**
  286:7
**beforehand (1)**
  200:10
**begin (2)**
  46:22;237:7
**beginning (3)**
  145:1;157:5;177:21
**begins (1)**
  274:24
**behalf (19)**
  12:10;40:2;41:16;45:16;
  47:23;48:1,3,12,22;49:7,16;
  50:9;51:1,17;52:15;53:2,11;
  58:3;59:23
**behavior (11)**
  24:7;158:23;162:22;
  188:2;232:9,14,22;242:18,
  24;243:9;282:14
**behind (1)**
  289:6
**believes (1)**
  31:13
**below (1)**
  107:11
**benefit (3)**
  288:17,22,23
**benefits (1)**
  286:24
**best (13)**
  26:9;87:6;97:14;157:23,
  24;171:11;172:1;174:11;
  180:12,13;200:18,19;223:9
**better (7)**

32:4;72:21;97:12,13;
  109:1;137:2;197:14
**beverages (1)**
  153:24
**beyond (6)**
  54:20;81:12;87:18;247:6;
  268:11;276:18
**bicycle (1)**
  56:23
**bicyclist (1)**
  56:24
**big (7)**
  6:7;149:9;154:15;172:3;
  174:13;185:12;289:12
**bike (151)**
  15:15;17:6;18:1,22;19:2;
  24:12;68:1,11,13,19,23;
  69:2,8;76:22;79:17;80:17;
  82:1;83:16,20;89:8;90:1;
  91:23;92:2,8,8,11,16,20;
  93:23;94:1,13;95:18;97:17;
  100:10,15;101:11;106:12;
  111:7;112:2,8,10,18;114:14;
  118:16;119:18;125:17,19;
  126:1,19;127:8;128:18;
  129:9;133:1;134:21;135:12,
  15;136:2;137:2,18;141:20,
  23;143:4;146:21,23;148:23;
  153:9;154:9;159:8,10;
  163:1,20,21,21;164:7,13;
  165:14;173:9,11,16,19;
  174:3,7,14,21;175:3;177:8,
  16;179:14;180:8,19,23;
  182:19;187:11,24;189:21;
  193:14,24;194:6,8;195:22;
  197:13;205:10,19;213:12;
  218:20;219:17,18;228:18;
  229:16;230:15;237:12;
  238:5,6,16;240:7;241:18;
  242:4;243:16;244:9,23;
  248:11;253:5;255:1;256:2;
  259:1,5,10,11,14,24;260:1,
  16,21;261:6,23;262:8;
  266:15;273:22;278:2;281:3,
  14,18,22;285:24;287:22;
  288:1,9,19,21;290:9;291:4
**bikes (31)**
  22:3,7,16,17,19;69:19;
  74:19;75:6;88:15;92:1;
  94:21;100:3,5,6,8;101:15;
  102:6;111:20;138:2;140:10;
  181:11,13;184:19;193:22;
  254:9;261:20,21;262:6;
  266:16;271:21;274:20
**bill (6)**
  40:14,20;148:5;165:4,9,9
**Bio (2)**
  255:10,10
**bit (12)**
  8:14;19:4,18;75:5;77:12;
  105:11;126:2,3;144:18;
  228:1;251:14;283:19
**black (2)**

123:5,7
**blank (1)**
  30:23
**bleeding (1)**
  205:13
**blue (1)**
  258:1
**BMW (77)**
  68:15,15,23;69:5;73:9,13;
  78:22,22;79:13,16;80:4;
  82:12;89:6;92:12;93:4;
  94:11,23;97:5;99:10;
  105:22;109:15;111:4;113:9;
  121:14,15;126:24;135:14,
  20;138:1,20;143:6;146:12;
  148:15,21;158:15;159:2;
  160:19;173:8;175:13;176:2,
  20;178:1;180:2;181:16;
  182:16;189:23;213:4,14,18;
  219:15;238:11,21;239:14;
  245:13;248:7,20;256:4;
  261:3,6,19;262:6;265:21;
  266:14;268:17;269:16;
  270:14;271:19;272:12,15;
  273:13,15,19;275:14;
  283:15;287:4,7;290:21
**BMWNA55 (1)**
  121:15
**BMWNA64 (1)**
  121:16
**BMW's (5)**
  27:9;237:18;267:13;
  272:18;273:4
**boat (1)**
  276:9
**body (2)**
  68:7;169:3
**boils (2)**
  119:8,10
**bold (3)**
  122:6,24;154:15
**book (4)**
  33:9;113:18;128:22;
  153:10
**books (1)**
  202:24
**border (3)**
  226:6,11;227:2
**borrowing (1)**
  134:22
**Boston (1)**
  216:1
**both (10)**
  10:22;30:17;33:11;44:21;
  69:19;78:21;102:6;118:15;
  177:5;195:15
**bother (1)**
  261:24
**bottle (5)**
  64:6,7;65:5,7,12
**bottom (11)**
  60:16;68:3;154:7;165:17;
  166:2;168:12;177:21;260:9;

263:15;269:11;271:6
**bought (11)**
  22:4;23:5;160:16,18;
  162:4;164:13;165:4,9;
  216:18;217:9;218:16
**box (7)**
  65:9,11,12,14,15,16;123:1
**brake (2)**
  21:21;218:5
**brakes (2)**
  205:13;218:7
**break (14)**
  57:20;70:18,19;99:4;
  143:23;149:10,12,14;
  210:15;220:23;221:2;250:7,
  11;257:22
**Breen (5)**
  7:23,24;71:8;264:5;
  270:21
**Breen's (1)**
  263:4
**brief (1)**
  72:16
**bring (5)**
  66:4;67:4,11;69:9;212:21
**broad (3)**
  220:5,7,9
**brought (8)**
  67:15,19;68:14;69:3;
  195:19;250:13;284:8;285:8
**Brunswick (4)**
  39:10,15,22;40:1
**build (2)**
  85:9;268:19
**bulkhead (3)**
  47:12,13,14
**Bulletin (2)**
  279:11,15
**Bulletin/Recall (1)**
  280:9
**bunch (1)**
  189:1
**buried (2)**
  64:21;275:9
**burn (3)**
  269:17;278:3;289:3
**burning (2)**
  276:15;278:4
**bury (1)**
  124:22
**burying (1)**
  180:8
**business (8)**
  6:3,5;12:22;48:7;49:21;
  75:20,23;199:5
**button (4)**
  126:16,22;256:11;268:24
**buttons (1)**
  218:8
**buy (4)**
  22:5,11,24;185:18
**buys (2)**
  163:1,4

Exhibit B

**Byrd (1)**
30:8

# C

**cable (2)**
21:21,21
**cables (1)**
21:21
**caliber (1)**
205:17
**call (6)**
58:18;203:3;234:5,6;
257:1;258:3
**called (3)**
251:6,8;255:20
**calling (1)**
279:14
**calls (1)**
227:8
**came (5)**
73:10;101:6;165:3;
218:14;252:3
**Campaign (3)**
280:2,24;281:2
**Can (164)**
8:6;11:23;12:1;18:8;
23:18;24:12;26:4,5,6,9,10;
29:22;31:14,19;32:11,19;
43:22;46:16,22;47:6,10;
55:15;56:5,22;66:10,13,19;
67:5,8;70:17;72:13;82:7,24;
84:5,14;86:24;87:3,6;88:10;
89:20;91:5,6;93:6;94:5,15;
96:10,11;97:21;103:14,15;
113:5;119:18;122:2,12;
123:15;126:18;127:10,15,
16;131:1,23;132:20;134:5,
14,16;136:17;142:10;
143:11,12;160:21,21;
161:16;162:9,10;165:14;
169:2,19;170:17;172:1,2;
176:4,7;181:22;183:9,19;
184:9;186:5,7;188:19;
190:7,10,12;192:14,15,16;
193:14,18,23;196:15,20;
197:15;198:13,23;199:2,18;
201:3,14;202:6,9,20;203:3,
21;204:2,10,20;205:18;
206:2;207:3,4,16;208:19;
211:15,15,16;215:12;
216:21;222:23;223:6,8;
224:4;226:20,20;232:15;
235:24;236:24;237:1;
244:20;246:17;250:15;
256:10;257:22;259:24;
260:2;262:19;263:12;270:8;
271:24;272:13;273:8;
274:16;276:16,17;277:13;
278:1;279:11;282:22;
284:15,17;285:1;286:1,2;
287:13;289:7,8
**capable (1)**
99:11
**capacity (6)**
10:6;34:17,18;36:10,12;
254:11
**capitals (1)**
122:24
**caps (1)**
122:6
**capture (3)**
9:14;204:1;285:20
**car (7)**
51:9,11,12,13;216:18;
217:4;253:8
**carburetors (1)**
256:7
**card (7)**
233:8,13,20,22,24;234:2,9
**cardinal (1)**
214:11
**care (1)**
64:15
**Carolina (1)**
33:17
**Carr (1)**
53:6
**carrier (1)**
12:4
**cart (2)**
51:10;52:7
**case (75)**
6:22;7:7;11:4;13:19,23;
15:1,10;27:7;38:9;39:24;
40:5,9;41:1,4,9,15;44:2;
45:12;46:7;47:21;48:1;
49:12;51:21;53:21;54:6,7,
17,21;58:12;65:23;68:16;
71:4,16,23;72:10;75:17;
77:9,12;85:1;89:22;95:2;
103:21;118:2,8;119:8,10;
140:15;175:19;176:22;
177:6,9;181:10;186:3;
188:1;192:3;202:5;203:14;
204:16;213:16;217:16;
221:11;227:11,13;234:9;
242:1,2;244:5;254:1;261:8;
270:23;274:13;284:10;
285:14;292:10;293:8
**cases (22)**
12:5,7,19;13:4,7,13,15,21,
24;14:7,9,10,15;15:1,12,17,
19;38:17;43:13,15,16;46:11
**cat (1)**
211:19
**catalytic (2)**
124:6;154:21
**catastrophic (1)**
81:19
**catch (7)**
17:11;31:23;130:20;
135:7;138:11;181:12;
274:20
**catching (2)**
281:23;282:8
**categorized (1)**
261:19
**categorizes (1)**
68:22
**category (3)**
50:7;68:24;69:1
**caught (1)**
130:12
**causal (3)**
239:2,20;243:3
**causation (3)**
242:3,8,9
**cause (5)**
93:6;94:5;95:11;114:19;
124:9;127:10;234:4;273:14;
278:1,24;281:12;286:22;
287:17,22,23
**caused (5)**
8:1,3;229:10,14;281:13
**causes (1)**
86:17
**causing (4)**
168:24;173:13;270:10;
272:13
**Caution (2)**
18:4;195:12
**caveat (1)**
228:13
**CC (1)**
258:15
**Center (5)**
76:5;222:22;260:1;
290:10,16
**certain (9)**
57:2,2;59:10;91:6;210:18;
245:7,18,23;247:5
**certainly (15)**
80:3;87:20;100:10,13;
130:9;138:24;142:9;146:14;
170:17;194:14;207:17;
222:20;232:6;265:8,16
**certainty (1)**
245:9
**certification (1)**
5:9
**certified (1)**
59:13
**cetera (3)**
43:18;67:18;275:12
**chain (1)**
283:3
**challenge (3)**
54:5,24;57:24
**challenges (2)**
54:3;55:2
**chance (3)**
152:15;262:23;277:12
**change (13)**
8:2,3;110:24;145:15;
232:8,14,22;241:15;242:23;
255:2;270:2;279:17,24
**changed (4)**
111:5;240:9;242:17;243:9
**changing (1)**
181:20
**chapter (5)**
33:9;199:7;212:19;214:6,
8
**chapters (2)**
215:5,5
**characteristic (5)**
80:16;91:9,13,19;291:23
**characteristics (9)**
90:22;92:16;93:22;97:4,
10;150:2;247:17,24;248:10
**characterization (1)**
200:15
**characterize (1)**
292:1
**charges (1)**
219:16
**check (4)**
31:16;38:20;288:19,21
**checked (3)**
290:9,16;291:4
**chicken (2)**
45:14,21
**choice (3)**
19:12;78:22;90:15
**choices (1)**
79:1,16
**choke (33)**
106:8,13;109:18;126:16,
22,22;129:2,6;132:14,14,16;
134:2,4,5,7,9;136:2,4;137:4,
13,20,23;138:8;140:12;
267:22;268:3,6,20,22,23,23;
272:22;284:4
**choose (3)**
88:17;156:24;181:20
**chooses (1)**
85:17
**choosing (1)**
90:16
**chose (7)**
79:18;80:5;81:9;89:7;
123:6;189:23;291:15
**chrome (1)**
193:3;289:7
**cigarette (1)**
227:15
**circuit (1)**
88:10
**circumstance (1)**
283:11
**circumstances (2)**
220:5,8
**cite (1)**
78:7
**cited (9)**
102:3,19;103:2,4,5;199:7;
200:5;212:9,21
**citing (2)**
81:19;93:9
**claim (3)**
113:3;125:23;212:14

Exhibit B

**claiming (3)**
143:7;146:13;245:14
**claims (1)**
113:2
**clamps (1)**
222:21
**clarify (5)**
46:24;69:18;96:4;123:16;
167:16
**clarity (1)**
96:8
**class (3)**
36:21,22;37:6
**classes (14)**
34:3,24;35:2,9;36:2,3,17,
19;37:1,9,16,18,19;38:6
**classical (1)**
234:18
**classification (1)**
261:22
**cleaner (1)**
195:13
**cleaning (1)**
195:12
**cleanly (1)**
240:13
**clear (10)**
69:10;95:20;130:18;
138:24;151:15;152:2;
155:12;170:18;267:3;
291:22
**clearly (2)**
218:9;240:13
**client (7)**
83:16;84:2;176:11,12;
182:4,7;185:16
**clients (2)**
11:11;159:23
**close (1)**
183:17
**clothes (3)**
44:6;50:18;52:23
**clothing (4)**
49:14,15;122:12;195:11
**clutch (2)**
21:21;218:4
**clutter (15)**
190:2,10,18,21;198:15;
201:15;204:17,19;205:21;
206:13,22,24;208:8;210:7,
19
**cold (10)**
101:12;126:17;128:18;
129:2,6;132:10,13;137:11,
11;251:19
**collecting (1)**
150:21
**collision (2)**
41:6;56:23
**collisions (2)**
15:13;38:4
**colored (1)**
70:20

**Columbus (1)**
75:19
**columnist (1)**
253:22
**combination (1)**
92:7
**combined (1)**
206:2
**combustible (3)**
128:11;132:23;155:1
**combustibles (3)**
100:12;124:15;133:3
**coming (3)**
31:15;124:15;289:19
**comment (3)**
269:15;270:6;286:8
**commented (1)**
253:1
**comments (1)**
263:3
**common (8)**
54:19;60:5;77:9;116:18;
217:7;275:11;287:15,16
**commonly (2)**
61:15;200:11
**communicate (11)**
52:3;178:2;180:3;181:7,
18;182:5;185:17;217:14;
238:12;239:15;267:4
**communicated (6)**
127:5;180:7;182:13;
183:3;186:20;217:18
**communicating (1)**
180:10
**communication (3)**
140:17;210:5;212:19
**companies (2)**
11:11;45:18
**Company (11)**
44:11;45:7,7,19;50:14;
52:11,20;72:6,7;203:3;
230:20
**compared (2)**
78:18;264:17
**comparing (1)**
107:15
**comparison (2)**
277:18,21
**compelled (1)**
96:1
**competitive (2)**
233:6;235:6
**competitor (1)**
264:8
**complete (8)**
7:15;50:4;70:6;104:11;
180:18;182:16;189:21;
220:9
**completely (3)**
276:18;280:10,20
**completeness (1)**
174:9
**compliance (1)**

**complied (1)**
288:2
**comply (3)**
18:8;147:1;225:5
**complying (1)**
204:7
**component (1)**
100:14
**components (2)**
63:13,16
**composition (1)**
81:18
**compromise (1)**
234:7
**concept (2)**
186:14;270:16
**concern (3)**
19:18;43:16;87:23
**concerned (5)**
180:21;182:21,24;183:2;
206:22
**concise (3)**
220:11,12;267:3
**concluded (2)**
206:19;293:21
**conclusion (4)**
30:19,24;31:1;45:23
**conclusions (7)**
61:10,12;64:8,10;73:11;
139:3;263:5
**condition (1)**
286:1
**conduct (6)**
191:14;202:22,24;204:5;
210:21;241:15
**conducted (2)**
74:6;191:19
**confident (1)**
83:15
**configuration (2)**
272:11;286:14
**conflict (13)**
87:5;126:14,21;128:21,
23;132:18;133:22;134:1;
135:10,13,17;146:22,23
**conflicting (2)**
128:16;280:20
**conjunction (1)**
284:18
**Connecticut (2)**
55:6,11
**connection (1)**
243:4
**cons (1)**
98:8
**conscious (1)**
242:12
**consequence (6)**
131:24;140:18;198:10;
241:24;288:24;291:24
**consequences (5)**
17:20;84:14;117:22;

193:1,19
**consider (22)**
23:9,11,20,21;24:7,13,19,
23;25:5;26:21,24;38:8;60:4;
88:1;91:15,17;94:3;105:4;
131:9;212:3;279:5;292:5
**considerably (1)**
110:6
**considered (5)**
105:6;179:15;190:21;
197:24;257:18
**considering (2)**
203:17,18
**consistent (19)**
132:4;139:11;146:20;
158:24;162:21;194:5;256:4;
267:4,9,14;272:15,18;273:3,
15,19;274:19;275:13;287:5,
7
**console (2)**
69:4;222:22
**conspicuously (1)**
194:16
**consultant (1)**
211:11
**Consulting (4)**
6:6;10:10,12;203:2
**consumer (2)**
31:12;64:20
**consumers (2)**
31:2;158:24
**Consumers' (2)**
30:15,22
**contact (4)**
122:13;124:16;125:2;
128:11
**container (3)**
64:4;65:14,16
**contemporary (2)**
224:2,5
**context (1)**
246:17
**continue (4)**
26:10;32:13;61:20;84:11;
155:8;187:22
**contraindications (1)**
65:1
**contrary (3)**
128:16;265:20;280:10
**contrast (2)**
107:23;135:17
**contribution (1)**
85:14
**control (3)**
69:4;198:19;199:8
**controllers (1)**
21:20
**controls (4)**
24:23;25:3,8;219:2
**conversation (1)**
85:14
**converter (2)**
124:6;154:21

Exhibit B

**convey (3)**
148:21;245:13,15
**conveyed (1)**
241:8
**Conzola (1)**
33:3
**cool (4)**
100:22;253:5;254:4;
278:14
**cooler (1)**
254:7
**coolers (1)**
254:9
**cooling (1)**
253:8
**copies (7)**
67:5,6,9;70:16,20;194:19;
250:3
**copy (8)**
43:23;66:22;67:7;101:2;
103:11;236:21;258:18;
262:20
**corner (1)**
121:22
**corners (2)**
28:3,9
**corporate (1)**
73:5
**Corporation (4)**
48:7,17;157:19;191:20
**correctly (2)**
260:13,14
**correlated (2)**
10:22;130:14
**correlation (1)**
128:3
**Council's (1)**
199:4
**counsel (3)**
5:7;78:14;220:18
**count (3)**
46:16,17,20
**counted (1)**
53:16
**counter (1)**
287:20
**counting (1)**
47:4
**country (2)**
33:24;213:24
**couple (7)**
17:6;19:6;66:6;101:21;
137:10;230:13;251:18
**course (7)**
35:4,13,15,16,17;51:15;
273:21
**COURT (11)**
5:1;23:23;53:23;54:8,23;
55:17;56:22;58:1;76:13;
142:14;143:14
**cover (10)**
67:23;93:5,13,14,16,17;
94:5;102:15;121:1;263:3

**covered (2)**
293:6,11
**covering (3)**
95:3,10;102:9
**covers (1)**
95:8
**Cox (3)**
232:10,17;235:2
**C-O-X (1)**
232:17
**CPE (1)**
5:15
**crane (3)**
27:7;45:7;261:8
**crank (3)**
68:16;95:2;292:10
**crannies (1)**
151:2
**create (12)**
10:19;89:5;92:16;97:2;
132:21;190:10,18;204:17;
206:24;208:8;210:6,8
**created (6)**
72:8;81:3;86:24;210:19;
274:10;291:13
**creates (6)**
27:9;79:14;88:17;91:24;
92:8,21
**creating (1)**
204:19
**criteria (1)**
173:7
**critical (26)**
156:4;178:2,5,6,8,23;
179:8,22;180:3,6,16;181:2;
182:5,11,18;183:2;184:18;
185:16,17;186:2,20;187:8,
13;188:12;216:11;217:13
**criticism (7)**
78:18;118:2;122:22;
176:15,18;182:14;217:18
**criticisms (1)**
263:4
**criticize (4)**
80:19;123:9;156:19;
175:12
**criticized (4)**
158:6;176:11,12;182:7
**criticizing (5)**
11:2;90:10;97:6,7;182:4
**cross-examine (1)**
53:20
**cruiser (1)**
261:23
**cuff (2)**
207:9,11
**currently (4)**
12:10,19;13:2;14:7
**Curriculum (1)**
120:17
**customary (1)**
119:19
**customer (1)**

99:12
**customization (2)**
21:15,16
**cut (4)**
27:16;157:7;193:2;220:16
**CV (6)**
29:20;33:19;58:16;
222:11;233:4;237:3

---

**D**

**daily (1)**
31:15
**damage (8)**
18:8;132:7;193:2,20;
195:14;235:9;254:21;
274:15
**damages (1)**
41:22
**dance (1)**
176:4
**dangerous (1)**
217:4
**dark (1)**
260:18
**date (7)**
30:1,2;38:12,13;121:6;
214:9;229:3
**Daubert (5)**
54:2,4,17,24;55:1;56:8;
57:24;58:6
**David (2)**
38:23;41:21
**day (8)**
7:17;17:2;128:18;157:10;
192:18;237:17;248:17;
251:16
**days (1)**
129:2
**deal (20)**
16:14;25:23;29:12;34:10;
35:3;42:3,5,11;63:18;
163:24;180:12,14;189:23;
193:6;200:6;214:10,13;
265:22;274:7;289:12
**dealer (3)**
216:19;217:5;219:16
**dealership (2)**
135:14,22
**dealing (10)**
30:9;34:7;60:8;67:16;
124:8;125:1;181:9;212:20;
233:5;277:15
**deals (4)**
32:22;33:12;35:4;124:15
**dealt (3)**
42:2;114:17;277:8
**death (3)**
193:1,20;274:15
**decades (1)**
269:23
**deceased (1)**
47:24

**December (2)**
216:19;235:5
**decide (12)**
88:23;162:20;192:21,24;
201:1,24;202:4,6,19;212:24;
230:23;277:7
**decided (6)**
85:22;197:13;199:17;
200:16;240:8;266:14
**deciding (1)**
86:2
**decision (12)**
151:17;192:22;196:21;
198:16;202:10;208:7,16;
211:22;223:10;242:11,12;
273:21
**decisions (3)**
9:16,18;79:1
**deck (1)**
40:7
**declare (1)**
83:10
**declared (1)**
23:24
**decrease (1)**
205:20
**deep (1)**
254:10
**defect (16)**
56:24;119:11,16,22;
157:2;159:4;167:8;170:22;
177:12;179:20,22;182:23;
265:23;291:20;292:2,23
**defective (8)**
80:23;81:13;176:1;242:4;
291:9,21;292:6,17
**defects (3)**
179:14;182:17;189:22
**Defendant (3)**
11:5,8,9;56:2;58:14;
213:16
**defense (3)**
7:22;55:17;187:21
**define (3)**
127:23;270:20;292:24
**defined (2)**
125:12;161:10
**defines (1)**
278:11
**definition (3)**
139:18;150:19;161:13
**deform (1)**
98:11
**deformed (3)**
109:24;292:11,22
**degree (6)**
149:22;150:3,5,7;242:22;
245:8
**degrees (2)**
98:12;242:21
**deLuca (1)**
12:15
**Deluxe (5)**

Exhibit B

16:1;20:24;21:5,19;41:11

**denominator (1)**
217:8

**depend (2)**
216:10;227:6

**depended (2)**
136:9;290:4

**dependent (1)**
78:21

**depending (4)**
19:10;159:2;211:1;265:19

**depends (29)**
13:19,23;24:4,16,18;25:4,
10,19;27:22;88:3,9;115:16,
17,18;151:13,21;152:7;
153:17;180:5;181:8;189:8;
209:22;211:19;215:17;
219:18;225:12,15;227:5,7

**depict (3)**
71:14;195:19;259:22

**depicted (2)**
178:21;261:8

**depicting (1)**
67:21

**deposed (1)**
5:22

**deposition (16)**
5:24;8:12;70:13;71:12;
117:6;130:4,11,15;140:21,
22;148:19;213:3;263:22,23;
275:6;293:20

**describe (2)**
9:3;291:22

**description (3)**
147:12;253:23;256:1

**design (153)**
10:2;24:15,20,24;25:7,13,
15,18;26:22;27:1,10,12;
33:4;37:5;44:7,22,23,24;
75:1;78:13,19,22;79:1,5,5,
11,13,16,19;80:17,19,20;
81:6,12;82:1,9,16,19;83:8,
11,20;84:7,8,10,13,14;85:5,
12,18,20,22;86:3,6,10,19,22,
23;87:8,12,13;88:2,11,17,
20,22;89:1,5,8,19;90:6,8,11,
16;91:18,22,23;92:2,7,15,
20;94:1,11;95:18,21,24;
96:4,6;97:7,8,18,19,23;98:1,
22;99:9;100:6;110:24;
111:4;119:11,13,16,22;
141:22;157:1,14,18,20,22;
158:2;159:4,15,20;167:8;
170:21,24;178:18;179:13;
180:19,20;181:20;183:9;
189:24;192:5,6,15,16;
193:17;196:14,15;199:19;
203:23,24;205:6;207:15;
208:3;230:4;232:1;234:24;
240:11;269:19;270:13;
272:11;275:7,23;276:4,5;
277:8;283:1;286:16,18;
288:15;292:12,23

**designated (1)**
258:11

**designations (1)**
112:12

**designed (20)**
26:2,3;27:2;81:3;83:16,
17,18,24;85:1,2,16;88:15;
92:21;233:19,20,23;265:8,9;
271:9;290:19

**designers (1)**
10:1

**designing (2)**
109:4;232:19

**designs (2)**
87:2;90:14

**detent (5)**
136:4;268:4,7,22;269:2

**D-E-T-E-N-T (1)**
269:8

**deteriorate (1)**
265:6

**determination (2)**
206:11;213:7

**determinations (1)**
213:15,21

**determine (34)**
17:19;18:15;72:24;73:7;
89:15;98:14,17,21;119:22;
163:9,10;182:16;183:10;
189:21;191:2,10,15,21;
192:12;194:8;195:18;
196:19;199:11;200:6,18;
201:17;203:12;204:5,12;
206:23;208:6;209:5;211:1;
214:19

**determined (5)**
196:24;212:10;213:5,6,8

**determining (1)**
199:14

**detrimental (2)**
190:22;198:13

**Deuce (2)**
20:5;21:1

**develop (1)**
278:19

**developing (2)**
204:10;232:20

**development (2)**
37:5;75:1

**device (1)**
236:11

**differ (1)**
282:16

**difference (7)**
138:7,15;150:15;172:4;
174:13;257:14;290:17

**different (59)**
9:8;21:22;28:22;31:2,7;
32:1;67:20;69:1;82:17;83:7;
85:5;88:20,22;98:11;102:9,
20;106:10;111:10,13;112:4;
119:3,5;124:9;125:7,7;
138:13;139:2;148:5;154:11;

161:16,19;164:6;169:24;
181:14,18;193:4;206:6;
207:21;208:3,18;211:10,14,
17,19;219:2,13;221:15;
256:12,12,13,24;259:15;
262:6;272:12;277:14,15;
279:1;280:21;282:10

**differently (6)**
83:17,24;85:1,3;88:16;
208:2

**dipstick (14)**
68:15;93:15,20;95:22;
98:14;261:7;286:19,20;
288:5,8,18;289:4,14,18

**dipsticks (3)**
94:22;269:22;270:8

**direct (5)**
55:19;126:14,20;128:21;
135:17

**directions (1)**
65:1

**directive (1)**
236:9

**directly (5)**
68:7;124:14;132:5;
220:17;259:4

**director (1)**
36:14

**dirt (3)**
15:15;22:3,19

**disadvantage (1)**
70:23

**disadvantages (3)**
289:13;290:1,6

**disagree (5)**
84:3,13;184:4;194:11;
220:20

**disconnect (1)**
82:6

**discontinued (1)**
111:7

**discovery (2)**
65:21;72:20

**discuss (2)**
69:7;72:17

**discussed (1)**
178:16

**discusses (2)**
231:19;232:4

**discussing (1)**
221:7

**discussion (3)**
78:3;174:18;195:3

**discussions (2)**
110:2;291:8

**disk (5)**
101:23,24;102:13;103:8;
236:22

**displays (4)**
24:23;25:3,7,8

**disregard (3)**
140:14;242:12;243:10

**dissertation (1)**

200:24

**distill (1)**
208:5

**distinct (1)**
125:6

**distinction (1)**
97:3

**distracted (11)**
19:13,16;227:20;229:10,
14;237:8;269:14,18;285:21;
286:7,10

**distraction (6)**
237:5,9;282:23,24;283:6;
285:2

**distributor (1)**
257:11

**District (2)**
55:9,12

**document (4)**
110:22;113:7,9;114:3

**documents (1)**
103:20

**done (36)**
6:21,23;7:2,2,4;12:18;
28:15,18,20;33:16;63:3,7;
71:15;94:17;153:24;160:22;
167:20;171:4;189:11;192:7;
194:7;195:23;196:5;205:5,
6,18;206:16,18;207:12;
225:14;232:7,10,11;239:17;
242:14;293:15

**door (2)**
228:7,21

**doors (1)**
228:23

**doubt (9)**
84:1;137:5;140:2;243:8;
245:2,4,5;246:23,24

**Down (29)**
49:2;66:14;71:21;80:2;
105:22,23;119:8,10;121:12,
21;126:23;136:3;143:24;
154:6;155:8;192:20;200:8;
202:4;205:16;222:19;
226:20;257:22;260:11;
268:4,22;269:17;276:15;
278:3,5

**downloaded (1)**
66:7

**dozen (1)**
55:3

**dozens (2)**
202:23,23

**Dr (1)**
144:14

**draw (1)**
190:23

**drinking (3)**
153:23;156:21,23

**drip (2)**
289:6,8

**dripping (3)**
288:9;289:1,23

Exhibit B

**drips (1)**
289:2
**drive (11)**
51:14;66:21;67:3;102:19;
103:13,24;113:14;129:23;
218:11;234:5;284:4
**driven (1)**
218:8
**driver (5)**
233:23,23;234:3,11,12
**drivers (1)**
233:14
**driving (1)**
114:12
**dropping (2)**
59:16;136:3
**drove (2)**
215:24;216:19
**drug (1)**
30:13
**dryer (7)**
44:6,8;50:18,23,24;52:23;
53:1
**due (8)**
82:1;93:24;94:1,10;99:16;
110:3;111:17;276:10
**duly (1)**
5:15
**during (8)**
37:16,16,19;196:14;
251:13,19;270:18,19
**Durkin (3)**
46:8;47:8,21

## E

**earlier (11)**
104:4,7;147:3;154:18;
174:18;189:20;194:15;
196:22;206:5;259:18;275:6
**early (1)**
90:2
**easier (2)**
269:21,24
**easiest (1)**
212:17
**easily (2)**
122:10;154:23
**easy (5)**
10:3;159:13,14,20;176:16
**eat (2)**
149:10;281:15
**edited (1)**
215:5
**Edition (1)**
199:6
**education (6)**
24:9;34:2,19;66:3;73:6;
208:24
**effect (5)**
84:18;190:22;198:14;
239:2,20
**effective (5)**

14:21;62:16;203:19;
223:2;232:21
**effectively (1)**
52:2
**effectiveness (9)**
43:18;214:12;232:5,8,12;
235:1,8,22;236:3
**efficiency (1)**
272:2
**efficient (1)**
10:4
**eg (1)**
169:18
**either (16)**
42:3;54:12;55:6;77:9;
97:11;102:6;109:21;110:4;
116:11,13;136:14;141:4;
146:10;220:16;237:2;
245:24
**electrical (3)**
16:14;60:7,9
**Electrolux (3)**
44:1;50:15;52:20
**elements (1)**
265:10
**elevated (2)**
168:24;173:13
**eliminate (10)**
79:19;87:22;170:23;
183:9;192:15;205:5;230:4;
240:10;275:7;283:1
**eliminated (3)**
79:17;199:18,19
**eliminates (2)**
98:2,23
**Eliminating (3)**
157:22;196:14;275:23
**else (24)**
19:19,22,24;71:2;74:12;
77:18;88:13;94:2,14;98:13,
16,21;104:13,19;113:17;
211:8;252:1;254:22;255:5;
288:10;289:21,24;291:11;
293:4
**elsewhere (1)**
283:8
**E-Max (1)**
104:10
**embrace (1)**
215:1
**Emily (1)**
48:16
**emphasis (1)**
34:12
**emphasizing (3)**
199:22;200:1,3
**empirical (3)**
201:7;202:21;204:13
**employee (1)**
8:20
**encountered (1)**
179:11
**encourages (1)**

156:5
**encouraging (1)**
238:17
**end (8)**
64:14;185:10;192:18;
264:13;266:19;275:16;
277:22;286:4
**engine (97)**
16:18;18:3,4,6,8;27:2,3;
67:22;80:1;100:16;105:24;
106:4,14,16,18;109:19,21;
110:5;111:17;122:14,17;
125:9;126:13,17,17;127:24;
128:9,15,19;129:4;131:20;
132:3,6,9,16;133:8,12;
134:3,4,7,10;135:3;136:2,
10,17;137:9,11,15;138:10;
139:20;140:12;155:10;
156:9;164:18;166:13,23;
169:1;240:17;251:18;254:4,
7,14,17;256:5,13;257:16;
260:23;267:6,21,23;268:14,
19;270:14,17;271:23;272:9;
278:14,16,18,21;284:2,15,
17;286:15,22;287:11,13,14;
289:1,3,6;290:3,11,19;
292:17,20,21
**engineer (2)**
74:24;84:20
**Engineering (1)**
75:24
**engineers (3)**
10:1;157:20;159:18
**engines (7)**
67:18;18;129:7;253:24;
256:9;270:4,11
**enough (6)**
83:23;126:18;136:15;
185:7;199:23;241:1
**Enrique (1)**
39:4
**ensure (1)**
214:12
**enthusiast (5)**
251:7;252:4;278:9,11,12
**enthusiasts (2)**
252:20;264:6
**entire (10)**
61:1;66:20,22;102:12,16;
103:6,8;123:4;133:15;
146:18
**entirely (1)**
148:5
**entitled (1)**
251:5
**environment (3)**
9:15;264:16;270:9
**environments (1)**
9:9
**equipment (4)**
35:5,7;115:20;271:12
**ergonomic (2)**
84:20;86:15

