

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PARVEZ & RAZIA YAZDANI | : CIVIL ACTION |
| v. | : NO. 2:15-cv-01427-PD |
| BMW OF NORTH AMERICA, LLC and BMW MOTORRAD USA, a Division of BMW OF NORTH AMERICA, LLC | : |

FILED
APR 20 2016
MICHAEL E. KUNZ, Clerk
By_____ Dep Clerk

## REPLY BRIEF IN SUPPORT OF THE MOTION OF DEFENDANT, BMW OF NORTH AMERICA, LLC TO PRECLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT, WILLIAM J. VIGILANTE, JR.

Defendant BMW of North America, LLC ("BMW NA")[1], filed a <u>Daubert</u> Motion to Preclude the Testimony of Plaintiffs' Expert, William J. Vigilante, Jr. Plaintiffs timely responded. BMW NA now files this Reply in support of its <u>Daubert</u> Motion.

Plaintiffs mischaracterize BMW NA's argument as an attack on the field of human factors and ergonomics as a whole. To the contrary, BMW NA does not doubt that William Vigilante is qualified in this field and <u>could</u> offer reliable opinions about the effectiveness of a product's warnings. ***But he does not do so in this case.*** Rather, BMW NA's attack on Vigilante arises because he has reached a litigation-driven conclusion, but by his own admission did not do the work necessary to support that conclusion, and the logical implications which flow from it. Plaintiffs repeatedly emphasize that Vigilante's methodology included consideration of industry standards and scientific literature. But those general considerations are insufficient; that veneer of science hides an utter failure to ask the questions or analyze the issues raised by Vigilante's

---

[1] BMW Motorrad USA is a division of BMW NA. Although it is a named defendant in this matter, it is not a separate legal entity.

1

opinions. A consideration of the logical steps needed to reach Vigilante's conclusions will make clear the lack of methodology underlying his results, and why his testimony should be precluded.

Plaintiffs have a problem. The Rider's Manual that accompanied Mr. Yazdani's motorcycle contained a clear warning that instructed users not to idle the motorcycle at a standstill, or a fire could start. Mr. Yazdani ignored this warning, and did precisely what he was instructed not to do; a fire was the result. We know the warning was clear because Vigilante recommends almost identical language for his version of the warning. Indeed, Mr. Yazdani testified that he understood the warning and the fire would not have occurred if he followed it. See Yazdani Deposition at 93:10-25.

To avoid this problem, Plaintiffs retained a human factors expert, William Vigilante, who needs to find a way to relieve users of the responsibility of reading the manual. Vigilante did exactly that, testifying that an operator had no obligation to read the manual if he <u>thought</u> he knew how to operate the motorcycle. See Vigilante Deposition at 165 ("If you think you can ride a bike without [the manual] then don't read it."); 244 (Q: "And if he knew how – if he thought he knew how to operate [the motorcycle], then he has no responsibility, in your opinion, to read the manual?" A: "I don't think so.").

But the Rider's Manual, like any manual, exists for a reason: to provide important instructions and warnings about the use of a product. If, as Vigilante contends, BMW NA cannot rely on the Rider's Manual to convey information, it then is reasonable to question how that information should be conveyed. Vigilante's conclusion in this case is to convey information by means of an on-product warning.[2]

---

[2] Plaintiffs note that on-product labels were issued as part of an earlier BMW NA recall campaign. However, that campaign involved different issues: an earlier model motorcycle, the R1100RSL, could overheat if left idling at a standstill, in some cases causing its fairing to ignite. The R1100RSL was discontinued, and a label and an insert for the Rider's Manual were issued for products sold before the recall that were still in the field. See Deposition

2

Conveniently, Vigilante opines only that the specific warning at issue in this case should appear in an on-product warning. The natural question that arises in response to that opinion is why only this particular warning is to be placed on the motorcycle. Is there no other information which otherwise would be in the Rider's Manual – which apparently cannot be relied upon to convey information – that the rider needs to know to safely operate it? Is there no other information within the 89-page Rider's Manual that should appear on the motorcycle itself? Presumably, following Vigilante's conclusions, the remaining 88 pages of the Rider's Manual, which address tires, brakes, headlights, necessary vehicle maintenance, operating instructions, and the like, can safely be ignored.[3]

Of course, that is not the case. Even Vigilante admitted the obvious implication that, if BMW NA could not rely on its Rider's Manual to impart information, then other portions of the Manual might have to appear on the motorcycle as well. See Vigilante Transcript at 188-90. But crucially, Vigilante did not consider any warnings other than the single warning at issue in this case to determine whether an on-product warning would be necessary. See id. at 194-96. In his own words, he "ha[s] not done that analysis." Id. at 196. Vigilante singled out the warning against idling as one that should appear on the motorcycle, not because he believes it is the most important warning, but because it is the only warning he thinks he needs to evaluate in this case:

> Q: Do you think the warning that you've been discussing about the risk of fire is the most important warning in regard to operating this motorcycle?
>
> A: The most important warning with respect to my opinions in this case, yes.
>
> Q: With respect to operating the motorcycle?

