# EXHIBIT B-1

# In The Matter Of:

*Yazdani  vs.*
*BMW*

---

*William Vigilante, Jr., Ph.D.*
*March 15, 2016*

---

*Thomas G. Oakes Associates*
*535 Route 38 East, Ste. 330*
*Cherry Tree Corporate Center*
*Cherry Hill, NJ  08002*
*National Toll-Free Scheduling Line: 1.877.625.3777*



Original File 3-15-16 - Yazdanio v BMW - William Vigilante Jr.txt
**Min-U-Script® with Word Index**

## Page 1

1      IN THE UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                   - - -

3   PARVEZ and RAZIA        :
    YAZDANI
4         Plaintiffs,       :

5         -vs-              :

6   BMW OF NORTH AMERICA,   :
    LLC
7       and                 :
    BMW MOTORRAD USA, a
8   Division of BMW OF      :
    NORTH AMERICA, LLC
9       Defendants     : NO. 2:15-cv-01427-PD

10               - - -
              Tuesday, March 15, 2016
11               - - -

12       Oral deposition of WILLIAM J.

13   VIGILANTE, JR., PhD, CPE was taken at the Law

14   Offices of deLuca Levine, Three Valley Square,

15   Suite 220, Blue Bell, Pennsylvania, commencing

16   at 10:00 a.m., before Debra J. Veneziale,

17   Court Reporter and Notary Public; in and for

18   the Commonwealth of Pennsylvania.

19

20               *  *  *

21

22        THOMAS G. OAKES ASSOCIATES
           National Court Reporting &
23         Litigation Support Services
24   Phone: 1.877.OAKES.77  Fax: 1.888.344.3778

## Page 2

1   APPEARANCES:

2        deLUCA LEVINE
          BY:  KENNETH T. LEVINE, ESQUIRE
3        klevine@delucalevine.com
          Three Valley Square, Suite 220
4        Blue Bell, Pennsylvania  19422
          Phone: (215) 383-0227
5        Representing the Plaintiffs

6

7        MARSHALL DENNEHEY WARNER COLEMAN
             & GOGGIN
8        BY:  KEITH D. HEINOLD, ESQUIRE
          kdheinold@mdwcg.com
9        2000 Market Street, Suite 2300
          Philadelphia, Pennsylvania  19103
10       Phone: (215) 575-4552
          Representing the Defendants

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## Page 3

1              I N D E X
2                - - -

3   WITNESS

4

5     WILLIAM J. VIGILANTE, JR., PhD, CPE

6

7   EXAMINATION                    PAGE

8     BY MR. HEINOLD                 5

9

10              - - -

11         E X H I B I T S

12            - - -

13

14   NUMBER      DESCRIPTION        PAGE MARKED

15   Vigilante-1   Report              120

16   Vigilante-2   Case List           120

17   Vigilante-3   Curriculum Vitae    120

18   Vigilante-4   Rider's Manual      120

19   Vigilante-5   Warning             222

20   Vigilante-6   Photographs         223

21   Vigilante-7   Sound Rider Article       250

22   Vigilante-8   You Motorcycle Article    252

23   Vigilante-9   American Spectator Article  253

24   Vigilante-10  Motorbike Writer Article   255

## Page 4

1   NUMBER      DESCRIPTION        PAGE MARKED

2   Vigilante-11  Revzilla Docuemnt         257

3   Vigilante-12  Photographs         258

4   Vigilante-13  Photographs         261

5   Vigilante-14  Photographs         262

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 5

1    THE COURT REPORTER: Usual
2 stipulations?
3    MR. HEINOLD: Yes.
4    MR. LEVINE: Yes.
5    - - -
6    (It is hereby stipulated
7 and agreed by and between counsel for
8 the respective parties that sealing,
9 certification, and filing are waived
10 and that all objections, except as to
11 the form of questions, be reserved
12 until the time of trial.)
13    - - -
14    WILLIAM J. VIGILANTE, JR.,
15 PhD., CPE, after having been first duly
16 sworn, was examined and testified as
17 follows:
18    - - -
19    EXAMINATION
20    - - -
21    BY MR. HEINOLD:
22 Q.  I know you've been deposed.
23   You don't need instructions from me about a
24   deposition, do you?

---

Page 6

1 A.  I don't think so.
2 Q.  Okay.  Tell me about your
3   business organization.  What's the official
4   name?
5 A.  I'm doing business as Vigilante
6   Forensic.  The LLC is Vigilante Consulting.
7 Q.  Okay.  How big is your
8   organization?
9 A.  You're looking at it.
10 Q.  No staff.
11    MR. LEVINE: I'm not on his
12 staff.
13    MR. HEINOLD: I'm not looking
14 at you.
15    THE WITNESS: No staff.
16    BY MR. HEINOLD:
17 Q.  You do everything yourself?
18 A.  Yes.
19 Q.  Do you outsource any of it?
20 A.  No.
21 Q.  So everything that you've done
22   here for this case is all you?
23 A.  All the work that I've done,
24   yes.

---

Page 7

1 Q.  Yes, all the work that you've
2   done.  Well, all the work that's been done,
3   the report, Vigilante Forensic is you, has
4   been done by you?
5 A.  That's correct.
6 Q.  You issued a report in this
7   case?
8 A.  Yes.
9 Q.  Is that your only report?
10 A.  Yes.
11 Q.  No others?
12 A.  No others.
13 Q.  No supplements?
14 A.  No supplements.
15 Q.  Is it full and complete to your
16   knowledge right now?
17 A.  As of the day I wrote the
18   report it is.
19 Q.  Is there something more that
20   you would add to it?
21 A.  Well, I've since received a
22   report of the defense expert.
23 Q.  Kevin Breen?
24 A.  Yes, Kevin Breen.

---

Page 8

1 Q.  And has that caused you to
2   change your opinions?
3 A.  It has not caused me to change
4   my opinions, but it does lead to additional or
5   new opinions.
6 Q.  Okay.  Can you tell me what
7   your new opinions are?
8 A.  Basically they're in rebuttal
9   to his report.  I don't believe that what he's
10   stating in his report is correct.  I take
11   issue with several of the points that he made
12   in his deposition, and I'm happy to go through
13   them if you would like.
14 Q.  Okay.  Let's get to that a bit
15   later.
16    How long have you been working
17   as Vigilante Forensic?
18 A.  Since October of 2015.
19 Q.  What were you prior to that?
20 A.  I was an employee of Robson
21   Forensic.
22 Q.  Were you doing the same type of
23   work?
24 A.  Yes.

---

Page 9

1  Q.  Human factors?
2  A.  Yes.
3  Q.  What do you describe as human
4  factors?
5  A.  Basically human factors are
6  ergonomics, which is a synonym, is a science
7  that studies how people interact with their
8  use of all different types of products,
9  machines, systems and environments.
10     And what we're interested from
11  the human factors side is the person that's
12  using the products.  We're interested in their
13  perceptual abilities, that is their ability to
14  see, hear and capture information from the
15  environment, how they process that information
16  and make decisions.  How things such as
17  expectancies and prior experiences affect how
18  we perceive things and how we make decisions.
19     We are also interested in
20  people's physical abilities and limitations.
21  For example, strengths and weaknesses, ability
22  to lift, range of motion, sizings of people,
23  human gait or ability to walk, run, so forth.
24     And then we as a field in a

Page 10

1  professional's work with engineers, designers
2  and architects design products, machines and
3  systems that are easy to use, that are
4  efficient to use and most importantly are safe
5  to use.
6  Q.  Do you work in any capacity
7  other than forensics?  Do you know what I mean
8  by that?
9  A.  Sure.  I do traditional
10  consulting work at times.
11  Q.  What percentage of your work is
12  what you refer to as traditional consulting
13  work?
14  A.  Traditionally it's been a small
15  percentage, anywhere from five to 10 percent.
16  At some point of the year it's zero percent.
17  Q.  When you say percentage, are
18  you talking about percentage of the income you
19  create from it, or are you talking about the
20  percentage of projects?
21  A.  I think they're probably
22  positively correlated, so both.
23  Q.  What percentage of your work do
24  you do for Plaintiffs?  And when I say

Page 11

1  Plaintiffs, I'm talking about in the
2  litigation setting where you are criticizing
3  the warning.
4  A.  Yes, overall my case work tends
5  to trend about 60, 65 Plaintiff, Defendant.
6  Q.  60 to 65 Plaintiff?
7  A.  Yes.
8  Q.  And the rest is Defendant?
9  A.  35, 40 Defendant.
10  Q.  All right.  How many of your
11  Plaintiff clients are insurance companies?
12  A.  Subrogation work is maybe 30
13  percent of my work.
14  Q.  Of your total?
15  A.  Yes.  Maybe that's little high.
16  Q.  How about for Allstate?
17  A.  Allstate, like total percentage
18  of work?
19  Q.  Allstate Insurance, how much
20  work do you do for them?
21  A.  I don't have a number to give
22  you.
23  Q.  Can you give me an
24  approximation?

Page 12

1  A.  I don't think I can give you
2  that.  It would be a wild guess.  I don't
3  track information based upon insurance
4  carrier.
5  Q.  Okay.  Well, how many cases do
6  you have open right now?
7  A.  Open cases, I'm going to say
8  around 50.
9  Q.  And how many of them are
10  currently open that you're retained on behalf
11  of Allstate?
12  A.  I don't know.  I would say that
13  there's at least one other, but I don't know
14  how many more if there is more than that.
15  Q.  How about this office, deLuca
16  Levine, how much work do you do for this
17  office?
18  A.  I've done work for them in the
19  past, and I'm currently working on other cases
20  for them.
21  Q.  And what percentage of your
22  business would you say is from this office or
23  iterations of this office?
24  A.  Yes, maybe less than five

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 13

1  percent.
2  Q.  How many do you have currently
3  open?
4  A.  I have maybe five, six cases
5  open.
6  Q.  Are any of those on-product
7  warning cases?
8  A.  Yes.
9  Q.  How many?
10  A.  All of them.
11  Q.  On product?
12  A.  Yes.
13  Q.  In each of those cases are you
14  advocating for an on-product warning?
15  A.  In each of those cases I'm
16  advocating to my opinion.
17  Q.  Is your opinion that there
18  should be an on-product warning?
19  A.  It depends on the case.
20  Q.  So the answer to my question
21  would be no, not each of the cases you're
22  advocating for an on-product warning?
23  A.  It depends on the case.  I
24  don't recall the cases at the moment.  So some

---

Page 14

1  of them may be on-product.  Some of them may
2  not be.  It may not be relevant.
3  Q.  All right.  I'm lost, so let me
4  start over.
5  A.  Sure.
6  Q.  You said you have five or six
7  cases currently with this office?
8  A.  Yes, five or six additional
9  cases.
10  Q.  Additional cases.  And I asked
11  how many of those involve the issue of
12  on-product warning and I thought you said all
13  of them?
14  A.  Yes, maybe I misunderstood the
15  question.  They're all warnings cases.
16  Q.  Yes.
17  A.  I don't recall if all of them,
18  in my opinions, I've come to the opinion that
19  they needed an on-product warning.  Some of
20  them may have been that the on-product warning
21  provided was not effective, and some of them
22  may not have involved an on-product warning at
23  all.
24  Q.  Have you issued reports in each

---

Page 15

1  of those cases, or are you involved in a case
2  where you haven't yet issued a report?
3  A.  I think most of them I have
4  issued a report.  There may be one or two that
5  I haven't.
6  Q.  Any of them involve
7  motorcycles?
8  A.  No.
9  Q.  Have you ever had a motorcycle
10  case before?
11  A.  In what way?  I've been
12  involved in motorcycle cases in the past where
13  they've been involved in collisions, whether
14  they be multi vehicle or single vehicle,
15  whether they be a dirt bike type vehicle or a
16  road vehicle.  So I've been involved in
17  motorcycle cases in the past.
18  Q.  Well, how about motorcycle
19  cases where the issue is warning?
20  A.  I don't recall any offhand.
21  Q.  Do you own a motorcycle?
22  A.  Yes.
23  Q.  What do you own?
24  A.  I own a Harley-Davidson Softail

---

Page 16

1  Deluxe 2007.
2  Q.  Is that air-cooled?
3  A.  It is air-cooled.
4  Q.  Does it have any warning
5  stickers affixed to it?
6  A.  I don't think that there's any
7  warning stickers on the exterior of the
8  surfaces.  There may be some under the seat,
9  but I don't recall offhand.
10  Q.  Okay. If you don't recall, then
11  this is probably an unfair question, but what
12  would the stickers under the seat say?
13  A.  My guess, if I have to guess,
14  is that they deal with the electrical system.
15  Q.  Okay.  You're not aware of any
16  other stickers?
17  A.  Nope.
18  Q.  Is this an air-cooled engine?
19  A.  Yes.
20  Q.  Do you idle it at a standstill?
21  A.  Yes, I do.
22  Q.  Okay.  For how long?
23  A.  I've been known to idle it for
24  up to 30 minutes sitting in my garage warming

---

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 17

1   up, the same thing Mr. Yazdani was doing on
2   the day of the incident.
3   Q.   How often?
4   A.   Every winter, because I do the
5   same thing that Mr. Yazdani did.  I would
6   start the bike every couple weeks and I would
7   let it run at least 10 minutes, sometimes 20,
8   sometimes up to 30.
9   Q.   Would you do that if there was
10  an item in the manual that said don't do that
11  because it might catch a fire?
12  A.   It doesn't say that in my
13  manual.  In fact, it tells me --
14  Q.   I said if it did.
15  A.   I'm sorry, in my manual it
16  tells me that you're supposed to let it idle
17  and warm up.  If there was a warning in the
18  manual, I would have to see it and figure out
19  why it's there, determine what the
20  consequences are.
21  Q.   The warning in your Softail
22  manual says what about warming it up?
23  A.   There is no warning against
24  warming it up.  It's an instruction that says

Page 18

1   to leave the bike idle and warm up.
2   Q.   Does it say how long?
3   A.   It says:  Starting the Engine,
4   Caution:  The engine should be allowed to run
5   slowly for 15 to 30 seconds.  This will allow
6   the engine to warm up and let oil reach all
7   surfaces needing lubrication.  Failure to
8   comply can result in engine damage.
9   Q.   That is 15 to 30 seconds?
10  A.   Yes.
11  Q.   When you idled your
12  Harley-Davidson -- do you still own it?
13  A.   Yes.
14  Q.   When you do that, how did you
15  determine what was the safe period of time to
16  do it?
17  A.   First of all, I didn't know
18  that there was an unsafe limit on how long to
19  leave it idle at a standstill.  I'm not sure
20  that there is an unsafe time period to leave
21  it idle at a standstill.  So obviously that
22  doesn't apply to my bike.
23      And this is the third
24  Harley-Davidson I've owned, and I've let all

Page 19

1   of them idle for multiple minutes in the
2   winter because I don't winterize the bike
3   because I like to ride them through the winter
4   months when it get a little bit warmer.
5      So I will start them every
6   couple weeks, this has been my practice for a
7   number of years, and let them idle.  How long
8   I let them idle, I let them at least idle 10
9   minutes and sometimes I let them go longer,
10  depending upon what I'm doing.
11  Q.   You let them go longer by
12  choice or you let them go longer because you
13  were distracted and didn't get back to it
14  after 10 minutes?
15  A.   Well, I don't think it's
16  necessarily that I was distracted and didn't
17  get back to it.  It's that I didn't have a
18  concern to let it go a little bit longer if I
19  was involved in something else.
20  Q.   Was it your intent to leave it
21  run for 30 minutes, or did you become involved
22  in something else and not think about it?
23  A.   Yes, I became involved in
24  something else and didn't think about it.  But

Page 20

1   it wasn't my intent not to let it run for 30
2   minutes.
3   Q.   What were the other two
4   Harley-Davidson motorcycles that you owned?
5   A.   I owned a 2006 Softail Deuce
6   and a maybe 2004 Sportster 880.
7   Q.   Do you only own the one now?
8   A.   Yes.
9   Q.   You only one at a time?
10  A.   Yes, that's all my wife will
11  allow.
12  Q.   Understood.  2004, what was it?
13  A.   Sportster.
14  Q.   And you said you did the same
15  in terms of starting them up?
16  A.   Yes.
17  Q.   All right.  When you obtained
18  each of these motorcycles, were they new?
19  A.   They were all used.
20  Q.   Did you get a manual with them?
21  A.   I don't think I got a manual
22  with any of them.
23  Q.   Did you secure a manual?
24  A.   I did for the '07 Deluxe.  I

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 21

1   don't recall if I did for '06 Deuce.
2   Q.   What about the '04 Sportster?
3   A.   I don't recall.
4   Q.   Why did you get a manual for
5   the '07 Deluxe?
6   A.   Well, typically I do my own
7   work, so I purchased the manual and the
8   service guide so if I have to add something,
9   take something off, do some work I have the
10   material I need to understand how to do so.
11   Q.   When you say you do your own
12   work, are you talking about doing your own
13   maintenance?
14   A.   Sure.  Then I do my own
15   customization.
16   Q.   What kind of customization work
17   do you do?
18   A.   Well, for example, on the
19   Deluxe I replaced the handlebars, the risers
20   and the controllers up front, replaced the
21   cables, clutch cable, brake cable, upgraded
22   them to stainless.  So different things like
23   that.
24   Q.   How long have you been riding

Page 22

1   and working on motorcycles?
2   A.   I started riding when I was
3   preteen, dirt bikes at the time, and then
4   there was a lapse before I bought my first
5   Harley, when I could afford to buy my first
6   Harley.
7   Q.   How long have you owned bikes?
8   A.   Well, I owned them since I was
9   preteen.
10   Q.   How long have you owned
11   Harleys?  When did you buy the 2004?
12   A.   Where or when?
13   Q.   When, what year?
14   A.   I'm going to say maybe 2007,
15   2008.
16   Q.   Did you own bikes before that?
17   A.   I did own bikes before that.
18   Q.   What did you own?
19   A.   I owned dirt bikes.
20   Q.   What type?
21   A.   I had a Yamaha.  That's it.
22   Q.   Just one?
23   A.   Yes.
24   Q.   And when did you buy that?

Page 23

1   A.   Maybe when I was 12, 13.
2   Q.   And had it for how long?
3   A.   I had it until about 17, 18.
4   Q.   And then you had nothing until
5   you bought the Sportster?
6   A.   That's right.
7   Q.   How old are you now?
8   A.   Forty four.
9   Q.   Do you consider yourself an
10   expert in motorcycles?
11   A.   I consider myself maybe an
12   advanced motorcyclist.  I'm not sure that
13   expert would be the correct term.
14   Q.   So the answer to my question is
15   no?
16   A.   The answer to your question is
17   what I gave you.
18   Q.   Can you answer that question
19   yes or no, are you an expert -- do you
20   consider yourself an expert in motorcycles?
21   A.   I would consider myself an
22   advanced rider.
23   Q.   Okay.  Well, we're in a court
24   of law and people are going to be declared

Page 24

1   experts or not.  Are you an expert in
2   motorcycles for purposes of your opinion here
3   today?
4   A.   It depends on the question as
5   to whether or not I'm an expert in that area
6   as it relates to motorcycling.  So if we're
7   talking about rider behavior, I would consider
8   myself, with the experience, knowledge,
9   education and training, to be an expert in
10   that area.
11   If you're talking about whether
12   or not I can whip a bike around the racetrack
13   at 150 miles an hour, I would consider myself
14   not an expert.
15   Q.   How about in design?
16   A.   It depends on the issue.
17   Q.   Outside of the warning issue?
18   A.   It depends on the issue.
19   Q.   What issues do you consider
20   yourself an expert in design of the
21   motorcycle?
22   A.   If there's issues related to
23   controls and displays, I consider myself an
24   expert in the design for a motorcycle or any

Page 25

1  other product.
2  Q.  All right.  How about other
3  than controls and displays?
4  A.  It depends on the issue.
5  Q.  What issues do you consider
6  yourself an expert in motorcycles other than
7  design and displays generally?
8  A.  Controls, displays,
9  instructional information, warnings.  It could
10  involve training.  It depends on the question.
11  Q.  How about an expert in
12  mechanical operations of a motorcycle, any
13  design and the way it operates?
14  A.  I won't be offering any
15  opinions with regard to the mechanical design
16  of the motorcycle unless I'm asked.
17  Q.  Are you an expert in the issues
18  of mechanical design of motorcycles?
19  A.  Again, it depends on the
20  question.  If I'm asked the question, I'll be
21  happy to answer.  My opinions, as I plan on
22  giving them, are set forth in my report which
23  deal with failure to provide adequate warning.
24  Q.  Are you an expert on how the

Page 26

1  oil system of an air-cooled motorcycle should
2  be designed?
3  A.  I never designed the --
4  Q.  You can answer that yes or no.
5  Can you not answer that question yes or no?
6  A.  Well, first of all, I can
7  answer it if you allow me to finish and not
8  interrupt me.  Second, I'll answer the way I
9  feel best.  If that works for you we can
10  continue.  Otherwise, we can stop now and come
11  back at a later time.
12  Q.  No, we're not going to stop.
13  I'm going to ask the question, you're going to
14  answer the question.  If I don't feel you
15  answered my question, I'll ask you again.  And
16  if I don't feel you answered it again, I'll
17  ask it again.  If we get to the point where
18  you don't answer my questions, perhaps then
19  we'll stop and we'll come back at a later
20  time.
21  So, do you consider yourself an
22  expert in the design of the oil system in an
23  air-cooled motorcycle?
24  A.  Yeah, I would not consider

Page 27

1  myself an expert in the design.  I never
2  designed an air-cooled engine or the oil
3  system for an air-cooled engine.  But there
4  are aspects of it that I may be or have expert
5  insight into, including potentially the
6  problems with the location of the oil sight
7  glass being on the left side of the crane case
8  as opposed to the right side and the potential
9  problems it creates based upon BMW's
10  substandard design.
11  Q.  What is your expertise in
12  motorcycle design that you feel permits you to
13  offer that type of opinion?
14  A.  Well, first of all, I don't
15  plan on offering it unless I'm asked.  But I'm
16  not going to cut myself off from being able to
17  answer it if you do, in fact, ask it.
18  So, again, my opinions as I
19  plan to give them are laid out in my report.
20  If you want to go into these other areas, I
21  want to reserve my ability to answer them.  So
22  it depends upon the question.
23  MR. LEVINE:  May I interject
24  for just a moment.  As you noticed, I haven't

Page 28

1  been very obstructive.  It is my understanding
2  that Mr. Vigilante's testimony, the scope of
3  will be within the four corners of his report,
4  although, they may be expanded by some
5  responses to your experts' report.  While I do
6  appreciate you're trying to understand the
7  full scopes of his expertise, we are only
8  offering him as an expert within the four
9  corners of his report.
10  BY MR. HEINOLD:
11  Q.  Have you ever written any
12  articles on motorcycle warnings?
13  A.  Not specifically to motorcycle
14  warnings.
15  Q.  Have you done any research on
16  motorcycle warnings?
17  A.  Not specific for motorcycle
18  warnings, but I have done a whole lot of
19  research on the factors that affect the
20  adequacy of product warnings, and I've done
21  research on the perceptions of motorcycle
22  riders for different issues and topics.
23  Q.  Operational issues?
24  A.  Yes.

