UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Parvez & Razia Yazdani**<br><br>        **Plaintiffs**<br>    v.<br><br>**BMW of North America, LLC**<br>**And BMW Motorrad USA, a Division of**<br>**BMW of North America, LLC**<br><br>        **Defendants** | Civil Action No:  2:15-cv-01427-PD |

## ORDER

**AND NOW**, this        day of                , 2016, upon consideration of Plaintiffs' Motion to Preclude Defendant BMW of North America LLC's Expert Kevin C. Breen and Defendant's response thereto, it is hereby **ORDERED** and **DECREED** that Plaintiffs' Motion is **GRANTED** and any testimony or report from Kevin C. Breen is precluded from trial.

BY THE COURT:

_____
Timothy R. Rice, United States Magistrate Judge

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Parvez & Razia Yazdani<br><br>　　　　　　**Plaintiffs**<br>　　v.<br><br>BMW of North America, LLC<br>And BMW Motorrad USA, a Division of<br>BMW of North America, LLC<br><br>　　　　　　**Defendants** | Civil Action No: 2:15-cv-01427-PD |

### PLAINTIFFS' MOTION TO PRECLUDE DEFENDANT BMW OF NORTH AMERICA, LLC'S EXPERT KEVIN C. BREEN

Plaintiffs, by and through undersigned counsel, file this Motion *in Limine* to Preclude Defendant BMW of North America LLC's Expert, Kevin C. Breen at Trial and relies on the attached Memorandum of Law in support thereof.

　　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　de LUCA LEVINE, LLC

BY: *Patrick A. Hughes*

　　　　　　　　　　　　　　　　　　RAYMOND E. MACK, ESQUIRE
　　　　　　　　　　　　　　　　　　I.D. No.: 91815
　　　　　　　　　　　　　　　　　　rmack@delucalevine.com
　　　　　　　　　　　　　　　　　　PATRICK A. HUGHES, ESQUIRE
　　　　　　　　　　　　　　　　　　I.D. No. 91415
　　　　　　　　　　　　　　　　　　phughes@delucalevine.com
　　　　　　　　　　　　　　　　　　Three Valley Square
　　　　　　　　　　　　　　　　　　512 East Township Line Rd, Ste. 220
　　　　　　　　　　　　　　　　　　Blue Bell, PA  19422
　　　　　　　　　　　　　　　　　　215-383-0227 (Direct)/ 215-383-0082 (Fax)
　　　　　　　　　　　　　　　　　　Attorneys for Plaintiffs

**Dated:**  May 2, 2016

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Parvez & Razia Yazdani**<br><br>　　　　　　**Plaintiffs**<br>　　　v.<br><br>**BMW of North America, LLC**<br>**And BMW Motorrad USA, a Division of**<br>**BMW of North America, LLC**<br><br>　　　　　　**Defendants** | **Civil Action No:  2:15-cv-01427-PD** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO PRECLUDE DEFENDANT BMW OF NORTH AMERICA LLC'S EXPERT KEVIN C. BREEN**

The instant action arises out of a fire that originated at a 2004 BMW R1150R motorcycle ("subject motorcycle") distributed by BMWNA. The subject motorcycle was parked in the Yazdanis' garage when the fire occurred and quickly spread throughout the Yazdani home causing substantial property damage. Plaintiffs contend that the subject motorcycle is defective in both design and warning and initiated this action to recover for the damages sustained in the February 25, 2012 fire. Plaintiffs now move to preclude Defendant's expert, Kevin C. Breen.

**I.   STATEMENT OF FACTS**

In 2011, Mr. Yazdani purchased the subject motorcycle "used" in a private sale. *See Exhibit A, Parvez Yazdani Dep. Tr., at pp. 6, 10, 41:15-20.* At the time of sale, the private seller provided Mr. Yazdani with the motorcycle's Rider's Manual and the service / maintenance records for the motorcycle. *See Exhibit A, Parvez Yazdani Dep. Tr., at p. 6.*

The subject motorcycle had an air cooled engine, a fundamentally different engine design that was unfamiliar to Mr. Yazdani. *See Exhibit A, Parvez Yazdani Dep. Tr., at pp. 20:15-18, 49:10-14.* Unlike a water-cooled engine, an air-cooled engine uses outside air and engine oil to

transfer and dissipate heat generated from the engine while in operation. Mr. Yazdani did not know the subject motorcycle had an air-cooled engine. *See Exhibit A, Parvez Yazdani Dep. Tr., at pp. 9:1-19; 20:15-18; 49:10-14; 50:8-12*.

