Exhibit "C"

1

1    IN THE UNITED STATES DISTRICT COURT
   FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2       - - -

3 PARVEZ and RAZIA   :
 YAZDANI

4    Plaintiffs,  :

5    -vs-    :

6 BMW OF NORTH AMERICA, :
 LLC

7   and    :
 BMW MOTORRAD USA, a :

8 Division of BMW OF  :
 NORTH AMERICA, LLC  :

9  Defendants  : NO. 2:15-cv-01427-PD

10     - - -

    Tuesday, March 15, 2016

11     - - -

12   Oral deposition of WILLIAM J.

13 VIGILANTE, JR., PhD, CPE was taken at the Law

14 Offices of deLuca Levine, Three Valley Square,

15 Suite 220, Blue Bell, Pennsylvania, commencing

16 at 10:00 a.m., before Debra J. Veneziale,

17 Court Reporter and Notary Public; in and for

18 the Commonwealth of Pennsylvania.

19

20     * * *

21

22

23   THOMAS G. OAKES ASSOCIATES
   National Court Reporting &
   Litigation Support Services

24 Phone: 1.877.OAKES.77 Fax: 1.888.344.3778

Exhibit C

William Vigilante, Jr., Ph.D.                    9

1       Q.      Human factors?

2       A.      Yes.

3       Q.      What do you describe as human

4   factors?

5       A.      Basically human factors are

6   ergonomics, which is a synonym, is a science

7   that studies how people interact with their

8   use of all different types of products,

9   machines, systems and environments.

10              And what we're interested from

11  the human factors side is the person that's

12  using the products.  We're interested in their

13  perceptual abilities, that is their ability to

14  see, hear and capture information from the

15  environment, how they process that information

16  and make decisions.  How things such as

17  expectancies and prior experiences affect how

18  we perceive things and how we make decisions.

19              We are also interested in

20  people's physical abilities and limitations.

21  For example, strengths and weaknesses, ability

22  to lift, range of motion, sizings of people,

23  human gait or ability to walk, run, so forth.

24              And then we as a field in a

Exhibit C

William Vigilante, Jr., Ph.D.                    10

1   professional's work with engineers, designers

2   and architects design products, machines and

3   systems that are easy to use, that are

4   efficient to use and most importantly are safe

5   to use.

6          Q.      Do you work in any capacity

7   other than forensics?  Do you know what I mean

8   by that?

9          A.      Sure.  I do traditional

10  consulting work at times.

11         Q.      What percentage of your work is

12  what you refer to as traditional consulting

13  work?

14         A.      Traditionally it's been a small

15  percentage, anywhere from five to 10 percent.

16  At some points of the year it's zero percent.

17         Q.      When you say percentage, are

18  you talking about percentage of the income you

19  create from it, or are you talking about the

20  percentage of projects?

21         A.      I think they're probably

22  positively correlated, so both.

23         Q.      What percentage of your work do

24  you do for Plaintiffs?  And when I say

Exhibit C

William Vigilante, Jr., Ph.D.                78

1    second.

2                        - - -

3         (Whereupon, a discussion was held off

4    the record.)

5                        - - -

6    BY MR. HEINOLD:

7         Q.      The warning that you cite in

8    the manual you talk about Mr. Yeldham's

9    testimony and you talk about Mr. Zazula's

10   report in the next paragraph.

11        A.      Okay.

12        Q.      Now, I had asked you about the

13   scope of your expertise as a motorcycle design

14   expert, you said -- your Counsel said you're

15   going to be sticking within your report.

16               Are your references here to

17   those things references to the need for a

18   warning as compared to a criticism of the

19   design other than a warning?

20        A.      Yes.  So my opinions are

21   both.  So the need for a warning is dependent

22   upon the design choice that BMW made or BMW

23   North America made.  So you can't have

24   opinions with respect to warnings without

Exhibit C

William Vigilante, Jr., Ph.D.                    79

1   understanding the design decisions and choices

2   that were available or made.

