IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PARVEZ & RAZIA YAZDANI, | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| BMW OF NORTH AMERICA, LLC, and | : | |
| BMW MOTORRAD USA, a Division of | : | No. 15-01427 |
| BMW OF NORTH AMERICA, LLC | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

    Plaintiffs Parvez and Razia Yazdani have sued Defendants BMW of North America, LLC and BMW Motorrad USA (collectively, "BMW") for strict liability and negligence. See Notice of Removal (doc. 1), Ex. A, Compl. They primarily allege BMW failed to properly design and provide adequate warnings for a 2004 BMW R1150R motorcycle (the "motorcycle") that caught on fire and damaged their home. See id. ¶¶ 9-35.

    BMW has filed a Motion to Preclude the Testimony of Plaintiffs' Expert, William J. Vigilante, Jr. (doc. 16), and a Motion for Summary Judgment (doc. 15). I grant in part BMW's motion to preclude Vigilante and deny BMW's summary judgment motion.

I.    Background

    In the spring of 2011, Parvez Yazdani purchased the motorcycle used from a previous owner in Boston, Massachusetts. See Motion to Preclude Expert, Ex. E, 9/22/2015 P. Yazdani Dep. at 6, 10. The motorcycle had an air-cooled engine, meaning it needed to be moving so air could cool the engine. Id. at 8-9, 20. Yazdani did not know this when he purchased the motorcycle; he was focused more on the fact that the motorcycle was shaft-driven. Id. at 8-9, 20, 46, 49-50.

During the purchase of the motorcycle, the previous owner provided Yazdani with the Rider's Manual, a three inch by five inch, 89-page book. Id. at 6-7; Motion for Summary Judgment, Ex. C, Rider's Manual. After riding the motorcycle to his home in Mechanicsburg, Pennsylvania, Yazdani read the entire Rider's Manual. P. Yazdani Dep. at 7-8, 10.

The Rider's Manual identified all of the motorcycle's parts as well as instructions for operating and maintaining the motorcycle. See Rider's Manual. It featured more than 50 warnings defined as "precautions and measures which are essential in protecting the rider or other persons from severe or fatal injury."[1] Id. at Yazdani000925. The warnings were identified by the word WARNING, a symbol of a black exclamation point in a white triangle, bold print, and lines above and below the "warning" information. Id. A warning on page 51 of the manual stated:

> . . . . Do not allow the engine to idle unnecessarily or for prolonged periods.
>
> –Risk of overheating or fire. Ride away immediately after starting the engine.

Id. at Yazdani000950. A similar warning on page 60 stated:

> Do not warm up the engine with the motorcycle at a standstill – risk of overheating or fire! Ride away immediately after starting the engine. To avoid even overheating the air-cooled engine and possible damage as a result, avoid even short warm-up periods at a standstill. . . .

Id. at Yazdani000955. Although Yazdani testified that he must have read these warnings while reading through the entire manual, he did not recall them. See P. Yazdani Dep. at 13-14, 21-24.

---

[1] Besides warnings, the manual included numerous "cautions" and "notes." Rider's Manual at Yazdani000925. The cautions were identified by the word CAUTION, a symbol of a white exclamation point in a black triangle, and lines above and below the "cautioned" information. Id. The notes were identified by the word NOTE and a symbol of a pointing finger. Id.

He further acknowledged that the warnings clearly stated a fire could start if the motorcycle was left running at a standstill.  Id. at 27-28, 93

Yazdani kept his motorcycle in his garage and during the winter, he warmed it up once or twice per week by starting the engine and letting it run at a standstill for about seven to nine minutes while he smoked a cigarette.  Id. at 15-16, 63-64.  In February 2013, Yazdani started the motorcycle in his garage, but before turning it off he became distracted, went in the house, and forgot that the motorcycle was on.[2]  Id. at 63.  Approximately 30 minutes later, he heard his smoke detector alarm and rushed into the garage to find the motorcycle on fire.  Id. at 65, 68-69.  He unsuccessfully attempted to drag the motorcycle out of the garage.  Id. at 69.  Fire fighters were summoned to extinguish the fire.  Id. at 85.  The Yazdanis' house and its contents were significantly damaged from the smoke.  Id. at 87, 89-91.

