UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| PARVEZ YAZDANI, et al, | ) | 15-CV-1427 |
| | ) | |
| Plaintiffs, | ) | **Portion of Hearing** |
| | **)** | **Transcribed** |
| vs. | ) | |
| | ) | |
| BMW OF NORTH AMERICA, LLC, | ) | |
| et al, | ) | Philadelphia, PA |
| | ) | June 15, 2016 |
| Defendants. | ) | 2:44 p.m. |


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE TIMOTHY R. RICE AND JURY
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiffs:          RAYMOND E. MACK, ESQUIRE
                             PATRICK A. HUGHES, ESQUIRE
                             DE LUCA LEVINE, LLC
                             Three Valley Square
                             Suite 220
                             Blue Bell, PA  19422


For the Defendants:          KEITH D. HEINOLD, ESQUIRE
                             MARSHALL DENNEHEY WARNER
                             COLEMAN & GOGGIN
                             2000 Market Street
                             Suite 2300
                             Philadelphia, PA  19103


Audio Operator:              A.J. FOLLMER


Transcribed by:              DIANA DOMAN TRANSCRIBING, LLC
                             P.O. Box 129
                             Gibbsboro, New Jersey  08026
                             Office:  (856) 435-7172
                             Fax:     (856) 435-7124
                             Email:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1                          I N D E X

2   WITNESS:                    CROSS    REDIRECT    THE COURT

3   Kevin Breen                   3        50          57

4   CHARGE OF THE COURT:                              PAGE

5     By Judge Rice                                    69

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Breen - Cross (Mac)                                            3

1             (The following was heard in open court at 2:44 p.m.)

2             THE COURT:  All right.  Welcome back, folks.  Have a

3        seat.  Let's see, are we moving to cross-examination or are

4        you still --

5             MR. HEINOLD:  Yes, Your Honor.  I have no further

6        questions.

7             THE COURT:  Okay.  Excellent.  Mr. Mack has no

8        questions I assume?

9             MR. MACK:  Just a few, Judge.

10            THE COURT:  I thought I'd try.

11            We have a new court reporter, Dennis Taylor.  One of

12       our stars of the courthouse and a big Phillies fan for those

13       of you who like baseball.  Yesterday not only was it hot in

14       the courtroom it was hot in Toronto.  The Phillies got smoked

15       as we know.  Welcome to the big leagues, right.

16            All right.  Mr. Mack, what have you got for us?

17            MR. MACK:  All right.

18                          CROSS EXAMINATION

19       BY MR. MACK:

20       Q    Good afternoon, Mr. Breen.  How are you?

21       A    Good.  Thank you.

22       Q    All right.  You -- you testify professionally for a

23       living, right?

24       A    I testify in court half a dozen times a year.

25       Q    All right.  And the other time you spend your work in the

Breen - Cross (Mac)                                    4

1   forensic consulting business, right?

2   A    Some of it, yes.

3   Q    All right.  Well, most of it, right?

4   A    Well, about two-thirds of it.

5   Q    All right.  And you own a business that does forensic

6   consulting work?

7   A    I'm one of about 100 people that own the business.

8   Q    Right.

9   A    Yes.

10  Q    Okay.  And you've been doing forensic consulting work

11  since the 1970's, is that right?

12  A    Somewhere thereabouts.

13  Q    Okay.  So the last 38, 40 years?

14  A    Yes.

15  Q    All right.  And how many times have you testified as a

16  professional witness in court?

17  A    I really don't know.  I'm sure it's more than 50 times

18  though.

19  Q    Okay.  How much of your work is performed for plaintiffs?

20  A    Typically 10 to 20 percent.

21  Q    10 to 20 percent?

22  A    Something like that.

23  Q    When was the last time you testified in court on behalf

24  of a plaintiff in a warnings case?

25  A    About a year ago.

1    Q    What case was that?

2    A    It was a boating accident.

3    Q    Was that in Florida?

4    A    Yes.

5    Q    What were your opinions -- what were your opinions in

6    that case?

7    A    That the accident was caused by the combination of the

8    design of the boat and the information the driver knew about.

9    Q    Okay.  And you testified on behalf of the plaintiff that

10   the accident was caused -- the plaintiff -- were people

11   injured by the boating accident?

12   A    Yes.

13   Q    And they were suing the driver of the boat?

14   A    The manufacturer.

15   Q    They were suing the manufacturer?  Okay.  Any other times

16   in the last five years?

17   A    I mean, offhand I don't recall.  There was one last year

18   that involved an off-road motorcycle -- motorcycle type

19   vehicle at a camp ground where I testified that the warnings

20   and the operation allowed in the camp ground was the cause of

21   the accident.

22   Q    What were the warnings at issue there?

23   A    Well, there weren't any.  That was my concern.

24   Q    Okay.  And so that's a big problem for you, right?  I

25   mean, if there are no warnings about a specific hazard?

1    A    Well, there was no -- no warnings and no instruction in

2    terms of how to use a certain area of the camp ground,

3    roadways, and there was a head-on collision.

4    Q    When did you first get this bike?

5    A    That particular one?  Maybe two or three weeks ago,

6    something like that.

7    Q    Two or three weeks ago?  And did you drive it?

8    A    I have not driven that particular bike.  No.

9    Q    Have you ever driven a bike like this, an 1150R?

10   A    Yes.

11   Q    All right.  Do you know how to start it up?

12   A    I mean, generally, yes.

13   Q    Could you come down and show the jury how you start it

14   up?

15   A    Well, there's no fuel in here, but you turn the key on

16   holding the clutch, hit the starter button.

17   Q    Okay.  Then what do you do?

18   A    Drop it in gear to go.

19   Q    Okay.  You have to drop it in gear.  So after -- after --

20   well, not while it's idling, right?  You don't drop it in gear

21   while it's idling?

22   A    Sure.

23   Q    You do?  Okay.

24   A    Well, I've got my hand on the clutch and it's in idle.

25   You drop it in gear and you go.

Breen - Cross (Mac)                                    7

1   Q    If you've made the mistake of not letting it warm enough

2   before you get up and go and the engine stalls, say you're

3   pulling out onto a street, can you get hit by a car?

4   A    If it stalls that potential exists.

5   Q    All right.  So you have to make sure as a rider to make

6   sure it's warmed up before you try to merge into traffic or

7   get up and go, right?

8   A    Sure.  Typically, you know, any vehicle you start up and

9   let it run for a few seconds to make sure everything's okay.

10  Q    All right.  You can go back.  You understand that Mr.

11  Yazdani testified in this case that what he did in February of

12  2013 was start it up and drop it into the run position.  You

13  understand that, right?

14  A    In the wrong position?

15  Q    In other words turn the choke off.

16            THE COURT:  Did you say wrong or run?

17            MR. MACK:  Run.  Run position.

18            THE COURT:  R-U --

19            THE WITNESS:  Oh, I'm sorry, I thought you said

20  wrong.

21            MR. MACK:  Run.

22            THE COURT:  R-U-N.

23            MR. MACK:  The C position.  Sorry.  The no choke.

24            THE WITNESS:  I understand that he testified he

25  started it up first on the -- in that mode and then dropped it

1   in the run mode.

2   BY MR. MACK:

3   Q    Which you have to, right?  I mean, he followed the

4   operating procedure, right?

5   A    It appears he did, yes.

6   Q    Okay.  Now, what -- where in the manual does it tell Mr.

7   Yazdani not to do what he did?

8            THE COURT:  Do you have the manual there, sir?

9            THE WITNESS:  Yes, I do.

10           THE COURT:  I think the operative pages are 51 and

11  60, is that right?

12           THE WITNESS:  Yes.

13           MR. MACK:  Well, we'll see.

14           THE COURT:  Well, at least those are the pages --

15           MR. HEINOLD:  Your Honor --

16           THE COURT:  -- so he doesn't have to read the whole

17  manual.

18           MR. HEINOLD:  -- if I could ask?  When he says what

19  he did does he mean the way he operated the choke or does he

20  mean the way he -- he --

21           THE COURT:  What he testified to, right?

22           MR. HEINOLD:  Well, his question is vague.  I don't

23  know what --

24           THE COURT:  All right.

25           MR. HEINOLD:  -- it means.

1              THE COURT:  Well, what Mr. Yazdani testified he did.

2   BY MR. MACK:

3   Q    You understand the question?

4   A    Well, I think so.

5   Q    What -- what about what Mr. Yazdani testified that he did

6   violated the instructions of the manual?

7   A    Well, the first one is on page 51 under --

8   Q    That's -- what section is that?

9   A    Important notes.

10  Q    And what subsection is that?

11  A    Essentially starting off.

12  Q    Well, the subsection on the top of the page says what?

13  A    Important notes.

14  Q    And then it says catalytic converter, right?

15  A    It says risk of fire under the column this one's in.

16              MR. MACK:  Well, let's pull it up.

17              UNIDENTIFIED SPEAKER:  51?

18              MR. MACK:  It's P-1.

19              (Pause)

20  BY MR. MACK:

21  Q    Do you have a copy of the manual, right?

22  A    I have a copy of it, yes.

23              (Pause)

24  BY MR. MACK:

25  Q    You're talking about the -- the warning?

1          MR. MACK:  First of all, let's pull up this page.

2   Let's highlight this page.  Okay.  There's two pages here, so

3   just this page.

4          THE COURT:  The page on the right.

5          THE WITNESS:  Well, the page on the right is

6   actually both of those columns.  You've got them both pulled

7   up.

8          UNIDENTIFIED SPEAKER:  Yes.

9          MR. MACK:  All right.  Let's put it in the center

10  and make it as big as we can.

11  BY MR. MACK:

12  Q    All right.  Now, the page on the right it's --

13         MR. MACK:  We don't want to see the page on the left

14  yet.  All right.

15  BY MR. MACK:

16  Q    Now, is that -- is that the instruction you were talking

17  about?

18  A    Yes, this first one.

19  Q    Okay.  And so that's -- it says catalytic converter,

20  right?

21  A    On the left panel.  Risk of fire on the right panel.

22  Q    On the left panel does it say catalytic converter at the

23  top or not?

24  A    The top of the left panel, yes.

25  Q    Okay.  So you're saying the catalytic converter section

1    is only the left panel?

2    A    No.

3    Q    The whole page is about the catalytic converter, sir?

4    A    No.

5    Q    Oh, it's not?

6    A    No.

7    Q    Okay.  So risk of fire it -- it says high temperatures

8    occur at the exhaust system, particularly -- particularly if a

9    what is installed?

10   A    Catalytic converter is installed.

11   Q    All right.  But this has nothing to do with the catalytic

12   converter this risk of fire?

13   A    That language right there does not.  No.

14   Q    So why is it talking about a catalytic converter?

15   A    Because that's what's started on the left panel and

16   continues on down to the top part of the right panel.

17   Q    Okay.  You're telling the jury that this page has nothing

18   to do with the catalytic converter?  Only the word says

19   catalytic converter on the left-hand side of the page, right?

20   Is that what you're saying?

21   A    I didn't say that.

22   Q    Tell me what you're saying.

23   A    I said the left panel is about the catalytic converter.

24   It continues over in the first paragraph of the right panel.

25   Q    Okay.  And so it says risk of fire, right?

1    A    Right.

2    Q    And that deals with the catalytic converter, right?

3    A    Right.

4    Q    Okay.  That doesn't deal with starting the vehicle?

5    That's not in the starting section, is it?

6    A    No.

7    Q    All right.  That has nothing to do with what he did,

8    right?

9    A    Up to that point, correct.

10   Q    All right.  So let's go -- let's go to the next part, the

11   starting procedure.  Let's go to page 61 in the manual.

12   A    Well, just so it's clear there's -- there's additional

13   information in that warning block that deal with -- do not

14   allow the engine to idle unnecessarily or for prolonged

15   periods.  Risk of overheating or fire.  Ride away immediately

16   after starting the engine.

17   Q    That's right.  Let's talk about that.  We just said you

18   can't ride away immediately after starting the engine.  That's

19   dangerous, right, you can stall and you can die, right?

20   A    Well, I think you've got to start engine and make sure

21   everything is working and then you can ride away.  It takes a

22   few seconds to check all that out.

23   Q    Not immediately, right?  You can't -- you can't start it

24   and drive away immediately?  You've got to check everything

25   out.

1  A    You've got -- it takes time to drop it in gear and all

2  that type of stuff.

3  Q    Right.  So not immediately?  You can't do it immediately?

4  A    Right.  But you shouldn't hesitate and wait several

5  minutes.

