UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


PARVEZ YAZDANI, et al,       )  15-CV-1427
                           )
          Plaintiffs,   )  **Portion of Hearing**
                         **)**     **Transcribed**
                           )
     vs.               )
                           )
BMW OF NORTH AMERICA, LLC,  )
et al,                 )  Philadelphia, PA
                         )  June 16, 2016
          Defendants.   )  9:39 a.m.


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE TIMOTHY R. RICE AND JURY
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:         RAYMOND E. MACK, ESQUIRE
                      DE LUCA LEVINE, LLC
                      Three Valley Square
                      Suite 220
                      Blue Bell, PA  19422


For the Defendants:        KEITH D. HEINOLD, ESQUIRE
                      MARSHALL DENNEHEY WARNER
                      COLEMAN & GOGGIN
                      2000 Market Street, Suite 2300
                      Philadelphia, PA  19103


Audio Operator:            A.J. FOLLMER
                      ANDREA MACK


Transcribed by:            DIANA DOMAN TRANSCRIBING, LLC
                      P.O. Box 129
                      Gibbsboro, New Jersey  08026
                      Office:  (856) 435-7172
                      Fax:     (856) 435-7124
                      Email:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                              I N D E X

2

3     CLOSING ARGUMENTS:                              PAGE

4        By Mr. Mack                              7

5        By Mr. Heinold                           25

6

7

8

9

10

11

12

13     **Transcriber's note -- (Inaudibles) are due to attorneys not**

14     **being in front of the microphone.**

15

16     **Please note -- transcription was stopped at 10:29:47 a.m. due**

17     **to settlement.**

18

19

20

21

22

23

24

1

2               (The following was heard in open Court 9:39 a.m.)

3               THE COURT:  Hey, good morning, everyone.

4               MR. MACK:  Good morning, Judge.

5               MR. HEINOLD:  Good morning, Judge.

6               THE COURT:  We've got the jury coming out.  And it's

7       a little warm in here today, isn't it?

8               MR. HEINOLD:  It is.

9               THE COURT:  Andy?

10              MR. MACK:  Judge, we just had a question.  Your

11      Honor's procedure was when we marked an item, you asked for

12      whether there was an objection and then you said "admit,"

13      right?  I mean, that's what your procedure was?

14              THE COURT:  Yes.

15              MR. HEINOLD:  Can we wait?

16              THE COURT:  Hold on a second, ma'am.

17              Do you have the list?

18              COURTROOM DEPUTY:  The list of --

19              THE COURT:  Exhibits, do you have the list?

20              COURTROOM DEPUTY:  They have it.

21              MR. MACK:  Right here.  Counsel just had a question

22      about whether the deposition transcripts are admitted.  We all

23      agree that they shouldn't go to the jury, but they were

24      identified, objected to or not, and admitted?

25              THE COURT:  Yes, if they were -- if they were

Colloquy                                                                4

1    offered to impeach, all right, the law is the jury can

2    consider them, so if the jury wants to see the portions that

3    were used for impeachment, they can.

4              MR. MACK:  They can.

5              THE COURT:  They can.

6              MR. MACK:  The portions for impeachment.  But the

7    transcripts themselves, the entire transcripts --

8              THE COURT:  No.

9              MR. MACK:  -- were marked.

10             THE COURT:  No.

11             MR. MACK:  Okay.

12             THE COURT:  Only the --

13             MR. MACK:  So just the portion --

14             THE COURT:  -- relevant passages.

15             MR. HEINOLD:  Right.

16             MR. MACK:  Okay.

17             MR. HEINOLD:  So we're not --

18             THE COURT:  So we're not -- we're not handing those

19   out.

20             MR. MACK:  Okay.

21             THE COURT:  We're not --

22             MR. HEINOLD:  Right, we're not moving those --

23             THE COURT:  If the jury asks hey, what was that

24   deposition, line 14 to 20 --

25             MR. MACK:  Okay.

```
 1              THE COURT:  -- we'll give it to them.

 2              MR. HEINOLD:  Yes.  But in terms of like -- you

 3    know, I used Mr. Yazdani's deposition.  I'm not intending to

 4    offer it into evidence.

 5              THE COURT:  Correct.

 6              MR. HEINOLD:  The questions and his answers

 7    regarding the deposition are the evidence --

 8              THE COURT:  Correct.

 9              MR. HEINOLD:  -- as I understand it, and the same

10    for Mr. Yeldham.

11              MR. MACK:  Well, for Mr. Yeldham, it -- it's a

12    little different when you're talking about a product liability

13    case and the deposition testimony of a corporate designee,

14    which is what Mr. Yeldham's testimony was.  We marked it, we

15    only used part --

16              THE COURT:  No --

17              MR. MACK:  -- of it but --

18              THE COURT:  No, no, no, no.

19              MR. MACK:  I'm not arguing.

20              THE COURT:  Mr. Yeldham testified -- is live.

21              MR. MACK:  Yes.

22              THE COURT:  His live testimony is a statement of a

23    party offered against a party.  If you impeached him with

24    something in his deposition, that's admissible --

25              MR. MACK:  Okay.
```

Colloquy                                                 6

1          THE COURT:  -- under the rule as under 801(d).

2          MR. HEINOLD:  Okay.

3          MR. MACK:  We just need clarity as to what was --

4          THE COURT:  Yes.

5          MR. MACK:  -- evidence is all.

6          MR. HEINOLD:  Yes, but the entire deposition

7    transcript doesn't go out.