**ergonomics (3)**
9:6;188:3;236:19
**ergonomist (1)**
97:24
**Erin (1)**
74:22
**Ernesto (1)**
39:4
**error (1)**
138:22
**escape (4)**
100:15;132:21;169:1;
278:24
**especially (1)**
271:14
**essence (1)**
203:10
**essential (1)**
261:20
**essentially (1)**
251:15
**establish (2)**
81:20,24
**established (2)**
81:16;263:20
**establishing (2)**
81:16,23
**E-Star (3)**
104:10,10,11
**estate (2)**
47:24;265:17
**et (7)**
39:1;43:18;45:7;46:9;
48:6;67:18;275:12
**etc (1)**
122:12
**evaluate (4)**
38:2;210:24;211:2,24
**evaluation (4)**
207:5;211:6;233:7;235:7
**even (13)**
132:7;137:19;143:4;
161:18;188:5;203:21;
222:22;230:16;251:20;
253:8;272:18;273:18;
282:18
**event (6)**
58:9;81:19;172:15,18;
248:3;249:24
**Eventually (2)**
247:2;253:3
**everybody (2)**
84:9;159:1
**everyone (1)**
274:17
**evidence (1)**
146:10
**evident (1)**
124:11
**exact (1)**
68:17
**exactly (6)**
49:15;125:24;138:12;

Exhibit B

148:4;179:3;238:11

**EXAMINATION (1)**
5:19

**examined (1)**
5:16

**example (36)**
9:21;21:18;34:10;37:24;
60:6;64:5,24;65:5;67:12;
68:9;72:15;73:2,18;79:4;
98:10;101:11;104:3;109:18;
122:11;125:16;152:11;
153:21;163:18;164:1;
168:14,23;173:6;205:12,14;
206:4;218:1;233:2;236:6;
253:2;259:3;291:2

**examples (3)**
101:7;236:5;252:24

**except (6)**
5:10;62:6;69:16;123:5;
242:14;270:18

**exception (1)**
276:14

**exclamation (2)**
133:10;135:5

**excuse (11)**
65:11;81:15;92:13;
134:19;146:2;147:21;
153:22;184:12;248:9,17;
283:17

**execute (1)**
38:2

**exemplar (1)**
74:1

**exhaust (21)**
109:21;110:4,5;111:21;
112:1;122:13;124:5,11,16,
20,21;125:2;128:12;132:24;
154:20;155:1;169:2;193:3;
281:15;289:8,10

**exhaustive (1)**
215:13

**Exhibit (29)**
120:12,16;131:7;222:3,5,
10,11,12,13;223:19;250:18;
252:14,18;253:14;255:14;
257:2,4,8;258:4,6,18;259:7,
13,13;260:7;261:12;262:10,
16,20

**Exhibits (4)**
73:23;120:19;222:9;
256:16

**exist (8)**
83:19;85:18;86:4;92:1,9,
10;286:19;292:3

**existence (2)**
237:23;239:18

**exists (3)**
82:13;92:2;98:2

**expanded (1)**
28:4

**expect (5)**
126:21;154:3;163:15;
193:7;231:13

**expectancies (1)**
9:17

**expectation (1)**
31:2

**expected (3)**
124:17;274:8,18

**experience (13)**
24:8;66:3;73:6;75:7,7;
100:8;138:18,19;207:13;
209:1;210:2;215:19;232:19

**experiences (6)**
9:17;75:4,5;135:19;
139:12;146:19

**expert (44)**
7:22;23:10,13,19,20;24:1,
5,9,14,20,24;25:6,11,17,24;
26:22;27:1,4;28:8;55:21;
56:3;58:11,13;74:17;78:14;
80:22;82:22;83:11,22;84:7,
20;86:6,15;87:9;88:2,6;
97:24;197:20;215:3;244:4;
283:15;284:13;285:8,23

**expertise (6)**
27:11;28:7;78:13;83:23;
191:5;212:14

**experts (7)**
24:1;40:11;82:12;91:20;
155:18;157:9,13

**experts' (1)**
28:5

**explain (11)**
77:12;131:23;142:7;
162:13;163:12;233:15;
252:18;257:8;263:9;273:8;
290:21

**explains (1)**
252:5

**explanation (13)**
108:21;161:5;168:22;
171:10;173:12;174:10;
175:5;183:21;185:10;
251:11;266:3,4;290:24

**explicit (11)**
105:12,18,19;107:21;
108:2,8;109:6;126:9;
129:16;139:10;166:21

**explicitly (1)**
106:19

**explore (1)**
87:16

**exposed (1)**
230:15;274:18;292:22

**express (3)**
70:11;186:14;293:7

**expressed (1)**
148:7

**extended (7)**
99:13;268:20;271:11,16,
18;281:4,14

**extent (1)**
93:7

**exterior (1)**
16:7

**external (1)**
254:9

**Extra (2)**
67:6,7

**extract (1)**
150:17

**eye (2)**
38:1;195:10

## F

**F800 (3)**
68:15;69:18;261:3

**fact (25)**
17:13;27:17;81:17;94:4;
109:17;119:10,17;127:9;
130:9,15;140:15;141:7;
145:2;155:22;194:20;
195:20,20;200:13;232:13,
22;237:7;244:17;278:20,22;
284:24

**factors (20)**
9:1,4,5,11;28:19;54:11;
157:9,13,17;159:12,18;
191:4;194:1;200:12;202:10;
203:2;212:3;214:4,18;228:4

**factory (1)**
254:14

**fail (20)**
93:6,15,17;94:5;95:7,11;
100:15;111:17;119:18;
127:10,15;132:20;169:1;
173:14;272:13;278:23;
279:6;286:21;287:17,23

**failed (9)**
44:15;73:11;81:18;89:23;
112:24;176:2;224:2;248:8,
21

**failing (5)**
112:18;124:10;275:13;
276:22;282:4

**Failure (22)**
18:7;25:23;42:7;44:5,24;
50:20,21;52:1;112:20;
127:5;177:12;180:22;225:5;
244:16;246:19;247:13,16,
23;248:10,24;249:3;282:11

**failures (1)**
110:13

**fair (3)**
141:9;185:7;241:1

**fairing (14)**
68:12;109:20,22;110:3,8,
9,10;111:3,19,24;112:4;
281:16;282:1,7

**fairings (2)**
112:14;281:23

**fairly (5)**
60:8;71:14;124:11;293:6,
11

**fall (3)**
40:6;49:21;50:2

**false (3)**

285:18,19;286:18

**familiarity (1)**
236:8

**Family (1)**
44:10

**fan (4)**
79:23;171:1;253:7;271:9

**far (3)**
65:21,23;222:9

**Farms (2)**
39:5;40:22

**farther (1)**
204:9

**fashion (4)**
85:16;150:21;156:5;
160:12

**Fashions (1)**
49:12

**fault (1)**
165:2

**FDA (1)**
63:22

**fearful (1)**
188:7

**feasibility (1)**
233:6

**feasible (5)**
89:13;17;98:2;284:9;
285:12

**feature (2)**
203:13;286:23

**features (11)**
90:22;149:20;150:1,6;
159:8;164:7;247:16,23;
248:11;264:7;274:20

**February (1)**
49:20

**Federal (3)**
54:23;227:8,10

**feedback (1)**
77:13

**feel (13)**
26:9,14,16;27:12;87:17;
143:19;150:24;195:21;
206:21;216:8,14;218:21,22

**feet (1)**
265:17

**fell (1)**
54:9

**felt (2)**
56:1;284:13

**few (2)**
80:15;211:21

**fiber (1)**
45:12

**fidelities (1)**
211:17

**field (6)**
9:24;54:10,18;56:12;
212:14;277:6

**fifth (1)**
153:5

**fight (1)**

91:20
**figure (5)**
  17:18;180:11;192:8,9;
  219:13
**file (5)**
  66:20,22;70:6;72:6,14
**filed (2)**
  56:16;58:6
**filing (1)**
  5:9
**filling (1)**
  61:19
**filter (1)**
  255:3
**find (9)**
  32:10;100:21;101:8;
  165:12;177:20;181:18;
  205:18;235:11;244:10
**finding (4)**
  101:7;224:1;286:13;287:3
**findings (1)**
  286:13
**fine (2)**
  223:11;224:19
**finish (3)**
  26:7;79:10;96:11
**finished (4)**
  114:4;127:20;133:4;
  223:13
**fire (130)**
  17:11;31:18,23;44:7;46:3;
  50:23,24;52:24;53:1;76:21;
  79:15;80:17;81:4;84:15;
  86:22;91:24;92:17,22;93:6;
  94:6,10;99:12,16;100:16;
  101:17;106:2,9;108:21;
  110:7;112:17,20,20,22;
  114:19;115:5;116:17;122:1,
  16;124:4,9,12,18;126:5,8;
  127:10,14;130:12,14,20,24;
  131:19,22,24;132:21,23;
  133:9;135:5,7;138:11;
  139:22;140:23;141:15,21;
  142:3,8,18,24;143:3;145:22;
  147:18;151:12;154:15,19;
  156:10;164:20;165:20,20;
  166:12,22;167:7;168:22;
  177:14;178:24;180:22;
  181:12;193:16;221:7;
  229:24;238:23;240:7,17;
  244:19,21;246:20;247:19;
  248:2,12;249:1,4;266:8,16,
  18;267:1;270:10,24;272:12,
  13;273:23;274:21;276:10;
  278:24;279:6,14;281:3,8,12,
  13,17,20,21,24;282:8,17;
  286:22;287:14,17,21,23;
  292:2;293:2
**fireplace (1)**
  47:19
**fires (5)**
  100:11;101:9;109:15;
  112:13;125:22

**first (41)**
  5:15;18:17;22:4,5;26:6;
  27:14;30:7;32:16;43:10,24;
  60:10;61:16,16;62:11;73:8;
  86:18;90:15;91:13;100:9;
  114:14;124:3;131:13;143:4;
  144:13;148:23;157:23;
  198:12;199:3;205:2,4;
  207:23;226:13;229:17;
  233:22,24;234:2;237:12;
  238:4;243:3;286:12;289:2
**fit (1)**
  202:21
**five (14)**
  10:15;12:24;13:4;14:6,8;
  129:13;137:17;140:8,11;
  203:16;208:11,12;209:3,5
**five-minute (1)**
  220:23
**fix (7)**
  157:13,18,20;159:3;
  170:21;181:20;269:18
**fixed (2)**
  157:4;234:12
**fixes (1)**
  98:15
**fixing (2)**
  119:12;178:18
**flammable (2)**
  122:10;154:23
**flash (5)**
  102:19;103:13,24;113:14;
  129:22
**flatbed (1)**
  47:14
**Flores (1)**
  49:20
**Florida (1)**
  55:17
**flow (1)**
  278:14
**flowing (1)**
  165:17
**focus (3)**
  187:22;188:5;211:16
**focused (2)**
  273:11;283:8
**folks (1)**
  82:12
**follow (13)**
  37:15;107:4;133:24;
  172:16;185:11;197:4;
  214:24;230:1,8,19;269:13;
  275:4;276:2
**followed (4)**
  230:11;231:3;237:15,18
**following (2)**
  175:5;275:21
**follows (1)**
  5:17
**follow-up (1)**
  263:13
**food (1)**

45:15
**foremost (1)**
  86:18
**Forensic (5)**
  6:6;7:3;8:17,21;72:3
**forensics (1)**
  10:7
**foresee (2)**
  166:12,21
**foreseeable (10)**
  119:19;155:20;158:15;
  164:22;268:13,17;271:19,
  20;292:22,24
**forewarning (2)**
  31:20,21
**forget (5)**
  80:21;114:3;115:10;
  127:12;160:5;229:10
**forgets (1)**
  274:6
**forgetting (2)**
  117:18;249:22
**forgot (9)**
  116:13;117:18;142:23;
  147:8;227:20;237:8;238:13;
  249:10;268:3
**form (5)**
  5:11;123:9;161:14,16;
  275:19
**format (5)**
  30:9;63:24;103:10;
  226:23,24
**formatted (1)**
  128:13
**formatting (2)**
  33:12;226:4
**forth (3)**
  9:23;25:22;111:14
**Forty (1)**
  23:8
**found (4)**
  41:21;57:12;187:12;
  257:19
**Foundation (3)**
  33:20,23;34:3
**fountain (1)**
  289:19
**four (12)**
  23:8;28:3,8;153:13;
  203:16;223:16;226:19,21;
  251:2;252:8;257:24;258:1
**four-lane (1)**
  41:13
**four-page (1)**
  260:7
**frailty (1)**
  283:4
**frame (1)**
  54:22
**frankly (2)**
  86:12;183:19
**free (1)**
  34:4

**frequency (1)**
  274:3
**friend (1)**
  74:16
**friends (2)**
  76:18;77:4
**friend's (1)**
  134:22
**front (11)**
  21:20;64:24;68:12;
  111:13,19,24;112:5;123:6;
  153:11;216:22;279:12
**fuel (2)**
  68:11;256:8
**full (6)**
  7:15;28:7;96:20;104:8;
  268:19,23
**fully (2)**
  142:6;243:5
**functioning (1)**
  278:2
**further (5)**
  64:22;171:9,12;241:5,10
**fuzzy (1)**
  228:1

## G

**gain (1)**
  158:10
**gait (1)**
  9:23
**gaps (1)**
  61:20
**garage (13)**
  16:24;164:4;227:23;
  228:7,8,11,15,19,20,22;
  237:17,20;249:23
**gas (12)**
  47:19;205:14,23,24;
  206:12;207:22;208:1,4,8,18;
  222:20;259:2
**gasket (1)**
  194:18
**gasoline (1)**
  195:13
**gauge (1)**
  283:23
**gave (9)**
  23:17;30:3;38:5;101:18;
  138:20;215:21;219:22;
  222:9;246:19
**Gear (1)**
  49:12
**gears (1)**
  218:6
**general (16)**
  32:6;47:2;58:22;77:15,17;
  90:19;100:18;186:15,16,17;
  212:7;256:16,19;270:16;
  271:13;281:10
**generalities (2)**
  75:8;263:23

Exhibit B

**generalization (2)**
264:19,22
**generalized (2)**
69:14;264:10
**generally (8)**
25:7;29:9,11;31:1;59:5;
150:24;163:13;194:4
**generate (2)**
85:23;87:2
**generated (2)**
84:8,10
**generates (1)**
85:21
**generation (1)**
87:12
**generically (2)**
47:20;186:4
**gentleman (1)**
187:21
**German (1)**
138:23
**gets (10)**
64:17;97:23;116:22;
124:12;155:2;200:8;216:13;
218:7;274:1,17
**given (10)**
32:6;86:9;89:7;90:14;
158:2;172:9;190:20;205:8;
263:20;274:4
**gives (8)**
202:9;244:18;247:18;
248:2,24;249:24;253:23;
255:24
**giving (8)**
25:22;56:20;131:23;
209:15;210:10;214:2;
256:11;257:13
**glass (68)**
27:7;52:10;67:21,24;
68:18;80:24;81:17;92:5,21;
93:5,13,14,16,17;94:5;95:1,
4,6,8,11,14,22;98:11,15;
109:24;110:13,16,19;
111:16;112:17,19,20,24;
119:18;124:10;127:5,9,15;
132:20;168:24;173:14;
180:22;193:18;259:23;
260:3,22;269:21,24;270:2;
272:13;276:21;278:23;
279:6;282:4,11;286:16;
287:16,23;288:4,4,20;290:2;
291:10,14,15;292:6,13,16
**glasses (3)**
75:6;88:6,7
**gluggy (1)**
256:7
**goal (1)**
159:18
**God (2)**
58:2,10
**goes (8)**
39:17;73:10;86:19;93:9;
192:23,23;268:7;273:10

**golf (5)**
51:9,10,11,15;52:7
**good (12)**
45:22;152:15;153:21;
158:21,22;215:7;216:4;
232:9;254:15,19;256:4;
270:11
**grab (1)**
283:7
**graduate (2)**
33:17;62:2
**granted (1)**
58:7
**grass (1)**
122:11
**great (1)**
167:16
**greater (1)**
153:9
**green (1)**
41:13
**ground (1)**
183:19
**group (1)**
211:16
**GS (5)**
68:15;69:18;112:16;
261:3;283:20
**guard (5)**
157:24;205:6;275:8,24;
276:5
**guarded (1)**
199:20
**guarding (3)**
79:22;80:4;81:7
**guards (1)**
196:15
**guess (9)**
12:2;16:13,13;49:18;75:1;
174:5;225:16
**guide (1)**
21:8
**guided (1)**
210:2
**guideline (4)**
196:13;197:21;198:22;
208:11
**guidelines (16)**
191:14;196:8,10;198:24;
199:1,14;201:13;202:14,22;
207:14;212:2,12;214:4,24;
224:3,5
**guiltless (2)**
85:24;86:2
**gun (1)**
249:8
**guy (2)**
188:4;253:6
**guys (2)**
156:18;203:3

**H**

**half (4)**
118:18;126:1;251:8;
265:15
**halfway (1)**
260:3
**hallway (1)**
211:15
**hand (2)**
219:3;255:9
**Handbook (2)**
214:8;215:4
**handlebar (1)**
137:14
**handlebars (3)**
21:19;218:4;222:21
**hands-on (1)**
203:19
**happen (4)**
131:1;238:9,9,10
**happened (3)**
72:24;73:1;140:23
**happening (1)**
125:23
**happens (2)**
192:19;249:12
**happy (6)**
8:12;25:21;38:20;84:11;
203:4;223:4
**hard (6)**
67:1,5,6;103:11;210:10;
220:10
**hardy (1)**
265:10
**Harley (4)**
22:5,6;100:4;101:19
**Harley-Davidson (22)**
15:24;18:12,24;20:4;
41:10;69:1;92:10;102:14;
103:9,10;137:12;182:20,22;
183:1,5;184:16;188:11,15;
267:7,12,15;286:20
**Harley-Davidsons (3)**
218:13;252:23;270:7
**Harleys (2)**
22:11;289:5
**harness (4)**
50:3;111:19;127:16;169:3
**hay (1)**
122:11
**hazard (106)**
31:18,19;44:7;46:3;58:1;
76:21;79:6;80:17;81:4,24;
82:9,13,20;83:4,8,19;84:1,8,
10,16,22;85:3,10,11,17,21,
23;86:3,17,24;87:2,12;
88:16,18,24;89:6,7,10,19;
90:17,23;91:4,24;92:8,17,
22;93:12;97:11,16,17;98:3,
23;100:5;101:17;108:5;
116:24;118:12;127:4;
131:17,22;141:22;142:19;
143:3;147:18;166:12,22;
167:8;168:2,6;170:24;

172:13;177:14;180:12,14;
183:6;193:5,17;194:3;
206:16;213:11;229:21;
230:14;231:16,24;242:10;
244:22;266:8;272:19;273:5,
7,20;274:10;275:15;276:16;
277:7;278:7;280:5;281:3,7,
8,9,20,21;282:13,15;291:13
**hazardous (1)**
79:14
**hazards (19)**
60:13;100:2;159:16;
180:19;183:8;192:9,12,19,
20;196:12;199:10,20,21,21,
21;200:14;208:1;282:9;
283:1
**head (1)**
69:5
**header (2)**
226:24;227:1
**headers (1)**
169:2
**headlight (2)**
42:24;164:2
**headlights (1)**
164:3
**hear (5)**
9:14;145:10;161:9;
181:24;192:5
**heard (3)**
143:22,23;182:1
**heat (8)**
111:20;129:3;169:2;
268:19;278:17,18;284:15,16
**heating (1)**
109:19
**heat-related (1)**
254:21
**heck (1)**
138:17
**Hector (1)**
39:4
**hedge (1)**
200:12
**heed (1)**
275:4
**HEINOLD (131)**
5:3,21;6:13,16;28:10;
32:24;40:13,17;58:5;67:10;
70:15,21,24;76:10;77:2;
78:6;82:3,23;83:2;84:12;
85:4;86:5,8;87:7,24;91:16;
96:11,14,19,23;97:1;99:7;
103:16,22;104:20,23;120:9,
15,22;121:9,11;123:18;
142:10;143:11,21;144:3,20;
145:6,11,16,19;149:11,17;
161:12,19,24;162:3,16;
170:6,13;174:23;175:8,11;
183:16,22;184:12,20,24;
185:4,8,9,15,21;186:1,7,11,
16,18,23;187:2,15,19;
188:16,20;195:6;200:2;

Exhibit B

204:24;207:8;219:23;220:6,
19,24;221:5;222:2,8,15;
223:22;225:15,21;228:5;
232:23;236:2;240:23;241:2;
242:2,6;246:5,11,14;250:2,
10,15,21;252:11,17;253:11,
17;255:17;257:1;258:3,9,16,
20;261:15;262:3,13,19,22;
263:1;271:2;293:15

**held (2)**
78:3;195:3

**helmet (6)**
38:1;42:1;152:12,15;
193:12;195:10

**help (4)**
127:23;145:8;149:10;
234:5

**helpful (1)**
220:17

**helping (1)**
128:4

**hence (2)**
104:19;115:12

**hereby (1)**
5:6

**here's (9)**
68:9;83:4;92:18;97:12;
153:21;198:24;209:9,20;
277:21

**heuristic (3)**
207:5,7;211:6

**hey (3)**
163:2;165:3,9

**hierarchy (6)**
79:4;192:14;275:18,22;
276:2,3

**high (15)**
11:15;124:4;126:15;
132:9;134:7,9;137:23;
140:12;154:19;233:7;
267:22;268:2,5,8;277:14

**high-engine (2)**
132:12,15

**higher (4)**
61:6;109:18;127:3;277:10

**highest (2)**
274:16;276:16

**Higinbotham (1)**
74:22

**himself (1)**
84:5

**hire (1)**
203:2

**hired (1)**
249:8

**history (2)**
270:5,12

**hit (1)**
56:24

**hold (12)**
36:13;126:16;129:2,5;
132:13,16;134:4,9;137:3;
189:10,12;244:20

**holding (2)**
126:22;136:2

**Home (6)**
50:15;66:24;114:12,13;
216:19;218:15

**hope (1)**
167:3

**hoped (1)**
217:4

**hoping (1)**
41:23

**horrible (1)**
86:1

**hot (17)**
80:3;95:8;100:15;122:13;
124:12,16,21;125:1,2;
132:21;155:2;169:1;270:9;
278:23;286:21;289:11;
292:10

**hour (2)**
24:13;126:1

**hours (1)**
137:4

**house (10)**
227:24;228:8,12,16;
229:12;249:23;269:16;
276:15;278:3,5

**housekeeping (2)**
106:22;120:7

**Hughes (2)**
98:5;103:1

**Hughes' (1)**
113:12

**Human (15)**
9:1,3,5,11,23;54:11;157:9,
13,17;159:12,18;191:4;
203:2;249:3;283:3

**hundred (5)**
49:10;83:3;216:1,21;
228:14

**hurt (2)**
269:17;277:13

**hypothesis (3)**
72:18;73:7;210:7

**hypothetical (2)**
207:19;240:4

**I**

**IBM (7)**
157:19;191:20;233:7;
234:20,22;235:11,15

**icon (4)**
226:7,9,12,23

**IDA (1)**
49:2

**idea (4)**
139:14;216:5,15;256:11

**Ideascan (1)**
235:5

**identification (12)**
120:13,20;222:6;223:20;
250:19;252:15;253:15;

**identified (3)**
97:4;100:5;152:23

**identify (5)**
29:22;47:6;97:16;100:2;
223:5;224:4

**idle (42)**
16:20,23;17:16;18:1,19,
21;19:1,7,8,8;76:24;106:7,
12;109:18;122:14;124:23;
125:3,10;127:10,14,18,24;
128:9;130:7,19;155:10;
179:1;180:23;181:12;240:8;
256:2;267:22;268:2,4,8;
271:11;274:21;277:24;
281:4,14;286:11;287:22

**idled (1)**
18:11

**idling (12)**
76:22;84:15;93:4;99:12;
100:12;109:17;135:6;
237:16;238:22;247:18;
248:1;270:8

**ignite (5)**
100:16;111:20;127:16;
169:2;278:24

**igniting (5)**
109:20,23;110:3;111:3;
281:16

**ignition (3)**
110:9,10;282:15

**IIHS (1)**
261:19

**illustration (5)**
169:11;171:5;172:19;
173:2,6

**imagination (1)**
207:20

**immediately (14)**
94:11;106:3,16,18;
122:16;126:13;127:23;
128:15,19;129:8;132:3,18;
267:13;280:7

**impacted (2)**
286:5,6

**impart (1)**
167:23

**imparted (3)**
118:3;167:21;206:20

**implemented (1)**
234:23

**important (32)**
34:6;61:19;115:7,14;
116:5,7;117:3,8;135:11;
141:17,19,24;142:4,9;
144:10;147:14;148:8,12;
152:22;154:9,14;156:4;
165:1;169:24;170:8,14;
179:24;194:2;202:9;217:14;
221:8,10

**importantly (1)**
10:4

**impossible (1)**
86:20

**impractical (1)**
284:9

**improve (1)**
33:24

**inaccuracies (1)**
263:6

**inadequate (27)**
80:11;81:10;119:14;
123:21,22,23,24;127:2;
130:22,23;131:10;149:4,5,7;
155:23;156:5;160:10,11,12;
162:15,18,20,23;163:13;
208:20;245:13;273:13

**inadequately (1)**
155:22

**Inadvertent (1)**
52:6

**inappropriate (9)**
80:10;81:10;149:7;157:2;
158:3;208:20;213:13;277:5;
279:24

**incident (19)**
17:2;52:4;67:24;68:19;
73:24;94:7;111:7;112:8;
119:1;147:19;149:2;213:12;
237:23;239:2,20;251:16;
269:11;273:14

**incidents (1)**
280:3

**inclination (1)**
207:23

**include (7)**
69:22;108:11;171:12;
278:17;279:11;280:10;
284:14

**included (2)**
165:19;194:21

**including (7)**
27:5;113:20;193:19;
267:7;283:22;286:15,20

**income (1)**
10:18

**inconsistent (7)**
132:11;135:13;138:18,19,
21;193:21,22

**Incorporated (5)**
39:1;46:9;47:9,17;51:6

**incorrect (5)**
201:20;208:17;214:9;
218:23;285:17

**increased (2)**
106:7,12

**increases (2)**
168:23;173:13

**increasing (3)**
110:7;172:14,15

**Indemnity (1)**
45:6

**indented (1)**
107:6

**independent (1)**

288:14
**indicate (2)**
231:8;284:1
**indicates (2)**
223:7;287:11
**indicating (6)**
66:23;223:12;255:11;
260:16,19;271:6
**indicator (7)**
283:17;284:10,14,16,17;
285:23;286:2
**individual (4)**
190:15;198:14;210:3;
275:4
**individually (2)**
198:17;201:18
**individual's (1)**
190:22
**Industries (1)**
53:7
**Industry (9)**
199:5;224:3,5;267:9;
272:16;273:16;274:12;
275:12;287:6
**ineffective (1)**
180:10
**Inevitably (3)**
82:8;84:21;86:18
**infer (1)**
152:13
**influence (1)**
236:8
**inform (6)**
130:24;131:15;141:21;
143:3;216:11;266:7
**information (125)**
9:14,15;12:3;25:9;59:6;
60:6,15,23;61:2,4,14,16,18,
18;63:22;64:13,14,18,21,23;
69:13;72:24;74:14;75:9;
76:14;108:3,4,12,15,17;
110:19;115:7,12;116:18,21;
117:15;118:3,6;124:14,22;
125:5;127:1,8;130:22;
135:10;139:11;142:15;
143:15;149:4,6;150:18,22;
151:23;152:8,19,20,21;
153:15,19;155:6;156:4;
158:10,18;160:11;165:1;
167:6,20;171:12;172:1,6,10,
12;173:16;174:2;178:3,9,
23;179:10,11;180:4,16;
181:2,19;182:6,12,19;
184:19;185:18;186:3;187:9,
13;188:12;190:3;206:20;
207:2;208:10;210:21;
214:14,22;215:12,14,22;
216:12,24;217:14,17;226:2;
229:21;236:12,14;237:11;
242:13;245:12,13;256:17,
20;264:11;266:23;267:5;
273:12;275:1,19;279:17;
280:1;287:4

**informed (2)**
229:15;288:2
**inherent (1)**
90:17
**inherently (1)**
188:3
**inherit (1)**
89:1
**in-house (1)**
203:2
**initial (1)**
234:8
**injected (1)**
256:9
**injuries (1)**
280:4
**injury (7)**
193:19;200:8;274:14;
276:20;280:13,15,17
**inquiry (1)**
72:8
**insert (8)**
30:16;65:11;106:22;
107:13,16,24;108:3,22
**inserts (1)**
65:9
**insight (2)**
27:5;264:11
**inspected (1)**
73:19
**inspections (2)**
34:11;35:6
**install (3)**
233:21;234:3,10
**installed (6)**
45:13;124:7;233:13,14,
24;234:11
**instance (3)**
68:5;220:10;254:19
**instances (1)**
76:24
**instead (5)**
89:4;95:22;98:15;103:6;
119:12
**instruction (2)**
17:24;157:1
**instructional (1)**
25:9
**instructions (11)**
5:23;60:14;126:14;
128:17,22,24;179:9,23;
191:6;197:2;230:2
**insurance (8)**
11:11,19;12:3;44:11;
45:18;50:14;52:10,20
**insure (1)**
197:14
**insured (1)**
118:14
**integral (3)**
84:23;86:16;192:6
**intelligent (1)**
185:11

**intend (2)**
96:3;272:1
**intended (18)**
31:8;105:22;126:24;
143:8,8;146:13;170:20,22;
174:4;221:23;222:1;229:4;
245:14;268:15;272:17;
273:17;282:21;285:1
**intending (5)**
148:15,21;243:10;291:7;
293:7
**intends (1)**
31:11
**intent (3)**
19:20;20:1;283:9
**intention (4)**
31:4;59:23;227:14;237:18
**interact (1)**
9:7
**interested (12)**
9:10,12,19;73:18;103:12;
150:22,24;151:8;164:8;
201:3;203:13;216:24
**interesting (2)**
165:13;257:19
**interface (1)**
203:11
**interfere (2)**
190:12;208:9
**interference (5)**
191:11;198:11;201:15;
207:1;210:20
**interject (1)**
27:23
**internal (1)**
235:15
**interpret (1)**
129:17
**interpretation (7)**
30:15,22;125:21;126:10;
139:1,9;249:7
**interrupt (4)**
26:8;102:2;147:24;204:20
**interrupted (3)**
76:6;209:13,14
**interrupting (1)**
184:13
**into (31)**
27:5,20;41:11;56:8;60:7;
64:17;87:8;97:23;121:23;
122:12;137:20;147:6;
188:14;193:15;200:21;
206:3;219:12;227:24;228:8,
11,16;229:11;246:17;
249:23;253:10;264:6,11;
270:9;273:10;274:1,8
**introduced (3)**
286:18,23,24
**introduces (1)**
270:3
**intuitive (3)**
159:14,15,20
**intuitively (1)**

**investigate (4)**
248:10,13,18,20
**investigated (1)**
248:19
**investigating (4)**
75:17
**investigation (1)**
72:18
**involve (5)**
14:11;15:6;25:10;43:3;
110:12
**involved (25)**
14:22;15:1,12,13,16;
19:19,21,23;38:17;50:6,16;
51:8;52:3,22;53:8;77:8;
84:9;110:17,20;111:11;
112:19,22;254:1;262:8;
280:22
**involving (2)**
56:23;112:22
**irrelevant (8)**
64:19;117:10;118:8,19,
22,23;123:20;237:10
**isolated (1)**
188:9
**issue (67)**
8:11;14:11;15:19;24:16,
17,18;25:4;32:4;37:1;40:4;
41:3;42:6,7,21,22,23;43:2;
44:4;45:24;50:19;51:20,22;
56:1;59:5;63:4;72:16,22;
79:11,24;87:20;99:16;
100:8,10;108:5;109:11;
110:20;111:5;127:3;133:3;
172:13;177:17;178:24;
180:6,6,21;181:9,9,24;
182:1,11;186:3,19;187:11,
14;188:6;189:8;193:11;
196:3;205:20;225:1;234:12;
265:19;266:24;277:14;
280:5;281:12;287:8
**issued (4)**
7:6;14:24;15:2,4
**issues (24)**
24:19,22;25:5,17;28:22,
23;34:6;35:7;50:20,22;
74:14;79:7,9,22;86:6,9;
96:22,24;97:8;189:14;
279:1;280:22;282:22;285:1
**issuing (1)**
96:15
**item (3)**
17:10;166:2,7
**items (1)**
165:18
**iterations (1)**
12:23

**J**

**Jacqueline (1)**
49:2

95:9

**jams (1)**
270:22
**January (2)**
48:15;137:18
**Jay (1)**
47:17
**Jessica (2)**
46:8;47:8
**Jesus (1)**
49:20
**job (2)**
158:21,22
**John (1)**
48:16
**Journal (1)**
236:18
**Joyce (1)**
30:8
**JR (1)**
5:14
**Judge (12)**
54:3,8,18;55:18,24;56:17,
21;57:1,16;58:1,7;183:17
**July (5)**
39:9,13,16,21;40:22
**JumpKing (1)**
48:8
**June (3)**
39:17;40:16;52:9
**Jury (1)**
54:21
**Jury's (1)**
55:19
**justify (2)**
151:16,20

**K**

**Kawasaki (2)**
101:11,22
**keep (15)**
82:7;105:24;106:14;
147:24;209:15,17,19;
220:14;225:20;233:16;
253:8;268:5,5;269:1;279:20
**Kelvin (1)**
53:6
**Ken (6)**
70:16;82:3;145:7;183:16;
186:18;262:19
**Kevin (2)**
7:23,24
**key (1)**
199:22
**kickstand (6)**
67:23;95:3,7;260:2,21;
291:6
**kill (2)**
269:17;277:6
**killing (2)**
276:14;278:5
**kind (12)**
21:16;67:1;75:8;76:9;

77:13,14,17;127:3;208:16;
255:24;256:11;268:8
**kinds (2)**
139:3;191:12
**kit (3)**
79:23;271:9;272:3
**Kleiman (2)**
47:17;48:1
**knew (9)**
70:4;77:10;153:4;240:6;
243:18;244:11,12;254:1;
271:19
**knowing (1)**
250:1
**knowledge (19)**
7:16;24:8;57:15;61:19;
77:14;100:18;116:2;193:9,
23;200:9;207:13;210:3;
274:9,19;279:3,5;287:15,16;
288:14
**knowledgeable (1)**
264:7
**known (10)**
16:23;60:13,14,14;61:16;
85:23;91:10;151:9;155:7;
243:10
**knows (4)**
84:9;167:3;246:3;248:17
**Krystle (1)**
53:6