---

Transcript of Mark Yeldham, portions of which are attached hereto as Exhibit "G," at 168-71. The motorcycle at issue in this case, the R1150R, was designed without a fairing. In this case, Plaintiffs challenge the ignition of the oil sight glass, which was not at issue in the recall campaign. Vigilante recognized the distinction at his deposition. See Deposition Transcript of William Vigilante at 109-110.

[3] Plaintiffs argue that pointing this out is a "personal attack" on Vigilante and the field of human factors, rather than an exposure of his result-oriented conclusion whose bases can apply only to this case and, therefore, are not scientific.

3

> A: I don't think I went through all the different warnings for operating motorcycles.
>
> Q: So the answer is you don't know?
>
> A: I don't know.

Id. at 221.

By Vigilante's own admission, *he did not do the work* necessary to support his conclusions.

This is not simply a theoretical exercise. Vigilante also agreed that the presence of too many on-product warnings could create clutter and interfere with the awareness and understanding of warnings. Id. at 190. He suggested several methods, including usability testing and focus groups, to evaluate the efficacy of warnings and determine how many warnings are too many. See id. at 210-11. But Vigilante did not do any of those studies either. He did not evaluate any warnings or instructions contained in the Rider's Manual other than the warning against idling at issue in this case. See id. at 194-96.

Plaintiffs argue that Vigilante appropriately confined his analysis to the warning against idling because that specific warning is at issue in this case, and because it would not be relevant for him "to opine on the adequacy of the entirety of BMW NA's user manual." See Plaintiff's Memorandum of Law at 27 of 32. But Vigilante's approach has done exactly that, calling into question the entire manual, and opining that BMW NA cannot rely on it to convey important information. Having done so, and having further opined that some information in the Rider's Manual should appear on the motorcycle itself, of course it is relevant to ask which information should appear on the motorcycle. The question takes on added importance because of the possibility of clutter -- too many on-product warnings can interfere with the effectiveness of those warnings, so selectivity and judgment are necessary. Vigilante did not exercise that judgment, but simply ignored the issue.

4

Plaintiffs respond that Vigilante should not have had to analyze the clutter issue because usability studies and the like are incorporated into the industry standards he claims to have evaluated. See Plaintiffs' Memorandum of Law at 26-27 of 32. But again, Vigilante's analysis was limited to a single warning, cherry-picked for its importance to this case only. Vigilante's opinions lack the necessary context, as nowhere in his report or his testimony does he grapple with the issue of how many warnings are too many. Plaintiffs cite to no industry standard or scientific publication to support their claim that a product seller cannot rely on its manual to convey information, and yet only one piece of information – conveniently the subject of pending litigation – needs to be present in an on-product label.

Thus, Vigilante's reliance on industry standards and literature is insufficient. He used such items as a catch-all for the generic issues of warnings research. Vigilante cites nothing, and has tested nothing, to answer the very basic and important questions his parochial approach to this case raises. Why only one warning on the motorcycle? What other information is necessary on the product if BMW NA cannot rely on its manual to convey important information? How do you resolve the problem of too many on-product labels? These are questions that arise necessarily from Vigilante's approach, regardless of his credentials and the work he has done regarding warnings in general. These are questions which cannot be ignored in any reliably scientific analysis. And these are questions which Vigilante has chosen not to answer. His refusal to do so is understandable, because to answer them would be to reveal the fatal flaw in his approach.

Ultimately, Vigilante's conclusion ignores the obvious implications of his opinions (implications he himself acknowledges), and is not supported by the necessary testing or analysis. BMW NA is asking this Court to act as a gatekeeper, and to preclude the unsupported

and unreliable testimony of William Vigilante. Without the necessary methodology, Vigilante's opinions are nothing more than litigation-driven junk science and should not be admitted. See Oddi v. Ford Motor Co., 234 F.3d 136, 144 (3d Cir. 2000)(expert should be precluded for lack of demonstrable methodology); Williams v. United States, 321 F. App'x 129, 132 (3d Cir. 2009)(same); Scrofani v. Stihl Inc., 44 F. App'x 559, 562 (3d Cir. 2002)(same); Murray v. Marina Dist. Dev. Co., 311 F. App'x 521, 524 (3d Cir. 2008)(same); Furlan v. Schindler Elevator Corp., 864 F. Supp. 2d 291, 298 (E.D. Pa. 2012)(same).