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 29

1  Q.   Any presentations on motorcycle
2  warnings?
3  A.   Not specifically on motorcycle
4  warnings.
5  Q.   Okay.  Any articles or research
6  or presentations on on-product motorcycle
7  warnings?
8  A.   Not related specifically to
9  on-product warnings, but generally related to
10  motorcycle on-product warnings, yes.
11  Q.   Generally, how?
12  A.   Because they deal with product
13  warnings for all, not specifically a
14  motorcycle or specifically another widget, but
15  that apply to all products.
16  Q.   Have you written any articles
17  on on-product labels?
18  A.   Yes.
19  Q.   What have you written on
20  on-product warnings?  Is it in your C.V.?
21  A.   Yes.
22  Q.   Can you identify which ones are
23  related to on-product warnings?
24  A.   Sure.  Do you have a version

---

Page 30

1  date on there just so we're talking --
2  Q.   I have the version date that
3  you gave me, November 1, 2015.
4  A.   Okay.
5  Q.   Is there an updated version?
6  A.   There looks like that's the
7  most updated version.  So, Page 5, the first
8  one is a Joyce, Byrd, Vigilante, Wogalter
9  article dealing with labeling and format
10  preferences for on-product warnings and
11  labels.
12  Q.   Page 5, the one that says
13  Over-the-counter drug labeling?
14  A.   Correct.  The second one,
15  Consumers' interpretation of the statement:
16  "Do not leave (insert product here)
17  unattended."  That is both on product and in
18  manual.
19  Q.   What was your conclusion in
20  that article?
21  A.   I'm sorry?
22  A.   The Consumers' interpretation
23  of the statement, "Do not leave blank
24  unattended", what was your conclusion?

---

Page 31

1  A.   Generally, my conclusion is
2  that consumers have a different expectation or
3  understanding of that phrase as opposed to the
4  intention of the manufacturer.
5  Q.   Meaning what?
6  A.   Meaning that they believe the
7  phrase means something different than what the
8  manufacturer intended.
9  Q.   What do you believe they mean?
10  A.   Well, the manufacturer often
11  means it or intends it to mean don't leave the
12  product out of your site, whereas the consumer
13  believes that as long as the product is in
14  what they believe to be a safe state, they can
15  go about their daily lives coming back to
16  check on it on a periodic basis.
17       Particularly, not aware that
18  there's a potential fire hazard or other
19  hazard associated with the product that it can
20  occur at any moment without forewarning or
21  advanced forewarning.
22  Q.   You mean like don't leave this
23  because it might catch on fire?
24  A.   Sure.

---

Page 32

1  Q.   And that would send a different
2  message than just don't leave this unattended?
3  A.   Well, I think you're maybe
4  minimizing the issue.  It's better off to read
5  the paper.  I don't remember everything that's
6  in the paper.  I've given you the general --
7  Q.   Do you still have these papers?
8  A.   I'm sure I do.
9  Q.   If I requested them, you would
10  be able to find them and produce them?
11  A.   I might.  You can also obtain
12  them.  These are all publicly available.
13       Do you want me to continue?
14  Q.   Sure.
15  A.   The next one is the top of Page
16  6, Nemire and Vigilante.  Page 7, the first
17  one related to on-product is Vigilante
18  Wogalter 1999.
19       MR. LEVINE: Can you just spell
20  Wogalter for her?
21       THE WITNESS: W-O-G-A-L-T-E-R.
22  The second one also deals with on-product
23  labeling, Vigilante, Wogalter 1998.
24       BY MR. HEINOLD:

---

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 33

1  Q.  Did you study under him?
2  A.  Mike Wogalter is my major
3  advisor.  Wogalter, Conzola and Vigilante,
4  2006 is applicable to the design of the text
5  in on-product warnings.  There's a similar
6  publication under that, Wogalter, Vigilante,
7  1999.
8      Next page, Wogalter, Vigilante,
9  2006 is a book chapter related to the
10  attention switch and maintenance of warnings
11  both on product and in manual.  Wogalter,
12  Vigilante 2010 deals with formatting of on
13  product labels.
14  Q.  Some of these were written when
15  you were a student at NC State?
16  A.  Some of them were done while I
17  was a graduate student at North Carolina State
18  University.
19  Q.  I also saw in your C.V. that
20  you listed the Motorcycle Safety Foundation.
21  What is that?
22  A.  The Motorcycle Safety
23  Foundation is a nonprofit organization in this
24  country that looks to improve the safety of

Page 34

1  motorcyclist by offer of training and
2  education.  Many states, such as Pennsylvania,
3  it's Motorcyclist Safety Foundation classes
4  are offered free to licensed motorcyclists in
5  those looking to be a licensed motorcyclist.
6  Q.  What are the important issues
7  of safety that they're dealing with, mostly
8  operation?
9  A.  Mostly operation, and some of
10  them deal with, for example, precheck
11  inspections of the motorcycle.  But most of
12  the emphasis is on road training safety.
13  Q.  Have you published anything in
14  your work in that organization?
15  A.  I have not.
16  Q.  Do you serve -- in what
17  capacity do you serve in the organization?
18  A.  I don't serve in any capacity.
19  I've taken some of their education that they
20  offer.
21  Q.  You're a member?
22  A.  I'm not a member.
23  Q.  You're not a member.  There's
24  just classes that you take?

Page 35

1  A.  Sure.
2  Q.  Are they operational classes?
3  A.  Well, again, they deal with
4  basic rider course.  It deals with everything
5  from personal protective equipment to pretrip
6  inspections, the correct purchasing of the
7  equipment to issues related while you're
8  riding or traveling.
9  Q.  How many classes have you
10  taken?
11  A.  I've taken two.
12  Q.  And when did you take those?
13  A.  The basic rider course was
14  probably 2005.  The off-highway motorcycle
15  course maybe 2006, 2007.  Or I'm sorry, the
16  basic rider course was 2006, 2007.  The
17  off-highway motorcycle course was maybe a year
18  or two before that.
19  Q.  Anything about warnings in that
20  organization?
21  A.  How do you mean?
22  Q.  Well, anything taught about
23  warnings?
24  A.  Well, I'm sure they give plenty

Page 36

1  of warnings.
2  Q.  You said you took two classes.
3  Anything about warnings in those two classes?
4  A.  I don't understand what you're
5  asking me.
6  Q.  You're not a member of the
7  organization?
8  A.  That's correct.
9  Q.  You don't serve it in any
10  capacity?
11  A.  I don't serve it in any
12  capacity, that I'm aware of.
13  Q.  You don't hold a position where
14  you're an officer or a director or anything of
15  that nature?
16  A.  No, I do not.
17  Q.  Have you taught classes there?
18  A.  No, I have not.
19  Q.  So you've taken two classes?
20  A.  That's correct.
21  Q.  One was basic rider class and
22  one was an off-road riding class?
23  A.  That's correct.
24  Q.  And neither of those two

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 37

1  classes, did they address the issue of
2  warnings, motorcycle warning, manual or on
3  product?
4  A.  Are you asking me whether they
5  addressed the design and development of
6  warnings for motorcycles in the class, or are
7  you asking whether or not they provided
8  warnings related to the operation or ownership
9  of motorcycles in those classes?
10 Q.  Did they teach you about
11 warnings?
12 A.  Yes, I'm going to say yes.
13 Q.  What did they teach you?
14 A.  That you should look for
15 warnings and follow the warnings that they
16 provide during the classes and during the
17 training.
18 Q.  Were they classes -- they did
19 provide warnings during classes and training?
20 A.  Sure.
21 Q.  Were they operational in terms
22 of riding warnings?
23 A.  Sure.  They would give you
24 warnings.  For example, you should wear a

Page 38

1  helmet.  You should wear eye protection.  You
2  should practice the search, evaluate, execute
3  strategy when riding to potentially avoid
4  collisions.  So I'm sure that there was
5  multiple warnings that they gave through the
6  classes and trainings.
7  Q.  Any warnings that you would
8  consider relevant to your opinions in this
9  case?
10 A.  No.
11 Q.  I have your Testimony List.  Is
12 that up to date?
13 A.  Do you have a date on it?
14 Q.  1/1/16.
15 A.  It's been updated since then.
16 Q.  Okay.  Have any of these -- any
17 of the cases on the Testimony List involved
18 motorcycles?
19 A.  If you give me a moment, I'll
20 be happy to check.
21 A.  Okay.  Two of them.
22 Q.  Okay.  Which ones?
23 A.  August 2013, David Vititoe vs.
24 Rocky Mountain Pavement Maintenance,

Page 39

1  Incorporated, et al.
2  Q.  This is 2013?
3  A.  Yes.  And then 7/2014, Ramon
4  Ernesto Ortega vs. Hector Enrique Lopez,
5  Osceola Farms.  That's a motor scooter, not a
6  motorcycle.
7  Q.  Which one was that?  I'm
8  sorry.
9  A.  July 2014.
10 Q.  Vandenberg vs. Brunswick?
11 A.  I'm sorry, that's actually a
12 typo.  That should be 2015.
13 Q.  All right.  So July 2014 as it
14 appears at Page 4 at the top, Vandenberg vs.
15 Brunswick?
16 A.  On my Page 5 it's July 2014,
17 out of order.  It goes from June --
18 Q.  Oh, I see, okay.
19 A.  Sorry about that.
20 Q.  No.  I was looking at the top
21 of Page 4, July of 2014, Vandenberg vs.
22 Brunswick.
23 A.  No, that's not it.
24 Q.  In that case, who -- in

Page 40

1  Vandenberg vs. Brunswick, who retained you?
2  A.  I was retained on behalf of the
3  Plaintiff.
4  Q.  What was the issue in that
5  case?
6  A.  That had to do with fall
7  protection on the upper deck of a pleasure
8  yacht.
9  Q.  Is that case still pending?
10 A.  That --
11     MR. LEVINE: Experts are often
12 the last to know.
13     MR. HEINOLD: Only if their
14 bill has not been paid.
15     THE WITNESS: That one went to
16 trial in June of last year.
17     BY MR. HEINOLD:
18 Q.  What was the result?
19 A.  I don't recall.  And I don't
20 know if the bill was paid.
21 Q.  So Orgega vs. Lopez and Osceola
22 Farms, is that July 2015 or '16?
23 A.  2015.
24 Q.  Okay.  And that was also a

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 41

1   motorcycle case?
2   A.   That was a motor scooter.
3   Q.   Okay.  What was the issue in
4   that case?
5   A.   That was a truck versus motor
6   scooter collision at a T-intersection, and it
7   had to do with the ability of the operators to
8   see and avoid each other.
9   Q.   How about the Vivitoe case?
10  A.   Vivitoe was a Harley-Davidson
11  Softail Deluxe that ran into the back of a
12  trailer that was attached to a truck that was
13  stopped on a four-lane roadway at a green
14  traffic light at night.
15  Q.   Who retained you in this case?
16  A.   I was retained on behalf of Mr.
17  Vivitoe.
18  Q.   Did that go to trial?
19  A.   Yes.
20  Q.   What was the result?
21  A.   They found for David Vivitoe,
22  although the damages were less than Plaintiff
23  I think was hoping for.
24  Q.   Which sometimes occurs.

---

Page 42

1   A.   He wasn't wearing a helmet.
2   Q.   But neither of those dealt with
3   warnings -- did either of those deal with
4   warnings?
5   A.   Well, they didn't deal with
6   product warnings, per se.  The Vivitoe issue
7   was an issue of the failure of the lights on
8   the back of the trailer to provide adequate
9   warning as to the stopped state of the tractor
10  trailer.
11  Q.   Did any of this testimony deal
12  with motorcycle warnings?
13  A.   Warnings on the motorcycle
14  itself?
15  Q.   Yes, or related to the
16  motorcycle?
17  A.   Nothing in the Vivitoe matter.
18  The warnings related to the signals on the
19  back of the trailer of the truck.
20       The Ortega matter, I don't
21  recall if the issue was -- I don't recall if
22  the -- I don't recall if the issue was
23  related -- part of the issue was related to
24  whether or not Ortega was using his headlight

---

Page 43

1   and his turn signal.  I just don't recall if
2   that was an issue.
3   Q.   Okay.  Any of these involve the
4   assessment of the manufacturer's warnings,
5   whether in manuals or on product?
6   A.   No.
7   Q.   And I'm not limiting that
8   question to motorcycles.
9   A.   I don't understand.
10  Q.   The first questions I asked
11  about motorcycles.
12  A.   You're talking about these two
13  specific cases?
14  Q.   No.  I'm talking about your
15  list.  On your list, any of these cases --
16  your testimony in any of these cases concern
17  manufacturer's -- the quality of
18  effectiveness, et cetera, of the
19  manufacturer's warning, whether in a manual or
20  on product?
21  A.   Yes.
22  Q.   Can you tell me which ones?
23  A.   Starting on my copy it's the
24  first one, 2012, that's the Power vs.

---

Page 44

1   Electrolux North America.  The next one is a
2   product warnings case.
3   Q.   Tell me about Power, what was
4   the issue in Power?
5   A.   It was the failure to provide
6   adequate warning on a clothes dryer regarding
7   a lint fire hazard associated with the design
8   of the dryer.
9   Q.   And you were retained by whom?
10  A.   Looks like American Family
11  Mutual Insurance Company.
12  Q.   What was your opinion?
13  A.   All of them?
14  Q.   Give me the thumbnail.
15  A.   That the manufacturer failed to
16  provide adequate warning.
17  Q.   And what was your solution?
18  A.   The solution was to provide
19  adequate warning.
20  Q.   In what method?
21  A.   In had to do both with the
22  design of the product and the supplementation
23  of that design with an on-product warning or
24  the failure to provide a design solution

---

Thomas G. Oakes Associates
1-877-625-3777    www.TGOakes.com

---

Page 45

1  adding a warning to the product.
2  Q.  Did that go to trial or is that
3  still active?
4  A.  That one settled.
5  Q.  Okay.  What was the next one?
6  A.  Next one is Royal Indemnity
7  Company vs. Crane Company, et al.
8  Q.  Okay.
9  A.  The next one is --
10  Q.  Tell me about it.
11  A.  That one was a product warning
12  case.  I think that was fiber reinforced
13  plastic panels that were installed in an oven
14  room of a manufacturer of chicken nuggets, I
15  believe, food processor.
16  Q.  And you were retained on behalf
17  of whom?
18  A.  One of the insurance companies
19  for the company, the manufacturer or -- not
20  the manufacturer of the product, the
21  manufacturer of the chicken processor is
22  probably a good way to put it.
23  Q.  Is your conclusion that
24  whatever warning was at issue was satisfactory

---

Page 46

1  or unsatisfactory?
2  A.  I'm going to say they didn't
3  provide warning as to the fire hazard
4  associated with the use of the panels they
5  were selling with it.  That was part of the
6  problem.
7  Q.  What was the next case?
8  A.  Jessica Durkin vs. Paccar,
9  Incorporated, et al.
10  Q.  Are all of these -- would you
11  say all of these are warnings cases for
12  products?
13  A.  No.
14  Q.  Okay, go ahead.  How many would
15  you say there are?
16  A.  I can count them.
17  Q.  Go ahead, why don't you count
18  them.
19  A.  Do you want me to start from
20  the top or do you want me to count the ones we
21  already talked about?
22  Q.  We got two.  You can begin at
23  three.
24  A.  Now, just to clarify, are we

---

Page 47

1  looking at product warnings or are we looking
2  for warnings in general?
3  Q.  Looking for product warnings.
4  A.  Okay.  I'm counting 15.  I
5  would say 15.
6  Q.  Can you identify which ones?
7  A.  Sure.  So we did the two.  The
8  next one is 5/12 Jessica Durkin v. Paccar,
9  Incorporated.  The next one is also --
10  Q.  Can you tell me what the
11  product was?
12  A.  That was a bulkhead, aluminum
13  bulkhead, I believe it was an aluminum
14  bulkhead on a flatbed trailer.
15  Q.  Okay.
16  A.  The next one is also in May of
17  2012, Kleiman vs. Jay Peak, Incorporated.
18  Q.  What was the product?
19  A.  That was a gas fireplace.
20  Q.  If I say generically, on the
21  Durkin case, you were retained on the side of
22  the Plaintiff?
23  A.  Yes, I was retained on behalf
24  of the deceased Plaintiff, estate of.

---

Page 48

1  Q.  The Kleiman case on behalf of
2  the Plaintiff?
3  A.  Retained on behalf of the
4  Plaintiff's parents.
5  Q.  Okay.  What's next?
6  A.  10/2012, Mitchell Robinson, et
7  al. vs. YJ USA Corporation doing business as
8  JumpKing.
9  Q.  Okay.  What was the product?
10  A.  That was a trampoline.
11  Q.  And what was your -- were you
12  retained on behalf of the Plaintiff?
13  A.  Yes.
14  Q.  Okay.  Next?
15  A.  January 2013, it looks like
16  John and Emily McGrath vs. Rust-Oleum
17  Corporation.
18  Q.  Product?
19  A.  Yes.
20  Q.  What type?
21  A.  That I think that was a stain.
22  Q.  Were you retained on behalf of
23  the Plaintiff?
24  A.  Yes.

---

Page 49

1  Q.  Next, please.
2  A.  Jacqueline Down and IDA Wescott
3   vs. USC.
4  Q.  What was the product?
5  A.  That was a pole vault mat.
6  Q.  Okay.  And were you retained on
7   behalf of Plaintiffs?
8  A.  Yes.
9  Q.  Okay.  What is next?
10  A.  I think, I'm not a hundred
11   percent sure, but I think Megan Smith vs. In
12   Gear Fashions was a warnings case.
13  Q.  What was the product?
14  A.  It would be clothing.  I don't
15   remember exactly what article of clothing.
16  Q.  Were you retained on behalf of
17   the Plaintiff?
18  A.  I'm going to guess yes.
19  Q.  What would the next one be?
20  A.  February 2004, Jesus Flores v.
21   Alexander Andrew, doing business as Fall
22   Tech.
23  Q.  You said 2004, you meant 2014?
24  A.  You're correct.

Page 50

1  Q.  What was the product?
2  A.  That was a fall arrest system.
3  Q.  Like a harness?
4  A.  Well, it was the complete
5   system.  I'm trying to think now if that
6   actually involved an on-product warning.  So
7   we'll put that in the maybe category.
8  Q.  Okay.  Were you retained on
9   behalf of the Plaintiff?
10  A.  Yes.
11  Q.  Okay.  What would the next one
12   be?
13  A.  Next one that I see is March
14   2015, Member Select Insurance Company vs.
15   Electrolux Home Products and Sears.
16  Q.  What was the product involved
17   in that?
18  A.  That was a clothes dryer.
19  Q.  What was the issue?
20  A.  Multiple issues, but failure to
21   warn.  Failure to provide adequate on-product
22   warning was one of the issues.
23  Q.  Was that a dryer fire?
24  A.  Yes, lint dryer fire.

Page 51

1  Q.  Were you retained on behalf of
2   the Plaintiffs?
3  A.  Yes.
4  Q.  What would the next one be?
5  A.  Virginia and Robert Nester v.
6   Textron, Incorporated.
7  Q.  Okay.  What was the product
8   involved?
9  A.  That's a golf car.
10  Q.  Golf cart?
11  A.  Golf car.
12  Q.  Car?
13  A.  Car.
14  Q.  Like you drive around on the
15   golf course?
16  A.  Yes.
17  Q.  Were you retained on behalf of
18   the Plaintiff?
19  A.  Yes.
20  Q.  What was the issue in that
21   case?
22  A.  The issue was -- that I was
23   asked to address?
24  A.  Yes.

Page 52

1  A.  The failure of the on-product
2   warning to effectively and adequately
3   communicate the risks that were involved with
4   the incident.
5  Q.  What was the risk?
6  A.  Inadvertent activation of the
7   golf cart.
8  Q.  Okay.  What was the next one?
9  A.  The next one looks to be June
10   2016, Westfield Insurance vs. Modern Glass
11   Paint and Tile Company.
12  Q.  What was the product about?
13  A.  That may have been a stain as
14   well.
15  Q.  Were you retained on behalf of
16   the Plaintiff?
17  A.  Yes.
18  Q.  What's the next?
19  A.  August 2015, United Preferred
20   Insurance Company vs. Electrolux North
21   America.
22  Q.  What was the product involved?
23  A.  Clothes dryer.
24  Q.  Lint fire?

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 53

1 A.   Lint dryer fire, yes.
2 Q.   Were you retained on behalf of
3 the Plaintiff?
4 A.   Yes.
5 Q.   What's next?
6 A.   Kelvin and Krystle Carr vs.
7 Taylor Industries, LLC.
8 Q.   What product was involved?
9 A.   That was an oil well service
10 rig.
11 Q.   Were you retained on behalf of
12 the Plaintiff?
13 A.   Yes.
14 Q.   Next one?
15 A.   That's it.
16 Q.   You had said 15, I counted 14.
17 A.   Yes, I told you I thought it
18 was about 15.
19 Okay.  Well, I'm not going to
20 cross-examine you on that.  If I did, I don't
21 think I'd win the case.
22 Have you ever been precluded
23 from testifying by a Court?
24 A.   Sure.