In addition to an air cooled engine, the subject motorcycle had an atypical and unique hazard that played a significant role in the fire that occurred at the Yazdani home. The subject motorcycle used an oil sight glass located on the left side of the crank case. The kickstand is also on the left side of the subject motorcycle. The oil sight glass was sealed with a plastic composite cover to enable the rider to see the oil level in lieu of a dipstick. However, when the subject motorcycle idles in a stationary position – especially when the motorcycle is leaning to the left on its kickstand – the engine oil can overheat and melt the composite plastic cover of the oil sight glass, causing hot oil to leak onto the exhaust manifold – resulting in fire. The parties agree that this is ultimately how the fire occurred at the Yazdani residence.

In order to maintain the integrity of the subject motorcycle during the winter, Mr. Yazdani, approximately once a week during the colder months, would perform the same routine which involved turning the subject motorcycle on for seven to nine minutes and letting it idle and warm up while he smoked a cigarette. *See Exhibit A, Parvez Yazdani Dep. Tr., at pp*. 15-16:7. On the day of the fire, Mr. Yazdani left the motorcycle running in the garage for approximately 30 minutes. *See Exhibit A, Parvez Yazdani Dep. Tr., at p. 65*. Mr. Yazdani's home smoke alarms activated and he went to the garage where he saw flames coming from the engine (left side) of the motorcycle. *See Exhibit A, Parvez Yazdani Dep. Tr., at pp. 68-69*. The fire ultimately spread and caused severe property damage to the Yazdani residence.

Mr. Yazdani was not aware that leaving the bike idling in a stationary position for any period of time would compromise the oil sight glass causing hot engine oil to leak onto the exhaust

manifold and result in a catastrophic fire. *See Exhibit A, Parvez Yazdani Dep. Tr., at pp. 26-27.* However, BMWNA was aware of this atypical and unique fire hazard. Instead of adjusting the design of its motorcycle in accordance with safety engineering principles or fixing a warning directly on the motorcycle itself, BMWNA chose to bury warnings about this severe fire risk in its Rider's Manual.

Plaintiffs contend the subject motorcycle was defective in design because the oil sight glass could fail while the motorcycle was operating under foreseeable conditions and cause a catastrophic fire. Further, the subject motorcycle should have been designed with a "police fan kit" to cool the engine while stationary or a traditional dipstick instead of the oil sight glass. *See Exhibit B, Report of Michael Zazula.* Plaintiffs further contend that BMWNA failed to provide an adequate warning system, which included an on-product warning label that met contemporary industry standards, guidelines and practices regarding the fire hazard associated with warming the motorcycle at a standstill. Further, BMWNA's inadequate warning system rendered the subject motorcycle unreasonably dangerous and defective and deprived the Plaintiffs of critical safety information needed to safely use the motorcycle. Plaintiffs contend that the inadequate warning system caused the subject fire. *See Exhibit C, Report of Dr. Vigilante.*

Defendant produced a report from Kevin C. Breen to rebut Plaintiffs' experts' opinions that the subject motorcycle was defective in both design and warning. Breen opines that the design of the subject motorcycle is not defective, that the warning provided in the Rider's Manual was sufficient, and that an on-product warning is not necessary. *Exhibit D, Report of Kevin C. Breen.* For the reasons expressed in more detail herein, Breen should be precluded from testifying because many of his conclusions are baseless speculation founded on no discernable method and are irrelevant. Further, Breen has failed to show an adequate basis for his qualifications to opine on

the industry standards regarding subject motorcycle's unique design defect.