3        Q.       Okay.  Well, I understand, for

4   example, the product hierarchy, there is a

5   design and you should try to design out the

6   hazard.  If you can't, then you offer a

7   warning.  They're two separate issues.

8        A.       Well, they're not separate

9   issues.

10       Q.       Well, let me just finish.  I

11  understand that the design issue is a

12  predicate for the warning, right?

13       A.       Yes.  So the design of the BMW

14  creates a potential for a hazardous situation,

15  that is the potential for fire.  There was

16  choices that BMW made in the design of the

17  bike that could have eliminated that

18  potential.  They chose not to.  If they're

19  going to not eliminate through design, they

20  have the option of safeguarding it.

21            I think that Mike Zazula

22  addressed some of those issues guarding it

23  with the use of the optional police fan kit.

24  I don't recall offhand if he had an issue with

William Vigilante, Jr., Ph.D.                    80

1   respect to the monitoring of the engine

2   temperature, potential shutting it down if it

3   got too hot.  But certainly, those are

4   guarding solutions that were available to BMW

5   to my understanding and they chose not to do

6   that.

7                     And then so they relied upon a

8   warning as their mitigation strategy.  And my

9   opinion is that reliance on that warning was

10  inappropriate in that the warning they

11  provided was inadequate.  And that if they

12  were going to rely upon the warning, solely

13  upon the warning, they needed to provide it on

14  the motorcycle itself like they did with the

15  recall motorcycle a few years prior because of

16  the unique characteristic of the potential

17  fire hazard with the design of this bike.

18         Q.      I understand that.  My question

19  is:  Are you going to criticize the design as

20  a design?  Are you going to say the

21  motorcycle -- forget the warnings.  Are you

22  going to say I'm the motorcycle expert and

23  this motorcycle is defective because it had a

24  sight glass in this location and I'm offering

Exhibit C

William Vigilante, Jr., Ph.D.                    81

1    an alternative?

2          A.       No.  My opinion is that because

3    of the way they designed it, they created a

4    potential fire hazard, and as such they had a

5    responsibility to mitigate that, and they

6    could have mitigated it through design or

7    guarding.  If they weren't doing to do that,

8    they should have at least provide adequate

9    warning, and the warning that they did chose

10   to provide was inappropriate and inadequate.

11         Q.       Are you offering an opinion

12   that the design of the motorcycle beyond the

13   warning is defective and unsafe?

14         A.       I think that they were --

15   excuse me, I think that they already

16   established that.  I'm not establishing the

17   fact that oil sight glass or its position in

18   its composition failed meeting to a

19   catastrophic event.  That's why I'm citing

20   Mark Yeldham, his testimony, to establish

21   that.

22                  So I'm not planning on

23   establishing that on my own.  I'm using his

24   testimony to establish that there was a hazard

Exhibit C

William Vigilante, Jr., Ph.D.                    82

1   due to the design of this bike.

2        Q.      Okay.

3             MR. HEINOLD:  Ken, do you

4   understand my question?

5             MR. LEVINE:  I do.  I think

6   that you're asking him to disconnect

7   something -- let me start off, you can keep

8   this on the record.  Inevitably he has to say

9   that the design resulted in a hazard.  I don't

10  think that he is opining that personally other

11  than through the acceptance of statements by

12  folks at BMW and other experts that such a

13  hazard simply exists based on it.

14             I don't think he's going to

15  come in, and correct me if I'm wrong, and

16  testify that the design in and of itself

17  should have been different.  But he will say

18  the obvious, which he's already stated, that

19  if it did not have that design it would not

20  have that hazard.

21             So you're asking him is he an

22  expert in that area?

23             MR. HEINOLD:  See, I don't know

24  that I can agree with your last statement.

Exhibit C

1          MR. LEVINE:  Oh, okay.

2          MR. HEINOLD:  I'm with you a

3     hundred percent.  There's a warning that says

4     here's a hazard, don't do this, and that's

5     what we're here about.