II.     Motion to Preclude Vigilante

In support of their claims, the Yazdanis seek to present Vigilante as an expert witness in human factors and ergonomics.[3]  In a report, Vigilante opines that BMW failed to provide adequate warnings about the risk of a fire from running the motorcycle at a standstill.  See Motion to Preclude Expert, Ex. D, Vigilante Report at 5.  Vigilante explains BMW could not rely

---

[2]     Yazdani testified that a telephone call may have distracted him, but he was not really sure.  P. Yazdani Dep. at 64.

[3]     Vigilante explained human factors and ergonomics "is a science that studies how people interact with their use of all different types of products, machines, systems and environment." Motion to Preclude, Ex. F-1, 3/15/2016 W. Vigilante Dep. at 9; see also Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 322 n.10 (3d Cir. 2003) ("human factors engineering 'is concerned with an evaluation of the human factors that are involved in the design and use of products, equipment, and facilities'"); Durkin v. Wabash Nat., No. 10-2013, 2013 WL 1314744, at *16-17 (D.N.J. Mar. 28, 2013) (recognizing that "application of human factors principles can be highly subjective and thus conveniently malleable," but finding Vigilante's human factors methodology reliable); Dolfman v. Edwards, Nos. 13-2831, 13-6172, 2015 WL 3477736, at *1-*2 (E.D. Pa. June 15, 2015) (human factors expert's opinions about physiological process of perception were reliable).

on its motorcycle dealers to provide this "critical safety information" to motorcycle users because motorcycles often are resold. Id. at 5-6. He also states BMW could not reasonably rely on the Rider's Manual to communicate safety information because "[o]ften product manuals will not be read, read in their entirety, or may not be available at a later date or at all." Id. at 6. He further says that even if a manual is read, the warnings are likely to be overlooked, not encoded in the reader's memory, or forgotten during operation of the product. Id. at 7.

Relying on books and standards concerning warnings, Vigilante states that "critical warning information [must] be presented on the product to ensure the information is seen, read, and heeded at the time and location it is needed." Id. at 9; see also id. at 7 ("Critical warning and safety instructions must be provided where and when the information is needed and where the information is most likely to be encountered and seen (e.g., conspicuously and permanently placed on the motorcycle)."). Vigilante then concludes that BMW "should have conspicuously and permanently placed a warning [about the risk of fire from running the motorcycle at a stand-still] directly on the motorcycle and the motorcycle was defective and unreasonably dangerous without the warning." Id. at 10.

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  This rule has been interpreted to require that expert testimony be: (1) from a qualified source; (2) reliable; and (3) fit the facts of the case.  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-91 (1993); Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008).  This test should be applied flexibly in favor of admitting expert testimony.  See Daubert, 509 U.S. at 594-95; Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997).

      BMW does not challenge Vigilante's qualifications or the general field of human factors and ergonomics.  See Motion to Preclude Expert at ¶¶ 11-12; Reply Br. (doc. 19-2) at 1 (BMW does not doubt Vigilante is qualified in human factors and ergonomics).  Therefore, I need not address the first prong of the Rule 702 test.  BMW instead contests Vigilante's methodology and the reliability of his opinions.

      *Whether Mr. Vigilante's Opinions Are Reliable*

      BMW argues that Vigilante's opinion that it could not rely on the Rider's Manual to convey critical safety information because such manuals are not read by users is inconsistent with the law.  BMW further asserts that Vigilante provides no methodology to establish that the warning about running the motorcycle at a standstill needed to be on the motorcycle.  BMW states Vigilante improperly formed this opinion without considering any of the other information and warnings included in the Rider's Manual.  According to BMW, Vigilante needed to consider all of the information in the Rider's Manual and determine, based on an acceptable methodology, what information and warnings needed to be affixed to the motorcycle and what information and warnings did not need to be affixed to the motorcycle.

      The reliability prong focuses on the "principles and methodology" used by the expert, not the conclusions generated by those principles and methods.  Daubert, 509 U.S. at 595.  It

5

requires an expert's opinions to "be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his or her belief." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994) (quoting Daubert, 509 U.S. at 590). In determining whether a particular methodology is reliable, I may consider various factors, including: (1) whether the method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. See id. at 742 n.8; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) (Daubert factors also should be applied, as appropriate, to non-scientific experts).