6  Q    Okay.  So for several minutes?  Where does it tell Mr.

7  Yazdani how long he can wait?

8            THE COURT:  What page are we on?

9            MR. MACK:  We're in the manual.

10           THE COURT:  Which one?

11           MR. MACK:  I don't know which one.  I don't think it

12  says it.

13           THE COURT:  What page are we on, Mr. Breen?

14           MR. MACK:  He's looking at -- he's looking at 51.

15           THE COURT:  51?

16           THE WITNESS:  It tells him prolonged periods of

17  time.  It does not give him a three minute, two minute, seven

18  minute thing.  Prolonged is the word that's used.

19  BY MR. MACK:

20  Q    What does prolonged mean?

21  A    Well, I think it's an extended period of time beyond what

22  the engine needs to get to a proper idle.

23  Q    And how does the fire develop if you don't drive it away

24  immediately pursuant to that warning?

25  A    Well, if you allow it to idle for a prolonged period of

1    time at some point in time things keep -- heat keeps building

2    up, heat keeps building up, heat keeps building up and you --

3    it creates the risk of a fire.

4    Q    Heat keeps building up, heat keeps building up, heat

5    keeps building up.  Is that your testimony?

6    A    Right.  As you sit idling heat will build up.

7    Q    And what happens to the -- first of all, do you know the

8    operating temperature of the bike?

9    A    Under what conditions?  That's a pretty broad question.

10   Q    Idling, sir?  Idling at a standstill in a garage?

11   A    I've seen some of the documents from testing a new bike

12   that, you know, test lab environment from BMW that had the

13   idle temperature for the oil at about 300 degrees Fahrenheit.

14   Q    All right.  And that's the only information you have

15   about the operating temperature of the vehicle, right?

16   A    That I've seen in this case, yes.

17   Q    All right.

18   A    Well, there's other temperatures there in terms of

19   exhaust temperature and things like that, but that --

20   Q    Sure, but that's the only information you have.  You

21   don't have any other information.

22   A    In this case, no.

23   Q    Right.  About the R1150R, right?

24   A    Correct.

25   Q    And that testing document also says it's absolutely safe

1   to idle, right?

2   A    No, it doesn't say that.

3   Q    Oh, it doesn't?

4              MR. MACK:  Let's pull it up.  Let's take a look at

5   it.

6              (Pause)

7              MR. MACK:  It's pages 19 and 20 of that exhibit.

8   We're going to look at page 20 and we're going to blow up that

9   last -- that top paragraph.

10             THE COURT:  This is 126?

11             MR. MACK:  126, Judge.  P-126

12             THE COURT:  Got you.

13             MR. MACK:  Page 20, top -- top of the page.

14             (Pause)

15  BY MR. MACK:

16  Q    See it says normal idle is absolutely no problem?

17  A    Right.  That's not the question you asked, sir.

18  Q    Well, what would -- when you drop -- when you start a

19  bike in a stationary position on the center stand, all right,

20  you follow me so far?  You start a bike --

21  A    Okay.

22  Q    -- in a stationary position, center stand --

23  A    All right.

24  Q    -- after the few seconds of warm-up that you said you

25  have to do before you go, right?  Yes.

1    A    Well, go ahead because I'm confused by the center stand

2    part of it, but go ahead.

3    Q    Do you know what a center stand is?

4    A    Yes.

5    Q    Is it on the center stand now?

6    A    Yes.

7    Q    Are you confused about that?

8    A    No, but --

9    Q    All right.

10   A    -- you don't drop the bike and go.

11   Q    When it's started on -- when it's started you put it into

12   the C position?

13   A    Okay.

14   Q    That means no choke, right?

15   A    Correct.

16   Q    And it's otherwise referred to as normal idle, right?

17   A    Right.

18   Q    Is normal idle any problem?

19   A    I would think not.

20   Q    Okay.  If normal -- so part of your job as a human

21   factors or ergonomics forensic consultant is to talk about the

22   efficacy or adequacy of warnings, right?

23   A    Yes.

24   Q    And I was sitting over here listening to you testify and

25   I heard you mention that it's not important for manufacturers

Breen - Cross (Mac)                                    17

1    to -- I shouldn't say it's not important.  What I believe you

2    said was you shouldn't put any information on the bike unless

3    it's -- unless it's absolutely critical, right?

4    A    Well, I think it's a whole lot more than that.  I walked

5    through a whole system of whether you start putting labels on

6    the bike and -- and what types of labels for what purposes as

7    opposed to putting them in other forums.

8    Q    And you talked about situations where users are

9    encountering risks that they would have no idea about, right?

10   That would be something that would be a situation that had to

11   be warned about very clearly and concisely.

12   A    At some level, yes.

13   Q    Right.  And if someone was used to using a particular

14   product for a period of time, maybe their entire life, and the

15   use of a different company's product would present --

16   introduce a new risk that would be something that you would,

17   as a manufacturer, want to warn about --

18   A    Maybe.

19   Q    -- that new risk, right?

20   A    Maybe.

21   Q    Well --

22   A    It depends on what it is.

23   Q    Yes.

24   A    I mean, you have to, kind of, go through the process.

25   Q    I mean, we're talking about severity.

Breen - Cross (Mac)                                    18

1    A    You have to go through the process and see what it is.

2    Q    And you talk about severity and frequency, right?

3    A    Sure.

4    Q    And one of the things that you look at as a human factors

5    expert, like Dr. Vigilante did, was the exposure, right?  How

6    often somebody's exposed to the risk?  That's one of the

7    things.

8    A    Sure.

9    Q    And the severity of the risk is something else, right?

10   A    Sure.

11   Q    And fire is a severe risk, right?

12   A    At some level, yes.  It's --

13   Q    Some?

14   A    Comparative -- well, comparative.  I mean, compared to

15   personal injury it's a different issue.

16   Q    Can you be personally injured by a fire?

17   A    It's possible.

18   Q    Okay.  And as a manufacturer you can't assume that the

19   fire that you're going to cause is only going to cause

20   property damage, right?  You have to assume it's going to

21   cause personal injury or death, right?

22   A    Correct.

23   Q    All right.  This particular bike you examined it, right?

24   A    Yes.

25   Q    You're familiar with it?

1    A    In general, yes.

2    Q    All right.  You said you're familiar with air-cooled

3    engines from your prior experiences, your life experiences and

4    your -- and your professional experiences, right?

5    A    Right.  One of the motorcycles I own is air-cooled.

6    Q    Is this an air-cooled engine?

7    A    Yes, it is.

8    Q    Do you know what an oil-cooled engine is?

9    A    Yes.

10   Q    Do you know what oil-coolers are?

11   A    Yes.

12   Q    All right.  Are these oil-coolers?

13   A    We have oil-coolers in this engine as well as air-cooled.

14   Yes.

15   Q    Oh, so it's not just air-cooled.  It's also oil-cooled,

16   right?

17   A    Right, there's an oil-cooler in there as well, but it

18   cools the oil, not the engine.

19   Q    And that means when it's -- when you're -- when you're

20   idling there is a cooling system.  The oil is still pumping

21   through the oil-coolers, right?

22   A    Right.

23   Q    So it's dissipating heat while you're sitting in -- while

24   you're sitting on the bike or while it's idling, right?

25   A    At some level, sure.

Breen - Cross (Mac)                                    20

1    Q    Right.  Okay.  Where -- where do you get the information

2    that at idle, a normal idle, the engine will continue to heat

3    and heat and heat and heat and heat?

4    A    Well, if it continues to run, if the engine isn't cooled

5    by the air flow, it's going to continue to get hotter.

6    Q    Now, the testing that was performed by BMW established

7    that -- that after 25 minutes the temperature remains constant

8    through 50 minutes, right?

9    A    For that particular motorcycle, yes.

10   Q    Which is this particular motorcycle?

11   A    Well, no, this is a brand new version of this motorcycle.

12   This is 12 years old.

13   Q    And so --

14            MR. HEINOLD:  I didn't hear that last question.

15            THE COURT:  It's 12 years old.

16            MR. MACK:  This is 12 years old.

17   BY MR. MACK:

18   Q    Well, tell me what the difference is.  Do you think that

19   there would be a ride away temperature on a bike that was 12

20   years old?

21   A    Well, there's a lot of things that affect, you know, how

22   hot an engine gets.  I mean, how well it's tuned.  Whether the

23   two cylinders are synchronized.  Is the oil at the proper

24   level?  Is it -- is it even, you know, relatively new oil?  Is

25   it old oil?  Is the engine running the way it's supposed to?

Breen - Cross (Mac)                                           21

1   There's a lot of things that will affect it.

2   Q    Normal wear and tear will cause changes in temperature,

3   right?

4   A    At some level, sure.

5   Q    And you're not aware in this particular case of any

6   particular damage to the bike, Mr. Yazdani's bike, or any

7   special service to his bike that would have caused his engine

8   to run particularly hotter than -- than it did in the lab, are

9   you?

10  A    Not necessarily, but at the time of the incident it was

11  nine years old, it hadn't had the oil changed in two years, so

12  I don't know.

13  Q    How often had it been driven in those two years?

14  A    He indicates not a lot.  It looks like about 4, 5,000

15  miles.

16  Q    What does the manual say about changing the oil?

17  A    Every year or I think it's 8,000 miles.

18  Q    Tell me this, what does the manual say about winterizing

19  the bike?

20  A    There's not a lot of detail provided about winterizing.

21  Q    Well, tell me what detail there is.

22  A    There's not a winterizing schedule on the bike.

23  Q    There's no information about how to winterize the bike,

24  right?

25  A    That's correct.

Breen - Cross (Mac)                                        22

1    Q    Is there any information at all in the manual about how

2    to maintain the bike through a winter if you live in a colder

3    climate?

4    A    No.

5    Q    Mr. Yazdani's method of running the engine every so

6    often, 30 to 40 times because he did it over two winters,

7    didn't violate any of the provisions in the manual?

8    A    In and of itself, no.

9    Q    There's nothing in the manual that says he can't do what

10   he did?

11   A    Just go out and run it for a short period of time?  No.

12   Q    Well -- and there's nothing that defines -- defines what

13   a short period of time is, right?

14   A    Well, it talks about prolonged.  30 to 40 minutes is not

15   a short period of time.  I don't care how you look at it.

16   Q    You don't care?  What do you base that on?  30 to 40

17   minutes is not -- tell me about that.  Do you base it on the

18   test where it showed 50 minutes is absolutely no problem at

19   normal idle?  Is that what you base it on?

20   A    No.

21   Q    So you just ignored the test and this is your own

22   opinion?

23   A    It's my opinion to let a motorcycle run unattended for 30

24   to 40 minutes is a prolonged period of time.

25   Q    What is unattended mean?

1    A    Well, I think attended means being somewhere where you

2    can do something if something happens with the motorcycle.

3    You can shut it off.

4    Q    Shut if off?  Do you know if Mr. Yazdani's bike was still

5    running when -- when he came outside and it was on fire?

6    A    I believe he -- I believe he said it was, but I kind of

7    find that hard to believe.

8    Q    All right.  Well, would it surprise you if his testimony

9    was it was not still running?  Would that surprise you?

10   A    That would not surprise me.  I would not expect it to be

11   running.

12   Q    That would be consistent with your expectations, right,

13   that it would not --

14   A    Would not be running, correct.

15   Q    Okay.  Now, what about the bike would cause it to catch

16   fire while idling in place in Mr. Yazdani's garage in February

17   of 2013?

18   A    I've not investigated the fire.  I never saw the remains

19   of it, so I don't know what all the possibilities are.  I

20   understand that you all have suggested it's an oil leak that

21   led to a fire and that could be.  I just don't know.

22   Q    An oil leak?  How does -- how does that happen?  I mean,

23   what's the allegation?

24   A    It's my understanding that you all believe that the sight

25   glass deformed, allowed oil to leak out.

Breen - Cross (Mac)                                           24

1    Q     The sight glass?  I'm sorry.

2    A     The sight glass deformed and allowed oil to leak out.

3    Q     Allows oil to leak out?  Do you know the mechanism by

4    which the sight glass fails?

5    A     I don't.

6    Q     Do you know what the sight glass is made of?

7    A     I've seen a reference to some material called grimald or

8    something like that.

9              THE COURT:  I think he is telling you that he

10   doesn't know these answers.

11             MR. MACK:  I know he is --

12             THE COURT:  I know.

13             MR. HEINOLD:  -- Judge.

14             THE COURT:  So he -- this is not his area of

15   expertise.