8          THE COURT:  Correct.

9          MR. HEINOLD:  It's not admitted into evidence and

10   nor does the jury see it.

11         THE COURT:  Correct.

12         MR. HEINOLD:  If they have a question about a

13   specific line that was asked --

14         THE COURT:  Correct.

15         MR. HEINOLD:  Okay.  Thank you.

16         THE COURT:  Yes, okay.  All right, I guess we're

17   ready now.  Anything else?  Do you have all the exhibits

18   ready?  Because Leslie's going to --

19         MR. MACK:  Do you want Exhibit 3?

20         THE COURT:  We're going to give them all to the jury

21   after the closings.  Okay, Andy, thank you.

22         COURTROOM DEPUTY:  Thank you, Judge.

23         THE COURT:  He's getting them, Leslie.

24         COURTROOM DEPUTY:  I'll get them.

25      (Pause in proceedings)

1          COURTROOM DEPUTY:  All rise.

2          THE COURT:  Sorry about the false start there,

3   folks.  I apologize.  We're ready to go now.  We're trying to

4   get that -- the heat adjusted here.  All right, you can be

5   seated, folks.  All right, we're ready for the closing

6   speeches.

7          Mr. Mack, are you ready to address the jury?

8          MR. MACK:  Yes, Your Honor.

9          THE COURT:  All right, you may do so.

10         MR. MACK:  All right, thank you.

11         Good morning, Counsel.

12         MR. HEINOLD:  Good morning.

13         MR. MACK:  Good morning, Your Honor.

14         THE COURT:  Good morning.

15         MR. MACK:  Good morning.

16         THE JURY:  Good morning.

17         MR. MACK:  The heat has been sort of a problem over

18  the last few days, it goes hot-cold, hot-cold, believe me,

19  it's hotter under the lights than it is sitting down.

20         At the beginning of this case I showed you some

21  testing and I wanted you to consider it very carefully, the

22  testing that BMW conducted in 2002.  Now, the purpose of that

23  testing was two-fold.

24         First, the testing showed that -- and we can put it

25  up with the -- in two seconds -- the testing showed two things

1    that matter in my mind, and that's in 2002, BMW thought idling

2    on center stand for at least 50 minutes was absolutely safe,

3    all right?

4            The second thing is that they -- they knew that

5    idling on high idle, or as the testimony showed in the detent

6    position, before you go to the "C" position, while in the warm

7    up period -- is what caused the vehicle to sustain

8    catastrophic damage, heat damage, thermal damage, quickly.

9    They shut the test off after three minutes to avoid the bike

10   from actually breaking down.

11           Now, BMW, there's been a lot of talk, and I'm not

12   going to dwell, believe it or not, on this manual for very

13   long today, I promise you.  There's been a lot of talk about

14   this manual and whether or not what Mr. Yazdani was doing was

15   violative of the instructions in this manual.

16           And that 2002 testing date is important.  This book,

17   as you'll be able to see, was produced in 2002, okay?  So the

18   same year this testing was produced or conducted, this book

19   was produced.

20           The book has a startup procedure and it's called

21   "Startup Procedure," and the startup procedure on page 60

22   talks about starting the bike up and warming it up.

23           The warm up is not what I thought it was when I

24   started this case.  When I first learned about Mr. Yazdani's

25   fire, I thought he was warming it up like I warm up a car in

1   the winter.

2          I thought he was running it to get it warm to go

3   somewhere or to do something, and I didn't understand or

4   appreciate what the difference was between warming up a

5   motorcycle like this and warming up a car.

6          I was unfamiliar with internal combustion engines.

7   I had no idea.  I have never owned one before, at least

8   certainly not on a motorcycle.  Maybe on my lawnmower, but I

9   never owned a bike before and what I learned is what you

10  learned.

11         The startup procedure is very quick on this bike.

12  It's a fuel injected engine.  It's not like your -- you know,

13  internal combustion engines on a bike 30 years ago.  This has

14  fuel injectors, and the second you start it up, you're in high

15  idle.  You have to be.

16         And then you drop it down to the detent position,

17  which is half idle, right?  Half choke, I should say, it's

18  half choke.  As soon as the engine smooths out, you drop it

19  into "off" -- the choke goes into the off position and now

20  your bike is running, okay?

21         So warm up is over.  Now, BMW had an expert testify

22  yesterday, Mr. Breen, from Florida, and what he said was very

23  important.  He sat in the box and he told you that you can't

24  start it up and drive away the motorcycle right away.  You

25  can't do it.

1          It's an impossibility.  He said you have to let it

2   smooth out, then you go, because you could stall.  If you

3   don't, you could stall and you could crash and you could get

4   hurt.  So he said it's impossible to start it up and drive

5   away immediately.

6          So the warning on page 60 where it says to do that,

7   that can't be done, as BMW's expert told you.  It's just an

8   impossibility.  Now, the 2002 testing, remember it showed that

9   in high idle -- they called it an elevated idle -- it normally

10   creates a -- creates problems?

11          Well, it does, which is why in their manual they put

12   that you don't drive away immediately while it's idling, while

13   it's in high idle.  You will cause damage.