**L**

**label (30)**
63:12,16;64:11,22;107:1,
8,20;173:22;201:1;225:9;
236:10,11;237:24;239:19;
241:22;242:13;265:14,19;
266:15,17;275:5,19;279:11,
16,18,23;280:10,23;287:10,
20
**labeled (1)**
218:10
**labeling (6)**
30:9,13;32:23;63:24;
64:12;265:5
**labels (8)**
29:17;30:11;33:13;195:9;
197:2;204:16;210:19;225:4
**lack (2)**
96:7;147:7
**laid (1)**
27:19
**land (1)**
233:7
**language (9)**
105:10,20;107:1,7,12;
146:16,16;169:4,20
**lapse (1)**
22:4
**large (3)**
122:5,19;257:11
**larger (1)**

122:20
**last (19)**
40:12,16;55:3;82:24;83:6;
121:7;131:24;184:15;228:4;
233:5;235:13;256:15;260:8,
9;262:4,5;263:2;275:2;
276:13
**late (1)**
248:16
**later (11)**
8:15;26:11,19;60:11;
66:16,19;74:20;118:18;
218:19;246:3;270:15
**launch (1)**
200:21
**law (1)**
23:24
**lawyer (1)**
86:1
**lead (6)**
8:4;84:14;90:22;97:10;
100:15;193:18
**leads (2)**
139:2;157:3
**leak (1)**
112:23
**lean (1)**
254:19
**leaning (1)**
291:5
**learned (2)**
208:23;246:22
**least (11)**
12:13;17:7;19:8;81:8;
89:20;110:2;117:21;171:4;
218:17;246:3;251:19
**leave (28)**
18:1,19,20;19:20;30:16,
23;31:11,22;32:2;84:15;
88:12;89:8;91:19,21;98:13,
16;114:18;130:7,19;135:6;
138:8;139:8,23;172:2;
230:15;237:11;254:24;
272:4
**leaves (5)**
99:12;122:11;126:10;
139:1,12
**leaving (8)**
76:22,23;126:4;138:9;
179:1;268:10;273:23;
287:22
**led (2)**
86:21;109:11
**left (30)**
27:7;68:16;72:7;93:4;
95:2,7,16;100:12;119:18;
192:21;196:18;197:12;
237:16,20;260:21,23;261:7;
267:22;268:8,19;270:8;
290:8,10,22;291:5,11;292:9,
16,20,21
**leisurely (1)**
150:21

**length (2)**
156:17;157:10
**less (8)**
12:24;41:22;126:3;
159:17,17,18;233:18;278:4
**lesser (3)**
60:13,14,14
**letter (1)**
112:11
**letters (1)**
122:6
**letting (10)**
100:22;126:6;127:14;
133:1;229:23;240:7;277:24;
281:3,14;286:11
**level (8)**
127:3;168:24;173:13;
260:18;278:10,11,12;290:11
**levels (3)**
111:13;112:4;193:4
**levers (2)**
218:3;219:3
**LEVINE (89)**
5:4;6:11;12:16;27:23;
32:19;40:11;67:8;70:19;
77:24;82:5;83:1,13;84:19;
85:7;86:7,11;87:10;91:15;
96:1,13,18,21;103:14,18;
104:22;121:7;123:8,14;
143:19,22;144:13,22;145:8,
13,17;147:23;161:7,15,21;
162:2,11;170:4;174:19,24;
183:18;184:3,14,22;185:2,7,
14,20;186:5,9,13,17,22,24;
187:7,17,20;188:19;195:1;
199:24;204:20;207:6;
219:21;220:1,7,21;223:15;
225:13;228:3;232:15;
235:24;240:21;241:1;242:1;
246:2,7;250:4;258:19;
262:2,21,24;269:1,5,9;
279:19
**licensed (2)**
34:4,5
**lift (1)**
9:22
**light (8)**
41:14;253:9;283:17,22;
284:14,16;285:24;286:2
**lights (2)**
42:7;283:21
**likelihood (2)**
68:6;200:9
**likely (14)**
65:3,3;115:9,9,10;154:18;
174:15;179:11;193:10;
210:14;212:19;242:18;
245:11;247:3
**limit (2)**
18:18;90:12
**limitations (7)**
9:20;115:6;231:19,23;
232:4;235:22;236:4

Exhibit B

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

**limited (3)**
86:12;265:13;280:3
**limiting (1)**
43:7
**line (1)**
148:22
**lines (2)**
107:7;241:8
**link (2)**
102:18;283:3
**lint (4)**
44:7;50:24;52:24;53:1
**liquid (1)**
260:19
**liquid-cooled (2)**
251:24;257:15
**List (30)**
38:11,17;43:15,15;54:13;
59:15,20,22;60:2,10,11,16,
20;61:2;65:20,22;71:13;
72:9,11;113:2;120:16;
159:22;165:18;192:19;
196:11;200:4;202:5;215:14;
222:9,11
**listed (3)**
33:20;59:9;65:18
**listen (1)**
148:3
**litany (2)**
211:9;230:17
**literature (9)**
59:12,21;99:20;190:17;
197:5;231:18,22;232:3;
235:21
**litigation (2)**
11:2;157:12
**little (14)**
11:15;19:4,18;75:5;77:12;
106:22;120:6;126:2,3;
144:18;149:8;228:1;251:14;
283:18
**live (1)**
247:11
**lives (1)**
31:15
**LLC (2)**
6:6;53:7
**located (2)**
75:14;226:1
**location (12)**
27:6;80:24;88:5,7;92:3;
117:15;214:10,13;222:19;
226:2;238:14;259:23
**locations (2)**
223:3,17
**long (22)**
8:16;16:22;18:2,18;19:7;
21:24;22:7,10;23:2;31:13;
124:24;125:4,24;136:6,14;
157:3;185:12;188:14;256:8;
270:5,12;271:1
**longer (9)**
19:9,11,12,18;126:2;

127:11;136:13;256:13;
270:22
**look (19)**
37:14;67:5;76:17;86:22;
99:24;106:5;138:16;151:18;
165:24;177:18;206:2,10,15;
207:4;208:14,19;209:23;
212:13;231:6
**looked (21)**
59:7;66:7;70:5;73:13;
74:2,13,15,15,18;94:20;
101:11,14,22;105:8;194:21;
206:5;216:23;235:7;236:6;
267:17;279:2
**looking (21)**
6:9,13;34:5;39:20;47:1,1,
3;73:24;106:23;113:8;
129:19;144:24;207:14;
212:15;214:6;235:5;242:21;
259:12;260:13,14;277:18
**looks (12)**
30:6;33:24;44:10;48:15;
52:9;109:14;112:21;123:4;
169:8,11;250:23;253:20
**Lopez (2)**
39:4;40:21
**loss (1)**
199:8
**lost (3)**
14:3;76:9;188:7
**lot (13)**
28:18;60:4;65:12;94:21,
21;156:20;181:13;184:8;
197:1,1;198:4;219:16;
289:22
**low (10)**
134:5;271:13,18;274:18;
276:12,13,17;280:12,14,17
**lower (3)**
121:21;281:23;282:1
**lubricate (1)**
254:4
**lubrication (1)**
18:7
**luggage (1)**
122:12

# M

**machine (1)**
136:11
**machinery (1)**
115:20
**machines (2)**
9:9;10:2
**maintain (2)**
150:4;219:17
**maintenance (5)**
21:13;33:10;38:24;
219:11,14
**major (1)**
33:2
**majority (4)**

158:24;231:10,12,13
**makes (6)**
103:12;219:15;249:3;
252:21;254:13;272:12
**makeup (1)**
291:14
**Making (5)**
152:24;154:22;159:20;
211:22;285:17
**mandatory (2)**
227:3,4
**maneuvering (1)**
271:13
**manner (10)**
92:4;95:12;146:12;
154:11;182:13;215:19;
267:3;268:16;271:10;287:3
**manual (222)**
17:10,13,15,18,22;20:20,
21,23;21:4,7;30:18;33:11;
37:2;43:19;61:8;62:16;
74:15;78:8;84:17;90:23;
91:1;102:14;103:7,8;104:9;
105:24;107:13,16;108:11,
20,22;114:8,10,17;115:8,15;
116:15;117:13,20;118:1,4,7;
119:15;120:3;121:2;123:5,
10;126:15;127:2,17;130:15,
18,23;131:6,14,15;133:23;
134:2;135:11,17,18;137:13;
138:21;140:24;142:1;142:6,
20;143:2;146:1,2,3,19;
147:20,21;148:14,22;149:4,
5,6;150:10,12,13,19;151:17,
18;153:12;157:1,7,11,16,21;
158:1,14,16,17,20,20;159:3,
5,7,11,17;160:2;161:23;
162:1,2;163:1,5,19,23;
164:16;165:4,10,19;166:16;
167:11,13;168:18,21;169:5,
15,17;170:1,8,15;171:7,18,
23;172:1,9,11,18,20;173:18,
24;174:1,3,6,9,16;175:3,6,
14,22;176:14,21,24;177:7,
10;178:2,15;180:2,9,13;
181:2;182:4;183:11;185:17;
188:22,23;190:3;192:3,24;
193:15;194:8;195:8;196:21;
199:5,16;210:5;215:10,24;
216:3,8,11,15,17,20,21;
217:13,16;218:14,18;219:5,
10,13;224:21;225:1,4;
236:11,14;237:14,19,21,22;
238:9,10,17;239:13;240:16;
241:7;242:15;243:8,14;
244:7,10,14,17,18;245:1,12;
246:9,19,23;263:18,21,24;
264:1;266:24;267:18;273:1;
275:9
**manuals (33)**
43:5;58:19;59:7;62:6,6,
13,22;63:1,2;100:1,4,4,18;
101:14,18,20,22,24;102:5,

10,13;103:6;104:8,12;
108:15,16;116:19;156:17;
157:3;159:19;190:6;218:17;
236:7
**manufactured (1)**
92:5
**manufacturer (23)**
31:4,8,10;44:15;45:14,19,
20,21;58:3;60:12;85:17;
116:3;150:18;156:3;165:6;
198:17,19;201:23;202:3;
211:11;259:1,4;291:3
**manufacturers (10)**
59:6,15;68:6;90:16;101:9;
156:20,24;195:20;198:4;
267:6
**manufacturer's (5)**
43:4,17,19;191:1;197:10
**many (41)**
11:10;12:5,9,14;13:2,9;
14:11;34:2;35:9;46:14;
190:7,17;191:10,19;196:9,9,
11,11;197:6,7,12,21,24;
198:3,8;201:3,13;202:2,20;
203:16;204:17;205:3;
206:14;208:1,12;210:6;
216:9;223:5;243:22;264:17;
265:8
**March (1)**
50:13
**Mark (22)**
81:20;95:5;110:15;
119:23;120:9,15;121:12;
125:12;129:1,20;133:23;
134:6;135:24;136:21;137:1;
222:2,24;250:15;252:11;
253:11;259:20;291:16
**marked (17)**
120:13,20,24;121:1;
222:6,12;223:20;250:19;
252:15;253:15;255:15;
257:5;258:7;261:13;262:11,
17;264:3
**market (2)**
219:1;266:16
**marketplace (1)**
200:22
**marking (1)**
261:24
**marks (1)**
223:16
**Maryland (1)**
56:22
**master (2)**
283:17,22
**mat (1)**
49:5
**material (12)**
21:10;65:21;72:20,21;
74:9;92:4;113:20,21;
122:11;154:23;195:14;
291:15
**materials (4)**

Exhibit B

113:23;132:23;250:12;
262:15
**matter (8)**
42:17,20;115:3;116:10;
229:1;237:6;238:1,3
**mattered (2)**
144:2;240:4
**may (63)**
14:1,1,2,20,22;15:4;16:8;
27:4,23;28:4;47:16;52:13;
72:4;73:23;77:3,7;87:22;
95:6;102:24;115:24;116:5;
129:13,14;130:20;132:22;
134:23;136:10,12,15;139:3;
151:8;153:14,14;163:22;
164:7;175:1;176:13,14;
179:15;182:17,17;186:22,
23,24;187:4;189:22;191:3,
3;192:3;194:3,4;202:6;
217:15;243:8;271:11,15;
278:21;282:16;285:20;
286:24;287:13;289:6,8
**maybe (32)**
11:12,15;12:24;13:4;
14:14;20:6;22:14;23:1,11;
32:3;35:15,17;50:7;88:10;
98:12,15;126:1;134:22;
138:22;145:9;157:7,12;
163:19;164:2;187:6;193:2;
199:22;210:15;215:20;
219:2,3;282:18
**McGrath (1)**
48:16
**mean (34)**
10:7;31:9,11,22;35:21;
56:13;59:3,18;61:10;62:8;
66:19;71:21,22;93:9,11;
112:7;128:6;134:19,20;
146:13;148:15;151:15;
159:2;169:8;173:1;174:7;
175:20;198:8;204:22;
230:24;236:24;245:10;
273:6;289:17
**Meaning (4)**
31:5,6;134:2;173:7
**meanings (2)**
161:17,20
**means (17)**
31:7,11;95:9;125:14;
127:7;129:8;130:13;140:24;
141:9;158:1;159:1;186:18;
218:19;245:11;246:24;
247:3;287:2
**meant (3)**
49:23;118:1;186:14
**mechanic (1)**
164:4
**mechanical (4)**
25:12,15,18;278:2
**mechanism (1)**
281:17
**medication (3)**
64:5,11,12

**medications (2)**
65:13,13
**meet (3)**
207:16;224:2;227:9
**meeting (1)**
81:18
**Megan (1)**
49:11
**melting (1)**
292:8
**member (5)**
34:21,22,23;36:6;50:14
**mentally (1)**
269:14
**mention (2)**
96:7;127:13
**mentioned (8)**
73:19;104:4,7,24;113:16;
154:17;211:21;288:12
**menus (1)**
96:10
**merits (1)**
91:8
**message (3)**
32:2;117:20;148:20
**messages (1)**
106:11
**met (6)**
226:2,4,5,6,7;227:10
**Met-analysis (1)**
232:11
**method (2)**
44:20;217:19
**mid (1)**
137:20
**middle (2)**
106:24;183:19
**might (25)**
17:11;31:23;32:11;
114:18;135:7;137:9;138:11;
142:2;144:9,16;145:3;
149:10;155:17;160:6;181:3,
3;185:19;189:11,13;194:12;
195:24;217:8;244:24;245:3;
288:4
**Mike (6)**
33:2;79:21;89:15;171:2;
272:5;291:18
**mile (1)**
216:2
**miles (1)**
24:13
**Milford (1)**
76:4
**million (1)**
85:9
**mind (5)**
136:24;150:16;220:22;
240:10;279:20
**Mine (2)**
58:11;74:16
**mini (1)**
254:9

**minimal (1)**
220:4
**minimize (1)**
192:16
**minimizing (1)**
32:4
**minute (2)**
70:17;77:21
**minutes (36)**
16:24;17:7;19:1,9,14,21;
20:2;125:23;126:4,7;
127:11;129:14;137:10,17,
17,22,22,23;138:3;139:24;
140:4,5,7,8,11;227:16;
229:23;230:16;251:19;
267:24;268:11;270:8,23;
274:22;293:3,3
**miss (1)**
62:7
**missed (3)**
268:8;293:10,14
**misses (3)**
268:12,16;286:8
**misunderstood (1)**
14:14
**Mitchell (1)**
48:6
**mitigate (4)**
81:5;157:1;178:17;199:12
**mitigated (1)**
81:6
**mitigation (1)**
80:8
**mock (1)**
204:2
**mock-ups (1)**
203:22,22
**model (7)**
102:5;104:8;109:16;
258:10;262:7;280:2;283:20
**models (5)**
90:3;102:3;112:12,16;
264:8
**moderate (1)**
256:9
**Modern (2)**
52:10;157:10
**modified (1)**
254:18
**moment (8)**
13:24;27:24;31:20;38:19;
70:23;94:16;107:17;283:19
**moments (1)**
211:21
**Monday (1)**
141:8
**money (1)**
219:15
**monitor (2)**
284:15,16
**monitoring (1)**
80:1
**months (1)**

19:4
**more (40)**
7:19;12:14,14;54:19;61:7;
65:3,3;101:21;102:10;
108:4,16,17;119:5;131:21;
139:24;140:4,6;161:13;
170:8,14;171:23;184:9;
186:19;189:19;194:13;
208:11;219:22;220:17;
224:22;245:11,18,23;246:4,
12;247:2,21;254:20;260:24;
264:15;277:12
**morning (1)**
141:8
**most (22)**
10:4;15:3;30:7;34:11;
94:21;100:8;167:5;179:11;
181:11;183:14;193:10;
212:19;217:7;221:8,10;
230:19;231:22;234:1;
252:22;274:3;278:6;283:6
**mostly (2)**
34:7,9
**motion (4)**
9:22;56:16;58:7,8
**motor (4)**
39:5;41:2,5;258:15
**Motorbike (1)**
255:20
**motorcycle (174)**
15:9,12,17,18,21;24:21,
24;25:12,16;26:1,23;27:12;
28:12,13,16,17,21;29:1,3,6,
10,14;33:20,22;34:11;35:14,
17;37:2;39:6;41:1;42:12,13,
16;68:3,8;69:5,6;74:1,1,15,
16;78:13;80:14,15,21,22,23;
81:12;83:10;84:7;85:9,16,
19,20,21;88:2;90:21;93:4;
94:20;95:15;97:8;100:12;
104:4;105:1,2;106:1,6,15;
107:2;109:16;111:22,23;
114:11,12;118:13;119:12,
20;122:10;131:20;133:8,12;
134:14,17;135:2,4;136:6;
138:6,9,14;139:21;149:19,
20;150:9;152:14;153:23;
155:13;156:9,21,23;157:2;
158:9,13;160:16,18;162:5;
164:19;166:13,23;168:16;
170:19;171:6;173:3;176:1;
178:4;180:17;193:8;194:17;
195:10;197:3;203:24;
204:11;215:9,16;218:2,7,11;
219:2;221:9,13;227:14,23;
229:5,11;237:16,24;239:19;
241:15;243:12;244:6;
247:17,24;249:22;251:12;
252:20;257:12;258:1;
263:17;264:16;265:16;
266:6;267:1,6,9;270:17;
272:9,16;273:16;275:11;
276:10;277:10,20;278:10,

Case 2:15-cv-01427-TR   Document 17-2   Filed 04/15/16   Page 92 of 155
Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

16;279:3,12;280:22;281:1;
282:18;286:14;287:5;
288:15;291:9;292:5,17
**motorcycles (38)**
15:7;20:4,18;22:1;23:10,
20;24:2;25:6,18;37:6,9;
38:18;43:8,11;67:17,20;
73:20;74:3,17;75:2;94:18;
99:11,11,15;100:1;111:4;
135:20;177:13;183:7;
185:19;193:9;221:16;256:6,
12;264:8;265:13;270:5;
271:10
**motorcycling (2)**
24:6;264:6
**motorcyclist (6)**
23:12;34:1,3,5;68:21;
251:7
**motorcyclists (5)**
34:4;76:19;255:21;264:5,
15
**motorcycle (1)**
259:3
**Mountain (1)**
38:24
**mounted (1)**
92:5
**move (2)**
253:3;268:22
**moving (3)**
270:18;276:11;287:12
**much (6)**
11:19;12:16;217:9,11;
218:19;264:11
**multi (3)**
15:14;206:7;216:1
**multiple (15)**
19:1;38:5;50:20;55:1;
59:9;102:5;109:15;195:21;
196:5;201:17;202:1;206:9;
211:14;212:4;223:3
**must (2)**
85:23;179:9
**Mutual (1)**
44:11
**Myrtle (1)**
253:3
**myself (7)**
23:11,21;24:8,13,23;27:1,
16

### N

**NA (2)**
175:13;178:1
**name (4)**
6:4;71:7;75:22;232:16
**names (2)**
112:3,6
**narrowed (1)**
202:4
**National (1)**
199:4

**nature (4)**
36:15;83:20;85:18;264:16
**navigation (1)**
217:2
**NC (2)**
33:15;62:1
**near (4)**
100:12;112:1;132:24;
155:1
**necessarily (4)**
19:16;167:23;191:13;
292:19
**necessary (21)**
69:24;70:2;116:2;117:16;
125:19;126:11;129:15;
181:21;190:2;195:16,18,22;
211:24;212:1,23;213:2;
214:5;19;216:16;226:2;
230:5
**necessity (1)**
116:23
**need (63)**
5:23;21:10;58:8;61:6;
64:16,21;73:14;78:17,21;
88:18;89:2;106:19;108:6;
115:12;134:23;145:9;
147:24;153:3,15;154:2;
155:2;157:6;159:8,17;
161:12;166:11,16;168:3;
170:21,24;173:11,15;
179:15;181:24;184:16;
193:13;194:12;197:13,16;
199:9,15,16;200:16;201:1;
204:16;206:11,20;208:12;
211:9;213:1;215:15;216:8,
14;217:1;219:5,9;239:7;
241:14,18;262:18;279:1,4;
287:9
**needed (15)**
14:19;80:13;90:1;115:12;
116:21;179:10;181:17;
213:5;229:21;233:13;
237:11;238:15;270:2;
280:12,16
**needing (1)**
18:7
**needn't (1)**
215:13
**needs (12)**
64:24;153:9;170:19;
171:19;180:7;181:6;182:19;
183:12;198:18;200:13;
238:5;278:14
**neighbor (1)**
165:9
**neither (4)**
36:24;42:2;125:11,14
**Nemire (1)**
32:16
**Nester (1)**
51:5
**neutral (1)**
195:14

**new (11)**
8:5,7;20:18;55:7,8,11;
135:12,21;170:7;216:18;
270:3
**next (50)**
32:15;33:8;44:1;45:5,6,9;
46:7;47:8,9,16;48:5,14;49:1,
9,19;50:11,13;51:4;52:8,9,
18;53:5,14;62:20;70:19;
73:12;78:10;83:12;111:12;
132:2;167:4;252:7;253:18,
19;255:18,19;261:2;265:3,
4;266:9;269:20;271:8;
272:14;274:1,23;275:10,16;
276:8;279:9;282:20
**NHTSA (1)**
110:2,15,21;262:8
**nice (1)**
127:16
**night (1)**
41:14
**nine (2)**
227:16;230:16
**non-answer (1)**
209:16
**none (1)**
219:4
**nonexistence (2)**
237:23;239:19
**nonprofit (1)**
33:23
**nooks (1)**
151:2
**Nope (3)**
16:17;160:3;256:23
**nor (1)**
282:21
**normal (2)**
257:18;268:11
**North (22)**
33:17;44:1;52:20;73:13;
78:23;121:14,15;135:14;
146:12;173:8;213:4,14,18;
219:15;245:14;248:7,20;
265:21;273:19;275:14;
283:15;287:7
**note (10)**
108:18;232:18;257:15;
265:20;267:11;272:17;
275:6,12,13;280:4
**notebook (1)**
250:13
**noted (1)**
110:14
**notes (3)**
154:14;251:17;263:16
**notice (3)**
113:22,23;214:8
**noticed (3)**
27:24;252:21;264:18
**noticing (2)**
152:2;253:6
**notification (1)**

**110:15**
**November (1)**
30:3
**nuggets (2)**
45:14;176:8
**number (29)**
11:21;19:7;96:2;102:1,2;
105:8;121:13;131:6;138:3;
148:16;191:17;197:23;
210:19;224:1,10,13,13,13,
14,14,14;230:13;231:15;
238:8;280:3;282:23;286:13;
287:9,18
**numbers (1)**
224:8
**numerical (1)**
59:19

### O

**object (1)**
161:8
**objected (1)**
55:17
**objecting (2)**
161:13,15
**objections (1)**
5:10
**observable (1)**
155:7
**obstructive (1)**
28:1
**obtain (1)**
32:11
**obtained (1)**
20:17
**obvious (3)**
61:2,15;82:18
**obviously (5)**
18:21;124:8;125:18;
128:21;271:19
**occupants (1)**
278:6
**occur (7)**
31:20;91:5,6;92:9,10;
154:20;279:7
**occurred (2)**
140:23;287:21
**occurring (4)**
89:1,10;172:14;266:16
**occurs (5)**
41:24;97:18;108:21;
131:2;168:22
**October (5)**
8:18;72:2,3,5;74:18
**off (29)**
21:9;27:16;32:4;77:24;
78:3;82:7;136:16,17;
137:21;144:13;152:23;
172:2;193:15;195:1,3;
207:9,11;220:16;227:17;
251:13;253:4,5;276:9;
284:4;288:20;289:4,7,9,23

Exhibit B

**offensive (1)**
220:15

**offer (12)**
27:13;34:1,20;79:6;90:5;
93:19;95:13;203:4;207:3;
272:2;291:7,19

**offered (1)**
34:4

**offering (10)**
25:14;27:15;28:8;80:24;
81:11;90:7;91:22;95:23;
97:19;197:18

**offers (1)**
264:9

**offhand (10)**
15:20;16:9;79:24;102:7;
105:7;110:17;112:3;214:16;
289:24;290:20

**off-highway (2)**
35:14,17

**office (6)**
12:15,17,22,23;14:7;
113:12

**officer (1)**
36:14

**officers (1)**
271:15

**official (1)**
6:3

**officially (1)**
72:1

**off-road (1)**
36:22

**often (7)**
17:3;31:10;40:11;54:1;
137:19;151:10;243:22

**Ohio (2)**
75:14,18

**oil (98)**
18:6;26:1,22;27:2,6;53:9;
67:21,23,23;68:18;75:6;
81:17;88:7;92:5,21;93:5,13,
14,16,17;94:5,24;95:3,3,6,8,
8,8,11,14,22;100:15,22;
109:23;110:12,16,19;
111:16;112:17,19,20,22,23;
119:17;124:10;127:9,15;
132:20,21;168:23,24;169:1;
173:12,13;180:22;193:17;
254:3,9;255:3;259:23;
260:2,3,18,22,22,23;270:9;
272:13;276:21;278:22,23;
282:3,11;283:22,24;286:15,
21;287:16,23;288:4,9,19,20,
21,24;289:5,17,19,23;290:8;
291:4,10,14,14;292:5,10,13,
16

**oiling (1)**
254:11

**oils (2)**
256:7,10

**old (1)**
23:7

**older (1)**
256:6

**once (6)**
85:21;202:18;251:17,19

**one (118)**
12:13;15:4;20:7,9;22:22;
30:8,12,14;32:15,17,22;
36:21,22;39:7;40:15;43:24;
44:1;45:4,5,6,9,11,18;47:8,
9,16;49:19;50:11,13,22;
51:4;52:8,9;53:14;54:4;
55:4,4;60:17;63:1;67:7,20;
68:4;92:6;96:4;97:20;
101:19;102:6;105:8;106:11,
11,13;109:5;111:11;112:15;
113:17;115:6,23;121:4,17;
129:13;130:18;148:16;
174:19;177:3;178:11,12;
186:19;187:12;194:13,13,
17,18;195:7;204:21,22;
206:3,8;209:11;211:6,7;
212:17;214:18;218:5,14;
219:4;220:2,20;224:10,22;
226:16;228:21,23,24;
230:13;232:9;246:5,12;
247:11,21;252:7,20,24;
253:9,18,19;255:18,19;
256:22;257:10;259:9,18;
260:9;262:1;263:18;268:1;
282:23;290:2,24

**one-page (1)**
261:16

**ones (17)**
29:22;38:22;43:22;46:20;
47:6;67:7;160:2;163:8,9,10;
192:14,15,16;202:19;223:8;
237:1,2

**one's (4)**
218:4,4,6,6

**only (35)**
7:9;20:7,9;28:7;40:13;
55:15;56:19,21;57:1,2;
63:20,21;71:6,10;90:12;
94:6;99:1,11;102:14;
123:20;149:6;178:22;180:9,
15,20;182:10,11;186:2;
188:8;226:19;235:19;
239:22;257:18;261:21;
288:11

**on-product (84)**
13:6,14,18,22;14:1,12,19,
20,22;29:6,9,10,17,20,23;
30:10;32:17,22;33:5;44:23;
50:6,21;52:1;63:8,18,21;
64:1;73:14;105:5;107:1,8,
16,20;108:10,20;115:13;
116:23;119:9;168:12,14;
169:12;173:6,8;178:20;
179:15;190:1,8;191:24;
192:2;194:9;196:2;211:22;
212:1;213:1;214:5,19;
217:5;225:3,6,9,24;229:8;
230:20;231:19,24;232:5,20,

21;235:23;236:4;238:24;
243:7;265:5,22;266:5;
275:19,24;279:15,18,23;
280:19,23;287:10,20

**onto (3)**
165:18;285:24;289:1

**open (14)**
12:6,7,10;13:3,5;61:15;
103:15;125:21;126:10;
139:8;189:10,12;228:7,23

**opening (1)**
228:21

**operate (15)**
75:20;115:19;134:17,18;
135:2,15;149:21,23;195:8;
215:16;243:16,19;244:9,10,
12

**operated (2)**
218:3;268:15

**operates (2)**
25:13;257:17

**operating (6)**
134:14;221:9,12,15;
277:10;284:3

**operation (5)**
34:8,9;37:8;180:17;219:9

**Operational (3)**
28:23;35:2;37:21

**operations (1)**
25:12

**operator (6)**
91:6;138:6;180:7;218:14,
16;282:14

**operators (1)**
41:7

**opine (2)**
98:7;123:8

**opined (1)**
283:16

**opining (1)**
82:10

**opinion (65)**
13:16,17;14:18;24:2;
27:13;44:12;80:9;81:2,11;
84:23;85:15;87:14;88:14;
89:4,11,15,22;90:13,13;
92:13;93:19;95:14,24;98:1,
7,24;108:10;116:7;117:3,9;
138:5;139:19;140:1;141:18,
19,24;142:5,9,17;143:1,9;
144:1,11;147:14;148:7,12;
160:8;162:7;173:4;182:1;
208:22,24;209:24;212:13;
224:24;230:24;237:5;
239:12;240:12;244:13;
256:18;272:2;291:8,20;
292:15

**opinions (38)**
8:2,4,5,7;14:18;25:15,21;
27:18;38:8;54:20;56:11,20;
57:2,3,9,12;65:24;70:11,12;
71:17;77:17;78:20,24;87:1,
11;93:21;97:21;115:1;

118:5;123:13;140:15;148:9;
177:11;221:11;265:1;
280:20;293:7,12

**opposed (13)**
27:8;31:3;68:24;90:16;
131:14,23;150:20;151:1;
193:2;194:2;261:23;270:13;
274:11

**opposing (2)**
70:14;220:18

**option (5)**
79:20;89:18;157:23,24;
271:20

**optional (1)**
79:23

**options (1)**
86:23

**orange (2)**
227:1,1

**order (12)**
39:17;59:16,19,24;63:15;
149:21;170:20;206:20;
210:22;223:1;226:18;
254:15

**ordering (4)**
58:18;62:17,24;63:11

**organization (9)**
6:3,8;33:23;34:14,17;
35:20;36:7;212:10;253:21

**Orgega (1)**
40:21

**orientation (1)**
260:15

**original (2)**
121:3,4

**Ortega (3)**
39:4;42:20,24

**Osceola (2)**
39:5;40:21

**others (13)**
7:11,12;56:4;97:4,9,16;
119:21;195:24;214:15;
235:18;236:23;256:14;
292:8

**Otherwise (6)**
26:10;129:3;137:21;
233:14;243:11;285:21

**ought (2)**
189:2;210:3

**out (43)**
17:18;27:19;31:12;39:17;
59:22;70:20;75:15,16;79:5;
97:3,9;101:6,24;132:17;
134:5,10;136:3;137:18;
138:9;140:13;157:7;159:15;
180:11;192:8,9;194:23;
215:20;219:1,13;221:24;
222:24;227:8;230:18;
241:18;244:10;263:8;
266:14;284:23;285:19,22;
287:6;288:18;289:19

**outlandish (1)**
207:19

Exhibit B

**Outside (6)**
24:17;55:19;75:19;
227:15;228:6,13
**outsource (1)**
6:19
**oven (1)**
45:13
**over (20)**
14:4;94:21;111:1;144:6;
145:16;146:2;160:22,23;
162:1;165:17;178:7;197:12;
204:22,24;209:18,18;
247:14;253:4;275:8;288:5
**overall (1)**
11:4
**overcome (2)**
55:3;283:6
**overheat (7)**
114:19;252:23;254:16;
278:21;279:7;286:1;287:13
**overheating (21)**
67:17;106:2,9;109:19;
111:18;122:15;131:18;
132:6;133:9;135:5;139:22;
156:10;164:20;254:12,20;
267:1;277:24;278:1,16;
279:13;287:14
**overlook (1)**
115:9
**Over-the-counter (7)**
30:13;63:12,15,23;64:2,
12;65:13
**own (29)**
15:21,23,24;18:12;20:7;
21:6,11,12,14;22:16,17,18;
81:23;83:16;135:1,18;
139:14;149:21;161:9;164:3;
200:17;201:5;219:11;
232:18,19;272:18;273:7;
275:14;287:7
**owned (8)**
18:24;20:4,5;22:7,8,10,
19;143:4
**Owner (12)**
91:1;149:18;150:8;
151:17,18;155:13;158:8,13;
159:24;243:12;244:5;
277:20
**owners (6)**
178:3;180:4;182:7;183:4;
264:17;279:4
**Owner's (5)**
90:23;150:10,12;195:8;
236:7
**ownership (1)**
37:8

**P**

**Paccar (2)**
46:8;47:8
**package (1)**
64:3

**packages (1)**
111:10
**Page (95)**
30:7,12;32:15,16;33:8;
39:14,16,21;62:15,20;63:10;
69:11;73:24;77:20,21;
102:9,15;105:13;106:23;
107:5;108:19;109:5;121:7,
18,18,22;122:21;123:6;
124:1;127:1,6;130:23;
131:5,8,14;132:4;153:1,6,
11,14,22;154:12,14;155:14,
23;156:7,12;158:4,7,21;
159:3;164:17;165:16,16,18,
24;166:5;168:10,19;171:5;
172:7,10;173:2,5;177:18,20;
178:12,21;179:18;216:21;
221:20;223:23;224:7,12;
233:4,5;235:12,14;251:1;
260:8,10,20;263:15;264:4;
265:24;266:13,14,22,22;
271:22;272:8;279:9;280:11,
16,18
**page-and-a-half (1)**
157:7
**pages (17)**
101:1,5;102:23;103:5,7,
11;104:12;121:2;127:7;
131:16;190:3;239:13;
240:16;251:2;252:8;258:1;
261:2
**paid (2)**
40:14,20
**Paint (1)**
52:11
**pan (1)**
289:5
**panel (4)**
69:4;105:10;283:21,24
**panels (2)**
45:13;46:4
**paper (5)**
32:5,6;193:2;203:22;
254:6
**papers (1)**
32:7
**paragraph (27)**
78:10;93:10;154:3,5,7;
166:21;167:4;177:21;264:4,
13;265:4;266:1;267:20;
270:15;271:4,8;272:14;
273:10;274:1,23;275:10,16,
17;276:8;277:23;282:21;
286:4
**parameter (1)**
137:7
**parameters (3)**
136:5,19,24
**parents (1)**
48:4
**parked (1)**
122:10
**part (39)**