Respectfully submitted,

**MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN**

BY: _____
KEITH D. HEINOLD
Attorney for Defendant
BMW of North America, LLC

2000 Market Street, Suite 2300
Philadelphia, PA 19103
215-575-2640 (P)
215-575-0856 (F)
kdheinold@mdwcg.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Reply Brief of Defendant, BMW of North America, LLC, was served this date, via the Court's electronic filing system, to the following counsel:

Patrick A. Hughes
de LUCA LEVINE, LLC
Three Valley Square
512 East Township Line Road
Suite 220
Blue Bell, PA 19422

                                    **MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN**

                              BY: _____
                                      KEITH D. HEINOLD
                                      Attorney for Defendant
                                      BMW of North America, LLC

                                      2000 Market Street
                                      Suite 2300
                                      Philadelphia, PA 19103
                                      215-575-2640 (P)
                                      215-575-0856 (F)
                                      kdheinold@mdwcg.com

**DATED:** _____

# EXHIBIT G

Mark Yeldham

```
                                                        Page 1

            IN THE UNITED STATES DISTRICT COURT

         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

    -------------------------------
                                    : CIVIL ACTION
    PARVEZ & RAZIA YAZDANI          :
                                    :
                                    :
       -vs-                         :
                                    :
    BMW OF NORTH AMERICA, LLC       :
                                    : NO. 2:15-cv-01427-PD
                                    :
    -------------------------------


                         - - -
                   DECEMBER 17, 2015
                         - - -
```

Oral deposition of MARK YELDHAM, held in the offices of Marshall Dennehey Warner Coleman & Goggin, P.C., 2000 Market Street, Suite 2300, Philadelphia, Pennsylvania 19103, commencing at 10:20 a.m. on the above date, before Robin M. Valentini, a Certified Court Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph | 917.591.5672 fax

deps@golkow.com

Mark Yeldham

Page 166

1   got the paint so hot that it would start to blister
2   away from the plastic and then create vapors that
3   could be ignited.
4       Q. The R 1150 R does not have a full fairing;
5   correct?
6       A. Does not have any fairing.
7       Q. Does not have any fairing.
8       A. Correct.
9       Q. I want to make sure I'm not confused,
10  which happens at times and often a lot.
11          The failure modes that we talked
12  about when leaving a bike running in the stationary
13  position or leaving the bike idling in a stationary
14  position, the oil sight glass heat damage to the
15  fairing, you also said heat damage to the wiring
16  harness.
17      A. Yes.
18      Q. That's in addition to the heat damage to
19  the fairings and the oil sight glass failure modes;
20  correct?
21      A. Yes.
22      Q. And in what model motorcycles have you
23  seen, again sticking with the situation of the bike
24  idling and in the stationary position, damage to the

Page 167

1   wiring harness that has resulted in a fire?
2       A. I can't remember specifically. I think I
3   may have had an R, like the subject motorcycle. I
4   think I may have had an RS, as well as an RT.
5           And as far as the R and the RS, the
6   area where the harness was damaged is underneath the
7   motorcycle or at the bottom area of the motorcycle,
8   usually in proximity of the side stand, or let's say
9   the center bottom of the motorcycle is where the
10  heat buildup would affect a wiring harness.
11          So, the R and the RS from, let's say,
12  the waist down is basically identical. So, whether
13  I remember if it was an RS or an R, it's basically
14  the same physical parameters. So it could have
15  happened to both or either.
16          And for the RT where I have more
17  bodywork down low, it may have happened as well, and
18  it may have -- you may consider the fact that
19  there's bodywork there. It's going to contain heat
20  and maybe it happened sooner, let's say.
21          But it's basically the same mechanism
22  in all the models.
23      Q. And were those incidents between 1995 and
24  the present?

Page 168

1       A. Yes.
2       Q. Are those incidents that you just
3   described contained within the document production
4   or the 25 claims produced in this case?
5       A. Yes.
6       Q. If you could turn to the next page from
7   the Service Bulletin that you were reading.
8       A. (Witness complies.)
9       Q. Can you tell me what this document is?
10      A. This is talking about a rider manual --
11  Rider's Manual insert, insert sheet for the
12  operating instructions of R 1100 RS.
13      Q. And I know this isn't a great copy. This
14  is what was, again, up on the NHTSA website.
15          It says: "Warning. Do not keep the
16  engine running while the motorcycle is at a
17  standstill, risk of overheating and fire. Ride away
18  immediately after starting the engine to prevent the
19  air cooled engine from overheating and further
20  damage. Even short warmup periods at a standstill
21  must be avoided. After a cold start avoid high
22  speeds until the engine has warmed up."
23      A. Correct. Yes.
24      Q. Similar to, but not identical to what's