Page 54

1 Q.   How often?
2 A.   There are two Daubert
3 challenges where the Judge ruled that I would
4 not be allowed -- actually, one Daubert
5 challenge where they would not allow me to
6 testify in a case.
7 And then there was a case in
8 Virginia State Court where a Judge wouldn't
9 let me testify because she fell the state of
10 Virginia didn't recognize the field of or
11 science of human factors.
12 Q.   Are either of those on your
13 Testimony List?
14 A.   No.
15 Q.   They preceded that or did you
16 not give testimony?
17 A.   The Daubert case was 2004 where
18 the Judge ruled that the field of psychology
19 was nothing more than common sense.
20 Therefore, my opinions were beyond the
21 province of the Jury.  The Virginia case was,
22 I'm going to say, around the 2010 time frame.
23 Q.   What Federal Court was the
24 Daubert challenge?

Page 55

1 A.   Well, I've had multiple Daubert
2 challenges that have been successfully
3 overcome in the last dozen years.
4 Q.   I'm talking about the one that
5 you were precluded.
6 A.   That one was either Connecticut
7 or New York.
8 Q.   If New York, the Southern
9 District?
10 A.   I don't remember whether it was
11 New York or Connecticut.  I don't remember
12 which particular district.
13 Q.   Have you been precluded any
14 other times?
15 A.   The only other thing I can
16 remember was after -- I was in trial in
17 Florida State Court and the defense objected
18 to my testimony and the Judge had me go and
19 direct the Plaintiff outside the Jury's
20 purview, and then ruled afterwards that he
21 wasn't going to let any expert testify.
22 So, I think that would preclude
23 me from testifying.  But I don't think it had
24 anything to do with my testimony.  The Judge

Page 56

1 felt it was a veracity issue between the
2 Plaintiff and Defendant, so he wasn't going to
3 let any expert testify.
4 Q.   Any others?
5 A.   Not that I can recall.
6 Q.   Have you ever been -- have you
7 ever had any portion of your testimony
8 restricted going into trial by Daubert or any
9 other reason other than what you just told me?
10 A.   I'm pretty sure my testimony is
11 always restricted to what my opinions are in
12 my field.
13 Q.   Do you know what I mean by that
14 question?
15 A.   You're saying that --
16 Q.   Someone filed a Motion and said
17 I want to preclude him and the Judge precluded
18 some of it, but not all of it?
19 A.   The only time -- if they were
20 the opinions I was planning on giving, the
21 Judge wouldn't let me give all them, the only
22 time I can remember was a Court in Maryland
23 involving a bicycle collision where the
24 bicyclist hit a defect in the sidewalk, and I

Page 57

1  think the Judge only allowed me to testify on
2  certain -- or only provide certain opinions of
3  the substantive opinions that I planned to
4  give.
5  Q.  Do you know why you were
6  restricted?
7  A.  I don't know why.
8  Q.  Well, do you know whether you
9  were restricted because your opinions were not
10  scientific?
11  A.  I don't believe that my
12  opinions have ever been found to be not
13  scientific.
14  Q.  Has any of your testimony, to
15  your knowledge, been stricken after you have
16  testified by a trial judge or subsequently on
17  appeal?
18  A.  No.
19      - - -
20  (Whereupon, a short break was taken at
21  this time.)
22      - - -
23      THE WITNESS: I remembered
24  another Daubert challenge in Virginia State

Page 58

1  Court where the Judge ruled that the hazard
2  was an act of God.  Therefore, there was no
3  responsibility on behalf of the manufacturer
4  to provide a warning.
5      BY MR. HEINOLD:
6  Q.  So someone filed a Daubert
7  Motion to preclude you and the Judge granted
8  that Motion because he said there was no need
9  for a warning because the event was an act of
10  God?
11  A.  Mine and the other expert in
12  the case.
13  Q.  Expert for Plaintiff or
14  Defendant?
15  A.  Plaintiff, same side.
16  Q.  I saw in your C.V. some various
17  publications that are references to what I'll
18  call ordering and prioritizing warnings and
19  product manuals?
20  A.  Okay.
21  Q.  Does that sound correct, my
22  general statement?
23  A.  Sure.
24  Q.  You recognize what I'm talking

Page 59

1  about?
2  A.  I believe so.
3  Q.  What does that mean, what are
4  those articles?
5  A.  Generally, it's an issue with
6  the way manufacturers provide information in
7  manuals.  These were studies that looked
8  at -- they were for power tools, there were
9  multiple power tools and they were UL listed
10  power tools.  And UL has a certain set of
11  requirements for warnings to be presented in
12  the literature for the particular product to
13  be UL certified.
14      The problem is that the
15  manufacturers are taking that list of warnings
16  and dropping them in within the order that UL
17  is providing.
18  Q.  Do you mean sort of the
19  numerical order of the UL requirements?
20  A.  No.  UL has a list of warnings,
21  these warnings have to be in the literature,
22  and they just list them out.  There's no real
23  reason or intention for -- on behalf of UL to
24  say this is the order in which you have to

Page 60

1  present the warning.  It's just these are the
2  list of warnings you have to present.
3      The problem with it is that a
4  lot of UL warnings are what we would consider
5  common sense, warnings that people would have
6  information on.  So, for example, don't
7  submerge an electrical product into water,
8  that's a fairly well-known warning dealing
9  with electrical tools.  So why should that be
10  first on the list.
11      Later on in the list and other
12  warnings that the manufacturer give that
13  product specific are lesser known hazards,
14  lesser known instructions, lesser known
15  information, and they tend to be populated at
16  the bottom of the list.
17      One of the things we know from
18  a warnings perspective is if you give people
19  warnings that they're well aware of at the
20  start of a list or at the start of a
21  publication they're going to stop reading it
22  because they're going to think that it's
23  information they already know or have or
24  self-evident and therefore, there's no reason

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 61

1   to spend the time reading through an entire
2   list of obvious information.
3        So if you want to get the user
4   to read and understand information that is
5   specific to your product or unique to your
6   product, you need to provide it higher in that
7   prioritization or make it more of a priority
8   in the way you're presenting it in the manual.
9   Q.   Were there rules about that?  I
10  mean, did you come to conclusions about how to
11  prioritize it?
12  A.   There are conclusions in the
13  studies.  Typically, I suggest in the study
14  that you put information that people are not
15  aware of, not open and obvious, not commonly
16  known first, present that information first so
17  the user will recognizes that they're getting
18  information that they didn't know, information
19  that is important, that it's filling knowledge
20  gaps and that it's worthwhile to continue
21  reading.
22  Q.   Those were studies that you
23  did?
24  A.   Yes.

Page 62

1   Q.   And you did those while at NC
2   State as a graduate student?
3   A.   Yes.
4   Q.   I didn't see any other
5   publications on that topic of prioritizing in
6   manuals, warnings in manuals, except for two,
7   1997, 1996.  Did I miss any?
8        I mean, when I asked the
9   question about prioritization you went to
10  those studies.
11  A.   The first two that are related
12  to the prioritization of warnings and product
13  manuals are Vigilante 1998 and Vigilante 1997,
14  and then should be a --
15  Q.   Okay.  That's on Page 6, 1998,
16  Product manual safety warnings effective
17  ordering?
18  A.   Yes.
19  Q.   And 1997, okay.
20  A.   Okay.  Then on the next page,
21  Vigilante, Wogalter 1997 on the prioritization
22  of safety warnings in product manuals.  And
23  then there's Vigilante, Wogalter 1996,
24  Ordering of safety warnings in product

Page 63

1   manuals.  So those are one that are specific
2   to product manuals.
3   Q.   Have you done any other
4   research on the issue of prioritizing warnings
5   on products?
6   A.   On product, yes.
7   Q.   What have you done for
8   prioritization on-product warnings?
9   A.   What I've published under
10  Publications and Presentations is Page 7 would
11  be Vigilante Wogalter, The ordering of
12  over-the-counter pharmaceutical label
13  components.
14  Q.   What year?  Oh, I see, 1997,
15  The preferred order of over-the-counter
16  pharmaceutical label components?
17  A.   Yes.
18  Q.   Did that deal with on-product?
19  A.   Yes.
20  Q.   Only?
21  A.   That was only on-product.  The
22  information on that study was used by the FDA
23  when they redid their over-the-counter
24  labeling format requirements in 1999.

Page 64

1   Q.   When you talk about on-product
2   on over-the-counter pharmaceuticals, are you
3   talking about on the package?
4   A.   On the container of the, for
5   example, medication pills or tablets or
6   whatever, your aspirin bottle or your Tylenol
7   bottle or what have you.
8   Q.   What conclusions did you reach
9   there?
10  A.   Well, the conclusions that I
11  reached was the way medication label --
12  over-the-counter medication labeling was
13  presented, the information was presented was
14  with information that the user, the end user
15  didn't care about, couldn't understand, didn't
16  need.
17       So it gets into the problem,
18  again, where you're presenting information
19  that's irrelevant or not understandable to the
20  consumer and preventing them from getting the
21  information that they need which is buried
22  further in the label.
23       So if you put the information
24  the user needs up front, like, for example,

Page 65

1 directions and contraindications, the user
2 doesn't have to go searching for it.  They're
3 more likely to see it and they're more likely
4 to read it.
5 Q.  So, for example, a bottle of
6 aspirin, you're talking about putting it on
7 the bottle?
8 A.  Yes.
9 Q.  Not the box, not the inserts?
10 A.  Well, I think the requirements
11 for the box and the insert -- excuse me, the
12 box and the bottle are the same because a lot
13 of medications, over-the-counter medications
14 are sold just in a container, not a box,
15 although some are sold in the box, the
16 container in the box.
17 Q.  All right.  I read your report,
18 you listed the things that you reviewed and
19 relied on.  Is there anything that you didn't
20 list that you reviewed or relied on?
21 A.  As far as discovery material, I
22 list everything in here that I reviewed for
23 this case.  As far as specific references used
24 to support my opinions, I provided them in

Page 66

1 Section G.
2     Other things that I'm relying
3 upon are my education, experience and
4 training.  And then I did bring some
5 additional photographs that I did not provide
6 in the report.  And I did have a couple other
7 websites that I had looked at, downloaded
8 prior to writing my report that I didn't
9 reference specifically in the report.
10 Q.  So is this something you can
11 provide me?
12 A.  Sure.
13 Q.  That I can see it, or are you
14 going to tell me I have to write it down?
15 A.  Do you want to see it now or
16 you want it later?
17 Q.  I don't know what they are.
18 A.  Sure.
19 Q.  I mean, we can do it later.
20 A.  I provided my entire file on
21 the thumb drive.  It's my understanding you
22 wanted a copy of my entire file.
23 Q.  Oh, here (indicating)?
24 A.  Yes, it's yours to take home.

Page 67

1 Q.  It's kind of hard for me to
2 question you about it if it's on the thumb
3 drive.
4 A.  The other stuff I did bring
5 hard copies so we can look at it here.
6 Q.  Extra hard copies?
7 A.  Not extra ones.  Just one copy.
8     MR. LEVINE: I can make
9 copies.
10     BY MR. HEINOLD:
11 Q.  Of what?  What did you bring?
12 A.  So, for example --
13 Q.  Of the things that are on
14 there?
15 A.  -- I brought some printouts
16 from websites dealing with winterization of
17 motorcycles, overheating of air-cooled
18 engines, water-cooled engines, et cetera.  And
19 then I brought several photographs of
20 different motorcycles.  One is a Yamaha YZF,
21 1998, depicting the oil sight glass on the
22 right side of the engine so that when it's on
23 its kickstand the oil doesn't cover the oil
24 sight glass like it does on the incident

Page 68

1 bike.
2     I also photographed warnings
3 that are on the bottom of that motorcycle.  As
4 I'm sure one of the things you've asked about
5 was -- for instance, the propensity of
6 likelihood of the manufacturers to put
7 warnings directly on the body of the
8 motorcycle.
9     So here's an example of the
10 Yamaha putting a warning sticker right on the
11 fuel tank above the Yamaha YZF sport bike and
12 a warning on the windshield front fairing of
13 the bike.
14     Then I brought a photograph of
15 a BMW, 2010 BMW F800 GS showing the dipstick
16 on the left side of the crank case in a
17 similar position, although not exact, same
18 position as the oil sight glass on the
19 incident bike.
20     And then I provided just an
21 article from American Motorcyclist in 2007
22 that categorizes the Yamaha YZF and the
23 BMW R1150 R sports bike.  So they're in the
24 same category as opposed to my

Page 69

1  Harley-Davidson, which is a different category
2  of bike.
3     And then I brought photographs
4  of the control panel console and the steering
5  head of an R1150 R BMW motorcycle and an
6  R1100rsl motorcycle.
7     In my report I discuss
8  alternatives to place the warning on the bike,
9  and I wanted to bring photographs to show the
10  area I was talking about so we are clear and
11  on the same page as to what I was referring to
12  in the report.
13  Q.  Is all of this information that
14  you just generalized for me here something you
15  had prior to writing your report?
16  A.  I had everything except for the
17  photographs of the Yamaha YZF and photographs
18  of the F800 GS.  Just to clarify, I did see
19  both bikes in person prior to writing my
20  report.  I didn't photograph them until after
21  writing my report.
22  Q.  Okay.  Why did you not include
23  those in your report?
24  A.  I didn't think it was necessary

Page 70

1  at the time.
2  Q.  Why do you think it's necessary
3  now?
4  A.  Because I knew you would ask me
5  about everything I looked at and I tried to
6  make sure my file was complete as possible.
7  Q.  Did you think when you were
8  writing your report I wasn't going to ask you
9  that?
10  A.  Typically when I write my
11  report I write it to express my opinions and
12  support my opinions.  When I get ready for a
13  deposition I try to anticipate what's going to
14  be asked or required by the opposing attorney.
15     MR. HEINOLD: I would like to
16  get copies of those, Ken.  You don't have to
17  do it this minute.  You can do it when we take
18  a break.
19     MR. LEVINE: Okay, next break
20  I'll send it out for colored copies.
21     MR. HEINOLD: I am going to
22  want to ask him about that.  Having not seen
23  them I'm at a disadvantage at this moment.
24     BY MR. HEINOLD:

Page 71

1  Q.  Other than those additional
2  things, is there anything else in your report
3  that you reviewed or relied for purposes of
4  this case?  I'm sorry, that you reviewed or
5  relied on?
6  A.  The only additional work I did
7  was review the report of -- I think his name
8  was Mr. Breen?
9  Q.  Yes.
10  A.  So I think that's the only
11  additional thing I did other than prepare for
12  the deposition.
13  Q.  And does the list of the things
14  you reviewed and the report fairly depict all
15  work that you've done to perform -- to prepare
16  your report in this case and reach your
17  opinions?
18  A.  I'm not quite sure I understand
19  that.
20  Q.  Okay.  Tell me what you did to
21  prepare your report.  I don't mean sit down
22  and prepare your report, but I mean from the
23  time you were retained in this case -- when
24  were you retained, by the way?

Page 72

1  A.  I was officially retained in
2  October of 2015.  I should say Vigilante
3  Forensic was retained in I think October of
4  2015.  I may have been retained prior than
5  October 2015 when I was with my prior
6  company.  I don't have the file from my prior
7  company because I left.  So I don't have the
8  inquiry sheet, if it was created before then.
9  Q.  Do you have a list of the
10  activities you performed in this case?
11  A.  I don't have a list of
12  activities, per se.  But typically my reports
13  are written in the way that I can go through
14  the file.
15     So, for example, I'll start
16  with a brief understanding of the issue, and
17  then I'll discuss a purpose to my
18  investigation.  That is the hypothesis I want
19  to test, and then I'm provided with the
20  discovery material that's available.  I'll go
21  through that material to get a better
22  understanding of the product, of the issue
23  relevant to my purpose, and I'll go through
24  the information to determine what happened and

Page 73

1    how it happened.
2        So, for example, Mr. Yazdani's
3    testimony as to what he did, why he did, how
4    he did it.  And then I go through my analysis,
5    and in going through my analysis I corporate
6    my education, training and experience to
7    determine and test my hypothesis.
8        So the first thing I addressed
9    was did BMW provide adequate warning?  My
10   analysis goes through the steps on how I came
11   to my conclusions that they failed to provide
12   adequate warning.  Then the next thing I did
13   was looked at whether BMW North America was
14   aware of the need to provide on-product
15   warning.
16   Q.  I seen your report.  We don't
17   have to go through it.
18       I'm interested in, for example,
19   you mentioned that you inspected some other
20   vehicle, some other motorcycles?
21   A.  Yes.
22   Q.  Okay.  And in your report you
23   say you may use as Exhibits as photos --
24   looking at Page 2, photos of the incident

Page 74

1    motorcycle and exemplar motorcycle.  You
2    didn't say that you had looked at other
3    motorcycles.
4    A.  I'm sorry?
5    Q.  So I'm wondering what other
6    activities that you conducted prior to
7    authoring your report?
8    A.  Well, I did --
9    Q.  You reviewed the material that
10   you said was available?
11   A.  Yes.
12   Q.  What else?
13   A.  I looked at the websites to get
14   information on issues that are relevant.  I
15   looked at my motorcycle manual.  I looked at
16   my motorcycle.  I talked to a friend of mine
17   that is an expert in motorcycles.  And when I
18   was at his place back in October I looked at
19   his bikes which are the photographs that I
20   took later on.
21   Q.  Who is that person?
22   A.  Erin Higinbotham.
23   Q.  And you say he is?  What is he?
24   A.  Well, he's an engineer with a

Page 75

1    background in I guess design, development and
2    testing of motorcycles.
3    Q.  And what did you ask?
4    A.  We talked about my experiences
5    and his experiences.  We talked a little bit
6    about the use of oil sight glasses in bikes,
7    his experience with them, my experience with
8    them.  Just kind of generalities.
9    Q.  Did he give you any information
10   you thought useful?
11   A.  Yeah, I don't think that he
12   told me anything I didn't know.
13   Q.  Where is he?
14   A.  He's located in Ohio.
15   Q.  You went out there?
16   A.  Well, I was out there for
17   another case that he and I were investigating.
18   Q.  Where in Ohio?
19   A.  He's outside of Columbus.
20   Q.  Does he operate a business?
21   A.  Yes.
22   Q.  What's the name of his
23   business?
24   A.  830 Engineering.

Page 76

1    Q.  8-3-0?
2    A.  Correct.
3    Q.  What town?
4    A.  I'm going to say Milford
5    Center.
6    Q.  I'm sorry, I interrupted your
7    answer to ask that question.  Go ahead.
8    A.  I don't know where I was.  I
9    kind of lost track.
10       MR. HEINOLD: Do you want to
11   read it back.
12       - - -
13   (Whereupon, the court reporter read the
14   pertinent information.)
15       - - -
16       THE WITNESS: Okay, so I did
17   that.  I did look at the websites, and I don't
18   recall if I asked friends that are
19   motorcyclists their understanding of the
20   potential -- if they understood that there was
21   a potential fire hazard associated with
22   leaving their bike idling, what their
23   practices were with respect to leaving it
24   idle.  I just don't recall specific instances,

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 77

1  but it's possible that I did.
2     BY MR. HEINOLD:
3  Q.  You may have talked to some of
4  your friends?
5  A.  Sure.
6  Q.  Or you did?
7  A.  I'm saying I may have because I
8  typically -- because typically if I'm involved
9  in a case that is either a common product or a
10  product that has a -- people that I knew that
11  you used them, you know, I'll talk to them
12  about my case and explain a little bit about
13  it, kind of get their feedback on what their
14  practices and knowledge were.  Just kind of a
15  general research, if you will, not something
16  that I'm specifically relying upon for my
17  opinions.  Just kind of general background.
18  Q.  Anything else?
19  A.  I think that would be it.
20  Q.  On Page 6 of your report --
21  wait a minute, Page 5 of your report, Section
22  E, talking about providing an adequate
23  warning.
24     MR. LEVINE:  Off the record a

Page 78

1  second.
2     - - -
3  (Whereupon, a discussion was held off
4  the record.)
5     - - -
6     BY MR. HEINOLD:
7  Q.  The warning that you cite in
8  the manual you talk about Mr. Yeldham's
9  testimony and you talk about Mr. Zazula's
10  report in the next paragraph.
11  A.  Okay.
12  Q.  Now, I had asked you about the
13  scope of your expertise as a motorcycle design
14  expert, you said -- your Counsel said you're
15  going to be sticking within your report.
16     Are your references here to
17  those things references to the need for a
18  warning as compared to a criticism of the
19  design other than a warning?
20  A.  Yes.  So my opinions are
21  both.  So the need for a warning is dependent
22  upon the design choice that BMW made or BMW
23  North America made.  So you can't have
24  opinions with respect to warnings without

Page 79

1  understanding the design decisions and choices
2  that were available or made.
3  Q.  Okay.  Well, I understand, for
4  example, the product hierarchy, there is a
5  design and you should try to design out the
6  hazard.  If you can't, then you offer a
7  warning.  They're two separate issues.
8  A.  Well, they're not separate
9  issues.
10  Q.  Well, let me just finish.  I
11  understand that the design issue is a
12  predicate for the warning, right?
13  A.  Yes.  So the design of the BMW
14  creates a potential for a hazardous situation,
15  that is the potential for fire.  There was
16  choices that BMW made in the design of the
17  bike that could have eliminated that
18  potential.  They chose not to.  If they're
19  going to not eliminate through design, they
20  have the option of safeguarding it.
21     I think that Mike Zazula
22  addressed some of those issues guarding it
23  with the use of the optional police fan kit.
24  I don't recall offhand if he had an issue with

Page 80

1  respect to the monitoring of the engine
2  temperature, potential shutting it down if it
3  got too hot.  But certainly, those are
4  guarding solutions that were available to BMW
5  to my understanding and they chose not to do
6  that.
7     And then so they relied upon a
8  warning as their mitigation strategy.  And my
9  opinion is that reliance on that warning was
10  inappropriate in that the warning they
11  provided was inadequate.  And that if they
12  were going to rely upon the warning, solely
13  upon the warning, they needed to provide it on
14  the motorcycle itself like they did with the
15  recall motorcycle a few years prior because of
16  the unique characteristic of the potential
17  fire hazard with the design of this bike.
18  Q.  I understand that.  My question
19  is:  Are you going to criticize the design as
20  a design?  Are you going to say the
21  motorcycle -- forget the warnings.  Are you
22  going to say I'm the motorcycle expert and
23  this motorcycle is defective because it had a
24  sight glass in this location and I'm offering

Page 81

1   an alternative?
2   A.  No.  My opinion is that because
3   of the way they designed it, they created a
4   potential fire hazard, and as such they had a
5   responsibility to mitigate that, and they
6   could have mitigated it through design or
7   guarding.  If they weren't doing to do that,
8   they should have at least provide adequate
9   warning, and the warning that they did chose
10  to provide was inappropriate and inadequate.
11  Q.  Are you offering an opinion
12  that the design of the motorcycle beyond the
13  warning is defective and unsafe?
14  A.  I think that they were --
15  excuse me, I think that they already
16  established that.  I'm not establishing the
17  fact that oil sight glass or its position in
18  its composition failed meeting to a
19  catastrophic event.  That's why I'm citing
20  Mark Yeldham, his testimony, to establish
21  that.
22      So I'm not planning on
23  establishing that on my own.  I'm using his
24  testimony to establish that there was a hazard

Page 82

1   due to the design of this bike.
2   Q.  Okay.
3       MR. HEINOLD: Ken, do you
4   understand my question?
5       MR. LEVINE: I do.  I think
6   that you're asking him to disconnect
7   something -- let me start off, you can keep
8   this on the record.  Inevitably he has to say
9   that the design resulted in a hazard.  I don't
10  think that he is opining that personally other
11  than through the acceptance of statements by
12  folks at BMW and other experts that such a
13  hazard simply exists based on it.
14      I don't think he's going to
15  come in, and correct me if I'm wrong, and
16  testify that the design in and of itself
17  should have been different.  But he will say
18  the obvious, which he's already stated, that
19  if it did not have that design it would not
20  have that hazard.
21      So you're asking him is he an
22  expert in that area?
23      MR. HEINOLD: See, I don't know
24  that I can agree with your last statement.