II. **ARGUMENT**

a. **Legal Standard (*Daubert*)**

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

F.R.E.. 702.

This has been interpreted to require the proponent of an expert to show that the expert is: (1) qualified to give an expert opinion, (2) the opinion given is based on a reliable method, and (3) the opinion offered fits, i.e. is relevant to the case at bar. *See e.g. Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir.2000); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

b. **Breen Has not Demonstrated he is Qualified to Opine on the Industry Standard Regarding the Subject Motorcycle's Fire Hazard**

Breen opines that the subject motorcycle's design is not defective, in part, because the BMWNA's approach to warn users of the unique and atypical fire hazard associated with the subject motorcycle was "appropriate and consistent within the motorcycle industry." *Exhibit D,*

*Kevin C. Breen Report, at p. 6.* Breen argues that the motorcycle industry, in response to the fire hazard of the subject motorcycle, apprises the user of the danger of the hazard by placing warnings in the manual and not on the motorcycle itself. *Exhibit D, Kevin C. Breen Report, at p. 6.* Breen has overextended his qualifications with regard to his opinion on the industry standard regarding the defect of the subject motorcycle.

Breen admitted that he had never heard of a situation where an idling air-cooled engine motorcycle could cause the plastic oil sight glass to melt and result in a fire. *Exhibit F, Kevin C. Breen Dep. Tr., at p. 162:13-20.* Breen has not identified a single other motorcycle in his report that has the same design defect/failure mode to give him the necessary basis to opine on the industry standard of this atypical and unique hazard.

Breen does mention other air-cooled Suzuki, Yamaha, and Harley Davidson motorcycles. *Exhibit D, Kevin C. Breen Report, at p. 6.* However, these only provide examples of the industry response to the risk of an overheating air-cooled engine in general – not examples of industry responses to an air-cooled engine that employs a plastic oil sight glass capable of melting. The risk of overheating an air-cooled engine motorcycle is substantially different than the failure mode of the subject motorcycle. When an air-cooled engine motorcycle overheats, the risk of harm is to the integrity of the engine and the risk of fire due to the possible presence of combustibles located near or adjacent to the motorcycle. In other words, to prevent a fire, the rider only has to ensure that combustible materials are not close to the hot exhaust system.

Whereas here, the risk of the subject motorcycle involves the melting of a component, allowing flammable engine oil to release onto the hot exhaust system and catch fire. Thus, Breen's familiarity and research on the industry standards regarding the communication of risk of overheating in general is irrelevant to the case at bar where the risk is substantially different.

Since Breen has not identified any other motorcycle with a similar risk where the motorcycle itself can catastrophically fail in the same manner, he is not qualified to give an opinion as to the industry standard regarding this unique and atypical hazard.

### c. Breen Did not Employ a Reliable Method to Determine the Manual was Adequate, an On-Product Warning was Unnecessary, and an Inadequate Warning did not Cause the Subject Fire

BMWNA's expert Kevin Breen's opinions that the warnings provided by BMWNA were adequate are nothing more than improper "it is because I say so" opinions. "When the expert testifies to scientific knowledge, the expert's opinions must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Dalton v. McCourt Elec. LLC*, 112 F. Supp. 3d 320, 325 (E.D. Pa. 2015) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir.1994) (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786))) (quotations omitted). An expert's opinions must be based on more than "just the *ipse dixit* of the expert." *Pappas v. Sony Elecs., Inc.*, 136 F. Supp. 2d 413, 426 (W.D. Pa. 2000).

A condition precedent to having a *reliable* method is having *a* method. "Although *Daubert* does not require a paradigm of scientific inquiry as a condition precedent to admitting expert testimony, it does require more than the haphazard, intuitive inquiry . . . ." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000). In other words, an expert who employs no discernable method is inadmissible under the *Daubert* standard. *See Oddi*, 234 F.3d at 156; *Williams v. United States*, 321 F. App'x 129, 132 (3d Cir. 2009) (Expert report excluded when "replete with conclusory statements with no scientific method"); *Scrofani v. Stihl Inc.*, 44 F. App'x 559, 562 (3d Cir. 2002)(Excluded expert "employed absolutely no methodology at all, merely setting forth a series of unsubstantiated opinions."); *Murray v. Marina Dist. Dev. Co.*, 311 F. App'x 521, 524 (3d