6          But your last statement that

7     he's going to say if you had a different

8     design you wouldn't have the hazard, he

9     doesn't have that in his report.  And if you

10    are going to declare him to be a motorcycle

11    design expert, then we'll see if he

12    qualifies.  But that is the next step.

13         MR. LEVINE:  The part that you

14    don't agree with me on, let me just address

15    that just for a second, I'm rather confident

16    that your own client who designed the bike

17    would say that if designed differently, as

18    some other vehicles are designed, that that

19    precise hazard would not exist.  It's just a

20    nature of the design of that particular bike.

21         So I don't think it requires

22    him to be an expert, although he probably has

23    enough of that expertise to say that

24    statement, that if it was designed differently

Exhibit C

William Vigilante, Jr., Ph.D.                    84

1    it would not have that hazard.  I doubt your

2    client or you when you pause for a second

3    would disagree with that statement.  So that's

4    all that he would be saying, I believe, and he

5    can answer for himself.

6              So when you say is he a

7    motorcycle expert as to the design or whether

8    or not the design generated that hazard, I

9    believe that everybody involved knows that the

10   design generated that hazard.  So I'm not

11   sure -- I'll be happy to continue.

12             MR. HEINOLD:  I will say this,

13   I don't disagree with you that it has a design

14   and that design can lead to the consequences

15   of a fire if you leave it idling at

16   standstill, because there's a hazard

17   recognized and a warning in the manual to that

18   effect.

19             MR. LEVINE:  Then a safety

20   engineer or an ergonomic expert will

21   inevitably say every single time you've got

22   this hazard that I've been asked to address,

23   but that integral with that opinion is the

24   straightforward statement that if it had been

Exhibit C

William Vigilante, Jr., Ph.D.                    85

1   designed differently, it's not the case with

2   all products, but if it was designed

3   differently it would not have that hazard.

4            MR. HEINOLD:  And what's the

5   different design he's going to say it should

6   be?

7            MR. LEVINE:  Oh, he's not going

8   to say it should be because there's six

9   million ways to build a motorcycle, and some

10  of them will have that hazard, some of them

11  will not have that hazard based on their

12  design.

13           I think that -- again, I

14  welcome his contribution to the conversation,

15  but I think his opinion is that when a

16  motorcycle is designed in this fashion, if the

17  manufacturer chooses to allow this hazard to

18  exist, because the nature of the design of

19  this motorcycle, not unlike every other

20  motorcycle, but the design of this type of

21  motorcycle generates this hazard, and once

22  they decided to have that design, which would

23  generate this known hazard, then they must do

24  X, Y and Z, but they are not guiltless --

Exhibit C

1   that's a horrible lawyer word that I'm using.

2   They're not guiltless deciding, all right,

3   we're going to design it to allow this hazard

4   to exist.

5            MR. HEINOLD:  You have an

6   expert who has addressed the design issues.

7            MR. LEVINE:  Yes, we have.

8            MR. HEINOLD:  And this witness

9   has addressed the warning issues given the

10  design.

11           MR. LEVINE:  You have just

12  limited, frankly, the scope of his testimony.

13  He was asked to analyze the safety.  You want

14  to say he was asked to analyze the warning.  I

15  think any ergonomic expert is going to be

16  asked to analyze the safety.  Integral to that

17  is a review as to the hazard and what causes

18  them, first and foremost, and that inevitably

19  goes back to the design.

20           So it would be impossible for

21  him to say I'm analyzing the safety that led

22  to fire, that he did not look at the design,

23  the design options and whether or not they

24  created a hazard.  I don't -- you can ask him

Exhibit C

William Vigilante, Jr., Ph.D.                    87

1  if he has opinions with regard to other

2  designs that would not generate the hazard.

3              You can ask him whatever

4  questions you'd like to ask him.  I've tried

5  to answer I think the conflict between you as

6  best I can.