As an initial matter, Vigilante's opinion that it was unreasonable for BMW to rely on its Rider's Manual is a conclusion that cannot be challenged in a Rule 702 motion. See Daubert, 509 U.S. at 595 (reliability prong focuses on methodology, not conclusions). Nevertheless, this opinion is not contrary to Pennsylvania law. Although there is a presumption that warnings will be read, the presumption applies only if the warnings were adequate, which is disputed here. See Pavlik v. Lane Ltd/Tobacco Exporters Intern., 135 F.3d 876, 883 (3d Cir. 1998) (presumption "works in favor of the manufacturer or seller of a product where an adequate warning has been provided").

Vigilante also used an acceptable methodology to reach his conclusion that the warning needed to be conspicuously placed on the motorcycle. His methodology included a review of various peer-reviewed books, product safety standards, and manuals and warnings provided with

6

other motorcycles. See Vigilante Report at 2, 17; Miller v. Gray Manuf. Co., No. 14-5444, 2015 WL 5000988 at *6 (E.D. Pa. Aug. 20, 2015) (expert's warnings opinions were not unreliable where based on a review of information provided by other manufacturers); Durkin, 2013 WL 1314744, at *11 (reliance on deposition testimony, product manual and relevant safety regulations was a sufficient methodology); compare Almeciga v. Ctr. for Investigative Reporting, Inc., 2016 WL 2621131, at *10, 15 (S.D.N.Y. May 6, 2016) (handwriting analysis fails to satisfy Rule 702 because it is "at best, a form of subjective expertise," not scientific methodology, and is too vague to constitute a reliable specialized knowledge). It also included a review of information relating to a BMW recall involving a different motorcycle that presented a risk of fire. See Vigilante Report at 2, 11-12, 14; Pineda, 520 F.3d at 248-49 (expert's opinion that warning was inadequate was reliable given expert's specialized knowledge about product and comparison of product manual with information provided during recall of product). Based on this information, Vigilante concluded that the warning about running the motorcycle at a standstill needed to be displayed on the motorcycle because the fire hazard scenario was complex and it was improbable that a rider would expect a fire to occur from performing that activity. Vigilante Report at 12.

BMW fails to cite, and I cannot find, any authority that suggests that Vigilante needed to examine all of the other information in the Rider's Manual and determine whether any of that information also needed to be on the motorcycle. Vigilante's opinions are not inadmissible under Rule 702 because he did not engage in a broader analysis. Instead, BMW may test Vigilante's opinions on this basis through rigorous cross-examination. See Daubert, 509 U.S. at 596 (vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking weak but admissible

opinion evidence); Pineda, 520 F.3d at 249 ("[a]ny dispute between the parties about the strength of the [expert's opinions] should be resolved by the jury").

*Whether Vigilante's Opinions Fit This Case*

BMW argues that many of Vigilante's opinions do not fit the facts of this case. It asserts that Vigilante's opinion that BMW could not rely on its dealers to convey safety warnings is irrelevant because Yazdani did not interact with a dealer. Similarly, BMW contends that Vigilante's opinions that it could not rely on the Rider's Manual because second-hand users of the motorcycle may never obtain that manual and because users may never read the manual are irrelevant because Yazdani possessed and read the entire Rider's Manual.

An expert's opinion must assist the trier of fact in resolving an issue relevant to the case. In re Paoli, 35 F.3d at 742. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." See Daubert, 509 U.S. at 591 (citing 3 Weinstein & Berger ¶ 702, at 702-18).

The Yazdanis contend that Vigilante's opinion that BMW could not rely on its dealers to provide warnings about the motorcycle is relevant because his opinion is related to testimony provided by BMW's corporate designee. BMW's designee, however, testified that BMW did not rely on dealers to instruct users to ride the motorcycle. See Response to Motion to Preclude (doc. 17), Ex. G, 12/17/2015 Dep. of M. Yeldon at 75 ("I wouldn't say [BMW relies] on [dealers]."). He solely said BMW offered a warranty and technical training, but he was not certain if BMW sales representatives had to attend it. Id. at 77. Furthermore, this testimony is not relevant to any issue in this case because Yazdani did not purchase the motorcycle or receive any instructions about riding it from a BMW sales representative or dealer. See Fed. R. Evid. 401; supra at 1.