16             MR. MACK:  Well, I -- I would agree, Judge.

17             THE COURT:  He's not a --

18             MR. MACK:  Absolutely.

19             THE COURT:  -- fire causation expert.

20             MR. MACK:  No, he's a design -- he's supposed to be

21   a motorcycle design expert.

22             THE COURT:  Okay.

23             MR. MACK:  So I'm asking him about --

24             THE COURT:  You can ask him about that.

25             MR. MACK:  -- what the composition of the materials

Breen - Cross (Mac)                                    25

1   are that this bike was built of.

2           THE COURT:  Okay.

3   BY MR. MACK:

4   Q    So, sir, you don't know what kind of plastic it is?

5   A    I've seen it referenced as grimald.

6   Q    Do you know what point it melts at or deforms at?

7   A    There's a reference to 325 degrees Fahrenheit.

8   Q    How about 329 degrees, is that closer to the truth?

9   A    That might be.

10  Q    All right.  What's the temperature of the exhaust

11  manifold or the exhaust pipes right here while operating at a

12  standstill on center stand at normal idle?

13  A    It's got 300 degree Centigrade, so that's going to be

14  four something.

15  Q    300 degrees Centigrade.  Well, I believe the document --

16  the testing document that you're -- says 300 to 310 degrees

17  Centigrade, is that right?

18  A    Right.

19  Q    And that translates to 572 degrees Fahrenheit to 590

20  degrees Fahrenheit, correct?

21  A    Something like that, yes.

22  Q    Something like that?  What's a few hundred degrees

23  between friends, right?  Tell me this --

24          MR. HEINOLD:  Objection, Your Honor.

25          THE COURT:  Sustained.

1            MR. MACK:  Withdrawn.  Tell me this --

2            THE COURT:  Don't argue with the witness.

3            MR. MACK:  Not my intention.  Sorry.

4    BY MR. MACK:

5    Q    You referenced a Yamaha manual.  You told the jury that

6    you reviewed this Yamaha manual.  It's 14-C.

7            MR. MACK:  Can you put up 14-C, please, page two.

8            UNIDENTIFIED SPEAKER:  Is that D?

9            MR. MACK:  It's Defense 14-C.

10           (Pause)

11   BY MR. MACK:

12   Q    There is a warning on the lefthand side, top lefthand

13   corner.

14           MR. MACK:  If we could blow up that entire warning

15   caution box of it.

16           (Pause)

17           MR. MACK:  Actually this -- yes, there you go.

18   Right.  Correct.  Well, the whole -- the whole square.

19   BY MR. MACK:

20   Q    Let me ask you a question before we get to this.  What --

21   did you examine one of these Yamaha motorcycles?

22   A    Not for this case.  I have not.

23   Q    Was it important for you to know how that Yamaha --

24   Yamaha motorcycle failed in examining the warning?

25   A    I don't know that it failed.

Breen - Cross (Mac)                                                27

1   Q    Or how it could fail?

2   A    I mean, other than the matters that they identified, no.

3   Q    Let me just understand something right now.  Is it your

4   opinion that if you put risk of fire into any manual any place

5   it covers your butt if the fire -- if the product catches

6   fire?

7   A    I think you'd have to look at the context of where --

8   what it's put on.

9   Q    It's got to be the context, right?

10  A    Sure.

11  Q    In other words, it has to be a targeted one?

12  A    Right.

13  Q    You can't -- you don't get the benefit of just putting a

14  catchall in a manual and say, I mean, thank God it said risk

15  of fire because a fire occurred.  I had no idea it could occur

16  that way, but thank God I put risk of fire.  That doesn't help

17  you, right?

18  A    Well, I think that if the goal is to communicate how a

19  person is to use the product to minimize the risk of fire

20  you'd want to address the use pattern.

21  Q    Minimize the risk of fire?  Tell me how a fire starts in

22  this bike if you idle it normally for 30 to 40 minutes, all

23  the ways that it could.

24  A    I don't know.  I'm not a fire expert.  I've not looked at

25  all the possibilities.

Breen - Cross (Mac)                                              28

1   Q    If BMW told us that the only way it could is if this

2   plastic piece down here fails and leaks oil would that

3   surprise you?

4   A    I've not gone through all the fire possibilities in the

5   bike.

6   Q    How about the Yamaha?  Do you know if that has a sight

7   glass or does it have a dipstick?

8   A    It has a dipstick.

9   Q    Okay.  Do you know how that can cause a fire from

10  overheating itself?

11  A    It does not say.  It just simply says do not allow engine

12  to idle too long under the heading of prevent a fire hazard or

13  other damage, so I don't --

14  Q    So that bike you can't let idle too long, right?

15  A    Correct.

16  Q    All right.  That -- there's no warning saying you can't

17  let this bike idle too long can you -- normal idle?

18  A    I thought that was what we were just talking about,

19  wasn't it?

20  Q    You're talking about on page 51 under the catalytic

21  converter section?

22  A    Right.  Do you allow the engine -- it's not under the

23  catalytic, it's under the warning dealing with fire hazards.

24  Do not allow the engine to idle unnecessarily or for prolonged

25  periods.

1              MR. MACK:  Can we pull up --

2              THE WITNESS:  Risk of -- risk of overheating or

3      fire.

4              MR. MACK:  -- 51 and put it next to this one?

5              (Pause)

6              MR. MACK:  Excuse me.  Put a side by side comparison

7      so we can take a look at the two.

8              (Pause)

9      BY MR. MACK:

10     Q    While Dan is working his magic do you know if other

11     manufacturers -- you're a design expert of motorcycles?

12     A    Yes.

13     Q    Would you agree with Dr. Vigilante's premise that the

14     first goal of a bike manufacturer would be to design out any

15     risk of fire hazards -- design it out of the product if you

16     could?

17     A    I would say in general the goal is to design out any risk

18     you can in general.

19     Q    You agree with that?

20     A    In general, yes.

21     Q    All right.  And so you -- do you think it was BMW's

22     responsibility to design out the risk of fire rather than warn

23     about it if that was possible, right?

24     A    Well, design out the risk of fire under normal use

25     conditions, sure.

Breen - Cross (Mac)                                    30

1   Q    You keep saying this word normal use.  That's not what

2   manufacturer's look at, is it?

3   A    Within some range they have to.  Sure.

4   Q    They're looking for something called foreseeable use,

5   right?

6   A    At some level, sure, but not a wide range.

7   Q    And they perform things like extended use testing, right?

8   A    Yes.

9   Q    Because they know people are going to do it.

10  A    It can happen.  Sure.

11  Q    And so they want to predict what people are going to do

12  and make sure that their bike can perform safely in the

13  circumstances?

14  A    Right.  They want to build in some margin.  Sure.

15  Q    They're just not trying to make it perform safely for the

16  -- for the 80 percent, the people -- most of the people who

17  use it exactly as they specify in their manual?  That's not

18  what their intention is, right?

19  A    Well, within some latitude they're trying to accommodate

20  minor variations on use pattern.  Sure.

21  Q    Minor variations like allowing a bike to idle at center

22  stand for 50 minutes?  They want to make sure that it can idle

23  at center stand for 50 minutes safely.  That's what BMW did

24  here, right?

25  A    Well, they did a test to see what would happen there, but

1   that -- shouldn't expect that to be the normal use of a

2   motorcycle.

3   Q    Well, they did a test and to pass it it said that you

4   can't have any heat damage on the motorcycle at all, no heat

5   damage on the bike.  Do you recall that?

6   A    They don't say that's to pass it.  They just note that

7   there was no heat damage.

8   Q    Oh, no, sir.  I actually -- we're going to come back to

9   that point in just one second.  Let's look right here.  Those

10  two warnings, the warning that you reference in the Yamaha.

11  Let me get out of the jury's way.  The warning you reference

12  in the Yamaha is the warning under the catalytic converter

13  section, right?

14  A    It's under --

15            THE COURT:  You mean in -- in --

16            MR. MACK:  The Yamaha.

17            THE COURT:  The Yamaha's under catalytic converter?

18            MR. MACK:  Well, it's on the screen.

19  BY MR. MACK:

20  Q    So you can tell us if it's under the catalytic converter

21  section or not?

22  A    It's under the panel that starts catalytic converter.

23  Q    Right.  And the warning on our bike -- on this -- the

24  warning in the manual is -- on the R1150R is under the

25  catalytic converter section, right?

Breen - Cross (Mac)                                   32

1    A    Well, it starts with that, but then moves to other

2    topics.

3    Q    Right.  And you don't have any -- well, okay, you're

4    entitled to your opinion.

5              THE COURT:  The jury has the book.

6              MR. HEINOLD:  Objection, Your Honor.

7              MR. MACK:  Yes.

8              THE COURT:  They can make their own determination.

9              MR. MACK:  The jury will make that determination.

10   BY MR. MACK:

11   Q    Let me ask you this.  On a bike with a -- with a

12   dipstick, right, can the bike while just idling catch fire?

13   A    I guess it's possible if it gets hot enough that certain

14   things will deteriorate.

15   Q    You've never in your -- how long have you been at this?

16   How long have you been doing this work?

17   A    About 40 years.

18   Q    Never in your 40 years have you had such a case?

19   A    I don't investigate fires.

20             MR. HEINOLD:  Objection, Your Honor.  It's beyond

21   what the witness has been called for.

22             THE COURT:  What's your reply?

23             MR. MACK:  I disagree, Judge.

24             THE COURT:  I know you disagree, but why?

25             MR. MACK:  The witness talked about his experience

1   and how he's so well qualified, so well versed with the

2   failure modes, the hazard presented by motorcycle operation

3   that he actually can design motorcycles.  I'm entitled to know

4   what his experience is about motorcycle failures.

5          THE COURT:  He said he's never known of one to catch

6   on fire --

7          MR. MACK:  Well --

8          THE COURT:  -- with a dipstick.

9          MR. MACK:  In 40 years.

10          THE COURT:  Okay.

11          MR. MACK:  Right.

12          THE COURT:  So you can argue what you want from

13   that.

14          THE WITNESS:  Right.  And this is the only one I've

15   worked on with a motorcycle standing still without one.

16   BY MR. MACK:

17   Q    And you've never seen any testing documentation to prove

18   that an air -- an oil-cooled engine with a dipstick can catch

19   fire while idling at center stand for 30 or 40 minutes?

20   A    No, I've not.

21   Q    Do you know that other manufacturers build their bikes

22   with oil sight glasses made of actual glass?

23   A    I'm aware some do, yes.

24   Q    Are you aware of any other manufacturer in the world that

25   uses the plastic that BMW used for their oil sight glass?

1    A     Offhand I don't.

2    Q     No, you don't?

3          MR. HEINOLD:  Objection.

4          MR. MACK:  Tell me -- tell me --

5          THE COURT:  What's the objection?

6          MR. HEINOLD:  There's no proof of the implication of

7    his question.

8          THE COURT:  Well, he's an expert.  He asked him if

9    he knew, so I'll allow it.  He said he didn't know.

10   BY MR. MACK:

11   Q     Tell me this.  Is the oil sight glass made of plastic in

12   this application a unique characteristic of the BMW 1150R in

13   your mind?

14   A     Relative to what?  I'm not sure what you mean there.

15   Q     Every other bike you've ever examined in your life?

16   A     Offhand I don't know.

17   Q     Well, you do know that you've never seen one before like

18   this, right, with a plastic sight glass?

19   A     I don't know if I have or not.  I've seen motorcycles

20   with sight glasses, whether they're made of some plastic or

21   glass derivative, I don't know.  I've not gone door to door to

22   check every one of them.

23   Q     Well -- and you've never heard of fire occurring, right?

24         THE COURT:  All right.  We've covered -- we've

25   covered this.

1    BY MR. MACK:

2    Q    Well, I want to know what your basis is for saying that

3    the bike is not defectively designed?

4    A    Well, based on what I've seen if the bike is used in the

5    manner that it's described and intended to be used in the

6    owner's manual, or even some variation of that, there's a

7    very, very low, if almost zero, risk of a fire if you follow

8    the instructions that are intended to be followed -- followed.

9    Q    All right.  And you're not telling the jury that this

10   hazard could not be designed out of this bike, right?  You're

11   not telling the jury that?

12   A    No, but I'm saying if you let an engine run long enough

13   and it gets hot enough then bad things are going to happen.

14   Q    Bad things are going to happen.  Well, I need to stick

15   specific to this bike.  So what bad things are going to happen

16   to this bike if you let it idle from 30 or 40 minutes on

17   center stand in the stationary position in a garage like Mr.

18   Yazdani?

19   A    Well, the engine's going to overheat and then what

20   happens from there depends on a lot of things.  I don't know.