14          And they talked about a risk of fire, and the risk

15   of fire is from that test.  That's the test -- the 2002 test

16   showed that if you have it in high idle, there might be a risk

17   of fire.

18          It didn't talk about normal idle -- normal -- like

19   Mr. Yazdani was doing when his bike failed -- in normal idle,

20   it's absolutely no problem.  Now, Mr. Breen, BMW's expert

21   witness, said some other important things.

22          He said that a manufacturer's responsibility to its

23   consumers is to design a safe product, and he says how you

24   design a safe product is you identify hazards -- do a hazard

25   analysis.

1           When you identify the safety hazards on a product

2    like a motorcycle, you try to eliminate those hazards through

3    engineering, and that's your number one rule.  You don't go to

4    "guarding" (sic) as he called it and using warnings and

5    instructions to prevent harm until you're certain you can't

6    eliminate the hazard by designing the bike differently.

7           Now, the design of the bike obviously has limits.

8    You're not going to change the bike.  No one is saying that

9    this has to be a liquid cooled bike.  Nobody is saying at this

10   point that this bike has to be substantially different.

11          The only thing that has to change to make this bike

12   safe to engineer the risk of fire out of the bike, even on

13   high idle, the only thing that has to be done differently is

14   where you put oil into -- there's already a hole, there's

15   already a lid where you put the oil into the -- into the oil

16   reservoir.

17          All you have to do is add a dipstick.  That's it.

18   And then you don't have any problems.  You don't have to worry

19   about -- you don't have a safety hazard that you have to

20   instruct the valve whether it's high idle or not.  You don't

21   have any problems.

22          You just put a dipstick, and the manufacturers

23   around the world use dipsticks in air cooled engines on the

24   crank case for this purpose, to prevent harm.  BMW did

25   something else that it could have done differently, as Mr.

1   Yeldham testified and Mr. Zazula testified.

2           They could have used glass.  This is a plastic part

3   on an engine that has operating -- normal operating

4   temperatures.  We're not talking about -- there's no severe

5   environment.  This is normal operating temperatures.

6           When you're stuck in traffic on the Schuylkill

7   Expressway for 20, 30, 40 minutes, this bike is going to --

8   that 25 minutes, it's going to smooth out to a temperature

9   that's anticipated, and it's hot.

10          It's not going to continue to heat and heat and heat

11  and heat and heat, you got the oil that (inaudible) the

12  radiator that -- that gives off heat, and the testing from BMW

13  shows you that it doesn't.

14          It doesn't continue to escalate.  It smooths out and

15  stops at a certain -- within their operating temperature.  At

16  that point in time, there is enough heat that if this oil site

17  glass fails, this manifold, this exhaust pipe is at 7 -- more

18  than 700 degrees Fahrenheit -- more than 700 degrees

19  Fahrenheit.

20          You have to, as a manufacturer of motorcycles,

21  prevent oil from leaking from your bike and contacting this,

22  because that's a severe safety hazard.  That is not a sort-of

23  hazard, it's not -- we're not talking about, you know, wiping

24  the windshield with the right type of fluid.

25          We're talking about a severe safety hazard that only

1    exists -- only exists because they used plastic, a plastic

2    that melts at 329 degrees Fahrenheit.

3           They used a rubber seal that degrades over time,

4    that with the expansion and contraction of the engine crank

5    case through normal operation -- Mr. Yazdani did -- normal

6    operation -- and eventually fails.

7           Mr. Yeldham testified that the oil site glass is a

8    part covered under the warranty.  They fail.  They fail for a

9    lot of reasons.  They fail -- they're exposed to heat and

10   they're comprised of these materials -- rubber and plastic

11   that melt.

12          Then they fail.  They fail while the vehicle is

13   running, they fail while it's idling.  These plastic site

14   glasses fail.  On the 2004, eight times before Mr. Yazdani,

15   they failed and caused a fire.

16          The 2000 model, the 2001 model, the 2002 model, the

17   2003 model, the 2005 model, the 2006 model, the 2007 model --

18   they could have stopped the 2006 -- the 2006 model.  They

19   never had a fire failure in any other model, just this one.

20          They have no evidence, nor is there any evidence

21   from any of these expert witnesses who testified, to suggest

22   that people aren't doing with this bike exactly what Mr.

23   Yazdani did in the wintertime.

24          In fact, they know it happens.  Mr. Breen testified

25   that in Florida, he doesn't do it.  Well, when he lived in

1   Michigan, Illinois, Wisconsin, he said he did do it.

2          He said the better practice and the one he does now

3   is to remove the oil -- to drain the oil and drain the fluids

4   from it and to remove the battery, and that's what he does--

5   put a fuel stabilizer in and remove the battery and that's how

6   he winterizes his bike now.

7          That would have been really helpful information to

8   Mr. Yazdani in February of 2013.  It would have been really

9   helpful information.  It's not in -- there is no prohibition

10  by BMW that he not do what he did.  Their lawyers are going to

11  say there is.

12         The person who's responsible for handling these

13  claims on behalf of BMW North America may say there is, but

14  there was no engineer, there was nobody who made this bike

15  that came in here and said to you, yeah, what he was doing was

16  wrong.  Nobody.