42:23;46:5;83:13;95:6;
99:24;104:14;107:8,12;
108:14;113:13,19;117:12;
131:24;136:7;141:2;146:16;
147:21;148:2;158:14,16,17,
20;163:23;188:1;192:6,22;
201:19,20,21;225:12,16,17,
17,22,23;233:8;234:15;
256:21;276:13
**particular (10)**
55:12;59:12;83:20;
109:16;155:5;180:21;
187:12;208:7;230:12;
236:13
**Particularly (7)**
31:17;124:6;154:9,21;
157:15;232:1;275:8
**parties (1)**
5:8
**parts (12)**
133:23;134:1;135:18;
138:21;150:23;151:3,6;
226:3,4,5,6;257:12
**party (1)**
213:24
**passenger (1)**
264:17
**past (6)**
12:19;15:12,17;116:1;
138:19;220:16
**Pat (1)**
103:1
**patrol (1)**
271:14
**pause (2)**
84:2;96:9
**Pavement (1)**
38:24
**PC (7)**
233:8,13,22,24;234:2,9,10
**PDF (1)**
103:10
**Peak (1)**
47:17
**pedals (2)**
218:5;219:4
**Peer (4)**
234:16,17;235:2;236:17
**peer-reviewed (1)**
198:22
**pencil (1)**
203:22
**pending (1)**
40:9
**Pennsylvania (1)**
34:2
**people (52)**
9:7,22;23:24;60:5,18;
61:14;77:10;96:5;115:8;
116:18;117:13;139:12,16,
17;146:17;151:10;152:16;
156:5;167:5;174:8;181:13;
185:18;193:7,8,9,12,21;

194:4,5;200:9;216:9,9,10;
230:1,7,19;231:10,13,14;
234:2;243:22,23;252:22,24;
256:1;264:11;266:7;280:13,
15,18;285:20,24
**people's (3)**
9:20;125:22;193:23
**per (2)**
42:6;72:12
**perceive (1)**
9:18
**percent (12)**
10:15,16;11:13;13:1;
49:11;83:3;228:14;245:16,
24;246:4;247:4,6
**percentage (8)**
10:11,15,17,18,20,23;
11:17;12:21
**perceptions (1)**
28:21
**perceptual (1)**
9:13
**perform (3)**
71:15;211:15,16
**performed (1)**
72:10
**perhaps (6)**
26:18;113:22;147:7,8;
150:23;182:2
**period (21)**
18:15,20;99:13;125:21;
126:6,16;127:19;128:20;
129:6,9,11;132:9;138:4;
255:4;256:8;268:12,20;
281:4,15,19;287:12
**periodic (1)**
31:16
**periods (18)**
122:15;124:24;125:4,10;
127:11;128:1,5,10;132:8;
155:11;181:14;256:14;
267:2;270:18;271:12,16,18;
276:12
**permits (1)**
27:12
**person (15)**
9:11;69:19;74:21;124:17;
152:5;153:7;155:21,24;
160:9;163:16;166:11;
215:14,20;218:7;231:9
**personal (2)**
35:5;276:20
**personally (3)**
82:10;97:5;176:6
**person's (2)**
162:21;283:7
**perspective (1)**
60:18
**pertinent (5)**
76:14;114:16;142:15;
143:15;241:6
**Peters (1)**
214:11

Exhibit B

**pharmaceutical (2)**
63:12,16
**pharmaceuticals (1)**
64:2
**PhD (1)**
5:15
**phone (1)**
228:9
**photo (1)**
222:23
**photograph (5)**
68:14;69:20;194:15;
259:7;261:9
**photographed (1)**
68:2
**photographs (8)**
66:5;67:19;69:3,9,17,17;
74:19;257:21
**photos (6)**
73:23,24;262:4,5,17;
265:11
**phrase (3)**
31:3,7;127:22
**physical (1)**
9:20
**physically (3)**
184:19;188:13;204:3
**pick (1)**
260:5
**picked (1)**
164:16
**picking (1)**
216:2
**picture (4)**
152:12;260:4,19,20
**pictures (9)**
104:4,17;195:19;223:17;
258:23;259:22,24;261:1;
279:10
**piece (2)**
115:19;150:18
**pieces (1)**
206:19
**pills (1)**
64:5
**pinned (1)**
222:19
**pistons (1)**
255:2
**pivot (1)**
222:22
**placard (5)**
122:7,23;154:16;168:11;
173:21
**place (15)**
69:8;74:18;111:9;198:12;
203:17;204:3,22;205:15,19;
222:16;229:17;237:12;
243:3;273:22;286:12
**placed (5)**
187:24;194:17;204:4;
205:14;292:9
**placement (2)**

172:9;236:8
**places (1)**
204:11
**plain (1)**
285:2
**Plaintiff (20)**
11:5,6,11;40:3;41:22;
47:22,24;48:2,12,23;49:17;
50:9;51:18;52:16;53:3,12;
55:19;56:2;58:13,15
**Plaintiffs (4)**
10:24;11:1;49:7;51:2
**Plaintiff's (2)**
48:4;247:13
**plan (8)**
25:21;27:15,19;88:10;
90:13;95:17;97:2,6
**planned (3)**
57:3;126:4,6
**planning (13)**
56:20;81:22;90:7,9;92:14;
95:13,21,23;118:17;164:3,8;
219:10;229:22
**plastic (1)**
45:13;234:9
**please (7)**
49:1;142:11;166:5;
210:15;223:6;246:13;257:9
**pleasure (1)**
40:7
**plenty (3)**
35:24;158:12;164:11
**plural (1)**
182:6
**pm (1)**
293:21
**point (32)**
26:17;97:9;99:19;101:3;
111:8;114:13;118:9;133:10;
134:11;135:5;137:20;
148:16;159:5,7;167:18;
180:24;209:8;210:1,17;
212:17;263:8;268:9,12,16;
271:17;278:8;284:18;
285:16;286:9;287:6,15;
292:9
**pointed (2)**
285:22;291:1
**pointing (5)**
97:3;110:5;236:11;
284:23;285:18
**points (5)**
8:11;10:16;265:21;268:1;
282:23
**pole (1)**
49:5
**police (3)**
79:23;271:9;272:3
**poorly (1)**
265:8
**populated (1)**
60:15
**portion (3)**

56:7;105:5;279:12
**portions (1)**
241:7
**pose (1)**
286:17
**position (13)**
36:13;68:17,18;81:17;
87:8;93:5;134:9;136:4;
240:8;267:22;268:3,20;
290:13
**positively (1)**
10:22
**possess (1)**
116:2
**possibility (5)**
189:10,13;194:12;207:21;
247:1
**possible (19)**
70:6;77:1;132:7;146:14,
15;154:18;159:19,21;189:4,
5,15;194:14;206:1;242:16,
18;265:7;283:13;284:14;
290:20
**possibly (2)**
269:17;277:6
**potential (34)**
27:8;31:18;76:20,21;
79:14,15,18;80:2,16;81:4;
99:15;101:16;111:16,18;
124:12;128:11;166:12,22;
181:1,15;266:8;267:1;
270:24,24;274:14;276:24;
277:2,4,11;279:6,13;282:24;
287:14;291:23
**potentially (7)**
27:5;38:3;274:17;276:14;
278:5;281:16;288:8
**Power (7)**
43:24;44:3,4;59:8,9,10;
254:18
**practical (2)**
283:10,13
**practice (11)**
19:6;38:2;101:16;171:12;
172:2;269:13;273:4,7,19;
275:11,14
**practiced (1)**
239:15
**practices (7)**
76:23;77:14;101:13;
174:11;224:3,6;272:18
**preceded (1)**
54:15
**preceding (1)**
260:20
**precheck (1)**
34:10
**precise (2)**
83:19;222:19
**precisely (3)**
169:8,10;222:17
**preclude (3)**
55:22;56:17;58:7

**precluded (4)**
53:22;55:5,13;56:17
**predicate (1)**
79:12
**preface (1)**
246:16
**preference (1)**
157:18
**preferences (1)**
30:10
**Preferred (3)**
52:19;63:15;275:8
**prepare (4)**
71:11,15,21,22
**Prepared (1)**
113:11
**presence (1)**
239:1
**present (10)**
60:1;2;61:16;91:18;96:3;
156:3;182:17;196:20;
200:18,19
**presentations (3)**
29:1,6;63:10
**presented (31)**
59:11;64:13,13;97:20;
124:1;128:13;151:14,14,22,
22,23,24;152:8,9,9,10;
153:11,12,18,18,19,20;
154:10;155:5,22;158:18;
159:10;160:12;163:23;
173:9;182:19
**presenting (4)**
61:8;64:18;152:21;190:6
**presents (1)**
98:4
**pressure (1)**
268:6
**preteen (2)**
22:3,9
**pretrip (1)**
35:5
**pretty (2)**
56:10;166:20
**prevent (5)**
88:24;89:9;94:10;235:9;
254:11
**prevented (3)**
97:11;286:10;287:19
**preventing (1)**
64:20
**Prevention (1)**
199:4
**previously (2)**
120:24;246:16
**primarily (1)**
273:11
**principles (1)**
214:12
**print (2)**
122:20;221:23
**printed (3)**
101:6;104:6;222:14

Exhibit B

**printouts (1)**
67:15
**prior (19)**
8:19;9:17;66:8;69:15,19;
72:4,5,6;74:6;80:15;92:12;
116:9;135:19;146:19;
147:15,19;237:22;259:7;
270:23
**prioritization (10)**
61:7;62:9,12,21;63:8;
205:8;212:20;214:11;274:2,
8
**prioritize (4)**
61:11;202:15,18;223:8
**prioritizing (3)**
58:18;62:5;63:4
**priority (2)**
61:7;274:4
**probably (20)**
10:21;16:11;35:14;45:22;
83:22;132:24;140:7;152:13;
174:13;189:1;193:13;
205:15,16;215:6;216:16;
218:10;219:5;220:19;255:4;
289:3
**problem (24)**
46:6;59:14;60:3;64:17;
91:23;93:11;96:16;98:12,
16,20;108:13,14;117:12;
120:1;129:15;139:6;155:4;
174:5;181:11,16;190:5;
209:21;234:4;236:13
**problems (4)**
27:6,9;255:4;278:1
**process (7)**
9:15;134:11;196:18;
199:9;209:5,7;251:14
**processor (2)**
45:15,21
**produce (3)**
32:10;188:22;254:18
**produced (1)**
265:11
**product (121)**
13:11;25:1;28:20;29:12;
30:16,17;31:12,13,19;33:11,
13;37:3;42:6;43:5,20;44:2,
22;45:1,11,20;47:1,3,11,18;
48:9,18;49:4,13;50:1,16;
51:7;52:12,22;53:8;58:19;
59:12;60:7,13;61:5,6;62:12,
16,22,24;63:2,6;72:22;77:9,
10;79:4;96:6;97:24;106:20;
108:24;109:2;115:24;
118:14;157:22;159:24;
161:22;163:5,20;170:1;
171:16,20,22;173:23;
177:17;179:19;183:8,13;
189:7,14;191:15;192:6,7,10,
13,23;194:2;196:20;197:18;
198:5,20;199:8,11,15;200:7,
10,13,17,21;201:2,14,16,23,
23;202:20,21;203:12,17,20;

204:23;205:1;206:21;
213:10;216:16;219:1;
225:10,10;233:10;234:8,24;
244:5;273:12;274:11;277:5;
279:4;287:1;291:9,20
**production (1)**
113:9
**products (12)**
9:8,12;10:2;29:15;46:12;
50:15;63:5;85:2;115:24;
159:13;191:23;198:6
**professional (3)**
157:17;207:13;245:6
**professional's (1)**
10:1
**Programs (1)**
199:6
**prohibited (1)**
239:11
**projects (1)**
10:20
**prolonged (15)**
122:15;125:10,12,14,20;
126:11;127:19,24;128:5,10;
155:11;267:2;276:11;
281:19;287:12
**prominence (1)**
153:10
**promise (2)**
144:24;145:17
**promising (1)**
145:9
**proof (4)**
264:9,10,19,23
**propensity (2)**
68:5;172:15
**proper (2)**
118:13;184:17
**property (3)**
193:1,20;274:15
**propose (1)**
237:24
**proposed (1)**
221:20
**proposing (1)**
169:5
**proposition (2)**
187:3,4
**pros (1)**
98:8
**protection (3)**
38:1;40:7;195:10
**protective (2)**
35:5;195:11
**provide (56)**
25:23;37:16,19;42:8;44:5,
16,18,24;46:3;50:21;57:2;
58:4;59:6;61:6;66:5,11;
73:9,11,14;80:13;81:8,10;
88:21,24;89:3,9,21,23;
101:2;103:1;108:12,15,17;
109:2;157:14;159:16;168:1;
170:23,24;172:10;176:2;

178:20;183:10;192:17;
196:15;230:5,18;232:13,21;
248:8,21;264:24;265:14;
275:18;283:1;287:10
**provided (36)**
14:21;37:7;65:24;66:20;
68:20;72:19;80:11;96:5;
102:8,12,14;103:7,8;113:14;
114:10;118:7;119:14;
130:22;131:19;135:21;
157:5;179:9;222:14;225:9,
10;229:20;236:20;250:11;
266:24;271:20;273:13;
280:1;283:16;287:4,24;
288:6
**provides (5)**
108:4;150:18;158:10;
172:11
**providing (20)**
59:17;77:22;88:11,19;
89:5;90:13;95:17;102:20;
103:6;115:7;119:13;135:15;
149:5;157:23;165:7;178:18;
181:21;191:18;203:10;
275:24
**province (1)**
54:21
**provisions (1)**
233:9
**proximity (1)**
110:4
**psychology (1)**
54:18
**publication (4)**
33:6;60:21;121:5;251:5
**publications (4)**
58:17;62:5;63:10;191:14
**publicly (1)**
32:12
**published (4)**
34:13;63:9;234:19,20
**pull (4)**
194:23;222:24;253:4;
288:18
**pulled (2)**
101:24;261:21
**purchased (4)**
21:7;114:11;135:21;
263:16
**purchaser (5)**
135:12;176:13,13;215:9;
217:8
**purchasers (2)**
175:14;217:15
**purchases (1)**
238:6
**purchasing (1)**
35:6
**pure (2)**
264:18,22
**purport (1)**
107:7
**purpose (7)**

72:17,23;166:18;198:11;
239:23;254:3;283:9
**purposes (6)**
24:2;71:3;115:1;240:15;
272:17;273:17
**purview (1)**
55:20
**push (1)**
256:10
**put (70)**
45:22;50:7;61:14;64:23;
68:6;90:1;98:18,19;101:24;
103:3;106:6;107:2;108:23;
109:5;126:15;144:24;
169:19;171:4,24;172:19;
173:11,15,21,23;174:7,9,10,
12;175:10;184:16;188:13;
189:7,14;193:13;195:21;
196:1;197:1,3;198:3,8;
201:1,4,14,16,24;203:18,24;
206:11;209:6;213:9;218:24;
223:16;228:4,13;233:22;
234:2,8;236:10;246:17;
258:17;259:1;266:14;
269:15;284:9,16,17;285:5,
23;286:1,2
**putting (6)**
65:6;68:10;180:13;
203:17;259:4;291:3

**Q**

**qualifies (2)**
83:12;215:2
**quality (1)**
43:17
**quarterback (1)**
141:8
**questionable (1)**
140:10
**quite (2)**
71:18;151:10

**R**

**R1 (2)**
258:14;261:20
**R1100rsl (1)**
69:6
**R1150 (2)**
68:23;69:5
**R850 (1)**
263:21
**racetrack (1)**
24:12
**radiating (1)**
278:17
**Ramon (1)**
39:3
**ran (3)**
41:11;240:17;253:9
**range (2)**
9:22;257:17

**rate (1)**
233:7
**rather (7)**
83:15;89:17;109:23;
147:7,8;269:18;288:14
**reach (4)**
18:6;64:8;71:16;223:9
**reached (2)**
64:11;209:8
**reaction (1)**
153:6
**read (186)**
32:4;61:4;65:4,17;76:11,
13;114:7,13,16,21,21,23;
115:2,2,4,4,14,22;116:4,5,6,
8,11,11,12,15,18;117:1,2,5,
6,13,14,17;118:10,15,20;
119:1;121:23;124:17;130:2,
10;131:16;132:22;133:14;
135:2;140:2,16;141:2,3,4,4,
14;142:3,5,10,14,20,20,21;
143:1,5,5,11,14;145:22,24,
24;146:1,3,4,5,7,7,11,11,15;
147:5,15,20,21;148:4,14,18,
22;150:9,13;151:16,19;
152:5;153:2,5,22;154:2,16,
19;155:2,13,19,21,24;156:6;
158:9,14,16,17,19,20;
159:10;160:1,2,5,7,14,17;
161:2,11;162:6,15,18,22;
163:2,6,14,18;164:5,10,12,
17,21,23;165:4,10,13,15;
167:14;174:8;190:24;195:8;
214:17;215:24;216:8,9,14,
17,22;218:16;219:9;226:20;
237:14,21;238:9,9,10,15,17,
19,19;239:5,13,13,24;
240:15;241:6,21;242:15;
243:1,5,13,17,20;244:6,9,13,
17,17;245:1;246:9,19,23;
248:23;249:9;259:18;
263:18;283:18;293:18
**reader (4)**
125:15;127:6;128:4;
162:17
**readers (1)**
125:6
**readily (2)**
155:6,7
**reading (24)**
60:21;61:1,21;107:3;
124:17;130:15;140:19,21,
22;146:18;150:16,20;152:6;
153:24;155:8;160:10;165:2;
179:5;204:6;216:2,20;
218:21;284:1;288:7
**reads (2)**
133:7;139:20
**ready (2)**
70:12;185:14
**real (4)**
59:22;265:17;288:16;
289:10

**reality (1)**
128:17
**realize (1)**
268:21
**really (10)**
133:3;154:8;170:18;
173:1;174:6,15;175:23;
176:8;276:9;288:21
**realms (1)**
207:20
**rear (1)**
218:6
**reason (15)**
56:9;59:23;60:24;88:22;
89:6,7;95:6;108:14;155:8;
175:10;219:12;261:21;
270:11;284:7;292:11
**reasonable (26)**
149:22;150:3,5,7;151:9;
153:6;154:1,3;155:21,24;
160:9,9,10;163:15;177:24;
216:7,9,17;231:9;243:21,22,
23;244:3;245:8;268:11;
287:2
**reasonably (1)**
163:15
**reasons (6)**
127:1;131:3;155:16;
158:12;163:17;164:11
**rebuttal (1)**
8:8
**recall (46)**
13:24;14:17;15:20;16:9,
10;21:1,3;40:19;42:21,21,
22;43:1;56:5;76:18,24;
79:24;80:15;90:2;102:7,24;
105:1,2,7,9;107:9;109:11;
110:17,20;111:7;118:24;
146:1,4;147:20;170:7;
213:19;218:12;225:10,10;
262:8;265:22;266:2,11;
273:21;279:14;281:2;
288:12
**recalled (4)**
119:3,7;239:16;242:11
**recalling (1)**
115:11
**received (7)**
7:21;104:15;175:22;
176:24;177:10;263:17;
264:2
**recognize (4)**
54:10;58:24;231:23;
275:22
**recognized (2)**
84:17;281:7
**recognizes (1)**
61:17
**recollection (2)**
116:19;190:13
**recommendations (2)**
159:24;207:15
**recommending (2)**

226:6,7
**reconsidering (1)**
197:17
**record (9)**
77:24;78:4;82:8;121:23;
183:24;195:1,4;223:15;
264:21
**redid (1)**
63:23
**reduce (2)**
206:8;266:15
**refer (3)**
10:12;198:23;202:9
**reference (13)**
66:9;100:19;114:2;127:9;
177:20;178:22;199:2,3;
210:5;212:21;214:7;236:6;
283:24
**referenced (4)**
103:23;114:2;232:10;
237:2
**references (17)**
58:17;65:23;78:16,17;
102:19,22;103:2,4;104:14;
199:13;200:5;212:9,9,11,16;
224:11;251:23
**referred (3)**
107:23;194:20;215:3
**referring (8)**
69:11;105:14;120:7;
178:10;179:6,7;186:4;
222:24
**regard (9)**
25:15;87:1,12;97:21;
118:6;221:8;247:18;248:1;
277:10
**regarding (15)**
44:6;112:14;165:19;
232:1;236:12;240:16;
248:11;272:19;273:4,7,20,
22;275:14;279:13;287:8
**regardless (3)**
233:21;238:5;281:16
**register (4)**
146:5,8;147:22;148:24
**registered (2)**
147:6,6
**regs (1)**
227:10
**regulate (1)**
193:14
**regulation (1)**
227:8
**reinforce (3)**
239:4,24;242:14
**reinforced (5)**
45:12;238:16;239:7,10;
243:8
**reinforcing (1)**
242:17
**related (50)**
24:22;29:8,9,23;32:17;
33:9;35:7;37:8;42:15,18,23,

23;62:11;103:20,21;124:20,
23;125:3;128:8,10;131:17;
154:8;178:2,6,6,9,23;180:3,
16;182:5,11;183:3;184:18;
185:18;186:2,21;187:8,13,
13;188:12;200:5;205:24;
219:14;253:21,23;269:12;
275:1;276:21;282:22;285:1
**relates (1)**
24:6
**relating (1)**
178:24
**relatively (3)**
276:12,12,17
**release (4)**
126:18;129:4;234:8;268:7
**released (1)**
268:23
**relevance (1)**
284:5
**relevant (22)**
14:2;38:8;72:23;74:14;
94:6;123:13;153:4,15;
164:9;175:18,23;176:22;
177:6,9;204:4;205:10,11,11,
18,22;212:23;213:2
**reliance (2)**
80:9;217:13
**relied (6)**
65:19,20;71:3,5;80:7;
157:21
**rely (13)**
80:12;156:24;157:14,16;
175:14;176:20;178:1;180:2;
196:12;230:5;231:2;256:18;
283:2
**relying (14)**
66:2;77:16;89:18;97:15;
119:21,23;137:1;158:1;
176:11;178:15;182:4;
185:16;288:13;291:16
**remember (14)**
32:5;49:15;55:10,11,16;
56:22;112:3;114:23;117:14;
140:19;141:6;226:18;
228:23;248:24
**remembered (14)**
57:23;238:15,24;239:5,6,
9,12,24;241:11,17,22;243:2,
6,11
**remind (1)**
239:23
**reminded (2)**
117:19;238:14
**reminder (2)**
241:14,19
**remove (1)**
288:8
**render (1)**
176:17
**rendered (1)**
176:15
**repeat (4)**

107:7;108:20;172:19;
236:1
**repeated (5)**
168:21;169:14,16;171:7,9
**repeating (2)**
147:24;148:3
**repetitive (1)**
173:1
**rephrase (1)**
210:16
**replaced (2)**
21:19,20
**report (84)**
7:3,6,9,18,22;8:9,10;15:2,
4;25:22;27:19;28:3,5,9;
65:17;66:6,8,9;69:7,12,15,
20,21,23;70:8,11;71:2,7,14,
16,21,22;73:16,22;74:7;
77:20,21;78:10,15;83:9;
87:9,19;96:20;103:2,4,5,24;
105:13;106:24;107:6;
108:18;109:5;120:10;
165:17;168:10;171:6;
175:12;176:16,18,19;
177:15,19;178:13,21;179:2,
17;194:22;199:3;215:6;
222:10;223:23;233:5;
234:21;235:17;237:3;263:3,
4,5;266:20;273:10,11;
275:7;285:14;293:2
**reported (2)**
109:15;280:4
**reportedly (1)**
267:21
**REPORTER (4)**
5:1;76:13;142:14;143:14
**reports (4)**
14:24;72:12;233:3;235:20
**represents (2)**
279:16,24
**requested (1)**
32:9
**require (8)**
174:2,4;175:4;189:22;
227:10;256:7,13;267:12
**required (6)**
70:14;115:19,22;187:9;
227:11;268:2
**requirement (3)**
116:3,4;227:9
**requirements (5)**
59:11,19;63:24;65:10;
229:9
**requires (3)**
83:21;208:3;226:1
**requiring (2)**
226:3,4
**research (20)**
28:15,19,21;29:5;63:4;
77:15;99:17,18,24;100:22,
24;101:5;190:16,19;191:6,
13;230:18;232:19;269:24;
270:1

**researched (2)**
101:20;233:1
**reserve (1)**
27:21
**reserved (1)**
5:11
**residual (3)**
192:20;199:20,21
**resource (1)**
215:7
**respect (11)**
76:23;78:24;80:1;95:24;
97:18;175:24;177:12;
199:14;221:11,12;279:5
**respectful (1)**
176:5
**respective (1)**
5:8
**responding (1)**
213:23
**response (1)**
284:12
**responses (1)**
28:5
**responsibility (21)**
58:3;81:5;149:19;150:9,
12,14;191:2;197:11;243:13,
17;244:4,6,13,18;246:20;
247:19;248:2;249:1,11,18,
24
**responsible (4)**
244:21;248:4;249:3,15
**responsive (1)**
210:13
**rest (6)**
11:8;93:10;154:2,4;155:3;
274:12
**restricted (4)**
56:8,11;57:6,9
**result (11)**
18:8;40:18;41:20;87:13;
110:8;111:3;112:17;132:7;
229:24;282:17;287:13
**resulted (1)**
82:9
**retained (25)**
12:10;40:1,2;41:15,16;
44:9;45:16;47:21,23;48:3,
12,22;49:6,16;50:8;51:1,17;
52:15;53:2,11;71:23,24;
72:1,3,4
**rev (1)**
256:2
**review (4)**
71:7;86:17;113:21,24
**reviewed (12)**
65:18,20,22;71:3,4,14;
74:9;113:20;234:16,18;
235:3;236:17
**Revzilla (1)**
257:11
**revzillacom (1)**
257:11

**ridden (1)**
135:19
**ride (23)**
19:3;94:11;106:3,15,17;
122:16;126:12;127:22;
128:14,18;129:7;132:2,17;
134:20;137:21;152:14;
153:23;156:21,22;165:14;
219:7;251:13;267:12
**rider (31)**
23:22;24:7;35:4,13,16;
36:21;126:21;127:6;129:13,
14;130:24;137:19;138:14,
23;141:21;153:16;158:15;
160:9,19;166:24;167:3,21,
23;168:2,4;251:6,7;252:4;
278:20;280:6;284:2
**riders (7)**
28:22;159:1;183:14;
271:14;278:10,15;279:4
**Rider's (8)**
107:13,16;121:2;151:18;
178:1,15;180:2;190:3
**ridiculous (2)**
153:3;207:24
**riding (7)**
21:24;22:2;35:8;36:22;
37:22;38:3;122:9;126:23;
154:22;218:20;251:20;
257:12;264:15;267:23;
271:15,17;280:6
**rig (1)**
53:10
**right (68)**
7:16;11:10;12:6;14:3;
20:17;23:6;25:2;27:8;39:13;
65:17;67:22;68:10;79:12;
86:2;95:1,10,15;98:18,19;
104:17,21;113:3;121:10,22;
122:6;131:8;139:4,16;
141:10;156:10,13,14;
169:19;170:3;172:8;174:22;
187:22,23;188:3;194:24;
197:22;201:6;202:11,12;
208:16,22;209:19;210:8;
212:13;213:9,17;224:9;
226:15;227:19;237:9;
245:16;255:9;256:24;
259:23;262:15;263:7;289:5;
290:12,13,15,22;291:3;
292:4
**right-hand (2)**
121:22;154:13
**risers (1)**
21:19
**rising (1)**
110:6
**risk (66)**
52:5;99:16;106:2,8;110:7;
122:1,15;124:4,18;127:14;
130:24;131:18;133:9;135:4;
139:21;151:11;154:13,15,
19;156:10;164:19;165:20;

212:18;221:7;238:23;240:7,
17;241:7;246:8,21,22;248:1,
11;250:1;266:15,18,19;
270:3;271:1;273:23;274:2;
275:15,17,23;276:2,10;
277:3,11,23;278:4;280:6,12,
14,17;281:18,23;282:2,3,5,
7,10,11;286:17,18;292:2,2
**risks (6)**
52:3;274:2;277:9,19;
287:1,1
**road (4)**
15:16;34:12;102:4;104:9
**roadway (1)**
41:13
**Robert (1)**
51:5
**Robinson (1)**
48:6
**Robson (1)**
8:20
**Rocky (1)**
38:24
**rode (1)**
218:15
**role (1)**
157:10
**room (2)**
45:14;139:1
**Royal (1)**
45:6
**RSL (1)**
262:7
**RT (1)**
112:22
**ruined (1)**
193:3
**ruled (4)**
54:3,18;55:20;58:1
**rules (1)**
61:9
**run (18)**
9:23;17:7;18:4;19:21;
20:1;126:1,4,7;203:19;
229:16,23;230:16;251:18;
267:2;271:12;276:11;
277:24;287:11
**running (12)**
106:1,14;138:10;227:23;
228:18;229:11;237:20;
238:22;249:23;254:15,19;
270:17
**runs (1)**
278:18
**Rust-Oleum (1)**
48:16

## S

**safe (16)**
10:4;18:15;31:14;170:20,
22;174:3,6;180:17;192:11;
200:21;206:21;229:24;

Exhibit B

267:10;272:16;273:16;
284:2
**safeguard (13)**
88:24;89:9,12,20;119:14;
157:6,14;159:16;171:1;
178:19;181:21;192:17;
240:11
**safeguarding (1)**
79:20
**safeguards (3)**
183:10;230:5;283:2
**safely (4)**
149:21;180:8;193:23;
208:19
**Safety (52)**
33:20,22,24;34:3,7,12;
62:16,22,24;84:19;86:13,16,
21;97:24;150:6;156:4;
165:1;173:8;178:2,5,7,8,23;
179:8,23;180:3,15;182:5,11,
18;183:2,6;184:18;185:17;
186:2,21;187:8,13;188:12;
192:14;199:4,8;207:2;
208:9;210:20;216:11;
217:14;225:3,6;227:1;
275:21;276:3
**sake (1)**
174:10
**sale (1)**
197:18
**same (50)**
8:22;17:1,5;20:14;58:15;
65:12;68:17,24;69:11;
99:15,16;112:2;121:4;
143:17;146:17;152:24;
153:12;160:22;169:13;
171:23;182:21,23,24;
200:15;206:7;209:4,15,18,
20;213:10;218:3;256:21;
259:6,9,9,10,11,13,14,18;
261:22;280:4,5,11;281:18,
20;282:13,14,16;290:13
**sat (1)**
270:22
**satisfactory (3)**
45:24;173:23;263:10
**satisfies (1)**
229:8
**saw (4)**
33:19;58:16;118:15;270:1
**saying (24)**
56:15;77:7;84:4;90:5;
91:8;92:15;107:19;152:4;
154:24;155:18;158:8,21;
161:3,9;167:24;180:1;
183:17;230:11;231:24;
234:10;273:2,14,18;290:14
**scan (2)**
102:16;103:11
**scanner (2)**
235:9,10
**scenario (2)**
124:9;282:16

**science (2)**
9:6;54:11
**scientific (5)**
57:10,13;197:6,8;245:9
**scooter (3)**
39:5;41:2,6
**scope (6)**
28:2;78:13;86:12;87:10,
18,19
**scopes (1)**
28:7
**se (2)**
42:6;72:12
**seal (1)**
292:13
**sealing (1)**
5:8
**search (3)**
38:2;101:8,10
**searching (1)**
65:2
**Sears (1)**
50:15
**season (2)**
251:13,20
**seat (2)**
16:8,12
**Second (24)**
26:8;30:14;32:22;78:1;
83:15;84:2;125:9;128:14;
131:18;157:24,24;174:19;
175:14;176:13;204:21;
226:10,16;233:4;235:13;
251:1;264:4;271:5;275:2;
283:14
**secondary (4)**
178:3;180:4;182:6;183:4
**secondhand (5)**
176:20,24;181:1;188:24;
217:15
**seconds (4)**
18:5,9;129:13;137:10
**Section (10)**
66:1;77:21;121:18;124:3,
18,20;125:1;163:19;269:11,
20
**sections (1)**
114:16
**secure (1)**
20:23
**seeing (3)**
204:6;207:16;214:16
**Select (1)**
50:14
**self (2)**
124:11;161:10
**self-evident (1)**
60:24
**selling (2)**
46:5;215:20
**send (3)**
32:1;70:20;266:14
**sense (4)**

54:19;60:5;103:12;234:18
**sentence (8)**
132:1,2;133:7,15,16;
155:9;178:10;275:2
**separate (3)**
79:7,8;256:22
**separated (1)**
125:5
**separately (1)**
279:2
**series (1)**
257:20
**serve (5)**
34:16,17,18;36:9,11
**served (1)**
239:23
**service (10)**
21:8;53:9;150:4;203:5;
234:5;279:11,14;280:2,9,24
**set (6)**
25:22;59:10;152:23;
193:15;215:20;217:1
**sets (2)**
257:23,24
**setting (4)**
11:2;133:1;164:2,3
**settled (1)**
45:4
**seven (4)**
208:12;227:16;229:23;
230:16
**several (10)**
8:11;67:19;104:8;115:4;
116:15;137:17;178:16;
200:14;216:20;256:16
**severe (8)**
193:1,19,19;194:3;
274:14;278:4,6,6
**severity (6)**
193:4;200:8;274:4,16;
276:13,16
**sheet (2)**
72:8;121:2
**shop (1)**
219:15
**short (12)**
57:20;88:10;99:4;132:7;
149:14;159:19;221:2;
225:20;233:17;250:7;
270:18,20
**shorter (1)**
136:11
**show (7)**
69:9;120:23;134:23;
136:1;261:22;263:24;
265:11
**showed (2)**
194:15;232:12
**showing (2)**
68:15;203:23
**shows (1)**
230:18
**shrinks (1)**

192:19
**shutting (1)**
80:2
**si (1)**
158:2
**side (34)**
9:11;27:7,8;47:21;58:15;
67:22;68:16;95:1,10,15;
98:19,20;137:15;154:13;
218:5;219:4;259:24;260:23;
261:7;289:6;290:2,8,10,13,
13,15,22,22;291:3,5;292:9,
16,20,21
**sidewalk (1)**
56:24
**sight (68)**
27:6;67:21,24;68:18;75:6;
80:24;81:17;88:6,7;92:5,21;
93:5,13,14,16,17;94:5;95:1,
3,6,8,11,14,22;98:15;
109:23;110:12,16,19;
111:16;112:17,19,20,23;
119:17;124:10;127:5,9,15;
132:20;168:24;173:13;
180:22;193:18;259:23;
260:3,22;269:21,24;270:2;
272:13;276:21;278:22;
282:3,11;286:15;287:16,23;
288:4,4,20;290:2;291:10,14,
15;292:5,13,16
**sign (2)**
275:5;293:18
**signal (14)**
43:1;105:9;123:3;153:13;
226:3,5,7,8,12,14,22,23,24;
227:1
**signals (1)**
42:18
**significance (3)**
255:22;258:21;261:4
**significant (6)**
252:2;254:22;265:5,18;
274:3;275:3
**signs (1)**
225:4
**similar (9)**
33:5;68:17;242:21;267:5;
273:5,7,20;275:15;287:8
**simple (4)**
144:12;188:18,21;209:11
**simply (11)**
82:13;88:14;89:16;97:9;
167:24;171:9;176:8;210:1;
255:2;275:20;277:1
**single (5)**
15:14;84:21;190:14;
198:14;206:3
**sink (2)**
147:8;148:23
**sit (11)**
71:21;100:23;148:3,13;
215:13;273:23;274:21;
281:4,14,19;282:19