Page 169

1   currently in the manual; is that correct, sir?
2       A. That's what I was just looking to see if
3   it was identical or not.
4           Back to --
5       Q. I think they're 950 and 955.
6       A. Okay. And 950 and 955 were identical?
7       Q. No, no, no. I was just giving you the
8   page numbers.
9       A. No. I'm saying, are those two identical
10  within the same manual?
11      Q. No.
12      A. I just want to see the warning.
13      Q. Sure. Take your time.
14          And the question that's pending is:
15  That's similar to the warning currently in the
16  manual, but not identical; would you agree?
17      A. Yes.
18      Q. In addition to the manual insert with a
19  new warning that BMW NA was sending out to users,
20  were there any other remedies that were a part of
21  this recall?
22      A. No.
23      Q. Okay.
24      A. Oh, I'm sorry.

43 (Pages 166 to 169)

Mark Yeldham

Page 170

1 The insert for the Rider's Manual and
2 the label that goes on the steering head.
3 Q. And what was the label?
4 A. That's shown on Page 3 of the Bulletin.
5 It's shown in several different languages.
6 English being: "Avoid increased
7 idle" -- there are six labels shown here, and one of
8 them is in English. "Avoid increased idle speed at
9 a standstill with choke in use. Risk of overheating
10 and fire."
11 Q. Whose decision was it to include an
12 on-product label as part of the remedy to this
13 recall campaign?
14 A. BMW AG.
15 Q. Do you know why BMW AG decided to include
16 an on-product label with this remedy in addition to
17 revising the warning and sending out a new manual
18 insert?
19 A. What they wanted to do was -- well, here's
20 the key. As soon as BMW AG investigated this
21 problem, and decided that they needed to notify the
22 operators, they stopped selling the RSL with the
23 lower fairing. So that eliminated the risk of new
24 models that have not been produced yet of this

Page 171

1 scenario of the blistering of the paint on the lower
2 fairing. That eliminated that because there now is
3 no lower fairing.
4 So, in order to reduce the risk of
5 this occurring to motorcycles that have already been
6 sold into the stream of commerce, they decided to
7 put the label on the motorcycle itself.
8 Q. How do you know that information?
9 A. Well, it's -- I was -- it's a long time
10 ago, but I believe I was told that, and -- yes, I
11 was informed by BMW NA Motorrad Department of the
12 basics of this recall.
13 And I was informed of the decision
14 that they would stop selling the motorcycle with the
15 lower fairing, the RSL model, in the United States.
16 I'm not aware if they stopped selling it in other
17 countries. I can only speak for the United States.
18 So, it's just the simple logic that,
19 if you stop selling the bike, then you don't have a
20 reason to put a label on the -- now you don't have a
21 reason to put the label on the bike without the
22 fairing. But you have a certain number of these
23 bikes that have already been sold and they're out on
24 the street. They decided they needed to put the

Page 172

1 label on that.
2 Q. Well, wouldn't the insert in the manual be
3 sufficient?
4 A. Well now you're asking me an opinion
5 because I -- the insert in the manual is --
6 MR. HEINOLD: You don't have to give an
7 opinion.
8 MR. HUGHES: And I'm not asking for an
9 opinion.
10 MR. HEINOLD: It sounded like one.
11 MR. HUGHES: I didn't say, what is your
12 opinion?
13 MR. HEINOLD: You said, wouldn't it be?
14 MR. HUGHES: I'm trying to shorten it up.
15 I tried getting that past you. He's still
16 awake.
17 MR. HEINOLD: Barely. But now I'm awake
18 again.
19 MR. HUGHES: Let me ask it another way.
20 I'll get there. Just give me a second.
21 MR. HEINOLD: I think you can ask him
22 factually what went into that decision if he
23 knows.
24 MR. HUGHES: Yes. And I think he already

Page 173

1 testified to that.
2 MR. HEINOLD: He doesn't know.
3 BY MR. HUGHES:
4 Q. Other than what you testified about
5 factually what went into the decision to also send
6 out a label to be placed on the motorcycle in
7 addition to the revised warning and insert?
8 A. I have nothing more to offer than what I
9 said.
10 It's simply the fact that these
11 vehicles were already out in the field, and they
12 couldn't -- there was no practical way to retrofit a
13 new fairing or less of a fairing or cut off the
14 fairing.
15 And one of the reasons why the RSL
16 was sold and the full fairing -- what I'm trying to
17 say is that there would be a certain number of
18 customers that bought that bike because of the way
19 the fairing looked or the way the motorcycle looked,
20 and by taking the fairing off or half the fairing
21 off, it would be more than just a modification to
22 address a product issue.
23 So, if you take the lower fairing
24 away, you no longer have the risk, which is what we

44 (Pages 170 to 173)