Page 83

1       MR. LEVINE: Oh, okay.
2       MR. HEINOLD: I'm with you a
3   hundred percent.  There's a warning that says
4   here's a hazard, don't do this, and that's
5   what we're here about.
6       But your last statement that
7   he's going to say if you had a different
8   design you wouldn't have the hazard, he
9   doesn't have that in his report.  And if you
10  are going to declare him to be a motorcycle
11  design expert, then we'll see if he
12  qualifies.  But that is the next step.
13      MR. LEVINE: The part that you
14  don't agree with me on, let me just address
15  that just for a second, I'm rather confident
16  that your own client who designed the bike
17  would say that if designed differently, as
18  some other vehicles are designed, that that
19  precise hazard would not exist.  It's just a
20  nature of the design of that particular bike.
21      So I don't think it requires
22  him to be an expert, although he probably has
23  enough of that expertise to say that
24  statement, that if it was designed differently

Page 84

1   it would not have that hazard.  I doubt your
2   client or you when you pause for a second
3   would disagree with that statement.  So that's
4   all that he would be saying, I believe, and he
5   can answer for himself.
6       So when you say is he a
7   motorcycle expert as to the design or whether
8   or not the design generated that hazard, I
9   believe that everybody involved knows that the
10  design generated that hazard.  So I'm not
11  sure -- I'll be happy to continue.
12      MR. HEINOLD: I will say this,
13  I don't disagree with you that it has a design
14  and that design can lead to the consequences
15  of a fire if you leave it idling at
16  standstill, because there's a hazard
17  recognized and a warning in the manual to that
18  effect.
19      MR. LEVINE: Then a safety
20  engineer or an ergonomic expert will
21  inevitably say every single time you've got
22  this hazard that I've been asked to address,
23  but that integral with that opinion is the
24  straightforward statement that if it had been

Page 85

1  designed differently, it's not the case with
2  all products, but if it was designed
3  differently it would not have that hazard.
4      MR. HEINOLD: And what's the
5  different design he's going to say it should
6  be?
7      MR. LEVINE: Oh, he's not going
8  to say it should be because there's six
9  million ways to build a motorcycle, and some
10 of them will have that hazard, some of them
11 will not have that hazard based on their
12 design.
13     I think that -- again, I
14 welcome his contribution to the conversation,
15 but I think his opinion is that when a
16 motorcycle is designed in this fashion, if the
17 manufacturer chooses to allow this hazard to
18 exist, because the nature of the design of
19 this motorcycle, not unlike every other
20 motorcycle, but the design of this type of
21 motorcycle generates this hazard, and once
22 they decided to have that design, which would
23 generate this known hazard, then they must do
24 X, Y and Z, but they are not guiltless --

Page 86

1  that's a horrible lawyer word that I'm using.
2  They're not guiltless deciding, all right,
3  we're going to design it to allow this hazard
4  to exist.
5      MR. HEINOLD: You have an
6  expert who has addressed the design issues.
7      MR. LEVINE: Yes, we have.
8      MR. HEINOLD: And this witness
9  has addressed the warning issues given the
10 design.
11     MR. LEVINE: You have just
12 limited, frankly, the scope of his testimony.
13 He was asked to analyze the safety.  You want
14 to say he was asked to analyze the warning.  I
15 think any ergonomic expert is going to be
16 asked to analyze the safety.  Integral to that
17 is a review as to the hazard and what causes
18 them, first and foremost, and that inevitably
19 goes back to the design.
20     So it would be impossible for
21 him to say I'm analyzing the safety that led
22 to fire, that he did not look at the design,
23 the design options and whether or not they
24 created a hazard.  I don't -- you can ask him

Page 87

1  if he has opinions with regard to other
2  designs that would not generate the hazard.
3      You can ask him whatever
4  questions you'd like to ask him.  I've tried
5  to answer I think the conflict between you as
6  best I can.
7      MR. HEINOLD: Well, I think
8  your position tries to turn him into a design
9  expert, which he doesn't have in his report.
10     MR. LEVINE: I think the scope
11 of his opinions that he will say at trial with
12 regard to design and hazard generation as a
13 result of this design are stated in his
14 opinion and will be the testimony at the time
15 of trial.
16     But if you want to explore
17 that, if you feel as if he's going to give
18 testimony at trial beyond the scope of his
19 abilities or the scope of his report, I
20 certainly appreciate that, and an issue will
21 arise that we're going to have to address.
22 But I think that your questions may eliminate
23 that concern.
24     BY  MR. HEINOLD:

Page 88

1  Q.  Do you consider yourself a
2  motorcycle design expert?
3  A.  It depends on the specific
4  topic.
5  Q.  How about on the location of
6  sight glasses, are you an expert in the
7  location and use of sight glasses for oil
8  systems?
9  A.  It depends on the question.  So
10 maybe I can short circuit this.  I do not plan
11 on providing an alternative design solution.
12 So I would leave that to Zazula and Yeldham
13 and anybody else that testifies.
14     My opinion is simply that it's
15 my understanding that bikes that are designed
16 differently don't have this hazard.  If you're
17 going to choose this design that creates this
18 hazard you need to A, accept that you're doing
19 it, and then B, think about providing a
20 different design.
21     If you can't provide a
22 different design for whatever reason, you have
23 to decide whether or not you're going to
24 provide a safeguard to prevent the hazard from

Page 89

1   occurring that is inherit in your design.  And
2   if you're not going to do that, then you need
3   to provide an adequate warning.
4       My opinion is that instead of
5   providing a design that doesn't create the
6   hazard, BMW, for whatever reason, I don't know
7   for whatever reason, given the hazard, chose
8   to leave it in the design of the bike.  They
9   didn't provide a safeguard to prevent the
10  hazard from occurring.
11      It would be my opinion if asked
12  that it's unreasonable if the safeguard is
13  available and feasible, I didn't do the
14  analysis of what they should be, that's for
15  Mike Zazula to determine, but my opinion is
16  simply that if it's available and it's
17  feasible, it should have been used rather than
18  relying upon a third option.  If they have a
19  hazard because of the design and they're not
20  going to safeguard it, the least they can do
21  is provide adequate warning.
22      My opinion in this case is that
23  they failed to provide adequate warning.  If
24  they're going to solely on the warning, what

Page 90

1   they needed to do was to put it on the bike
2   like they did in the recall back in the early
3   models.
4   Q.  So if I understand what you're
5   saying, you're not going to offer any type of
6   alternate design; correct?
7   A.  I'm not planning on offering
8   alternative design.
9   Q.  You're not planning on
10  criticizing any specific aspect of this
11  design?
12  A.  The only thing I would limit my
13  opinion to or plan on providing an opinion is
14  that I've given alternative designs, they
15  should have been the first choice of
16  manufacturers as opposed to choosing a design
17  they had an inherent hazard.
18  Q.  But that's going to be a
19  general statement --
20  A.  Yes.
21  Q.  -- about this motorcycle has
22  features and characteristics that lead to a
23  hazard that the Owner's Manual addresses;
24  correct?

Page 91

1   A.  The Owner Manual does attempt
2   to address it.
3   Q.  Okay.  I'm not trying to say
4   there isn't a hazard.  I'm acknowledging that
5   what has been said about what can occur if the
6   operator does certain things can occur, and
7   there's a warning about that.  I'm not arguing
8   the merits of the warning.  I'm saying it's
9   there, so therefore the characteristic is
10  known.
11      You're going to say, as I
12  understand it, that if you have that
13  characteristic the first thing you should do
14  is --
15      MR. LEVINE: Consider.
16      BY MR. HEINOLD:
17  Q.  -- to consider is to have a
18  design that doesn't present that
19  characteristic.  That you're going to leave
20  that fight to other experts; correct?
21  A.  Yes, I'm going to leave -- I'm
22  not offering a design solution.  But the
23  problem is that the design of the bike is
24  unique in that it creates a fire hazard that

Page 92

1   doesn't exist on other types of bikes.  And it
2   exists because of the design of the bike.
3       Whether it's the location
4   and/or the material or the manner in which the
5   oil sight glass was manufactured and mounted,
6   I don't know whether it's one or the other or
7   a combination of all three.  But the design of
8   this bike creates a unique hazard to this bike
9   that does not occur or exist in my
10  Harley-Davidson, does not occur or exist in
11  the Yamaha bike that Mr. Yazdani had for 20
12  years prior to the BMW.
13  Q.  Is that opinion -- or excuse
14  me, in that statement are you planning to talk
15  about the specifics of the design in saying
16  the characteristics of this bike create a
17  hazard of fire?  Are you going to say and
18  here's what they are?
19  A.  I'm going to say that Mr.
20  Yeldham testified that the design of this bike
21  and the designed oil sight glass creates a
22  fire hazard.
23  Q.  I don't think he testified as
24  to that.

Page 93

1  A.   Sure he did.
2  Q.   What did he say?
3  A.   Mr. Yeldham testified that if
4  BMW R 1150 R motorcycle is left idling in a
5  stationary position the oil sight glass cover
6  can fail and cause a fire.
7  Q.   That's the extent of what
8  you're going to talk about there?
9  A.   I mean, he goes on.  I'm citing
10 the rest of that paragraph as to why this is a
11 problem.  I mean, he's acknowledging in that
12 testimony that there is a hazard associated
13 with the oil sight glass cover.  And if you
14 don't have the oil sight glass cover it can't
15 fail, and if you have a dipstick you don't
16 have an oil sight glass cover.  And therefore,
17 from the oil sight glass cover can't fail.
18 Q.   Okay.  So are you going to
19 offer an opinion about it should have had a
20 dipstick?
21 A.   No, I am not, but my opinions
22 because of the unique characteristics of this
23 bike users don't understand or appreciate it
24 because it's abnormal, atypical due to the

Page 94

1  unique or due to the design of this bike.
2  Q.   Is there anything else that you
3  consider abnormal or unique?
4  A.   Other than the fact that the
5  oil sight glass cover can fail and cause a
6  fire, that's the only thing that's relevant to
7  this incident.
8  Q.   Are you aware of any --
9  A.   Well, I take that back, because
10 apparently to prevent the fire due to the
11 design BMW wants you to ride away immediately
12 and that, again, is a unique or atypical trait
13 associated with this bike.
14 Q.   Anything else?
15 A.   Not that I can think of at the
16 moment.
17 Q.   Have you done a survey on
18 motorcycles?
19 A.   I've not surveyed every
20 motorcycle ever available, but I've looked at
21 a lot of bikes over a lot of years and most of
22 them have dipsticks.
23 Q.   Any that don't other than BMW?
24 A.   Well, the Yamaha has an oil

Page 95

1  sight glass, but it's on the right side of the
2  crank case that when it's on its left
3  kickstand the oil isn't covering the oil sight
4  glass.
5       And Mark Yeldham testified that
6  part of the reason why the oil sight glass may
7  fail is because when its on its left kickstand
8  the oil, hot oil covers the oil sight glass.
9  So to me intuitively that means that if it's
10 on the right side and it's not covering the
11 oil sight glass it can't cause it to fail in
12 that manner.
13 Q.   Are you planning to offer the
14 opinion that the oil sight glass on this
15 motorcycle should have been on the right side,
16 not the left?
17 A.   I do not plan on providing an
18 alternative design to this bike.
19 Q.   And I think we've already
20 agree, but I want to be clear, you're not
21 planning on design that says there should be a
22 dipstick instead of an oil sight glass?
23 A.   I was not planning on offering
24 an opinion with respect to alternative design.

Page 96

1       MR. LEVINE: I'm compelled to
2  step in.  He has said a number of times that
3  he does not intend to present alternative
4  design.  I just want to clarify that in one
5  way.  Some people view warnings provided on a
6  product as an alternative design.  I just
7  wanted to mention that so there's no lack of
8  clarity.
9       And I would ask that we pause
10 so I can go do and get those menus.
11      MR. HEINOLD: Can I just finish
12 this?
13      MR. LEVINE: Sure.
14      MR. HEINOLD: And I understand
15 what you say about the warning issuing
16 wasn't -- that's not a problem.  I didn't take
17 it that way.
18      MR. LEVINE: Okay.
19      MR. HEINOLD: We do have a
20 report full of --
21      MR. LEVINE: Of warning
22 issues.
23      MR. HEINOLD: Of warning
24 issues.

Page 97

BY MR. HEINOLD:
1

2  Q.  Do you plan -- I want to create
3  a distinction between pointing out
4  characteristics that others have identified,
5  BMW and Mr. Zazula, and you personally
6  criticizing them yourself, do you plan on
7  criticizing the design, not the warning
8  issues, the design of this motorcycle or
9  simply point out based on what others have
10  said that these characteristics lead to this
11  hazard and either should be prevented or a
12  better warning, here's what I think is a
13  better warning?
14  A.  I think the best way to answer
15  is that I'm relying on Yeldham and Zazula and
16  others to identify the hazard associated with
17  this bike and understanding why that hazard
18  occurs with respect to design.  I'm not
19  offering an alternative design solution.
20     If one is presented to me, I
21  can have opinions with regard to whether or
22  not that would be the appropriate thing to
23  do.  So that gets back into this design work.
24  As an ergonomist and product safety expert,

Page 98

1  it's my opinion that if an alternative design
2  exists that's feasible that eliminates the
3  hazard, that is the appropriate thing to do.
4     So, if someone presents it,
5  whether it's you or Mr. Hughes, at the time of
6  trial, I'm asked that question, that would be
7  my opinion.  I'm not going to opine what the
8  alternative should be or the pros and cons of
9  it or how, you know -- because I don't know.
10     For example, they could have
11  used a different glass that doesn't deform at
12  329 degrees.  Maybe that solves the problem.
13  I'll leave that to, you know, someone else to
14  determine that.  If they use a dipstick
15  instead of the sight glass maybe that fixes
16  the problem.  I'll leave that to somebody else
17  to determine.
18     If you put it on the right
19  side, if they could have put it on the right
20  side, does that alleviate the problem, I'll
21  let someone else determine that.
22     But if there is a design
23  solution that eliminates the hazard, it's my
24  opinion that would have been appropriate.  Not

Page 99

1  only appropriate, but the correct thing to do.
2  Q.  Okay.
3     - - -
4  (Whereupon, a short break was taken at
5  this time.)
6     - - -
7     BY MR. HEINOLD:
8  Q.  Okay, I think I get it.  You
9  said that this design is unique.  Is it your
10  understanding that the BMW air-cooled
11  motorcycles are the only motorcycles capable
12  of fire if the customer leaves it idling for
13  an extended period at a standstill?
14  A.  Yeah, I'm not aware of any
15  other motorcycles that have the same potential
16  fire risk due to the same issue.
17  Q.  Did you research that?
18  A.  I did not research it.
19  Q.  So you can't point me to any
20  source, literature or anything that says that,
21  to support your understanding; it's just your
22  understanding?
23  A.  Well, I should take that back.
24  Part of the research I did was look at the

Page 100

1  manuals for other motorcycles to see what they
2  identify as hazards associated with their
3  bikes.  Like I said, I went through the Yamaha
4  manuals and the Harley manuals and it wasn't
5  identified as being a hazard with those bikes,
6  in the design of those bikes.
7     I'm not aware of it through my
8  experience as being an issue with most bikes.
9  This was the first time I became aware that it
10  was an issue with any bike.  And certainly, I
11  understand that there could be fires if a
12  motorcycle is left idling near combustibles.
13  So certainly that was something that I
14  understood, but not that a component on the
15  bike would fail and lead hot oil to escape the
16  engine and ignite and start a fire.
17  Q.  Okay.  But other than your
18  general knowledge and the manuals you
19  reference, is there any other basis for your
20  understanding?
21  A.  I didn't find anything when I
22  was doing the research on oil cool and letting
23  them sit at a standstill when I did the web
24  research.

Page 101

1  Q.  Are those the web pages that
2  you're going to provide me with a copy with at
3  some point?
4  A.  Well, no, I did a web
5  research.  These are just some of the pages
6  that I came across that I printed out as some
7  examples of what I was finding on the web.
8  Q.  Did you find -- did you search
9  for fires for other manufacturers?
10  A.  I didn't do a specific search,
11  for example, Kawasaki XYZ bike.  I just looked
12  at starting at a standstill, cold weather
13  winterization trends, tips, practices.  I
14  looked at, like I said, the manuals for the
15  other bikes to see if they were warning
16  against the practice because of a potential
17  fire hazard and I didn't see any.
18  Q.  You gave me three manuals,
19  three Yamaha and one Harley, were those the
20  manuals that you said you researched?
21  A.  I do have a couple more Yamaha
22  manuals that I looked at, and Kawasaki, I
23  think.  They're on the disk.  So whatever
24  manuals I pulled out I put on the disk.

Page 102

1      There was a number -- I'm sorry
2  to interrupt, but there were a number of
3  years.  Like I cited the 2002 models and the
4  XVS 1100 and the Road Star XV 16A.  There were
5  multiple model years manuals that I had for
6  either one or both of the bikes.  I don't
7  recall offhand.
8  Q.  It was -- well, you provided
9  like a covering page for two different
10  manuals.  Do you think there's something more
11  some?
12  A.  I think I provided the entire
13  manuals for the Yamahas on the disk.  The
14  Harley-Davidson Manual I only provided the
15  cover of the page because I would have had to
16  scan the entire thing.
17  Q.  Well, what is on -- I got a
18  link from your attorney that had the
19  references which you cited.  This flash drive
20  that you're providing that's different;
21  correct?
22  A.  Yes, I'm sorry.  The references
23  were to those specific pages.  So I think
24  that's why when I -- I don't recall, you may

Page 103

1  have asked Pat Hughes to ask me to provide my
2  references that were cited in my report.
3      So I put together the
4  references that were cited in my report.  In
5  my report I cited specific pages to those
6  manuals.  So instead of providing the entire
7  manual I provided those specific pages.  On
8  the disk I provided the entire manual for the
9  Yamahas, not for the Harley-Davidson because I
10  didn't have the Harley-Davidson in PDF format,
11  I had hard copy.  So I had to scan the pages
12  that I was interested in, if that makes sense.
13  Q.  This flash drive, what's on it?
14      MR. LEVINE: I can tell you
15  because I have it open, or you can ask him.
16      MR. HEINOLD: Well, I'm going
17  to ask him.
18      MR. LEVINE: Okay.
19      THE WITNESS: It's all the
20  documents that I have that are related to --
21  specifically related to this case.
22      BY MR. HEINOLD:
23  Q.  Anything that's not referenced
24  in your report on the flash drive?

Page 104

1  A.  Yes.
2  Q.  What?
3  A.  Well, for example, the
4  motorcycle pictures that I mentioned earlier.
5  Q.  Okay.
6  A.  The websites that I printed
7  that I mentioned earlier.  And then like I
8  said, the full manuals for several model year
9  Yamahas.  There's a Road Star 2000 Manual,
10  E-Star 2010, E-Max 2011, E-Star 2001 and
11  E-Star 2002.  I believe they're the complete
12  manuals, not just pages.
13  Q.  Anything else on there that
14  wasn't part of your references that I would
15  have received?
16  A.  I don't believe so.  Other than
17  what we talked about, right, the pictures and
18  the --
19  Q.  Yes, hence the word "else".
20      MR. HEINOLD: That's for me,
21  right?
22      MR. LEVINE: That is for you.
23      BY MR. HEINOLD:
24  Q.  Let's talk about, you mentioned

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 105

1   the recall motorcycle and the warning on the
2   recall motorcycle.
3   A.   Okay.
4   Q.   Did you consider that warning,
5   the on-product portion adequate?
6   A.   I don't know that I considered
7   that adequate. I don't recall offhand what
8   the warning looked like, number one. So I
9   don't recall if it had the appropriate signal
10  word panel. And two, the language is still a
11  bit -- what's the word I want to use? It's
12  not specific and explicit.
13  Q.   What page in your report are
14  you referring to?
15  A.   11.
16  Q.   Okay.   What is -- I think you
17  said not specific and some other --
18  A.   Explicit.
19  Q.   What is not explicit and
20  specific in that language?
21  A.   Well, my understanding is that
22  BMW intended -- well, you go down to the --
23  I'm sorry, you go down to the warning in the
24  manual, it says: Do not keep the engine

Page 106

1   running while the motorcycle is at a
2   standstill - Risk of overheating and fire.
3   Ride away immediately after starting the
4   engine.
5       When you look at the warning
6   that was on the -- they put on the motorcycle
7   itself it says: Avoid increased idle speed at
8   a standstill with choke in use - Risk of
9   overheating and fire.
10      They're two different
11  messages. So the one says -- the one that's
12  on bike says: Avoid increased idle speed at a
13  standstill with choke in use. The other one
14  says: Do not keep the engine running while
15  the motorcycle is at a standstill. Ride away
16  immediately after starting the engine.
17      So if you want them to ride
18  away immediately after starting the engine you
19  need to specifically and explicitly state that
20  in the warning on the product.
21  Q.   Okay. Is the warning from the
22  insert -- let's do a little housekeeping.
23      We're looking at Page 11 of
24  your report, and in the middle you have the

Page 107

1   language from the on-product label that was
2   put on the 1997 motorcycle; correct?
3   A.   I'm sorry, I was reading it and
4   I didn't follow your question.
5   Q.   Okay. We're on Page 11 of your
6   report, and indented there you have three
7   lines that purport to repeat the language that
8   was on the on-product label as part of that
9   recall?
10  A.   Yes.
11  Q.   And just below that you have
12  the language that was part of the warning
13  insert to the Rider's Manual?
14  A.   Yes.
15  Q.   And you were comparing the
16  on-product to the Rider's Manual insert just a
17  moment ago?
18  A.   I was -- yes.
19  Q.   And you were saying that the
20  on-product label wasn't sufficient, wasn't
21  explicit or specific?
22  A.   Yes.
23  Q.   And in contrast you referred to
24  the insert?