Cir. 2008) (excluding expert stating: "we agree that Sutor's report and deposition testimony fail to demonstrate any methodology"); *Furlan v. Schindler Elevator Corp.*, 864 F. Supp. 2d 291, 298 (E.D. Pa. 2012), aff'd, 516 F. App'x 201 (3d Cir. 2013) (Expert excluded when "only standard that guided [expert's] analysis was his perception"); *Curry v. Royal Oak Enterprises, LLC*, No. CIV.A. 11-5527, 2013 WL 3196390, at *6 (E.D. Pa. June 25, 2013) ("unsupported speculation is not enough to render [expert's] opinion reliable."); *Westfield Ins. v. Detroit Diesel Corp.*, No. 3:10-CV-100, 2012 WL 1611311, at *5 (W.D. Pa. May 8, 2012) (Expert excluded when he did "not explain what, if any, methodology he employed to reach that conclusion or what facts support it"); *Maldonado v. Walmart Store No. 2141*, No. CIV.A. 08-3458, 2011 WL 1790840, at *11 (E.D. Pa. May 10, 2011) ("To be admissible, an expert's report simply cannot be based on unsupported speculation or conjecture.").

Breen offers several opinions to which he provides no support.

> i. Breen provides no basis for his opinion that an on product warning was not required because the potential for engine overheating is "common knowledge".

There is nothing scientific about the methodology Mr. Breen employed in determining that BMWNA's warnings for the subject motorcycle were adequate. In his report, Breen baldly opines,

> There was no need to provide an on-product warning label that indicates that if the engine is run without moving for a prolonged period of time that the engine can overheat and may result in a fire. The potential for engine overheating is common knowledge and this information is more appropriately provided in the BMW Rider's Manual.

*See Exhibit D, Kevin C. Breen Report, ₱ 4, p. 9.*

Breen's opinion is flawed because he failed to analyze similarly designed motorcycles. Breen neglected to consider or evaluate air cooled engine motorcycles that utilize a plastic oil sight glass. Instead, he only considered air cooled motorcycles in general. The methodology Breen used is not

reliable because the difference in designs (i.e., motorcycles with an oil sight glass v. not) presents different hazards. The different hazards present the need to communicate different critical safety information to users. For example, an air cooled motorcycle that uses a dipstick does not present the same hazard as the plastic oil sight glass. Since Mr. Breen did not analyze the warnings associated with motorcycles that use a plastic oil sight glass like the subject motorcycle his methodology is not reliable.

Breen's opinion that an on-product warning is unnecessary in this case is premised on his unsupported conclusion that users are already aware of the risk of fire from allowing an air-cooled motorcycle to idle. *Exhibit D, Kevin C. Breen Report, at pp. 4, 7, 9.* Breen baldy concludes that this hazard is "common knowledge." *Exhibit D, Kevin C. Breen Report, at p. 9.* When pressed on how he made the determination that the risk of fire is common knowledge, he agreed that it was a "general statement" and that "in all candor, [Breen] viewed this as sort of the sun rises kind of statement, everybody knows that because that's the way it is." *Exhibit F, Kevin C Breen Dep. Tr., at p. 175.* Breen's report is absent of any analysis that supports his opinion that the potential for engine overheating is "common knowledge". More importantly, Breen's report is absent of any analysis that supports any opinion that the unique and atypical hazard in this case was "common knowledge".

Even the diminutive methodology Breen claims to have performed was not reliable. According to Breen, a human factors analysis of whether an on-product warning is necessary is dependent upon a calculus of several factors including the knowledge of the user, the severity of the potential harm, and the frequency of occurrences. *See e.g. Exhibit F, Kevin C. Breen Dep. Tr., at pp. 247-48.* However, the *primary* purpose of an on-product warning is to apprise users of a risk they would not otherwise be aware of. *Exhibit D, Kevin C. Breen Report, at p. 7.* When Breen

assumed that the other users were aware of this fire risk, he incorporated this unsupported speculation and his subjective belief into the calculus of factors. Therefore, Breen's entire calculus that he used to determine whether the warning system was adequate and whether the warning should have been on the product was the result of an unreliable method. Rather than the product of a reliable, scientifically driven method, Breen's opinion was based on unsupported speculation, and the *ipse dixit* of the expert.