7              MR. HEINOLD:  Well, I think

8  your position tries to turn him into a design

9  expert, which he doesn't have in his report.

10             MR. LEVINE:  I think the scope

11  of his opinions that he will say at trial with

12  regard to design and hazard generation as a

13  result of this design are stated in his

14  opinion and will be the testimony at the time

15  of trial.

16             But if you want to explore

17  that, if you feel as if he's going to give

18  testimony at trial beyond the scope of his

19  abilities or the scope of his report, I

20  certainly appreciate that, and an issue will

21  arise that we're going to have to address.

22  But I think that your questions may eliminate

23  that concern.

24  BY  MR. HEINOLD:

Exhibit C

William Vigilante, Jr., Ph.D.                    88

1       Q.      Do you consider yourself a
2   motorcycle design expert?
3       A.      It depends on the specific
4   topic.
5       Q.      How about on the location of
6   sight glasses, are you an expert in the
7   location and use of sight glasses for oil
8   systems?
9       A.      It depends on the question.  So
10  maybe I can short circuit this.  I do not plan
11  on providing an alternative design solution.
12  So I would leave that to Zazula and Yeldham
13  and anybody else that testifies.
14          My opinion is simply that it's
15  my understanding that bikes that are designed
16  differently don't have this hazard.  If you're
17  going to choose this design that creates this
18  hazard you need to A, accept that you're doing
19  it, and then B, think about providing a
20  different design.
21          If you can't provide a
22  different design for whatever reason, you have
23  to decide whether or not you're going to
24  provide a safeguard to prevent the hazard from

Exhibit C

William Vigilante, Jr., Ph.D.                    89

1    occurring that is inherit in your design.  And

2    if you're not going to do that, then you need

3    to provide an adequate warning.

4              My opinion is that instead of

5    providing a design that doesn't create the

6    hazard, BMW, for whatever reason, I don't know

7    for whatever reason, given the hazard, chose

8    to leave it in the design of the bike.  They

9    didn't provide a safeguard to prevent the

10   hazard from occurring.

11             It would be my opinion if asked

12   that it's unreasonable if the safeguard is

13   available and feasible, I didn't do the

14   analysis of what they should be, that's for

15   Mike Zazula to determine, but my opinion is

16   simply that if it's available and it's

17   feasible, it should have been used rather than

18   relying upon a third option.  If they have a

19   hazard because of the design and they're not

20   going to safeguard it, the least they can do

21   is provide adequate warning.

22             My opinion in this case is that

23   they failed to provide adequate warning.  If

24   they're going to solely on the warning, what

Exhibit C

William Vigilante, Jr., Ph.D.                    90

1    they needed to do was to put it on the bike

2    like they did in the recall back in the early

3    models.

4          Q.      So if I understand what you're

5    saying, you're not going to offer any type of

6    alternate design; correct?

7          A.      I'm not planning on offering

8    alternative design.

9          Q.      You're not planning on

10   criticizing any specific aspect of this

11   design?

12         A.      The only thing I would limit my

13   opinion to or plan on providing an opinion is

14   that I've given alternative designs, they

15   should have been the first choice of

16   manufacturers as opposed to choosing a design

17   they had an inherent hazard.

18         Q.      But that's going to be a

19   general statement --

20         A.      Yes.

21         Q.      -- about this motorcycle has

22   features and characteristics that lead to a

23   hazard that the Owner's Manual addresses;

24   correct?

William Vigilante, Jr., Ph.D.                    91

1        A.      The Owner Manual does attempt

2   to address it.

3        Q.      Okay.  I'm not trying to say

4   there isn't a hazard.  I'm acknowledging that

5   what has been said about what can occur if the

6   operator does certain things can occur, and

7   there's a warning about that.  I'm not arguing

8   the merits of the warning.  I'm saying it's

9   there, so therefore the characteristic is

10  known.