The Yazdanis further argue that Vigilante's opinions about the reasons why the warnings in the Rider's Manual were inadequate, i.e., the fact that a second-hand user may never obtain or read an operating manual, are relevant to whether the motorcycle was defective.[4] They contend that the fact that Yazdani possessed and read the Rider's Manual solely impacts the issue of causation. See Response to Motion to Preclude at 28 (BMW "is confusing evidence of a defect with evidence of causation"), 29 ("While the exact way in which the inadequate warning caused the injury is relevant to the issue of causation, the other alternative ways in which an injury could occur are all relevant to the issue of whether the product is defective and unreasonable dangerous to the public as a whole."). However, even if Vigilante's opinions have some relevance to whether the motorcycle was defective in general, such relevance is minimal and substantially outweighed by the danger of unfair prejudice and jury confusion on the issue of causation, which concerns a user who had the Rider's Manual and read all of it. See Fed. R. Evid. 403; supra at 1-2.

Vigilante, therefore, shall be precluded from testifying that: (1) it was unreasonable for BMW to rely on its dealers to convey safety warnings; and (2) it was unreasonable for BMW to rely on the Rider's Manual because second-hand users are unlikely to obtain the manual and users are unlikely to read all or parts of the manual.

---

[4] To prevail on their strict liability claim, the Yazdanis must prove: (1) the motorcycle was defective based on a defective design or failure to warn; (2) the defect existed when the motorcycle left BMW's control; and (3) the defect caused their damages. See Barton v. Lowe's Home Centers, Inc., 124 A.3d 349, 354-55 (Pa. Super. 2015) (citing Restatement (Second) of Torts § 402A). Similarly, for their negligence claim, the Yazdanis must show: (1) a duty or obligation requiring BMW to conform to a standard of conduct; (2) BMW failed to conform to that duty, or breached the duty; (3) a causal connection between the breach and their damages; and (4) damages suffered from the breach. See Atcovitz v. Gulf Mills Tennis Club, Inc., 812 A.2d 1218, 1222 (Pa. 2002).

III.     Motion for Summary Judgment

BMW seeks summary judgment, claiming the warnings in the Rider's Manual were adequate and non-defective as a matter of law and, therefore, it had no duty to provide an additional warning or design the motorcycle differently.  It also contends that the Yazdanis cannot prove that the lack of an additional warning on the motorcycle caused the fire.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If a reasonable jury could hold in the nonmovant's favor on a fact that would affect the outcome of the suit, summary judgment must be denied.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Moreover, all evidence and any inferences from the evidence must be viewed in the light most favorable to the non-moving party.  See Ray v. Warren, 626 F.2d 170, 173 (3d Cir. 2010).

*Adequacy of the Manual Warnings and Duty to Warn*

In a defective warning case, I must make an initial determination as to whether there were adequate warnings as a matter of law.[5]  See Pavlik, 135 F.3d at 886; Mackowick v. Westinghouse Elec. Corp., 575 A.2d 100, 102-03 (Pa. 1990).  I must decide "whether, under the plaintiff's averment of the facts, recovery would be justified; and only after this judicial

---

5      BMW and the Yazdanis suggest that this case is controlled by Tincher v. Omega Flex, Inc., 104 A.3d 328, 407 (Pa. 2014), in which the Supreme Court of Pennsylvania held that the question of whether a product is defective is an issue for the trier of fact unless the evidence is so clear that reasonable minds could not differ on the issue.  See BMW's Memo. of Law in Support of Motion for Summ. J. (doc. 15) at 5 n.6; Pl.'s Response (doc. 18-1) at 7-8.  The Court, however, declined to decide whether its holding applied to failure to warn cases like this one. See Tincher, 104 A.3d at 409.  Further, in February 2016, the Supreme Court granted allocator to consider whether Tincher applies to failure to warn cases and that case has yet to be decided. See Amato v. Bell & Gossett, 130 A.3d 1283 (Pa. 2016).  Thus, I must continue to apply pre-Tincher law.  See Wright v. Ryobi Tech., Inc., No.15-1100, 2016 WL 1241860 at *10 (E.D. Pa. March 30, 2016); Hatcher v. SCM Group North Amer., Inc., No. 15-1630, 2016 WL 807731 at *4 (E.D. Pa. March 1, 2016)).

determination is made is the case submitted to the jury to determine whether the facts in the case support the averments in the complaint." Mackowick, 575 A.2d at 102-03 (citing Azzarello v. Black Bros. Co., 391 A.2d 1020, 1026 (Pa. 1978), overruled by Tincher, 104 A.3d at 428). In deciding whether a defective warning claim may be presented to a jury, I must consider whether the danger was obvious and, if not, whether the manufacturer adequately warned the intended user of that nonobvious danger. Id. at 102 ("A warning of inherent dangers is sufficient if it adequately notifies the intended user of *unobvious* dangers inherent in the product.").