21   I didn't investigate this fire to determine what happened.

22   Q    All right.  Let me ask you a hypothetical.  You -- if you

23   learned that this was the only bike in the world that had a

24   plastic sight glass, okay, the only 1150R motorcycle like

25   this, oil twin, hose box or engines, oil-cooled, that has an

Breen - Cross (Mac)                                    36

1   oil sight glass like this made of plastic would that affect

2   your opinion?

3          MR. HEINOLD:  Objection, Your Honor.  The reason is

4   he's injecting into a hypothetical something he's acting as

5   true and there's no proof of its truth.

6          The question had been regarding what information --

7   whether other people used it or not and I objected to the last

8   question and it's the same problem here.

9          Mr. Mack is expressing it as if that's the truth and

10  he's not allowed to do that if he doesn't have proof that

11  that's the truth.

12         MR. MACK:  This is a motorcycle design expert,

13  Judge.  I'm just asking him if the composition of the plastic

14  sight glass matters to him as to whether --

15         THE COURT:  All right.  Ask him that.  You can ask

16  him that.

17  BY MR. MACK:

18  Q    Does that matter, the composition of the plastic sight

19  glass?

20  A    Well, not in and of itself.

21  Q    All right.

22  A    Because it depends on how it's being used, how the

23  motorcycle's intended to be used, that type of thing.

24  Q    In this application you tell me does it matter whether

25  it's plastic or glass?

Breen - Cross (Mac)                                37

1    A    In and of itself, no, because it depends on everything

2    else in the system.

3    Q    Mr. Yazdani's not the only person in your experience who

4    starts his bike up in the wintertime to turn the fluids and

5    make sure the engine stays in shape, right?

6    A    I'm familiar with that, yes.

7    Q    All right.  So that's not -- that's not extraordinary?

8    You've heard of that before?

9    A    Sure.

10   Q    Okay.  And there's nothing in the manual that says you

11   can't do that, right?

12   A    Correct.

13   Q    All right.

14          MR. HEINOLD:  I'm sorry, can't do what?

15          THE COURT:  Can't do that.

16          MR. MACK:  Can't do that.

17   BY MR. MACK:

18   Q    Can't start his bike on center stand idle to turn it over

19   to winterize it?  There's nothing that tells you that?

20   A    No.

21          (Pause)

22   BY MR. MACK:

23   Q    Now, 1997.  Well, let's get back to this just so we can

24   get off the topic completely.  You don't know anything more

25   about the bike from which this warning came, right, this

1    Yamaha?

2    A    I mean, I'm generally familiar with it.  I don't know

3    much beyond that.  I mean, I've ridden one I'm sure, but

4    beyond that, no.

5    Q    Right.  Nothing about the engineering or design or any of

6    that?

7    A    No, not in terms of this part of the bike, no.

8              MR. MACK:  All right.  Let's take that off.  Let's

9    go to the 1997 customer satisfaction notification.

10             UNIDENTIFIED SPEAKER:  P-53?

11             MR. MACK:  63.

12             UNIDENTIFIED SPEAKER:  63.

13             MR. MACK:  P-63.

14   BY MR. MACK:

15   Q    Now, in -- are you aware that in 1997 BMW learned that

16   one of its motorcycles when idling at high speed at a

17   standstill could catch fire?  Are you aware of that?

18   A    Yes.

19   Q    All right.  And BMW at the time had in its manual for

20   that bike to start up and drive away immediately, right?

21   A    That's not my recollection specifically of what was in

22   that manual.  What section are you referring there?

23   Q    Well, why don't we just take a look down here at page two

24   of this exhibit?

25   A    What -- what are you looking at?

Breen - Cross (Mac)                                    39

1    Q    I'm going to show you.

2    A    Okay.

3    Q    I'm going to pull it up.

4              MR. MACK:  Number five.

5              (Pause)

6    BY MR. MACK:

7    Q    All right.  Now, can you read the screen?  If not, I'll

8    come over here and hand this to you.  I want you to be able to

9    see this.

10   A    No, I think I've got the document that you're looking at.

11   Q    Number five?

12   A    Okay.

13   Q    Did the -- did the owner's manual in the 1997 RSL warn

14   riders not to let their bike idle?

15   A    That's what it says there, yes.

16   Q    It says that they -- the owner's manual, the involved

17   models warns the rider not to leave the engine running

18   unnecessarily, right?

19   A    Right.

20   Q    Does this manual warn the rider not to leave its bike

21   running unnecessarily?

22   A    This meaning?

23   Q    The 1150R, Mr. Yazdani's bike?

24   A    Yes.

25   Q    It says the word running?

Breen - Cross (Mac)                                             40

1   A    It doesn't use those words, but it says to ride away

2   immediately after starting the engine.

3   Q    All right.  So BMW in 1997 already knew that it had that

4   instruction in its manual for the R1100's, right, the RSL's?

5   A    Right.

6   Q    Okay.  And what happened?

7          MR. HEINOLD:  I didn't hear the question.

8          MR. MACK:  What happened?

9   BY MR. MACK:

10  Q    What happened to the bikes out -- the RSL's out there in

11  the world where it said in the manual don't leave them running

12  unattended?

13  A    There were apparently some of them that a situation where

14  the fairing trapped the heat and a fire ensued.

15         MR. MACK:  Well, let's go down to number six and

16  let's blow up from starting with the word initially.

17         (Pause)

18  BY MR. MACK:

19  Q    Initially the cause of these incidents could not be

20  determined since no vehicle malfunction or defect is involved.

21  After investigating the incidents and learning that many of

22  the owners reported that their vehicles had been left

23  unattended at engine speeds above idle BMW conducted further

24  analysis to evaluate the effects of such operation.  Are you

25  familiar with that?

Breen - Cross (Mac)                                      41

1    A    I've -- I've seen this document.

2    Q    All right.  Let's finish that sentence.  BMW ultimately

3    found that -- oh this is where it skips.  Operating in such a

4    manner overheating could occur and the heat generated could

5    eventually cause fairing components to catch fire, is that

6    right?

7    A    That's what it says.

8    Q    As a result BMW decided to conduct a customer

9    notification campaign, right?

10   A    Right.

11   Q    And in that situation the riders of the motor vehicles,

12   the RSL's, didn't know that they had plastic fairings that

13   could catch fire, right, when exposed to excessive idle?

14   A    I would presume so.

15   Q    All right.  And so BMW took the steps necessary to make

16   those riders aware of that unique hazard, right?

17   A    Yes.

18   Q    And what did they do?

19   A    They sent a notification to customers.

20   Q    Okay.  So they sent a detailed explanation of what the

21   problem was, right?

22   A    Right.

23   Q    And then what else did they do?

24   A    They also --

25            THE COURT:  Why don't you -- why don't you lead him

1    on that.  All right.

2    BY MR. MACK:

3    Q    They also included a warning label to affix to the bike,

4    right?

5    A    Right.

6    Q    Well, where did they have that warning label?  Where did

7    they instruct customers and BMW dealers throughout the country

8    to affix that warning label?

9    A    I believe it's up on the steering head.

10   Q    Now, is it your opinion that BMW would have had no

11   responsibility to do that, to send a warning label to

12   customers to remind them because it was already in the manual?

13   A    No, because I think that's -- they had a little bit

14   different situation there in that they had an unusual fire

15   pattern that they uncovered with 1,200 or so bikes in the

16   field.

17         And so rather than sending them, you know, a

18   different manual that addressed that in different language

19   they had -- they either -- which would not have been a good

20   idea because you have two manuals, what do you do with it --

21   they decided to supplement the manual with an on-product

22   sticker for those bikes.

23   Q    Well they actually sent a manual too, right?

24   A    At a later date they developed a different manual, yes.

25   Q    No.

1          MR. MACK:  Let's pull up -- let's continue in that

2     exhibit.  Let's go to page three --

3          UNIDENTIFIED SPEAKER:  What page number?

4          MR. MACK:  Page three.

5          (Pause)

6          MR. MACK:  Four, sorry.  Let's go to description of

7     remedy down at the bottom and let's blow it up where -- where

8     it continues on the next page like you did for --

9     BY MR. MACK:

10    Q    Why don't you -- in the meantime, sir, could I ask you to

11    read page four, the draft recall letter, the customer

12    notification letter.  The bottom of the page says description

13    of remedy.

14    A    Right.

15    Q    All right.  So now the remedy actually involved sending

16    this letter which has above the section -- above the section

17    has a description -- specific description of the problem

18    encountered, right?

19    A    Right.

20    Q    And then the remedy was to not just tell folks about it

21    with the targeted letter, but to also give them a warning

22    label, right?

23    A    Right.

24    Q    And then to give them two manual inserts, right?

25    A    Well, it depended on which manual they had what insert

Breen - Cross (Mac)                                                    44

1    they got.

2    Q    So that you got a manual insert.  So they changed the

3    manual right then and there?

4    A    Right.  But they had people in the field that had a

5    manual that they needed to correct.

6    Q    All right.  Now, you're familiar with -- BMW stopped

7    manufacturing that bike, right?

8    A    Right.

9    Q    We talked about the engineering hierarchy.  We talked

10   about how you have to design out a hazard before you can guard

11   against it or warn, right?

12   A    Well, it all works together, but you -- to the extent you

13   can design out risk that's always a good thing.

14   Q    Okay.  And that's what BMW did in 1997.  They designed

15   out the risk by stop -- they stopped making that bike with the

16   fairings, right?

17   A    That's my understanding, yes.

18   Q    And then to the extent they were already in the world

19   they warned about the specific hazard that riders would

20   encounter if they continued to use the bike, right?

21   A    Yes.

22   Q    They did that because it was a unique characteristic of

23   that bike, right?

24   A    Yes.

25            MR. HEINOLD:  Objection, Your Honor.

1                THE COURT:  What's the objection?

2                MR. HEINOLD:  The issue is the Court's order limited

3    the warning.

4                THE COURT:  Notice you mean?

5                MR. HEINOLD:  The response of the warning.

6                THE COURT:  All right.  Well, I think we've covered

7    it in any event, so let's move on.

8    BY MR. MACK:

9    Q    Here's a plastic piece next to --

10               MR. HEINOLD:  Objection.

11               THE COURT:  What's the objection there?

12               MR. HEINOLD:  The same one.  He's not talking

13   about --

14               THE COURT:  Are you talking about this bike or the

15   other bike?

16               MR. MACK:  I'm talking about this bike right here.

17   The 1150R.

18               THE COURT:  What's your question?

19               MR. MACK:  The question is about the plastic piece

20   and whether that represented a specific hazard just like the

21   plastic fairings represented a specific hazard.

22               THE COURT:  Sir?

23               THE WITNESS:  Well, I don't know the extent to which

24   the plastic fairings represented a specific hazard during

25   normal use, but the plastic piece that you've been referring

Breen - Cross (Mac)                                    46

1   to here from what I can see does not represent a risk when the

2   vehicle's being used in a normal manner.

3            Now, is there a risk of the engine overheating if

4   allowed to run for too long?  Sure.

5            MR. MACK:  Okay.

6            (Pause)

7            MR. MACK:  Just one moment, Your Honor.

8            (Pause)

9   BY MR. MACK:

10  Q    You're aware that Mr. Yazdani read his manual, correct?

11  A    That's what he testified to.

12           MR. HEINOLD:  Couldn't hear him, Your Honor.

13           THE COURT:  Mr. Yazdani read his manual.

14           MR. MACK:  I said you're aware that Mr. Yazdani read

15  his manual, correct?

16  BY MR. MACK:

17  Q    Are you aware of that?

18  A    Yes, that's what he testified to.

19  Q    And do you know why he read it?

20  A    I guess I --

21           THE COURT:  He can't answer that.

22           MR. MACK:  Well, he testified why he read it.

23           THE COURT:  Did he -- did you read where he said why

24  he read it?

25           THE WITNESS:  Offhand I don't recall.

1              THE COURT:  All right.  He doesn't recall.

2    BY MR. MACK:

3    Q    Was Mr. Yazdani looking for specific information about

4    the operations of his motorcycle when he was reading --

5    reading the manual?

6    A    I think he indicated he looked through the entire manual,

7    so I don't -- I don't know that he's looking for specific

8    information.

9    Q    And you weren't here when Mr. Yazdani testified earlier

10   this week?

11   A    No.

12   Q    Right?  You were not here?

13   A    I've read his deposition where he said he read the manual

14   completely, yes.