17         That information is in there.  They could have

18  brought somebody in and they could have told you, hey, I

19  designed the bike.  Wolf Busch, the author of this email,

20  could have -- could have come in and said, hey, I know how the

21  bike was designed, it wasn't designed for this purpose, he was

22  using it on the -- in an unattended way.

23         They could have done that.  Who did you hear from?

24  First the manager and a paid consultant from Florida.  Nobody

25  from Germany.  You -- they haven't presented you with any

1   documents from (inaudible).

2             Nothing, no testing data that supports their theory

3   that what he did was unsafe or wrong.  Mr. Yazdani has the

4   burden of proof, no doubt, and all he can do is present to you

5   the evidence that BMW decides to share.

6             And the evidence they decided to share in this case

7   was this email.  Now, that's a defective design.  It is a risk

8   that you do not expect to find on a motorcycle because no

9   other motorcycle has it.

10            If you ran the motorcycle on idle for too long on

11  any other motorcycle, what you would expect -- what I would

12  expect when I hear 30 minutes -- I say all right, well even he

13  didn't intend to leave it on for 30 minutes is fair, that

14  that's right.

15            The worst case scenario is I expect his bike to fail

16  in a safe manner.  Brakes -- he's got to get it fixed.  He's

17  got to spend another $1,000 at the BMW dealer; buy a new

18  (inaudible).

19            What I wouldn't expect or he didn't expect at all

20  ever is for the little piece of plastic to deform and spew hot

21  oil onto a hot exhaust pipe because nobody knows that that's

22  capable of happening.

23            The experts testify that their -- let's put it this

24  way.  How many other fires besides the 2-11, the (inaudible)

25  from other manufacturers, other bikes, did the experts talk

1    about?  None.  In 40 years the man has never encountered it.

2    Mr. Breen has never encountered something like this.

3            Mr. Zazula, Dr. Vigilante, they never encountered

4    something like this.  This is a unique design characteristic

5    of BMW.  It presents a unique hazard, a hazard that even in

6    2002 they did not know existed.

7            If you idle at an extended period of time, it should

8    be absolutely no problem, not a fire condition.  That is not

9    what they were attempting to warn about.  This has nothing to

10   do with that.  This is high idling.

11           That's what the testing data shows.  The testing

12   data shows that elevated idle -- idle normally creates a

13   problem -- problems.  You're going to have those emails or

14   that email.  It's going to go back to you.

15           You're going to be able to look at it for yourself,

16   you'll be able to read the whole thing, and it's to that man,

17   Mr. Yeldham, from somebody in Germany, a BMW employee in

18   Germany.

19           Now, I -- common sense tells us that if there was

20   evidence that they knew normal idle presented a problem in

21   2002 when they wrote this, they would have come to Court and

22   they would have showed it to you.

23           They would have said Ray's all wrong, we always knew

24   -- we always knew normal idle was a problem when idling at

25   center stand for an extended period of time, we've always

1    known that, look at the testing, here it is.

2              Now, there is something called negligence that

3    you're going to have to decide as well -- there's a strict

4    liability design defect.  We think that the plastic shouldn't

5    have been used, that they should have used glass or a dipstick

6    to design the hazard out of the product that Mr. Breen said

7    could happen.

8              Then the product's defectively designed.  There's

9    the warnings.  If you find that they didn't even know that

10   normal idle was a problem in 2002 when they printed the

11   manual, how could he have known?  These are the German

12   automakers.

13             Mr. Yazdani's a Harrisburg accountant.  So that's

14   the -- that's the warnings -- then there's negligence.  BMW

15   had a responsibility -- BMW North America, right here, had a

16   responsibility to sell a bike that was safe.

17             They knew in 1997 that a similar accident -- similar

18   situation happened, that they had built a bike, BMW Germany

19   built a bike, sold it in the United States, that when used in

20   a manner that they didn't really think would be done, that it

21   would fail.

22             And so BMW North America immediately took action.

23   In that incident -- in that instance they stopped making the

24   bike.  They told BMW Germany, and Germany stopped making the

25   bike.

Mack - Closing Argument                            18

1              They then sent a letter to everybody who owns one

2      and they said look, we tell you not to do this in the manual,

3      but we didn't tell you that it was going to cause a fire, and

4      here's how it causes a fire, this is information you need to

5      know to be safe.  This is a safety defect.  It's right there

6      in the documents.  You're going to have them back there with

7      you.

8              In addition to explaining the hazard in detail to

9      the consumer in a way that the consumer could appreciate,

10     understand and approach the risk, they also sent a label, and

11     the label was to put right on the front of the bike.

12             In that model it was here, but the point is it's on

13     the front of the bike and Dr. Vigilante said there's several

14     places you could put it, alerting folks in context that you

15     should not idle the bike, and there it was highlighted, right?

16     Here it should have been highlighted -- here it always was

17     highlighted.

18             That was the danger that they knew about in 2002.

19     But they should have warned.  And if they had warned in

20     context, context tells you if I'm going to the starting

21     procedure, I'm going to follow the starting procedure and I

22     want to avoid risks from the starting procedure.

23             There's some information about the catalytic

24     converter which has nothing to do with this case, don't --

25     please accept -- accept that argument.  It has nothing to do

1   with the case.