Exhibit B

**site (1)**
31:12

**sitting (6)**
16:24;147:9;253:2;271:1,
11;288:19

**situation (9)**
79:14;190:20;209:22;
211:1,20;219:18;269:12;
284:6;287:19

**six (4)**
13:4;14:6,8;85:8

**size (5)**
221:21,22,24,24;222:13

**sizings (1)**
9:22

**skin (1)**
211:19

**skip (4)**
151:4,12;152:16;154:4

**skipping (1)**
150:23

**slow (1)**
271:15

**slowly (1)**
18:5

**small (1)**
10:14

**Smith (1)**
49:11

**smoke (1)**
227:15

**smooth (1)**
140:13

**smoothed (1)**
138:9

**smooth-out (2)**
134:10,11

**smooths (3)**
134:4,10;136:3

**Softail (4)**
15:24;17:21;20:5;41:11

**softly (1)**
144:18

**sold (3)**
65:14,15;234:24

**sole (1)**
180:9

**solely (4)**
80:12;89:24;178:1;269:12

**soliloquy (1)**
187:19

**solution (8)**
44:17,18,24;88:11;91:22;
97:19;98:23;189:6

**solutions (2)**
80:4;232:2

**solvent (1)**
195:13

**solves (1)**
98:12

**somebody (14)**
98:16;152:13;154:4,19;
163:4;164:23;190:24;

204:15;206:10;214:23;
219:6;276:15;277:6;291:11

**Someone (20)**
56:16;58:6;98:4,13,21;
115:21;131:16;132:22;
133:7;134:13,16,23;135:1;
137:3;139:20;155:17;163:1;
197:4;198:2;269:17

**sometimes (4)**
17:7,8;19:9;41:24

**soon (1)**
134:7;136:16,17

**sorry (33)**
17:15;30:21;35:15;39:8,
11,19;71:4;74:4;76:6;102:1,
22;105:23;107:3;113:20;
165:16,20;173:4;182:15;
194:23;207:10;209:17;
224:12,22;225:19;226:13;
227:5,12;235:24;248:16;
251:1;266:10;269:7;279:17

**sort (2)**
59:18;185:12

**sound (3)**
58:21;251:6,7

**source (1)**
99:20

**Southern (1)**
55:8

**space (3)**
108:16;265:13,18

**speaking (1)**
179:16

**specific (34)**
28:17;43:13;60:13;61:5;
63:1;65:23;76:24;88:3;
90:10;101:10;102:23;103:5,
7;105:12,17,20;107:21;
108:2,8;109:6;125:7;126:9;
129:16;139:10;153:8;
177:14;184:17,18;197:23;
211:12;275:4;280:2;281:6,
11

**specifically (15)**
28:13;29:3,8,13,14;66:9;
77:16;103:21;106:19;
177:16;179:17;205:19;
212:21;256:18;271:9

**specifics (1)**
92:15

**Spectator (1)**
253:20

**speculation (2)**
264:19,22

**speech (1)**
160:23

**speed (3)**
106:7,12;277:14

**speeds (6)**
132:9,12,15;271:13,15,18

**spell (2)**
32:19;269:6

**spend (1)**

61:1

**spin (1)**
249:8

**sport (5)**
68:11;261:6,20,20;264:6

**sports (2)**
68:23;258:24

**Sportster (5)**
20:6,13;21:2;23:5;137:13

**spots (2)**
205:18,20

**spray (1)**
286:21

**spraying (1)**
270:9

**spread (1)**
132:20

**staff (3)**
6:10,12,15

**stain (2)**
48:21;52:13

**stainless (1)**
21:22

**stall (7)**
126:19;129:4,7;132:17;
134:8;136:18;137:22

**stand (4)**
133:1;265:10;290:10,16

**standard (1)**
269:13

**standards (3)**
207:14;224:3,5

**standing (2)**
122:9;154:23

**standpoint (3)**
159:13;184:8;197:19

**standstill (45)**
16:20;18:19,21;84:16;
99:13;100:23;101:12;106:2,
8,13,15;111:18,21;114:18;
119:19;130:8,19;131:21;
132:8;133:9,12;135:4,7;
138:10;139:21,24;156:9;
164:19;166:14,24;179:1;
180:23;181:12,14;229:16;
237:17,20;238:22,23;
240:18;247:18;248:1,12;
281:19;282:19

**Star (2)**
102:4;104:9

**start (34)**
14:4;17:6;19:5;46:19;
60:20,20;72:15;82:7;
100:16;111:1;121:24;122:2;
125:19;126:22;131:15;
132:10,13;134:3,20,24;
136:1;144:6;145:16;146:2;
162:1;178:7;197:16;203:21;
218:9;227:14;241:18;
247:14;268:2;273:9

**started (8)**
22:2;118:17;126:5,8;
229:5,17;230:15;267:21

**Starting (18)**
18:3;20:15;43:23;101:12;
106:3,16,18;118:17;122:16;
125:17;126:13;128:15,17,
19;132:3;149:8;170:6;
286:11

**starts (1)**
124:4

**starving (1)**
149:9

**state (13)**
31:14;33:15,17;42:9;54:8,
9;55:17;57:24;62:2;106:19;
146:10;168:19;275:21

**stated (4)**
82:18;87:13;131:3;144:15

**statement (25)**
30:15,23;58:22;82:24;
83:6,24;84:3,24;90:19;
92:14;113:6;135:3,16;
141:9;146:24;175:17;
185:16;252:22;254:13;
264:9,10;265:16;284:24;
285:17,18

**statements (2)**
82:11;231:7

**states (15)**
34:2;166:10;167:4;256:3;
264:5,14;265:4,12;266:23;
267:15,21;272:8;275:17;
282:20;286:14

**stating (4)**
8:10;254:5,6;261:18

**stationary (5)**
93:5;240:8;273:23;281:4;
287:22

**stay (1)**
137:16

**steering (1)**
69:4

**step (4)**
83:12;96:2;134:14;199:22

**steps (1)**
73:10

**stick (1)**
192:10

**sticker (2)**
68:10;168:12

**stickers (5)**
16:5,7,12,16;206:12;
208:8

**sticking (1)**
78:15

**still (13)**
18:12;32:7;40:9;45:3;
105:10;122:9;132:3;154:23;
239:10;242:4;251:12;
265:18;281:18

**stipulated (1)**
5:6

**stipulations (1)**
5:2

**stock (1)**

Exhibit B

254:15
**stop (7)**
26:10,12,19;60:21;218:9;
271:24;288:20
**stopped (3)**
41:13;42:9;253:8
**straight (1)**
256:10
**straightforward (1)**
84:24
**strategy (3)**
38:3;80:8;267:4
**street (1)**
126:23
**strengths (1)**
9:21
**stretches (1)**
207:20
**stricken (1)**
57:15
**strike (3)**
109:9;144:5;176:11
**strip-down (1)**
111:12
**student (3)**
33:15,17;62:2
**studies (8)**
9:7;59:7;61:13,22;62:10;
198:22;232:7,24
**study (17)**
33:1;61:13;63:22;150:12,
14;190:16;191:2;210:6,22;
211:5;234:13;235:2,3,4,6;
236:9,15
**studying (2)**
150:16,20
**stuff (4)**
67:4;124:15;125:1;189:2
**styles (1)**
256:13
**Styro-foam (1)**
204:2
**subject (3)**
111:22,23;269:11
**subjective (13)**
129:11,12,17;134:11,12;
136:8,13,22,23;138:2;139:2,
7,14
**submerge (1)**
60:7
**Subrogation (1)**
11:12
**subsequently (2)**
57:16;238:13
**substance (1)**
123:10
**substandard (1)**
27:10
**substantial (1)**
265:6
**substantive (1)**
57:3
**success (1)**

270:12
**successful (1)**
270:6
**successfully (1)**
55:2
**succinct (1)**
109:7
**sue (1)**
197:4
**sufficient (13)**
107:20;108:23;109:3;
117:20;171:8,13,15,17,22;
172:5,18;173:10;174:1
**sufficiently (1)**
108:7
**suggest (5)**
61:13;168:15;231:11;
243:16;269:24
**suggested (1)**
229:9
**summary (4)**
113:10;114:2;129:20;
145:24
**sump (1)**
254:10
**sunk (1)**
114:22
**super (1)**
261:20
**supplemental (1)**
236:9
**supplementation (1)**
44:22
**supplements (2)**
7:13,14
**support (5)**
65:24;70:12;99:21;
264:20,24
**supposed (11)**
17:16;132:13;139:7,8,9,
10,15,15;146:21,22;290:9
**supposition (1)**
145:1
**Sure (75)**
10:9;14:5;18:19;21:14;
23:12;29:24;31:24;32:8,14;
35:1,24;37:20,23;38:4;47:7;
49:11;53:24;56:10;58:23;
66:12,18;68:4;70:6;71:18;
77:5;84:11;93:1;96:13;
114:21;119:1,23;121:24;
122:4,8;125:24;134:20;
141:1;149:1,22,24;151:5;
152:21;154:22;158:5;169:6,
22;172:21;179:3;185:11,23;
187:6;190:9,11,15;191:12;
196:13;210:11;215:11;
217:20,23;218:13;220:24;
224:7;228:14;229:6;231:4;
239:8;245:17;249:6,20;
250:4;258:19;264:24;265:2;
273:9
**surface (1)**

288:9
**surfaces (2)**
16:8;18:7
**survey (1)**
94:17
**surveyed (1)**
94:19
**Suzuki (3)**
267:7,16,18
**switch (5)**
33:10;136:4;137:14;
268:6,22
**sworn (1)**
5:16
**sympathetic (1)**
256:9
**synonym (1)**
9:6
**system (16)**
16:14;26:1,22;27:3;50:2,
5;10:6;122:13;124:5,16,20,
21;154:20;167:17;272:15;
273:15
**systems (5)**
9:9;10:3;88:8;214:13;
254:11

**T**

**tablets (1)**
64:5
**talk (13)**
64:1;77:11;78:8,9;92:14;
93:8;104:24;154:12;173:17;
175:13;202:14;228:8;
263:23
**talked (13)**
46:21;74:16;75:4,5;77:3;
104:17;171:2;190:1;196:22;
208:15;216:6;272:22;275:5
**talking (30)**
10:18,19;11:1;21:12;24:7,
11;30:1;43:12,14;55:4;
58:24;64:3;65:6;69:10;
77:22;147:9;152:1,6;
155:14;178:12;186:4;192:1;
209:8;219:8;220:13;277:1;
278:20;280:23;289:18,19
**tank (13)**
68:11;205:15,23,23,24;
206:12;207:22;208:2,4,8,18;
222:20;259:2
**tasks (1)**
204:5
**taught (2)**
35:22;36:17
**Taylor (1)**
53:7
**teach (2)**
37:10,13
**teaches (1)**
219:6
**Tech (1)**

49:22
**technical (5)**
233:3,5;234:21;235:17,20
**technique (3)**
198:21;230:22;231:1
**telling (5)**
127:18;131:19;138:12;
167:19;172:24
**tells (4)**
17:13,16;134:3;190:17
**temperature (10)**
80:2;110:6;136:9,10,12;
168:23;173:12;283:23;
284:1,3
**temperatures (6)**
124:5;140:11;154:20;
257:17;292:23;293:1
**tend (3)**
60:15;264:5,14
**tendency (1)**
256:1
**tends (1)**
11:4
**term (2)**
23:13;269:2
**terms (10)**
20:15;37:21;120:2;
125:11;129:17;204:19;
214:3;274:3;275:17;291:20
**test (6)**
72:19;73:7;204:12;207:2;
208:6;234:15
**testable (1)**
210:7
**testified (39)**
5:16;57:16;92:20,23;93:3;
95:5;110:16;111:15;114:20;
117:4,24;118:21;125:13,17;
129:1,10;130:5,11,16;134:6,
8;136:8,21;140:20;141:1,
16;142:5;144:5,8;145:3,23;
147:2,3,18,19;215:23;
231:15;266:12,13
**testifies (1)**
88:13
**testify (7)**
54:6,9;55:21;56:3;57:1;
82:16;148:1
**testifying (3)**
53:23;55:23;123:15
**testimony (40)**
28:2;38:11,17;42:11;
43:16;54:13,16;55:18,24;
56:7,10;57:14;73:3;78:9;
81:20,24;86:12;87:14,18;
93:12;119:24;120:16;128:2;
129:21;130:17,20,21;133:6,
13,23;135:8,9;145:24;146:6,
9;166:15;222:11;231:7,11;
291:16
**testing (21)**
75:2;191:15;197:11,14;
200:17;201:5;202:21,23,24;

Exhibit B

203:6,8,9,20;204:14;207:4;
210:8;211:16,17,18;233:8,9
**tests (1)**
191:19
**Textron (1)**
51:6
**Therefore (15)**
54:20;58:2;60:24;91:9;
93:16;116:1;143:4;164:9;
167:6;168:5;181:6;229:16;
239:18;241:20;291:24
**thinking (9)**
115:11;116:14,20;117:11;
118:11;142:7;149:1;242:10;
263:19
**third (5)**
18:23;89:18;155:9;
179:16;267:20
**Thirty (1)**
233:18
**thought (12)**
14:12;53:17;75:10;
123:16;184:23;185:2;214:1;
243:18;244:12;246:10;
270:24;285:23
**three (16)**
46:23;92:7;101:18,19;
107:6;111:10;193:22;194:1;
200:12;203:16;218:13,18;
219:3;226:20;241:13;262:5
**threw (1)**
144:17
**throw (1)**
144:20
**thumb (2)**
66:21;67:2
**thumbnail (1)**
44:14
**thus (1)**
222:9
**tied (1)**
283:19
**Tile (1)**
52:11
**times (7)**
10:10;55:14;96:2;178:17;
182:2;196:5;212:5
**T-intersection (1)**
41:6
**tips (2)**
101:13;215:21
**today (1)**
24:3
**today's (2)**
156:17;256:8
**together (3)**
103:3;250:22;252:8
**told (7)**
53:17;56:9;75:12;133:16;
140:23;217:6;234:1
**tongue-tied (1)**
149:9
**took (8)**

36:2;74:20;111:9;137:22;
146:16;250:11;258:23;
262:16
**tool (1)**
211:2
**tools (6)**
59:8,9,10;60:9;211:4,10
**top (18)**
32:15;39:14,20;46:20;
154:8;166:7;168:19;172:6,
10;174:1;194:18;222:20;
260:19;261:8;265:24;
266:22;271:22;272:8
**topic (8)**
62:5;88:4;125:7,8;206:7;
212:22;213:2;277:15
**topics (4)**
28:22;206:6;220:13;
253:23
**total (2)**
11:14,17
**touch (1)**
292:10
**town (1)**
76:3
**track (2)**
12:3;76:9
**tractor (2)**
42:9;265:17
**traditional (3)**
10:9,12;123:2
**Traditionally (1)**
10:14
**traffic (5)**
41:14;253:2;270:19,22;
271:1
**trailer (6)**
41:12;42:8,10,19;47:14;
265:17
**trained (1)**
136:1
**training (13)**
24:9;25:10;34:1;37:17,19;
66:4;73:6;135:13,20,23;
138:20;160:19;208:24
**trainings (1)**
38:6
**trait (1)**
94:12
**trampoline (1)**
48:10
**transformed (1)**
147:6
**translation (1)**
138:22
**transmission (3)**
207:1;208:9;210:20
**traveling (2)**
34:12;35:8
**trend (1)**
11:5
**trends (1)**
101:13

**trial (13)**
5:12;40:16;41:18;45:2;
55:16;56:8;57:16;87:11,15,
18;98:6;123:15;293:8
**tried (2)**
70:5;87:4
**tries (1)**
87:8
**trip (1)**
216:2
**trouble (1)**
172:23
**truck (3)**
41:5,12;42:19
**true (3)**
175:16;238:2;265:15
**truth (1)**
184:15
**try (9)**
70:13;79:5;181:23;
210:15;230:4;234:3;263:12;
264:24;279:20
**trying (17)**
28:6;50:5;91:3;138:17;
143:7;163:12;176:5;202:19;
210:9;220:14;225:20;228:2;
238:12,21;239:14;279:19;
284:19
**tune (1)**
254:19
**turn (6)**
43:1;87:8;166:5;227:16;
253:4;284:4
**two (62)**
15:4;20:3;35:11,18;36:2,
3,19,24;38:21;43:12;46:22;
47:7;54:2;62:6,11;79:7;
102:9;105:10;106:10;
111:12;112:2,10,12;115:23;
116:3,16;118:18;121:2;
128:7;137:4;138:13,15;
177:2;178:20;193:20;
194:16;202:5;203:15;206:6;
215:4,5;218:3,5,17;223:17;
228:4,23;230:17;231:15;
232:16;235:19;238:8;
257:23;259:21;261:2;
265:21;268:1,3;279:1;
280:21;282:23;283:5
**two-car (2)**
228:20,22
**two-page (1)**
255:7
**Tylenol (1)**
64:6
**type (18)**
8:22;15:15;22:20;27:13;
48:20;85:20;90:5;138:22;
153:13;158:9;180:4;211:2;
213:10;230:22;261:23;
273:20;280:5;292:8
**types (2)**
9:8;92:1

**typically (12)**
21:6;61:13;70:10;72:12;
77:8,8;127:17;194:5;
200:10;218:2;283:6;289:4
**typo (1)**
39:12

## U

**UL (8)**
59:9,10,13,16,19,20,23;
60:4
**unaddressed (1)**
192:8
**unattended (4)**
30:17,24;32:2;282:17
**under (16)**
16:8,12;33:1,6;63:9;
113:21;132:5;150:19;152:5;
154:13;156:7,13,15;169:19;
173:5;240:3
**underlying (1)**
281:17
**underneath (2)**
124:14;137:14
**understandable (2)**
64:19;147:10
**understands (3)**
140:21,24;214:24
**Understood (56)**
20:12;76:20;100:14;
116:8,13;117:2,5,7,17,21,
24;118:15,20;130:3,6,16;
140:16,17;141:3,5,14;142:2,
6,22;143:5,6,10;144:4,8,9,
11,16,17;145:4,4,5,21;
146:11;147:4;148:14,20,22;
175:1;237:14,22;238:20;
239:14;240:1;241:7,21;
243:1,5;246:8;247:2;
248:23;249:10
**unfair (1)**
16:11
**unfamiliar (1)**
134:21
**unimportant (1)**
148:9
**unique (19)**
61:5;80:16;91:24;92:8;
93:22;94:1,3,12;99:9;
116:23;118:12;141:21;
153:8;154:9;177:14;193:16;
244:22;274:11;290:18
**uniquely (1)**
217:3
**unit (1)**
263:17
**United (1)**
52:19
**University (1)**
33:18
**unless (5)**
25:16;27:15;126:21;

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

134:21;262:1
**unlike (1)**
85:19
**unlikely (1)**
168:4
**unnecessarily (11)**
122:14;124:24;125:4,10,
11,14;127:18,24;128:5,9;
155:11
**unnecessary (1)**
287:1
**unreasonable (3)**
89:12;272:10;286:17
**unsafe (6)**
18:18,20;81:13;218:21,
23;272:10
**unsatisfactory (1)**
46:1
**up (59)**
16:24;17:1,8,17,22,24;
18:1,6;20:15;21:20;38:12;
64:24;109:19;126:1,18;
129:3,9;131:20;132:16;
133:7,12;134:7;135:3;
137:16,23;138:4;139:13,20,
23;140:3,12;156:8;158:2;
162:19;164:16,18;166:13,
23;181:13;202:3;204:2;
216:2;220:11;227:15;237:1;
256:3,3,8;260:3,5;265:10;
267:17;268:15,19;281:15;
283:19;284:2,8;285:8
**updated (3)**
30:5,7;38:15
**upfront (1)**
156:11
**upgraded (1)**
21:21
**upgrades (1)**
255:1
**upon (38)**
12:3;19:10;27:9,22;66:3;
77:16;78:22;80:7,12,13;
89:18;110:21;119:23;
128:12;136:9;137:1;145:2;
146:19;148:18;151:21;
152:7;156:24;157:15,16,21;
158:1;159:2;176:20;192:24;
196:12,21;211:1;216:10;
230:6;265:19;277:4;283:2;
291:16
**upper (1)**
40:7
**upright (1)**
291:5
**upside (1)**
260:11
**urgent (1)**
152:22
**USA (1)**
48:7
**usability (14)**
191:15;202:22,24;203:6,

8,9;207:2,4;208:6;210:21;
211:5,18;234:15;235:6
**usable (1)**
203:13
**USC (1)**
49:3
**use (50)**
9:8;10:3,4,5;46:4;73:23;
75:6;79:23;88:7;98:14;
105:11;106:8,13;115:19;
116:2;119:20;122:23,23;
134:2;146:21,22;159:14,14,
15,15,20,22;169:21;170:20,
22;174:4;180:8;184:17;
193:7,8,21,23;194:5;195:14;
196:2;216:15;217:7;219:6;
235:16;246:3;269:21;270:6,
13;289:13;291:13
**used (25)**
20:19;63:22;65:23;77:11;
89:17;98:11;114:11;116:1;
135:19;147:5;176:13;
185:18;200:11,11;211:2;
215:9;217:8,9;218:13;
263:17;269:22;271:10;
283:5,7;285:19
**useful (3)**
75:10;207:1;271:14
**user (19)**
61:3,17;64:14,14,24;65:1;
108:13;129:12,12,17;
136:14;155:8;172:12;
176:24;181:1,19;188:24;
266:19;274:9
**users (6)**
93:23;176:20;203:10,23;
204:5;280:1
**uses (2)**
291:10;292:5
**using (8)**
9:12;42:24;81:23;86:1;
164:8;231:23;261:7;269:1
**Usual (2)**
5:1;237:4
**usually (1)**
254:15
**utilized (3)**
267:5;272:15;273:15

**V**

**valid (4)**
141:10;146:23,24;217:19
**validated (1)**
264:1
**van (1)**
272:3
**Vandenberg (4)**
39:10,14,21;40:1
**variable (1)**
136:16
**various (2)**
58:16;277:19

**vault (1)**
49:5
**vehicle (12)**
15:14,14,15,16;73:20;
151:1;179:1;195:8;253:22;
254:2;257:22;270:18
**vehicles (5)**
83:18;253:21;264:18;
265:9;267:7
**veracity (1)**
56:1
**version (5)**
29:24;30:2,5,7;111:12
**versions (2)**
112:2,10
**versus (5)**
41:5;199:15;236:13;
253:24;280:24
**view (1)**
96:5
**VIGILANTE (22)**
5:14;6:5,6;7:3;8:17;30:8;
32:16,17,23;33:3,6,8,12;
62:13,13,21,23;63:11;72:2;
144:14;214:7;257:7
**Vigilante-1 (3)**
120:10,12;222:10
**Vigilante-10 (1)**
255:14
**Vigilante-11 (1)**
257:4
**Vigilante-12 (2)**
258:6;259:15
**Vigilante-13 (1)**
261:12
**Vigilante-14 (1)**
262:10
**Vigilante-2 (1)**
120:19
**Vigilante-4 (1)**
121:1
**Vigilante-5 (1)**
222:5
**Vigilante-6 (3)**
223:19;259:16;262:17
**Vigilante-7 (2)**
250:16,18
**Vigilante-8 (1)**
252:14
**Vigilante-9 (1)**
253:14
**Vigilante's (1)**
28:2
**violated (4)**
224:21,23;225:1,11
**violates (2)**
225:17,22
**Virginia (5)**
51:5;54:8,10,21;57:24
**Vitae (1)**
120:17
**Vititoe (1)**
38:23

**Vivitoe (6)**
41:9,10,17,21;42:6,17
**vs (20)**
38:23;39:4,10,14,21;40:1,
21;43:24;45:7;46:8;47:17;
48:7,16;49:3,11;50:14;
52:10,20;53:6;283:15
**VTX (1)**
253:7
**vulnerable (1)**
254:20

**W**

**wait (4)**
77:21;121:5;192:7;277:5
**waiting (1)**
225:16
**waived (1)**
5:9
**walk (1)**
9:23
**walked (6)**
227:22;228:11,12,15
**wants (2)**
94:11;188:4
**warm (20)**
17:17;18:1,6;129:9;
131:20;133:7,11;135:3;
136:12;137:8,9,23;138:4;
139:20;140:3;156:8;164:18;
181:13;227:14;256:3
**warmed (2)**
137:16;268:15
**warmer (3)**
19:4;136:12;251:14
**warming (8)**
16:24;17:22,24;139:23;
140:12;166:13,22;256:8
**warms (2)**
126:17;132:16
**warm-up (5)**
128:20;132:8;256:14;
268:12;270:19
**warn (5)**
50:21;177:12;192:22;
193:12;276:5
**warning (285)**
11:3;13:7,14,18,22;14:12,
19,20,22;15:19;16:4,7;
17:17,21,23;24:17;25:23;
37:2;42:9;43:19;44:6,16,19,
23;45:1,11,24;46:3;50:6,22;
52:2;58:4,9;60:1,8;68:10,
12;69:8;73:9,12,15;77:23;
78:7,18,19,21;79:7,12;80:8,
9,10,12,13;81:9,9,13;83:3;
84:17;86:9,14;89:3,21,23,
24;91:7,8;96:15,21,23;97:7,
12,13;101:15;105:1,4,8,23;
106:5,20,21;107:12;108:4,
10,20;114:17;115:13;
116:23;117:12,24;118:13;

Thomas G. Oakes Associates
1-877-625-3777www.TGOakes.com

Exhibit B

119:3,4,9,14;120:2;122:1,3,
4,5,7,8,18,23,24;123:10;
124:13,19;125:2;130:22;
131:22;139:13,14,18;
140:16;141:11,20;142:2;
143:7;145:21;146:4,6;
151:11,19,20;152:3,4,6,12,
14,24;153:5,22;154:15,16,
22;155:5,14,17,22;156:8,13,
15;157:15,16,21;158:6,9;
159:3;160:11;163:3,13,18,
22;164:9,12,17,18;166:14,
24;167:2,9;168:1,8,9,13,15,
20;169:11;171:5,7,9,14,16,
18,21,23;172:16,19;173:2,5,
7,18,22;174:21;175:2,3,5;
176:3;178:20;179:8,15,17,
20,23;182:12;183:11;
186:21;187:24;189:23;
190:2,15;191:16;192:5;
195:7;198:12,14;203:24;
205:14;206:5,7,8;207:15;
210:3;211:23;212:1;213:1,
9;214:12,13;215:1,2;217:5;
221:6,8,10,20;222:13;224:2,
21;229:8,20;230:12,21;
231:3,24;232:5;233:9,11,12;
234:9;235:8;236:10,10;
237:15,15,19;238:4,13,16;
239:1;240:9;242:19;243:7;
248:8,21;249:15,17;259:1,2,
17;265:22;266:5;272:24,24;
273:22;275:1,5,9;276:1;
280:19;282:21,22;283:9,10,
21,22;284:24;285:1,4,5,9,
16;286:3;287:10,24

**warnings (174)**
14:15;25:9;28:12,14,16,
18,20;29:2,4,7,9,10,13,20,
23;30:10;33:5,10;35:19,23;
36:1,3;37:2,6,8,11,15,15,19,
22,24;38:5,7;42:3,4,6,12,13,
18;43:4;44:2;46:11;47:1,2,
3;49:12;58:18;59:11,15,20,
21;60:2,4,5,12,18,19;62:6,
12,16,22,24;63:4,8;68:2,7;
78:24;80:21;96:5;108:16;
115:8;139:7;153:1,2,13;
156:19,20;160:1,4,6,13,17;
161:1,11,22,22;162:5,15;
163:6,8;173:8;178:3,9;
182:6,18;183:3;190:6,8,18,
23;191:5,6,10,17,24;192:2,
3,10;194:9,16;195:21;196:2,
12,13,18;197:2,12,19,24;
198:1;199:15;200:5,6,7;
201:17;202:1,1,15,16;
203:14,16;204:3;205:9,24;
207:22;208:4,18;210:6;
212:10,18,20;214:8;215:4;
220:13;221:15;225:1;230:2,
6,8,19;231:20,22;232:8,12,
14,20,22;235:23;236:4,7;

238:20;244:4;259:4,7;
265:8,9;272:21;273:12;
278:15,17,19;283:5,7;
285:19
**wash (1)**
188:8
**water (2)**
60:7;257:17
**water-cooled (2)**
67:18;253:24
**way (48)**
15:11;25:13;26:8;45:22;
59:6;61:8;64:11;71:24;
72:13;81:3;96:5,17;97:14;
116:13;123:2,24;128:12;
129:3;141:10,10;145:7;
146:20,22;148:15;155:5,10;
159:10;167:14;180:9,12,14;
181:7,18;184:5,10;188:10;
193:21;206:8;207:17;218:3;
225:14;231:13;233:23;
274:8;276:1;285:3;290:19,
24
**ways (4)**
85:9;206:9;211:14,19
**weakest (1)**
283:3
**weaknesses (1)**
9:21
**wear (4)**
37:24;38:1;193:12;195:9
**wearing (1)**
42:1
**weather (3)**
101:12;137:9,11
**web (4)**
100:23;101:1,4,7
**website (8)**
250:23;251:6,8;252:5,19;
255:19,20;257:10
**websites (5)**
66:7;67:16;74:13;76:17;
104:6
**week (1)**
251:19
**weeks (3)**
17:6;19:6;251:18
**welcome (1)**
85:14
**well-designed (3)**
254:14,17;283:21
**well-known (1)**
60:8
**weren't (4)**
81:7;170:23;171:3;280:21
**Wescott (1)**
49:2
**Westfield (1)**
52:10
**What's (25)**
6:3;48:5;52:18;53:5;
70:13;75:22;85:4;103:13;
105:11;110:14;114:15;

120:23;141:19;150:15;
152:5;159:5;166:18;217:24;
255:18,22;258:21;261:4;
265:3;266:9;288:24
**Whenever (1)**
262:22
**whereas (1)**
31:12
**Whereupon (23)**
57:20;76:13;78:3;99:4;
120:12,19;142:14;143:14;
149:14;195:3;221:2;222:5;
223:19;250:7,18;252:14;
253:14;255:14;257:4;258:6;
261:12;262:10;293:20
**whip (1)**
24:12
**white (2)**
123:5,7
**whole (8)**
28:18;124:19,20;189:1;
198:11;199:7;283:9;289:22
**who's (1)**
283:8
**widely (1)**
272:9
**widget (1)**
29:14
**wife (1)**
20:10
**wild (1)**
12:2
**WILLIAM (1)**
5:14
**win (1)**
53:21
**windshield (5)**
68:12;194:18;195:12,14;
259:3
**winter (3)**
17:4;19:2,3
**winterization (3)**
67:16;101:13;251:9
**winterize (2)**
19:2;125:18
**winterizes (1)**
251:12
**winterizing (1)**
125:20
**wipe (2)**
289:7,8
**wire (1)**
127:16
**wireless (2)**
233:7,19
**wiring (2)**
111:19;169:3
**within (11)**
28:3,8;59:16;78:15;
124:24;126:5;198:15;211:3;
234:22;245:8;267:9
**without (22)**
31:20;78:24;152:15;

165:14;166:14,24;167:2,9;
171:9,23;216:20;218:20;
242:5;249:14,17;250:1;
264:10;270:9;276:11;
287:11;288:7;291:21
**WITNESS (35)**
6:15;32:21;40:15;57:23;
76:16;86:8;103:19;121:8,
10;123:12;142:17;143:17;
144:14;148:11;162:12,14;
170:10;175:9;184:10;
187:10;205:2;207:7;220:22;
222:14;223:7,16;225:19;
232:17;242:3;246:12;269:3,
7,10;279:22;293:17
**Wogalter (16)**
30:8;32:18,20,23;33:2,3,6,
8,11;62:21,23;63:11;214:7;
232:11,18;235:2
**W-O-G-A-L-T-E-R (1)**
32:21
**woh (1)**
197:21
**wondering (1)**
74:5
**word (20)**
86:1;104:19;105:10,11;
122:18,24;147:5;153:13;
174:4;177:21;226:3,5,7,8,
12,14,22,23,24;227:1
**words (5)**
144:19;175:1;184:17;
233:18;283:19
**work (30)**
6:23;7:1,2;8:23;10:1,6,10,
11,13,23;11:4,12,13,18,20;
12:16,18;21:7,9,12,16;
34:14;71:6,15;97:23;123:3;
169:3;191:21;204:13;
233:15
**workaround (1)**
234:12
**worked (5)**
157:19,19;191:21;233:21,
21
**working (3)**
8:16;12:19;22:1
**works (3)**
26:9;204:12;274:7
**world (2)**
156:18;191:4
**worry (1)**
289:17
**worthwhile (1)**
61:20
**write (4)**
66:14;70:10,11;177:15
**Writer (1)**
255:20
**writing (5)**
66:8;69:15,19,21;70:8
**written (8)**
28:11;29:16,19;33:14;

Exhibit B

72:13;186:13;212:6,8
**wrong (15)**
82:15;139:5,17;148:8;
159:1,2;175:4;187:23;
188:3;204:18;208:2;213:7;
218:22;285:2,4
**wrote (5)**
7:17;177:16;226:19;
233:3;235:20

## X

**XV (1)**
102:4
**XVS (1)**
102:4
**XYZ (1)**
101:11

## Y

**yacht (1)**
40:8
**Yamaha (22)**
22:21;67:20;68:10,11,22;
69:17;92:11;94:24;100:3;
101:19,21;194:15;195:19;
206:5;258:1,14;261:19;
265:11;267:8,11,14;291:2
**Yamahas (3)**
102:13;103:9;104:9
**Yazdani (48)**
17:1,5;92:11;114:7,20;
116:8;117:23;118:10,15;
125:16,24;130:2;131:7;
140:16;142:1,5,18;144:7;
145:3,20;146:15;148:1,14;
158:19,22;175:21,24;
176:23;177:7;215:23;
219:11;230:11;231:2;
237:14;238:6,8;243:13;
246:8;247:13;249:22;
251:15;252:5;263:16,20;
267:21;269:13;278:12;
287:21
**Yazdani-1 (2)**
120:24;222:12
**Yazdani's (9)**
73:2;177:15,16;227:13;
247:16,23;280:24;281:22;
284:6
**year (8)**
10:16;22:13;35:17;40:16;
63:14;104:8;118:17;258:10
**year-and-a-half (1)**
116:17
**years (10)**
19:7;55:3;80:15;92:12;
94:21;102:3,5;115:4;
116:16;118:18
**Yeldham (20)**
81:20;88:12;92:20;93:3;
95:5;97:15;110:16;111:15;