Page 108

1   A.   Yes.
2   Q.   Is that specific and explicit?
3   A.   The information in the insert
4   warning provides more information to
5   understand the hazard and what the issue is
6   and what you need to do to avoid it.
7   Q.   So is that sufficiently
8   explicit and specific?
9   A.   I think that it's okay for an
10  on-product warning. My opinion would be that
11  if you're going to include that in your manual
12  that you provide additional information to let
13  the user know what the problem is and why it's
14  a problem. So part of the, you know, reason
15  that you provide information in manuals,
16  warnings in manuals is you have more space to
17  provide more information.
18      So as I note in my report on
19  Page 15 that the appropriate thing to do was
20  to repeat the on-product warning in the manual
21  with an explanation of how the fire occurs.
22  Q.   So the insert in the manual is
23  okay, it's sufficient if you were going to put
24  that on the product?

Page 109

1  A.  I think it's better than what
2  they did provide on the product.
3  Q.  Is it sufficient?
4  A.  If I was designing it I would
5  say you put the one on Page 14 of my report.
6  I think that's specific and explicit and
7  succinct.
8  Q.  Do you understand that --
9  strike that.
10    Do you have an understanding of
11  the issue that led to the recall?
12  A.  Yes.
13  Q.  What is it, your understanding?
14  A.  It looks like there were
15  multiple fires reported to BMW with this
16  particular model motorcycle.  They attributed
17  it to the fact that while it was idling at a
18  higher idle than no choke, for example, that
19  the engine was heating up, overheating and
20  igniting the fairing that was adjacent to
21  either the exhaust or the engine itself.
22  Q.  Okay.  So it was the fairing
23  which was igniting rather than the oil sight
24  glass which was deformed?

Page 110

1  A.  I think -- my understanding is
2  that at least from the discussions with NHTSA
3  it was the fairing that was igniting due to
4  its proximity to either the exhaust or the
5  engine.  They're pointing it to the exhaust
6  system temperature rising considerably
7  increasing the risk of fire.
8  Q.  As a result of the fairing, the
9  ignition of the fairing?
10  A.  The ignition of the fairing,
11  yes.
12  Q.  This did not involve oil sight
13  glass failures?
14  A.  That's not what's noted in the
15  NHTSA notification.  I don't know if Mark
16  Yeldham testified that the oil sight glass was
17  involved or not.  I don't recall offhand.
18  Q.  Okay.  Do you have any
19  information if the oil sight glass was
20  involved in the recall issue?
21  A.  Not based upon the NHTSA
22  document that I have.
23  Q.  What is your understanding of
24  what the change in the design would be -- let

Page 111

1  me ask you.  Let me start that over.
2    Do you have an understanding
3  whether as a result of the fairing igniting,
4  whether the design of the BMW motorcycles at
5  issue is changed?
6  A.  It's my understanding that the
7  incident bike in the recall was discontinued
8  at some point in time, and then the 1150,
9  R 1150 took its place and that the R 1150 had
10  three different packages, if you will.  The
11  one involved in this incident was like a
12  strip-down version.  And then the next two had
13  different levels of front bearings and so
14  forth.
15    I think Yeldham testified that
16  there was a potential for the oil sight glass
17  to fail in the 1150 due to the engine
18  overheating at a standstill and the potential
19  for the front fairing and/or wiring harness on
20  the bikes to ignite because of the heat of the
21  exhaust when at a standstill.
22  Q.  On the subject motorcycle?
23  A.  Not on the subject motorcycle
24  because it didn't have a -- the front fairing

Page 112

1  wasn't near the exhaust, but on the -- there's
2  two other versions of that same bike.  I don't
3  remember the names offhand, but they had
4  different levels of the amount of fairing on
5  the front of it.
6  Q.  When you say the names, what do
7  you mean?
8  A.  Well, the incident bike was the
9  R 1150 R.  My understanding is that there were
10  two versions of that bike.  There was the
11  R 1150 R, and I don't know what the letter
12  designations were for those other two models.
13  Q.  Were you aware of any fires
14  regarding the fairings?
15  A.  Apparently one of the other
16  models is the R 1150 GS, and I'm aware of a
17  fire as a result of the oil sight glass
18  failing on that bike.  There's an R 1150 80V
19  that also was involved in an oil sight glass
20  fire, oil sight glass failure fire.
21    And it looks like there's a
22  fire involving an R 11 RT that involved an oil
23  leak.  It doesn't say whether the oil sight
24  glass failed or not.

Page 113

1 Q.   These are allegations; correct?
2 A.   These are a list of claims.
3 Q.   Right.  A claim is an
4 allegation?
5 A.   I don't know if I can agree or
6 not agree with that statement.
7 Q.   Okay.  What is that document
8 you're looking at?
9 A.   It's a BMW production document
10 summary.
11 Q.   Prepared by?
12 A.   Mr. Hughes' office.
13 Q.   Is that part of what you
14 provided me on this flash drive?
15 A.   It has to be.
16 Q.   Okay.  You hadn't mentioned it
17 as one of the -- when I said anything else,
18 but it's your book and your --
19 A.   I think that was part of the
20 material reviewed.  I'm sorry, I was including
21 that under the material available for review.
22 Q.   Perhaps I didn't notice it.  I
23 didn't notice it in your materials available
24 for review.

Page 114

1 A.   Yeah, I don't -- I didn't
2 reference the summary.  I just referenced the
3 document.  Now I forget the question there.
4 Q.   There wasn't.  You finished.
5 A.   Okay.
6 Q.   What assumption, if any, did
7 you make about whether Mr. Yazdani read this
8 manual?
9 A.   It's my understanding that he
10 was provided with the manual for the
11 motorcycle when he purchased it used and that
12 after getting home -- driving the motorcycle
13 home, at some point in time he read it when he
14 first got the bike.
15 Q.   What's your assumption about
16 whether he read the pertinent sections of this
17 manual that dealt with the warning not to
18 leave it at a standstill because it might
19 overheat and cause a fire?
20 A.   Mr. Yazdani testified that he's
21 not sure if he read them, and if he read them,
22 that it sunk in, if you will.  And if he had
23 read them, he didn't remember them,
24 Q.   What are your assumptions for

Page 115

1 purposes of your opinions about whether he
2 read those or didn't read those?
3 A.   To me it doesn't matter if he
4 read them or didn't read them several years
5 before the fire.
6      That's one of the limitations
7 of providing information and important
8 warnings in the manual is that people are
9 likely to overlook it, they're likely to
10 forget it, and they're likely not to be
11 recalling or thinking about it at the time the
12 information is needed.  Hence the need for an
13 on-product warning.
14 Q.   Is it important to read the
15 Manual?
16 A.   It depends.
17 Q.   It depends on what?
18 A.   It depends on whether it's
19 required or not to use and operate the piece
20 of equipment or machinery.
21 Q.   How does someone know whether
22 it's required until they read?
23 A.   Well, two things.  One is that
24 the product may be like other products that

Page 116

1 they've used in the past, and therefore they
2 possess the knowledge necessary to use it.  Or
3 two, the manufacturer has a requirement to
4 read it.  And then if they have a requirement
5 to read it, it may not be all that important
6 to read it.
7 Q.   Is it important to your opinion
8 whether Mr. Yazdani read it and understood it
9 prior to the accident?
10 A.   No, it doesn't matter to me.
11 My assumption is that either he read it, read
12 it and didn't understand it, or read it,
13 understood it and forgot it.  Either way he
14 wasn't thinking about it at the time.
15      He had read the manual several,
16 I don't know if it's two years or
17 year-and-a-half before the fire, but it's very
18 common for people to read information in
19 manuals and then not have a recollection of it
20 or not be thinking about it at the time the
21 information is needed.
22      Again, this gets back to the
23 necessity of on-product warning for a unique
24 and atypical hazard.

Page 117

1  Q.  If he did not read, but would
2  have understood it if he had read it, is that
3  important for your opinion?
4  A.  I think he testified that had
5  he read it he would have understood it.  I
6  think he read it and in his deposition said he
7  understood it.
8  Q.  Okay.  Is that important to
9  your opinion?
10  A.  To me it's irrelevant because
11  he wasn't thinking about it at the time.  So
12  that's part of the problem with the warning in
13  the manual, is that people, A, don't read it,
14  B, read it and don't remember it at the time
15  or the location where the information is
16  necessary.
17  Q.  If he read it and understood
18  it, forgetting about whether he forgot it or
19  whether he should have been reminded of it,
20  the message in the manual was sufficient at
21  least to be understood as to the activity and
22  the consequences; correct?
23  A.  That's what Mr. Yazdani
24  testified, that he understood what the warning

Page 118

1  meant in the manual.
2  Q.  So in this case your criticism
3  is not of the information imparted in the
4  manual because it was adequate, was it not?
5  A.  Well, I have opinions with
6  regard to whether or not the information that
7  was provided in the manual is adequate or not,
8  but to this case they're irrelevant.
9      The point is that we don't know
10  if Mr. Yazdani read it or not, but he wasn't
11  thinking about it at the time.  It was a
12  unique or atypical hazard associated with this
13  motorcycle, and had the proper warning been on
14  the product it would have insured that Mr.
15  Yazdani saw it, read it, understood it both
16  when he got the bike and then when he was
17  started it or planning on starting it a year
18  and a half, two years later.
19  Q.  Is it also irrelevant because
20  he said I read it and understood it?
21  A.  That's what he testified to.
22  Q.  Does that make it irrelevant?
23  A.  It doesn't make it irrelevant
24  because he didn't recall it at the time of the

Page 119

1  incident.  He's not sure if he ever read it.
2  Q.  Do you think he would have
3  recalled if the warning had been different?
4  A.  I think that had the warning
5  been different it would have been more
6  appropriate, but I don't know that he would
7  have recalled it at the time.
8  Q.  So this case boils down to an
9  on-product warning?
10  A.  The case boils down to the fact
11  that there was a design defect in the
12  motorcycle, and that instead of fixing it
13  through a design or providing an adequate
14  safeguard they provided an inadequate warning
15  in the manual.
16  Q.  And the design defect was what?
17  A.  The fact that the oil sight
18  glass can fail when the bike is left at a
19  standstill, which is a customary, foreseeable
20  use of the motorcycle.
21  Q.  But you're relying on others to
22  determine that design defect?
23  A.  Sure.  I'm relying upon Mark
24  Yeldham and his testimony as to what the

Page 120

1  problem was.
2  Q.  So in terms of the warning in
3  the manual, let me --
4  A.  I have it here if you would
5  like it.
6  Q.  Yes, let's do a little
7  housekeeping.  We've been referring to some
8  things.
9      MR. HEINOLD: Let's mark his
10  report as Vigilante-1.
11      - - -
12  (Whereupon, Exhibit Vigilante-1 was
13  marked for identification.)
14      - - -
15      MR. HEINOLD: And we'll mark
16  his Testimony List as Exhibit 2 and his
17  Curriculum Vitae as 3.
18      - - -
19  (Whereupon, Exhibits Vigilante-2, 3 and
20  4 were marked for identification.)
21      - - -
22      BY MR. HEINOLD:
23  Q.  I'm going to show you what's
24  been previously marked as Yazdani-1 and now

Page 121

1   marked as Vigilante-4, which is the cover
2   sheet and two pages of the Rider's Manual that
3   you have the original of and I have the
4   original of.  Do we have the same one?
5   A.  Wait, you have a publication
6   date on that?
7       MR. LEVINE: The last page.
8       THE WITNESS: 10/2002?
9       MR. HEINOLD: Yes.
10      THE WITNESS: All right.
11      BY MR. HEINOLD:
12  Q.  I didn't mark down the Bates
13  number.
14  A.  It's BMW North America 1
15  through BMW North America 2, BMWNA55 and
16  BMWNA64.
17  Q.  One is 55, I believe that is
18  Page 351, Section 3, Page 351?
19  A.  That is -- I'm going to say
20  it's 51.
21  Q.  Okay.  Down in the lower
22  right-hand corner of that page, all right,
23  would you read that into the record?
24  A.  Sure.  You want me start from

Page 122

1   Risk of fire or the Warning?
2   Q.  You can start with the
3   Warning.
4   A.  Warning:  Make sure --
5   Q.  There's a Warning in large
6   letters, all bold, all caps, right, with a
7   Warning placard?
8   A.  Oh, Warning:  Make sure that
9   whether riding or standing still or when the
10  motorcycle is parked no easily flammable
11  material (for example, hay, grass, leaves,
12  clothing or luggage, etc.) can come into
13  contact with the hot exhaust system.  Do not
14  allow the engine to idle unnecessarily or for
15  prolonged periods - Risk of overheating or
16  fire.  Ride away immediately after starting
17  the engine.
18  Q.  Okay.  Now, the word Warning is
19  large; correct?
20  A.  It's larger than the print on
21  the page.
22  Q.  Do you have a criticism with
23  the use of the Warning placard, the use of the
24  word Warning with all capitals and all bold

Page 123

1   and in a box?
2   A.  It's not the traditional way to
3   do signal work, but I'm not going to argue
4   about it because it looks like the entire
5   manual is black and white, except for the
6   front page.  So they apparently chose to do
7   everything in black and white.
8       MR. LEVINE: He does not opine,
9   I don't believe, or criticize the form and
10  substance of the in manual warning; am I
11  correct?
12      THE WITNESS: That's correct.
13  It wasn't relevant to my opinions.
14      MR. LEVINE: He will not be
15  testifying as such at trial.  You can do what
16  you want.  I just thought that I would clarify
17  that.
18      BY MR. HEINOLD:
19  Q.  But is it -- you say it's
20  irrelevant.  My only question is, is it
21  inadequate?
22  A.  It is inadequate.
23  Q.  Is adequate or inadequate?
24  A.  It is inadequate the way it's

Page 124

1   presented on that page.
2   Q.  Why?
3   A.  Well, first of all, the section
4   above it starts:  Risk of fire, high
5   temperatures at the exhaust system,
6   particularly if the catalytic converter is
7   installed.
8       So obviously that's dealing
9   with a different fire cause scenario than the
10  oil sight glass failing.  So I would think
11  that it's fairly self evident that the exhaust
12  gets hot and there's a potential for fire.
13      So now we have a warning
14  directly underneath that information that
15  deals with, again, stuff, combustibles coming
16  in contact with the hot exhaust system.  A
17  person reading it would be expected to read
18  the Risk of fire section above it, get to the
19  warning and think that the whole thing, the
20  whole section was related the exhaust system
21  and the exhaust system being hot.
22      So they bury the information
23  related to not allowing it to idle
24  unnecessarily or for long periods within the

Page 125

1　section dealing with don't let hot stuff
2　contact hot exhaust.  So that warning should
3　have been related to don't let it idle
4　unnecessarily for long periods, should have
5　been separated from the other information to
6　make it distinct and to let readers know that
7　it's a different topic, a different specific
8　topic.
9　　Second, Do not allow the engine
10　to idle unnecessarily or prolonged periods.
11　Neither of those terms, unnecessarily or
12　prolonged, are defined.  I think Mark Yeldham
13　testified to that as well.  We don't know what
14　unnecessarily or prolonged means and neither
15　does the reader.
16　　So, for example, Mr. Yazdani
17　testified that he was starting the bike
18　because he didn't winterize it.  So obviously
19　it was necessary to him to start the bike
20　because he wasn't winterizing it.  A prolonged
21　period is, again, open to interpretation.
22　　Some people's fires apparently
23　claim they're happening in 10 to 15 minutes.
24　Mr. Yazdani is not sure how long exactly he

Page 126

1　let the bike run, up to a half hour, maybe a
2　little bit longer.  It could have been a
3　little bit less.  So we don't know if he had
4　planned on leaving it run for 30 minutes
5　whether the fire would have started within
6　that period of time.  If he planned on letting
7　it run for 15 minutes you don't know whether
8　the fire would have started in that time or
9　not.  So, it's not specific, it's not explicit
10　and leaves open to interpretation as to what
11　is necessary, what is prolonged.
12　　And then we have:  Ride away
13　immediately after starting engine.  That's in
14　direct conflict with other instructions in the
15　manual that tell you have to put it in high
16　choke, hold the button in for some period of
17　time on a cold engine until the engine warms
18　up enough that you can release it so that the
19　bike doesn't stall.
20　　So that's apparently in direct
21　conflict, unless you expect the rider to be
22　holding the choke start or the choke button in
23　while riding down the street, which I don't
24　think BMW intended.  So they're some of the

Page 127

1　reasons why this information on Page 51 of the
2　manual is inadequate.
3　　Kind of a higher level issue is
4　that this atypical hazard associated with the
5　failure of the sight glass isn't communicated
6　to the rider or the reader until Page 51.
7　That means they've had 50 pages of other
8　information about the bike that doesn't
9　reference the fact that the oil sight glass
10　can fail and cause a fire if you let it idle
11　for periods of 10 to 15 minutes or longer.
12　　And then I did forget to
13　mention too that it doesn't tell you why
14　there's a risk of fire for letting it idle,
15　that being the oil sight glass can fail or the
16　wire harness can ignite.  So it would be nice
17　to know, typically in the manual, why they're
18　telling me why not to idle unnecessarily or
19　for a prolonged period of time.
20　Q.  Are you finished?
21　A.  Yes.
22　Q.  Okay.  Doesn't the phrase "ride
23　away immediately" help define not allowing the
24　engine to idle unnecessarily or prolonged

Page 128

1　periods?
2　　Is it your testimony that
3　there's no correlation there, there's no
4　assistance in helping the reader understand
5　what unnecessarily or for prolonged periods
6　mean?
7　A.  Well, two things.  The question
8　is whether or not it's related to Do not allow
9　the engine to idle unnecessarily or for
10　prolonged periods, or is related to the
11　potential for combustible to contact the
12　exhaust.  So we don't know based upon the way
13　it's formatted and presented.
14　　Second, the ride away
15　immediately after starting the engine is
16　contrary and conflicting with other
17　instructions, and the reality of starting this
18　bike on a cold day.  That you can't ride away
19　immediately after starting the engine.  You
20　have to go through a warm-up period.  So
21　obviously it's in direct conflict with other
22　instructions in the book.
23　Q.  Where is the conflict for the
24　other instructions?

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 129

1  A.  Well, Mark Yeldham testified
2  that on cold days you have to hold the choke
3  in all the way for it to heat up.  Otherwise,
4  the engine will stall if you release it.
5     So, again, if you have to hold
6  the choke in for a period of time on cold
7  engines to get it not to stall, you can't ride
8  away immediately.  It means that you have to
9  let that bike warm up for some period of time.
10     Now, Mr. Yeldham also testified
11  that what that period of time is subjective to
12  the user.  So if it's subjective to the user,
13  one rider may think that five seconds is okay,
14  another rider may think 10 minutes is
15  necessary.  Again, that's the problem with not
16  being specific and explicit, you're allowing
17  the user to interpret subjective terms.
18  Q.  You agree that -- what are you
19  looking at there?
20  A.  Oh, this is my summary of Mark
21  Yeldham's testimony.
22  Q.  That's also on your flash
23  drive?
24  A.  Yes.