By contrast, Breen's conclusion that the BMWNA's actions with respect to the recall of the BMW R1100RSL was appropriate illustrates how flawed his method was with regard to the subject motorcycle (BMW R1150R). The air-cooled R1100RSL had a similar issue in that, when idling, the front fairings could catch fire. *Exhibit D, Kevin C. Breen Report, at p. 8.* For the 1997 recall of the R1100RSL, BMWNA provided owners with an insert into the manual and an on-product warning label to apprise users regarding the potential for overheating and/or fire. *Exhibit D, Kevin C. Breen Report, at p. 8.*

Breen surmised that the on-product warning was appropriate because it "represented a change in the information provided to users for this specific model" – i.e. that the users were previously not aware of the danger caused by overheating and/or fire. *Exhibit D, Kevin C. Breen Report, at p. 8.* However, it is entirely unclear how Breen can argue that the users of the BMW R1100RSL *did not* know about the risk of overheating and/or fire from idling its air-cooled engine, while the users of the BMW R1150R *did* know of the same risk. This is especially egregious because, like the subject motorcycle, the BMW R1100RSL already had a warning against allowing the air-cooled engine to idle in its user manual prior to the recall.

Breen testified that he believed the new on-product warning and new manual insert was appropriate because, although riders may have been warned in the manual of letting the motorcycle

idle, riders of the recalled R1100RSL did not know that the motorcycle's front fairings could catch fire if left idling. *Exhibit F, Kevin C. Breen Dep. Tr., at pp. 274.* However, even Breen a self-admitted motorcycle enthusiast acknowledged that he was not aware of the unique and atypical hazard caused by the use of BMW's plastic oil sight glass. *Exhibit F, Kevin C. Breen Dep. Tr., at p. 162:13-20.*

The simple fact is Breen's opinion about the inadequacy of BMWNA's warning and the need for an on product label are not based on objective testing or scientific analysis. They are based solely on Breen's subjective beliefs. His opinion boils down to "it is because I say so" and should be precluded.

> ii. *Breen Provides No Basis For His Conclusion that BMWNA's Warnings is Consistent with Industry Practice and Standards*

Again Breen offers an opinion based on speculation and conjecture, not scientific analysis. In his report, Breen opines

> The manner in which BMWNA provided information, including information regarding the risk of engine overheating and fire to users, is consistent with that of the motorcycle industry and is a reasonable and safe approach from a human factors standpoint. The approach is systematic, effective and appropriate. In this case, Parvez Yazdani indicated that he read this information prior to the day of the subject incident.

*See Exhibit D, Kevin C. Breen Report, ₱ 3, p. 9.*

The methodology Breen used to support the above opinion is flawed. Breen neglected to consider or evaluate air cooled engine motorcycles that utilize a plastic oil sight glass like the subject motorcycle. Instead, he only considered air cooled motorcycles in general that do not present the same hazard. Breen's dependence on how manufacturers of motorcycles that do not share the same unique and atypical hazard as the subject motorcycle (use of a plastic oil sight glass that can fail under foreseeable engine temperatures) communicate critical safety information is not a

reliable methodology to determine is adequacy or effectiveness of the warning in this case.