11              You're going to say, as I

12  understand it, that if you have that

13  characteristic the first thing you should do

14  is --

15              MR. LEVINE:  Consider.

16  BY MR. HEINOLD:

17       Q.      -- to consider is to have a

18  design that doesn't present that

19  characteristic.  That you're going to leave

20  that fight to other experts; correct?

21       A.      Yes, I'm going to leave -- I'm

22  not offering a design solution.  But the

23  problem is that the design of the bike is

24  unique in that it creates a fire hazard that

Exhibit C

William Vigilante, Jr., Ph.D.                    92

1   doesn't exist on other types of bikes.  And it

2   exists because of the design of the bike.

3                    Whether it's the location

4   and/or the material or the manner in which the

5   oil sight glass was manufactured and mounted,

6   I don't know whether it's one or the other or

7   a combination of all three.  But the design of

8   this bike creates a unique hazard to this bike

9   that does not occur or exist in my

10  Harley-Davidson, does not occur or exist in

11  the Yamaha bike that Mr. Yazdani had for 20

12  years prior to the BMW.

13          Q.      Is that opinion -- or excuse

14  me, in that statement are you planning to talk

15  about the specifics of the design in saying

16  the characteristics of this bike create a

17  hazard of fire?  Are you going to say and

18  here's what they are?

19          A.      I'm going to say that Mr.

20  Yeldham testified that the design of this bike

21  and the designed oil sight glass creates a

22  fire hazard.

23          Q.      I don't think he testified as

24  to that.

William Vigilante, Jr., Ph.D.                    93

1       A.       Sure he did.

2       Q.       What did he say?

3       A.       Mr. Yeldham testified that if

4  BMW R 1150 R motorcycle is left idling in a

5  stationary position the oil sight glass cover

6  can fail and cause a fire.

7       Q.       That's the extent of what

8  you're going to talk about there?

9       A.       I mean, he goes on.  I'm citing

10 the rest of that paragraph as to why this is a

11 problem.  I mean, he's acknowledging in that

12 testimony that there is a hazard associated

13 with the oil sight glass cover.  And if you

14 don't have the oil sight glass cover it can't

15 fail, and if you have a dipstick you don't

16 have an oil sight glass cover.  And therefore,

17 from the oil sight glass cover can't fail.

18      Q.       Okay.  So are you going to

19 offer an opinion about it should have had a

20 dipstick?

21      A.       No, I am not, but my opinions

22 because of the unique characteristics of this

23 bike users don't understand or appreciate it

24 because it's abnormal, atypical due to the

Exhibit C

William Vigilante, Jr., Ph.D.                94

1    unique or due to the design of this bike.

2         Q.      Is there anything else that you

3    consider abnormal or unique?

4         A.      Other than the fact that the

5    oil sight glass cover can fail and cause a

6    fire, that's the only thing that's relevant to

7    this incident.

8         Q.      Are you aware of any --

9         A.      Well, I take that back, because

10   apparently to prevent the fire due to the

11   design BMW wants you to ride away immediately

12   and that, again, is a unique or atypical trait

13   associated with this bike.

14        Q.      Anything else?

15        A.      Not that I can think of at the

16   moment.

17        Q.      Have you done a survey on

18   motorcycles?

19        A.      I've not surveyed every

20   motorcycle ever available, but I've looked at

21   a lot of bikes over a lot of years and most of

22   them have dipsticks.

23        Q.      Any that don't other than BMW?

24        A.      Well, the Yamaha has an oil

Exhibit C

William Vigilante, Jr., Ph.D.                    95

1   sight glass, but it's on the right side of the

2   crank case that when it's on its left

3   kickstand the oil isn't covering the oil sight

4   glass.

5            And Mark Yeldham testified that

6   part of the reason why the oil sight glass may

7   fail is because when its on its left kickstand

8   the oil, hot oil covers the oil sight glass.

9   So to me intuitively that means that if it's

10  on the right side and it's not covering the

11  oil sight glass it can't cause it to fail in

12  that manner.

13           Q.      Are you planning to offer the

14  opinion that the oil sight glass on this

15  motorcycle should have been on the right side,

16  not the left?