Vigilante opines that the risk of fire from running the motorcycle at a standstill is not obvious because it requires knowledge of several complex steps.[6] See Vigilante Report at 12. He further states that a rider is unlikely to expect a fire to occur from running the motorcycle at a standstill. See id.; W. Vigilante Dep. at 99-100 (risk of fire from running the motorcycle at a standstill was not identified in the product manuals associated with other motorcycles). Yazdani also testified that, although he had owned motorcycles in the past, he "never" would have "thought that just warming up a motorcycle would, eventually, you know, catch fire." P. Yazdani Dep. at 20; see also id. at 26 ("when you're riding and there's a traffic jam and you are there for maybe, you know, I don't know, 15 minutes, 20 minutes, the bike is not supposed to catch fire just because you're sitting there on the motorcycle"). Based on this evidence, I cannot

---

[6] Vigilante outlines ten steps a user would need to know: (1) the motorcycle possesses an air-cooled engine; (2) engine heat is dissipated by moving air across the engine's cooling fins and that air flow will be inadequate if the bike is not moving; (3) as the engine temperature rises, it will increase speed and further increase the engine temperature; (4) as the engine temperature increases, the oil temperature will increase; (5) the motorcycle uses an oil sight glass; (6) the oil sight glass contains a plastic cover that fails at 329°F and a seal that can fail at elevated temperatures; (7) engine oil can reach 329°F if the engine is allowed to warmup in a stationary position; (8) the elevated engine temperature can cause the oil sight glass to fail; (9) if the oil sight glass fails, extremely hot liquid and vapors will be released from the engine; and (10) the oil vapors can ignite upon contacting the exhaust header, causing fire. Vigilante Report at 12-13.

find that the risk of fire from running the motorcycle at a standstill was obvious to an intended user.

I also cannot find that the warnings in the Rider's Manual were adequate as a matter of law. Although the Rider's Manual included two warnings about the risk of fire from running the motorcycle at a standstill and the warnings were marked with a warning symbol, lines, and bold print, these two warnings were included among more than fifty other warnings. See Rider's Manual. Similarly, the Rider's Manual featured numerous other cautions, notes, and information about safe operation of the motorcycle. See id. Indeed, although Yazdani testified that the warnings in the manual clearly stated a fire could ignite if the motorcycle was left running at a standstill, he did not recall reading those warnings. See P. Yazdani Dep. at 22, 27-28. Further, Vigilante has opined that where a warning is presented in a multi-page manual with a wide variety of other information, it may be unnoticed or overlooked. See Vigilante Report at 7. He also has opined that the warning at issue here contained critical safety information that needed to be on the motorcycle. Id. at 12.

Because the warnings in the manual could be deemed inadequate, BMW is not automatically entitled to a presumption that those warnings would be read and heeded, negating any need for an additional on-product warning or different design. See Pavlik, supra at 6. This case also is distinguishable from the cases cited by BMW, in which the courts found that the manufacturers had adequately warned the users about the dangers with the products and an additional on-product warning was unnecessary. See BMW's Memo. of Law in Support of Summ. J. at 10-11 (citing David v. Berwind Corp., 690 A.2d 186 (Pa. 1997) and Hatcher v. SCM Group North Amer., Inc., No. 15-1630, 2016 WL 807731 (E.D. Pa. March 1, 2016)).