15   Q    All right.  And did you read his entire transcript?

16   A    Yes.

17   Q    Is that the only time he talks about reading the manual?

18   A    No.

19   Q    Okay.  He talks about it at other points where he says,

20   now I didn't read every word, right?

21   A    Well, he says he didn't remember.  At later points I

22   might have read it.  I don't recall reading that particular --

23   I mean, I probably did.  That's what he says.  He says he read

24   it completely in the other part.

25   Q    In your mind if a bike or any product has a unique

1    characteristic that makes it exceptionally dangerous compared

2    to other problems -- similar problems is -- is the unique

3    character device something that should be warned about

4    specifically?

5             MR. HEINOLD:  Objection.

6             THE WITNESS:  It depends a lot --

7             THE COURT:  What's the objection?  I don't even know

8    what the question means.  I'm going to sustain it.

9             MR. MACK:  Okay.

10            THE COURT:  All right.

11   BY MR. MACK:

12   Q    Unique design characteristics that present a hazard are

13   something that should be warned about specifically in your

14   mind?

15   A    In general it needs to be reviewed from that possibility,

16   yes.

17   Q    And it's not absurd or unreasonable for a manufacturer to

18   put a warning label advising a motorcycle rider say that there

19   is a unique design characteristic of this bike that may cause

20   you to change your behavior about how you normally use the

21   bike?

22   A    The question being it's not absurd for them?

23   Q    Yes or unreasonable?

24   A    Well, I think there's other ways to handle it which is

25   traditionally the way the motorcycle industry has handled it

1    and that's through owner's manuals.

2    Q    Or like BMW where they sent the label, right?

3              THE COURT:  All right.  We've been through all this.

4    We've covered all of this.

5              (Pause)

6              THE COURT:  Do you have any brief redirect?

7              MR. HEINOLD:  Oh, is he finished?

8              THE COURT:  I think he is.

9              MR. MACK:  I'm almost done.

10             (Pause)

11             MR. MACK:  Judge, just very quickly.

12   BY MR. MACK:

13   Q    Does this -- does this bike have -- strike that.  Do all

14   bikes have the same warnings on them -- labels?

15   A    There are --

16   Q    All motorcycles?

17   A    There are some common labels or label themes that are

18   required by law.

19   Q    All right.

20   A    Yes.

21   Q    And others manufacturers can decide to put on a bike,

22   right?

23   A    Yes.

24   Q    To keep their rider safe?

25   A    Or whatever reason that they decide to put labels on.

1    Q    All right.  You prepared an exhibit that had how many

2    labels?

3    A    I think I counted 20 or 22.

4    Q    All right.  Do all of those labels in your mind represent

5    critical safety information that a rider needs to keep himself

6    safe?

7    A    Well, it's all safety related information at some level.

8    Q    All safety related?  Is any of it unique to a particular

9    design or is it all common characteristics that are

10   encountered by users when they operate all motorcycles?

11   A    I would say in general these are common types of issues.

12            MR. MACK:  Okay.  Those are all the questions I

13   have.  Thank you.

14            MR. HEINOLD:  I have some.

15                    REDIRECT EXAMINATION

16   BY MR. HEINOLD:

17   Q    Can I ask you to turn to page 51 of the manual?

18            MR. HEINOLD:  I'm not going to put it up, Your

19   Honor.  I think we've probably all memorized it by now.

20   BY MR. HEINOLD:

21   Q    And that says ride away immediately, don't -- don't idle

22   for a prolonged period of time?

23            MR. MACK:  Objection to the form.  It's not what it

24   says.

25   BY MR. HEINOLD:

1   Q    All right.  Would you read what it says at the bottom,

2   please?

3   A    Do not allow the engine to idle unnecessarily or for

4   prolonged periods.  Risk of overheating or fire.  Ride away

5   immediately after starting the engine.

6   Q    Now, you don't understand that to mean that somebody has

7   to turn the engine on and jump on it before the few seconds it

8   takes a fuel-injected engine to -- to warm up a little bit, do

9   you?

10  A    Right.  The word is --

11  Q    Immediately?

12  A    The word is unnecessarily.  So if it takes 10, 15 seconds

13  to get everything up to snuff, that's fine.

14  Q    So you think that authorizes someone who reads that, or

15  would authorize them in their own mind, someone who reads

16  that, to let a bike run 30 or 40 minutes?

17  A    No.

18           MR. HEINOLD:  Okay.  Can we have P-126 up, please?

19  You guys have it.

20           MR. MACK:  Sorry.

21           MR. HEINOLD:  Okay.  We have to switch it.

22           MR. MACK:  We just switched it over.  Hold on.

23           MR. HEINOLD:  Sorry.  And I want you to put the two

24  pieces of it.

25           (Pause)

1   BY MR. HEINOLD:

2   Q    While he's doing that let me ask you this.  You said this

3   had an oil cooler?

4   A    Yes.

5   Q    Okay.  And it's an air-cooled engine?

6   A    Right.

7   Q    No radiator?  No water cooling?

8   A    That's correct.

9   Q    Okay.  Does the fact that it has an oil cooler mean it

10  still won't get hot?

11  A    No.

12  Q    Does it mean it still won't overheat?

13  A    No.

14  Q    Does it mean it still doesn't run the risk of having a

15  fire if you let it run unattended for 30, 40 minutes?

16  A    No.

17  Q    Does the activity of starting the bike up and turning it

18  over, winterizing it from -- you know, from that standpoint,

19  activities in the winter, does that include running it 30 or

20  40 minutes unattended?

21  A    I would certainly think not.

22  Q    Are you surprised that a sight glass or any other thing

23  would ultimately deform or fail if a motorcycle is left to run

24  30 to 40 minutes attended?

25  A    I would think at some point in time a nine or 10-year-old

1    motorcycle running for a half an hour or so the potential for

2    something bad happening exists.

3    Q    Okay.  Now, I want to go to this -- this document, this

4    test report.  You said this was a new vehicle?

5    A    Yes.

6    Q    And it's -- it's -- is this considered an extreme test?

7    A    Yes.

8              MR. MACK:  Objection.

9              THE COURT:  What's the objection?

10             MR. MACK:  Well, I don't know how he knows that.  He

11   hasn't laid a foundation at all for that.

12             MR. HEINOLD:  He's -- he's aware of testing in the

13   industry, so --

14             THE COURT:  What is an extreme test?

15             MR. HEINOLD:  He --

16             THE COURT:  What does that mean?

17             MR. HEINOLD:  Extreme.

18             THE COURT:  Yes.  What does that mean?  Do you know

19   what that means?

20             THE WITNESS:  Yes.  What they characterize this as

21   is an extended in-use, so they're extending the use pattern of

22   the -- of the engine.

23   BY MR. HEINOLD:

24   Q    This is beyond normal use?

25   A    Right.

1    Q    And they're seeking information?

2    A    Right.

3    Q    Okay.  And at the bottom of this when they're reporting

4    on the condition and the test results of this new vehicle they

5    then say other factors are synchronization of the two

6    cylinders.  Bad synchronization has great effect on exhaust

7    temperatures, engine setting in general, motorcycle on the

8    side stand and ambient temperature.  How do those things

9    affect the rate of heat and the increase of heat in that type

10   of test?

11           MR. MACK:  Judge, he has no foundation.  Objection.

12           THE COURT:  All right.  Well, I think we've been

13   over it in any event.

14           MR. HEINOLD:  Well, Your Honor, I asked --

15           THE COURT:  We're getting repetitive.

16           MR. HEINOLD:  He opened it up.  We're not

17   repetitive.

18           THE COURT:  Well, I think we are, so I'll sustain

19   it.

20           MR. MACK:  Thank you, Judge.

21           THE COURT:  All right.

22   BY MR. HEINOLD:

23   Q    You were asked if you were aware of other fires in other

24   motorcycles and that's not generally what you do, correct?

25   A    Correct, I'm not a fire investigator.

Breen - Redirect (Hei)                          55

1   Q    Okay.  Would you know?  Do you have access to the fire

2   experience of other motorcycle -- motorcycle manufacturers?

3   A    No.

4   Q    Would anybody except the motorcycle manufacturers?

5   A    I don't know how else you would know other than you're

6   the manufacturer.

7   Q    All right.  You were --

8           MR. HEINOLD:  Can we get D-2, D-3 back up, please,

9   quickly?

10          (Pause)

11  BY MR. HEINOLD:

12  Q    Looking at D-2, D-3 you were asked about whether they

13  cover turning the engine over.  When you -- when you hear

14  turning the engine over like Mr. Yazdani was doing what does

15  that mean to you?

16  A    Starting the engine.

17  Q    Does it mean letting it run at idle for 30 to 40 minutes

18  unattended?

19  A    No.

20  Q    Do these warnings cover that?

21  A    Yes.

22  Q    Do they tell you not to do it?

23  A    Yes, they do.

24  Q    They're clear?

25  A    Very clear.

Breen - Redirect (Hei)                                    56

1   Q     The -- the 1997 customer service action regarding the RSL

2   vehicles with the -- with the fairings, did those warnings in

3   the manuals that were being supplemented contain any

4   information about the risk of fire?

5   A     No.

6   Q     Did the supplement talk about the risk of fire?

7   A     The supplement meaning?

8             THE COURT:  The stuff they mailed out.

9             MR. HEINOLD:  The manual insert.

10            THE COURT:  The insert.

11            THE WITNESS:  No.

12  BY MR. HEINOLD:

13  Q     Did the -- did the manual insert add to the warning of

14  the risk of fire?

15  A     It doesn't appear that they do.

16  Q     Let me --

17  A     Unless I'm looking at the wrong page here.

18  Q     Let me see if I can find it.

19            THE COURT:  Well, it's all in evidence already, so

20  why are we --

21            MR. HEINOLD:  This is my last question.

22            THE COURT:  I know.  But why are we having him go

23  over this when we already know the answers?

24            (Pause)

25  BY MR. HEINOLD:

Breen - The Court                                    57

1    Q     Page?  What is it?

2    A     Page eight.

3    Q     Okay.  Did that new warning add to it information much

4    like what's here in discussing the risk of fire?

5    A     Yes, it does.

6               MR. HEINOLD:  Okay.  That's all I have, Your Honor.

7               THE COURT:  All right.  Jurors, anybody have any

8    questions to have any testimony clarified from this witness?

9               Excuse us one second, sir.  Dennis, could you grab

10   those for me?  Thank you.

11              (Pause)

12              THE COURT:  Thanks, Dennis.

13              COURTROOM DEPUTY:  You're welcome, Judge.

14              (Pause)

15                          EXAMINATION

16   BY THE COURT:

17   Q     All right.  Sir, do you know if it's possible for a

18   motorcycle engine to increase idle on its own?  For example,

19   without human adjustment?

20   A     Not a motorcycle that's running properly.  No.

21   Q     Okay.

22              MR. MACK:  I didn't hear the answer to that.

23              THE COURT:  Not a motorcycle that's running

24   properly.

25   BY THE COURT:

Breen - The Court                                        58

1   Q    Are you aware of how some people advocate starting

2   motorcycles and warming them up during the winter to avoid

3   damage?  Are you aware of that?

4   A    Yes, I spent my tour of duty in Michigan and Illinois

5   before I moved to Florida, so I --

6               MR. MACK:  I can't hear that, Your Honor.

7               THE WITNESS:  I said lived in Michigan and Illinois

8   before I moved to Florida, so I'm familiar with starting

9   vehicles in the wintertime.

10  BY THE COURT:

11  Q    So do you agree that this should be done to motorcycles?

12  A    That's not the best thing to do.

13  Q    Okay.  Did you do it?

14  A    No, I pulled the battery and stabilized the fuel.

15              THE COURT:  Okay.  All right.  Any follow-up on any

16  of those questions?

17              MR. MACK:  No, Judge.

18              MR. HEINOLD:  No.

19              THE COURT:  Okay.  Sir, thank you.  Have a safe trip

20  back to Florida.

21              (Pause)

22              THE COURT:  Any other evidence for the defense?

23              MR. HEINOLD:  No, Your Honor.

24              THE COURT:  Plaintiff, any rebuttal?

25              MR. MACK:  Judge, I think we're done.  Thank you.

1             THE COURT:  Okay.  All right, jurors.  What that

2    means is the presentation of evidence has concluded.  What

3    we're going to do now is I'm going to give you law.  You don't

4    have to take any notes on it.

5             You can take your time, sir.

6             THE WITNESS:  All right.

7             MR. MACK:  Judge, can we have a break before we do

8    -- you instruct on the law?