2          But when starting the bike, there was -- there's a

3   danger that -- in their minds with high idling, all right?  So

4   if they had put a warning on this bike that said the danger

5   that they thought existed in 2002, right, just as they did in

6   1997 -- they did that in 1997, had they done it here, Mr.

7   Yazdani testified that he would have seen that and he would

8   have -- he would have not let his bike idle.

9          Even though that wasn't the danger, he would have

10  not let it idle.  The man bought the bike in 2011 from a guy

11  in Boston.  He searched it out, he went up there and drove it

12  700 miles home.

13         He testified when he got home that he immediately

14  brought it to a BMW -- BMW dealer to have it inspected, to

15  have any necessary maintenance performed because he wanted to

16  be a safe driver.

17         He wanted to be as safe as he could on that bike and

18  he didn't want it to fail on him while he was driving it.  He

19  had -- he paid more than $1,000 to have the bike just

20  maintained, and then he drove it to Atlanta at one point over

21  the year and a half.

22         On the way back from Atlanta it was sluggish, so he

23  took it -- again it took it to another BMW dealer and had

24  whatever work they wanted performed on it because he was

25  responsible.

1           Over the wintertime 30 to 40 times this man started

2    his bike in the cold and let it run to turn the fluids in the

3    engine.  It's an internal combustion engine.  We started off

4    talking about that.  There's nothing prohibited about that in

5    the manual.

6           There's nothing that any of the experts said that --

7    nobody showed you a document and said you can't do this,

8    nobody can do this, this is not safe.

9           Nobody showed you that.  Their own expert, the

10   person who BMW that -- not an engineer from Germany but the

11   guy they called from Florida came up here and said he did, and

12   he knows other people who did, and it's not unusual for

13   somebody to do that.

14          He doesn't agree it's the right thing but it's not

15   unusual.  It's what people do.  All of the evidence suggests

16   that if he had any concern for safety on February 25th, 2013,

17   he wouldn't have let it idle, period.

18          He wouldn't have started it up on center stand.  The

19   guy probably would have driven it around cold.  I mean, look

20   at everything he did to maintain his bike.  Money wasn't an

21   object.  He found the bike he wanted, went to Boston, found it

22   and brought it back.

23          He would have maintained it because he spent

24   thousands of dollars maintaining it in the short time period

25   that he owned it, and he spent the time to warm it up during

Mack - Closing Argument                              21

1    the wintertime to insure that the integrity of the engine was

2    maintained because there's nothing in the manual saying you

3    shouldn't do that and he knows it's an internal combustion

4    engine and he doesn't want to damage it.

5           There is nothing to suggest he was negligent.  Now,

6    they're going to say that well, he forgot.  He's going to tell

7    you he -- that's not what happened on that day.  It's not what

8    happened at all -- he forgot, he went inside for 30 or 40

9    minutes.  Reasonably prudent people forget, ladies and

10   gentlemen.

11          I forgot my pen was in my pocket when I went through

12   security today.  Reasonably prudent people forget.  They make

13   mistakes.  BMW as a manufacturer of motorcycles and

14   automobiles, they know that.

15          They know that.  That's why they perform an

16   extended-use testing, to make sure that when people make a

17   mistake it's not catastrophic and it doesn't cause a fire.

18   This is the responsibility of the manufacturer.

19          They acknowledge it through their own testing.  The

20   only people who are going to say differently are their lawyers

21   and their risk management people.  But the engineers in their

22   testing data, they speak volumes.

23          This was a safe practice on any other bike but this

24   one with the plastic.  Leaving it, forgetting it -- that

25   happens.  The punishment should be at worst engine damage, not

1    $385,000 to the man's home.

2         When weighing the evidence in this case it's

3    important to consider the sophistication of the two parties.

4    Mr. Yazdani is an accomplished man, as Counsel pointed out on

5    his cross-examination.

6         Mr. Yazdani, he -- he came from India to this

7    country.  He's owned motorcycles in this country since 1981.

8    He had a nice house.  He's a responsible man but he's not --

9    he's not a design engineer of German -- the ultimate -- the

10   ultimate driving machine.

11        The people who built the ultimate driving machine

12   knew they put a piece of plastic there.  They knew it was

13   dangerous.  Certainly after they wrote this they did.  The

14   2004 model proved that.  In 2002 they didn't, as it shows

15   (inaudible).

16        But they knew.  They're the ones who actually tested

17   the machine.  Mr. Yazdani -- nobody tests their cars like

18   their manufacturer does -- nobody tests their motorcycle like

19   the manufacturer does.

20        You don't buy a car, take it home and say all right,

21   this battery of tests, I got to run these, I've got to make

22   sure that every situation is accounted for and that this

23   vehicle is going to perform safely, otherwise I'm going to

24   bring it back to the dealer.

25        The dealers -- the manufacturers do that before you

1    get it, and you know that so you assume that it's safe and

2    it's that assumption of safety that BMW profits off of.  It's

3    the assumption that the vehicle is safe and that if I use it

4    in an ordinary manner, it's not going to harm me.

5            The idling, I submit to you, is one of the most

6    ridiculous things I've ever heard, is that normal idle should

7    cause this to catch fire.  People get stuck in traffic on

8    these bikes.

9            If he had driven around -- if you accept their

10   proposition, if he had driven the bike to the end of the

11   driveway and back and then put it on center stand and ran it,

12   it's good because he started it up and drove away.