119:24;125:12;129:1,10;
133:24;134:6;135:24;136:8,
21;137:1;138:1;291:16
**Yeldham's (3)**
78:8;129:21;266:3
**YJ (1)**
48:7
**York (3)**
55:7,8,11
**younger (1)**
137:19
**YZF (8)**
67:20;68:11,22;69:17;
258:14;261:20;265:11;
291:2

## Z

**Z535.2 (1)**
226:1
**Z535.4 (5)**
173:7;224:21;225:2,11;
227:3
**Zazula (8)**
79:21;88:12;89:15;97:5,
15;171:2;272:5;291:18
**Zazula's (1)**
78:9
**zero (4)**
10:16;249:19;282:5,8

## 0

**04 (1)**
21:2
**06 (1)**
21:1
**07 (2)**
20:24;21:5

## 1

**1 (13)**
30:3;121:14;131:7;166:2;
167:1,3,6;171:5;173:6;
224:13,15,18;258:17
**1,000 (1)**
258:15
**1/1/16 (1)**
38:14
**10 (26)**
10:15;17:7;19:8,14;
125:23;127:11;129:14;
137:10,17,22;165:16,18;
166:7,10,16,18;167:1,4,6,
19;168:3,5;202:5;205:23;
229:23;293:3
**10/2002 (1)**
121:8
**10/2012 (1)**
48:6
**100 (1)**
182:2

**11 (7)**
105:15;106:23;107:5;
112:22;236:6;257:2,8
**1100 (2)**
102:4;262:7
**1150 (16)**
93:4;111:8,9,9,17;112:9,
11,16,18;177:17;178:4;
181:16;182:16;261:19;
263:21;283:20
**1150s (1)**
163:21
**12 (4)**
23:1;165:17,24;258:4
**12th (1)**
199:6
**13 (3)**
23:1;165:18;166:5
**14 (9)**
53:16;109:5;168:10;
171:5;173:2,5;178:12;
179:18;221:21
**15 (19)**
18:5,9;47:4,5;53:16,18;
108:19;125:23;126:7;
127:11;137:22;168:20;
172:7,10;178:21;214:11;
223:23;251:18;274:21
**150 (1)**
24:13
**16 (1)**
40:22
**16A (1)**
102:4
**17 (5)**
23:3;161:16,19;224:7,12
**171 (1)**
266:14
**175 (1)**
266:17
**18 (1)**
23:3
**1995 (1)**
236:15
**1996 (2)**
62:7,23
**1997 (7)**
62:7,13,19,21;63:14;
107:2;213:10
**1998 (6)**
32:23;62:13,15;67:21;
258:14;265:10
**1999 (5)**
32:18;33:7;63:24;214:10;
235:5

## 2

**2 (7)**
73:24;120:16;121:15;
222:10;224:13,15;286:13
**20 (13)**
17:7;92:11;140:5,7;202:5;

206:12,19;207:21;208:3,7,
18;251:18;274:21
**2000 (2)**
104:9;235:6
**2001 (1)**
104:10
**2002 (3)**
102:3;104:11;173:7
**2004 (6)**
20:6,12;22:11;49:20,23;
54:17
**2005 (1)**
35:14
**2006 (3)**
20:5;33:4,9;35:15,16;
214:10
**2007 (5)**
16:1;22:14;35:15,16;
68:21
**2008 (1)**
22:15
**2010 (6)**
33:12;54:22;68:15;
104:10;261:3,6
**2011 (1)**
104:10
**2012 (2)**
43:24;47:17
**2013 (3)**
38:23;39:2;48:15
**2014 (5)**
39:9,13,16,21;49:23
**2015 (10)**
8:18;30:3;39:12;40:22,23;
50:14;52:19;72:2,4,5
**2016 (1)**
52:10
**25 (3)**
204:16,22,22

## 3

**3 (9)**
120:17,19;121:18;214:7;
222:11;224:13,15;263:15;
287:3
**30 (16)**
11:12;16:24;17:8;18:5,9;
19:21;20:1;126:4;139:24;
140:4;267:23;268:10;270:8,
22;274:21;293:3
**329 (1)**
98:12
**35 (1)**
11:9
**351 (2)**
121:18,18

## 4

**4 (9)**
39:14,21;120:20;222:12;
224:1,14,15;264:4;287:9

Exhibit B

**4:50 (1)**
293:21
**40 (1)**
11:9
**49 (1)**
153:22

---

### 5

**5 (8)**
30:7,12;39:16;77:21;
222:13;224:14,15;287:18
**5/12 (1)**
47:8
**50 (2)**
12:8;127:7
**50.1 (5)**
245:16,23;246:4;247:3,6
**51 (10)**
121:20;127:1,6;130:23;
153:11;154:12;155:14,23;
238:10;239:13
**53 (2)**
155:23;265:17
**55 (1)**
121:17
**59 (1)**
131:16

---

### 6

**6 (12)**
32:16;62:15;77:20;
177:18,20;224:14,15,18;
259:13;265:24;266:22,22
**60 (14)**
11:5,6;131:5,8,14;156:7,
12;158:4,7,21;159:3;
164:17;238:11;239:14
**64 (1)**
131:6
**65 (2)**
11:5,6

---

### 7

**7 (6)**
32:16;63:10;271:22;
272:8;280:11,16
**7/2014 (1)**
39:3

---

### 8

**8 (3)**
252:12,18;280:18
**80V (1)**
112:18
**830 (1)**
75:24
**8-3-0 (1)**
76:1
**850s (1)**

163:22
**880 (1)**
20:6
**89 (1)**
190:3

---

### 9

**9 (3)**
166:3;233:4;253:12

Exhibit B

# VIGILANTE FORENSIC

## Human Factors ǀ Ergonomics Consulting

| | |
|---|---|
| **Report of:** | William J. Vigilante, Jr., PhD, CPE |
| **Date:** | January 29, 2016 |
| **Case Caption:** | Parvez & Razia Yazdani<br>Vs.<br>BMW of North America |
| **VF Case Number:** | 15-004 |
| **Prepared for:** | Patrick A. Hughes<br>de Luca Levine, LLC<br>Three Valley Square, Suite 220<br>512 E. Township Line Road<br>Blue Bell, PA 19422 |



EXHIBIT

200 Pembrooke Circle
Phoenixville, PA 19460

www.vigilanteforensic.com

Tel: 267.439.1551
bill@vigilanteforensic.com

Exhibit B

- Service records, Bates No. Yazdani000896 to Yazdani000969
- Report of Bradley A. Schriver, dated 12/20/2015
- Report of Michael Zazula, dated 1/29/2016

## C.    PRODUCT DESCRIPTION

The fire involved a BMW model R1150 R motorcycle (VIN WB10439A64ZF49253). The motorcycle was manufactured by Bayerische Motoren Werke (BMW) AG in Germany in 2004. BMW Group is a subsidiary of BMW AG (MY, 49). BMW of North America (BMW NA) is a part of BMW Group (MY, 49). BMW NA is the wholesale distributor of BMW motorcycles in the United States (MY, 56). BMW NA only sells motorcycles to authorized BMW dealerships (MY, 56,57).

The BMW R1150 R motorcycle was manufactured for model years 2000 to 2006 and was discontinued in 2007 (MY, 62,63). The BMW R1150 R motorcycle has an air/oil cooled twin cylinder engine (MY 58,59). 1150 designates the approximate size of the engine in cubic centimeters (MY, 60). BMW also offered an 850cc engine version of the motorcycle (e.g., R850R). An 89 page Rider's Manual is provided with the sale of a new motorcycle. The motorcycle possess five on-product warning labels (MY, 157).

The BMW R1150 R motorcycle is fuel injected with a manual choke (MY, 70-72). The choke is used to increase the engine speed (i.e., RPM) to assist in warming up the engine faster and more efficiently (MY, 72). The choke is controlled by a switch located on the left handlebar (MY, 70-72). The switch has three positions: off, detent, and press and release (full) (MY, 70,72). The full choke position increases the engine speed (RPM) more than the detent position (MY, 72).

The BMW R1150 R engine has an oil sight glass located on the left, front side of the crank case (MY, 96,97,102,103). The oil sight glass possesses a seal and a clear plastic cover with markings that allows the rider to check the level of oil in lieu of a dip stick (MY, 96,97). The plastic cover of the oil sight glass fails (i.e., melts, deforms) at a temperature of 329°F (MY, 107,109). The oil sight glass seal can also fail at elevated engine temperatures (MY, 106).

## D.    BACKGROUND AND INCIDENT DESCRIPTION

Parvez Yazdani and his family live in a single family home located at 1200 Windsor Road, Mechanicsburg, PA. Yazdani purchased the house in 2000/2001 (PY, 87). The home has an attached two car garage (PY, 16,18).

In April 2011, Parvez purchased a used BMW R1150 R motorcycle from a private owner (PY, 10,48). Parvez was given a manual when he purchased the motorcycle (PY, 6). Parvez read the manual after purchasing the motorcycle (PY, 7,10,22). Parvez parked the motorcycle in his garage (PY, 16,18).



VIGILANTE FORENSIC
Human Factors Ergonomics Consulting
Exhibit B

Parvez had previously owned a Yamaha motorcycle that he purchased used in 1981 or 1982 (PY, 37,38). Parvez owned the Yamaha motorcycle for about 20 years (PY, 40). Parvez rode the Yamaha for recreation and always liked motorcycles (PY, 39,40). Parvez had also ridden other motorcycles and scooters in the past (PY, 35-37,53). Parvez did not take any motorcycle classes or subscribed to any motorcycle magazines (PY, 56,58).

Parvez testified that he decided to purchase the BMW R1150 R after researching motorcycles on the internet and based upon his ownership of BMW passenger vehicles (PY, 42,43,48). Parvez's purchase decision was also based on cost, bike weight, and whether the motorcycle was shaft or chain driven (PY, 9,42,43,45,46). Parvez did not care nor was he aware if the motorcycle was air-cooled or liquid-cooled (PY, 9,49,50,60).

Parvez was aware that the motorcycle had a two stage choke that he read about in the manual that he was given with the motorcycle (PY, 51,52). When Parvez started the motorcycle cold, he would hold the choke switch in the full position (PY, 51,52). Once the engine warmed up enough he would release the choke lever into the detent position (PY, 51,52). When he was satisfied that the engine was running fine he would turn the choke off (PY, 51,52).

Parvez did not winterize the motorcycle and would periodically start it one or two times a week to let the engine warm up and to keep everything running during the colder months (PY, 14-16,64). Typically, Parvez let the engine run seven to nine minutes with the motorcycle stationary while he smoked a cigarette (PY, 64).

At about 3:25 PM on February 25, 2013, Parvez started the motorcycle in his garage to warm up the engine (PY, 9,10). Parvez left the engine run while the motorcycle was stationary (PY, 9,14). While the engine was idling, Parvez got distracted, and went into the house (PY, 64,65). About 30 minutes after starting the motorcycle, the smoke alarms in his home went off and Parvez ran out to the garage where he found the bike on fire (PY, 64,65,68,69,77, 99,100). Parvez testified that the fire was coming from the motorcycle's engine and that the engine was no longer running (PY, 70,71). Yazdani also testify that there was oil on the garage floor from the motorcycle (PY, 70). A neighbor called 911 (PY, 72).

Bradley Shriver, plaintiff's fire origin and cause expert, investigated the fire. Within his December 20, 2015 report, Mr. Shriver concluded that the BMW R1150 R motorcycle was the ignition source of the fire. In his January 29, 2016 report, Michael Zazula, plaintiff's certified fire and explosion investigator, concluded that the fire was caused by an overheating condition from the motorcycle being left running in a stationary position, which caused the failure of the oil sight glass or sealing material allowing hot engine oil to escape and contact the exhaust header pipe and ignite.

Mark Yeldham is the Special Product Investigation Manager for BMW NA and testified as BMW NA's corporate designee in this matter (MY, 4,10,11). Mark Yeldham also investigated the fire.



VIGILANTE FORENSIC
Human Factors Ergonomics Consulting
Exhibit B

Case 2:15-cv-01427-TR   Document 17-2   Filed 04/15/16   Page 110 of 155

Mark Yeldham concluded that the fire was a result of a failure of the oil sight glass consistent with the conclusions of Shriver and Zazula (MY, 129,130).

## E.    ANALYSIS

### E.1.  BMW NA Failed to Provide Adequate Warning.

BMW NA was aware of the potential fire hazard created by warming up the engine with the motorcycle at a standstill (MY, 177).  For example, the copyrighted 2002, BMW R1150 R Rider's Manual notes:

> WARNING:
> Do not warm up the engine with the motorcycle at a standstill – risk of overheating or fire! Ride way immediately after starting the engine.

Mark Yeldham testified that if a BMW R1150 R motorcycle is left idling in a stationary position, the oil sight glass cover can fail and cause a fire (MY, 155,177).  Because the engine is air-cooled, heat can build up in the engine when the motorcycle is stationary.  As the engine temperature increase, the oil temperature can increase to a level that will cause the oil sight glass cover and/or its seal to fail (MY, 113).  If the oil sight glass cover/seal fails, extremely hot oil will be released from the engine (MY, 111,112).  The oil will drip down, splash out, and vaporize (MY, 111-123).  The released oil vapor can ignite when it comes into contact with the motorcycle's exhaust header and start a fire (MY, 111-113,123,127,128).

Although they were aware of the potential fire hazard created by warming up the engine with the motorcycle at a standstill, BMW did not provide any device on their R1150 R motorcycle to prevent the engine or exhaust from overheating (MY, 201,202).  For example, in his January 29, 2016 report, Michael Zazula noted that BMW NA sold an optional fan kit to reduce engine temperature while the motorcycle was running/idling while standing still.  Zazula also concluded:

> In addition, the "optional police fan kit" should have been installed on the subject motorcycle as a standard equipment when manufactured/sold.  It is clearly evident based upon the history of overheating of this motorcycles and usage within traffic or extended idling periods, this is a foreseeable event.  Installing this BMW fan kit would have most likely prevented this incident.

Rather than implementing any design changes or adding any safeguards to prevent a fire, BMW NA chose to rely solely on the user recognizing the importance of riding away immediately after the motorcycle has been started.  To alert and inform riders of the fire hazard and the need to immediately ride away after starting the motorcycle, BMW NA relied on their dealers to instruct the purchaser of a new motorcycle on the proper starting method and the use of warnings presented in the motorcycle's manual.



VIGILANTE FORENSIC
Human Factors & Engineering Consulting
Exhibit B

BMW NA requires their authorized dealers to train their sales people (MY, 76). The training includes how to deliver a new motorcycle to a customer (MY, 74). The delivery process includes instructing the rider on how to properly start the motorcycle (MY, 74). However, relying upon instructions given to the original owner of the motorcycle is not an adequate method to ensure that critical safety information reaches all users of the motorcycle including subsequent owners.

BMW NA was aware that their motorcycles are often re-sold by the initial owner (MY, 91). For example, the incident motorcycle was purchased and re-sold on prior occasions before Yazdani bought it. BMW NA was also aware that subsequent owners of the motorcycle were not likely to be provided with adequate instruction on the operation of the motorcycle (MY, 91). For example, Mark Yeldham testified (MY, 91):

> Yes. That's the vehicle -- the Owner's Manual becomes the publication that the used – the purchaser of the used motorcycle relies on to learn how to operate it, unless he asks and the seller spends time showing him how to operate it. But there again, that person is not trained by anybody to teach how to operate it.

If the subsequent owner is not provided with proper instruction and warning from a BMW NA trained representative when they purchase the motorcycle they will have to learn about the fire hazard created by warming up the engine with the motorcycle at a standstill from another source. BMW could not reasonably rely on dealer-provided training to alert, inform, and remind all potential users of the motorcycle of the fire hazard created by attempting to warm up the engine with the motorcycle at a standstill.

BMW motorcycles are sold with a Rider's Manual (i.e., product manual) when purchased new. The BMW R1150 R Rider's Manual instructs the reader on how to start the motorcycle and warns of the risk of fire if the engine is allowed to warm up at a standstill. With respect to the purchase of used motorcycles, BMW NA relies solely upon their Rider's Manual to communicate the features of the bike to secondary owners (MY, 91).

However, it is not reasonable for BMW NA to rely solely on a Rider's Manual to communicate critical safety related information and warnings to secondary owners of their R1150 R motorcycle (1-6). Critical warning and safety instructions must be provided where and when the information is needed and where the information is most likely to be encountered and seen (e.g., conspicuously and permanently placed on the motorcycle) (1-6). Often product manuals will not be read, read in their entirety, or may not be available at a later date or at all (2,3,5,7-11). For example, warnings research has shown that product users:

- Do not have the manual available for second hand products (9);
- Are less likely to read manuals for products they do not perceive as complex (7,11);



- Are less likely to read manuals when they believe they know how to use the product; that the manual will not be helpful or provide useful information; or it is quicker to learn about the product by using it (8);
- Often do not read the entire manual and only refer to sections of the manual that are of interest (7); and
- Believe hazardous products should have warnings located in close proximity to the product (10).

Consistent with the research cited above, BMW NA was aware that purchasers of used motorcycles may not always receive the Rider's Manual.  For example, when discussing motorcycles sold between private parties, Mark Yeldham testified "One can only hope that they sold the bike and the Owner's Manual is still there." (MY, 91).  "Hoping" is not a reasonable way to ensure that critical safety related information and warnings are communicated to second hand users of a product.

Furthermore, warnings presented in a Rider's Manual are likely to be overlook, not encoded in memory, and/or forgotten during future operation of the motorcycle.  For example,

- A warning presented in a multi-page manual can go unnoticed or overlooked when presented with additional, unrelated, and/or more interesting information (1-3,5,7,8,12);
- If the warning is read, the reader may not encode the information into their long term memory due to overload from all of the other information presented in the manual (2,3);
- Safety information that is read and encoded into long term memory is subject to decay and forgetting over time particularly if it is not relevant to the typical use of the product (2,3,12).

The Rider's Manual provided with the BMW R1150 R motorcycle is 89 pages long and presents information on a wide variety of topics including the motorcycle's features, operation, and maintenance.  Within the 89 page Rider's Manual, there are only two references to the potential fire hazard associated with allowing the motorcycle engine to warm up at a standstill and the need to immediately ride away upon starting (pages 51 and 60).  Given the amount of other, unrelated information and topics, it was foreseeable to BMW NA that riders would (a) overlook the warnings, (b) not encode the warnings, and/or (c) subsequently forget the warnings.

The BMW Rider's Manual's failure to provide adequate warning is evident in the testimony of Parvez Yazdani.  Parvez testified that he received and read the manual that he was given when he purchased the incident BMW motorcycle.  However, Parvez also testified:



**VIGILANTE FORENSIC**

Human Factors | Ergonomics Consulting

Exhibit B

Case 2:15-cv-01427-TR   Document 17-2   Filed 04/15/16   Page 113 of 155

- He read the manual basically to learn about things like type of engine, brake oil, level of oils, how to adjust control levers, how to adjust the suspension, and how to make sure proper maintenance was done (PY, 8,10).
- He read the manual but he does not recall if he read the warnings regarding leaving the engine idle at a standstill (PY, 22-24).
- If he read the warnings in the manual, he does not recall reading them (PY, 22).
- He did not recall any warnings from the manual at the time he started the motorcycle (PY, 21).

A critical purpose of a product warning is to ensure the operator is aware of important safety information at the time and location it is needed (1-6,12). However, the BMW Rider's Manual has the disadvantage of typically not being available or used during subsequent or later uses of the motorcycle. A consequence of this expected nonuse of the Rider's Manual is that the warnings previously read in the manual are of no use to the rider if they are not thinking about it at the time the safety information is needed because they are focused on something else or simply forgot (2,3,12). For example, Parvez testified that he read the manual he was given with the motorcycle when he purchased it (PY, 22-24). However, Parvez also testified that when he was starting the motorcycle on the day of the fire he was not thinking about the warnings in the manual, he did not remember any warnings he may have read in the manual, and was not aware of the risk of letting the motorcycle run at a standstill (PY, 14,20,21).

Effective warnings not only inform people of information they were not previously aware of but also remind users of critical safety information that they may have previously learned or encountered at the time and location the information is needed (2,12). The use of product warnings as a cue or reminder at the time and location the information is needed is related to the distinction between knowledge versus awareness (12). For example, Laughery and Hammond provided the following discussion on the importance of knowledge versus awareness in the design and use of product warnings in their introductory chapter to the textbook *Warnings and Risk Communication* (12):

> The distinction between knowledge and awareness is important in understanding issues of risk perception and how they map on to the design and effectiveness of warnings. The difference is analogous to a distinction made in cognitive psychology between short term memory (this may be thought of as what is in consciousness) and long term memory (one's more permanent knowledge of the world). The point is simply that people may have information or experiences in their overall knowledge base that at any given point in time is not what they are thinking about (i.e., they are not aware of or conscious of that information). In the context of dealing with hazards, it is not enough to say that people know something. Rather it is critical that people be aware of (thinking about) the relevant information at the right time. This distinction has significant implications for one of the important functions of warnings: they serve as reminders or cues which help access that information stored in memory.



VIGILANTE FORENSIC
Human Factors | Ergonomics Consulting
Exhibit B

There are multiple reasons why a product user may not remember a critical warning that they may have read or encountered in the past including distraction, inattention, interference, hurrying, stress, forgetting, etc. (2,3,12). Fundamental safety considerations to overcome these basic human factors is to eliminate the hazard through design, minimize the hazardous consequences of the user's actions, provide necessary safe guards, and/or provide salient cues where and when needed to draw the user's attention to the potential hazard and the actions necessary to avoid the hazard (2,3,12).

On-product warnings are typically relied upon to overcome the shortcomings of warnings presented in product manuals (1-6,12). For example, on-product warnings are typically presented where and when the information is needed, are designed and formatted to draw attention and standout from clutter and other information, and are used as a cue to remind users of information they may have learned before but were not currently thinking about (1-6,12). On-product warnings are also a reliable way of ensuring critical safety related information is available to secondary owners/users compared to "hoping" that they are given a manual when purchasing the motorcycle second hand.

Consistent with the benefits of on-product warnings, standards and guidelines for the design of effective warning systems recommend that critical warning information be presented on the product to ensure the information is seen, read, and heeded at the time and location it is needed. For example, ANSI Z535.4, *Product Safety Signs and Labels*, provides the following recommendation for the placement of product warnings (4):

> Product safety signs and labels shall be placed such that they will: (1) be readily visible to the intended viewer and (2) alert the viewer to the potential hazard in time to take appropriate action.

In their chapter on attention switch and maintenance of warnings, published in the textbook *Handbook of Warnings*, Wogalter and Vigilante note (3):

> In general, a warning's attention getting power will be facilitated by placing it close (or proximate) in time and space to the hazard. Thus, in most cases warning noticeability will be benefitted by its attachment directly to the product (or its container) as opposed to a more distant placement such as in a separate instruction manual.

And

> However, the warning should not be too distantly placed from a hazard as it might be forgotten in the intermediate time. For example, a verbal warning given to a farm worker who a week later starts using a hazardous pesticide is less likely to be remembered, and therefore, less effective than one given immediately prior to using the product.

With respect to design and placement of critical safety warnings, Woodson et al. note in their textbook Human Factors Design Handbook (2):



**VIGILANTE FORENSIC**
Human Factors & Ergonomics Consulting
Exhibit B

Make critical signs and signals conspicuous, legible, visible, and understandable and place them where the user is expected to be looking.

In a paper published in the journal *Occupational Health and Safety*, Peters provides the following guideline for the placement of product warnings (5):

The warning should be placed where needed and when needed.  A warning buried in an operator's manual may be of little help to a typical machine operator.

The FMC Corporation is one of the world's foremost diversified chemical companies in the world and a leader in the agricultural, industrial, and consumer markets.   In their 1990 edition of their *Product Safety Signs and Label System* manual, FMC notes (6)

When such safety signs and labels are placed on products in appropriate locations, they can help to reduce the occurrence of accidents through more effective communication.

Contrary to contemporary industry standards and guidelines for the design of effective warning systems, BMW NA failed to provide any warning on Yazdani's R1150 R motorcycle regarding the risk of fire if the motorcycle engine is warmed up at a standstill (MY, 157).

It was not reasonable for BMW NA to rely solely upon the use of the Rider's Manual to warn subsequent BMW R1150 R motorcycle owners and riders of the fire hazard associated with warming up the engine with the motorcycle at a standstill.  BMW NA should have conspicuously and permanently placed a warning directly on the motorcycle and the motorcycle was defective and unreasonably dangerous without the warning.

BMW NA failed to provide an adequate warning system, which included a conspicuous on-product warning, which met contemporary industry standards, guidelines, and practices regarding the fire hazard associated with warming up the motorcycle engine at a standstill.

BMW NA's failure to provide an adequate warning system regarding the fire hazard associated with warming up the engine at a standstill, which included the use of a conspicuous on-product warning, was unreasonably dangerous, rendered the BMW R1150 R motorcycle defective and unreasonably dangerous, needlessly placed consumers and product users in danger, and caused the fire.

BMW NA's failure to provide an adequate warning system regarding the fire hazard associated with warming up the motorcycle engine at a standstill deprived Parvez Yazdani of critical safety information he needed to safely use the motorcycle.  For example, Parvez Yazdani testified that prior to the fire:

- He did not understand the risk of overheating the engine by letting the motorcycle engine run at a standstill (PY, 20);
- He never thought that warming up a motorcycle would result in it catching fire (PY, 20).



VIGILANTE FORENSIC
Human Factors | Ergonomics Consulting
Exhibit B

Case 2:15-cv-01427-TR   Document 17-2   Filed 04/15/16   Page 116 of 155

- He was not aware that he was doing anything unsafe and he thought it was safe to let the motorcycle engine idle (PY, 27).

BMW NA's failure to comply with long known applicable guidelines, practices, and the American National Standard Z535.4 deprived Parvez Yazdani of the protection afforded to the public by those guidelines and standards.

BMW NA's failure to provide an adequate warning system is evident in Mark Yeldham's investigation of 6 to 12 motorcycle fires caused by the failure of the oil sight glass cover due to excessive engine oil temperatures (MY, 121).

**E.2. BMW NA was aware of the need to provide adequate warning including an on-product warning.**

BMW NA was aware of the need to provide a warning label directly on their motorcycles to alert, inform, and remind riders of the potential fire hazard associated with allowing a BMW motorcycle with an air-cooled engine to warm up at a standstill (MY, 156).

In 1997, BMW NA implemented a recall campaign related to the 1994 to 1997 model year BMW R1100RSL motorcycles. The recall involved BMW NA sending out and adding warnings labels to the steering head/upper fork bridge of R1100RSL motorcycles (MY, 170,171). The recall warning label stated:

> Avoid increased idle speed
> at a standstill with choke in use.
> Risk of overheating and fire.

The recall campaign also included an insert that was added to the Rider's Manual for the BMW R1100RSL. The insert includes the following a warning:

> Warning
> Do not keep the engine running while the motorcycle is at a standstill – risk of overheating and fire.
> Ride away immediately after starting the engine.

A similar warning appears in the Rider's Manual of the BMW R1150 R motorcycle as noted in the previous section of this report.

The BMW R1100RSL motorcycle possesses an air-cooled engine similar to the BMW R1150 R motorcycle. Unlike the BMW R1150 R, the BMW R1100RSL possesses a full front fairing. Both the BMW R1100RSL and the R1150 R possess manual chokes controlled by the rider. The choke increases the engine idle speed (i.e., RPM) to help the engine warm up faster (MY, 72,73,137). However, as the engine temperature increases, the engine idle speed will increase when the



Case 2:15-cv-01427-TR   Document 17-2   Filed 04/15/16   Page 117 of 155

choke is in the full or detent position (MY, 137,138).  As the engine speed increases so does the temperature of the engine and engine oil (MY, 134-136).

Similar to the BMW R1100RSL, there is a fire hazard associated with the BMW R1150 R motorcycle if the engine is allowed to run when the bike is stationary (MY, 177).  Mark Yeldham, BMW NA corporate designee, testified that BMW NA is aware of only two modes for the BMW R1150 R motorcycle to catch fire when it is left idling at a standstill: (1) the oil sight glass fails allowing extremely hot oil to escape the engine, and (2) body work (e.g., front fairing) or wiring harness near the exhaust header is heated (MY, 130).  The latter is the same failure mode prompting the recall campaign that BMW NA initiated in 1997.

Although the BMW R1150 R motorcycles possess a fire hazard potential similar to the R1100RSL, BMW NA failed to provide any warning label directly on the BMW R11500R motorcycle to alert, inform, and/or remind riders of the potential fire hazard associated with warming up the engine at a standstill.

Mark Yeldham testified that they added the recall label to their BMW R1100RSL motorcycles because there was a risk of fire if the bike was left running while stationary (MY, 175-177).  Mark Yeldham also testified that the label was added to make the end user aware that there was a risk of fire (MY, 175).  Yeldham's testimony is consistent with BMW NA's admission that "..., because the product is too complex and the average or ordinary consumer would not be capable of forming an expectation about the product.[1]"

It is the complexity of the fire hazard scenario and the improbability that the rider will expect a fire to occur by simply allowing the motorcycle to idle in a stationary position that made it critical for BMW NA to ensure that adequate warning was provided with their BMW R1150 R motorcycles.  To foresee the potential fire hazard associated with warming up the engine with the motorcycle at a standstill without adequate warning, the rider would have to know that:

1. The motorcycle possesses an air-cooled engine;
2. Engine heat is dissipated by moving air across the engine's cooling fins and if the bike is not moving the air flow will not be adequate to dissipate the heat;
3. As the engine temperature rises, its speed will increase, which further increases the temperature of the engine;
4. As the engine temperature increases, the oil temperature increases as well;
5. The R1150 R engine possess an oil sight glass;
6. The oil sight glass possess a plastic cover that fails at 329°F and a seal that can also fail at elevated temperatures;
7. Engine oil can reach 329°F if the engine is allowed to warmup in a stationary position;
8. The elevated engine temperature can cause the oil sight glass to fail;
9. If the oil sight glass fails, extremely hot oil liquid and vapors will be released from the engine;

---

[1] BMW NA's Answer with Affirmative Defenses: Fourteenth Affirmative Defense.



**VIGILANTE FORENSIC**
Human Factors  Ergonomics Consulting

Exhibit B

10. The oil vapors can ignite upon contacting the exhaust header causing a fire.

Unfortunately, most people lack awareness of, experience with, and/or knowledge of the technology features of many products, including mechanical relationships, thermal characteristics, gaseous and combustible materials, and conditions that cause fires (2,12). Because people generally do not know what causes products to ignite or explode they are not prepared to identify or deal with the potential hazard without adequate warning (2). Most people would not be expected to appreciate or anticipate the chain events and characteristics of the BMW R1150 R motorcycle that creates the fire potential without adequate warning (2,12-14).

The prohibition against letting the motorcycle engine warmup while stationary is also inconsistent with common experience and practice. For example, it is common for people to allow motor vehicles to warm up after starting before driving away or to let a vehicle idle for an extended period of time. Consistent with these common experiences, Mark Yeldham testified that:

- He has started his car on a cold day and let the engine warm up before he got it in and drove away (MY, 81,82).
- People generally know that starting up a cold engine on a winter's day and then flying down the street at high speed is not a good idea (MY, 81).
- Everyone knows that when you start an engine on a very cold day it does not start up so readily and it is not smooth right away (MY, 80).
- When it is really cold outside, you have to hold the choke open longer until the ending warms up and smooths out and that if you close the choke too soon the engine can stall (MY, 88).
- It is foreseeable that riders will get stuck in traffic which can result in the engine running while the motorcycle is stationary for an extended period of time (MY, 146,147).

Other motorcycle manufacturers do not prohibit riders from warming up their engine while the motorcycle is at a standstill. On the contrary, competitor motorcycle manuals explicitly state that the engine should be warmed up before riding off. For example, 2002 Yamaha motorcycle manuals state:

CAUTION: For maximum engine lift, always warm the engine up before starting off.[2]

Harley Davidson also notes under the "Starting the Engine" section of their 2007 Softtail motorcycle manual:

---

[2] Owner's Manuals for 2002 models XVS1100AWR and XVS1100ATR (LIT-11626-16-46. Pg. 5-3) and RoadStar XV16A/AT (Pg. 5-2).


**VIGILANTE FORENSIC**
Human Factors | Ergonomics Consulting
Exhibit B

Case 2:15-cv-01427-TR   Document 17-2   Filed 04/15/16   Page 119 of 155

CAUTION:
The engine should be allowed to run slowly for 15-30 seconds. This will allow the engine to warm up and let oil reach all surfaces needing lubrication. Failure to comply can result in engine damage.

The 2002 Yamaha motorcycles cited have a manual choke. The 2007 Softtails are fuel injected without a manual choke. Both the Yamaha and Harley Davidson motorcycles cited feature air-cooled engines.

BMW NA implemented the recall campaign after receiving notice of eleven incidents related to the fire hazard associated with the design and operation of the R1100RSL motorcycle. Predictably BMW NA learned during their investigation of the incidents that many owners reported that the motorcycle had been left unattended at engine speeds above idle causing the engine to overheat. Similar to the scenario that BMW NA's recall campaign was intended to address, the current fire occurred when Yazdani left the motorcycle unattended while warming up the engine to keep everything running during the colder months (PY, 14-16,64).

BMW NA knew or should have known that a warning label was needed on the BMW R1150 R motorcycle to alert, inform, and/or remind riders of the potential fire hazard associated with letting the engine warm up at a standstill.


**E.3. BMW NA should have provided an adequate warning system.**

If they chose not to eliminate or guard against the fire hazard associated with warming up the engine at a standstill, BMW NA should have ensured that a conspicuous on-product warning was provided on the BMW R1150 R motorcycles. The warning should have been placed on cockpit (e.g., above the ignition switch and below the ABS warning light) or the upper fork bridge/steering head of the BMW R1150 R motorcycle (MY, 170). The warning should have alerted riders to the fire hazard associated with allowing the motorcycle engine to warm up at a standstill.

Illustration 1 presents an example of an on-product warning meeting the ANSI Z535.4-2002 criteria for on-product safety warnings that BMW NA should have permanently presented on the BMW R1150 R motorcycle (4).



⚠ **WARNING**

**Fire Hazard**
Do NOT warm up engine with motorcycle standing still.
Engine can overheat and cause a fire.
Ride away immediately after starting engine.

Illustration 1. Fire hazard warning.