Page 130

1  Q.  Would you agree that Mr.
2  Yazdani said when he read it that he
3  understood it?
4  A.  In his deposition that's what
5  he testified to.
6  Q.  Yes.  And that he understood
7  that he should not leave it at idle at a
8  standstill?
9  A.  After the fact he certainly did
10  read it and understand it, but he also
11  testified that until the deposition he wasn't
12  aware of why this thing caught fire, which
13  means he didn't understand what he did and how
14  it correlated with the fire.  So after the
15  fact in his deposition reading the manual he's
16  testified that he understood it.
17  Q.  So it's your testimony that
18  this manual is not clear about one, don't
19  leave it at idle at a standstill because it
20  may catch on fire, is that your testimony?
21  A.  My testimony is it's an
22  inadequate warning.  The information provided
23  on Page 51 of the Manual is inadequate to
24  alert and inform a rider as to the fire risk

Page 131

1  and how to avoid it and what can happen if
2  it's not avoided and why it occurs.
3  Q.  For the reasons you stated?
4  A.  Yes.
5  Q.  How about on Page 60 of the
6  manual.  I think it's Bates number 64 on
7  Yazdani Exhibit 1.
8  A.  Page 60, right?
9  Q.  Yes.  Do you consider that
10  inadequate?
11  A.  Yes.
12  Q.  Why?
13  A.  Again, first of all, it's on
14  Page 60 of the manual as opposed to being at
15  the start of the manual to alert and inform
16  someone before they read 59 pages of things
17  that are not related to this hazard.
18     Second, the risk of overheating
19  or fire is provided after telling them do not
20  warm up the engine with the motorcycle at a
21  standstill.  It would have been more
22  appropriate to say, warning, fire hazard, and
23  then you can explain it, as opposed to giving
24  the consequence of fire as the very last part

Page 132

1  of that sentence.
2     The next sentence says:  Ride
3  away immediately after starting the engine,
4  which is consistent with the other page.
5  However, directly under that it says:  To
6  avoid overheating the air-cooled engine and
7  possible damage as a result, avoid even short
8  warm-up periods at a standstill.  However, it
9  says, period, avoid high engine speeds after a
10  cold start.
11     So, again, it's inconsistent.
12  You have to have high-engine speeds after a
13  cold start because you're supposed to hold the
14  choke in.  The choke in is associated with
15  high-engine speeds.  Again, if you have to
16  hold the choke in until the engine warms up so
17  it doesn't stall out you can't ride away
18  immediately.  So there's a conflict.
19     Also, it doesn't tell you that
20  the oil sight glass can fail and spread or
21  allow hot oil to escape and create a fire.  So
22  someone may read that and think that if it's a
23  fire it's because combustible materials are
24  near the exhaust.  That's probably why they

Page 133

1   want me setting this bike -- letting it stand
2   still for a while.  If I don't have any
3   combustibles it's not really an issue.
4   Q.  Are you finished?
5   A.  I think so.
6   Q.  So is it your testimony that if
7   someone reads this sentence:  Do not warm up
8   the engine with the motorcycle at a
9   standstill, the risk of overheating or fire,
10  with an exclamation point, that they are not
11  going to understand that they should not warm
12  up the motorcycle and engine at a standstill,
13  is that your testimony?
14  A.  I think that if they read the
15  entire sentence they would understand that's
16  what the sentence had told them.  But
17  again --
18  Q.  They would understand what not
19  to do; correct?
20  A.  But they would understand --
21  Q.  Correct?
22  A.  It's in conflict with other
23  parts of the manual and the testimony of Mark
24  Yeldham, that they can't follow it.

Page 134

1   Q.  The conflict with other parts
2   of the manual meaning the use of the choke?
3   A.  It tells you start the engine,
4   but hold the choke in until the engine smooths
5   out, go to low choke, and then you can go.
6       Mark Yeldham testified that if
7   you come up high choke too soon the engine
8   will stall.  He testified that you have to
9   hold the choke in its high position until the
10  engine smooths out, and that smooth-out
11  process is subjective or the smooth-out point
12  is subjective.
13  Q.  Okay.  So that someone who is
14  operating a motorcycle, can we -- let me step
15  back.
16      Can we assume that someone who
17  is going to operate a motorcycle has a basic
18  understanding of how to operate it?
19  A.  As you mean -- excuse me, do
20  you mean how to start it and ride it, I'm sure
21  they do, unless it's an unfamiliar bike that
22  maybe they're borrowing a friend's or what
23  have you, then may need someone to show them
24  how to start it.

Page 135

1   Q.  So someone who is going to own
2   and operate a motorcycle they read the
3   statement:  Do not warm up the engine with
4   motorcycle at a standstill, risk of
5   overheating or fire, exclamation point, is not
6   going to understand don't leave this idling at
7   a standstill or it might catch on fire, is
8   that your testimony?
9   A.  No.  My testimony is that it's
10  in conflict with other information in the
11  manual, but it's also, this is important too,
12  for the purchaser of a new bike, it's
13  inconsistent and in conflict with the training
14  that the BMW North America dealership is
15  providing him on how to operate the bike.
16      So you've got a statement in
17  the manual that's in direct contrast, conflict
18  with other parts in the manual, their own
19  prior experiences if they've ridden and used
20  motorcycles before, and the training that BMW
21  provided them if they purchased it new from
22  the dealership.
23  Q.  What is that training?
24  A.  According to Mark Yeldham

Page 136

1   they're trained to show them how to start the
2   bike by holding in the choke until the engine
3   smooths out and then dropping it down to the
4   detent position of the choke switch.
5   Q.  Are there any parameters on how
6   long that takes in a motorcycle like this?
7   A.  Well, that's part of what Mr.
8   Yeldham testified to.  It's subjective and
9   it's depended upon the ambient temperature and
10  the temperature of the engine.  So it may take
11  a shorter amount of time if the machine is
12  warm or if the temperature is warmer.  It may
13  take a longer time.  It's also subjective to
14  the user.  And either you let it go long
15  enough, whatever that time may be because it
16  is very variable, or you come off too soon,
17  and if you come off too soon the engine can
18  stall.
19  Q.  Are there any parameters on
20  that time?
21  A.  Mark Yeldham testified it was
22  subjective.
23  Q.  Subjective.  Are there any
24  parameters in your mind?

Page 137

1  A.  I'm relying upon Mark Yeldham.
2  He should know the bike better than me.
3  Q.  So could someone have to hold
4  the choke in for two hours?
5  A.  I doubt it.
6  Q.  Okay.  So there has to be some
7  parameter?
8  A.  But it could be in warm
9  weather.  It could be a warm engine.  It might
10  be 10 seconds.  It could be a couple minutes.
11  If it's cold weather, cold engine.
12      Now, my Harley-Davidson
13  Sportster had a manual choke.  It wasn't on
14  the handlebar.  It was a switch underneath
15  the -- or on the side of the engine, I
16  believe, and it would have to stay warmed up
17  for several minutes.  In five or 10 minutes if
18  I was taking that bike out in January, which I
19  did often, even when I was a younger rider, to
20  get it to get into the mid point of the choke
21  before I could ride off, otherwise it would
22  stall.  It took minutes, 10 minutes, 15
23  minutes to warm up at high choke.
24      It wasn't -- I don't know what

Page 138

1  the BMW is.  According to Mr. Yeldham it's
2  subjective.  But I do know with other bikes
3  that it could take a number of minutes, a
4  period of time for it to warm up.
5  Q.  So the basis of your opinion is
6  that the operator of an motorcycle would not
7  be able to tell the difference between the
8  time you have to leave the choke on until it
9  smoothed out and not leaving the motorcycle
10  engine running at a standstill because it
11  might catch on fire?
12  A.  Exactly.  You're telling him
13  two different things.
14  Q.  And the motorcycle rider can't
15  tell the difference between those two things?
16  A.  I think he would look at it and
17  say what the heck is this trying to say,
18  because it's inconsistent with my experience,
19  my past experience, and it's inconsistent with
20  the training BMW gave me, and it's
21  inconsistent with other parts of the manual.
22  So is this some type maybe translation error
23  from German.  I don't know what the rider is
24  going to think, but it's certainly not clear

Page 139

1  and it leaves room for interpretation, which
2  is subjective, which leads to all different
3  kinds of conclusions.  Some of them may be
4  right, but some of them are going to be
5  wrong.
6      And that's the problem,
7  warnings aren't supposed to be subjective.
8  They're not supposed to leave open for
9  interpretation.  They're supposed to be
10  specific, explicit and they're supposed to be
11  consistent with other information and
12  experiences.  If they're not, it leaves people
13  to question the warning and then come up with
14  their own subjective idea of what the warning
15  is supposed to me and what they're supposed to
16  do.  And some people will get it right and
17  some people will get it wrong.  And that's not
18  the definition of an adequate warning.
19  Q.  Okay.  So it's your opinion if
20  someone reads, Do not warm up the engine with
21  the motorcycle at a standstill - Risk of
22  overheating or fire, is going to say it's okay
23  for me to leave this warming up at a
24  standstill for 30 minutes or more?  Is that

Page 140

1  your opinion?
2  A.  I doubt that they will read
3  that and say that allowing it to warm up for
4  30 minutes or more is appropriate.
5  Q.  Okay.  How about 20 minutes or
6  more, would they say that?
7  A.  Probably not 20 minutes.
8  Q.  How about five minutes?
9  A.  That's where it get
10  questionable because then some bikes -- some
11  temperatures it's going to take five minutes
12  of warming up on high choke for that engine to
13  smooth out.
14  Q.  So do you disregard for your
15  opinions in this case the fact that Mr.
16  Yazdani read the warning and said I understood
17  it, I understood the communication to me what
18  not to do and the consequence of it and I just
19  don't remember reading it?
20  A.  Well, I think he has testified that
21  reading it in the deposition he understands.
22  That's reading it in the deposition after a
23  fire occurred, after being told what happened
24  he understands what the manual means.

Page 141

1    He testified that he's not sure
2  if he read that part of the manual or if he
3  read it, if he understood it at the time he
4  read it, or if he read it and either
5  understood it or didn't understand it, but he
6  didn't remember it.
7    So asking him after the fact,
8  the Monday morning quarterback, what that
9  statement means is not fair and is not the
10  right way or a valid way to assess the
11  adequacy of that warning.
12  Q.  Do you believe -- you said that
13  he didn't know whether he would have
14  understood it if he read it back before the
15  fire?
16  A.  That's what he testified to.
17  Q.  And that's important to your
18  opinion?
19  A.  What's important to my opinion
20  is that the warning wasn't on the bike to
21  alert and inform the rider of the unique fire
22  hazard associated with the design of this
23  bike.
24  Q.  Is it important to your opinion

Page 142

1  that you believe Mr. Yazdani would not --
2  might not have understood the warning if he
3  read it back before the fire?
4  A.  It would be important to my
5  opinion if Mr. Yazdani testified that he read
6  it in the Manual, he fully understood it,
7  could explain it and was thinking about it at
8  the time of the fire and did it anyway.  That
9  would certainly be important to my opinion.
10    MR. HEINOLD: Can your read
11  back my question and please answer my
12  question.
13    - - -
14  (Whereupon, the court reporter read
15  back the pertinent information.)
16    - - -
17    THE WITNESS: It's my opinion
18  that Mr. Yazdani did not appreciate the fire
19  hazard associated with his actions, whether
20  it's because he didn't read the manual or read
21  it and didn't understand it, or read it,
22  didn't understand it or understood it and
23  forgot it.  He wasn't aware of it at the time
24  of the fire.

Page 143

1    It's my opinion had he read the
2  manual that it wouldn't have been adequate to
3  inform him of the fire hazard at the time he
4  first owned the bike.  Therefore, even if he
5  had read it and understood -- if he had read
6  it he wouldn't have understood what BMW was
7  trying or claiming that the warning is
8  intended to address and intended to say.  It
9  would be my opinion that he wouldn't have
10  understood it at that time.
11    MR. HEINOLD: Can you read the
12  question back and can you answer it this time.
13    - - -
14  (Whereupon, the court reporter read
15  back the pertinent information.)
16    - - -
17    THE WITNESS: It's the same
18  answer.
19    MR. LEVINE: Do you feel he's
20  not answering your question?
21    MR. HEINOLD: Yes.
22    MR. LEVINE: I heard the
23  question, I heard the answer.  Let me break it
24  down and see if I understand.  You've asked

Page 144

1  him, is it your opinion that it would not have
2  mattered?
3    MR. HEINOLD: No.  I asked
4  him -- he said he wouldn't have understood it
5  and that he testified -- strike that.  I'll
6  start over.
7    He said that Mr. Yazdani
8  testified that he wouldn't have understood it
9  back then or might not have understood it back
10  then.  And I said:  Is it important to your
11  opinion that he wouldn't have understood it?
12  That's a simple question.
13    MR. LEVINE: First off, is it
14  accurate that the witness here, Dr. Vigilante,
15  stated that he did not understand it, would
16  not have understood it, might have not
17  understood it, because you threw those in a
18  little bit softly there?
19    In other words --
20    MR. HEINOLD: I didn't throw
21  them in.
22    MR. LEVINE: Bear with me, I'm
23  going to get you your answer that you're
24  looking for, I promise you.  You put that

Page 145

1 supposition in in the beginning of your
2 question:  Based upon the fact that you have
3 testified Mr. Yazdani might have not have
4 understood, did not understood it or would not
5 have understood it.
6     MR. HEINOLD: I didn't ask the
7 question that way, Ken.
8     MR. LEVINE: I'm going to help
9 you here.  I'm promising you.  Maybe I need to
10 hear it again.  I apologize.
11     MR. HEINOLD: Go ahead, ask
12 whatever you want to do.
13     MR. LEVINE: No.  I was asking
14 her what your question was because I don't
15 want to change your question.
16     MR. HEINOLD: I'll start over.
17     MR. LEVINE: I promise you I'm
18 not going to let him avoid you.
19     BY MR. HEINOLD:
20 Q.  Do you believe Mr. Yazdani said
21 that he would not have understood that warning
22 if he had read it back before the fire?
23 A.  What I testified to, and I'll
24 read my summary of his testimony, he read the

Page 146

1 manual, but he does not recall if he read the
2 manual, if he -- excuse me, I'll start over.
3     He read the manual, but he does
4 not recall if he read the warning and didn't
5 register it or if he did not read the
6 warning.  So his testimony is he doesn't know
7 if he read it, and if he read it, it didn't
8 register to him.  So that's my understanding.
9     So there's no testimony,
10 there's no evidence to state that he either
11 read it and that if he read it, he understood
12 it in the manner in which BMW North America is
13 claiming they intended it to mean.
14     So it's possible, it certainly
15 is possible that Mr. Yazdani read that
16 language or part of that language and took it
17 to understand the same thing that other people
18 would understand by reading the entire
19 manual.  And based upon prior experiences,
20 that it's not consistent with the way you're
21 supposed to use the bike, and that it's in
22 conflict with the way you're supposed to use
23 the bike.  And if it's in conflict, how valid
24 is the statement.  And if it's not valid, why

Page 147

1 should I abide by it or comply with it.
2 Q.  Okay.  When you testified
3 earlier you said he testified he didn't
4 understand it, he didn't know if he understood
5 it.  You just read that and you used the word
6 registered and transformed registered into
7 lack of understanding rather than perhaps it
8 didn't sink in, perhaps he forgot rather than
9 understand.  We've been sitting here talking
10 about whether this is understandable or not.
11     I want to know -- after that
12 description of why I'm asking you this
13 question, I want to know this:  Is it
14 important to your opinion that he did not
15 understand it prior to the accident if he read
16 it?
17 A.  Again, my understanding is he
18 testified he was not aware of the fire hazard
19 prior to the incident.  He testified he
20 doesn't recall whether he read the manual --
21 excuse me, that part of the manual, if he read
22 it, it didn't register --
23     MR. LEVINE: I'm going to
24 interrupt.  You don't need to keep repeating

Page 148

1 what Mr. Yazdani did or didn't testify to.  I
2 appreciate that's part of your answer, but I
3 sit here and listen to you repeating
4 exactly -- we have read it.  We've seen it,
5 Bill.  The question was entirely different.
6     So he's asking you whether or
7 not his opinion as expressed there, and
8 correct me if I'm wrong, are important or
9 unimportant to your opinions here?  But if you
10 want to correct me, go ahead.
11     THE WITNESS: Yeah, it's not
12 important to my opinion if -- I don't want
13 to -- I'm not going to sit here and say that
14 Mr. Yazdani read that manual and understood it
15 the way BMW is intending it to mean at this
16 point in time.  So, that's number one, I'm not
17 going to say that I agree with that.
18     So based upon -- what I read
19 through his deposition, I don't think that's
20 correct that he understood the message that
21 BMW was intending to convey.  But if he did,
22 understood that line when he read that manual
23 when he first got the bike, it didn't sink in,
24 it didn't register, he wasn't aware of it and

Page 149

1  he sure wasn't thinking about it or aware of
2  it at the time of the incident.
3      And that's because A, the
4  manual is inadequate and the information in
5  the manual is inadequate.  And B, providing
6  the information only in the manual is
7  inadequate and inappropriate.
8      I'm starting to get a little
9  big tongue-tied because I'm starving.  So it
10  might help if I eat, take a break.
11      MR. HEINOLD: Let's take a
12  break.
13      - - -
14  (Whereupon, a short break was taken at
15  this time.)
16      - - -
17      BY MR. HEINOLD:
18  Q.  Do you believe the owner of a
19  motorcycle has the responsibility to
20  understand the motorcycle and its features in
21  order to own and operate it safely?
22  A.  To a reasonable degree, sure.
23  Q.  Okay.  How to operate it?
24  A.  Sure.

Page 150

1  Q.  Its features and
2  characteristics?
3  A.  To a reasonable degree.
4  Q.  How to maintain it, service it?
5  A.  To a reasonable degree.
6  Q.  What the safety features are?
7  A.  To a reasonable degree.
8  Q.  Do you believe the owner of a
9  motorcycle has the responsibility to read the
10  Owner's Manual?
11  A.  I don't believe they have the
12  responsibility to study an Owner's Manual.
13  They should read the manual, but I don't think
14  they have the responsibility to study it.
15  Q.  What's the difference between
16  reading and studying in your mind?
17  A.  The ability to extract every
18  piece of information the manufacturer provides
19  in the manual would be under the definition of
20  studying as opposed to reading it in a
21  leisurely fashion where you are collecting the
22  information that you're interested in and
23  perhaps skipping parts that you're not
24  interested in, and generally getting a feel

Page 151

1  for the vehicle as opposed to understanding
2  all of its nooks and crannies.
3  Q.  Are there parts that it's okay
4  to skip?
5  A.  Sure.
6  Q.  What parts are those?
7  A.  Things that you're not
8  interested in or that you think you may have
9  already known.  I think these are reasonable
10  things that people do quite often.
11  Q.  When it says "Warning, Risk of
12  fire", is that okay to skip?
13  A.  It depends on where it's
14  presented, how it's presented.
15  Q.  Well, I mean, let me be clear.
16  Is it okay not to read it?  Do you justify the
17  decision that an owner -- that a manual --
18  that an owner would look at the Rider's Manual
19  and see it said Warning, and then doesn't read
20  what the warning is?  Do you justify that?
21  A.  Again, it depends upon how it's
22  presented, where it's presented, why it's
23  presented and what other information it's
24  presented with.

Page 152

1  Q.  I'm not talking about not
2  noticing it.  Let's be clear on my question.
3      Let's say there's a warning and
4  it says Warning, are you saying it's okay for
5  that person to not read what's under that
6  Warning?  I'm talking about reading.
7  A.  Again, it depends upon the
8  information that it's presented with, how it's
9  presented, where it's presented, why it's
10  presented.
11      So, for example, if there's a
12  picture of a helmet and it says Warning,
13  somebody is going to infer that's probably
14  going to say, Warning, don't ride a motorcycle
15  without a helmet.  So there's a good chance
16  people are going to skip it.
17  Q.  Is that okay?
18  A.  Absolutely.  They already have
19  the information or believe they have the
20  information.  So the question is, again, how
21  you're presenting the information to make sure
22  that if it's important, if it's urgent, that
23  it's set off and it's identified as such.
24      Making the warning the same as

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 153

1   all the other warnings on the page, by the
2   time I read all the other warnings I'm like
3   this is ridiculous, I don't need to know this,
4   or this isn't relevant, or I already knew
5   this, why should I read the fifth warning on
6   the page.  That's a reasonable reaction of a
7   person.
8       So if it's unique and specific
9   to this bike it needs to have greater
10  prominence in the book and where it's
11  presented, not on Page 51, at the front of the
12  manual, and how it's presented.  Not the same
13  type of signal word as the other four warnings
14  that are on the page that may or may not be
15  relevant to the information I need as a
16  rider.
17      So it just depends on how it's
18  presented, where it's presented, why it's
19  presented and what other information it's
20  presented with.
21      So here's a good example, on
22  Page 49:  Warning, do not read -- excuse me,
23  do not ride the motorcycle after drinking
24  alcoholic beverages.  I'm done reading.  As a

---

Page 154

1   reasonable adult I know I should not be doing
2   that.  Do I need to read the rest of that
3   paragraph, no.  Is it reasonable to expect
4   that somebody is going to skip the rest of
5   that paragraph, absolutely.
6       If there is something down here
7   at the bottom of that paragraph that's not
8   really related to the top of it, but
9   particularly unique or important to this bike,
10  shouldn't it have been presented in a
11  different manner, absolutely.
12  Q.  Let's talk about Page 51 where
13  on the right-hand side under Risk of -- on a
14  page it says:  Important notes, where it says
15  Risk of fire, and then these big bold warning
16  placard, is it okay not to read that warning?
17  A.  Well, again, as I mentioned
18  earlier, it's very possible and likely that
19  somebody is going to read, Risk of fire, high
20  temperatures occur at exhaust system,
21  particularly in a catalytic converter.
22  Warning, making sure that whether riding or
23  standing still no easily flammable material, I
24  understand what they're saying, don't let

---

Page 155

1   anything combustible get near my exhaust
2   because it gets hot.  Do I need to read the
3   rest of that to understand, no.
4       So that's the problem with the
5   way this particular warning is presented,
6   because it's in the information that's readily
7   observable, readily known.  So there's no
8   reason for the user to continue reading down
9   to that third sentence that says:  Oh, by the
10  way, do not allow the engine to idle
11  unnecessarily or for prolonged periods.
12  Q.  So we're clear, it's okay with
13  you if the owner of a motorcycle doesn't read
14  the warning on Page 51 that we're talking
15  about, yes or no?
16      I'm not asking for reasons why
17  someone might not.  I'm asking you, a warning
18  experts, is it okay -- are you saying yes,
19  it's okay, you don't to have read that?
20  A.  It is foreseeable and
21  reasonable for a person not to read an
22  inadequately presented warning.  So the fact
23  that it's inadequate on Page 51, 53 would be
24  reasonable for a person not to read it.