Breen has not identified, nor evaluated the warnings for, a single other motorcycle in his report that has the same design defect/failure mode to give him the necessary basis to opine on the industry standard. In his report, Breen only review the manuals associated with Suzuki, Yamaha, and Harley Davidson – none of whom use the plastic oil sight glass with the same materials and in the same location as the subject motorcycle. Therefore, at best, Breen's analysis only pertains to the risk of an overheating air-cooled engine motorcycle in general. *Exhibit D, Kevin C. Breen Report, at p. 6.* The risk of overheating an air-cooled engine motorcycle is substantially different than the failure mode here. When an air-cooled engine motorcycle overheats, the risk of harm is to the integrity of the engine and the risk of fire due to the possible presence of combustibles located near or adjacent to the motorcycle. Whereas here, the risk of the subject motorcycle involves the melting of a component that will leak hot engine oil onto the exhaust system and result in a catastrophic fire. Thus, Breen's familiarity and research on the industry standards regarding the communication of risk of overheating is irrelevant to the case at bar where the risk is substantially different.

In sum, Breen has applied no reliable methodology to conclude that BMWNA's warnings about the atypical and unique hazard posed by the design of the subject motorcycle is consistent with industry standards. Further, the only evidence that does exists completely contradicts his conclusion. The only other motorcycle identified by Breen that is substantially similar and poses a substantially similar failure mode is the recalled, BMW R1100RSL. In response to this risk, BMW supplied an on-product warning to apprise the rider of the potential risk of harm. *Exhibit D, Kevin C. Breen Report, at p. 4.* In other words, the only evidence of the industry standard response to the risk of harm posed by the subject motorcycle's design is to put affix a warning to

the motorcycle itself, as opposed to relying on the manual.

>    iii. *Breen provides no basis for his conclusion that the subject motorcycle design was appropriate and/or not defective*

Breen failed to conduct a proper assessment of the adequacy of the design of the subject motorcycle. In his report, Breen opines:

> The overall configuration of the subject motorcycle, including an air-cooled engine and oil sight glass, is an appropriate design and does not pose an unreasonable risk, is not dangerous or unsafe, when the vehicle is used in an intended manner.

*See Exhibit D, Kevin C. Breen Report, ₱ 2, p. 9.*

Breen bases this opinion on the fact that air-cooled engines and oil-sight glasses are used commonly in the motorcycle industry. *Exhibit D, Kevin C. Breen Report, at p. 6.* However, Breen provides no analysis in his report about whether other motorcycle manufacturers use the same type of oil sight glass in the same location as the subject motorcycle. He provides no analysis that supports his position why the subject motorcycle's design is appropriate and does not pose an unreasonable risk. Further, he did not consider whether it was appropriate to use a plastic oil-sight glass, as opposed to another material not capable of melting at foreseeable engine oil temperatures. He does not consider whether it was appropriate to place the oil-sight glass on the left side of the motorcycle where it would be covered with oil while on side stand. Here, Breen specifically does not consider this type of configuration and concludes it was appropriate based on the industry-wide use of several components. Therefore, once stripped of the irrelevant basis of his conclusion, Breen's opinion that the design is appropriate becomes totally baseless and devoid of any adequate method.

> d. **Breen's Opinion Do Not Fit the Case**

The "fit" requirement is that the proffered testimony must assist the trier of fact in resolving an issue relevant to the case. *See e.g. Oddi,* 234 F.3d at 145 (3d Cir.2000); *In re Paoli,* 35 F.3d at

743. For an opinion to "fit" the case, there must be a connection between 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Oddi,* 234 F.3d at 145. Here, Breen offers several opinion that are irrelevant to the jury's determination of whether the product was defective.

> i. *Breen's Conclusion that BMWNA's Warnings were Consistent with the Industry Standards, Federal Motor Vehicle Safety Standards, and SAE Standards is Irrelevant as to Whether the Product was Defective*

Breen concludes that BMWNA's warnings were not defective because they were consistent with industry standards. *Exhibit D, Kevin C. Breen Report, at p. 6.* Further, Breen produced exhibits that show that the subject motorcycle was compliant with Federal Motor Vehicle Safety Standards (FMVSS) and/or standards from the Society of Automotive Engineers (SAE). However, compliance with industry and/or government standards is not indicative of whether a product is defective.