17           A.      I do not plan on providing an

18  alternative design to this bike.

19           Q.      And I think we've already

20  agree, but I want to be clear, you're not

21  planning on design that says there should be a

22  dipstick instead of an oil sight glass?

23           A.      I was not planning on offering

24  an opinion with respect to alternative design.

William Vigilante, Jr., Ph.D.                    96

1            MR. LEVINE:  I'm compelled to

2  step in.  He has said a number of times that

3  he does not intend to present alternative

4  design.  I just want to clarify that in one

5  way.  Some people view warnings provided on a

6  product as an alternative design.  I just

7  wanted to mention that so there's no lack of

8  clarity.

9            And I would ask that we pause

10  so I can go do and get those menus.

11            MR. HEINOLD:  Can I just finish

12  this?

13            MR. LEVINE:  Sure.

14            MR. HEINOLD:  And I understand

15  what you say about the warning issuing

16  wasn't -- that's not a problem.  I didn't take

17  it that way.

18            MR. LEVINE:  Okay.

19            MR. HEINOLD:  We do have a

20  report full of --

21            MR. LEVINE:  Of warning

22  issues.

23            MR. HEINOLD:  Of warning

24  issues.

Exhibit C

William Vigilante, Jr., Ph.D.                    157

1    Instruction Manual to mitigate the design

2    defect with the motorcycle, it's inappropriate

3    and it leads to long manuals.

4              So if they had fixed it from

5    the beginning or provided an adequate

6    safeguard, there wouldn't be a need to add it

7    to the manual, maybe cut a page-and-a-half out

8    of it.

9        Q.      So human factors experts have

10   no role in the length of the modern day

11   manual?

12       A.      Maybe litigation attorneys.

13   Human factors experts would say fix the

14   design, provide the safeguard, do not rely

15   upon a warning.  Particularly they would say

16   do not rely upon a warning in a manual.

17             As a human factors professional

18   my preference is to fix the design.  When I

19   worked for the IBM Corporation I worked with

20   the engineers to fix the design before we

21   relied upon a warning in a manual around the

22   product.  Eliminating it through design is

23   always the first and best option.  Providing a

24   guard is the second and second best option.

Exhibit C

William Vigilante, Jr., Ph.D.                    204

1   here, would this capture your attention?  You

2   can mock it up with Styro-foam if you have,

3   physically place the warnings where you think

4   that they're relevant or should be placed and

5   have the users conduct tasks and determine

6   whether or not they're seeing them, reading

7   them, understanding them and complying with

8   them.

9              As you get farther along in

10  developing, you can actually take the

11  motorcycle and have alternative places where

12  you're going to test to determine what works

13  and what doesn't work.  This is all empirical

14  testing.

15       Q.      If somebody was to come in this

16  case and say we need 25 labels, and that's too

17  many because it will create clutter, what

18  would you have to do to say no, they're wrong,

19  in terms of creating clutter?

20              MR. LEVINE:  Can I interrupt

21  for one second just so I understand.  Do you

22  mean 25 in one place or 25 all over the

23  product?

24              MR. HEINOLD:  All over the

Exhibit C

William Vigilante, Jr., Ph.D.                    205

1    product.

2                    THE WITNESS:  First I would

3    want to know why they have that many.  That

4    would be the absolute first question.  I'd

5    want to know what was done to eliminate

6    through design, what was done to guard against

7    it.  Then I would want to know the

8    prioritization that was given to each of the

9    warnings.  Then I want to know were they

10   relevant to on the bike, when they're

11   relevant, where they're relevant.

12                    So, for example, if it has

13   something to do with bleeding the brakes, for

14   example, the warning being placed on the gas

15   tank is probably not the appropriate place for

16   it.  You would probably want it down on the

17   caliper.  So it could be that when you get

18   done you can find the spots that are relevant

19   on the bike and place them specifically at

20   those spots and you decrease the issue of

21   clutter.