In Davis, the plaintiff injured her hand in a blender that included an on-product warning stating: "DANGER, KEEP FINGERS OUT OF DOOR OPENINGS." 690 A.2d at 190. The plaintiff argued the blender should have included another more specific warning that the blades could spin after the blender was turned off. Id. The Pennsylvania Supreme Court held an additional warning was unnecessary because the general on-product warning was adequate. Id. Similarly, in Hatcher, a woodworking machine with a spinning blade included an on-product warning that stated: "DON'T RUN THE MACHINE WITHOUT NECESSARY SAFETY GUARDS." 2016 WL 807731 at *5. The plaintiff argued that the product also should have included pictorial warnings. Id. at 6. The court disagreed, finding additional warnings were unnecessary because the danger of the spinning blade was obvious and the warning on the machine was adequate to alert the user to the danger of operating the machine without the safety guards. Id. Here, however, there was no warning on the motorcycle about the risk of fire from running the motorcycle at a standstill and the warnings in the manual may have been inadequate.[7]

Accordingly, the issue of whether the motorcycle was defective because it failed to adequately warn about the risk of a fire from running the motorcycle at a standstill must be decided by the jury. See Pavlik, 135 F.3d at 886.

*Causation*

BMW also contends that the Yazdanis cannot establish that the lack of an additional warning on the motorcycle caused their damages. It asserts that because Yazdani left the motorcycle running for more than 30 minutes on the day of the accident after becoming

---

[7] BMW argues that the courts in Davis and Hatcher did not rely on the fact that the warnings were on the products. See Reply Br. (doc. 21) at 4-5. The courts, however, found the warnings on the products were adequate and no such finding has been made here.

distracted by something inside his house, "it is unlikely that an additional warning would have made a difference." BMW's Memo. of Law in Support of Motion for Summ. J. at 15. However, Yazdani testified that if he had been aware of the warnings, he never would have started the motorcycle at a standstill in his garage. P. Yazdani Dep. at 93. Based on this testimony, a reasonable juror could find that a lack of adequate warnings caused Yazdani's damages because if he had been adequately warned of the risk of fire, he never would have started the motorcycle at a standstill on the date of the accident. See Phillips v. A-Best Products Co., 665 A.2d 1167, 1171 (Pa. 1995) (plaintiff may establish causation by showing he "would have avoided the risk had [he] been warned of it by the seller").

The cases relied on by BMW, in which the courts found insufficient evidence of causation, are inapposite. In Conti v. Ford Motor Co., 743 F.2d 195, 198 (3d Cir. 1984), the U.S. Court of Appeals for the Third Circuit held there was insufficient evidence to show that the lack of additional warnings caused the accident because the plaintiff knew about the danger of starting the car without disengaging the clutch and failed to do so at the time of the accident because he was not paying attention. The court concluded "[t]here is absolutely no evidence in the record to suggest that Mr. Conti would have paid any greater attention to what he was doing when starting the car if additional warnings were contained in Ford's operator manual, or even if a sticker reminding the operator to disengage the clutch before starting the car in gear was prominently displayed in the interior of the car." Id. Here, however, Yazdani testified he never would have started the motorcycle at a standstill if he knew of the fire hazard. See P. Yazdani Dep. at 93

In Hartsock v. Wal-Mart Stores East, Inc., No. 7-3200, 2009 WL 4268453, at *4 (E.D. Pa. Nov. 23, 2009), this Court also found the plaintiff's lack of warnings claim failed because he

14

could not establish the lack of warnings on the riding lawnmower caused his accident. The Court explained the plaintiff admitted that he did not remember receiving the operator's manual for the lawnmower and that he would not have read it if he had received it. Id. at *2. The Court also found that because the plaintiff testified that he never intended to ride the lawnmower onto a slope, a warning about the risks associated with the lawnmower rolling over would not have made a difference. Id. at *3. In contrast, Yazdani read the manual and said he would have followed the warning about not running the motorcycle at a standstill if he knew about it. Yazdani also intentionally warmed up his motorcycle in the garage.

Similarly, in Wright, 2016 WL 1241860 at *2, a table saw had a warning in the operator's manual about the dangers of kickbacks, as well as an on-product warning advising the user to pay particular attention to those instructions. The plaintiff, however, admitted he never read the operator's manual, he was aware of the dangers of kickbacks, and he took various protections to avoid those dangers. Id. at *10. Given this evidence, this Court held that an additional warning would not "have altered Wright's behavior or otherwise prevented the accident." Id. This case is distinguishable because Yazdani read the Rider's Manual, but nevertheless was not aware of the danger from running the motorcycle at a standstill.

Because an issue of material fact exists as to whether an additional warning on the motorcycle would have prevented the fire, BMW is not entitled to summary judgment on the issue of causation.

An appropriate Order follows.