9             THE COURT:  All right.  We'll resume at 4:00 then.

10   We'll take a 10 minute break.

11            MR. MACK:  Thank you, Judge.

12            THE COURT:  Thank you, sir.  You can step down.

13            (Pause)

14            THE COURT:  What time is your flight?

15            THE WITNESS:  6:30.

16            THE COURT:  Direct to RSW?

17            THE WITNESS:  Yes.

18            (Jury exits, 3:49 p.m.)

19            THE COURT:  All right.  Anything we have to talk

20   about?

21            MR. MACK:  Yes, just -- we were looking at the

22   factual cause charge and we looked at the proposed -- the

23   model jury instruction.  One of the questions we had, Judge,

24   is --

25            THE COURT:  What page?

1          MR. MACK:  -- the jury --

2          THE COURT:  What page?

3          MR. MACK:  Page six.

4          (Pause)

5          MR. MACK:  There's nothing in the -- in this charge

6    to let the jury know that if they find that the defective

7    product is a factual cause of the harm, in addition to Mr.

8    Yazdani's whatever they want to think he did, careless,

9    whatever, his conduct also was a cause of the harm that in

10   that case they still are required to find that the product was

11   defective and caused his harm because it has to be --

12         THE COURT:  Well, that's implicit because there's no

13   reference to comparative negligence for the strict liability

14   claims.

15         MR. MACK:  It's implicit to us.

16         THE COURT:  You can argue that.

17         MR. MACK:  I don't know if it -- I don't know if the

18   layperson understands.  They may think that they have to

19   choose between Mr. Yazdani's conduct and the strict liability

20   of the product and that's not the law.

21         THE COURT:  I don't know how they could do that

22   given the way the instructions are written and the jury

23   questions are asked.  I mean, we spent time fixing that.

24         MR. MACK:  I don't disagree.

25         THE COURT:  You can certainly argue that -- that the

1   comparative negligence only applies to the negligence piece,

2   not the strict liability.  That's certainly the situation

3   we're presenting them with.

4          You want -- you, I take it want me to say under --

5   on page -- top of page six somewhere that -- or somewhere in

6   the comparative negligence section that doesn't -- that only

7   applies to negligence, not strict liability?

8          MR. MACK:  The instruction that I would prefer that

9   you give is if you find that the product was defective the

10  defendant is liable for all harm caused to the plaintiff by

11  such defective condition.

12         In order for the plaintiff's to recover in this case

13  the defendant's defective product must have been a factual

14  cause of plaintiff's claim.  A defective condition is the

15  factual cause of harm if the harm would not have occurred

16  absent the defect.

17         The defect does not have to be sole cause of

18  plaintiff's harm even if other actions or events, including

19  those by plaintiffs, contributed to or partially caused

20  plaintiff's harm.  If the harm would not have occurred if the

21  product was free from defect then defendant's product

22  factually caused the accident.  And that's -- that's the

23  charge approved by the cases.  It's Reott.  It's the

24  Pennsylvania Standard Jury Instruction 16.70, 2015.  It's

25  Reott versus Asia Trend, Inc.

1          THE COURT:  Why are just telling me this now?

2    That's what I don't understand.  We've had like six

3    conversations on this.

4          MR. MACK:  Judge, if it -- I understand that you

5    know that we're working very hard on all aspects of this case

6    at all times.  Virtually 24 hours a day.  I don't want to get

7    the charge wrong after all this work.

8          THE COURT:  I gave you the charge a week ahead of

9    time, a week, and you're telling me two minutes before --

10   three weeks -- two weeks -- two minutes before I'm going to

11   charge you're telling me I have to rewrite the whole charge.

12         MR. MACK:  We made changes this morning.  We made

13   changes this afternoon.

14         THE COURT:  We didn't change this.  We didn't change

15   causation.

16         MR. MACK:  We changed other parts of the charge.

17         THE COURT:  We didn't touch this section.  Do you

18   want me to add a section that says under -- I'll add a section

19   that says under comparative negligence that this does not

20   apply to the failure to warn and design defect provision.  If

21   that's what you want me to add I'll add it.  Is that what you

22   want?

23         MR. MACK:  Yes, Your Honor.

24         THE COURT:  I mean, I can't rewrite the whole charge

25   now because --

1          MR. MACK:  And I apologize.

2          THE COURT:  -- I think everything you've read is in

3    there except for maybe one sentence.  Which sentence do you

4    want?

5          MR. MACK:  In no way am I intending to spring this

6    on you.  It's the last -- it's that last part.  It's that last

7    -- even if other actions or events, including those by

8    plaintiffs, contributed to or partially caused plaintiff's

9    harm, if the harm would not have occurred if the product was

10   free from defect then defendant's product factually caused the

11   accident.

12         MR. HEINOLD:  The problem I have, Your Honor, is

13   first of all, the standard jury instructions are not binding.

14   And as a matter of fact some of them are --

15         THE COURT:  No, I understand, but the point is not a

16   frivolous one and the question is whether I add it in

17   causation or whether I add it in comparative negligence.

18         MR. HEINOLD:  However, the point is that you've made

19   the point by saying as a defense to the negligence claim and

20   you don't have it in the strict liability.

21         THE COURT:  I understand, but that's a -- that's a

22   lawyer's reading of it and we're lawyers and I don't think

23   these eight people will pick up that distinction.

24         So, all right, I'll add the last sentence that you

25   read to the end of -- if you want it in factual cause, that's

Colloquy                                        64

1    on page -- the end of page six, is that where you want it?

2         MR. MACK:  Causation -- the defective product is the

3    factual cause -- the factual cause -- after -- on the first

4    paragraph after -- after a factual cause cannot be an imagined

5    -- imaginary or fanciful.

6         THE COURT:  All right.

7         MR. MACK:  After that sentence.

8         THE COURT:  I'll add it there.

9         MR. HUGHES:  What page are we on?  I'm lost.

10        THE COURT:  Pardon me.

11        MR. MACK:  Page six.

12        MR. HUGHES:  I'm lost at the last minute.

13        MR. MACK:  I have the language here.

14        (Pause)

15        THE COURT:  Where is this provision in?  I'm looking

16   at the suggested --

17        MR. MACK:  He's looking at (G) causation.  I'm not

18   sure what he's --

19        THE COURT:  I'm looking at factual causation, 16.70

20   in the form instructions.  What are you looking at?

21        MR. HUGHES:  We seem to have different pages we're

22   looking at.

23        MR. MACK:  No, no, no, I think -- I think Patrick

24   was looking at an earlier version.  That's all.

25        MR. HUGHES:  That's what I got from the Court.

1           MR. MACK:  (G) causation.  Yes, this is the one you

2    handed up.  It's page six.  Here, I'll show you.

3           THE COURT:  Page six of part two.

4           MR. MACK:  Page six of --

5           THE COURT:  And then the carryover paragraph.

6           MR. MACK:  That's right.

7           THE COURT:  It's two paragraphs above negligence.

8    No, I'm looking at the form from Pennsylvania.  I don't see

9    the language you just read to me.

10          MR. MACK:  Oh, the language --

11          UNIDENTIFIED COUNSEL:  The language is from <u>Reott</u>.

12          MR. MACK:  The language -- the beginning part is

13   from the form and then the second part is from the case.

14          THE COURT:  Well, the standard form in Pennsylvania

15   doesn't say that.

16          MR. MACK:  The beginning part does.  The second --

17   the second part is from <u>Reott</u> which I cite.  I'm not --

18          THE COURT:  You told me that the standard form --

19          MR. MACK:  I said -- I said the standard form in

20   <u>Reott</u> and I cited <u>Reott</u>.  I'm not -- I'm not trying to pull a

21   fast one, Judge.

22          THE COURT:  I'm just trying to follow the standard

23   form and I don't see that language that you read.  The

24   Pennsylvania form 16.7 doesn't say that.  Does it?

25          MR. MACK:  There were two citations on the -- on the

Colloquy                                            66

1    recommended charge.  The one was the standard jury

2    instruction.  The other was Reott versus Asia Trend.

3               UNIDENTIFIED COUNSEL:  Well, I'm confused, Your

4    Honor, because --

5               MR. MACK:  We got the --

6               UNIDENTIFIED COUNSEL:  Oh, we've got wrong one.

7               MR. MACK:  This is the new one from this afternoon.

8               UNIDENTIFIED COUNSEL:  This is not --

9               MR. MACK:  From this late afternoon, right?

10              LAW CLERK:  Right.

11              MR. MACK:  Okay.

12              LAW CLERK:  Did I not give you guys the same one?

13              MR. MACK:  So that's where the page difference is

14   coming from.

15              LAW CLERK:  You both should have the same one.

16              (Pause)

17              THE COURT:  It's the same language.  We never

18   changed it.

19              MR. MACK:  Right.  I understand that.

20              THE COURT:  Do you see the -- we're in the paragraph

21   (F) causation.  And he wants to add a sentence at the end of

22   that first paragraph from a case.

23              MR. HEINOLD:  That says what?

24              THE COURT:  Read it again.

25              MR. MACK:  Even if other actions or events,

1    including those by plaintiffs, contributed to or partially

2    caused plaintiff's harm, if the harm would not have occurred

3    if the product was free from defect then defendant's product

4    factually caused the accident.

5           THE COURT:  I mean, that seems to be an accurate

6    statement of the law to me.

7           MR. HEINOLD:  Okay.

8           THE COURT:  Pre-<u>Tincher</u>.  So give that language to

9    Leslie.

10          MR. HEINOLD:  Well, it's pre-<u>Tincher</u>.  That's part

11   of -- part of our problem.

12          THE COURT:  Well, I know.

13          MR. HEINOLD:  I'll note --

14          UNIDENTIFIED COUNSEL:  I made my comments.

15          THE COURT:  Right.  All right.  I'll add that

16   sentence.  Just give that to Leslie.  We'll add it and then

17   I'll --

18          LAW CLERK:  Is it in your proposed?

19          THE COURT:  I'm sorry.  Is it in your proposed

20   instruction?

21          LAW CLERK:  I don't see it.

22          MR. MACK:  No.

23          THE COURT:  Hence the problem.

24          MR. MACK:  Wait.  No, no, no, this last -- the last

25   sentence is not part in -- part of our proposed instruction.

1              THE COURT:  All right.  Why don't you --

2              MR. MACK:  The first part was.

3              THE COURT:  -- give Leslie the cite of where that it

4     is and we'll add it.

5              (Pause)

6              THE COURT:  Just give us the page and the case and

7     where it is.  And then make sure you show it to the defendant.

8              LAW CLERK:  So this was not submitted?

9              MR. MACK:  No, the first part of that was submitted.

10             THE COURT:  Well, the part you want me to add was

11    not submitted.  That's all we're saying.

12             MR. MACK:  Yes.

13             LAW CLERK:  So which part?  We're not adding all of

14    this?

15             MR. MACK:  Judge, you're right.  I'm sorry.  I want

16    to get it right, not wrong.  I feel that --

17             THE COURT:  Stop.

18             LAW CLERK:  This is where we're going to add it?

19             (Recess taken, 4:00 p.m. to 4:09 p.m.)

20             THE COURT:  Did you get the revision?

21             MR. MACK:  Yes, Judge.

22             MR. HEINOLD:  Yes.

23             THE COURT:  All right.

24             (Pause)

25             MR. MACK:  Attorney Heinold has one -- he's got one

1   more issue to talk about.

2               THE COURT:  About the charge?

3               MR. MACK:  Yes.  No, I'm only kidding.  I was going

4   to lay it on Mr. Hughes, but --

5               THE COURT:  Yes, I know who is responsible.  It's

6   not Mr. Hughes.  It's not Mr. Heinold.

7               (Jury enters, 4:10 p.m.)

8               THE COURT:  Well, we ended up working a full day

9   after all.  I'm sorry.  I apologize.  I thought we had a good

10  plan, but please be seated.  Sit back, relax.

11              You don't have to write anything down because I'm

12  going to give you a copy of all these legal rules to have with

13  you when you deliberate.

14              So what I need you to do now is just try to listen

15  because this is the law that's going to control your

16  deliberations and the law you should be thinking about when

17  the lawyers give their closing speeches tomorrow morning.

18              You and I have separate and distinct functions.  You

19  as the jury must determine what the facts are in this case.

20  You've listened to all the evidence now and from the evidence

21  you will determine what you consider the facts to be.

22              I must instruct you on the law because that's my job

23  and you should listen carefully while I go through these

24  instructions and you don't have to take any notes.

25              The instructions I give you consist of three parts.

1              The first part involves general rules and principles

2       that define and control your duties as jurors.  A lot of that

3       is similar to what we talked about on Monday.