13           If you accept their proposition that that that's

14   what he had to do, then he would have been safe in their minds

15   if he had just driven it down to the end of the driveway and

16   back, and then let it idle for 30 minutes.

17           That's absurd.  The testing is what tells you what

18   is dangerous and what is not, not arguments from counsel.

19   It's not me, I don't tell you.  The testing tells you.

20           I very much appreciate your attention throughout

21   this case.  It's been difficult climate-wise.  These arguments

22   are at times -- they seem meaningless.  Some of these points

23   -- how many times did we look at the -- the two pages of the

24   manual?

25           Again, I have a responsibility to Mr. Yazdani.  He

1   sustained great damage as a result of the fire caused by this

2   bike.  I have to tell you what -- what we know about it in the

3   way I can tell you about it so that you can make an informed

4   decision.

5           It's also my responsibility to you, and I take it

6   seriously.  I tried to give you as much information as I could

7   for the (inaudible) of what we can tell you.  Your attention

8   to it was impressive.  I watched you listening to the

9   instructions that the Judge gave.

10          And I know you understood that it's your obligation

11  at this point to look at those instructions in full and apply

12  them to the facts of this case and apply them to that test and

13  apply them to that manual and apply them to what your common

14  sense tells you when you think of a plastic part that melts

15  being put on the crank case of an engine to separate oil from

16  the -- a 700 degree-plus exhaust manifold.

17          And you're going to apply the law and in doing so

18  when you're analyzing whether this was defective or not, the

19  most important thing that I can tell you is that even if you

20  believe that he should not have left it idling for 30 minutes,

21  you still, if you think that the plastic in this application

22  and in this context was an inappropriate design, was an

23  improper design, it was an unsafe design and it presented

24  risks above that which every other bike posed, then you're to

25  find the bike defective.

1          You could agree and believe that he shouldn't have

2   left it idling.  You can agree that -- it doesn't even matter

3   whether you agree with -- with what the manual says or doesn't

4   say.  If you find in part that this bike failed and that fire

5   happened because of that failure, then you have to find the

6   bike defectively designed.

7          It's not easy to do.  It really isn't and that's why

8   we give you as detailed and concise instructions as we can,

9   because it's not an easy job.  It's really not.

10          But I think in this case the severity of the harm

11  posed, the simplicity of designing the hazard away from the

12  product and not having to try to rely on instructions is a

13  pretty clear decision.

14          Now, I'm going to sit down for a little bit, I know

15  you're tired of hearing me talk.  I'm tired of hearing me talk

16  too.  Counsel is going to present argument to you and then I'm

17  going to have an opportunity to talk to you just for a few

18  minutes at the end, okay?

19          So I thank you for paying attention to Counsel, he's

20  working hard just like all of us.  And keep an open mind.

21  Thank you.

22          THE COURT:  Thank you, Mr. Mack.

23          Mr. Heinold?

24          MR. HEINOLD:  Thank you, Your Honor.

25          Good morning --

1          THE JURY:  Good morning.

2          MR. HEINOLD:  -- ladies and gentlemen.  I hope you

3    won't mind but I have some notes and I just want to make sure

4    that I don't leave out some of the things that we've all been

5    listening to.

6          First, I want to thank you for your attention.  My

7    client wants to thank you.  You -- you've clearly been paying

8    attention to what we've been doing.  This is an important

9    issue for everyone and so I thank you for that.

10         But this is a case and we are here today because Mr.

11   Yazdani disregarded a very clear warning and he ran his

12   motorcycle for 30 or 40 minutes unattended.

13         The fact that a fire occurred is not enough for you

14   to say that a product is defective or that my client is

15   responsible for that.  What we're here to talk about is the

16   product and its warnings.

17         Now, we've seen these warnings a number of times,

18   and I'm not going to go over them in detail.  You can see it.

19   "Do not warm up the engine with the motorcycle at a

20   standstill.  Risk of overheating or fire.  Ride away

21   immediately."

22         It tells you what to do, what not to do, what's the

23   problem if it occurs.  Now, plaintiffs want to say that it's

24   BMW's fault that this motorcycle was left running 30 or 40

25   minutes while Mr. Yazdani went into his -- his house.

1          The key to this case is the warning, and it's key to

2     both of the theories of liability, and I'm going to talk about

3     that, whether it's a design defect or it's a warning case, so

4     I'm going to start with the warnings because that's what this

5     case has been about.

6          The Judge is going to tell you that if you find --

7     or he already told you -- well, let me say this.  If you find

8     that the warning is clear, it's understandable, that goes a

9     long way to answering both questions about whether it's a

10    design defect or it's a warning inadequacy.  So let's talk

11    about the warning.

12         As I've said, it's bold.  It's -- it attracts

13    attention.  It's understood.  Mr. Yazdani admitted all of

14    that.  I can go through his deposition where we -- we said

15    that.  I think you all remember, and I'll save us the time

16    from that.

17         But you remember he said I read it, I read it

18    completely.  And eventually, he said I just didn't remember

19    it.  I read it, I might not have remembered it, et cetera.

20    He's not sure.  It wasn't in his mind on that day.

21         But when he looked at it he said it was bold, it

22    attracted my attention, I understood it and most importantly

23    for what we're deciding, is it applied to what he was doing.