**VIGILANTE FORENSIC**
Human Factors, Ergonomics Consulting

Exhibit B

The warning depicted in Illustration 1 should have been repeated in the motorcycle's Rider's Manuals with an explanation of how the fire occurs (e.g., oil temperature increases to an elevated level causing the oil sight glass to fail and allow hot oil to escape the engine or heat from the exhaust headers can ignite the body work or wiring harness).

It would have been reasonable for BMW NA to provide an adequate warning system, including a conspicuous on-product warning, with the BMW R1150 R motorcycle. The cost in terms of money, effort, and time to do so would have been minimal and insignificant. For example, BMW NA added a warning label to the upper fork bridge/steering head of the BMW R1100RSL motorcycles they recalled to make riders aware of the potential fire hazard associated with letting the engine warm up at a standstill (MY, 170,175).

Had an adequate warning system, including a conspicuous on-product warning, been provided, BMW NA would have ensured that the Parvez Yazdani was provided with the information he needed to make an informed decision as to his operation of the incident BMW R1150 R motorcycle and avoided the fire.

## F.    FINDINGS

Within the bounds of reasonable scientific certainty, and subject to change if additional information becomes available, it is my professional opinion that:

1. BMW could not reasonably rely on dealer provided training to alert, inform, and remind all potential users of the motorcycle of the fire hazard created by attempting to warm up the engine with the motorcycle at a standstill.
2. It was not reasonable for BMW NA to rely solely upon the use of the Rider's Manual to warn subsequent BMW R1150 R motorcycle owners and riders of the fire hazard associated with warming up the engine with the motorcycle at a standstill.
3. BMW NA should have conspicuously and permanently placed a warning directly on the motorcycle and the motorcycle was defective and unreasonably dangerous without the warning.
4. BMW NA failed to provide an adequate warning system, which included a conspicuous on-product warning, which met contemporary industry standards, guidelines, and practices regarding the fire hazard associated with warming up the motorcycle engine at a standstill.
5. BMW NA's failure to provide an adequate warning system regarding the fire hazard associated with warming up the engine at a standstill, which included the use of a conspicuous on-product warning, was unreasonably dangerous, rendered the BMW R1150 R motorcycle defective and unreasonably dangerous, needlessly placed consumers and product users in danger, and caused the fire.
6. BMW NA's failure to provide an adequate warning system regarding the fire hazard associated with warming up the motorcycle engine at a standstill deprived Parvez Yazdani of critical safety information he needed to safely use the motorcycle.



**VIGILANTE FORENSIC**
Human Factors | Ergonomics Consulting
Exhibit B

7.  BMW NA's failure to comply with long known applicable guidelines, practices, and the American National Standard Z535.4 deprived Parvez Yazdani of the protection afforded to the public by those guidelines and standards.

8.  BMW NA's failure to provide an adequate warning system is evident in Mark Yeldham's investigation of six to 12 motorcycle fires caused by the failure of the oil sight glass cover due to excessive engine oil temperatures (MY, 121).

9.  It is the complexity of the fire hazard scenario and the improbably that the rider will expect a fire to occur by simply allowing the motorcycle to idle in a stationary position that made it critical for BMW NA to ensure that adequate warning was provided with the BMW R1150 R motorcycles.

10. BMW NA knew or should have known that a warning label was needed on the BMW R1150 R motorcycle to alert, inform, and/or remind riders of the potential fire hazard associated with letting the engine warm up at a standstill.

11. BMW NA should have ensured that a conspicuous on-product warning was provided on the BMW R1150 R motorcycles they distributed in the United States.

12. It would have been reasonable for BMW NA to provide an adequate warning system, including a conspicuous on-product warning, with the BMW R1150 R motorcycle. The cost in terms of money, effort, and time to do so would have been minimal and insignificant.

13. Had an adequate warning system, including a conspicuous on-product warning, been provided, BMW NA would have ensured that the Parvez Yazdani was provided with the information he needed to make an informed decision as to his operation of the incident BMW R1150 R motorcycle and avoided the fire.

_____

William J. Vigilante Jr., Ph.D.

**VIGILANTE FORENSIC**
Human Factors Ergonomics Consulting
Exhibit B

## G.    REFERENCES

1.  NSC (2001).  Accident Prevention Manual for Business & Industry: Administration & Programs (12th Edition).  Pgs. 110-117, 491-507.
2.  Woodson, Tillman, & Tillman (1992).  Human Factors Design Handbook.  Pgs. 363,714-718, 789.
3.  Wogalter & Vigilante (1999). Chapter 18: Attention Switch and Maintenance. In Handbook of Warnings. Pgs. 245-265.
4.  ANSI Z535.4 (2002).  Product Safety Signs and Labels.
5.  Peters (1984). 15 cardinal principles to ensure effectiveness of warning systems. Occupational Health and Safety.  May, 76-79.
6.  FMC (1990).  Product Safety Sign and Label System.
7.  Wright, Creighton, & Threlfall (1982).  Some factors determining when instructions will be read. Ergonomics, 25.  Pgs. 225 – 237.
8.  Celuch, Lust, & Showers (1992).  Product owner manuals: an exploratory study of nonreaders versus readers. Journal of Applied Social Psychology, 22(6), 492-507.
9.  Wogalter, Vigilante, & Baneth (1998).  Availability of operator manuals for used consumer products.  Applied Ergonomics, 29(3). Pgs. 193-200.
10. Wogalter, Brelsford, Desaulniers, & Laughery (1991).  Consumer product warnings: the role of hazard perception. Journal of Safety Research, 22, Pgs. 71-82.
11. Wogalter, Barlow, & Murphy (1995).  Compliance to owner's manual warnings: influence of familiarity and the placement of a supplemental directive.  Ergonomics, 38(6), 1081-1091.
12. Laughery and Hammond (1999).  Chapter 1: Overview. Warnings and Risk Communication. Pgs. 3-9.
13. Weegles & Kanis (2000).  Risk perception in consumer product use.  Accident Analysis and Prevention, 32. Pgs. 365 – 370.
14. Wagenaar (1992).  Risk taking and accident causation.  In Risk-Taking Behavior (Ed. Yates).  Pgs. 257-280.



**VIGILANTE FORENSIC**
Human Factors Ergonomics Consulting
Exhibit B

**H.**     **APPENDIX**

William J. Vigilante Jr., PhD, CPE
History of Expert Testimony by Deposition or Trial

1/1/2016
Page 1 of 6

| Date | Case Name and Description |
|------|---------------------------|

3/2012     Ryan Duff v. The Key West Reach Limited Partnership, et al.
Circuit Court
16th Judicial District
Case No. 2011-CA-79-K
Monroe County, FL; Deposition

3/2012     Community Association Underwriters of America, Inc et al. v. Widmer's, et al.
Circuit Court
Division I
No. 09-CI-2752
Kenton, KY; Deposition

4/2012     American Family Mutual Insurance Company, a/s/o John Power and Debra Doll-Power v. Electrolux North America, Inc. et al
United States District Court
1:10-CV-07864
Northern District of Illinois; Deposition

5/2012     Royal Indemnity Company, et al. v. Crane Company, et al.
Civil Action File #: CV 114-405
Superior Court of Fulton County, GA; Trial

5/2012     Jessica Durkin v. Paccar, Inc. et al
United States District Court
Civil Action No.: 1:10-cv-02013-JHR-AMD
District of New Jersey; Deposition

5/2012     Doniel Kleiman, Steve Kleiman v. Jay Peak Inc. et al
United States District Court
Civil Action No.: 1:10-cv-83
District of Vermont; Deposition

6/2012     Commonwealth of PA vs. John Epps, Jr.
Criminal Action No. CP-67-CR-0001332-2011
Court of Common Pleas, York County, PA; Trial

7/2012     Linas Brock et al. vs Sewerage & Water Board of New Orleans et al.
Case No. 2008-02861
Civil District Court for the Parish of Orleans, LA; Deposition

# VIGILANTE FORENSIC
Human Factors | Ergonomics Consulting
Exhibit B



William J. Vigilante Jr., PhD, CPE

History of Expert Testimony by Deposition or Trial

| Date | Case Name and Description |
|------|---------------------------|
| 8/2012 | James Markham v. Hall Worldwide Transportation, LLC et al. <br> United States District Court <br> Civil Action No: 5:11-CV-95; <br> Southern District of GA, Waycross Division; Deposition |
| 10/2012 | Mitchell Robinson et al v. YJ USA Corp. d/b/a JumpKing, et al <br> Cause No. 45D11-0809-CT-00118 <br> Superior Court, Crown Point, IN; Deposition |
| 11/2012 | Shirley and Ronald Pittman v. Joshua E. Hess, MAJA, Inc., Fedex Ground Package System, et al <br> Cause No. 79D01-1106-CT-00048 <br> Tippecanoe Superior Court, IN; Deposition |
| 12/2012 | Faith and Alex Hobbs v. Burger King Corp. <br> United States District Court <br> Case No. 2:11-cv-01469-DCN <br> District of South Carolina, Charleston Division; Deposition |
| 12/2012 | John McCray v. Washington Nationals Baseball Club, LLC et al. <br> No. 2011CA000101B <br> Superior Court – Civil Division <br> District of Columbia; Trial |
| 1/2013 | John and Emily McGrath v. Rust-Oleum Corp, et al. <br> United States District Court <br> Case No. 2:12-cv-01719-JP <br> Eastern District of Pennsylvania; Deposition |
| 4/2013 | Jacqueline Downing and IDA Wescott v. UCS, Inc. <br> United States District Court <br> Civil Action No.: 2:12-CV-638/9 <br> Eastern District of Virginia: Deposition |
| 5/2013 | Mike Allen and Leah Allen, et al. v. Christopher Aaron Poskey, et al. <br> Cause No. 2012-212 <br> County Court <br> Panola County, TX; Deposition |
| 7/2013 | Megan Smith vs. In Gear Fashions, Inc., et al. |

**VIGILANTE FORENSIC**

Human Factors | Ergonomics Consulting

Exhibit B

William J. Vigilante Jr., PhD, CPE
History of Expert Testimony by Deposition or Trial

| Date | Case Name and Description |
|---|---|
| | Civil Action No. 07-C-806-DS<br>Circuit Court<br>Mercer County, WV; Deposition |
| 8/2013 | David Vititoe v. Rocky Mountain Pavement Maintenance, Inc. et al.<br>Civil Action No. 2010-CV-8156<br>District Court<br>Denver County, CO; Trial |
| 10/2013 | Peter Hetzler v. Sunday River Skiway Corporation<br>Docket No. CV-2012-6<br>Superior Court<br>Oxford County, ME: Deposition |
| 11/2013 | Kimberly Greenberg v. Larox, Inc<br>Civil Action No. 6:2011-cv-06524<br>United States District Court<br>Western District of New York: Deposition |
| 12/2013 | Akira Nakasato v. 331 W. 51st Corp and Eleben Yau-Mei Wong<br>Index No. 103045/09<br>Supreme Court<br>New York County, NY: Trial |
| 12/2013 | Daniel Webb and Margaret Webb v. Oak Leaf Outdoors, et al.<br>11-CV-02456<br>United States District Court<br>Eastern District of Pennsylvania: Deposition |
| 1/2014 | Chalrie Mae Wade, as Administratrix Ad Litem of the Estate of Johny Lewis Williams, deceased v. James C. Townley Jr, et al<br>CV-2011-900606<br>Circuit Court<br>Jefferson County, AL: Deposition |
| 2/2014 | Jesus Flores v. Alexander Andrew, Inc. d/b/a Fall Tech<br>Cause No.: 29D01-0809-CT-01133<br>Superior Court<br>Hamilton County, IN; Deposition |

## VIGILANTE FORENSIC
Human Factors | Ergonomics Consulting

Exhibit B

William J. Vigilante Jr., PhD, CPE
History of Expert Testimony by Deposition or Trial

Date        Case Name and Description

7/2014      Scot and Patricia Vandenberg vs. Brunswick Corporation, et al.
            No. 2010 L 003188
            Circuit Court
            Cook County, IL; Deposition

8/2014      Eric Carter et al, vs. US of America
            Civil Action No. 4:13-cv-112
            United States District Court
            Eastern District of VA; Trial

9/2014      Ruth Vincent vs. Benjamin J. Solomon, III, et al.
            Docket No. UNN-L-318-09
            Superior Court
            Union County, NJ; Deposition

10/2014     Keisha Hudson vs. DC Water and Sewer Authority
            Case No. 2013 CA 003721B
            Superior Court
            Washington, DC; Deposition

10/2014     Raul Nunez vs. Martin Leasing, et al.
            Case No. 11 L 7937
            Circuit Court
            Cook County, IL; Deposition

12/2014     James C. Fuda, et al. vs. King County, et al.
            Consolidated Cause No. 11-2-19682-8
            Superior Court
            King County, WA; Deposition

2/2015      Jordan Lumber & Supply, Inc., et al. vs. Quality Sprinkler Co., Inc.
            Case No. 13-CVS-61
            NC Superior Court
            Montgomery County, NC; Deposition

3/2015      John Parkhurst / Karen Thiesfeld / Sandra Barkley / John and Jane Doe, as
            parent and next of friend of A.S., a minor  vs. DC WASA
            Case No. 2013 CA 003811/13/14/55 B
            Superior Court
            District of Columbia; Deposition

# VIGILANTE FORENSIC
Human Factors | Ergonomics Consulting

Exhibit B

William J. Vigilante Jr., PhD, CPE                                            1/1/2016
History of Expert Testimony by Deposition or Trial                          Page 5 of 6

Date        Case Name and Description

3/2015      Member select Insurance Company, a/s/o Chris and Renata Loiotile v. Electrolux
            Home Products, Inc. and Sears Holding Corporation
            Case No. 1:13-cv-4097
            United States District Court
            Northern District of Illinois, Eastern Division; Deposition

4/2015      Virginia and Robert Nester v. Textron, Inc. et al.
            Case No. 1:13-CV-00920-LY
            United States District Court
            Western District of Texas; Deposition

5/2015      Anthony DiBiaso v. Peter Dremonas, Koubaro, Inc. d/b/a Pete's Produce et al.
            Case No. 13 L 009445
            Circuit Court
            Cook County, IL; Deposition

6/2015      Scot and Patricia Vandenberg vs. Brunswick, Corporation, et al.
            No. 2010 L 003188
            Circuit Court
            Cook County, IL; Trial

6/2015      Debra Jane Phipps, Guardian of Wesley Baker v. PBV Conway-Myrtle Beach, LLC
            and Robert O'Neal McCants
            No 2014-CP-26-654
            Court of Common Pleas
            15th Judicial Circuit
            Horry Counter, SC; Deposition

6/2016      Westfield Insurance A/S/O Michael Flynn v. Modern Glass, Paint and Tile
            Company
            Civil Action No: 12-CV-288
            Court of Common Pleas
            Guernsey County, OH; Deposition

7/2014      Ramon Ernesto Ortega v. Hector Enrique Lopez, Osceola Farms Co.
            Case No: 502013CA012062XXXXMB-AO
            Circuit Court of the 15th Judicial Circuit
            Palm Beach County, FL; Deposition

# VIGILANTE FORENSIC

Human Factors | Ergonomics Consulting

Exhibit B

William J. Vigilante Jr., PhD, CPE                                        1/1/2016
History of Expert Testimony by Deposition or Trial                       Page 6 of 6

| Date | Case Name and Description |
|------|---------------------------|
| 7/2015 | Walter and Theresa Mazur vs. City of Philadelphia, et al.<br>No. 130900815<br>Court of Common Pleas<br>Philadelphia County, PA; Trial |
| 7/2015 | Robert and Catherine Connelly vs. Rhino Quatermasters, Inc. d/b/a Planet Fitness<br>No. 140301681<br>Court of Common Pleas<br>Philadelphia County, PA; Trial |
| 8/2015 | United Preferred Insurance Company a/s/o Jason and Melinda Swanson v. Electrolux North America, Inc., et al.<br>Case No. 14-cv-50169<br>United States District Court<br>Northern District of Illinois, Western Division; Deposition |
| 10/2015 | Kelvin & Krystle Carr v. Taylor Industries, LLC<br>Case No. 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<br>District Court<br>369th Judicial District<br>Anderson County, TX; Deposition |
| 10/2015 | Sarah and Barry Hantman vs. James Boozan<br>Docket No.: MER-L-2158-13<br>Superior Court of New Jersey<br>Mercer County, NJ; Deposition |

# VIGILANTE FORENSIC
Human Factors · Ergonomics Consulting

Exhibit B

**WILLIAM J. VIGILANTE JR., PhD, CPE**
**Human Factors / Ergonomics Expert**

## HUMAN FACTORS and ERGONOMICS EXPERIENCE

Over 22 years of experience in the researching, designing, and evaluating driver performance, roadway safety, pedestrian safety, control-display design, consumer and commercial products and equipment, safety and hazard analyses, risk perception, and design of warnings and instructional materials.

- **Warnings:** Assess the adequacy of warning labels, signs, and user manuals to communicate hazards, motivate compliance, and improve safety. Assess the effect of the warning design and presentation as well as situational and inter/intra personal factors on compliance and risk taking behavior.
- **Vision and Driving:** Assess issues related to visual perception, reaction time, and expectancies along with lighting and roadway conditions related to vehicle collisions. Investigation of pedestrian knockdown collisions, collisions involving stop or slow-moving vehicles, and collisions related to lack of positive guidance and adequate roadway signage.
- **Motorcycle:** Assess rider actions and visibility.
- **Slips, Trips, and Falls:** Determine how attention and perceptual issues affect a person's ability to detect and avoid slip, trip, and fall hazards. Standard of care for building owners/operators and retailers to ensure safe walking surfaces in public spaces.
- **Work Place Safety:** Assess work place and equipment design and safety procedures on incident occurrence and prevention.
- **Recreational and Sporting Activities:** Perceptual abilities and reaction times and how these human factors affect people's ability to safely interact with recreational vehicles, sporting equipment, firearms, and swimming pools.
- **Lighting:** Environmental lighting analysis and its effect on people's ability to notice and recognize walkway and roadway hazards.
- **Accessibility:** Evaluating consumer and commercial products to meet Section 508 of the Americans with Disabilities Act.
- **Aging:** Assess the effects of aging on older adult's ability to read product labels and warnings; operate motor vehicles including night driving and vision, perception/reaction time and roadway navigation; and wayfind in the built environment including the effects of changes in gait, walking ability, and detecting and avoiding walkway hazards.
- **Medication Labeling:** Assess people's ability to notice, read, and understand medication labeling and advertising.
- **Product Design and Development:** Developed a variety of hardware and software interfaces and support materials for a wide range of consumer and commercial products, including: graphical user interface designs, laptop and desktop computer systems, wireless systems, input devices, storage devices, visual displays, user guides, installation wizards, safety manuals, web sites, and an eXtensible markup language (XML).
- **User Centered Design:** Carried out User Centered Design processes and activities within all phases of the product design and development cycle, including: task analyses, competitive evaluation, focus groups, iterative usability testing, and design validation.

# VIGILANTE FORENSIC
Human Factors : Ergonomics Consulting
Exhibit B



**WILLIAM J. VIGILANTE JR., PhD, CPE**
**Human Factors / Ergonomics Expert**

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2015 to Present | **Vigilante Forensic**<br>*Principle*<br>Provide technical investigations, analysis, reports, and testimony toward the resolution of commercial and personal injury litigation involving human factors/ergonomics, safety and risk perception, warning design, product design and development, industrial/workplace safety, roadway safety, driver performance and night vision, and premises safety. |
| 2003 to 2015 | **Robson Forensic, Inc.**<br>*Associate*<br>Provide technical investigations, analysis, reports, and testimony toward the resolution of commercial and personal injury litigation involving human factors/ergonomics, safety and risk perception, warning design, product design and development, industrial/workplace safety, roadway safety, driver performance and night vision, and premises safety. |

**Fournier Robson, Inc.**
Consulted with manufacturers in the design, development, and/or assessment of product warnings and accompanied literature for consumer and commercial products.

| | |
|---|---|
| 2001 to 2003 | **ARCCA, Inc.**<br>*Forensic Scientist*<br>Consultant for consumer product and safety hazard litigation. Provided background research, written reports, and testimony. |
| 1998 to 2003 | **International Business Machine Corporation**<br>*Human Factors/Usability Engineer Consultant*      *1998 - 2002* |

- Worked with internal IBM clients to conduct usability studies; report user feedback data and recommendations; and transform results and recommendations into product design decisions.
- Provided human factors support in the design and development of a data mining program used to research and create action plans for failures reported from in-the-field storage servers.
- Provided human factors support in the design and development of storage servers and tape library systems.
- Provided usability support and evaluation in the design and development of IBM's eXtensible Markup Language (XML) and software interface updates to the IBM information development editors that support the new XML.

*Human Factors Engineer*      1998-2002

- User Centered Design (UCD) team lead for the IBM Personal Computing Division's T and S series ThinkPad laptop computers and wireless development.
- Initiated and implemented software and hardware product design changes resulting from focus groups, iterative usability testing, and heuristic reviews during the product development cycle.
- Conducted competitive assessments to evaluate products ease-of-use against major market competitors.

# VIGILANTE FORENSIC
Human Factors & Ergonomics Consulting

Exhibit B

**WILLIAM J. VIGILANTE JR., PhD, CPE**
**Human Factors / Ergonomics Expert**

- Inputted into the functional specifications and designed the user interface for the IBM Access ConnectionsTM network connection wizard.
- Section 508 Accessibility assessment of products developed within the ThinkPad and Options development teams.
- Worked within a cross-industry team to define user interface specifications and guidelines for the development of SIG qualified Bluetooth products.

1997 to    **International Business Machine Corporation**
1998       *Human Factors Engineer Co-op*
           Developed and conducted focus groups and usability test sessions for the assessment of various Internet and Intranet web sites.  Developed and implemented web based surveys to obtain user data.  Recommended and implemented design changes based on usability results.

1995       **Pennsylvania State University, Center for Cumulative Trauma Disorders**
           *Ergonomics Researcher*
           Performed on-site video recording, data collection, and data analysis for biomechanical task analysis. Collaborated with other team members to identify injury risk factors and develop solutions to reduce or eliminate worker exposure.

1994 to    **North Carolina State University, Department of Psychology**
1997       *Academic Advisor*
           Implemented and maintained an academic advising program for the psychology department. Responsible for advising undergraduate psychology students in scheduling their course work and progression towards a B.S. degree.

**RESEARCH EXPERIENCE**

1994 to    **North Carolina State University, Department of Psychology**
2001       *Research Assistant*
           Conducted research examining the factors that affect the adequacy of warnings and product user risk perception. Specialized in the format and layout designs of operator manuals, on-product warnings and instructions, and Direct-to-Consumer web site advertisements for prescription medications.  Supervised undergraduate students in a grant project focusing on the readability of over-the-counter medication labels.  Worked with students from the NCSU Cognitive Ergonomics lab in developing original research projects related to visual and auditory warnings and risk perception.

1992 to    **University of Scranton, Department of Psychology**
1993       *Research Assistant*
           Conducted literature reviews, designed a computer program for a reaction time experiment, collected and analyzed data. Instructed and proficiency tested students in word processing programs and statistical applications. Worked with students developing original research projects. Conducted literature reviews, collected data, analyzed results, and performed other research duties for a research study examining the prediction of relapse rates for dually diagnosed psychiatric in-patients.



**VIGILANTE FORENSIC**
Human Factors | Ergonomics Consulting
Exhibit B

**WILLIAM J. VIGILANTE JR., PhD, CPE**
**Human Factors / Ergonomics Expert**

## EDUCATION

Ph.D., Psychology/Ergonomics, North Carolina State University, Raleigh, NC, 2001

M.S., Psychology/Ergonomics, North Carolina State University, Raleigh, NC, 1997

B.S., Psychology/Cognitive Track, University of Scranton, Scranton, PA, 1993

## PROFESSIONAL CERTIFICATION

Board of Certification in Professional Ergonomics, CPE #2019

## WORKSHOPS and CONTINUING EDUCATION

- Ensuring Pedestrian Safety in Work Zones:
  - Webinar 28961: The American Traffic Safety Services Association. September 2012
- Safety and Emergency Response Training, Confined Space Safety, FIRECON, 2009
- Stairway Usability and Safety, Part 1: Uses and Falls by Individuals:
  - Workshop 1: Human Factors and Ergonomics Society S1st Annual Meeting. October, 2007 Instructor: Jake Pauls
- There Goes the Sun: Driver Vision and Behavior during Dusk and Darkness Workshop 14S:
  - 86th TRB Annual Meeting January 2007. Instructors: John D. Bullough, Rensselaer Polytechnic Institute; James R. Sayer, University of Michigan Transportation Research Institute; David M. Burns, 3M Company
- Human Factors Principles in Auditory Displays and Warning Signal Design
  - Workshop 8: Human Factors and Ergonomics Society 49th Annual Meeting. September, 2005. Instructors: John G. Casali & Jeff A. Lancaster, Virginia Tech
- Sound/Noise Measurement Basics with Specific Application to Human Factors Research and Practice
  - Workshop 12: Human Factors and Ergonomics Society 48th Annual Meeting. September, 2004. Instructors: John G. Casali & Gary S. Robinson, Virginia Tech
- Risk Assessment and Human Reliability: Some Practical Tools for Improving Safety
  - Workshop 125: 83rd TRB Annual Meeting. January 2004. Instructors: Dennis C. Bley & John Wreathall, The WreathWood Group; Joseph Myers, US Coast Guard; Emile Roth, Roth Cognitive Engineering
- Human Factors Approach to Accident Analysis and Prevention
  - Workshop 2: Human Factors and Ergonomics Society 47th Annual Meeting. October 2003. Instructors: Scott A. Shappell, Federal Aviation Admin.; Douglas A. Wiegmann, University of Illinois
- Motorcycle Safety Foundation:
  - Basic Rider Course (certificate)
  - Off-Highway Motorcycle Course (certificate)
- Raymond "Safety on the Move" Forklift Certification Program (Stand-up/Sit-down Reach/Counterbalanced trucks), Jan 2014

# VIGILANTE FORENSIC
Human Factors : Ergonomics Consulting

Exhibit B

**WILLIAM J. VIGILANTE JR., PhD, CPE**
**Human Factors / Ergonomics Expert**

## PROFESSIONAL MEMBERSHIPS and AFFILIATIONS

**Member:**
- American Society of Safety Engineers
- Human Factors and Ergonomics Society
  - Safety Technical Group (past and present) Program Chair
- Illuminating Engineering Society
- Transportation Research Board

**Reviewer:**
- Applied Ergonomics
- Ergonomics
- Human Factors and Ergonomics in Manufacturing
- International Journal of Human Factors and Ergonomics
- Proceedings of the Annual Human Factors and Ergonomics Society Meeting
- User-Centered Consumer Product Design Award: HFES Product Design Technical Group

## PUBLICATIONS and PRESENTATIONS

Eckhardt, B. J., Vigilante, W. J., Jr., & Coste, P. F. (2012) Visibility Factors in Small Boat Collisions. Presented at the 2012 International Marine Forensics Symposium. National Harbor, MD: The Society of Naval Architects and Marine Engineers & American Society of Naval Engineers.

Hicks, K. E., Vigilante, W. J., Jr. & Wogalter, M. S. (2001). Relative placement of benefit and risk information in direct-to-consumer advertisements of prescription drugs on the World Wide Web. In Proceedings from the Human Factors and Ergonomics Society 45th Annual Meeting (pp. 1196-1200). Santa Monica, CA: The Human Factors and Ergonomics Society.

Hicks, K. E., Wogalter, M. S., & Vigilante, W. J., Jr. (2005). Placement of benefits and risks in prescription drug manufacturers' Web sites and information source expectations. Drug Information Journal, 39 (3), 267.

Joyce, K. M., Byrd, T. G., Vigilante, W. J., Jr., & Wogalter, M.S. (1999). Over-the-counter (OTC) drug labeling: format preferences. Presented at the 107th Annual Convention of the American Psychological Association. Boston, MA: American Psychological Association.

Lim, R. W. & Vigilante, W. J., Jr. (2010). Consumers' interpretation of the statement: "Do not leave [insert product here] unattended." In Proceedings of the Human Factors and Ergonomics Society 54th Annual Meeting (1841 – 1845). Santa Monica, CA: The Human Factors and Ergonomics Society.

Lim, R. W., Keshishian, P., Hernandez, J., and Vigilante, W. J., Jr. (2008). Parent's expectations and beliefs toward the relative safety of their children riding bicycles at night. In Proceedings of the Human Factors and Ergonomics Society 52st Annual Meeting (1703-1707). Santa Monica, CA: The Human Factors and Ergonomics Society.

Lim, R. W. & Vigilante, W. J., Jr. (2007). Middle-school-aged children's expectations and beliefs toward the relative safety of riding bicycles at night. In Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting (1383-1387). Santa Monica, CA: The Human Factors and Ergonomics Society.



VIGILANTE FORENSIC
Human Factors | Ergonomics Consulting
Exhibit B

**WILLIAM J. VIGILANTE JR., PhD, CPE**
**Human Factors / Ergonomics Expert**

Nemire, K. & Vigilante, W.J., Jr. (2015). A call for updating the FHSA regulations with warnings research and to match ANSI ZS35.4. In Proceedings from the Human Factors and Ergonomics Society International 59th Annual Meeting (pp. 1471-1475). Santa Monica, CA: The Human Factors and Ergonomics Society.

Turina, M., Schaible, R., Vigilante, W. J., Jr. (2009). Forensic ergonomics: theory and practice. Paper presented and abstract published at the 41st Annual Conference of the Nordic Ergonomics Society. LO-Skolen, Helsinøre, Denmark: Nordic Ergonomics Society.

Tomcho, T. J., Vigilante, W. J., Jr., Church, M. A., Truscott, J. W., & Alford, B. A. (1993). Self-concept as a predictor of therapeutic response in dual-diagnosed psychiatric inpatients. Paper presented at the 64th meeting of the Eastern Psychological Association. Arlington, VA: Eastern Psychological Society.

Vigilante, W. J., Jr. (2005). Consumer beliefs toward the protection offered by motorcycle helmets: the effects of certification, price, and crash speed. In Proceedings from the Human Factors and Ergonomics Society 49th Annual Meeting (pp. 862-866). Santa Monica, CA: The Human Factors and Ergonomics Society.

Vigilante, W. J., Jr. (2001). Direct-to-Consumer (DTC) advertising of prescription medications on the World Wide Web: assessing the communication of risks and benefits. Dissertation Abstracts International, 63, 341.

Vigilante, W. J., Jr. (1998). Product manual safety warnings: the effects of ordering. In Proceedings from the Human Factors and Ergonomics Society 42nd Annual Meeting (pp. 593-597). Santa Monica, CA: The Human Factors and Ergonomics Society.

Vigilante, W. J., Jr. (1997). Product manual safety warnings: the effects of ordering. North Carolina State University. Masters Thesis.

Vigilante, W. J., Jr. & Fuccella, J. (Dec. 1997). eNetwork Web Site Survey Results. IBM Area Presentation, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. & Lim, R.W. (2010). Chapter 108: Hazard Perceptions of Consumer Products. In W. Karwowski and G. Salvendy (Eds.) Advances in Human Factors, Ergonomics, and Safety in Manufacturing and Service Industries (Ed.). Boca Raton, FL: CRC Press.

Vigilante, W. J., Jr & Lim, R.W. (2010). Hazard Perceptions of Consumer Products. In Proceedings of the 3rd International Conference on Applied Human Factors and Ergonomics. Louisville, KY: AHFE International.

Vigilante, W. J., Jr. & Lim, R. W. (2006). Children's expectations and beliefs toward the relative safety of riding bicycles at night. In Proceedings of the 16th World Congress on Ergonomics (pp. 1381-1386). Roma, Italy: International Ergonomics Association.

Vigilante, W. J., Jr., Mayhorn, C., & Wogalter, M.S. (2007). Direct-to-Consumer (DTC) prescription drug advertising on television and online purchases of medications. In Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting (pp. 1272-1276). Santa Monica, CA: The Human Factors and Ergonomics Society.

Vigilante, W. J., Jr. & Reeves, P. (2012). Human factors related to programmable thermostats: consumers knowledge and perceptions related to product use and hazards. In Proceedings from the

**VIGILANTE FORENSIC**
Human Factors · Ergonomics Consulting
Exhibit B

**WILLIAM J. VIGILANTE JR., PhD, CPE**
**Human Factors / Ergonomics Expert**

Human Factors and Ergonomics Society 56th Annual Meeting (pp.680-684). Santa Monica, CA: The Human Factors and Ergonomics Society.

Vigilante, W. J., Jr., & Reeves, P. & Lim, R. (2014). Hunting from elevated tree stands: hunter's safety practices and attitudes regarding the use of personal fall arrest systems. In Proceedings from the Human Factors and Ergonomics Society 58th Annual Meeting (pp. 1874-1878). Santa Monica, CA: The Human Factors and Ergonomics Society.

Vigilante W. J, Jr., & Rhoades, T., Arndt, S, & Cohen H.H. (2009). Forensic human factors/ergonomics practice from the perspective of the forensic consulting firms. In Proceedings of the Human Factors and Ergonomics Society 53rd Annual Meeting (pp. 546-548). Santa Monica, CA: Human Factors and Ergonomics Society.

Vigilante, W. J., Jr., & Wogalter, M. S. (2005). Assessing risk and benefit communication in direct-to-consumer medication Web site advertising. Drug Information Journal, 39(1), 3.

Vigilante, W. J., Jr., & Wogalter, M. S. (2001). Direct-to-consumer (DTC) advertising of prescription medications on the World Wide Web: assessing the communication of risks. In Proceedings from the Human Factors and Ergonomics Society 45th Annual Meeting (pp. 1279-1283). Santa Monica, CA: The Human Factors and Ergonomics Society.

Vigilante, W. J., Jr., & Wogalter, M. S. (1999). Over-the-counter drug labeling: format preferences. In Proceedings from the Human Factors and Ergonomics Society 43rd Annual Meeting (pp. 103-107). Santa Monica, CA: The Human Factors and Ergonomics Society.

Vigilante, W. J., Jr., & Wogalter, M. S. (1998). Older adults' perception of OTC drug labels: print size, white space, and design type. Presented at the International Occupational Ergonomics and Safety Conference XIIIth Annual Meeting. Ann Arbor, MI: The International Occupation Ergonomics and Safety Society.

Vigilante, W. J., Jr., & Wogalter, M. S. (1997). On the prioritization of safety warnings in product manuals. International Journal of Industrial Ergonomics, 20(4), 277-285.

Vigilante, W. J., Jr., & Wogalter, M. S. (1997). The preferred order of over-the-counter (OTC) pharmaceutical label components. Drug Information Journal, 31(3), 973-988.

Vigilante, W. J., Jr., & Wogalter, M. S. (1996). The ordering of over-the-counter (OTC) pharmaceutical label components. In Proceedings from the Human Factors and Ergonomics Society 43rd Annual Meeting (pp. 141-145). Santa Monica, CA: The Human Factors and Ergonomics Society.