---

Page 156

1   Q.  Is it okay with you?
2   A.  It's not okay with me, but it's
3   not okay for the manufacturer to present
4   important critical safety information in an
5   inadequate fashion that encourages people not
6   to read it.
7   Q.  How about on Page 60 under
8   Warning where it says:  Do not warm up the
9   engine with the motorcycle at standstill -
10  Risk of overheating and fire, that's right
11  upfront, isn't it?
12  A.  It's on Page 60.
13  Q.  It's right under Warning,
14  right?
15  A.  It is under Warning.
16  Q.  Let me ask you a question:  Do
17  you think the length of manuals in today's
18  world has anything to do with guys like you
19  who criticize warnings all the time and make
20  the manufacturers add a lot of warnings like
21  don't ride a motorcycle after you're drinking?
22  A.  I don't know about don't ride a
23  motorcycle after drinking, but I do know
24  manufacturers choose to rely upon an

---

Case 2:15-cv-01427-TR   Document 26-2   Filed 05/02/16   Page 42 of 54
Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 157

1  Instruction Manual to mitigate the design
2  defect with the motorcycle, it's inappropriate
3  and it leads to long manuals.
4     So if they had fixed it from
5  the beginning or provided an adequate
6  safeguard, there wouldn't be a need to add it
7  to the manual, maybe cut a page-and-a-half out
8  of it.
9  Q.  So human factors experts have
10  no role in the length of the modern day
11  manual?
12  A.  Maybe litigation attorneys.
13  Human factors experts would say fix the
14  design, provide the safeguard, do not rely
15  upon a warning.  Particularly they would say
16  do not rely upon a warning in a manual.
17     As a human factors professional
18  my preference is to fix the design.  When I
19  worked for the IBM Corporation I worked with
20  the engineers to fix the design before we
21  relied upon a warning in a manual around the
22  product.  Eliminating it through design is
23  always the first and best option.  Providing a
24  guard is the second and second best option.

Page 158

1  Relying upon a manual means you've already
2  given up on your design, and that to me si
3  inappropriate.
4  Q.  Go back to Page 60.
5  A.  Sure.
6  Q.  You criticized this warning
7  because it was on Page 60.  My question is:
8  Are you saying it's okay for the owner of this
9  type of motorcycle not to read that warning,
10  not to gain the information that it provides?
11  Yes or no?
12  A.  There's plenty of reasons why
13  it would okay for the owner of a motorcycle
14  not to read this part of the manual.  And it
15  was foreseeable to BMW that a rider wouldn't
16  read this part of the manual, and if they
17  didn't read this part of the manual they would
18  have gotten the information presented.
19  Q.  So if Mr. Yazdani didn't read
20  this manual, read this part of the manual on
21  Page 60, you're saying that's okay, good job,
22  Mr. Yazdani, good job?
23  A.  I would say his behavior is
24  consistent with the majority of consumers and

Page 159

1  riders.  So it means everybody is wrong, or
2  does it mean BMW is wrong for depending upon a
3  warning on Page 60 of their manual to fix a
4  design defect.
5  Q.  What's the point of a manual
6  then?
7  A.  The point of a manual is to say
8  here are the features of the bike, if you need
9  to know them because it's not apparent in the
10  way the bike is presented then read the
11  manual.
12     From a human factors
13  standpoint, again, you make products easy to
14  use, intuitive to use.  If you make them easy
15  to use and intuitive to use and you design out
16  the hazards to provide adequate safeguard the
17  need for a manual becomes less and less and
18  less.  The goal of the human factors engineers
19  is to make manuals as short as possible by
20  making the design intuitive and easy to use as
21  possible.
22  Q.  Do you have a list that you use
23  when you advise clients or make
24  recommendations to tell the owner of a product

Page 160

1  what warnings he should or shouldn't read in
2  the manual, which ones are okay not to read?
3  A.  Nope.
4  Q.  Are there some warnings that
5  are okay not to read?  Just forget about why
6  they might not, are there warnings that are
7  okay not to read?
8  A.  Again, it's my opinion that a
9  reasonable rider, a reasonable person would be
10  reasonable in not reading an inadequate
11  warning or inadequate information that's
12  presented in an inadequate fashion.
13  Q.  Tell me which warnings are okay
14  not to read.
15  A.  Well --
16  Q.  You just bought a motorcycle.
17  Which warnings are okay not to read?
18  A.  If I bought a motorcycle and I
19  went through my rider training with BMW --
20  Q.  I'm not asking that, sir.  And
21  we can go around and around, and I can do the
22  same thing we've done and I'll ask them over
23  and over again.  You've got your speech, I get
24  it.  I'd like you to answer my question.

Page 161

1    Are there warnings that are
2  okay not to read, yes or no?
3  A.  So as I was saying --
4  Q.  I'll tell you what, answer me
5  yes or no and then give whatever explanation
6  you want.
7      MR. LEVINE: I'm going to
8  object to this question, because if you were
9  to hear your own question, you're saying --
10  you haven't self defined it yourself, are
11  there warnings okay not to read?
12      MR. HEINOLD: I don't need any
13  more definition.  Are you objecting to the
14  form?
15      MR. LEVINE: I'm objecting to
16  the form because you can have 17 different
17  meanings.  So when he answers it you're not
18  even going to know what --
19      MR. HEINOLD: 17 different
20  meanings to what?
21      MR. LEVINE: It could have been
22  warnings that are in a product, warnings that
23  are in a manual.
24      MR. HEINOLD: I said in a

Page 162

1  manual.  I'll start over.
2      MR. LEVINE: In this manual.
3      BY MR. HEINOLD:
4  Q.  You just bought this
5  motorcycle, are there warnings that are okay
6  not to read?
7  A.  I think, again, my opinion is
8  it's --
9  Q.  Can you answer me yes or no?
10  Can we get that?  Answer me yes or no and --
11      MR. LEVINE: I would ask that
12  the witness answer the question and then
13  explain his answer.
14      THE WITNESS: Yes, it's okay
15  not to read inadequate warnings.
16      BY MR. HEINOLD:
17  Q.  How does the reader know that
18  they're inadequate if he hasn't read it?
19  A.  I think that it would be up to
20  me to decide whether it's inadequate or not
21  and it would be consistent with the person's
22  behavior as to whether they read it or not as
23  to  whether it was inadequate or not.
24  Q.  But do you come with the

Page 163

1  manual?  When someone buys this bike, do they
2  get you too and say hey, do I have to read
3  this warning?
4      My question is:  Somebody buys
5  a product, they get the manual.  Are there
6  warnings that they don't have to read?
7      You just said yes, there are
8  warnings.  So now I want to which ones they
9  are.  How do you determine which ones they
10  are?  How does he determine which ones they
11  are?
12  A.  As I was trying to explain
13  generally, if it's an inadequate warning it's
14  okay not to read it because that's what you
15  would reasonably expect from a reasonable
16  person.
17      There are other reasons why you
18  wouldn't read a warning.  So, for example,
19  maybe there's a section of the manual that
20  doesn't apply to your bike or your product,
21  this bike is for.  This bike is for R 1150s
22  and R 850s.  It may be a warning that's
23  presented in part of the manual that something
24  you're not going to deal with.

Page 164

1      So, for example, there's a
2  headlight basic setting in here.  Maybe I'm
3  not planning on setting my own headlights.
4  I'll let the garage and the mechanic do that.
5  So why am I going to read it.
6      You know, there's different
7  features of the bike that I may not be
8  interested in, don't planning on using them.
9  Therefore, the warning wouldn't be relevant to
10  me and that would be okay not to read it.
11  There are plenty reasons of why it would be
12  okay not to read a warning.
13  Q.  Okay.  I just bought a bike, I
14  want you to assume that.
15  A.  Okay.
16  Q.  I picked up this manual.  Is it
17  okay for me not to read the warning on Page 60
18  that says:  Warning, do not warm up the engine
19  with the motorcycle at a standstill - Risk of
20  overheating and fire?  Is it okay for me not
21  to read that?
22  A.  I think it would be foreseeable
23  that somebody would not read it, and it
24  wouldn't be okay because they're not getting

Page 165

1   important safety information, but it's not
2   their fault that they're not reading it.
3   Q.   If I came to you and said hey,
4   Bill, I just bought a manual, should I read
5   it, what would you tell me?  Yes or no?
6   A.   I would think as a manufacturer
7   I would say I'm providing --
8   Q.   That wasn't my question.  I'm
9   your neighbor, Bill.  Hey, Bill, I just bought
10  this, should I read this manual or not, yes or
11  no?
12  A.   Yes, I would say if you find it
13  interesting go ahead and read it.  If you
14  think you can ride a bike without it then
15  don't read it.
16  Q.   On Page 10 -- I'm sorry, Page
17  12 of your report at the bottom flowing over
18  onto Page 13, you list 10 items that should
19  have been included in this manual regarding
20  the fire as I -- I'm sorry, the risk of fire;
21  is that correct?
22  A.   I don't know what you're asking
23  me.
24  Q.   Look at Page 12.

Page 166

1   A.   Yes.
2   Q.   Do you see at the bottom Item 1
3   through 9?
4   A.   Yes.
5   Q.   Please turn to Page 13.
6   A.   Okay.
7   Q.   Do you see the top, Item 10?
8   A.   Yes.
9   Q.   What are those?
10  A.   As it states in there, it's 10
11  things that a person would need to understand
12  to foresee a potential fire hazard associated
13  with warming up the engine with motorcycle at
14  a standstill without adequate warning.
15  Q.   So is it your testimony that
16  these 10 things need to be in the manual?
17  A.   No.
18  Q.   What's the purpose of these 10
19  things?
20  A.   Well, I think it's pretty
21  explicit in the paragraph:  To foresee the
22  potential fire hazard associated with warming
23  up the engine with the motorcycle at a
24  standstill without adequate warning the rider

Page 167

1   would have to know 1 through 10.
2       So without adequate warning you
3   would have to hope that the rider knows 1
4   through 10.  As the next paragraph states,
5   most people are not going to know or have
6   information all of 1 through 10, therefore,
7   they're not going to appreciate the fire
8   hazard associated with the design defect
9   without adequate warning.
10  Q.   So this doesn't have to be in
11  the manual?
12  A.   I never said it had to be in
13  the manual.
14  Q.   Well, that's the way I read it.
15  That's why I'm here.  That's why I get to ask
16  you questions, to clarify.  It's a great
17  system.
18      So what is the point of these
19  10 things?  What is it you're telling us
20  should be done with this information?  How is
21  it imparted to the rider?
22  A.   Well, I don't know that it's
23  necessarily to impart all of it to the rider.
24  What I'm simply saying is that if you're not

Page 168

1   going to provide adequate warning and if you
2   want the rider to appreciate the hazard, they
3   would need to know all of these 10 things.
4   And it's very unlikely that a rider would know
5   all of these 10 things, and therefore, they
6   wouldn't be aware or appreciate the hazard.
7   Q.   So what is the adequate
8   warning?
9   A.   I give the adequate warning on
10  Page 14 of the report.
11  Q.   And that's the placard at the
12  bottom?  Is that the sticker for an on-product
13  warning?
14  A.   That is the example on-product
15  warning that I suggest should have been on the
16  motorcycle.
17  Q.   Okay.  What should have been in
18  the manual?
19  A.   As I state on the top of Page
20  15, the warning itself should have been
21  repeated in the manual along with the
22  explanation of how the fire occurs.  For
23  example, oil temperature increases to an
24  elevated level causing the oil sight glass to

Page 169

1   fail and allow hot oil to escape the engine or
2   heat from the exhaust headers can ignite the
3   body work or wiring harness.
4   Q.  Is that the language that you
5   are proposing should have been in the manual?
6   A.  Sure.
7   Q.  And is it just that where -- I
8   mean, I want to know precisely what it looks
9   like.
10  A.  Well, I give you precisely what
11  the warning looks like on the illustration --
12  Q.  That's the on-product.  It's
13  the same thing?
14  A.  I said it should be repeated in
15  the manual.
16  Q.  So that should be repeated in
17  the manual and then what?  How do you add this
18  e.g.?
19  A.  You can put it right under it.
20  Q.  And that's the language you
21  would use?
22  A.  Sure.
23  Q.  Now I understand.  Why is it
24  important to have something different in the

Page 170

1   manual than on the product?
2   A.  I didn't say it was.
3   Q.  All right.
4       MR. LEVINE: He said he didn't
5   say that.
6       MR. HEINOLD: I'm starting a
7   new question.  My question, as I recall, why
8   is it important to have it more in the manual,
9   and he said it's not.
10      THE WITNESS: No.  I said I
11  didn't say that.  You said that.  I didn't say
12  that.
13      BY MR. HEINOLD:
14  Q.  Is it important to have more in
15  the manual?
16  A.  I don't know that it is, but
17  certainly you can.
18  Q.  Let's be really clear then.
19  What is it that needs to be on this motorcycle
20  in order to make it safe for its intended use?
21  A.  They need to fix the design
22  defect, make it safe for its intended use.  If
23  they weren't going to provide or eliminate the
24  hazard for design they need to provide an

Page 171

1   adequate safeguard, such as the fan, what have
2   you, like Mike Zazula talked about.
3       If they weren't going to do
4   that, the least they could have done is put
5   the warning in Illustration 1 on Page 14 of my
6   report on the motorcycle itself and then
7   repeated the warning in the manual.
8   Q.  Is it sufficient if that
9   warning is simply repeated without further
10  explanation?
11  A.  I think it would be best
12  practice to include the further information.
13  Q.  Is it sufficient, just the
14  warning?
15  A.  I think it's sufficient with
16  just the warning on the product.
17  Q.  Is it sufficient with just the
18  warning in the manual?
19  A.  No.  It needs to be on the
20  product.
21  Q.  Let's assume the warning is on
22  the product, is it sufficient to have that
23  same warning in the manual without more?
24  A.  I think you could put it in the

Page 172

1   manual and you can add the information as best
2   practice or you can leave it off.  I don't
3   think it's going to make that big of a
4   difference.
5   Q.  So it's sufficient not to add
6   the additional information that's at the top
7   of Page 15?
8   A.  All right.  I think -- it's
9   given the placement in the manual you should
10  provide the information at the top of Page 15
11  in the manual.  I think it provides additional
12  information for the user to understand what
13  the issue is, what the hazard is and why it's
14  occurring, increasing their understanding of
15  the event and increasing the propensity to
16  follow the warning.
17  Q.  So the understanding of the
18  event is not sufficient in a manual if you
19  just put the warning illustration, repeat that
20  in the manual?
21  A.  I'm not sure what you're asking
22  me.
23  Q.  I'm having trouble
24  understanding what you're telling me.  I

Page 173

1    really don't mean to be repetitive, but the
2    warning that's an illustration on Page 14
3    should be on the motorcycle?
4    A.  I'm sorry, my opinion is that
5    the warning that's on Page 14, and it's under
6    Illustration 1, is an example of on-product
7    warning, meaning the ANSI Z535.4 2002 criteria
8    for on-product safety warnings, BMW North
9    America should have presented on the bike.
10   Q.  Okay.  And that is sufficient.
11   They don't need to put on the bike an
12   explanation about the oil temperature
13   increases elevated level causing the oil sight
14   glass to fail; correct?
15   A.  They don't need to put that
16   information on the bike.
17   Q.  Okay.  Now I want to talk about
18   the manual.  I want to assume this warning is
19   on the bike, okay?
20   A.  Okay.
21   Q.  If we put that placard, that
22   warning label that you have just said is
23   satisfactory to put on the product, if there
24   is -- if that is all that is in the manual on

Page 174

1    the top, is that sufficient for the manual, or
2    do you require this additional information to
3    be in the manual to make the bike safe for its
4    intended use?  Require is my word.
5    A.  So I guess I'm having a problem
6    with make it safe.  The manual is really an
7    afterthought.  I mean, you put it on the bike
8    so people see, read it and understand it, but
9    you put it in the manual for completeness
10   sake.  Whether or not you put the explanation
11   of it for best practices, yes, it should be
12   there.  If you don't put it, is it going to
13   make that big of a difference, probably not,
14   because if they're not getting it on the bike
15   they're really not likely to get it from the
16   manual.
17      You know, as we had this
18   discussion earlier about whether or not --
19      MR. LEVINE:  One second.  He
20   asked you when answering that question to
21   assume that the warning was on the bike.
22      Am I right about that?
23      MR. HEINOLD:  Oh, yes.
24      MR. LEVINE:  So, in other

Page 175

1    words, and you may not have understood the
2    question, he said if the warning is on the
3    bike and the warning is in the manual, do you
4    also require, correct me if I'm wrong, that
5    the explanation following the warning is also
6    in the manual?  I think that was your
7    question.
8       MR. HEINOLD:  Yes.
9       THE WITNESS:  I would say yes
10   because there's no reason not to put it.
11      BY MR. HEINOLD:
12   Q.  In your report you criticize
13   BMW NA because -- you talk about you can't
14   rely on second purchasers getting the manual;
15   correct?
16   A.  Okay.  I think it's a true
17   statement.
18   Q.  But is that relevant to this
19   case?
20   A.  What do you mean?
21   Q.  Because Mr. Yazdani got the
22   manual and he received that?
23   A.  Yeah, it's not really relevant
24   to what Mr. Yazdani did with respect to

Page 176

1    whether or not the motorcycle was defective
2    and whether or not BMW failed to provide
3    adequate warning.
4    Q.  We can dance around this, sir.
5    You know I'm trying to be respectful, and
6    personally, I think you're avoiding my
7    questions.  And we can just do some things
8    really simply and get to the nuggets of what
9    we want.
10      My question is this:  You have
11   criticized my client for relying on -- strike
12   that.  You criticized my client because they
13   may not -- a second purchaser, used purchaser
14   may not get the manual, correct?
15      You rendered that criticism in
16   your report.  That is easy to answer yes or
17   no.  Did you or did you not render that
18   criticism in your report?
19   A.  What I said in the report is
20   that BMW couldn't rely upon secondhand users
21   having the manual.
22   Q.  Is that relevant to this case?
23   And I ask that question because Mr. Yazdani as
24   a secondhand user received the manual, did he

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 177

1  not?
2  A.  You just asked me two
3  questions.  So which one do you want me to
4  answer?
5  Q.  Both.
6  A.  Is it relevant to this case,
7  yes.  Did Mr. Yazdani get a manual with the
8  bike, yes.
9  Q.  Why is it relevant to this case
10  if he received a manual?
11  A.  Because my opinions with
12  respect to the defect and the failure to warn
13  is on all of these motorcycles that have this
14  unique and specific fire hazard, not just Mr.
15  Yazdani's.  I didn't write a report
16  specifically for Mr. Yazdani's bike.  I wrote
17  it for the product at issue, the R 1150 R.
18  Q.  I'd like you to look at Page 6
19  of your report.  We'll come back to that.  I
20  can't find the reference.  It is on Page 6.
21  The bottom paragraph beginning with the word,
22  However... Are you with me?
23  A.  Yes.
24  Q.  However, it's not reasonable

Page 178

1  for to BMW NA to rely solely on the Rider's
2  Manual to communicate critical safety related
3  information and warnings to secondary owners
4  of the R 1150 R motorcycle.
5      What are the critical safety
6  related -- what is the critical related
7  safety -- I'm going to start over.
8      What is the critical safety
9  related information and warnings to which you
10  are referring in that sentence?
11  A.  Well, it's the one we're
12  talking about, the one that I have on Page 14
13  in my report.
14  Q.  So what is the alternative to
15  not relying on the Rider's Manual?
16  A.  Well, as we discussed several
17  times, the alternative is to mitigate it
18  through fixing the design, providing a
19  safeguard.  And then if you're not going to do
20  those two, provide an on-product warning as I
21  depicted on Page 15 of my report.
22  Q.  So your reference there is only
23  to critical safety related information
24  relating to this issue for this fire, from

Page 179

1  leaving the vehicle idle at a standstill?
2  A.  That's what my report is about,
3  but I'm not exactly sure what you're asking
4  me.
5  Q.  Well, I'm reading, is that what
6  you're referring to?
7  A.  Well, what I'm referring to
8  there is critical warning and safety
9  instructions must be provided where and when
10  the information is needed and where the
11  information is most likely encountered and
12  seen.
13      I don't know what other design
14  defects that are on this bike that an
15  on-product warning may need to be considered
16  as a third alternative, but I'm speaking
17  specifically in this report to the warning
18  that I have on Page 14.
19  Q.  Does it have to be a product
20  defect to have a warning?
21  A.  Well, it could be -- it doesn't
22  have to be a defect.  It has to be critical
23  warning and safety instructions.  So it has to
24  be important.

Page 180

1  Q.  So aren't you saying here that
2  BMW should not rely on the Rider's Manual to
3  communicate critical safety related
4  information of any type to secondary owners?
5  A.  Again, it depends on what the
6  issue is.  If there is a critical issue that
7  needs to be communicated for the operator to
8  safely use the bike, then burying it in the
9  manual as the sole and only way that you're
10  communicating it is ineffective.
11      So then they got to figure out
12  what is the best way to deal with that hazard,
13  and putting it in the manual is not the best
14  way to deal with that hazard.
15  Q.  But is this the only safety
16  related information that's critical to the
17  safe operation of a motorcycle?
18  A.  I haven't analyzed the complete
19  design of the bike and all the hazards
20  associated with its design.  I'm only
21  concerned about this particular issue, the
22  fire because of the oil sight glass failure
23  when the bike is allowed to idle standstill.
24  Q.  But your point is we have a

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 181

1  potential for a secondhand user and we have
2  critical information that's in the manual that
3  he might not get or she might not get;
4  correct?
5  A.  Absolutely.
6  Q.  And therefore, there needs to
7  be another way to communicate?
8  A.  It depends on how you're
9  dealing with issue, what the issue is.
10  So, again, in this case we have
11  an atypical problem.  Most bikes when you let
12  them idle at a standstill don't catch on fire.
13  A lot of people allow their bikes to warm up
14  at a standstill for different periods of time
15  that are not aware that this is a potential
16  problem with the BMW R 1150.
17  Because of that they needed to
18  find a different way to communicate that
19  information to the user if they're going to
20  choose not to fix it by changing the design or
21  providing a necessary safeguard.
22  Q.  I can understand why you don't
23  want to answer my question.  So let's try it
24  again.  This issue, I don't need to hear your

Page 182

1  opinion on this issue, I think I've heard it
2  100 times perhaps.
3  My question is:  Your
4  criticizing my client on relying on a manual
5  to communicate critical safety related
6  information and warnings, plural, to secondary
7  owners; correct?  You criticized my client for
8  that, yes?
9  A.  I -- yes, it's --
10  Q.  Is this the only -- is this
11  issue the only critical safety related
12  information or warning that has to be
13  communicated in some other manner if we accept
14  your criticism?
15  A.  I'm sorry, I did not analyze
16  the complete BMW R 1150 R to determine what
17  other defects may or may not have been present
18  and what other critical warnings or safety
19  information needs to be presented on the bike.
20  Q.  Should Harley-Davidson be
21  concerned about the same thing?
22  A.  Harley-Davidson doesn't have
23  the same defect, so I wouldn't think they
24  would be concerned about the same thing.