The Pennsylvania Supreme Court, in *Lewis v. Coffing Hoist Div., Duff-Norton Co.*, ruled that evidence of compliance with industry standards is irrelevant and therefore inadmissible to show that a given product is not defective. 515 Pa. 334, 343, 528 A.2d 590, 594 (1987); *see also Santiago v. Johnson Mach. & Press Corp.*, 834 F.2d 84, 85 (3d Cir. 1987). It reasoned that such evidence goes conduct of the defendant, rather than focusing on the product itself and has potential to mislead and prejudice the jury and unduly suggest that the product is not defective. *Id.* Simply, just because a product is in compliance with industry or government standards, it does not mean that the product is not defective.

Since *Lewis,* courts have routinely ruled that compliance with various government and industry standards are irrelevant in a Pennsylvania products liability case. *See Gaudio v. Ford Motor Co.*, 2009 PA Super 102, ¶¶ 46-47, 976 A.2d 524, 543-44 (2009) (collecting cases).

Upon information and belief, Defendant may attempt to introduce evidence that the subject motorcycle Plaintiffs allege to be defective was in compliance with Federal Motor Vehicle Safety Standards (FMVSS). However, such evidence is inadmissible to show the product was not defective. *See Harsh v. Petroll*, 840 A.2d 404, 425 (Pa. Commw. Ct. 2003), *aff'd,* 584 Pa. 606, 887 A.2d 209 (2005) ("Consequently, based on *Lewis,* the trial court properly excluded GM's evidence regarding its compliance with FMVSS.").

The Pennsylvania Superior Court recently reaffirmed the viability of *Lewis* in light of the Supreme Court's decisions in *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014). *See Cancelleri v. Ford Motor Co.*, No. 267 MDA 2015, 2016 WL 82449, at *3 (Pa. Super. Ct. Jan. 7, 2016). The Superior Court stated that "*Tincher* does not, nor does it purport to, affect the applicability of the rulings in *Gaudio* and *Lewis*." *Id.*

Accordingly, Defendant's compliance with government and/or industry standards, including FMVSS and SAE, is irrelevant to show the subject motorcycle is not defective and any marginal probative value is outweighed but its prejudice and ability to mislead the jury. *See e.g. Lewis,* 528 A.2d at 594; *Cancelleri*, 2016 WL 82449, at *3; *Harsh*, 840 A.2d at 425; *Gaudio*, 976 A.2d at 543-44 (collecting cases); *Santiago*, 834 F.2d at 85.

Further the standards proffered are irrelevant because none of them deal with standards governing air-cooled motorcycle engines, or plastic oil-sight glass caps, or on-product warnings. Simply,

> ii. Breen's Conclusion that the Design is Appropriate Fails to Consider Actual Design of Subject Motorcycle

Breen concludes that the design of the subject motorcycle is "appropriate" and does not pose an "unreasonable risk." *Exhibit D, Kevin C. Breen Report, at p. 9.* Breen bases this on the fact that air-cooled engines (in general) and oil-sight glasses (in general) are used commonly in

the motorcycle industry and have several potential advantages over differently configured designs. *Exhibit D, Kevin C. Breen Report, at p. 6.*

This opinion is irrelevant because Breen does not consider whether it was appropriate to use an air-cooled engine and an oil-sight glass with a plastic cap design *together*, like the subject motorcycle. Breen did not consider whether it was appropriate to use a plastic oil-sight glass, as opposed to another material not capable of melting at foreseeable engine oil temperatures. Breen did not consider whether it was appropriate to place the oil sight glass cap on the left side of the motorcycle, where the oil would likely cover the oil sight glass while idling on side stand.

Plaintiff's do not argue that the bike was defective because it had an air-cooled engine, or because it had an oil-sight glass cap, or even because it had a plastic oil-sight glass cap. Rather it was this unique, atypical combination that rendered the subject motorcycle unreasonably defective. The fact that other motorcycles can, without incident, have air-cooled engines, or oil-sight glass is entirely irrelevant to the question as to whether this specific design was defective.

> iii. Breen's Opinion on Intended Use of the Motorcycle and How Yazdani's Use was Inconsistent is Irrelevant

Breen concludes that, since Mr. Yazdani allowed the motorcycle to idle for approximately 30 minutes in derogation of the warning in the manual, Mr. Yazdani did not use the motorcycle as BMWNA intended. *See Exhibit D, Kevin C. Breen Report, at p. 6.* However, this opinion is irrelevant.