22                    If they're all relevant to the

23   tank, the gas tank, let's say you've got 10

24   warnings that are related to the gas tank, I

Exhibit C

William Vigilante, Jr., Ph.D.                    206

1   don't see how that's possible, then you got to

2   look at whether or not they can be combined

3   into a single one.

4              I think the -- for example, the

5   Yamaha warning that you looked at earlier,

6   there was two different topics addressed in

7   the same warning, so that's a multi topic

8   warning.  That's one way to reduce it.  You

9   know, there's just multiple ways of doing it.

10         Q.      So, if somebody said look, we

11  have made a determination that we need to put

12  20 stickers on the gas tank, what would you

13  have to do to say no, that would be clutter,

14  that would be too many?

15         A.      Again, I would have to look at

16  what was done from a hazard analysis --

17         Q.      You said all that.  I'm

18  assuming you've done that.  Now we've

19  concluded that there's 20 pieces of

20  information that need to be imparted in order

21  for us to feel as if our product is safe, but

22  we're concerned about clutter so we can't do

23  that, what would you have to do to determine

24  whether that would create clutter and be an

Exhibit C

William Vigilante, Jr., Ph.D.                    207

1   interference with the transmission of useful

2   safety information or not?  Usability test?

3          A.      Again, I can offer to do the

4   usability testing.  I can look at it and do a

5   heuristic evaluation of it.

6                  MR. LEVINE:  A what?

7                  THE WITNESS:  Heuristic.

8   BY MR. HEINOLD:

9          Q.      That's off the cuff?

10         A.      I'm sorry?

11         Q.      Is that like off the cuff?

12         A.      No.  It's done based on what

13  the professional knowledge and experience

14  looking at the standards, guidelines and

15  recommendations are from warning design,

16  seeing whether or not you can meet those.  So

17  that's a certainly a way to do it.

18                 But again, you've got a

19  hypothetical that is so outlandish that it

20  stretches the imagination in the realms of

21  possibility.  If you have 20 different

22  warnings that had to go on the gas tank, you

23  know, my first inclination is that you can't

24  do it, that this is ridiculous.  You shouldn't

Exhibit C

William Vigilante, Jr., Ph.D.                    208

1  have this many hazards associated with the gas

2  tank.  What did you do differently or wrong

3  with your design that requires 20 different

4  warnings on the gas tank.

5         Q.      So if I distill all this, you

6  would have to do a usability test to determine

7  whether that particular decision of 20

8  stickers on the gas tank would create clutter

9  or interfere with the transmission of safety

10 information because, as I understand, there's

11 no guideline that says anything more than five

12 is too many, you need to have five to seven,

13 you know, anything like that?

14         You would have to look at all

15 the other things you talked about to make that

16 kind of decision; is that right?

17         A.      I would say you're incorrect.

18 For 20 different warnings on the gas tank, I

19 think I can safely look at that and say that

20 that would be inappropriate and inadequate.

21         Q.      Well, what -- that would be

22 your opinion, right?

23         A.      That would be my learned

24 opinion based on my education, training and

Exhibit C

William Vigilante, Jr., Ph.D.                    209

1  experience.

2       Q.      Well, what would -- how about

3  five?

4       A.      Again, I'd go through the same

5  process, determine why there's five that you

6  would have to put on.

7       Q.      No, I got that process.  I'm

8  talking about we reached that point.

9               See, here's my question --

10      A.      Then I think --

11      Q.      -- it's a simple one.

12      A.      Well, do I get to answer or do

13  I get interrupted again?

14      Q.      Oh, you'll get interrupted

15  again if you keep giving the same answer,

16  non-answer.

17      A.      I'm sorry, go ahead.  You keep

18  asking the same question over and over again.

19      Q.      You're right, I do.  You keep

20  answering the same question.  Here's the

21  problem, your answer isn't my question.

22      A.      It depends on the situation.

23  I'd have to look at it and give you my

24  opinion.

Exhibit C