4              The second part deals with the specific rules of law

5       you must apply to the facts you find in this case.

6              And the third part, which I'll give you after the

7       lawyers make their speeches tomorrow, just give you some

8       guidelines on how to conduct your deliberations and how to

9       return a verdict.

10             So in deciding what really happened in this case you

11      must follow your recollection of the evidence, not the

12      recollection of the attorneys or even me.

13             If an attorney states something to be a fact or I

14      state something to be a fact at any time and it's the not the

15      same as your recollection then your recollection of the

16      evidence controls.  You must follow your own independent

17      recollection of what the evidence was.

18             You must make your determination of facts based

19      solely on the evidence you've heard and seen and not for any

20      reason outside of this trial.  For example, you can't base

21      your verdict on guess, suspicion, speculation, intuition or

22      conjecture.

23             Similarly, you must not allow sympathy or prejudice

24      to influence you.  The law demands a just verdict unaffected

25      by anything except the evidence, your common sense and the law

1    as I give it to you.  And once you determine what the facts

2    are, that is once you've decided what happened, then you apply

3    it to the law.

4              Now, my role along with giving you the law was to

5    conduct the trial in an orderly, fair and efficient manner and

6    to rule upon questions of evidence during the course of the

7    trial.

8              No one can question the facts as you find them, but

9    you must accept the law as I state it.  You may not disregard

10   any instruction and you must not give special attention to any

11   one instruction or question the wisdom of any rule of law.

12   You should consider all these legal principles in their

13   entirety as a whole.

14             Now, we've had a few objections in the trial.  You

15   now know what objections are.  It's the lawyer's job to do

16   that.  That's their duty to represent their client zealously.

17   And the fact that I've denied, granted, sustained or overruled

18   objections should not be taken by you as indicating that I

19   have any view about the case.  In ruling I was applying the

20   Rules of Evidence and confining the testimony to only what the

21   rules permit.

22             You must confine your consideration to the evidence

23   presented from the witnesses and any exhibits received into

24   evidence.

25             The fact that I've had discussions with the lawyers

1    at sidebar relating to the Rules of Evidence should have no

2    bearing directly or indirectly on the outcome of the case.  Do

3    not concern yourself that we met at sidebar or talked

4    privately or asked you to leave the room because we were

5    discussing legal matters that really didn't relate to your

6    role of determining the facts.

7            And similarly, as we said Monday, nothing I've said

8    or done during the trial should be taken by you as indicating

9    that I have any views either way about what your verdict

10   should be.  I'm totally impartial as are you.  You have to

11   decide the facts and that's totally your job.

12           Now, if during the course of the trial I sustain an

13   objection by counsel to the question asked by another counsel

14   you are disregard the question.  You must not speculate what

15   the answer would have been.

16           If after a question was asked and an answer given I

17   ruled the entry should be stricken from the record, and I

18   think I did that a few times, you are to disregard both the

19   question and the answer.  Such matters are not evidence and

20   should not be considered.

21           We had a few instances where the lawyers agreed on

22   facts.  If the parties stipulated to facts the law deems those

23   facts to be true.  You must, therefore, treat those facts as

24   having been proven for purposes of this case.

25           Now, let me go over again the legal standard that

1    you have to apply.

2              The Yazdani's must prove their claims by a legal

3    standard called a preponderance of the evidence and that means

4    the claim is more likely true than not true.

5              If after considering all the evidence you find the

6    Yazdanis' claims are more likely true than not then you must

7    find for them.

8              And remember you're supposed to think about a

9    balance scale.  Put all the evidence to the Yazdani's on one

10   side and to BMW, N.A. on the other side and if the scales tip

11   even slightly to the Yazdani's side then you must find for

12   them.

13             If, however, the scales tip even slightly to BMW's

14   side, or if the two sides of the scale balance evenly, then

15   you must find for BMW.

16             Now, the evidence from which you will find the facts

17   consist of the testimony of the witnesses, documents and other

18   things received into the record as evidence and any facts that

19   were agreed or stipulated to or that I instructed you to find.

20             Let me remind you of things that are not evidence.

21   Statements, arguments, questions of the lawyers are not

22   evidence.  If an attorney asked a question of a witness which

23   contains an assertion of fact, and those were leading

24   questions, you may not consider the assertion by the attorney

25   as evidence of that fact.  Only the answer is evidence.

1            Similarly, objections are not evidence.  If I told

2    you to disregard testimony it's not evidence and anything

3    you've seen or heard outside of court is not evidence and must

4    be -- must be disregarded.

5            Do not let rumor, suspicion or anything outside of

6    this courtroom influence your verdict in any way.  You are to

7    decide the case solely on the evidence that was presented in

8    this courtroom.

9            Now, we talked about the two types of evidence,

10   direct and circumstantial.

11           I'll remind you that direct evidence is direct proof

12   of a fact, such as testimony of an eyewitness or any exhibits

13   admitted into evidence.  That motorcycle is direct evidence.

14           Circumstantial evidence is evidence consisting of

15   facts and circumstances from which you may infer other

16   connected facts which reasonably follow according to the

17   common experiences of people.  And we talked about the rain

18   example that you could infer that it started raining if you

19   saw somebody who was wet or had an umbrella.

20           The law makes no distinction in the weight to be

21   given either direct or circumstantial evidence.  You can

22   consider both and you are to decide how much weight to give

23   any particular piece of evidence.

24           Now, any notes you've taken in the trial are aides

25   to your memory.  If you memory differs from your notes you

1    should rely on your memory and not your notes.  Notes are not

2    evidence.

3          If you've not taken notes you should rely on your

4    own independent recollection of the evidence and should not be

5    unduly influenced by the notes of other jurors.  Notes are not

6    entitled to any greater weight than the recollection or

7    impression of each juror about the testimony.

8          Now, one of your important jobs in any trial, and

9    especially this one, is to evaluate the credibility of the

10   witnesses.  Credibility is just a fancy legal word for

11   believability.

12         You are the sole judges of witness credibility and

13   only you can determine the importance or the weight that the

14   witness' testimony deserves.  I have nothing to do with that.

15         After making your assessment concerning witness

16   credibility you may decide to believe all the witness'

17   testimony, only a part of it or none of it.  This is the same

18   process you go through every morning if you make a piece of

19   toast.  All right.  Sometimes you make a piece of toast and

20   you can butter it and eat it and you're fine.  Other times you

21   have to cut part of it off because it's burned and other times

22   you have to throw the whole thing out because it's inedible.

23   So you can apply that same analogy to assessing the testimony

24   of witnesses.

25         In judging the credibility of the witnesses you may

1    consider a number of factors and we talked about those Monday,

2    those common sense factors that you use when you evaluate

3    testimony of witnesses and they're listed on pages seven and

4    eight of the instructions on part one.  I won't repeat them

5    since we just did it a couple of days ago.

6         It is for you to say what weight you'll give the

7    testimony from any and all witnesses.  You're not required to

8    accept testimony even though the testimony is uncontradicted

9    and the witness is not impeached.  You may decide because of

10   the witness' bearing and demeanor or the inherent

11   improbability of his or her testimony or for any other reason

12   that such testimony is not worthy of belief.

13        After making your own judgment or assessment about

14   the believability of a witness you can then attach such

15   importance or weight to that testimony, if any, that you feel

16   it deserves.

17        In making up your minds and reaching a verdict do

18   not -- not make any decision simply because there were more

19   witnesses on one side than the other.  Your job is to think

20   about the testimony of each witness you heard and decide how

21   much you believe of what he or she had -- he or she had to say

22   and how much weight to give that testimony.

23        The law does not require any party to call as

24   witnesses all people who may have been present at any time or

25   place involved in the case or who may appear to know something

1   about the facts at issue in this trial.

2         Now, we've heard from a bunch of experts.  Michael

3   Zazula, William Vigilante and Kevin Breen.  In weighing the

4   testimony of these witnesses you may consider the witness'

5   qualifications, the reasons for the witness' opinions and the

6   reliability of the information supporting those opinions as

7   well as the factors I've previously mentioned for weighing the

8   testimony of witnesses.

9         Opinion testimony should receive whatever weight and

10  credit, if any, you think appropriate given all the evidence

11  in the case.

12        In deciding whether to accept or rely on the opinion

13  of a witness you also may consider any bias that witness may

14  have, including the fact that the witness has been or will be

15  paid for reviewing the case and testifying or from evidence

16  that the witness testifies regularly and makes a large portion

17  of his income from testifying in court.

18        The opinion of a witness has a value only when you

19  accept the facts on which it's based.  This is true whether

20  the facts are assumed hypothetically -- and you heard a few

21  hypothetical questions to the experts -- they come from the

22  witness' personal knowledge or they come from some other

23  proper source or they're based on some combination of these.

24        If you find that any important fact assumed in a

25  hypothetical question posed to a witness has not been

1    established by the evidence you are to disregard the witness'

2    opinion given in response to that question.

3              Similarly, if a witness made it clear that his

4    opinion is based on the assumption that an important fact did

5    not exist and you find that it did exist you should disregard

6    the opinion.

7              Now, as I mentioned Monday, a deposition is a sworn

8    testimony of a witness taken before trial during which the

9    witness is placed under oath and swears to tell the truth and

10   the lawyers for each party may ask questions.

11             A court reporter like Dennis records that and you

12   saw some of the deposition testimony displayed to the

13   witnesses and they were questioned about it.

14             This deposition testimony is entitled to the same

15   consideration as if the witness had testified in court and you

16   should use the same factors to evaluate the believability of

17   this testimony as you would evaluate live testimony.

18             In determining the weight to give to the testimony

19   of a witness you should ask yourself whether there was

20   evidence tending to prove that the witness testified falsely

21   about some important fact or whether there was evidence that

22   at some other time the witness said or did something or failed

23   to say or do something that was different from what the

24   testimony was the witness gave at trial.

25             Inconsistencies or discrepancies in the testimony of

1    a witness or between the testimony of different witnesses may

2    or may not cause you to disbelieve or discredit such

3    testimony.

4            You should keep in mind that a simple mistake by a

5    witness does not necessarily mean the witness was not telling

6    the truth as he or she remembers it because as we know people

7    naturally tend to forget some things or remember other things

8    inaccurately.  Two or more people witnessing an incident or

9    transaction may simply see or hear it differently.

10           So if a witness has made a misstatement you need to

11   decide whether that misstatement was simply an innocent lapse

12   of memory or an intentional falsehood and the significance of

13   that may depend on whether it has to do with an important fact

14   or an unimportant detail.

15           Generally, the earlier inconsistent or contradictory

16   statements are admitted only to discredit or impeach the

17   credibility of the witness and not to establish the truth of

18   the earlier statements made somewhere other than here during

19   trial.

20           However, if the prior statement was given under

21   oath, such as during a deposition, that earlier statement may

22   be considered for its truth.  So if you're confronted with

23   testimony in this trial that differs from sworn testimony in a

24   deposition you can decide which version to believe since

25   they're both under oath.

1          It is for you to determine the credibility, if any,

2    to be given to the testimony of a witness who has made prior

3    inconsistent and contradictory statements.

4          If you decide that a witness has deliberately

5    testified falsely about a material point that is something

6    that could affect the outcome of the trial you may for that

7    reason alone choose to disbelieve the rest of the witness'

8    testimony, but you're not required to.

9          You're free to disbelieve the testimony of that

10   witness in whole or in part or believe it in part and

11   disbelieve it in part taking into consideration all the facts

12   and circumstances of the case.

13         You should consider not only the deliberate

14   falsehood, but all other factors bearing on witness

15   credibility in deciding whether to believe other parts of that

16   witness' testimony.

17         Now, those are the general principles that are going

18   to control your deliberations.

19         Now, I'm going to turn the actual substantive law on

20   the claims that the plaintiff has alleged.

21         The Yazdani's claims against BMW are based on the

22   legal principles of strict liability and negligence and BMW,

23   and specifically BMW, N.A. -- so when I refer to BMW that's

24   what I'm referring to -- denies those claims.

25         Now, the first theory is strict liability.  The

1    Yazdani's allege BMW is strictly liable to them for their

2    damages because the motorcycle was defectively designed and

3    did not have adequate warnings.

4           Strict liability for defects in consumer products is

5    primarily based on a policy that a person or entity engaged in

6    the business of selling a product has a duty to sell or market

7    a product that's free from a defective condition, unreasonably

8    dangerous to the consumer or the consumer's property.

9           Now, to prevail on their strict liability claim the

10   Yazdani's must prove the following elements by a preponderance

11   of the evidence.  Three things.