24         He admitted to us from the stand that he knew that

25    that warning applied to what he was doing.  He just didn't

1   have it in his mind that day.  Now, the Judge charged you

2   yesterday -- and they'll have these, right, Your Honor?

3              THE COURT:  Yes.

4              MR. HEINOLD:  Okay.  And with regard to the warning,

5   this is -- this is an important thing to keep in mind.  If you

6   find the warning in the rider's manual was adequate, you may

7   not find BMW liable for failure to warn because Mr. Yazdani

8   did not recall reading the warning.

9              If you find that this is what he said it was -- and

10  I don't know how they could argue it wasn't when he said it

11  was -- it was clear, it was understandable and he just forgot

12  it, if you find that adequate, then you can't find my client

13  responsible because he forgot it.

14             And, the Judge will tell you that when the seller

15  provides an adequate warning, it's entitled to presume that

16  that warning will be read and heeded, followed.

17             So the fact that he forgot doesn't matter if you

18  find that this warning said don't leave -- if you find he

19  understood that this warning, if he had remembered it, it

20  would have said don't do what he did that day, and that's what

21  he admitted.

22             I submit to you, that's sufficient.  That's enough

23  for your decision.  But, there's been a lot of other evidence

24  about this warning so let's talk about that.  What does "warm

25  up" mean?  What does "idle" mean?  What does "start" mean?

1          I submit none of that matters because he told you, I

2     agree, that applies to what he was doing.  That creates

3     confusion and if there's confusion in your mind about what's

4     going on, that doesn't satisfy the burden of proof.

5          If you have confusion about that, that doesn't

6     satisfy their burden, it's not a -- it's not a preponderance

7     of the evidence.  Now, we have a process in pretrial practice.

8     We spent a lot of time on this case before we brought it to

9     your attention.

10          It involves a lot of different things.  One of the

11     things it involves is the plaintiffs begin the lawsuit by

12     filing a complaint, and in that complaint you will remember

13     Mr. Yazdani said from the stand -- they said he was warming up

14     his engine.

15          That's what they said, he was warming it up.  Their

16     experts, Mr. Zazula and Mr. Vigilante -- Dr. Vigilante wrote

17     reports.  Those reports tell us what they're going to say and

18     then we question them in depositions, which we meet in

19     conference rooms and we ask a lot of questions under oath so

20     we can really explore what their theories are and the reasons

21     that they hold them.

22          In their reports, and you heard the testimony you'll

23     remember from the stand, Mr. Zazula said he was warming up the

24     engine.  Dr. Vigilante said he was warming up the engine.  In

25     their depositions they said they were warming up the engine.

1          So we come to trial and all of a sudden Mr. Yazdani

2     is confused about, well, was I warming it up or wasn't I

3     warming it up, and I took him to his deposition and he said

4     yup, I said I was warming it up.

5          And then I asked him, did it apply to what you were

6     doing?  And I think that is probably the most critical piece

7     of information -- he agreed that that warning applied to what

8     he was doing that way.

9          So this issue of is it idle, is it choke -- I mean,

10    you'll remember they were even trying to suggest that there

11    was a translational issue from the German to English about

12    what warm up meant.

13         And, there is a warning that says don't idle, so if

14    they want to choose "idle" there's a warning for that.  If

15    they want to choose "warm up" there's a warning for that.  But

16    that obfuscates the issue.

17         That's all it is because Mr. -- Mr. Yazdani admitted

18    -- and I submit to you the reason that this is going on, that

19    the warm up versus idle versus any of that stuff, is to

20    distract you from the clarity of that warning because if you

21    look at that, then you'd say that warning is clear and that's

22    the end of the story.

23         Now, you know, Mr. Breen -- you know, let me -- let

24    me say, Mr. Breen did say yes, you shouldn't start your

25    motorcycle up and jump into traffic immediately.

1           But we all know that's not what the context is in

2      terms of what this warning means and what you're supposed to

3      do.  This warning is telling you don't let your motorcycle sit

4      there and run because it will overheat.

5           So who did the plaintiffs bring in?  They had Mr.

6      Yazdani who said he was warming it up and he understood it

7      applied.  They bring in Mr. Zazula.

8           When we talked about the warning with him I asked

9      him if he would admit this was a clear warning.  And what was

10     his response?  I don't know, I'm not a warning expert.

11     Really?

12          You need to be a warning expert to decide whether

13     that is an adequate warning -- a warning that tells you what

14     not to do and what happens?  It tells you, you'll get a fire

15     if you do this.

16          Dr. Vigilante, you know, he comes to Court prepared

17     to give you an opinion -- that's what he does, he gets paid to

18     give opinions.  He doesn't consult.

19          There's nobody out there hiring him like you'll

20     remember Dr. Green (phonetic), he's hired, he consults.  He's

21     with SAE, Society of Automotive Engineers, and he's on

22     motorcycle committees, he deals with warnings, he deals with

23     design issues.

24          Dr. Vigilante comes in and if you give him the

25     money, he'll give you an opinion.  You can assess his

1    credibility in a lot of ways.

2             You can assess his credibility by the fact that he

3    is willing to render an opinion that somebody who gets on the

4    back of a golfcart doesn't realize he might fall off while

5    it's moving because he needs a warning there.