Vigilante, W. J., Jr., & Wogalter, M. S. (1996). The ordering of safety warnings in product manuals. In A. Mital, H. Krueger, S. Kumar, M. Menozzie, and J. E. Fernandez (Eds.), Advances in Occupational Ergonomics and Safety. Amsterdam: IOS Press.

Wogalter, M. S., Conzola, V. C., & Vigilante, W. J., Jr. (2006). Chapter 38: Applying usability engineering principles to the design and testing of warning text. In M. S. Wogalter (Eds.) Handbook of Warnings. Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Wogalter, M. S., Conzola, V. C., & Vigilante, W. J., Jr., (1999). Applying usability engineering principles to the design and testing of warning messages. In Proceedings from the Human Factors and Ergonomics Society 43rd Annual Meeting (pp. 921-925). Santa Monica, CA: The Human Factors and Ergonomics Society.



**VIGILANTE FORENSIC**
Human Factors | Ergonomics Consulting
Exhibit B

**WILLIAM J. VIGILANTE JR., PhD, CPE**
**Human Factors / Ergonomics Expert**

Wogalter, M. S., Magurno, A. B., Carter, A. W., Swindell, J. A., Vigilante, W. J., Jr., & Daurity, J. G. (1995). Hazards associations of warning header components. In Proceedings from the Human Factors and Ergonomics Society 39th Annual Meeting (pp. 979-983). Santa Monica, CA: The Human Factors and Ergonomics Society.

Wogalter, M. S., & Vigilante, W. J., Jr. (2006). Chapter 18: Attention switch and maintenance.  In M. S. Wogalter (Eds.) Handbook of Warnings. Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Wogalter, M. S., & Vigilante, W. J., Jr. (2003). Effects of label format on knowledge acquisition and perceived readability by younger and older adults. Ergonomics, 46(4), 327-344.

Wogalter, M. S., & Vigilante, W. J., Jr. (2001). Formatting Print on OTC Drug Labels to Benefit Seniors' Knowledge Acquisition Performance. In Proceedings from the Human Factors and Ergonomics Society 45th Annual Meeting (pp. 1481). Santa Monica, CA: The Human Factors and Ergonomics Society.

Wogalter, M. S., Vigilante, W. J., Jr., & Baneth, R. C. (1998). Availability of operator manuals for used consumer products. Applied Ergonomics, 29(3), 193-200.

## TECHNICAL REPORTS

Calcaterra, J., Sawin, D., Vigilante, W. J., Jr., & Ray, R. (August, 2002). Access connections usability test report. IBM Technical Report # 29.3557, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Krauss, F. S. H. & Vigilante, W. J., Jr. (September, 2002). A comparative study of alternative design for the IBM Microelectronics Internet Web site. IBM Technical Report # 29.3573, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Krauss, F. S. H. & Vigilante, W. J., Jr. (February, 2002). A Reference Guide for Remote Usability Activities Using NetMeeting and Sametime. IBM Technical Report # 29.3493, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Stewart, A. & Vigilante, W. J., Jr. (January, 2002). IBM monitor design recommendations. IBM Technical Report # 29.3491, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Stewart, A. & Vigilante, W. J., Jr. (July, 2001). IBM on-screen display (OSD) specifications for CRT and TFT monitor menus. IBM Technical Report # 29.344, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (June, 2003). XML DITA post-beta CUPRIMDSO survey. IBM Technical Report # 29.3656, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (May, 2003). XML DITA post-beta program online survey. IBM Technical Report # 29.3648, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (March, 2003). DITA trademark UCD test session results. IBM Technical Report # 29.3625, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (January, 2003). DITA language reference guide usability assessment. IBM Technical Report # 29.3609, Internal Use Only. Research Triangle Park, NC: International Business Machine.



**VIGILANTE FORENSIC**
Human Factors · Ergonomics Consulting
Exhibit B

**WILLIAM J. VIGILANTE JR., PhD, CPE**
**Human Factors / Ergonomics Expert**

Vigilante, W. J., Jr. (November, 2002). DITA map usability evaluation. IBM Technical Report # 29.3595, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (October, 2002). MetaDor map editor usability evaluation. IBM Technical Report # 29.3585, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (September, 2002). Epic DITA map Relationship table usability assessment. IBM Technical Report # 29.3576, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (September, 2002). Yield Management Web site utility design walkthrough and accessibility review. IBM Technical Report # 29.3574, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (August, 2002). Epic, Frame2000, and XMetaL feature survey. IBM Technical Report # 29.3561, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (August, 2002). Iterative evaluation of the information development workbench transform UI. IBM Technical Report # 29.3555, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (June, 2002). Comparison of usability testing methodologies. IBM Technical Report # 29.3534, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (June, 2002). Epic and Frame2000 XML editor usability recommendations. IBM Technical Report # 29.3533, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (June, 2002). IBM XML DITA usability recommendations. IBM Technical Report # 29.3532, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (June, 2002). XMetaL 3.0 Editor Usability Evaluation. IBM Technical Report # 29.3531, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (Oct, 2000). IBM High Rate Wireless LAN PC card: usability test and competitive evaluation. IBM Technical Report # 29.338, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (August. 2000). Personal Systems Group (PSG) eCIM usability study. IBM Technical Report # 29.3393, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (February, 2000). Options by IBM (OBI) Tape drive focus group study. IBM Technical Report # 29.3381, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (Dec. 1999). IdeaScan 2000 usability study and competitive evaluation. IBM Technical Report # 29.3258, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. (August 1999). Personal Systems Group (PSG) web site study and competitive analysis. IBM Technical Report # 29.3195, Internal Use Only. Research Triangle Park, NC: International Business Machine.



**VIGILANTE FORENSIC**
Human Factors : Ergonomics Consulting
Exhibit B

**WILLIAM J. VIGILANTE JR., PhD, CPE**
**Human Factors / Ergonomics Expert**

Vigilante, W. J., Jr. & Calcaterra, J. (October, 2002). IBM internal remote testing hints and tips. IBM Technical Report # 29.3584, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. & Hunt J. (May, 2003). Lotus WordPro feature on-line survey. IBM Technical Report # 29.3647, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. & Krauss, F. S. H. (September, 2002). Physical Design Turn-Around-Time Web site utility usability assessment. IBM Technical Report # 29.3562, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. & Ortega, K. (June, 2003). ISIT Deployer V2.1 usability test results. IBM Technical Report # 29.3652, Internal Use Only. Research Triangle Park, NC: International Business Machine.

Vigilante, W. J., Jr. & Priestley M. (March, 2003). Output formatting of DITA related links: Web survey results. IBM Technical Report # 29.3626, Internal Use Only. Research Triangle Park, NC: International Business Machine.

## PUBLISHED PATENTS

- Insertion of Null Packets to Mitigate the Effects of Interference in Wireless Communications
  - Lyle, R.D., Lynch, J.P., Udoh, U.E., & Vigilante W.
  - US Patent No. US 7,920,618 B2. Date: April 2011
- Apparatus and Method Employing Dynamic Hop Sequence Adjustment in FHSS Networks.
  - Lyle, R. D., Lynch, J. P., Quinn, M., & Vigilante, W. J., Jr.
  - US Patent No. 7,269,199. Date: September 11, 2007
- Apparatus, System, and Method for Mitigating Access Point Data Rate Degradation Lyle, R. D.,
  - Lynch, J. P., Reed, S. W., & Vigilante, W. J., Jr.
  - US Patent No. US 7,039,417. Date: May 2, 2006
- Portable Computer System with Hand-Warming.
  - Lyle, R. D., Lynch, J. P., Quinn, M. & Vigilante, W. J., Jr.
  - US Patent # US 6,878,902. Date: April 12, 2005
- Apparatus and system for vertically storing computing devices.
  - McClain, B.R., Nay, D.T., & Vigilante, W. J., Jr.
  - US Patent No. 7,527,155. Date: February 11, 2004
- Network Controller Having Dynamic Hop Sequence Adjustment in FHSS.
  - Lyle, R. D., Lynch, J. P., Quinn, M., & Vigilante, W. J., Jr.
  - Publication No. US 2005/0047481 A1. Date: March 3, 2005
- Authorization of Payment for a Commercial transaction VIA a Bluetooth Enabled Device.
  - Abell, J., Lynch, J. P., Oxrieder, C. B., Usen U., & Vigilante, W. J., Jr.
  - Pub. No.: US 2003/0172028 A1. Date: September 11, 2003



Rider's Manual (US Model)
R 1150 R

BMW Motorrad
On-board
documentation

consisting of
Rider's Manual
and Maintenance
Instructions



DEPOSITION
EXHIBIT
Vazdani 1
JW 9/22/15



EXHIBIT
Exhibit B

BMWNA000001

## Important notes



**⚠WARNING**

This symbol indicates pre-cautions and measures which are essential in pro-tecting the rider or other persons from severe or fatal injury.



**⚠ CAUTION**

Specific instructions and safety precautions intended to prevent damage to the motorcycle. Disregarding them may render the warranty invalid.



**☞ NOTE**

Specific instructions on how to operate, control, adjust or look after items of equipment on the motorcycle.

Exhibit B

*BMWNA000002*

## Important notes

**3**

Starting – Riding – Parking

### Catalytic converter

**⚠ CAUTION**

To avoid damage to the catalytic converter:
- Do not run the fuel tank dry
- Push-start only when the engine is cold
- Do not run the engine with a spark plug lead detached
- Do not exceed the engine-speed limits marked on the tachometer
- Comply with all specified maintenance intervals
- Stop the engine at once if it is misfiring
- In the event of misfiring or a severe drop in engine power, consult a BMW-certified shop, preferably an authorized BMW Motorrad retailer.

If misfiring or malfunction of the fuel-air mixture preparation system cause unburned fuel to reach the catalytic converter, there is a risk of it overheating and being damaged.

### Risk of fire

High temperatures occur at the exhaust system, particularly if a catalytic converter is installed.

**⚠WARNING**

**Make sure that whether riding or standing still or when the motorcycle is parked, no easily flammable material (for example hay, grass, leaves, clothing or luggage etc.) can come into contact with the hot exhaust system. Do not allow the engine to idle unnecessarily or for prolonged periods —Risk of overheating or fire. Ride away immediately after starting the engine.**

Exhibit B

BMWNA000055



## Starting

**3**

Starting – Riding – Parking

A B C 1

### Starting

**⚠ CAUTION**

If you attempt to start the engine when the battery is flat, you will hear the relay chattering. Further attempts will damage the starter relay and starter motor.
Before trying again:
Recharge the battery.

**⚠ WARNING**

Do not warm up the engine with the motorcycle at a standstill – risk of overheating or fire!
Ride away immediately after starting the engine.
To avoid overheating the air-cooled engine and possible damage as a result, avoid even short warm-up periods at a standstill. Avoid high engine speeds after a cold start.

BMWNA000064

⚠ **WARNING**

**Fire Hazard**
Do NOT warm up engine with motorcycle standing still.
Engine can overheat and cause a fire.
Ride away immediately after starting engine.



Exhibit B





Exhibit B

EXHIBIT



Exhibit B

http://www.soundrider.com/archive/bjs/motorcycle_winterization.aspx





## Half A$$ Winterization

Let's all face it. We live in the meteorological dead zone of the Pacific Northwest, where overcast days outnumber sun-dress sightings by about 300 to 1. All too often, when the clocks roll back, I tool along behind other cars in heavy traffic under a light drizzle. And I watch with envy as that same Beemer-guy rides past me in the HOV, all toasty and dry in full rain gear and heated vest and gloves, I feel like a wimp.

So, I'm not the ultimate hardcore rider. I'm not a 'fair weather rider' either. I'm just an enthusiast who prefers his nipples to be non-frosty. I ride three or four times a week for 6 or 8 months out of the year. And when the temperatures drop below 55, the bike only comes out when there's some sunshine and dry pavement.

**How do I deal with the cold weather, a semi-idle motorcycle, and the continual desire to be on two wheels, you ask?** I do something I call "Half-A$$ Winterization".

You guys have heard about "winterization" before. Every fall, I see at least two or three different articles on "winterizing tips". I scan, laugh, and move on to the article about the new Aprilia, or the latest barrage of insults back and forth between the helmets-r-good and the helmets-r-unconstitutional groups.

One man's opinion: these winterization lists all suck. They are ridiculously long and involved, and they don't apply to me or to this area. If you live in So Cal, there's no reason to winterize. If you live in Wisconsin, buy the video, take the class and get your certification. Me, I live just outside of Seattle. Even if I only ride ten times between late October and late March, there's no way I'm going to put the bike into full blown hibernation... because if that unseasonably warm, sunny day pops up on January 6 th, I want to get out and ride and my bike has to be ready to go.

So here is the Real World Guide to Winterizing Your Motorcycle in the good old PNW.

**EXTREMIST TIP: Fill the fuel tank, add fuel stabilizers, turn off the gas, run the engine dry, and empty the float bowls.**

**REALITY: If you can remember to keep beer stocked in the fridge, you can remember to start your bike once a week, and ride it around the block once or twice a month. Buy some Sta-bil. Don't bother**

## draining the float bowls.

Fuel stabilizer is good magic. Why? Gas gets old. It gets funky. And it turns into sticky, ooey, gooey varnish. Untreated fuel left sitting in your gas tank and carburetor will semi-solidify and clog the itty bitty sized openings and channels here and there.

Come springtime, your bike will die suddenly, have difficulty idling, or possibly fart in your general direction and refuse to start at all. And if this happens, plan to fork out a few hundred to a local shop to tear down your carburetor, soak the parts in cleaner, and reassemble. Or, you can do it yourself, enjoying 8 hours of adventure and mystery, wondering if that little spring was really necessary, right up until you thumb the starter. I have personal experience here. I'm cheap and mechanically inclined.

Trust me on this: there is nothing worse than being Charles-Manson-crazy-excited for your first ride of the year, dying to get out there and raise some hell on two wheels, rolling on the throttle, and getting a "ka-PUT-PUT-THUP-[silence]" while you madly stomp a foot down to keep from dumping it at 5 miles an hour at a stop sign and looking like a true squid. Not that I have personal experience here.

Fuel stabilizer can protect you from this embarrassment. Sta-bil is a brand that has a good reputation. It works by protecting the happy little gasoline molecules from the mean nasty oxygen molecules that break them down and change them into ooey-gooey's. A little bottle of this stuff is well worth the equivalent cost of two or three lattes. It's cheap, easy-to-use insurance.

The other part of fuel system winterizing that warrants our attention is keeping your gas tank full. There is a scientific reason behind this. And if I were so inclined, I could go into detail to explain the molecular-level interactions between reactive ions in metal materials and their romantic pursuit of the oxygen component of moisture that, over time, causes corrosion and broken homes.

But it would take way too long and nobody really cares about chemistry anyway. Besides, I've seen you guys try to calculate fuel efficiency. The details don't really matter. What matters is this: moisture is bad for metals. If left sitting, the interior walls of your tank will collect moisture. Your tank is metal. You do the math. Or chemistry. Whatever.

The Half-A$$ technique: every time you find the huevos to ride a few winter miles, stop at the gas station on your way home, and top it off. Pay attention to how much fuel you add. And when you get home, dribble some Sta-bil in there, based on the ratios they give you on the container. Or get a friend to read the directions for you.

**EXTREMIST TIP: Change your oil and filter at winter's start and end. Pull the spark plugs and squirt 25cc oil into the cylinders to coat the walls, piston rings, and valve seats. Rotate the crank by hand to coat the liners and cover the engine parts with oil.**

**REALITY: Run the engine every now and then, and change the oil based on actual calendar age.**

Why? If your engine is left to sit for a long time, our old friend (read, "eternal nemesis") moisture sneaks in and attacks the internal metal thingies. Like your mother-in-law who just shows up uninvited, and announces that she's "just visiting for a few days", and then proceeds to raise your children, re-program your wife's brain, and generally nose her way into your routine for two months, destroying any semblance of a normal, private life, until finally you have had it up to HERE and... huh? Oh. Right. Moisture.

www.soundrider.com/archive/bjs/motorcycle_winterization.aspx

1/7

Exhibit B

Water + Metal = Rust = Corrosion sucks a mean old Richard. Let's all repeat that to ourselves. The "before and after" winter oil and filter swap is intended to coat and protect the innards with a thin coat of fresh engine juice. The half-a$$'er does this the easy (and fun) way... by making sure that your bike doesn't sit silently for months at a time and keeping the oil fresh.

Just change your oil and filter as often as you usually do. Assuming you aren't a tightwad or wrench-o-phobe, you should be Jiffy Lubing every 3 to 5 thousand miles, or every 3 to 6 months, which ever comes first. During the winter, go by the calendar-age of the oil instead of the odometer-age. Running the engine degrades the oil, but so do air, moisture, and time.

Engine plugs are like girls in bikinis: I am happiest when they are covered in oil. No offense, ladies, just picture those guys in the 2003 Seattle Fire Department Calendar, it's all the same. The critical point is to keep coated in shiny goodness. Run the engine for 15 or 20 minutes at least once a week during the cold season, even if you aren't riding. This will effectively keep things lubed and protected. And be sure to get on the bike, pull in the clutch, and toe up and down through the gears to lube your transmission as well.

Pulling plugs and the rest of that knuckle-busting is all well and good if you are going to put the bike up for a few months, or don't expect to ride, and are willing to spend a full weekend day both times to prep it for winter and prep it for spring. But if you want the option to ride, just run it. The engine is napier if for you run it. It likes oil, gas, and air flowing through it, to keep away the bad, evil, naughty moisture monster. Make it happy.

**EXTREMIST TIP: Disconnect your battery from the terminals. Top it off with distilled water (for maintenance-free models). Store it in a cool, dry place. Consider purchasing a "smart" trickle-charger.**

**REALITY: Leave it in the bike. Buy a Battery Tender. Trickle-charge it before your weekly ritual, once a week.**

Are you guys picking up on the trend, yet? Don't winterize it. Just don't let it get lonely. A few little things, a few times each month, and your bike will be ready to ride when you are.

Modern batteries slowly discharge, all by themselves, just sitting there, doing nothing. The lazy little bastards. When you are riding regularly, you are keeping your battery charged because your motorcycle comes from the factory with (voila) a charging system.

If you aren't going to ride at all for 2 or 3 months, disconnect the battery and store it somewhere. But if you want to ride at a moment's notice, just pop open that tight little wallet and spring for a Battery Tender.

These "smart" trickle-chargers only push a current when it is needed. When the battery is fully charged, the system shuts down and monitors the level. Then it kicks back in as necessary. It's a lot like the thermostat in your house, only people don't fight over trickle-chargers.

So fuel, oil, battery... tie it all together and have a weekend ritual. Saturday night, pull the cover and connect the Battery Tender to the battery terminals. Don't forget to plug in the Battery Tender, as it functions more effectively. I have personal experience with this. Sunday morning, when your neighbors are sleeping in, disconnect the tender and get those exhaust pipe doggies barking. Move the gas and stabilizer through. Move the oil through. Coat the innards. Clean the pipes. Charge the bunny. Getting the common thread here?

---

**EXTREMIST TIP: Drop / Raise the pressure in your tires by 5 / 10 psi, and roll the bike up onto plywood or carpet, or put the bike up on front and rear stands.**

**REALITY: Get a carpet scrap or a hunk of MDP or plywood and roll your bike up onto it.**

This tip is, plain and simple, preventative maintenance and care for your tires. Your tires are rubber, and over time, guess w=at's bad for rubber? Yep, that's right, moisture. If your tires are left to sit motionless on a concrete garage floor, water droplets collect. By doing anything to keep your tires dry, you are extending their life.

The other aspect of this is the fact that cold air shrinks, just like hot air expands. If you don't believe me, go blow up a balloon and stick it in the freezer. Your tires are just big rubber balloons. During the winter, the air in your garage (and in your tires) gets cold. The tire pressure drops and your tires start calling each other names like "flatty" and "soft boy". More surface area on the bottom of the tire collects more moisture.

There isn't much you can do about this, unless you want to install equipment to make your garage a temperature-controlled environment. And I have heard and read people's advice about increasing the pressure a little, or decreasing is a little, before letting the bike sit, and everyone has an opinion here. The bottom line is, keep them dry, and check the pressure during your weekly ritual. It only takes a minute.

Besides, which would you rather say: "I had to swap my tires because I was lame and didn't ride for six months and they got wet and flat"... or "I had to swap my tires because I ride like a wicked sixth dimension demon and I like to light them up as often as possible." It's your choice, cub scout.

**EXTREMIST MISCELLANEOUS TIPS: Change your fork oil. Lube your cables. Flush your radiator and put in fresh coolant/water mixture. Spray your bike with lemon-scented furniture polish. Spray rubber protectant on your fork seals. Polish exposed metal and chrome bits. Stuff a rag with some gas in your exhaust pipe, or wrap it with plastic. Wipe down leather and vinyl with cleaning products.**

**REALITY: Take care of your ride.**

Use common sense. You should be changing your fork oil, replenishing your coolant and water, checking brake fluid, lubing cables, and all of that stuff regardless of what time of year it is. Most of these tips are just space fillers for authors with less verbal diarrhea than yours truly. But I recognize them for what they are: common sense.

Keep your bike looking good, and you will get to know it well. Buy the service manual from your local shop. Pay attention to the "little stuff". I'm not saying everyone should become a mechanic. If you don't want to learn to check and adjust valve clearances, that's fine. But give your ride a good wipe down on a regular basis. Look at all of those little containers of liquid and learn what the little lines all mean... which is usually "too much" or "too little", by the way, I'm pretty sure.

Some people recommend stuffing something in your exhaust pipe or sliding a bag over it to "keep critters out" during the winter months... listen, if some poor little rodent or bug crawls all the way up and into my canister (no wise cracks or Richard Gere jokes)... well, we all choose our own fate. And if you have rats crawling around in your garage... you might consider cleaning your garage. Just a thought.

Closing statement: If you ride all year, good for you. If you ride twice a year, sell your bike. If you are like

Exhibit B

11/4/2015                                                                                                          Motorcycle Winterization



MADE IN U.S.A. RIDDEN WORLDWIDE.

## TRENDING WITH READERS

1. 10 ways to stay warm on your motorcycle

2. 10 motorcycle luggage tips

3. Northwest Motorcycle Exhibit returns - to Portland

4. Buying a cruiser motorcycle

5. High tech rain gear you won't find at your dealer



**EVERGREEN**

**TRAINING & TESTING**

MOTORCYCLE
SCOOTER   3 WHEEL

## SPONSORED LINKS

**Rich's Custom Seats -** Ride more comfortably - *LONGER!*

*MotoStays -* Home sharing for motorcyclists. Spend less. Experience more.

**The Ultimate Tire Repair Kit-** Fixes tubes and tubeless right every time.

---

11/4/2015                                                                                                          Motorcycle Winterization

the rest of us, just use common sense and follow these general guidelines, give the engine what it wants (fresh oil, fresh fuel, and motion), and you can be a little wimpy during the winters.

I have personal experience here. *SR!*

*by Christian Kuwasaki*

*We've worked hard to upgrade this site. Click here to notify us of any problems we need to correct.*

## SUBSCRIBE FREE

**Subscription has its privileges** - Each month Sound *RIDER!* publishes new features on rides, clubs, dealers and events. Don't miss out on these informative stories.

Sign up today for your FREE subscription and you'll get notification each month when the new issue comes on line. You'll also be the first to find out about special Sound *RIDER!* events. From time to time, we also provide valuable coupons that can save you hundreds of dollars on motorcycle services. What are you waiting for? **Click here to sign up now!**



The SR! Tech Tire Repair Kit coupled together with the Cycle Pump and EZ Air Gauge A special kit - a special price

**CLICK HERE!**



**BMW Motorcycles of Seattle**

www.bmwmcofseattle.com

Exhibit B

11/4/2015                                                                                    Motorcycle Winterization



## SPONSORED LINKS

**Pacific Northwest Motorcycle Safety** - Beginner to advanced rider courses available

**Pacific Northwest Touring Books** - Leave the main roads behind

**Have you met my sister?** - check out www.seattledining.com



*Rich's*
**CUSTOM SEATS**

**Gel Pads**
**Leather**
**Exotic**

*Because stock seats aren't designed to fit every body...*



**KYMCO**
CHOOSE YOUR OWN PATH

*Available now at Seattle Scooter Center*

**Sound RIDER!**  f  ▶

Site Map | Search | About Us | Subscribe Free | Advertise | Privacy Statement |
Report a problem with the site
Copyright ©1999-2015 Mixed MEDIA

Exhibit B

# YOUMOTORCYCLE
Motorcycle lifestyle blog

**RIDES & EVENTS**    **REVIEWS & INFO**    **LEARN TO RIDE**    **TOP 10 LISTS**

🏠 Home / Reviews & Info / First Impressions / Air Cooled vs. Liquid Cooled Motorcycle Eng



## Air Cooled vs. Liquid Cooled Motorcycle Engines

👤 Posted by: YouMotorcycle   📁 in First Impressions, Reviews & Info, Versus   🕐 December 18, 2010   💬 10 Comme
👁 37,731 Views

- Air cooled motorcycles run quieter.
- You'll tend to see them more on cruisers as most cruisers typically run at lower RPMs then sportbikes, which tend to be liquid cooled.
- Air cool provides more simplicity, representing one less thing which could break or need to be replaced.
- Liquid cooling rads are sometimes fragile, and external or aftermarket oil-coolers can also be expensive and likely to break in a drop. Air cooled bikes may be cheaper.

- Air cooled is also likely more feasible for single cylinders (big thumpers) or parallel twin engines rather than V-Twins, where the back cylinder would remain hot.
- In liquid cooled engines, the circulating liquid evens-out hot spots in the cylinder head. This is better for detonation control and for emissions. The combustion chamber surfaces can be kept hot enough to encourage more complete combustion, but not so hot as to promote detonation or high NOx emissions.
- Liquid cooling is better for long-term durability since it allows tighter build tolerances.
- Liquid cooled engines transfer the heat to the rad at the front of the bike, making a long ride or a traffic grid lock more tolerable for the rider.



"WITHIN 18 MONTHS ...I WAS BUILDING CUSTOM MOTORCYCLES."
RYAN K. MMI GRAD

MMI GETS YOU READY TO WORK

**MMI** MOTORCYCLE MECHANICS INSTITUTE   **ACT NOW ▸**

around $90/hour. Instead of waiting to learn the hard way, read this and see the most common reasons a motorcycle ends up in the shop.



## Flake & Flames Interview with Jesper Bram

How would you feel about leaving your town to your the world, making a crowd-funded documentary on kustom kulture? Three years after the hot rods, motorcycles, pinup models, and rockabilly music of Flake & Flames hit the web, we say down to talk shop with Jesper. We've got his reflection on the documentary, his adventure, the impact on his life, what he's up to now, and his thoughts on a Flake & Flames: Part 2.



## The Best Websites for Motorcyclists

I've been doing this this online motorcycle thing for seven years. In …



**Safe Driving Bonus® Checks**
Only from Allstate

**@ Allstate**   **QUOTE NOW**


EXHIBIT
Vignette 8
3/18/17

Exhibit B

What you'll want depends entirely on your ride. Sportbike or other high-revving engine, you may want to make sure you're getting something with liquid cooling. Scooter or cruiser can probably get away with air-cooling. Many people say Harley-Davidson Sportsters never overheat, but if they do get hot, there are always things you can do, such as switching to a full synthetic motorcycle oil, or adding an OEM or aftermarket oil cooler.

Check out Adri's air-cooled 2007 Harley-Davidson Sportster!





## Have other questions?

You might also be interested in articles such as Disk Brakes vs. Drum Brakes, or Shaft Drive vs. Belt Drive vs. Chain Drive. Tap into our library of motorcycle knowledge here, or ask a question in the comments area below!

Tweet 8  Like 7  G+1 0  Sh...

<< Previous:
2007 Harley-Davidson Sportster XL-883

Next: >>
Honda Rebel 250cc Beginner
Motorcycle Review

## ABOUT YOUMOTORCYCLE

 YouMotorcycle is a lifestyle motorcycle blog to be appreciated by those who see motorcycling as a lifestyle and not simply a hobby, sport, or method of transportation. Most of the posts on the site are written by past and present motorcycle industry staff. We remain fiercely independent, innovative, and unconventional. Our goal is to encourage more people to enjoy the world's greatest outdoor sport by helping new riders get started and inspiring current riders to get out more. We motorcycle, do You?



## 10 COMMENTS

 alan B'stard MP (@alanBStardmp)
September 9, 2013 at 12:04 pm

water cooling on a bike is nonsense. Aircooled bikes don't overheat

Reply

 Jim
March 9, 2015 at 11:11 pm

I was sitting in traffic at Myrtle Beach. Couldn't move. I had to pull over and turn off the bike to cool (in 100 degrees no less). It was WAY over-revving. Then, I'd move a little, turn it off, move a little, turn it off.

## Exhibit B

Reply

## OUR FRIENDS

 



ADVERTISE HERE
For less than
a gallon of gas a month!



 Top 7 Best Apps for Motorcyclists
&#128340; February 27, 2014

 FAQ: How to Stage 1 Kit a Harley-Davidson Sportster
&#128340; June 5, 2011

 Suzuki Boulevard S40 Review
&#128340; April 7, 2012

 5 Reasons Your Motorcycle Won't Start & Goes to the Shop
&#128340; November 4, 2015

 Honda Rebel 250cc Beginner Motorcycle Review
&#128340; December 31, 2010

## FIND US ON FACEBOOK





**Eric Gumpher**
January 1, 2014 at 10:33 am

Hello,

Air cooled engines need much richer carburetion to cool them this means they pollute much more than liquid cooled engines. Liquid cooled engines can operate with carburetion set to burn all the fuel in the mixture. This chemical balance is called stoichiometric combustion where all the fuel is burned. Air cooled engines will never run with stoichiometric combustion because they would quickly overheat.

Water jackets in an engine act as sound insulators therefore liquid cooled engines are quieter than air cooled engines.

Its inevitable that governments will regulate motorcycle tailpipe emissions which will be the end of air cooled motorcycles.

Rgds
Eric

Reply



**Geoff Smith**
January 20, 2014 at 11:33 am

I am with Eric on this. Harley and those who have followed its lead have perfected the air cooled V-twin engine to the extent it can be. They are relatively clean and powerful, but a water cooled bike which allows tighter tolerances will pollute less and rev higher, producing more horsepower. The proof is riding on the road now. Look at the amazing power difference between Harley's lower displacement, water cooled V-Rod and their larger displacement cruisers.

I am riding my second Harley touring model and I love it, but I think by the time I get around to getting my next one it will be water cooled and it likely won't have push rods.

Jefe Smith

Reply



**musictoone@yahoo.com**
June 27, 2014 at 4:50 pm

I can't go back to air cooled. loved my yamahas but liquid cooling has been awesome in the las vegas desert. my vtx has a fan that comes on just like a car to keep cooling even if at a stop light. a few more parts? yes, but way worth it. if I didn't live in the desert? then air would be fine I think.

Reply



**Lewis Frank**
July 20, 2015 at 7:59 pm

Currently own Harley Road King(103) and it gets oppressively hot. I've had liquid cooled bikes and never had a problem with heat or cooling parts failure. I've got a friend with a 2014 Tri Glide(cooled heads) and they say it still gets very hot. Liquid cooled victory touring bike here I come!

Reply

Pingback: preparing your car for winter | bikerMetric

Pingback: Anonymous

Pingback: Honda Rebel 250cc Beginner Motorcycle Review - YouMotorcycle

Pingback: KYMCO Downtown 300i - YouMotorcycle

## WHAT DO YOU THINK?

Enter your comment here...

---

## @YOUMOTORCYCLE





An Introduction To The Safe Use Of Jumper Cables on Motorcycles https://t.co/AeT6R9KS1A https://t.co/p1GgJdjX94     2015/11/03

RT @Fuzzygalore: If you would have told 21 year old me that I would ever enjoy riding a motorcycle that was... https://t.co/o8yMMkZxjV https:...     2015/11/03

## SWEET DEAL ALERT!





COUNTDOWN TO
**BLACK FRIDAY**
DEALS WEEK
It's never too early for a good deal

› Shop now

## PRODUCTS



**Motorcycle Journeys Through North America: A guide for choosing and planning unforgettable motorcycle journeys**
$29.95 $18.32



**Generic Bestpriceam Anti Dust Cycling Bicycle Bike Motorcycle Racing Ski Half Face Mask**
$19.99 $9.99



**AMPP MotoBuff Motorcycle Surface Sealant and Polish**
$16.98



**TomTom RIDER Motorcycle GPS Navigator with Lifetime Maps**
$299.99



**The Essential Guide to Motorcycle Maintenance: Tips & Techniques to Keep Your Motorcycle in Top Condition**
$29.95 $20.94

## Exhibit B

© Copyright 2015, All Rights Reserved. Visit our brother site bikerMetric.



Exhibit B



# THE AMERICAN SPECTATOR

Car Guy

# Air-Cooled vs. Water-Cooled

Which bike is the more dependable ride?

By Eric Peters – 3.7.14

Most of us have a preference for one — or the other.

I own — and have owned — numerous examples of both types. There are pros — and cons — either way.

My '76 Kawasaki Kz900 is, of course, air-cooled. To be precise, it is air and oil-cooled — as all such bikes are. The engine castings are finned for a very functional reason: to help transfer — to radiate — heat away from the engine to the cooler surrounding air and so that airflow over the fins (and so on) can do the same thing. But oil is also used to keep the engine cool (as it does in water and oil-cooled bikes).

Because there is no other fluid to help keep things cool, the oil has to work harder in an engine sans water jackets, radiator and so on. It gets hotter — and thinner — faster. This is why many air/oil-cooled bikes have external oil coolers (mini-radiators, except for oil rather than anti-freeze) and — in some case — deep sump or additional capacity oiling systems.

If the engine is well-designed — and factory stock — and in good running order — usually, it will not overheat. However, if the engine was not well-designed, or if it's been modified to produce additional power — or it is not in good tune (running lean, for instance) it is more vulnerable to overheating and to heat-related damage.

I have modified my Kz900's engine to make more power. It has received a set of high-compression pistons and its displacement has been increased to 1015 CCs.

It makes more power now — but it also runs hotter. Quid pro quo, Clarice.

Here we come to one of the downsides of an air-oil cooled engine: Power production is limited (at least, as a practical matter) by the engine's ability to shed heat.

The Kz's plant is a DOHC four — the same basic layout used in many modern superbikes that have 180-plus hp and 180-plus MPH top speeds. But almost all of these engines are water-cooled. Because making that kind of power makes all kinds of heat — too much for air and oil alone to deal with. My bike's factory hp rating was 82. I've pushed that to around 120 or so. This approaches the limit of reasonableness for an air-cooled street motorcycle engine… if, that is, you'd like it to last. Drag bikes powered by the much-hopped-up versions of the old Zed big four make a lot more than 120 hp — but they only have to live for a few passes down the quarter-mile.

No idling in traffic when it's 95 degrees outside.

EXHIBIT

Exhibit B