Page 183

1  Q.  Okay.  Does Harley-Davidson
2  have to be concerned about critical safety
3  related warnings not being communicated to
4  secondary owners?
5  A.  I think that Harley-Davidson in
6  their hazard analysis and safety analysis of
7  their motorcycles would want to see what
8  hazards are associated with its product,
9  eliminate those that they can through design,
10  provide adequate safeguards and then determine
11  whether or not a warning in the manual is
12  appropriate or whether or not it needs to be
13  on the product because it's atypical and not
14  something that most riders would be aware of
15  or think about.
16  MR. HEINOLD: Ken, I'm getting
17  this close to saying let's go see a Judge.
18  MR. LEVINE: I think it's a
19  middle ground, frankly.  I think that he can
20  answer the questions yes or no and then give
21  an explanation.
22  MR. HEINOLD: You know what I'm
23  asking.  You know what I'm asking.  You don't
24  have to admit this on the record.  You know

Page 184

1  what I'm asking and you know he's not
2  answering.
3  MR. LEVINE: I'm going to
4  disagree with that.  And I agreed with you
5  before, by the way.  I agreed with you before
6  that he wasn't answering your question.
7  You're asking him something
8  that from his analysis standpoint takes a lot
9  more than a yes or no.  It just does.  You can
10  tell the way that this witness does his
11  analysis.
12  MR. HEINOLD: Excuse me for
13  interrupting --
14  MR. LEVINE: No, it's okay.
15  The truth is -- you want to know -- the last
16  question was does Harley-Davidson need to put
17  any specific -- let me use the proper words
18  here, any specific critical safety related
19  information physically on their bikes?
20  MR. HEINOLD: No, I didn't say
21  that.
22  MR. LEVINE: I apologize, I
23  thought that was your question.
24  MR. HEINOLD: I didn't say that

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 185

1 at all.
2     MR. LEVINE: I thought that was
3 your question.
4     MR. HEINOLD: I'll tell you
5 what, I'm going to tell you, okay, and then
6 you see if he answers the question.
7     MR. LEVINE: Fair enough.
8     MR. HEINOLD: Okay.
9     MR. HEINOLD: This is an
10 explanation with a question at the end.  I'm
11 sure you're intelligent to follow it and not
12 have to sort through it and say this big long
13 thing.
14     MR. LEVINE: I'm ready.
15     MR. HEINOLD: He's made a
16 statement critical of my client for relying on
17 a manual to communicate critical safety
18 related information to people who buy used
19 motorcycles because they might not get it.
20     MR. LEVINE: Yes.
21     BY MR. HEINOLD:
22 Q.  Correct?
23 A.  Sure.
24 Q.  Okay.

Page 186

1     MR. HEINOLD: So, I want to
2 know is this the only critical safety related
3 information, this issue in this case, to which
4 he's referring, or is he talking generically?
5     MR. LEVINE: I can answer your
6 question.
7     MR. HEINOLD: I know you can
8 answer it.
9     MR. LEVINE: And I believe that
10 he has, actually.
11     MR. HEINOLD: What do you think
12 the answer is?
13     MR. LEVINE: As written there,
14 it was meant to express the concept in
15 general.
16     MR. HEINOLD: In general?
17     MR. LEVINE: Yes, in general.
18     MR. HEINOLD: That means, Ken,
19 does it not, that there's more than one issue
20 that has to be communicated in a critical
21 safety related warning in an alternate --
22     MR. LEVINE: There may be.
23     MR. HEINOLD: There may be.
24     MR. LEVINE: There may be, I

Page 187

1 agree with that.
2     BY MR. HEINOLD:
3 Q.  So I accept the proposition
4 there may be.  Do you accept that proposition?
5 A.  If you asked that question I
6 would say maybe, sure.
7     MR. LEVINE: And also, then you
8 said to him what other critical related safety
9 information would be required?  To which I
10 believe the witness said, I have not analyzed
11 the bike for any other issue other than this
12 particular one, which I found to be of a
13 critical related, safety related information
14 issue.  And then I believe --
15     MR. HEINOLD: And then I think
16 he went on to --
17     MR. LEVINE: Well, he does his
18 thing.
19     MR. HEINOLD: -- a soliloquy.
20     MR. LEVINE: Well, let me say
21 this to you in defense to the gentleman to my
22 right, and that is this:  We continue to focus
23 on whether or not it was right or wrong for a
24 warning to be placed on the bike, because I

Page 188

1 know that's part of this case, but when asked
2 about the behavior, whether or not that was
3 right or wrong, inherently as an ergonomics
4 guy he also wants to say that we should never
5 even -- in addition to your focus on that
6 issue, we should never have gotten there, and
7 he is fearful that it will get lost in the
8 wash and then it will be only the answer to
9 the very isolated question you have.
10     By the way, you then went on to
11 ask him about the Harley-Davidson, whether or
12 not their critical related safety information
13 that they should have physically put on it, to
14 which he went into his very long answer that I
15 haven't analyzed the Harley-Davidson.
16     MR. HEINOLD: I asked that
17 because he wouldn't answer my other question.
18 It's a simple question.
19     MR. LEVINE: I can answer that.
20     BY MR. HEINOLD:
21 Q.  It's a simple question.  If
22 you're not going to produce the manual -- if
23 they're not going to get the manual because
24 they're a secondhand user, would you agree

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 189

1  with me there's probably a whole bunch of
2  stuff that they ought to know that they're not
3  going to get?
4  A.  It's possible.
5  Q.  Okay, it's possible.  And if
6  they're not going to get it, is the solution
7  to put something on the product?
8  A.  It depends on what the issue
9  is.
10  Q.  You hold open the possibility
11  that you might have other -- you haven't done
12  the analysis, I understand that, to hold open
13  the possibility that there might be other
14  issues that you have to put on the product?
15  A.  Anything is possible.
16  Q.  You don't know?
17  A.  I don't know what?
18  Q.  You don't know whether there
19  would or wouldn't be more?
20  A.  As I said earlier, I did not
21  analyze the complete bike to determine what
22  other defects there may be that would require
23  a warning because BMW chose not to deal with
24  it in its design.

Page 190

1  Q.  You've talked about on-product
2  warning is necessary because of the clutter of
3  information, 89 Pages of the Rider's Manual;
4  correct?
5  A.  That is a problem with
6  presenting warnings in manuals.
7  Q.  Can you have too many
8  on-product warnings?
9  A.  Sure.
10  Q.  Can you create clutter there?
11  A.  Sure.
12  Q.  Can it interfere with
13  understanding awareness and recollection?
14  A.  Of each -- or a single
15  individual warning, sure.
16  Q.  Is there any study or research
17  or literature that tells how many such
18  warnings would create clutter?
19  A.  There's not research that's
20  going to tell you any given situation whether
21  or not it would be considered clutter or have
22  a detrimental effect on the individual's
23  warnings ability to draw attention, have
24  somebody read it and understand it.

Page 191

1  It would be the manufacturer's
2  responsibility to do that study to determine
3  what may or may not be appropriate.
4  Q.  In the human factors world of
5  expertise, are there any warnings or
6  instructions, warnings or research that would
7  tell you that?
8  A.  Tell me what?
9  Q.  Tell you about how -- how to
10  determine how many warnings there would be so
11  as to avoid interference with understanding?
12  A.  Sure, there's all kinds of text
13  and research, not necessarily text,
14  publications, guidelines on how to conduct
15  usability testing on your product to determine
16  whether or not a warning is appropriate,
17  whether the number of warnings you're
18  providing is appropriate.
19  I conducted many of tests like
20  that when I was with the IBM Corporation to
21  determine what worked and what didn't work.
22  Q.  On what?
23  A.  On products.
24  Q.  No, but on-product warnings?

Page 192

1  I'm talking about --
2  A.  Yes, on-product warnings and
3  manual warnings, whatever the case may be.
4  Again, and I know you don't
5  want to hear it, but the warning design is an
6  integral part of the product design.  You
7  don't wait until the product is done and then
8  figure out that you have all these unaddressed
9  hazards and now you have to figure out what
10  warnings you're going to stick on the product
11  to make it safe.
12  You determine what hazards
13  there are with your product, and then you go
14  through the safety hierarchy, which ones can I
15  eliminate through design, which ones can I
16  minimize through design, which ones can I
17  provide a safeguard for.
18  At the end of the day what
19  happens is that list of hazards shrinks, and
20  now you're down to whatever residual hazards
21  are left and you have to decide on how you're
22  going to warn.  And part of that decision is
23  what goes on the product, what goes in the
24  manual.  And you decide that based upon

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

---

Page 193

1  consequences such as death and severe property
2  damage as opposed to a paper cut and maybe I
3  ruined the chrome on my exhaust.  So there's
4  different levels of the severity of the
5  hazard.
6      You deal with it based on how
7  you expect people are going to use your
8  motorcycle, how people use the other
9  motorcycles and the knowledge that the people
10 are most likely going to have.
11     So if it's an issue well, we
12 want to warn people to wear a helmet, that's
13 probably not something you need to put on the
14 bike itself, but something you can regulate or
15 set off into the manual.
16     But if you have a unique fire
17 hazard associated with the design of your oil
18 sight glass, that's something that can lead to
19 severe consequences, including severe injury
20 or death and property damage.  And two, it's
21 inconsistent with the way you know people use
22 bikes.  And three, it's inconsistent with
23 people's knowledge of how you can safely use
24 the bike.

---

Page 194

1      So those three factors make it
2  important that it be on the product as opposed
3  to another hazard that may not be as severe or
4  people may know about it generally or is
5  consistent with how people typically use their
6  bike.
7  Q.  Have you done an analysis for
8  this bike, this manual, to determine whether
9  there should be any other on-product warnings?
10 A.  I have not.
11 Q.  Do you agree or disagree with
12 the possibility that there might be the need
13 for one if you did that analysis, one or more?
14 A.  It's certainly possible.  I
15 showed you a photograph of that Yamaha earlier
16 that had two warnings that were conspicuously
17 placed on the motorcycle, one on the
18 windshield and one on the top of the gasket.
19 Q.  We didn't get copies of those
20 yet.  You referred to the fact that you had
21 looked at them and had it included in your
22 report, but I didn't see them yet.
23 A.  I'm sorry, I'll pull them out
24 right now.  There you go.

---

Page 195

1      MR. LEVINE:  Off the record.
2      - - -
3  (Whereupon a discussion was held off
4  the record.)
5      - - -
6      BY MR. HEINOLD:
7  Q.  One warning says:  Before you
8  operate this vehicle read the Owner's Manual
9  and all labels.  The other says:  Always wear
10 approved motorcycle helmet, eye protection and
11 protective clothing.  The other on the
12 windshield says:  Caution, cleaning with
13 alkaline or acid cleaner gasoline solvent will
14 damage the windshield.  Use neutral material.
15     Do you believe both of those
16 are necessary?
17 A.  I didn't do an analysis to
18 determine if they were necessary on that
19 Yamaha.  I brought those pictures to depict
20 the fact that some manufacturers do, in fact,
21 put multiple warnings that they feel are
22 necessary on the bike.
23 Q.  So you haven't done an analysis
24 of whether there might be others that you

---

Page 196

1  would think would be appropriate to put -- to
2  use as on-product warnings if that was the
3  issue before you; correct?
4  A.  I think that I've answered this
5  multiple times, but I have not done that
6  analysis.  So I do not have an answer to your
7  question.
8  Q.   Are there any guidelines that
9  say how many is too many?
10 A.  There are no guidelines that
11 say how many is too many.  If you have a list
12 of warnings or hazards that you rely upon
13 warnings, the guideline is to make sure that
14 during design you're eliminating those that
15 you can through design and provide guards for
16 those you can't.
17     When you've gone through that
18 process and you are left with the warnings,
19 then you have to determine how you're going to
20 present it.  And it can be on the product or
21 in the manual, and that decision is based upon
22 those things I talked about earlier.
23 Q.   And if you've gone through all
24 of that and you determined that there are a

---

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 197

1  lot of things that you want to put on -- a lot
2  of labels and warnings and instructions that
3  you want to put on the motorcycle so that
4  someone doesn't sue you if they don't follow
5  it, are there -- is there any literature, is
6  there any scientific approach to say how many
7  is too many?
8  A.   There is a scientific approach.
9  Q.   What is it?
10  A.   It is the manufacturer's
11  responsibility to do their testing.  If
12  they've got that many warnings left over that
13  they decided need to be on the bike they
14  better go and do their testing to insure that
15  they can do it appropriately.  If they can't
16  do it appropriately, then they need to start
17  reconsidering whether or not they should be
18  offering that product for sale.
19  Q.   But from a warnings standpoint,
20  an expert such as yourself, there's no
21  guideline that says woh, that's too many,
22  right?
23  A.   There's no specific number of
24  warnings that are considered too many

Page 198

1  warnings.
2  Q.   But you agree that someone
3  could put too many on there?
4  A.   A lot of manufacturers do.
5  Q.   On product?
6  A.   On products.
7  Q.   And when you say they do, you
8  mean they do put too many on there?
9  A.   Absolutely.
10  Q.   And the consequence of that is
11  an interference with the whole purpose of
12  having the warning in the first place?
13  A.   It can have a detrimental
14  effect on any single or any individual warning
15  within that clutter.
16  Q.   But that decision has to be
17  made individually by a manufacturer?
18  A.   It needs to be made by the
19  manufacturer.  They're in control of their
20  product.
21  Q.   But there's no technique, no
22  guideline, no peer-reviewed studies, no any of
23  that they can refer to that says this is --
24  here's the guidelines?

Page 199

1  A.   Again, there are guidelines on
2  what you do.  You can reference some of them
3  in my report.  The very first reference is the
4  National Safety Council's Accident Prevention
5  Manual for Business and Industry
6  Administration Programs, 12th Edition.  In
7  there they give a whole chapter, I've cited on
8  loss control and product safety.  They tell
9  you the process that you need to go through to
10  analyze the hazards associated with your
11  product to determine how you're going to
12  mitigate it.
13     There are references and
14  guidelines with respect to determining which
15  warnings need to be on the product versus
16  need -- or could be in the manual.
17     Then after you decided which
18  can be eliminated or which should be
19  eliminated through design, which should be
20  guarded, so it's the residual hazards such as
21  hazards, all hazards, the residual hazards,
22  maybe that's a key step I'm not emphasizing
23  enough.
24     MR. LEVINE: Oh, you're

Page 200

1  emphasizing.
2     BY MR. HEINOLD:
3  Q.   You're emphasizing.
4  A.   But then there is a list of
5  other warnings related references that I cited
6  that deal with how to determine what warnings
7  go on the product, what warnings don't, and it
8  gets down to the severity of the injury, the
9  likelihood of the people having the knowledge
10  beforehand, and how the product is typically
11  used or commonly used.
12     So those three factors hedge to
13  the fact that it needs to be on the product.
14  If you have several hazards that are
15  associated or have that same characterization
16  and you decided that they need to be on the
17  product, now you go do your own testing to
18  determine how you're going to best present
19  them.  And if you can't best present them,
20  then you got to question whether or not it's
21  safe to launch the product into the
22  marketplace.
23  Q.   Okay.  So that's my question.
24  You did all of the dissertation about how to

Page 201

1  decide if you need to put a label on a
2  product, and then the question that I'm
3  interested in is:  Well, then how many can you
4  put on there?  And you said you would have to
5  do your own testing.  That's the answer to
6  that question, right?
7  A.  It's an empirical question.
8  Yes.
9  Q.  Okay.  So then you agree with
10  me that when I'm -- well, you're agreeing with
11  me because I'm not -- I'm asking the question,
12  but my understanding from what you said is
13  that there are no guidelines about how many
14  you can put on the product so that you don't
15  achieve clutter and interference, or where you
16  have to put them, if you've got a product, you
17  got multiple warnings, you have to determine
18  that individually; correct?
19  A.  Well, part of what you said was
20  correct.  Part of what you said was incorrect.
21  Q.  What part was correct?
22  A.  That you have -- you're the
23  product manufacturer, it's your product,
24  you're going to have to decide where to put

Page 202

1  those warnings if you have multiple warnings.
2  Q.  Okay.  How many?
3  A.  That's up to the manufacturer
4  to decide.  If they narrowed it down that they
5  have of list of two, 10, 20, whatever the case
6  may be, they have to decide can they do that
7  adequately.
8  Q.  Okay.  And there's nothing that
9  they can refer that gives them the important
10  factors about how to make that decision; is
11  that right?
12  A.  That's not right.
13  Q.  Okay.  Where is it?
14  A.  The guidelines talk about what
15  warnings should be -- how you prioritize
16  warnings.
17  Q.  Yes.
18  A.  Okay.  Now, once you prioritize
19  it and you're trying to decide which ones go
20  on the product or how many, I should say, can
21  fit on the product, that's empirical testing.
22  There's guidelines how to conduct usability
23  testing.  There's, you know, dozens and dozens
24  of books on how to conduct usability testing.

Page 203

1  If you don't have the ability
2  in-house, you hire a human factors consulting
3  company to do it for you.  You guys can call
4  me, I'd be happy to do it for you.  I offer
5  that service.
6  Q.  Did you say usability testing?
7  A.  Yes.
8  Q.  What is usability testing?
9  A.  Usability testing is, in
10  essence, taking your users and providing them
11  or allowing them to interface with your
12  product and determine whether or not whatever
13  feature you're interested in is usable.
14  So, in the case of warnings,
15  you want to know whether or not the two,
16  three, four, five or how many warnings you're
17  considering putting on the product, the place
18  where you're considering to put it on would be
19  effective.  So you run them through hands-on
20  testing with the product.
21  You can even start with doing
22  mock-ups, pencil paper mock-ups where you're
23  just showing users the design.  If this is the
24  design of a motorcycle and I put a warning

Page 204

1  here, would this capture your attention?  You
2  can mock it up with Styro-foam if you have,
3  physically place the warnings where you think
4  that they're relevant or should be placed and
5  have the users conduct tasks and determine
6  whether or not they're seeing them, reading
7  them, understanding them and complying with
8  them.
9  As you get farther along in
10  developing, you can actually take the
11  motorcycle and have alternative places where
12  you're going to test to determine what works
13  and what doesn't work.  This is all empirical
14  testing.
15  Q.  If somebody was to come in this
16  case and say we need 25 labels, and that's too
17  many because it will create clutter, what
18  would you have to do to say no, they're wrong,
19  in terms of creating clutter?
20  MR. LEVINE: Can I interrupt
21  for one second just so I understand.  Do you
22  mean 25 in one place or 25 all over the
23  product?
24  MR. HEINOLD: All over the

Yazdani  vs.
BMW

William Vigilante, Jr., Ph.D.
March 15, 2016

Page 205

1  product.
2      THE WITNESS: First I would
3  want to know why they have that many.  That
4  would be the absolute first question.  I'd
5  want to know what was done to eliminate
6  through design, what was done to guard against
7  it.  Then I would want to know the
8  prioritization that was given to each of the
9  warnings.  Then I want to know were they
10  relevant to on the bike, when they're
11  relevant, where they're relevant.
12      So, for example, if it has
13  something to do with bleeding the brakes, for
14  example, the warning being placed on the gas
15  tank is probably not the appropriate place for
16  it.  You would probably want it down on the
17  caliber.  So it could be that when you get
18  done you can find the spots that are relevant
19  on the bike and place them specifically at
20  those spots and you decrease the issue of
21  clutter.
22      If they're all relevant to the
23  tank, the gas tank, let's say you've got 10
24  warnings that are related to the gas tank, I

Page 206

1  don't see how that's possible, then you got to
2  look at whether or not they can be combined
3  into a single one.
4      I think the -- for example, the
5  Yamaha warning that you looked at earlier,
6  there was two different topics addressed in
7  the same warning, so that's a multi topic
8  warning.  That's one way to reduce it.  You
9  know, there's just multiple ways of doing it.
10  Q.  So, if somebody said look, we
11  have made a determination that we need to put
12  20 stickers on the gas tank, what would you
13  have to do to say no, that would be clutter,
14  that would be too many?
15  A.  Again, I would have to look at
16  what was done from a hazard analysis --
17  Q.  You said all that.  I'm
18  assuming you've done that.  Now we've
19  concluded that there's 20 pieces of
20  information that need to be imparted in order
21  for us to feel as if our product is safe, but
22  we're concerned about clutter so we can't do
23  that, what would you have to do to determine
24  whether that would create clutter and be an

Page 207

1  interference with the transmission of useful
2  safety information or not?  Usability test?
3  A.  Again, I can offer to do the
4  usability testing.  I can look at it and do a
5  heuristic evaluation of it.
6      MR. LEVINE: A what?
7      THE WITNESS: Heuristic.
8      BY MR. HEINOLD:
9  Q.  That's off the cuff?
10  A.  I'm sorry?
11  Q.  Is that like off the cuff?
12  A.  No.  It's done based on what
13  the professional knowledge and experience
14  looking at the standards, guidelines and
15  recommendations are from warning design,
16  seeing whether or not you can meet those.  So
17  that's a certainly a way to do it.
18      But again, you've got a
19  hypothetical that is so outlandish that it
20  stretches the imagination in the realms of
21  possibility.  If you have 20 different
22  warnings that had to go on the gas tank, you
23  know, my first inclination is that you can't
24  do it, that this is ridiculous.  You shouldn't

Page 208

1  have this many hazards associated with the gas
2  tank.  What did you do differently or wrong
3  with your design that requires 20 different
4  warnings on the gas tank.
5  Q.  So if I distill all this, you
6  would have to do a usability test to determine
7  whether that particular decision of 20
8  stickers on the gas tank would create clutter
9  or interfere with the transmission of safety
10  information because, as I understand, there's
11  no guideline that says anything more than five
12  is too many, you need to have five to seven,
13  you know, anything like that?
14      You would have to look at all
15  the other things you talked about to make that
16  kind of decision; is that right?
17  A.  I would say you're incorrect.
18  For 20 different warnings on the gas tank, I
19  think I can safely look at that and say that
20  that would be inappropriate and inadequate.
21  Q.  Well, what -- that would be
22  your opinion, right?
23  A.  That would be my learned
24  opinion based on my education, training and