Pennsylvania product liability law will only find a product defective if it is unreasonably dangerous for its "intended use" and "intended user." *See e.g. Pennsylvania Dep't of Gen. Servs. v. U.S. Mineral Products Co.*, 898 A.2d 590, 600-01 (Pa. 2006) (defendant not liable for release of chemicals after fire consumes defendant's building materials because fire not an intended use

of product); *Phillips v. Cricket Lighters,* 841 A.2d 1000, 1007 (Pa. 2003) (plurality opinion) (lighter manufacturer not liable for fire started by small child because a small child is not the intended user of a lighter).

The question of the intended use of a given product is a question of law to be determined by the trial court. *Schindler v. Sofamor, Inc.*, 774 A.2d 765, 773 (Pa. Super. 2001). Courts have focused on the general, public perception of the use of a given product, rather than use specified by defendant at court or in manuals or other literature provided to the consumer. *See e.g. Smith v. Yamaha Motor Corp.*, U.S.A., 5 A.3d 314, 321 (Pa. Super. 2010) ("ATV is an off-road vehicle and its intended utilization is to be driven in an off-road setting." Trial court erred in accepting defendants defense that plaintiff was not using the ATV in accordance with the manual that he received with that vehicle.); *Lynn ex rel. Lynn v. Yamaha Golf-Car Co.*, 894 F. Supp. 2d 606, 634-35 (W.D. Pa. 2012) (rejecting Defendants definition of the intended use of a golf cart: "a vehicle that is only used to convey persons on a turf golf course by licensed drivers" in favor of: "[a vehicle] to convey persons from one point to another at a relatively low speed.").

Accordingly, Breen's analysis of the manual to determine the "intended use" of the subject motorcycle is improper. Courts have focused on the everyday, functional use of the product, not literature provided to the user. Here, Mr. Yazdani was idling the motorcycle, with the intent to allow it to warm up during the winter months. As Breen even testified, that a motorcycle rider would warm up the motorcycle in the winter is entirely foreseeable use of a motorcycle. *Exhibit F, Kevin C. Breen Dep. Tr., at p. 245:13-25*.

### III. CONCLUSION

For the reasons enumerated above, Plaintiffs respectfully request this Honorable Court grant its Motion *in Limine* to Preclude Defendant BMW of North America LLC's Expert, Kevin C. Breen at trial and precluded the report and testimony of Kevin C. Breen.

Respectfully submitted,

**de LUCA LEVINE, LLC**

BY: *Patrick A. Hughes*

RAYMOND E. MACK, ESQUIRE
I.D. No.: 91815
rmack@delucalevine.com
PATRICK A. HUGHES, ESQUIRE
I.D. No. 91415
phughes@delucalevine.com
Three Valley Square
512 East Township Line Rd, Ste. 220
Blue Bell, PA  19422
215-383-0227 (Direct)
215-383-0082 (Fax)
Attorneys for Plaintiffs

Dated: May 2, 2016

**CERTIFICATE OF SERVICE**

    I, Patrick A. Hughes, hereby certify that a true and correct copy of the above was served on May 2, 2016, upon counsel listed below by ECF/PACER:

Keith D. Heinold, Esquire<br>
Marshall Dennehey Warner Coleman & Goggin<br>
2000 Market Street, Suite 2300<br>
Philadelphia, PA 19103

                                **de LUCA LEVINE, LLC**

**BY:** *Patrick A. Hughes*

                              RAYMOND E. MACK, ESQUIRE
                              I.D. No.: 91815
                              rmack@delucalevine.com
                              PATRICK A. HUGHES, ESQUIRE
                              I.D. No. 91415
                              phughes@delucalevine.com
                              Three Valley Square
                              512 East Township Line Rd, Ste. 220
                              Blue Bell, PA  19422
                              215-383-0227 (Direct)
                              215-383-0082 (Fax)
                              Attorneys for Plaintiffs