12          First, the motorcycle was defective based on a

13   design -- a defective design and/or on inadequate warnings.

14          Second, the defect existed when the motorcycle left

15   BMW, N.A.'s control.

16          And, three, the defect caused the damages the

17   Yazdani's are claiming.

18          I'm going to explain those in a little detail.  You

19   may find the motorcycle had a defective design if you

20   determine that a reasonable seller would not have sold the

21   motorcycle as designed knowing the risks involved such as the

22   probability and seriousness of harm.

23          Thus, a reasonable seller would have found that the

24   risks of harm from selling the motorcycle as designed outweigh

25   the benefits to the user and the public as well as the burden

1    or cost of taking precautions.

2              A seller's precautions to advert danger should

3    anticipate and reflect the type and magnitude of risk posed by

4    the sale and use of the product.

5              Now, in balancing the risks and benefits I've

6    mentioned you may consider several factors and I'm going to

7    read them to you.  There's six of them and they're listed on

8    page three of Part Two.

9              Number one, the usefulness and desirability of the

10   motorcycle as designed.  It's usefulness to the user and the

11   public as a whole.

12             Two, the safety aspects of the motorcycles.  That is

13   the likelihood that the motorcycle would cause injury --

14   injury and probable seriousness of the injury.

15             Three, the availability of substitute products which

16   would meet the same need as the motorcycle and not be unsafe.

17             Four, BMW's ability to eliminate the unsafe

18   character of the motorcycle without impairing its usefulness

19   or making it too expensive to maintain its usefulness.

20             Five, the user's ability to avoid danger by the

21   exercise of care in the use of the motorcycle.

22             And, six, the user's anticipated awareness of

23   dangers inherent in the motorcycle because of general public

24   knowledge of the obvious condition of the motorcycle or the

25   existence of suitable warnings or instructions.

1          Now, on the failure to warn the Yazdani's --

2   Yazdani's allege that the motorcycle was defective because it

3   had inadequate warnings about the risk of fire from running

4   the motorcycle at a standstill.

5          A product is defective due to a failure to warn if

6   it was distributed without sufficient warnings to notify an

7   intended user of non-obvious dangers inherent in the product.

8          In deciding whether a warning is adequate you may

9   consider several factors, including its words, position, form,

10  size and color.

11         Alternatively, you may find that a warning is

12  adequate if it renders a product safe for use if it is

13  followed.

14         A product bearing such a warning is neither

15  defective nor unreasonably dangerous.

16         You may find that the motorcycle was defective

17  because it included inadequate warnings if you conclude two

18  things were proven by a preponderance of the evidence.

19         Number one, the warnings about the danger of fire in

20  the rider's manual were inadequate.

21         And, two, this deficiency in warnings made the

22  motorcycle unreasonably dangerous.

23         With regard to the first element if you find that

24  the warnings in the rider's manual were adequate you may not

25  find BMW liable for a failure to warn because -- simply

1   because Mr. Yazdani did not recall reading the warnings.

2           Where a seller provides adequate warnings the seller

3   is entitled to presume under the law that those warnings will

4   be read and heeded.

5           If you find the Yazdani's have established the first

6   element of the strict liability test, that is that the

7   motorcycle was defective because it had a defective design

8   and/or inadequate warnings, you may move to the second element

9   of the strict liability test, that is whether the defect

10  existed when the motorcycle left BMW's control.

11          For this element the Yazdani's must show that the

12  motorcycle was expected to and did reach them without

13  substantial change in condition from the time it was sold.  A

14  seller is not liable for damages if it delivers a product in

15  safe condition and subsequent mishandling, alteration or other

16  causes beyond its control render the product defective.

17          The parties do not dispute that the motorcycle was

18  not substantially changed from the time it was sold by BMW.

19  Normal wear and tear is not a substantial change.  Therefore,

20  if you find that the motorcycle was defective you must find

21  that the defect existed when it left BMW's control.

22          The final element of the strict liability test is

23  causation.  The Yazdani's -- Yazdani's must show that the

24  motorcycle's defective condition was a factual cause of their

25  damages.

1            A defective product is a factual cause of harm when

2    the harm would not have occurred absent the defective

3    condition of the product.   The defective condition must have

4    been an actual real factor in causing the harm even if the

5    result is unusual or unexpected.

6            A factual cause cannot be an imaginary or fanciful

7    factor having no connection or only an insignificant

8    connection with the harm.

9            Even if other actions or events, including those by

10   Yazdani's, contributed to or partially caused the Yazdani's

11   harm, if the harm would not have occurred if the product was

12   free from defect then the product factually caused the

13   accident.

14           Thus, for their defective design claim the Yazdani's

15   must show their damages would not have occurred absent the

16   motorcycle's defective design.

17           For their inadequate warnings claim the Yazdani's

18   must show that Mr. Yazdani would not have run his motorcycle

19   at a standstill if he had been properly warned of the risk of

20   fire by BMW.

21           The Yazdani's also claim BMW was negligent in

22   distributing a defectively designed motorcycle.

23           Now, negligence is different from strict liability

24   and I'll explain the difference with negligence.

25           To prevail on a negligence claim the Yazdani's must

1    prove the following elements by a preponderance and there's

2    two things.

3              First, BMW was negligent, which I'm going to explain

4    to you.

5              And, second, the negligence was a factual cause of

6    the damages.

7              Negligence, which is also known as carelessness, is

8    the absence of ordinary care that a reasonably prudent person

9    would use under the circumstances.

10             Negligent conduct may consist either of an act or a

11   failure to act when there is a duty to do so.  Negligence is

12   the failure to do something that a reasonably careful person

13   would do or do something -- doing something that a reasonably

14   careful person would not do in light of all the surrounding

15   circumstances established by the evidence in the case.

16             You may find BMW was negligent under the facts and

17   circumstances of this case if you conclude that a reasonably

18   careful seller would not have sold the motorcycle as designed.

19             As with their strict liability claim the Yazdani's

20   must show that BMW's negligent conduct was a factual cause of

21   their damages or their damages would not have occurred absent

22   BMW's negligent conduct.

23             Further, to be a factual cause BMW's conduct did not

24   need to be the only cause of damages.  It could concur with

25   other causes.

1        A cause may be a factual cause as long as it

2    contributes to the damages in a way that is not minimal or

3    insignificant.

4        Now, in a negligence case, unlike a strict

5    liability, design defect or failure to warn, Mr. Yazdani's

6    negligence is something you should consider.

7        BMW as a defense alleges Mr. Yazdani's own

8    negligence was a factual cause of his damages.  To establish

9    this defense, which applies only to negligence, not strict

10   liability, BMW must show Mr. Yazdani was negligent, meaning he

11   failed to act as a reasonably careful person under the facts

12   and circumstances and his negligence was a factual cause of

13   his own damage -- the damages from the fire.  Meaning that Mr.

14   Yazdani's damages would not have occurred absent his own

15   negligent conduct.

16       If you decide that both BMW and Mr. Yazdani were

17   negligent and that the negligence of both parties was a

18   factual cause of the Yazdani's damages you must then decide

19   how much each parties negligence contributed to the damages.

20       I'll give you a verdict slip on the negligence count

21   where you should state each parties share of the negligence in

22   form of a percentage and together these percentages must equal

23   100 percent.  So you can break down or portion the negligence

24   if you find both sides were negligent.

25       If you conclude that BMW is liable to the Yazdanis

1    based on principles of strict liability and negligence then

2    you need not decide the issue of damages.

3              The parties have reached an agreement or stipulation

4    on the amount of damages, so all you have to decide is who is

5    liable for strict liability, who is liable for negligence.

6              And then the parties have agreed that once you make

7    that determination they've agreed on what the damages are, so

8    you don't have to decide a dollar amount of the damages.

9              Now, we're going to adjourn for the evening, but

10   first I want to just to talk to the lawyers for one second at

11   sidebar.

12              (Sidebar discussion begins)

13              THE COURT:  Anybody have any objections to the

14   charge that I've read, other than the ones you've already

15   preserved?

16              MR. MACK:  No, Judge.

17              MR. HEINOLD:  At the very end you said you have to

18   decide who is liable.  I think it's better if you say if

19   anyone's liable.

20              THE COURT:  Okay.

21              MR. HEINOLD:  That's the only thing.

22              THE COURT:  Okay.  I'll fix that.  Anything else for

23   the plaintiff?

24              MR. MACK:  No, Judge.

25              THE COURT:  Okay.  Thank you.

Colloquy                                                    89

1          (Sidebar discussion ends)

2          THE COURT:  All right.  At the end I referenced that

3     your job is to decide who is liable and if anybody's liable.

4          You might return a verdict that BMW's not liable and

5     if that's the case you don't even need to reach any other

6     issues, but your job is to decide who, if anyone, is liable

7     for the damages that were caused in this case.

8          Now, you still can't discuss the case yet.  Almost.

9     We're going to adjourn for the evening.  Keep an open mind.

10    We're going to start tomorrow promptly at 9:30 and we're going

11    to start with the opening -- or the closing arguments of the

12    plaintiff.  We'll then have closing arguments of the defendant

13    and then the plaintiff will have time to make a brief

14    rebuttal.

15         By that time it should be pretty close to the lunch

16    hour so Ms. Settles will have your lunch ready and waiting for

17    you so you can then begin deliberating and -- over the lunch

18    hour and we'll have the case ready for your consideration

19    then.

20         So thanks for your patience today.  I'm sorry we

21    didn't keep to the time frame I thought we'd keep to and I

22    apologize if those of you who may have made plans had to a

23    change your plans.  So have a great night and enjoy the

24    beautiful weather.  Thank you.

25         (Pause)

1              (Jury exits, 4:37 p.m.)

2              THE COURT:  I have all the jury questions.  Do you

3     guys want to look at them or do you want to prepare your

4     closing argument unfettered by these questions?

5              MR. MACK:  I'd like to look at them.  We'd like to

6     look at them.

7              THE COURT:  All right.  What we'll do is, Steven,

8     could you make a copy for each side --

9              MR. MACK:  Thank you, Judge.

10             THE COURT:  -- so you have them.  You can be seated,

11    everyone.

12             (Pause)

13             THE COURT:  Leslie's been keeping track of the

14    exhibits, but I'm hopeful that you guys can confer tonight and

15    get the exhibits set.

16             We're going to give the jury just a pile of both

17    exhibits that have been admitted and they'll be able to take

18    them back with them to the jury room.

19             So if you guys could work on that and make sure that

20    all that's done so we don't have some type of argument

21    tomorrow that's going to delay the deliberations or delay the

22    closings.

23             Anything else we have to do tonight?

24             MR. MACK:  Not that I can think of.

25             THE COURT:  Okay.

Colloquy                                91

1          MR. HEINOLD:  No, Your Honor.

2          THE COURT:  All right.  Well, I appreciate

3    everyone's patience and thank you for persevering on a tight

4    schedule today and I look forward the -- the closings.

5          I've -- I'm going to tentatively have their lunch

6    delivered about 11:30, so roughly two hours.  I'm not going to

7    time you, but that's probably the goal that we should try to

8    stick -- stick to for the closings.  Is that agreeable to

9    everyone?

10         MR. MACK:  If I were going to go over an hour I

11   think Patrick would pull out a knife and stab me in the neck

12   right here in the courtroom.  He's not going to let me.

13         MR. HUGHES:  I'm not a violent man, but --

14         MR. HEINOLD:  Please go long.  Let the record

15   reflect --

16         MR. MACK:  I would never say --

17         MR. HEINOLD:  -- I said that with a smile and I was

18   joking.

19         MR. MACK:  I would never say such things about --

20   about counsel.

21         THE COURT:  I saw -- I saw a whole bunch of people

22   lining up behind Patrick, but they can go sit down now.

23         All right.  You guys did a great job.  Thank you.  I

24   appreciate.  I'll see you tomorrow morning.

25         MR. MACK:  Thank you, Judge.

1          THE COURT:  All right.

2          MR. HEINOLD:  Thank you, Your Honor.

3          (Proceedings concluded at 4:40 p.m.)

4                    * * *

5     **(Remainder of hearing was requested not to be transcribed)**

6

7               C E R T I F I C A T I O N

8

9          I, Joan Pace, court approved transcriber, certify

10    that the foregoing is a correct transcript from the official

11    electronic sound recording of the proceedings in the above-

12    entitled matter.

13

14    _____     November 10, 2016

15    JOAN PACE

16    DIANA DOMAN TRANSCRIBING, LLC

17

18

19

20

21

22

23

24