6             And he also said in that situation that well, if you

7    had it on a product you might not notice it, it might wear off

8    and all that stuff.  He says that a college student who's

9    involved in a gymnastics event needs to be told that if you do

10   a back flip wrong, you could get hurt.

11            That's -- that the kind of thing.  In this case,

12   what has he done?  He's come in and he said well, warm up

13   doesn't really mean warm up, it's at a standstill, it's

14   confusing, idle is confusing.

15            Except when he wrote his report and he gave his

16   deposition it was all about warming it up, running the bike,

17   letting it sit there.  He did admit something.

18            And can we have D-100, please?

19            He did admit that warnings are best when they're in

20   the context of instructions, and you'll remember that Mr.

21   Yazdani testified that he went to look up how to start it --

22   and it's on page 61 -- and right next to it in the fold of the

23   manual when you open it up and you see it, is the warning and

24   it says don't warm it up at a standstill, risk of overheating

25   or fire.

1          Think about that.  Think about the statement that if

2     you -- if you warm it up and what you've done is you've taken

3     off and put it on idle, that it's -- that you're going to

4     start a fire in that warm up period -- what they're calling

5     the warm up period?

6          That's -- that's crazy.  This tells you don't --

7     don't just let your bike run because it's an internal

8     combustion engine.  It's air cooled.  It's going to have a

9     problem.

10          What was Dr. Vigilante's solution to this?  It was a

11     warning -- can we have D-2 and D-5, please -- that he said put

12     on the bike.  And while that's coming up we'll look at that

13     briefly, but they are substantially the same.

14          There's hardly a difference.  "Do not warm up your

15     engine with the motorcycle standing still."  Now, Mr. Mack

16     come before you and said woo, woo, warm up, what's warm up

17     mean?  Their own expert wrote a warning that's the same as

18     ours and used "warm up."

19          You had to see what's going on here.  This is a

20     distraction.  What he said was you have to put it on the bike.

21     He drafted this before he realized it wasn't going to work I

22     suppose.  Yet he wants to tell you that the BMW warning in the

23     manual is defective.

24          Now, here's what's curious about that because Mr.

25     Yazdani says that it covered what he was doing, so that

1    warning is applicable.  But if you accept what the plaintiffs

2    are trying to tell you now, they put on an expert who offered

3    a warning that's not applicable to the case.

4           Now, does that make sense?  This is what happens

5    when you try to twist evidence and opinions to achieve a

6    result, and that's what Mr. Vigilante is doing.  Things don't

7    make sense.

8           What does make sense is the clarity of that warning

9    -- don't warm it up, it might catch -- don't warm it up at a

10   standstill, it might catch fire, ride off.  Now, this warning

11   was supposed to be only on the bike.

12          Now, you don't have -- I asked Dr. Vigilante --

13   well, let me say it this way.  You'll remember his testimony

14   that I asked him, hey, do you need to read the manual?  And he

15   said no, if the operator thinks he knows how to use it, he

16   doesn't have to read the manual.

17          Well, think about that.  You've got a manual with a

18   lot of important safety information in it.  You really do.

19   There's a lot of stuff in there, and their expert says you

20   don't have to read the manual if you think you know how to --

21   to use it.

22          Well, what's the next logical question?  Well, isn't

23   there some important information in that manual that you would

24   have -- have to put on there?

25          Do you want people to get on this bike and drive

1    around on the highways that -- that we all occupy with the

2    risks of a motorcycle that you heard Dr. -- Mr. Green talk

3    about that are a lot different and a lot more substantial than

4    just driving a car?

5              Do you want somebody like that not to have a manual

6    and not to read the manual?  Dr. Vigilante says the only

7    warning -- you don't have to read the manual and the only

8    warning you need is that one.  That's the most important one.

9    He gave you no real basis for doing that.

10             I submit the basis is that's the issue that's in the

11   case that he's testifying about today or this week.  Why does

12   he do that?

13             Because he knows he can't admit that you need to

14   read the manual because he knows the manual was read and he

15   knows the clear warning that would have prevented all of this

16   had it been followed is in the manual.

17             So we get warm up doesn't equal warm up and you

18   don't need to read the manual.  The next logical step then is

19   okay, if you do need some information and you don't have to

20   read the manual, then you've got to put it on the bike.

21             And can we have D-13, please?

22             And you heard Mr. Breen address that, and this is a

23   guy that deals with manuals, he deals with warnings, he deals

24   with recreational vehicles including motorcycles in everyday

25   life.

1          People -- he doesn't just testify, he does that but

2     he also works of committees and for businesses that consult

3     with him.  And he made it very clear what his opinion about

4     this situation is through his experience in consultation and

5     through his examination of this.

6

7     **(Reminder of hearing was requested not to be transcribed)**

8

9

10

11                              * * *

12

13              **C E R T I F I C A T I O N**

14

15          I, Diane Gallagher, court approved transcriber,

16     certify that the foregoing is a correct transcript from the

17     official electronic sound recording of the proceedings in the

18     above-entitled matter.

19

20

21

22      /s/Diane Gallagher                September 13, 2016

23     _____        _____

24     DIANE GALLAGHER                   DATE

25     DIANA DOMAN TRANSCRIBING, LLC